**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:**-cv-***-***

CHASE MANUFACTURING, INC., d/b/a
THERMAL PIPE SHIELDS,

<i>Plaintiff</i>,

v.

JOHNS MANVILLE CORPORATION, and
INDUSTRIAL INSULATION GROUP, LLC,

<i>Defendants.</i>

---

**COMPLAINT WITH JURY DEMAND**

---

CHASE MANUFACTURING, INC., doing business as Thermal Pipe Shields, brings this action against Johns Manville Corporation for its deliberate, systematic, and illegal attempts to maintain its 98% monopoly in a market for insulation products; by attempting to destroy competition in that market by exclusionary tactics; by threatening to refuse to sell to any company that buys competing products from Thermal Pipe Shields; by tying sales of insulation products to other Johns Manville industry-standard products that distributors need; and by falsely disparaging the quality of Thermal Pipe Shields products (even though they come from the identical factory that Johns Manville had once used); and, for its complaint, Thermal Pipe Shields alleges as follows:

1

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction of this action under sections 4 and 16 of the Clayton Act, 15 USC §§15 and 26; 15 USC §1231, the Lanham Act; and 28 USC §1331 and 28 USC §1367. The actions alleged affect interstate commerce.

2.     This Court has personal jurisdiction over Johns Manville Corporation and Industrial Insulation Group, LLC, and venue is proper in this District under 15 USC §22, because both defendants' headquarters are located in Denver, Colorado.

## PARTIES

3.     Chase Manufacturing, Inc. is a privately-held company organized under the laws of the State of Washington. It is in the business of supplying mechanical insulation products for construction contractors, and does business under the name Thermal Pipe Shields.

4.     Johns Manville Corporation is organized under the corporate laws of the State of Delaware, with its head office located in Denver, Colorado. It is a wholly-owned subsidiary of Berkshire Hathaway. Johns Manville manufactures and sells construction products, including mechanical insulation products.

5.     Industrial Insulation Group, LLC, is a limited liability company. Upon information and belief, it is organized under the laws of the State of Delaware, with its head office located in Denver, Colorado. Industrial Insulation Group, LLC, manufactures and sells industrial and mechanical insulation products. It is a wholly-owned subsidiary of Johns Manville Corporation, its operations are controlled by senior executives of Johns

2

Manville Corporation, and the two companies operate as a single, integrated unit for purposes of the facts related in this complaint. For this reason, this complaint uses the term "Johns Manville" to refer to both defendants.

## RELEVANT MARKET

6.     This action involves "calsil" insulation pipe and block products. "Calsil" is a shorthand term for hydrous calcium silicate thermal insulation that is factory formed into flat blocks or curved sections designed to encapsulate pipes, equipment or tanks. It is manufactured in accordance with ASTM C533 Type I. (ASTM International, whose former name was the American Society for Testing and Materials, is an international standards organization that publishes material specifications widely used by engineers to qualify generic product types, as opposed to specifying a brand-name product.)

7.     Calsil replaced asbestos as the industry standard for mechanical insulation in mid-high temperature applications starting around 1973. The applications include piping, tanks, and other equipment that operate at temperatures up to 1200° Fahrenheit within large industrial facilities, such as oil refineries, chemical and power generation plants and pulp and paper mills.

8.     Because of its unique physical properties, Calsil is extremely heat resistant and provides very high compressive strength to resist damage and physical abuse much better than other products. Its extreme durability provides long service life by preventing crushing due to on-site foot traffic and abuse; it is inherently non-combustible; it generates no smoke when exposed to flame, which provides passive fire protection; it contains

integral corrosion-inhibiting chemistry; and it offers low thermal conductivity to prevent heat loss and reduce the surface temperature of insulated surfaces, characteristics that protect workers from burn injuries in the plant. These special attributes of calsil make it the essential product for mid to high-temperature piping and equipment because there are no reasonable interchangeable substitutes that provide the same combination of physical properties with the accompanying benefits that meet the requirements of ASTM C533 type I: Standard Specification for Calcium Silicate Block and Pipe Thermal Insulation.

9.      Calsil's performance characteristics for heat resistance, corrosion resistance, abuse resistance, and fire resistance make it exceptionally and uniquely suitable for industrial applications where heat-resistant insulation is required such as in process areas where there is significant risk of corrosion under insulation (CUI) or fire outbreak; or locations within 16 feet of ground level, where there is a greater likelihood that workers may stand or walk on the piping or equipment, and where, therefore, there is a greater need for the high compressive strength of the product.

10.     As a result, based on performance and life cycle cost, industrial project engineers specify calsil because there are no reasonably interchangeable substitutes that meet all of these specifications.

11.     Based on all these factors, calsil is a distinct product market.

12.     The demand for calsil is national, and calsil is sold in every market in the United States. As a result, the geographic market for calsil is national.

13.     Upon information and belief, at one point there were eight U.S. calsil factories owned by competing manufacturers.  But over time, through plant closures and every other manufacturer exiting the market, Johns Manville now owns and operates the only two remaining calsil factories in North America.

14.     Upon information and belief, Johns Manville now has a market share of at least 98% of the U.S. calsil market, which is believed to be about $45 to $50 million per year.

