IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC.,

     Plaintiff,

v.

JOHNS MANVILLE CORPORATION, and
INDUSTRIAL INSULATION GROUP, LLC,

     Defendants.

---

# ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**

     Calsil is an insulation product that is used in large industrial facilities. This action arises from a clash in the United States' calsil market between the only two companies that currently compete in that market. Plaintiff Chase Manufacturing, Inc. d/b/a Thermal Pipe Shields is one competitor, while Defendants Johns Manville Corporation and its wholly owned subsidiary Industrial Insulation Group, LLC are the other. Plaintiff's first foray into the calsil market occurred in the spring of 2018, while Defendants are the leading producers of calsil who control ninety-eight percent of the domestic market. Based on Plaintiff's belief that Defendants are engaging in anticompetitive conduct to restrict its ability to sell calsil, Plaintiff filed the Complaint alleging claims under the Sherman Act, the Lanham Act, and Colorado common law. In response to the Complaint, Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) seeking dismissal of all claims because Plaintiff has failed to state a claim upon which relief can be granted. For the following reasons, the Court grants Defendants' motion and dismisses the Complaint without prejudice.

## BACKGROUND

### I.      Statement of Facts

The following are relevant factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by Plaintiff in the Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Calsil, short for hydrous calcium silicate, is a mechanical insulation designed to encapsulate pipes, tanks, and other equipment in industrial facilities such as oil refineries, chemical and power generation plants, and pulp and paper mills.  Calsil's physical properties and ability to resist heat, corrosion, abuse, and fire make it especially suitable for industrial applications in which heat-resistant insulation is required or workers may need to walk across the piping encapsulated by calsil.  Because of these unique characteristics and uses, customers who purchase calsil demand that the product meet or exceed the requirements set forth in ASTM C533 Type I, a standard developed by an international standards organization that publishes material specifications relied on by engineers to qualify generic product types.

Johns Manville Corporation manufactures and sells construction products, including insulation products.  Industrial Insulation Group, LLC is a wholly owned subsidiary of Johns Manville Corporation which also manufactures and sells insulation products.  Defendants own and operate the only two remaining calsil manufacturing plants in North America and maintain a market share of at least ninety-eight percent of the United States' calsil market.  Defendants have total annual sales of all of their products of over three billion dollars, with calsil accounting for approximately fifty million dollars of total sales.

In 2017, Plaintiff was approached by the owner of BEC Industrial (Shanghai) Co., Ltd. ("BEC"), a Chinese factory that had previously produced calsil for Defendants.  BEC offered Plaintiff the chance to be the exclusive United States importer of BEC calsil.  During this period, Defendants were also trying to persuade Plaintiff to purchase their calsil.  To win Plaintiff's business, Defendants offered to test the BEC calsil against Defendants' calsil to determine which product was superior.  The test results showed that BEC's calsil met or exceeded the ASTM allowable thresholds.  Based on these results and other independent tests, Plaintiff and BEC signed an exclusive agreement in March 2018.

Plaintiff began marketing its calsil under the brand-name TPSX-12™.  As part of its marketing strategy, Plaintiff arranged for its calsil to be tested side-by-side with Defendants' calsil. Those results indicated that TPSX-12™ met or exceeded the requirements of ASTM C533 Type I, never contained asbestos (which is relevant as described below), and outperformed Defendants' calsil in several categories.

Plaintiff and Defendants sell their products to national and regional distributors which then resell the products to industrial customers or plant operators.  Essentially, five major mechanical insulation distributors dominate most of the regions in the country.  The distributors' customers require the distributors to carry other construction products made by Defendants.  Defendants' fiberglass products and expanded perlite products are most relevant here.  Defendants' fiberglass products occupy up to ninety percent of the market share in many major metropolitan areas and enjoy a high market share in many areas of the United States.  Defendants are also major suppliers of expanded perlite pipe and block insulation, which is regularly used as industrial insulation along the Gulf Coast.

In late 2017, when at least one of Defendants' large customers expressed an interest in purchasing Plaintiff's calsil, Defendants began threatening customers that they would not sell them calsil or any other products if the customers purchased TPSX-12™. These threats were communicated by Defendants' sales employees from at least late 2017 through late January 2019. According to Plaintiff, Defendants made other anti-competitive comments to their customers. The threats included a warning that Defendants were tracking and monitoring import records to enable them to watch Plaintiff's calsil sales. As stated in the Complaint, Defendants also told customers that Plaintiff's calsil was "poor quality" and "cannot be trusted to meet 'specifications,'" "'may have asbestos,'" and was "Chinese," referring to where it was produced.

Plaintiff sold less than one million dollars of calsil from March 2018 through March 2019. Plaintiff claims that it would have sold substantially more but for Defendants' threats and other anti-competitive conduct. Plaintiff also claims Defendants' actions were intended to perpetuate their monopoly, and to eliminate the only competitor in the United States' calsil market. Again, the total domestic calsil market is approximately fifty million dollars per year, and calsil is sold in every market in the country.