15.     To be used and accepted by customers, the calsil product must meet North American market requirements, meaning it must meet or exceed all physical properties in accordance with ASTM C533 type I.

16.     The use of ASTM standards promotes competition by allowing the use of various competing products in a project as long as they meet the ASTM performance specifications. This standard creates a significant barrier to entry.  There are only three factories in the entire world that can produce calsil that not only meets all applicable ASTM C533 type I requirements, but is also produced with North American sizing norms for both length and dimensional tolerances in accordance with ASTM C585: Standard Practice for Inner and Outer Diameters of Thermal Insulation for Nominal Sizes of Pipe and Tubing. Two of those factories are in the U.S. and both are owned by Johns Manville.

17.     Both Johns Manville and Thermal Pipe Shields sell industrial insulation products to national and regional distributors. There are essentially five major mechanical

insulation distributors that dominate most regions of the country. The distributors then resell those products to industrial customers or plant operators.

## RELEVANT FACTS
### Johns Manville's Chinese Calsil

18.     In 1987, a Chinese government agency, Shanghai Electric Power Co., Ltd, built a calsil factory near Shanghai to provide insulation materials for a nearby coal-fired power plant and other domestic projects. This factory was originally named Shanghai Electric Power Machine Works (SEPMW).

19.     In 2002, a joint venture was formed between a firm called Calsilite and Johns Manville. This new American company was named Industrial Insulation Group, LLC (IIG).  This joint venture consolidated all remaining U.S. calsil factories under the IIG umbrella.

20.     In 2004, IIG formed a separate formal joint venture with Shanghai Electric Power Co., Ltd. The Chinese calsil factory was then renamed IIG Thermal Insulation (Shanghai) Co., Ltd. but was simply known as "IIG Shanghai."

21.     IIG provided the technology and recurring orders. The Shanghai Power was responsible for the production of calsil that met all ASTM C533 type I requirements with U.S. sizing norms.

22.     In 2012, Johns Manville bought out Calsilite's interests in the joint venture, and Industrial Insulation Group, LLC (IIG) became a wholly-owned subsidiary of Johns Manville, now known as the Johns Manville Industrial Insulation Group.

23.     During this period, Johns Manville bought, imported and sold this Chinese calsil product in the United States under its own brand name, Thermo-12 Gold®.

24.     In 2014, the ownership of the Chinese factory changed, and it was renamed BEC Industrial (Shanghai) Co., Ltd.

25.     At some unknown point, Johns Manville stopped its purchases of calsil from the Chinese factory, and resumed manufacturing all its calsil requirements at the two remaining United States factories in Fruita, Colorado and Ruston, Louisiana.

### Thermal Pipe Shields Tries to Enter the Single Supplier Market

26.     In 2017, Thermal Pipe Shields was approached by the new owner of the Chinese factory, now known as BEC Industrial (Shanghai) Co., Ltd, and was offered the opportunity to become the exclusive United States importer for BEC calsil.

27.     Thermal Pipe Shields was BEC's largest U.S purchaser of calsil for their OEM insulated pipe support products.

28.     But, in mid-2017, Johns Manville itself was trying to convince Thermal Pipe Shields to buy its calsil from Johns Manville.

29.     To this end, David Shong, the Johns Manville Industrial Insulation Group Western Regional Technical Manager, convinced Thermal Pipe Shields to allow Johns Manville to test a random sample of BEC calsil in the hope that the tests would show that the Johns Manville product was superior.

30.     Thermal Pipe Shields agreed on the condition that it receive a copy of the actual product testing reports.

7

**Johns Manville's Own Test of BEC Calsil**
**Shows that it Meets or Exceeds ASTM Standards**

31.     Shong obtained a random sample of BEC calsil and disclosed to Johns Manville his intention to release the test results to Thermal Pipe Shields as part of his marketing campaign.

32.     Johns Manville tested the random sample of the BEC calsil at the Johns Manville Technical Center in Littleton, Colorado, in accordance with selected ASTM test methods for incombustibility, friability, chemistry, and thermal conductivity which are contained within the ASTM C533 type I material standard.

33.     The test results showed that the sample provided by TPS met or exceeded all of the ASTM allowable thresholds.

34.     Following this successful test by Johns Manville and several other independent lab results, BEC and Thermal Pipe Shields signed an exclusive supply agreement in March 2018. Thermal Pipe Shields began to market their calsil product under the brand-named designation TPSX-12™.

35.     Technically speaking, the calsil that BEC Industrial (Shanghai) Co., Ltd. produces is TPSX-12™ filter pressed, water resistant calcium silicate pipe and block insulation.

36.     The calsil produced under this agreement is made at the exact same factory that had made the Johns Manville Thermo-12 Gold® product since 2004.

37.     Furthermore, because of the continuity in the staffing of the plant, the management, engineering and production staff responsible for the manufacture of the

8

Thermo-12 Gold® product during the "IIG Shanghai" joint venture are largely the same management, engineering and production staff responsible for the manufacture of the Thermal Pipe Shields product.