## II.    Procedural History

Plaintiff filed its Complaint on March 22, 2019. ECF No. 1. Plaintiff asserted five claims: (1) monopolization in violation of Section 2 of the Sherman Act; (2) tying in violation Sections 1 and 2 of the Sherman Act; (3) false advertising in violation of Section 43(a) of the Lanham Act; (4) common law trade disparagement; and (5) common law tortious interference with business. *Id.* ¶¶ 121-66. Defendants filed the motion to dismiss on May 15, 2019. ECF No. 18. Plaintiff filed its response on June 5, 2019, in which it contested the dismissal of the first three claims, but Plaintiff voluntarily withdrew claims (4) and (5). ECF No. 24. Accordingly, the only issues for

the Court to determine are whether Plaintiff states plausible claims for monopolizing, tying, and violating the Lanham Act.  Defendants filed their reply on June 14, 2019.  ECF No. 25.  The Court held a hearing on the motion to dismiss on June 18, 2019.

## LEGAL STANDARDS

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint.  *Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.  Twombly* requires a two-prong analysis.  First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory.  *Id.* at 680.  Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief."  *Id.* at 681.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss.  *Id.* at 679.

Plausibility refers "'to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"  *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)).  "The nature and specificity of the allegations required to state a plausible claim will vary based on context."  *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011).  Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case

in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1192.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.* (quotation marks and citation omitted).

## DISCUSSION

Defendants seek to dismiss the Complaint on three grounds: (1) Plaintiff has not stated a monopoly claim under the Sherman Act; (2) Plaintiff has not stated a tying claim under the Sherman Act; and (3) Plaintiff has not stated a claim based on a violation of the Lanham Act.[1] The Court analyzes the first and second grounds for dismissal together because "[t]ying can support a Sherman Act claim either under § 1, as an unlawful restraint on trade, or under § 2, as an unlawful act of monopolization or attempted monopolization." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 397 (3d Cir. 2016). Further, the parties do not distinguish between Plaintiff's tying allegations in support of its monopoly claim and Plaintiff's stand-alone tying claim. *See*

---

[1] Defendants also request that the Court accept Plaintiff's voluntary dismissal of the claims for common law trade disparagement and tortious interference with business. ECF No. 25 at 19. The Court deems those claims withdrawn and does not consider them in this Order.

ECF No. 24 at 22 ("We already addressed the validity of the tying claim in our discussion of monopolization."); ECF No. 25 at 18 ("Therefore, as explained in [the section addressing tying conduct as to Plaintiff's monopoly claim] above, the Court must also dismiss the stand-alone tying claim."). Consequently, the following discussion evaluates Plaintiff's monopoly claim, including Plaintiff's tying allegations, and Plaintiff's Lanham Act claim.

## I.     Monopolization Claims

Plaintiff first claims Defendants created and maintained a monopoly in the calsil market through exclusionary conduct in violation of Section 2 of the Sherman Act. Section 2 of the Sherman Act makes it illegal to "monopolize . . . any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. The purpose of the Sherman Act "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

There are three elements to a Section 2 monopolization claim. The first element is a "monopoly power in the relevant market." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.* (*Lenox I*), 762 F.3d 1114, 1119 (10th Cir. 2014). The second element is "willful acquisition or maintenance of this power through exclusionary conduct." *Id.* In considering whether conduct is exclusionary "it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985). "If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory." *Id.* (internal quotation marks omitted). However, an entity that has acquired a lawful monopoly is not prohibited outright

from taking advantage of its scale economies because of its size; such an advantage is "a consequence of size and not the exercise of monopoly power." *Id.* at 597. Monopoly power under the second element "can be proven through identification of a relevant produce and geographic market, with a showing that the defendant had a sufficient market share and that new competitors would face significant barriers to entry." *Lenox I*, 762 F.3d at 1123 (internal quotation marks omitted). The final element is "harm to competition." *Id.* at 1119

Defendants argue Plaintiff has failed to plead a monopoly claim because the Complaint does not establish that Defendants acquired or maintained a monopoly through "exclusionary conduct," the second element. ECF No. 18 at 9. Plaintiff counters that the following actions, outlined in the Complaint, show that Defendants engaged in exclusionary conduct violative of the Sherman Act: tying, exclusive dealing, refusal to deal, spying, and product disparagement.[2] ECF No. 24 at 11-22. The Court analyzes each of these forms of exclusionary conduct separately.

A. <u>Tying</u>

A tying arrangement under the Sherman Act "is an agreement by a party to sell one product—the 'tying product'—only on condition that the buyer also purchase a second product— the 'tied product'—or at least agree not to buy that product from another supplier." *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1078 (D. Colo. 2013) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992)), *aff'd* 841 F.3d 827 (10th Cir. 2016). Tying arrangements can be analyzed using a per se rule or a rule of reason. *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1037 (10th Cir. 2017).