### American Laboratory Tests Confirm TPSX-12™ Meets ASTM Standards

38.     As part of the marketing launch for TPSX-12™, TPS independently paid for both their product and the Johns Manville calsil to be tested side-by-side at a well-respected U.S. third-party laboratory.

39.     The personnel of this independent laboratory have highly-regarded knowledge and experience not only in ASTM testing, but also extensive expertise on the chemistry and production processes of calsil.

40.     The independent laboratory test results confirmed that TPSX-12™ meets or exceeds all physical property requirements of ASTM C533 type I, the industry-standard specification for calsil insulation.

41.     The full battery of tests included the latest corrosion test method ASTM C1617. These independent results demonstrated that TPSX-12™ meets a specification fully equal in quality and performance to that of the Johns Manville calsil product.

42.     And contrary to Johns Manville's disparaging claims, as related below, TPSX-12™ has never contained asbestos.

43.     Furthermore, independent testing from several laboratories, confirmed that several of the TPSX-12™ physical properties outperformed the Johns Manville product. First, TPSX-12™ provides significantly higher compressive strength to resist crushing.

Second, TPSX-12™ provides much higher flexural strength to prevent breakage in transit and handling on the job site.  Finally, these two properties combine to provide improved performance during the friability test with dramatically less weight loss by tumbling at 10 minutes. These enhanced physical properties are desirable because of the benefits they offer during transit, storage, installation and on-site performance in industrial plants.

44.     TPSX-12™ is the strongest available water-resistant type I calsil insulation in the world. It robustly supports metal cladding, which acts as the primary weather barrier to keep the insulation dry, and prevents on-site system damage due to plant workers walking on the insulated pipes. This high-strength element provides long service life, optimizes process control, and prevents bulk water ingress, which is a main cause of corrosion under insulation (CUI).

**Johns Manville's Legal Department**
**Threatens Thermal Pipe Shields**
**<u>and Proposes an Agreement Not to Compete</u>**

45.     In early March 2018, David Shong, the Johns Manville Industrial Insulation Group Western Regional Technical Manager, went to work for Thermal Pipe Shields as Vice President of Industrial Business Development & Technical Services.

46.     Johns Manville immediately tried to disrupt and destroy Thermal Pipe Shields' potential entry and its attempt to break the Johns Manville monopoly.

47.     To begin with, Johns Manville threatened David Shong.

48.     Immediately after Shong's hire, in early March 2018, Brian D. Zall, Johns Manville's associate general counsel, wrote to Shong, delivering a long lecture on business

10

ethics and claiming that Shong was not entitled to market to or sell to industrial buyers in the United States that were customers of Johns Manville's Industrial Insulation Group.

49.    Mr. Zall took the position, presumably with the authority, approval, and backing of Johns Manville itself, (a) that unless Thermal Pipe Shields publicly listed the name of a customer on its website, then Thermal Pipe Shields (or Shong) was not allowed to market to or sell to that customer if it were also a Johns Manville customer; and (b) that therefore, engaging in competition with Johns Manville for these customers was a violation of Shong's employment commitments to Johns Manville.

50.    Specifically, Mr. Zall claimed that if Shong were to contact any "JM/IIG customers" who were not currently Thermal Pipe Shield customers and listed on the Thermal Pipe Shields website, then that would represent the illegal use of Johns Manville/IIG "confidential customer information."

51.    Mr. Zall proposed that Shong and Thermal Pipe Shields agree that Thermal Pipe Shields would not market to Johns Manville's customers.

52.    This proposal, offered by the Johns Manville associate general counsel, was essentially an invitation by one horizontal competitor to reach a non-compete arrangement for its own customers with another competitor, an action that would be a per se violation of section 1 of the Sherman Act.

53.    In fact, the names of major industrial distributors (as well as other customers) were and are a matter of public knowledge. Their names all appear in published industry directories such as NIA, WICA, SWICA, MICA, TIAA, and TIAC, among others. As a

result, the identity of these distributors or customers could never in good faith be considered "proprietary" information belonging to Johns Manville.

54.     Furthermore, both Shong's and Thermal Pipe Shields' knowledge of these customers was a matter of professional and personal contacts and involvement in the industry built up over many years, and was not in any way "proprietary information" resulting from Shong's employment at Johns Manville.

55.     Shong fully intended to, and did, live up to every legal and moral responsibility under the Johns Manville employment agreement.

56.     But absolutely nothing in any of Shong's employment obligations with Johns Manville prevented him from working for a living in the industry in which he had worked for years, and using his general skill and knowledge to support his family.

57.     Johns Manville's corporate headquarters is located in Denver, Colorado. Shong's right to work in his own field is explicitly protected by Colorado law (as well as the public policy labor laws of many other states). For example, Colorado Statutes, Labor and Industry, C.R.S § 8-2-113, reads:

**"Unlawful to intimidate worker - agreement not to compete**

"It shall be unlawful to use force, threats, or other means of intimidation to prevent any person from engaging in any lawful occupation at any place he sees fit."

58.     Johns Manville's threats were knowingly and intentionally designed to intimidate Shong, as well as Thermal Pipe Shields, and essentially induce them to agree not to compete for any existing Johns Manville customers, ensuring that Johns Manville would maintain and perpetuate its monopoly in calsil.