---

[2] The Complaint alleges other exclusionary conduct, including full-line forcing, threats to boycott, actual boycotts, and threatening to charge one of Plaintiff's employees with misappropriation, ECF No. 1 ¶¶ 123-24, but Plaintiff does not rely on any of these allegations to support its monopoly claim in its response to Defendants' motion to dismiss.

A per se rule is appropriate when "a seller's share of the tying market is high, or when the seller offers a unique product that competitors are not able to offer," because "the Supreme Court has held that the likelihood that market power is being used to restrain competition in a separate market is sufficient to make *per se* condemnation appropriate." *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns,* 311 F. Supp. 2d 1048, 1092 (D. Colo. 2004) (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 17 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)). The four elements of a per se tying violation are "(1) two separate products or services are involved; (2) the sale or agreement to sell one product or service is conditioned on the purchase of another; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a not insubstantial amount of interstate commerce in the tied product is affected." *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 886 (10th Cir. 1997). Only the third element of a per se tying claim is in dispute. *See, e.g.*, ECF No. 18 at 18 ("[B]y not alleging market power in the 'tying' products, TPS has not alleged a valid tying claim—the same defect that blocks its argument for exclusionary conduct through tying . . . .").

If a plaintiff does not allege a per se rule violation, "the court may further analyze the tie using the rule of reason to determine whether it actually harms or threatens to harm competition." *In re: Cox Enters., Inc.*, 871 F.3d 1093, 1104 (10th Cir. 2017). The rule of reason involves a burden-shifting framework. *Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1067 (D. Colo. 2012) (applying burden shifting to a motion to dismiss). The first burden a plaintiff must overcome is establishing a "prima facie showing of a substantially adverse effect on competition." *Suture Express, Inc.*, 851 F.3d at 1038.

Under either analysis, the market power of the tying product is important. *Id.* at 1039; *see also Sports Racing Servs., Inc.*, 131 F.3d at 890 ("[T]he market subject to direct economic power is the tying product market, rather than the tied product market."). Market power is the power "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish*, 466 U.S. at 14. "Market power is important because if the defendant has substantial power in the tying market, then the tie has the potential of injuring competition by forcing consumers to take the tied product just to get the tying one." *Suture Express, Inc.*, 851 F.3d at 1039. "Without power in the tying market, we would expect that a customer would not feel obliged to take the tie, as he could simply go elsewhere to buy the tying and tied products separately." *Id.*

Evaluating the relevant tying market requires an appropriate product market and geographic market. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1024 (10th Cir. 2002); *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, No. 10-cv-02516-WJM-KLM, 2014 WL 4412529, at *3 (D. Colo. Sept. 8, 2014). The relevant geographic market is "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). The focus of the geographic market is not where the seller attempts to sell its products, but where the customers are able to buy the products. *Lantec, Inc.*, 306 F.3d at 1027. The selected geographic market must "both correspond to the commercial realities of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962) (internal quotation marks and footnote omitted).

Defendants argue Plaintiff has not alleged tying because the Complaint fails to claim Defendants have sufficient market power in the "tying" products—fiberglass and expanded perlite—to force its customers to buy their calsil, the tied product. ECF No. 18 at 12-14, 17-19.

Plaintiff counters that Defendants have sufficient economic power in these markets to enable Defendants to force their customers to buy their calsil for two reasons. First, the Complaint alleges the distributors who purchase products from Defendants have customers who demand that the distributors carry the tying products. Therefore, the distributors must purchase calsil from Defendants if they want to continue selling the tying products to their customers. ECF No. 24 at 18. Second, the Complaint alleges Defendants' fiberglass division controls up to ninety percent of the market in many major metropolitan areas of the United States. *Id.* Defendants respond that Plaintiff's proposed geographic market is not specific enough. ECF No. 25 at 9-10.

The Complaint sufficiently alleges two product markets—the markets for fiberglass and expanded perlite—but does not adequately allege a geographic market. Applied to this case, the geographic market is the area within which the distributors can find alternative suppliers of the tying products. For fiberglass products, the geographic market is vaguely alleged to be "many major metropolitan areas," where Defendants supposedly have a ninety percent market share for fiberglass products, and "many areas of the U.S." where Defendants' market share is "high." ECF No. 1, ¶¶ 78, 105. For expanded perlite products, the geographic market is alleged to be "the Gulf Coast," where Defendants are "a major supplier" and where Defendants' expanded perlite "is used as a major staple industrial insulation." *Id.* ¶ 81. Based on these allegations, Plaintiff appears to argue for a regional market.

The problem with this, however, is there are "essentially five" national and regional distributors who purchase the tying products and who "dominate most regions of the country."[3]

---

[3] The allegations that there are "essentially five major" distributors who "dominate most regions of the country," ECF No. 1, ¶ 17, imply that there are more than five insulation distributors in the United States. This implication further undermines Plaintiff's argument that it has established Defendants have market power in the tying products because, by implication, there may be other distributors who do not buy Defendants' products.