59.     Later in March 2018, Thermal Pipe Shields received a second letter from the Johns Manville legal department. This time, Cynthia L. Ryan, the Johns Manville general counsel, wrote, claiming that Shong had violated his obligation to maintain the confidentiality of proprietary technical analyses conducted by Johns Manville.

60.     Specifically, Ms. Ryan claimed that "we have reason to believe that David Shong may have improperly taken JM confidential and proprietary material and disclosed it to Thermal Pipe Shields." This referred to the disclosure of the test results mentioned above.

61.     Ms. Ryan claimed that Johns Manville was conducting a "forensic analysis" of Shong's electronic devices, but that "one example" of Shong's "apparent misappropriation" was the disclosure of the "ASTM C355 Pipe Thermal Conductivity: Delta T VS Ambient >200F" values, which, the general counsel claimed, Shong had sent to Thermal Pipe Shields "without proper authorization."

*62.*     Once again, the Johns Manville charges were without truth or substance. Despite the reference in the accusatory letter to "several examples" of disclosure "without proper authorization," in fact, the ASTM C335 thermal data was the only "example" ever produced. And the answer to that false charge was that *Shong had disclosed the test results of the BEC calsil product provided by Thermal Pipe Shields with the knowledge of Johns Manville, as part of his attempt, when he was employed at Johns Manville, to convince Thermal Pipe Shields that their Chinese product was inferior and that Thermal Pipe Shields should buy Johns Manville calsil instead.*

13

63.     In short, the disclosure of the test results was made with Johns Manville's knowledge, and as part of Shong's good-faith attempt to generate sales *for* Johns Manville, not to divert sales *from* Johns Manville.

64.     Had Johns Manville performed even a superficial review of its own records, it would and should have known this. Instead, it chose to make false, defamatory, and intimidating threats to Thermal Pipe Shields and Shong.

65.     In the same letter from Ms. Ryan, she stated that "JM welcomes fair competition in the pipe insulation market."

66.     In response to Ms. Ryan's letter, Thermal Pipe Shields counsel explained why Johns Manville's charges were unsubstantiated.

67.     Then, in response to Ms. Ryan's "fair competition" claim, Thermal Pipe Shields counsel informed Johns Manville that Thermal Pipe Shields had heard in the marketplace that Johns Manville representatives had tried to unfairly influence, threaten and intimidate Thermal Pipe Shield's potential customers using the following tactics:

   a.  by impugning the quality of the Thermal Pipe Shields Chinese product without substantiation;

   b.  by making threats that suggest that the Chinese product could be blacklisted in commercial and regulatory specifications;

   c.  by making threats to refuse to deal with any customers who buy calsil from Thermal Pipe Shields;

    d.  by making threats to tie the sales of other Johns Manville products to the Johns Manville calsil product; and

    e.  by making threats to adopt a pricing and bundling structure that would essentially make it economically unsound for any customers to buy from Thermal Pipe Shields.

68.     Thermal Pipe Shields' counsel asked the Johns Manville's general counsel to investigate these charges and report back.

69.     Ms. Ryan, Johns Manville's general counsel, ignored that request and never answered.

70.     But in fact, Thermal Pipe Shields' charges were true, as shown by the following exclusionary conduct undertaken by senior Johns Manville executives.

**Johns Manville Executives Threaten Customers**

71.     The first incident occurred in late-2017, before Thermal Pipe Shields publicly announced its exclusivity agreement with BEC, when Hal Shapiro (Johns Manville Industrial Insulation Group National Sales Leader) told a large Johns Manville customer, who had shown interest in buying calsil from BEC after they met at a tradeshow, that Johns Manville had received "approval from legal" to refuse to sell them any Johns Manville calsil products if they bought calsil from BEC or anyone else.

72.     Shapiro even volunteered that the Johns Manville legal "justification" for this behavior was that, since Johns Manville's monopoly would be broken, they no longer had to play by the rules surrounding their "very high market share paradigm."

73.     Following this threat, the customer did not purchase any calsil from Thermal Pipe Shields.

74.     In April 2018, Jack Bittner (Johns Manville Industrial Insulation Group Senior Product Manager) threatened a customer warning him that "You don't want to be the first to switch [to Thermal Pipe Shields calsil]. We [Johns Manville] have a plan."

75.      Following this threat, the customer did not purchase any calsil from Thermal Pipe Shields.

76.     After these threats, as related below, Johns Manville continued a series of similar exclusionary actions designed to intimidate and threaten customers who wanted to benefit from the competition in calsil that Thermal Pipe Shields was trying to offer.

77.     As mentioned, Johns Manville sells many other products besides calsil, some of which are widely recognized for their industry-leading quality, and which are essential to the inventory of construction supply distributors. Upon information and belief, Calsil makes up less than 2% of Johns Manville's total sales, but the distributors need to carry the other industry-standard Johns Manville products because their customers require and demand those products.

78.     These include Micro-Lok®, which is generally recognized as the best fiberglass pipe insulation in the market. On information and belief, Johns Manville's fiberglass products command up to 90% market share in many major metropolitan areas of the United States and amount to over $2 billion of sales per year, out of Johns Manville's total sales of over $3 billion.