*Id.* ¶ 17.  Because the focus is on where the customers can purchase the products, and the customers are national and regional distributors selling throughout the county, the appropriate market must be a national market, rather than regional markets.  *See Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 738-39 (7th Cir. 2004) (holding plaintiff failed to establish the relevant geographic market was the Southeast region where suppliers competed in national market and where customers purchased from suppliers outside the region).

Regarding a national market, Plaintiff has failed to adequately allege sufficient economic power in the tying products.  As to Defendants' fiberglass products, the Complaint alleges Defendants maintain a ninety percent market share for fiberglass products in "many major metropolitan areas" and a "very high market share in many areas of the U.S."  ECF No. 1 ¶¶ 78, 105.  But it is too speculative to extrapolate from these allegations that Defendants have a sufficiently high national market share in fiberglass products to compel the national distributors to buy their fiberglass.  Similarly, the Complaint does not claim the regional distributors primarily operate in the areas where Defendants' fiberglass products have a high market share.  Plaintiff nonetheless argues the Court could infer that "the five key insulation distributors" are "located in major metropolitan areas," and that accounting for "some lower market shares in other non-metropolitan areas," the Complaint still establishes at least a sixty-two percent national market share for Defendants' fiberglass products.  *See* ECF No. 24 at 19.  This argument is unpersuasive, because it is not supported by facts in the Complaint.

The Complaint also falls short as to Defendants' expanded perlite.  The Complaint only claims that Defendants are "a major supplier" in the Gulf Coast.  ECF No. 1 ¶ 81.  This allegation is insufficient to establish national market power for two reasons.  First, the phrase "major supplier" does not describe the level of clout Defendants have in the Gulf Coast expanded perlite

market.  Describing Defendants as "*a* major supplier" implies that there are other major suppliers, or at least other suppliers, from whom the distributors could purchase expanded perlite.  Second, the market of expanded perlite is limited only to the Gulf Coast.  Without more factual details, the Court cannot reasonably infer that national and regional distributors would feel obligated to purchase Defendants' expanded perlite based only on its status as a "major supplier" of Gulf Coast expanded perlite.  Thus, the Complaint does not allege a per se tying violation.

Although Plaintiff's response to the motion to dismiss contains a very brief reference to the rule of reason, it does not provide any insight into how the rule of reason saves the tying claims.  ECF No. 24 at 19.  The Complaint therefore fails to allege a tying claim under the rule of reason.  *See Suture Express, Inc.*, 851 F.3d at 1039 ("Though the majority of Supreme Court (and our) cases discussing the need to prove market power as part of a tying claim are per se cases, we see no reason why the same theoretical underpinning would not make the inquiry relevant under a rule of reason analysis.").

Plaintiff also argues that regardless of the lack of a geographic market, the Complaint still alleges tying conduct because Defendants "actually exerted the power to coerce customers into not buying from [Plaintiff]" and cites to paragraphs 73, 75, 87, 111, and 113 of the Complaint.  ECF No. 24 at 19.  Paragraphs 73, 75, and 87 are irrelevant because they only involve Defendants threatening to withhold their calsil, the tied product.  ECF No. 1 ¶¶ 71-75, 86-87.  Paragraph 111 does not support a tying claim because Defendants did not refuse to sell the tying products to the customer.  *Id.* ¶¶ 110-11.  Finally, paragraph 113 claims a customer did not buy any calsil from Plaintiff after Defendants told the customer that buying Plaintiff's calsil "would endanger their ability to purchase *any* Johns Manville products."  *Id.* ¶¶ 112-13.  This paragraph lacks specificity,

because it is unclear whether the customer declined to purchase Plaintiff's calsil for fear of losing

the ability to buy the tying products or any one of Defendants' other products.

Accordingly, the Complaint fails to state a monopoly claim based on tying and likewise

fails to state a stand-alone tying claim.

B.  Exclusive Dealing

"An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase

certain goods or services only from a particular seller for a certain period of time." *ZF Meritor,*

*LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012).  Exclusive dealing arrangements are not

unlawful in the absence of anticompetitive effects. *Tampa Elec. Co.*, 365 U.S. at 327.  To state a

claim for unlawful use of exclusionary agreements under the Sherman Act, a plaintiff must show

that a defendant's "exclusive dealing arrangements foreclose competition in a substantial share of

the line of commerce affected." *Crocs, Inc. v. Effervescent, Inc.*, 248 F. Supp. 3d 1040, 1058 (D.

Colo. 2017) (citing *Tampa Elec. Co.*, 365 U.S. at 327).  A plaintiff must also show anticompetitive

effects resulting from "a substantial foreclosure of their ability to compete in the relevant

market." *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at

*8 (D. Colo. Apr. 7, 2010) (citing *Tampa Elec. Co.*, 365 U.S. at 328).

The Complaint does not allege sufficient facts suggesting that Defendants' actions have

foreclosed a substantial share in the calsil market or Plaintiff's ability to compete in that market.