16

79.     By threatening to withhold its other essential products unless customers also buy calsil exclusively from Johns Manville, Johns Manville can perpetuate its monopoly in calsil.

80.     As related below, Johns Manville has threatened to cut off sales or extend lead times of Micro-Lok® to companies that buy calsil from Thermal Pipe Shields.

81.     Johns Manville is also a major supplier of expanded perlite pipe and block insulation, sold under the brand name Sproule WR-1200®, which is used as a major staple industrial insulation in the Gulf Coast.

82.     Upon information and belief, Johns Manville has threatened to cut off sales of expanded perlite to any company that buys calsil from Thermal Pipe Shields. This is also an essential product for these customers.

83.     One of Johns Manville's corporate mottos displayed on its website is "We Build Lasting Relationships." But the website does not explain that Johns Manville builds these "lasting relationships" through intimidation, threats, and coercion, and not through competition on the merits, or "fair competition," as Ms. Ryan, the Johns Manville's general counsel, had phrased it.

84.     Johns Manville's anti-competitive threats continued throughout the year.

85.     In September 2018, Chad Meyer, Johns Manville Industrial Insulation Group Midwest Regional Sales Manager, and Eric Alley, Johns Manville Industrial Insulation Group National Sales Leader, met with another customer.

86.     Meyer and Alley told the customer that "We know you have been buying from Thermal Pipe Shields because we track their import records," and then directly threatened the customer's future ability to buy calsil from Johns Manville if it continued to buy Thermal Pipe Shields calsil.

87.      Following this threat, the customer did not buy any more calsil from Thermal Pipe Shields.

88.     Meyer also disparaged the Thermal Pipe Shields product, claiming, without any substantiation, that it was poor quality and cannot be trusted to meet the "specifications."

89.     Upon information and belief, in Spring 2018, a Johns Manville sales representative made calls on two Wyoming contractors and stated that the Thermal Pipe Shields calsil "may have asbestos." These statements were and are false.

90.     Furthermore, those statements were somewhat ironic considering that Johns Manville was once a leading producer of asbestos products that caused mesothelioma and asbestos-related diseases, not only to workers but also to their families as a result of secondhand exposure. In 1982, Johns Manville declared bankruptcy to escape its asbestos liabilities. A trust was established in 1988 to pay claims directly to asbestos victims and their families that is currently valued at $2.5 billion.

91.     In 1988, David T. Austern, then general counsel of the Manville Personal Injury Settlement Trust, wrote to the Trustees concerning a series of Manville corporate documents:

> "The documents noted above, however, show corporate know-ledge of the dangers associated with exposure to asbestos dating back to 1934.  In addition, the plaintiffs' bar will probably take the position -not unreasonably- that the documents are evidence of a corporate conspiracy to prevent asbestos workers from learning that their exposure to asbestos could kill them."

92.     Following false claims about asbestos made by Johns Manville, Thermal Pipe Shields immediately paid a U.S. lab to test for both crystalline silica and asbestos. The independent results showed below detectable limits for crystalline silica and negative for asbestos.

93.     Furthermore, as stated above, the factory that supplies Thermal Pipe Shields has never used any asbestos from the time it was built in 1987.

**Johns Manville Disparages Chinese Product and
Falsely Claims It Never Sold Chinese Calsil**

94.     Johns Manville continued its attempts to deter or threaten potential customers. In October 2018, Chad Meyer, the Johns Manville Industrial Insulation Group Midwest Regional Sales Manager, approached a customer and made threats that Johns Manville might stop selling to them unless the customer stopped buying Thermal Pipe Shields calsil.

95.     Meyer also warned the customer that Johns Manville was "monitoring" import records and knew what Thermal Pipe Shields was doing.

96.     Finally, Meyer continued to disparage Thermal Pipe Shields calsil, stating that it was "Chinese," and asking why the customer would want to "risk buying an unproven product that may not meet the specifications."

19

97.    As part of his attempt to disparage Thermal Pipe Shields products, Meyer also falsely represented that Johns Manville had *never* sold calsil produced in China, stating:

> "JM/IIG has never bought calsil from any Chinese factory and if David Shong continues to make that false claim in the market, he will be hearing from the JM Legal Department!"

98.    In fact, as related above, Johns Manville continued to buy and resell the Chinese calsil known as Thermo-12 Gold®. The following pictures taken at a customer's warehouse show a Johns Manville branded box of Thermo-12 Gold®, with the designation of origin as "Made in China." The photograph was taken in October 2018 at a U.S. customer warehouse.





**Johns Manville Visits the Chinese Factory it Disparaged,
and Tries to Induce BEC to Breach its Contract with Thermal Pipe Shields**

99.     Furthermore, even while Johns Manville was denying that it had ever bought Chinese calsil, and even while it was disparaging the BEC product as "Chinese," claiming it was "substandard," claiming it possibly was "unable to meet specifications," and claiming it possibly "ha[s] asbestos," Johns Manville tried to open discussions with BEC to explore the possibility of a buying relationship. Had it succeeded, this would have violated Thermal Pipe Shields' contractual rights of exclusivity with BEC to distribute its products in the U.S. calsil market.