Plaintiff relies on Defendants' threats to not sell fiberglass products or expanded perlite products

to distributors who purchase TPSX-12™ to show Defendants are illegally cutting Plaintiff out of

the calsil market.  ECF No. 24 at 13-15.  But "the demand for calsil is national, and calsil is sold

*in every market in the United States*." ECF No. 1 ¶ 12 (emphasis added).  Defendants' threats only

apply to "major metropolitan areas," the "Gulf Coast," and other undefined areas of the United

States.  ECF No. 1, ¶¶ 78, 81, 105.  In other words, while calsil is sold all over the United States,

the Complaint only alleges facts showing Plaintiff may be foreclosed from selling calsil in certain

markets.  Because the Complaint does not state any facts regarding the size of the allegedly

foreclosed calsil markets or how much of the calsil market is involved in the exclusive dealing

agreements, it is consequently "impossible to determine the extent to which [Defendants'] conduct

has foreclosed Plaintiff[']s ability to compete."  *Compliance Mktg., Inc.,* No. 2010 WL 1416823,

at *9.

Plaintiff claims two cases support its exclusive dealing argument: *United States v. Dentsply

Int'l*, 399 F.3d 181 (3d Cir. 2005) and *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir.

2001).  Plaintiff's reliance on these cases is misplaced.  In each case, the courts reaffirmed the

requirement that a party allege the degree of foreclosure.  *See Dentsply Int'l*, 399 F.3d at 196

(noting defendant's conduct "effectively choked off the market for artificial teeth, leaving only a

small sliver for competitors"); *Microsoft Corp.*, 253 F.3d at 70 ("Though what is 'significant' may

vary depending upon the antitrust provision under which an exclusive deal is challenged, it is clear

that in all cases the plaintiff must define the relevant market and prove the degree of foreclosure.").

Plaintiff has failed to plead this requirement.

Accordingly, the Complaint fails to state a monopoly claim based on exclusive dealing.

C.  Refusal to Deal

The Court concludes Plaintiff has waived any claim that Defendants' alleged exclusionary

conduct could be based on a refusal to deal.  Waiver requires "the intentional relinquishment or

abandonment of a known right."  *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal

quotation marks omitted).  A party may expressly or implicitly waive a right.  *See, e.g.*, *Yates v.

Am. Republics Corp.*, 163 F.2d 178, 180 (10th Cir. 1947).  A waiver can occur in briefing or during

oral argument.  *See Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1231 (10th Cir. 1990) (finding waiver when plaintiff did not argue the issue in his brief or at oral argument.); *Mitchell v. Kraft Pizza Co.*, 162 F. App'x 801, 803 (10th Cir. 2006) (finding waiver when plaintiff did not argue the issue in her brief).

The Complaint categorizes "refusals to deal" as one of the types of exclusionary conduct in which Defendants have engaged.  ECF No. 1 ¶ 123.  The Complaint could be read as advancing a refusal to deal theory on Defendants' threats to refuse to sell products to its customers if those customers purchased calsil from Plaintiff.  But Plaintiff distanced itself from this theory in its response brief by arguing that refusals to deal only apply when a company refuses to deal with a competitor, not when a company refuses to deal with customers.  That brief asserted refusal to deal cases "*apply only where a rival—not a customer—claims the right to deal with the monopolist . . . . [Plaintiff] is not asking to deal with [Defendants]*. . . . These cases are absolutely irrelevant to this lawsuit."  ECF No. 24 at 11-12 (emphasis in original).  Plaintiff continued that *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), one of the Supreme Court's recent refusal to deal cases, "does not apply at all because [Plaintiff] is *not* asking to do business with [Defendants]."  *Id.* at 13 (emphasis in original).

At oral argument on Defendants' motion to dismiss, counsel for Plaintiff explicitly disclaimed Plaintiff's reliance on a refusal to deal theory.  While discussing Defendants' argument on refusal to deal, Plaintiff's counsel stated "the refusal to deal doctrine has nothing to do with anything we allege.  Answering questions about it is like asking one to divide by zero.  A refusal to deal is actually a refusal to deal with rivals."  Counsel described a refusal to deal situation as one in which "[Plaintiff] wants to purchase something from [Defendants] and they refuse to sell it to us and we say well they're a monopolist," reinforcing Plaintiff's argument that refusals to deal

only apply when a company refuses to deal with a competitor.  At the conclusion of his argument on refusal to deal, counsel noted this case is not "even close" to the refusal to deal paradigm, and Plaintiff is "not alleging that so that's completely irrelevant to this case."  By explaining refusal to deal as only applying to dealing with competitors, reiterating that this case does not involve Defendants' refusal to deal with Plaintiff, and claiming refusals to deal are not applicable to this case, Plaintiff has clearly and knowingly expressed that it is not relying on a refusal to deal theory.