100.    To this end, in July 2018, three Johns Manville executives, including Jack Bittner, Johns Manville Industrial Insulation Group Senior Product Manager, travelled to China and, on July 30, 2018, met with the owner and staff of BEC.

101.    In this picture, taken July 30, 2018, Bittner, Jeff Semkowski, Johns Manville Industrial Portfolio Leader, and Robert Price, Johns Manville International Supply Chain Leader, stand on the left, surrounding the owner and next to the engineering and production staff of the BEC factory that it claims produced substandard and unproven Chinese products; that it claims might be unable to meet U.S. specifications; and that it claims possibly have contained asbestos.  The marketing poster hanging on the right side of the wall, with a man standing on calsil pipe insulation, was in fact, modeled by Mr. Bittner himself.



102.    During Bittner's discussions with BEC, he specifically raised the possibility of Johns Manville restarting a buying relationship with BEC. This offer was conditional upon BEC providing samples for Johns Manville to test that would meet/exceed ASTM C533 type I requirements.

103.    If Johns Manville had succeeded in obtaining any agreement for calsil from the BEC factory, it would inevitably have caused a breach of BEC's exclusive agreement with Thermal Pipe Shields, an agreement that Johns Manville knew existed.

### Johns Manville Continues to Threaten
### to Boycott Customers Who Buy from Thermal Pipe Shields

104.    In early January 2019, Johns Manville told several customers that, if they bought Thermal Pipe Shields calsil, Johns Manville would not only not sell them calsil, but would also refuse to sell them other essential Johns Manville products that the distributors needed to stay in business.

105.    As mentioned before, Johns Manville supplies a range of industry-essential construction products. One example is Micro-Lok®, which is generally recognized as the best fiberglass pipe insulation on the market. On information and belief, Johns Manville's fiberglass products used for mechanical and building insulation applications maintain very high market share in many areas of the U.S and constitute a large percentage of Johns Manville total sales of over $3 billion per year.

106.    Johns Manville is also a major supplier of expanded perlite pipe and board, mineral wool pipe and board, calcium silicate fireproofing board, high temperature cements, microporous thin blanket and aerogel sub-sea insulations. These products constitute nearly all the other distinct types of above-ambient industrial insulations commonly specified and purchased throughout the United States.

23

107.    Upon information and belief, Johns Manville has threatened to cut off sales, extend lead times or alter rebate programs for these other Johns Manville insulation product lines as a punitive measure to any company that buys calsil from Thermal Pipe Shields.

108.    In January 2019, Johns Manville informed an executive with a large customer that, if they continued to buy Thermal Pipe Shields calsil, Johns Manville would not only stop selling them calsil in those specific locations but would also refuse to sell them calsil at *any* of their locations anywhere in the country.

109.    In mid-January 2019, Johns Manville senior executives met with a customer and made similar threats. The Johns Manville executives included:

    a.  Dave Skelly: Johns Manville General Manager Performance Materials

    b.  Eric Alley: Johns Manville Industrial Insulation Group National Sales Leader

    c.  David Benjamin: Johns Manville Performance Materials – National Accounts Manager

    d.  Jeff Semkowski: Johns Manville Portfolio Leader - Industrial Insulation

110.    During this meeting, these Johns Manville senior executives warned the customer that:

    a.  Johns Manville would punish the customer by changing their rebates if it purchased TPSX-12™ (the Thermal Pipe Shields calsil product).

    b.  Johns Manville would stop selling calsil to the customer in markets where they purchased TPSX-12™.

c. Johns Manville would punish the customer by creating longer lead times for *all* JM products if it purchased TPSX-12™.

d. And, if the customer remained loyal to Johns Manville, then Johns Manville would provide price concessions in markets that compete against TPSX-12™.

111.   Following these threats, the customer did not purchase any calsil from Thermal Pipe Shields.

112.   In late January 2019, Thermal Pipe Shields learned that Johns Manville told a major customer that if they bought calsil from Thermal Pipe Shields, it would endanger their ability to purchase *any* Johns Manville products, which they needed to serve their customers.

113.    Following this threat, the customer did not purchase any calsil from Thermal Pipe Shields.

114.   On information and belief, Johns Manville regularly sells to customers who buy other insulation product types from competing manufacturers such as mineral wool, fiberglass, expanded perlite, fireproofing board, adhesives, thin blankets and PVC jacketing products. To Thermal Pipe Shields' knowledge, Thermal Pipe Shields is the only supplier that Johns Manville has blackballed, with threats that customers will no longer be able to buy Johns Manville calsil, and that lead times or rebates for other products could be adversely harmed if they buy calsil from Thermal Pipe Shields.

115.    Upon information and belief, Johns Manville has attempted to influence contractor and regulatory specifications to exclude Thermal Pipe Shields products.

## INJURY TO COMPETITION

116.    In early March, Thermal Pipe Shields began to sell TPSX-12™.  But in the last year, it has sold less than $1 million of this product because of Johns Manville's threats and intimidation of potential customers. Except for Johns Manville's threats, intimidation, and other anticompetitive conduct, Thermal Pipe Shields would have sold substantially more than $1 million of this product.