Accordingly, any monopoly claim based on Defendants' alleged refusals to deal with its customers has been waived.[4]

D.   Spying

Commercial spying can be grounds for exclusionary conduct to support an antitrust monopoly claim.  *See Utah Pie Co. v. Cont'l Baking Co.*, 386 U.S. 685, 697 (1967) (concluding there was sufficient evidence to uphold a jury verdict finding predatory behavior based on defendant's industrial spying).  Such cases involve a company using its employees to infiltrate a competing company to covertly obtain information about the competitor, *see Utah Pie Co.*, 386 U.S. at 696-97 (antitrust violation when "industrial spy" entered the plaintiff's plant to gather

---

[4] Even if Plaintiff had not waived this theory, the Complaint still would have failed to allege plausible exclusionary conduct through Defendants' alleged refusal to deal with its customers. "'[A]s a general rule . . . purely unilateral conduct' does not run afoul of section 2—'businesses are free to choose' whether or not to do business with others and free to assign what prices they hope to secure for their own products." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns*, 555 U.S. 438, 448 (2009)).  The Complaint does not allege facts sufficient to overcome this presumption, because there are no facts showing Defendants' threatened "discontinuation of the preexisting course of dealing . . . 'suggest[ed] a willingness to forsake short-term profits to achieve an anti-competitive end.'"  *Id.* at 1074-75 (quoting *Trinko*, 540 U.S. at 409 and citing two Tenth Circuit cases).  The Complaint never explicitly claims Defendants' refusal to sell their products to customers who purchase TPSX-12™ demonstrates a willingness to sacrifice short-term profits.  Moreover, it is too speculative to infer from the facts alleged that Defendants' threats demonstrated such a willingness, as opposed to the result of other legitimate business considerations.

information to convince grocery store chain not to do business with the plaintiff); *Am. Tobacco Co. v. United States*, 147 F.2d 93, 113 (2d Cir. 1944) (antitrust violation when "[s]pies pretending to be regular customers, were sent out by appellant companies to check among various dealers as to the retail prices at which they were selling"), or a company creating code numbers and a network of "special agents" to tattle tale on distributors who violate the company's resale prices, *see Fed. Trade Comm'n v. Beech-Nut Packing Co.*, 257 U.S. 441, 455 (1922).

Plaintiff's spying argument is based on two comments Chad Meyer, a regional sales manager for Defendants, made to customers.  ECF No. 24 at 20.  Meyer told one customer that Defendants were "'track[ing]'" Plaintiff's import records, and he told another customer that Defendants were "'monitoring' import records and knew what [Plaintiff] was doing."  ECF No. 1 ¶¶ 86, 95.  These comments, which do not even describe how Defendants were tracking and monitoring Plaintiff's imports, do not amount to commercial spying.  *See Solargen Elec. Motor Car Corp. v. Am. Motors Corp.*, 530 F. Supp. 22, 25 (S.D.N.Y. 1981) (concluding allegation of commercial spying did not violate the Sherman Act when the plaintiff could not "specify even a single instance of illegal conduct by" the alleged spy "whose greatest act of espionage appears to have been meetings . . . wherein he obtained publicly available information about" the plaintiff), *aff'd*, 697 F.2d 297 (2d Cir. 1982).  Accordingly, the Complaint fails to state a monopoly claim based on spying.

E.  <u>Product Disparagement</u>

To prove that product disparagement rises to the level of exclusionary conduct, the disparagement must overcome the presumption that the effect on competition is *de minimis*.  *Lenox I*, 762 F.3d at 1127.  "A Section 2 plaintiff may rebut this presumption by satisfying a six-factor test, showing that the disparagement was: (1) clearly false, (2) clearly material, (3) clearly likely

18

to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals."[5]  *Id.*

Plaintiff relies on four comments to support its argument that Defendants' product disparagement amounts to exclusionary conduct.  *See* ECF No. 24 at 20.  In spring 2018, an unidentified sales representative told two Wyoming contractors that Plaintiff's calsil "'may have asbestos.'"  ECF No. 1 ¶ 89.  Next, in September 2018, Meyer told a customer that Plaintiff's calsil was "poor quality and cannot be trusted to meet 'specifications.'"  *Id.* ¶¶ 85-88.  In October 2018, Meyer asked a different customer why it "would want to 'risk buying an unproven product that may not meet the specifications.'"  *Id.* ¶ 94-96.  Finally, at some unspecified time to an unidentified entity, Defendants claimed TPSX-12™ was "substandard."  *Id.* ¶ 99.

Defendants argue the statements do not overcome the *de minimis* presumption because they were not material, likely to induce reasonable reliance, or made to buyers without knowledge of TPSX-12™, and did not continue for a prolonged period of time.  ECF No. 18 at 15.  Defendants also claim the statements could have been easily neutralized by Plaintiff's calsil test results.  *Id.* at 15-16.  Plaintiff counters the comments were (1) material because no rational buyer would buy substandard goods, (2) designed to induce reasonable reliance coming from the leading manufacturer of industrial insulation in the United States, (3) made to buyers who did not know

---

[5] United States Courts of Appeals disagree as to whether this test requires a plaintiff to satisfy all six elements, or whether the elements should be weighed.  *Compare Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 371 (6th Cir. 2003) (treating all factors as relevant but none as dispositive) *with Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997) (requiring a plaintiff to "satisfy *all* six elements to overcome de minimis presumption").  The Tenth Circuit has not "determine[d] whether a plaintiff must satisfy all six factors to overcome the *de minimis* presumption."  *Lenox I*, 762 F.3d at 1128 n.9.  Assuming a court should treat the factors as a balancing test rather than treat any one factor as dispositive, the balance of the factors weigh in favor of finding that Plaintiff has not overcome the *de minimis* presumption.

about TPSX-12™, (4) continued for a prolonged period of time, and (5) were not readily susceptible to neutralization because of the danger associated with products potentially containing asbestos.  ECF No. 24 at 21-22.