117.    Thermal Pipe Shields TPSX-12™ is priced below the Johns Manville product, fully complies with all relevant ASTM standards, and is at least as good if not better than the Johns Manville product. But for Johns Manville's threats, intimidation, and other anticompetitive conduct, customers that purchased from either or both Thermal Pipe Shields and/or Johns Manville would have paid less for their calsil because of additional competition, as well as Thermal Pipe Shields lower prices.

118.    Johns Manville's actions hurt competition, not merely a competitor. Thermal Pipe Shields is the only company that currently even attempts to compete against Johns Manville's 98% market share. Johns Manville's actions were intended to perpetuate its monopoly and destroy potential or emerging competition in the U.S. calsil market.

119.    Johns Manville's threats, intimidation, and other anticompetitive conduct caused customers to purchase substantially less calsil from Thermal Pipe Shields than they would have without these actions, which had the effect of keeping Thermal Pipe Shields

26

from achieving sufficient economies of scale to further reduce its prices and/or improve its product and service relating to calsil.

120.    By using these illegal actions to maintain its monopoly, Johns Manville deprived customers of a competitive choice and also customers of the benefits of a lower priced alternative for the same quality product. If Johns Manville is permitted to continue these threats, intimidation, and anticompetitive conduct, Thermal Pipe Shields will be excluded from the calsil market, a result that would—once again—leave Johns Manville as the only company serving this market. On information and belief, this is Johns Manville's plan, which they have begun implementing and will continue to do so unless this Court stops them.

## FIRST CLAIM
## MONOPOLIZATION

121.    Thermal Pipe Shields realleges all previous paragraphs.

122.    Johns Manville has a market share in calsil believed to be at least 98% and, as a result, possesses monopoly power in the calsil market. Johns Manville has no existing U.S. competitor other than Thermal Pipe Shields. The barriers to entry are high because any factory capable of making calsil requires major capital investment, but the market size for calsil is declining. As a result, the cost of a new factory is effectively prohibitive, and there is no potential entrant for this market.

123.    Johns Manville has maintained its monopoly by a host of exclusionary tactics, including full-line forcing, tying, product disparagement, threats to boycott, actual

boycotts, and refusals to deal, all with the purpose of preventing Thermal Pipe Shields from entering the calsil market and providing competition where none existed.

124.    In addition, Johns Manville's legal department threatened Thermal Pipe Shields with phony charges of "misappropriation," which they knew were not true, and tried to get Thermal Pipe Shields to agree not to compete for any Johns Manville customers who were not listed on Thermal Pipe Shields' own website.

125.    These exclusionary actions demonstrate an intent to monopolize.

126.    Johns Manville's anticompetitive conduct and monopolization affected interstate commerce because calsil is routinely bought and sold and transported across state lines. In addition, Johns Manville's executives travelled from city to city across state lines to intimidate and threaten customers in person to not purchase calsil from Thermal Pipe Shields.

127.    Furthermore, these exclusionary actions are not the result of any unauthoriz-ed "rogue" action, but were, instead, developed, engineered and methodically and consistently carried out by senior executives of Johns Manville. There are no legitimate or pro-competitive business reasons for these acts.

128.    Johns Manville's acts of monopolization have injured Thermal Pipe Shields in its business and property, by intimidating or threatening customers and thereby severely restricting or destroying the potential sales that Thermal Pipe Shields could have made to otherwise willing distributors.

129.     Johns Manville's acts of monopolization also harmed competition, as Thermal Pipe Shields offers the only competition and alternative source of supply of calsil for customers.

130.     Furthermore, upon information and belief, Johns Manville has a 98% share of the calsil market and its actions were specifically designed to exclude the only potential competitor and ensure that competition in the calsil market would be injured or destroyed.

131.     Johns Manville has thus violated Section 2 of the Sherman Act.

132.     As a result of the foregoing, Thermal Pipe Shields has been damaged in an amount to be determined at trial, but which is expected to be no less than $20 million.

## SECOND CLAIM
## TYING

133.     Thermal Pipe Shields realleges all previous paragraphs.

134.     As related above, Johns Manville repeatedly threatened to refuse to sell non-calsil products that customers wanted to buy if they bought calsil from Thermal Pipe Shields instead of from Johns Manville.

135.     Johns Manville has economic power in the market for fiberglass and expanded perlite (the tying products), and it consistently used that power to coerce customers to buy Johns Manville calsil (the tied product), even though customers wanted to buy TPSX-12™ from Thermal Pipe Shields instead.

136.     Each of these is a separate product and customers want the freedom to buy those separate products from different vendors.

137.    Johns Manville appreciably restrained free competition in the market for calsil and a not-insubstantial amount of commerce in the tied market is restrained.

138.    Johns Manville thus violated Sections 1 and 2 of the Sherman Act.

139.    As a result of the foregoing, Thermal Pipe Shields has been damaged in an amount to be determined at trial, but which is expected to be no less than $20 million.

### THIRD CLAIM
### LANHAM ACT VIOLATIONS

140.    Thermal Pipe Shields realleges all previous paragraphs.

141.    Johns Manville has repeatedly, consistently, and falsely disparaged the quality of Thermal Pipe Shields calsil to customers, falsely claiming that it is defective, that it is an "unknown" factor, that it fails to meet "specifications," that it may not be acceptable to contractors, and that it may "contain asbestos."