Plaintiff has failed to allege facts to meet the third, fourth, fifth, and sixth factors.  The third factor is not satisfied because the Complaint does not contain any facts suggesting that the contractors or the customers were likely to reasonably rely on Defendants' statements.  Plaintiff argues that the statements were "designed to induce reasonable reliance, coming from the preeminent manufacturer of industrial insulation products in the United States," *id.* at 21, but this is an argument, not an allegation of fact contained in the Complaint, and requires too much speculation to accept.

The fourth factor is not satisfied because the Complaint does not contain any facts suggesting the contractors or the customers had no knowledge of Plaintiff's calsil.  Plaintiff argues the buyers knew generalities about insulation, but not the specifics of TPSX-12™.  *Id.*  But, again, this is an argument, not a factual assertion, and a reasonable inference from the Complaint is that the buyers did know of the specifics of Plaintiff's calsil because Plaintiff touted the test results of TPSX-12™ as part of its marketing campaign.  ECF No. 1 ¶ 38.

The fifth factor is not satisfied because the comments did not occur over a prolonged period of time.  The allegedly disparaging comments occurred only four times over several months and were made to only three distinct companies.[6]  These "isolated statements to very limited audiences spaced by [several months] are not the sort of sustained, systematic false advertising that would have more than a de minimis effect on competition."  *TYR Sport, Inc. v. Warnaco Swimwear, Inc.,*

---

[6] Plaintiff claims the disparaging comments continued through January 2019.  ECF No. 24 at 21.  However, the January 2019 comment that Plaintiff references was a threat Defendants allegedly made to not sell a customer any of its products if it bought calsil from Plaintiff.  *See* ECF No. 1 ¶ 112.  The last allegedly disparaging comment occurred in October 2018.  *Id.* ¶¶ 94-96.

709 F. Supp. 2d 821, 837 (C.D. Cal. 2010); *see also Emulex Corp. v. Broadcom Corp.*, No. SACV 09-01310 JVS(RNBX), 2010 WL 11595718, at *6 (C.D. Cal. June 7, 2010) (finding three statements made over a seven-month period did constitute a prolonged period of time).

Finally, the sixth factor is not satisfied because Defendants' alleged comments could have been easily neutralized.  Plaintiff tested BEC calsil before it signed its exclusive agreement with BEC.  ECF No. 1 ¶¶ 32-34.  The test showed that BEC's calsil "met or exceed all of the ASTM allowable thresholds." *Id.* ¶ 33.  After BEC began producing Plaintiff's calsil, Plaintiff, as part of its marketing launch of TPSX-12™, tested TPSX-12™ alongside Defendants' calsil. *Id.* ¶ 38.  These tests confirmed TPSX-12™ "meets or exceeds all physical property requirements of ASTM C533 type I, the industry-standard specification for calsil insulation," outperformed Defendants' calsil in some categories, and did not contain asbestos. *Id.* ¶¶ 40-43.  In summary, Plaintiff had two different testing results that could have been used to neutralize Defendants' alleged claims, and Plaintiffs intended to use the test results to market its calsil to the very customers to whom Defendants allegedly talked.

Accordingly, the Complaint fails to state a monopoly claim based on product disparagement.

## II.   Lanham Act Claim

Plaintiff next claims that Defendants engaged in false advertising in violation of Section 43(a) of the Lanham Act.  To state a false-advertising claim under this provision, a plaintiff must allege: "(1) that [the] defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the

plaintiff." *Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 784 (10th Cir. 2016) (internal quotation marks omitted). Each of these elements must be satisfied. *Id.* Only the made "in connection with the commercial advertising or promotion of its product" aspect of the first element is in dispute.

For misrepresentations to constitute "commercial advertising" or product promotion, the misrepresentations must, among other things not relevant here, "be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1274 (10th Cir. 2000) (quoting *Gordon & Breach Science Publishers, S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994)). "[T]he extent of distribution necessary to constitute commercial advertising or promotion in a particular case may be an elastic factor, so that a relatively modest amount of activity may be sufficient in the context of a particular case." *Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 1005 (10th Cir. 2002). Nonetheless, "*some* level of *public* dissemination of information" is required. *Id.*

Plaintiff relies on five statements to support its Lanham Act claim. ECF No. 24 at 23-24. Four of those statements are the same statements Plaintiff relies on for its trade disparagement argument. Those four statements included a sales representative telling two Wyoming contractors that Plaintiff's calsil "'may have asbestos'" in spring 2018; Meyer hypothesizing to one customer in September 2018 and another in October 2018 that Plaintiff's calsil may not meet "specifications"; and someone claiming Plaintiff's calsil is "'substandard.'" ECF No. 1 ¶¶ 88-89, 96, 99. The fifth statement, also made by Meyer to the October 2018 customer, was that Plaintiff's calsil was "Chinese." *Id.* ¶ 96.