142.    Johns Manville has also falsely disparaged Thermal Pipe Shields products as sub-standard because they are "Chinese," whereas in fact, Johns Manville itself tested Thermal Pipe Shields' calsil and determined that it is not sub-standard.

143.    Johns Manville itself bought calsil from the identical Chinese factory and sold it in the United States under its brand name Thermo-12 Gold®.

144.    Johns Manville's statements were literally false and misleading and deceived, or at least had the capacity to deceive, consumers.

145.    Johns Manville's deception had a material effect on the consumers' purchasing decision.

146.    The misrepresentation affects interstate commerce.

147.    Thermal Pipe Shields has been, or likely will be, injured as a result of the false or misleading statement.

148.    Due to Johns Manville's false statements, Thermal Pipe Shields has suffered, and will suffer, ongoing injury to its commercial interest both in loss of sales and damage to its business reputation, all proximately caused by Johns Manville's misrepresentations, in violation of the Lanham Act.

149.    Johns Manville has thus violated Section 43(a) of the Lanham Act.

150.    As a result of the foregoing, Thermal Pipe Shields has been damaged in an amount to be determined at trial, but which is expected to be no less than $20 million.

## FOURTH CLAIM
## TRADE DISPARAGEMENT

151.     Thermal Pipe Shields realleges all previous paragraphs.

152.    Johns Manville's defamatory statements about Thermal Pipe Shields calsil were false.

153.    Johns Manville's defamatory statements were published to a third party.

154.    Johns Manville's defamatory statements were derogatory to the plaintiff's business in general, or its quality.

155.    Johns Manville intended to cause harm to the plaintiff's pecuniary interests.

156.    Johns Manville's defamatory statements were published with malice, including the specific intention of harming Thermal Pipe Shields' business reputation and ensuring that customers would not buy TPSX-12™ from Thermal Pipe Shields.

157.    Johns Manville's defamatory statements caused special damages.

158.    Johns Manville has thus violated Restatement (Second) of Torts §§ 623(A) and 624 (1976), which the Colorado Court of Appeals adopted in *Teilhaber Mfg. Co. v. Unarco Materials Storage*, 791 P.2d 1164, 1166 (Colo. App. 1989), and also violated the laws of other various states where the tortious acts occurred.

159.    As a result of the foregoing, Thermal Pipe Shields has been damaged in an amount to be determined at trial, but which is expected to be no less than $20 million.

## FIFTH CLAIM
## TORTIOUS INTERFERENCE WITH BUSINESS

160.    Thermal Pipe Shields realleges all previous paragraphs.

161.    Thermal Pipe Shields had legitimate business expectancies with many buyers of calsil, who wanted an alternative source of the product.

162.    Johns Manville knew of Thermal Pipe Shields' relationships and expectancies with potential customers.

163.    To disrupt those relationships and expectancies, Johns Manville intentionally interfered with them, threatened them, exerted economic pressure over them, and caused a termination of the expectancy.

164.    Johns Manville intentionally induced these potential customers not to enter into or continue the prospective relation with Thermal Pipe Shields, and prevented Thermal Pipe Shields from acquiring or continuing the prospective relationship.

165.    These actions violated Restatement (Second) of Torts § 767, which the Supreme Court of Colorado adopted in *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 501 (Colo. 1995), as modified on denial of reh'g (Jan. 16, 1996), and also violated the laws of other various states where the tortious acts occurred.

166.    As a result of the foregoing, Thermal Pipe Shields has been damaged in an amount to be determined at trial, but which is expected to be no less than $20 million.

WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT AS FOLLOWS:

(a) An injunction barring Johns Manville from engaging in any anti-competitive or defamatory behavior, or false statements, including but not limited to:

    i.   Tying;

    ii.   forcing full-line purchases of its products;

    iii.   refusing to deal with customers who buy, or wish to buy, products from Thermal Pipe Shields;

    iv.   threatening to or actually seeking restrictive specifications of any sort that are designed to exclude the Thermal Pipe Shields product from competitive consideration;

(b) Actual damages in an amount to be determined at trial but believed to be not less than $20 million;

(c) Trebling of the actual damages;

(d) Reasonable attorneys' fees;

(e) Together with the costs and expenses of this action.

Plaintiff requests a trial by jury.

DATED: March 22, 2019

KLENDA GESSLER & BLUE LLC

_s/ Geoffrey N. Blue_

Geoffrey N. Blue
1624 Market Street, Suite 202
Denver, CO 80202
Telephone: (720) 432-5705
Facsimile: (720) 379-9214
Email: gblue@klendagesslerblue.com

_Attorney for Plaintiff_
_Chase Manufacturing, Inc._

Jarod Bona, Esq.*
*   Admitted only in California
Steven Levitsky, Esq.**
** Admitted only in New York
BONA LAW PC
San Diego Office
4275 Executive Square #200
La Jolla, CA 92037
Telephone: (858) 964-4589
Email: jarod.bona@bonalawpc.com