Defendants argue these statements do not amount to "commercial advertising or promotion of its product," because the comments were isolated and sporadic, and there is no allegation that the comments were widely publicized within the calsil industry.  ECF No. 18 at 20.   Plaintiff contends that because the Complaint alleges there are five major distributors, and two of these distributors heard the statements, the statements "are actually virtually comprehensive in covering the key distribution buyers in the market."  ECF No. 24 at 24.  Plaintiff also implies that its Lanham Act claim should not be dismissed, because additional discovery may reveal even more misrepresentations made by Defendants.  *Id.*

Regarding Plaintiff's contention that the false advertising was sufficiently disseminated, the Complaint fails for a lack of specificity.  Plaintiff requests the Court to combine the allegation that there are "essentially five major mechanical distributors that dominate most regions of the county," with the allegations that Meyer told two "customers" that Plaintiff's calsil was substandard, and one "customer" that Plaintiff's calsil was "Chinese."   This combination, according to Plaintiff, could lead to the inference that forty percent of all calsil customers were subjected to false advertising.  The problem with this request is that the Complaint says there are "*essentially*" five calsil purchasers who "dominate *most* regions of the country," rather than "only" five customers who "dominate *all* regions of the country."  ECF No. 1 ¶ 17 (emphasis added).  As worded, the Complaint implies that there are more than five calsil purchases.  The Complaint also does not say that the two customers to whom Meyer spoke are also two of the five major distributors.  To reach Plaintiff's desired conclusion, therefore, the Court would have to make two inferences.  The first inference would have to be that there are only five distributors in the entire calsil market.  The second inference would have to be that the two customers Meyer spoke to were among the five calsil distributors.  Based on the lack of specificity in the Complaint, this double-

layered inference is unreasonable.  *See, e.g.*, *Globe Cotyarn Pvt. Ltd. v. Next Creations Holdings LLC*, No. 18 CIV. 04208 (ER), 2019 WL 498303, at *5 (S.D.N.Y. Feb. 8, 2019) ("[T]hree messages sent to two customers in a marketplace of an unidentified size are not sufficiently disseminated to the relevant purchasing public to fall within the Lanham Act's coverage.").  The statements to the two Wyoming contractors fare no better because the Complaint does not allege any facts regarding the number of contractors in the calsil market.

Accordingly, the Complaint fails to state a claim under the Lanham Act.

## III.    Leave to Amend

The Tenth Circuit has instructed that "[g]ranting [a] motion to dismiss  is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quoting *Duran v. Carris,* 238 F.3d 1268, 1270 (10th Cir. 2001)).  Typically, "[a] dismissal ... is appropriate where a complaint fails to state a claim ... and granting leave to amend would be futile."  *Kenney v. AG Equip. Co.*, 462 F. App'x 841, 843–44 (10th Cir. 2012)  (quoting *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006)); *see also Hall v. Bellmon*, 935 F.2d 1106, 1109–10 (10th Cir. 1991) ("Although dismissals under Rule 12(b)(6) typically follow a motion to dismiss, *giving plaintiff notice and opportunity to amend his complaint*, a court may dismiss sua sponte when it is patently obvious that the plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile.") (emphasis added).  Here, the Court finds that based on the complaint, briefing, and oral argument, one or more claims may be stated with sufficient particularity and, therefore, justice requires that leave to amend be granted to the Plaintiff.  Should Plaintiff choose to file an Amended Complaint, it shall do so on or before July 24, 2019.

## **CONCLUSION**

In sum, after reviewing the Complaint, the parties' briefing, and the oral argument, the Court concludes that the Plaintiff has stated only possible claims for relief, rather than plausible ones.   Accordingly, for the reasons stated herein, Plaintiff has failed to state a claim for monopolization in violation of Section 2 of the Sherman Act; tying in violation Sections 1 and 2 of the Sherman Act; and false advertising in violation of Section 43(a) of the Lanham Act. Defendants' Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim Upon Which Relief can be Granted (ECF No. 18) is therefore **granted** and Plaintiff's Complaint (ECF No. 1) is **dismissed**.

The Court nonetheless concludes that the Complaint should be **dismissed without prejudice** because Plaintiff may be able to state one or more claims for relief through more specific allegations.   Plaintiff is granted leave to file an Amended Complaint no later than **Wednesday, July 24, 2019**.

Dated at Denver, Colorado, this 3rd of July, 2019.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge