## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:19-cv-00872-MEH**

CHASE MANUFACTURING, INC., d/b/a
THERMAL PIPE SHIELDS,

<em>Plaintiff</em>,

v.

JOHNS MANVILLE CORPORATION,

<em>Defendant.</em>

---

## FIRST AMENDED COMPLAINT WITH JURY DEMAND

---

1.      Chase Manufacturing, Inc., doing business as Thermal Pipe Shields, brings this action against Johns Manville Corporation for its deliberate, systematic, and illegal attempts to maintain its 98% monopoly in a market for calcium silicate thermal insulation; by tying sales of calcium silicate thermal insulation to other Johns Manville industry-standard products that distributors need; by threatening to refuse to supply any customer that buys competing products from Thermal Pipe Shields; by forcing customers to deal exclusively with Johns Manville; by falsely disparaging the quality of Thermal Pipe Shields products (even though they come from the identical factory that Johns Manville had once used); and by attempting to destroy competition in that market by other exclusionary tactics; and, for its complaint, Thermal Pipe Shields alleges as follows:

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction of this action under sections 4 and 16 of

the Clayton Act, 15 USC §§ 15 and 26; 15 USC § 1231, the Lanham Act; and 28 USC § 1331 and

28 USC § 1367. The actions alleged affect interstate commerce.

3.      This Court has personal jurisdiction over Johns Manville Corporation, and venue

is proper in this District under 15 USC § 22, because the defendant's headquarters are located in

Denver, Colorado.

## PARTIES

4.      Chase Manufacturing, Inc. is a privately-held company organized under the laws

of the State of Washington. It is in the business of supplying mechanical insulation products, in-

cluding calcium silicate thermal insulation, for distributors that sell to construction contractors,

and does business under the name Thermal Pipe Shields.

5.      Johns Manville Corporation is organized under the corporate laws of the State of

Delaware, with its head office located in Denver, Colorado. It is a wholly-owned subsidiary of

Berkshire Hathaway. Johns Manville manufactures and sells construction products, including me-

chanical insulation products such as calcium silicate thermal insulation.[1]

## RELEVANT MARKET

6.      This action involves "calsil" insulation pipe and block products. "Calsil" is a short-

hand term for hydrous calcium silicate thermal insulation that is factory formed into flat blocks or

---

[1] Based on Johns Manville's counsel's representation that "as of December 31, 2018, In-
dustrial Insulation Group merged into Johns Manville and no longer exists as a separate legal en-
tity.  Johns Manville is the proper legal entity to be named in the complaint," Thermal Pipe
Shields is not naming Industrial Insulation Group as a defendant in this First Amended Com-
plaint.

curved sections designed to encapsulate pipes, equipment or tanks. It is manufactured in accordance with ASTM C533 Type I. (ASTM International, whose former name was the American Society for Testing and Materials, is an international standards organization that publishes material specifications widely used by engineers to qualify generic product types, as opposed to specifying a brand-name product.)

7.      Calsil replaced asbestos as the industry standard for mechanical insulation in mid-high temperature applications starting around 1973. The applications include piping, tanks, and other equipment that operate at temperatures up to 1200° Fahrenheit within large industrial facilities, such as oil refineries, chemical and power generation plants and pulp and paper mills.

8.      Because of its unique physical properties, calsil is extremely heat resistant and provides very high compressive strength to resist damage and physical abuse much better than other products. Its extreme durability provides long service life by preventing crushing due to on-site foot traffic and abuse; it is inherently non-combustible; it generates no smoke when exposed to flame, which provides passive fire protection; it contains integral corrosion-inhibiting chemistry; and it offers low thermal conductivity to prevent heat loss and reduce the surface temperature of insulated surfaces, characteristics that protect workers from burn injuries in the plant. These special attributes of calsil make it the essential insulation for mid- to high-temperature piping and equipment because there are no reasonably interchangeable substitutes that provide the same combination of physical properties with the accompanying benefits that meet the requirements of ASTM C533 Type I: Standard Specification for Calcium Silicate Block and Pipe Thermal Insulation.

9.      Calsil's performance characteristics for heat resistance, corrosion resistance, abuse resistance, and fire resistance make it exceptionally and uniquely suitable for industrial applications where heat-resistant insulation is required such as in process areas where there is significant risk of corrosion under insulation (CUI) or fire outbreak; or locations within 16 feet of ground level, where there is a greater likelihood that workers may stand or walk on the piping or equipment, and where, therefore, there is a greater need for the high compressive strength of the product.

10.      As a result, based on performance and life cycle cost, industrial project engineers specify calsil because there are no reasonably interchangeable substitutes that meet all of these specifications.

11.      Based on all these factors, calsil is a distinct product market.

12.      The demand for calsil is national, and calsil is sold to distributors at their respective locations in every market in the United States. As a result, the geographic market for calsil is national.

13.      At one point there were eight United States calsil factories owned by competing manufacturers. But over time, through plant closures and every other manufacturer exiting the market, Johns Manville now owns and operates the only two remaining calsil factories in North America.

14.      Johns Manville now has a market share of at least 98% of the United States calsil market, which is believed to be about $50 million per year.

15.      To be used and accepted by customers, calsil must meet North American market requirements, meaning it must meet or exceed all physical properties in accordance with ASTM C533 Type I.

16.     The use of ASTM standards promotes competition by allowing the use of various competing products in a project as long as they meet the ASTM performance specifications. This standard creates a significant barrier to entry. There are only three factories in the entire world that can produce calsil that not only meets all applicable ASTM C533 Type I requirements, but is also produced with North American sizing norms for both length and dimensional tolerances in accordance with ASTM C585: Standard Practice for Inner and Outer Diameters of Thermal Insulation for Nominal Sizes of Pipe and Tubing. Two of those factories are in the United States and both are owned by Johns Manville.  The third is in Shanghai, China, which sells its calsil in North America exclusively to Thermal Pipe Shields, as set forth below.

17.     Both Johns Manville and Thermal Pipe Shields sell mechanical insulation products, including calsil, almost exclusively through distributors.  The only exception to sales through distributors is that Johns Manville makes a very limited portion of its sales directly to certain long-time consumers and that portion is decreasing. There are five major mechanical insulation distributors that dominate the country. These five distributors each operate in at least 28, and in some cases as many as 66, different locations throughout the country. Between them, the five largest distributors operate in 218 locations nationwide. In many areas, there are no alternative sources of the mechanical insulation products that they distribute. Nearly all manufacturers of mechanical insulation products sell through distributors and do not make sales directly to end users.

18.     Each of these five distributors purchases calsil and other mechanical insulation products nationally, and together these five distributors account for approximately 85% of mechanical insulation sales (and, specifically, 85% of calsil, fiberglass pipe insulation, and expanded perlite sales, as discussed below).

19.     The five largest distributors are: Distribution International, Inc. (DI), headquartered in Houston, Texas and which purchases a range of mechanical insulation products in 66 locations in 29 states nationwide; Specialty Products & Insulation Co. (SPI), headquartered in Lancaster, Pennsylvania and which purchases a range of mechanical insulation products in 49 locations in 25 states nationwide; General Insulation Company, Inc. (GI), headquartered in Medford, Massachusetts and which purchases a range of mechanical insulation products in 46 locations in 23 states nationwide; MacArthur Co., headquartered in St. Paul, Minnesota and which purchases a range of mechanical insulation products in 29 locations in 12 states nationwide; and Bay Insulation Supply Inc. (Bay Insulation), headquartered in Green Bay, Wisconsin and which purchases a range of mechanical insulation products in 28 locations in 14 states nationwide.

20.     These and other smaller distributors then resell those products to industrial customers, sometimes referred to as "contractors," or plant operators.  But this downstream link in the chain of commerce is not at issue in this action. At issue are the sales from manufacturers to distributors.

**RELEVANT FACTS**
**Johns Manville's Chinese Calsil**

21.     In 1987, a Chinese government agency, Shanghai Electric Power Co., Ltd. (Shanghai Electric Power), built a calsil factory near Shanghai to provide mechanical insulation materials for a nearby coal-fired power plant and other domestic projects. This factory was originally named Shanghai Electric Power Machine Works (SEPMW).

22.     In 2002, Johns Manville formed a joint venture with The Calsilite Group (Calsilite). This new American company was named Industrial Insulation Group, LLC (IIG). This joint venture consolidated the three remaining United States calsil factories under the IIG umbrella.

23.     In 2004, IIG formed a separate formal joint venture with Shanghai Electric Power. The Chinese calsil factory was then renamed IIG Thermal Insulation (Shanghai) Co., Ltd. but was simply known as "IIG Shanghai."

24.     IIG provided recurring orders. Shanghai Electric Power was responsible for the production of calsil that met all ASTM C533 Type I requirements and United States sizing norms.

25.     In 2012, Johns Manville bought out Calsilite's interests in the joint venture, and IIG became a wholly-owned subsidiary of Johns Manville. As of December 31, 2018, IIG merged into Johns Manville and no longer exists as a separate legal entity.

26.     During this period, Johns Manville bought, imported and sold this Chinese calsil product in the United States under its own brand name, Thermo-12 Gold®.

27.     In 2014, the ownership of the Chinese factory changed, and it was renamed BEC Industrial (Shanghai) Co., Ltd.

28.     At some unknown point, Johns Manville stopped its purchases of calsil from the Chinese factory, and resumed manufacturing all its calsil requirements at the two remaining United States factories in Fruita, Colorado and Ruston, Louisiana.

29.     At this point, Johns Manville was the sole supplier of calsil in the United States.

**Thermal Pipe Shields Tries to Enter the Single Supplier Market**

30.     In 2017, Thermal Pipe Shields was the largest United States purchaser from the Chinese factory, now known as BEC Industrial (Shanghai) Co., Ltd (BEC), for their OEM insulated pipe support products.

31.     BEC then approached Thermal Pipe Shields and offered it the opportunity to become the exclusive United States importer for BEC calsil.

32.     But, in mid-2017, Johns Manville itself was trying to convince Thermal Pipe Shields to buy its calsil from Johns Manville.

33.     To this end, David Shong, the Johns Manville Industrial Insulation Group Western Regional Technical Manager at the time, convinced Thermal Pipe Shields to allow Johns Manville to test a random sample of BEC calsil in the hope that the tests would show that the Johns Manville product was superior.

34.     Thermal Pipe Shields agreed on the condition that it receive a copy of the actual product testing reports.

### Johns Manville's Own Test of BEC Calsil
### Shows that It Meets or Exceeds ASTM Standards

35.     Mr. Shong obtained a random sample of BEC calsil and disclosed to Johns Manville his intention to release the test results to Thermal Pipe Shields as part of his marketing campaign. Johns Manville approved this plan.

36.     Johns Manville tested the random sample of the BEC calsil at the Johns Manville Technical Center in Littleton, Colorado, in accordance with selected ASTM test methods for in-combustibility, friability, chemistry, and thermal conductivity which are contained within the ASTM C533 Type I material standard.

37.     The test results showed that the sample provided by TPS met or exceeded all of the ASTM allowable thresholds.

38.     Based on this successful test by Johns Manville and several other independent, third-party lab results, BEC and Thermal Pipe Shields signed an exclusive supply agreement in March 2018. Thermal Pipe Shields began to market their calsil product under the brand-named designation TPSX-12™.

39.     Technically speaking, the calsil that BEC produces is TPSX-12™ filter pressed, water-resistant calcium silicate pipe and block insulation.

40.     The calsil produced under this agreement is made at the exact same factory that had made the Johns Manville Thermo-12 Gold® product since 2004.

41.     Furthermore, because of the continuity in the staffing of the plant, the management, engineering, and production staff responsible for the manufacture of the Thermo-12 Gold® product during the "IIG Shanghai" joint venture are largely the same management, engineering, and production staff responsible for the manufacture of the Thermal Pipe Shields product.

**American Laboratory Tests Confirm TPSX-12™ Meets ASTM Standards**

42.     As part of the marketing launch for TPSX-12™, TPS independently paid for both their product and the Johns Manville calsil to be tested side-by-side at a well-respected United States third-party laboratory.

43.     The personnel of this independent laboratory have highly-regarded knowledge and experience not only in ASTM testing, but also extensive expertise on the chemistry and production processes of calsil.

44.     The independent laboratory test results confirmed that TPSX-12™ meets or exceeds all physical property requirements of ASTM C533 Type I, the industry-standard specification for calsil insulation.

45.     The full battery of tests included the latest corrosion test method ASTM C1617. These independent results demonstrated that TPSX-12™ is equal in quality and performance to Johns Manville's calsil.

46.     And contrary to Johns Manville's disparaging claims, as related below, TPSX-12™ has never contained asbestos.

47.     Furthermore, independent testing from several laboratories confirmed that several of the TPSX-12™ physical properties outperformed the Johns Manville product. First, TPSX-12™ provides significantly higher compressive strength to resist crushing.

48.     Second, TPSX-12™ provides much higher flexural strength to prevent breakage in transit and handling on the job site. Finally, these two properties combine to provide improved performance during the friability test with dramatically less weight loss by tumbling at 10 minutes. These enhanced physical properties are desirable because of the benefits they offer during transit, storage, installation, and on-site performance in industrial plants.

49.     TPSX-12™ is the strongest available water-resistant Type I calsil insulation in the world. It robustly supports metal cladding, which acts as the primary weather barrier to keep the insulation dry, and prevents on-site system damage due to plant workers walking on the insulated pipes. This high-strength element provides long-service life, optimizes process control, and prevents bulk water ingress, which is a main cause of corrosion under insulation (CUI).

**Johns Manville's Legal Department
Threatens Thermal Pipe Shields
and Proposes an Agreement Not to Compete**

50.     In early March 2018, Mr. Shong went to work for Thermal Pipe Shields as Vice-President of Industrial Business Development & Technical Services.

51.     Johns Manville immediately tried to disrupt and destroy Thermal Pipe Shields' potential entry into the market and its attempt to break the Johns Manville monopoly.

52.     To begin with, Johns Manville threatened Mr. Shong.

53.     Immediately after Mr. Shong's hire, in early March 2018, Brian D. Zall, Johns Manville's associate general counsel, wrote to Mr. Shong, delivering a long lecture on business ethics and claiming that Mr. Shong was not entitled to market to or sell to industrial buyers in the United States that were customers of Johns Manville's IIG.

54.     Mr. Zall took the position, presumably with the authority, approval, and backing of Johns Manville itself, (a) that unless Thermal Pipe Shields publicly listed the name of a customer on its website, then Thermal Pipe Shields (or Mr. Shong) was not allowed to market to or sell to that customer if it were also a Johns Manville customer; and (b) that therefore, engaging in competition with Johns Manville for these customers was a violation of Mr. Shong's employment commitments to Johns Manville.

55.     Specifically, Mr. Zall claimed that if Mr. Shong were to contact any "JM/IIG customers" who were not currently Thermal Pipe Shield customers and listed on the Thermal Pipe Shields website, then that would represent the illegal use of Johns Manville/IIG "confidential customer information."

56.     Mr. Zall proposed that Mr. Shong and Thermal Pipe Shields agree that Thermal Pipe Shields would not market to Johns Manville's customers.

57.     This proposal, offered by the Johns Manville associate general counsel, was essentially an invitation by one horizontal competitor to reach an agreement with another competitor not to compete for its own customers, an action that would be a per se violation of section 1 of the Sherman Act.

58.     In fact, the names of major industrial distributors (as well as other customers) were and are a matter of public knowledge. Their names all appear in published industry directories

such as NIA, WICA, SWICA, MICA, TIAA, and TIAC, among others. As a result, the identity of these distributors or customers could never in good faith be considered "proprietary" information belonging to Johns Manville.

59.     Furthermore, both Mr. Shong's and Thermal Pipe Shields' knowledge of these customers were a matter of professional and personal contacts, and involvement in the industry built up over many years, and was not in any way "proprietary information" resulting from Mr. Shong's employment at Johns Manville.

60.     Mr. Shong fully intended to, and did, live up to every legal and moral responsibility under the Johns Manville employment agreement.

61.     But absolutely nothing in any of Mr. Shong's employment obligations with Johns Manville prevented him from working for a living in the industry in which he had worked for years, and using his general skill and knowledge to support his family.

62.     Johns Manville's corporate headquarters is located in Denver, Colorado.

63.     Mr. Shong's right to work in his own field is explicitly protected by Colorado law (as well as the public policy labor laws of many other states). For example, Colorado Statutes, Labor and Industry, C.R.S § 8-2-113, reads:

> **Unlawful to intimidate worker—agreement not to compete**
>
> It shall be unlawful to use force, threats, or other means of intimidation to prevent any person from engaging in any lawful occupation at any place he sees fit.

64.     Johns Manville's threats were knowingly and intentionally designed to intimidate Mr. Shong, as well as Thermal Pipe Shields, and essentially induce them to agree not to compete

for any existing Johns Manville customers, ensuring that Johns Manville would maintain and per-petuate its monopoly in calsil.

65.     Later in March 2018, Thermal Pipe Shields received a second letter from the Johns Manville legal department. This time, Cynthia L. Ryan, the Johns Manville general counsel, wrote, claiming that Mr. Shong had violated his obligation to maintain the confidentiality of proprietary technical analyses conducted by Johns Manville.

66.     Specifically, Ms. Ryan claimed that "we have reason to believe that Mr. Shong may have improperly taken JM confidential and proprietary material and disclosed it to Thermal Pipe Shields." This referred to the disclosure of the test results mentioned above.

67.     Ms. Ryan claimed that Johns Manville was conducting a "forensic analysis" of Mr. Shong's electronic devices, but that "one example" of Mr. Shong's "apparent misappropriation" was the disclosure of the "ASTM C355 Pipe Thermal Conductivity: Delta T VS Ambient >200F" values, which, the general counsel claimed, Mr. Shong had sent to Thermal Pipe Shields "without proper authorization."

68.     Once again, the Johns Manville charges were without truth or substance. Despite the reference in the accusatory letter to "several examples" of disclosure "without proper authori-zation," in fact, the ASTM C335 thermal data was the only "example" ever produced. And the answer to that false charge was that *Mr. Shong had disclosed the test results of the BEC calsil product provided by Thermal Pipe Shields with the knowledge of Johns Manville, as part of his attempt, when he was employed at Johns Manville, to convince Thermal Pipe Shields that their Chinese product was inferior, and that Thermal Pipe Shields should buy Johns Manville calsil instead.*

69.     In short, the disclosure of the test results was made with Johns Manville's knowledge, and as part of Mr. Shong's good-faith attempt to generate sales *for* Johns Manville, not to divert sales *from* Johns Manville.

70.     Had Johns Manville performed even a superficial review of its own records, it would and should have known this. Instead, it chose to make false, defamatory, and intimidating threats to Thermal Pipe Shields and Mr. Shong.

71.     In the same letter from Ms. Ryan, she stated that "JM welcomes fair competition in the pipe insulation market."

72.     In response to Ms. Ryan's letter, Thermal Pipe Shields counsel explained why Johns Manville's charges were unsubstantiated.

73.     Then, in response to Ms. Ryan's "fair competition" claim, Thermal Pipe Shields counsel informed Johns Manville that Thermal Pipe Shields had heard in the marketplace that Johns Manville representatives had tried to unfairly influence, threaten and intimidate Thermal Pipe Shield's potential customers using the following tactics:

   a.   by making threats to tie the sales of other Johns Manville products to the Johns Manville calsil product;

   b.   by making threats to refuse to supply its calsil to any customers who buy calsil from Thermal Pipe Shields;

   c.   by making threats to adopt a pricing structure that would essentially make it economically unsound for any customers to buy from Thermal Pipe Shields;

   d.   by impugning the quality of the Thermal Pipe Shields' Chinese product without substantiation; and

   e.   by making threats that suggest that the Chinese product could be blacklisted in commercial and regulatory specifications.

74.    Thermal Pipe Shields' counsel asked the Johns Manville's general counsel to investigate these charges and report back.

75.    Ms. Ryan ignored that request and never answered.

76.    In fact, Thermal Pipe Shields' charges were true, as shown by the following exclusionary conduct undertaken by senior Johns Manville executives.

**Johns Manville Ties Calsil to Its Other Products to Capture
Customers Who Wish to Purchase Calsil from Thermal Pipe Shields**

77.    The tying of two separate products is unlawful when (1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the other; (3) the seller has sufficient economic power in the market for the tying product to be able to restrain trade in the market for the tied product; and (4) a not insubstantial amount of commerce in the market for the tied product is affected.

78.    Calsil makes up less than 2% of Johns Manville's total sales, but calsil distributors must carry the other industry-standard Johns Manville products because their customers require and demand those products.

79.    Johns Manville supplies a range of industry-essential construction products besides calsil, some of which are widely recognized for their industry-leading quality, and which are essential to the inventory of construction supply distributors. As examples, Johns Manville is also a major supplier of fiberglass pipe insulation, fiberglass duct wrap, fiberglass HVAC board (together, "fiberglass products"), PVC jacketing, ASJ jacketing, expanded perlite pipe and block, mineral wool pipe and board, calcium silicate fireproofing board, high temperature cements, mi-

croporous thin blanket and aerogel sub-sea insulations. These products constitute most other distinct types of mechanical insulations commonly specified and purchased throughout the United States.

80.     Before Thermal Pipe Shields' entry, Johns Manville was the only supplier of calsil, and every mechanical insulation distributor (large or small) that sells calsil also sells other Johns Manville products. And every mechanical insulation distributor (large or small) sold calsil bought it from Johns Manville.

81.     All mechanical insulation distributors purchase and resell at least two different brands of every type of product that they distribute (although they may not stock multiple brands at each of their locations). The only exception is calsil; Johns Manville's calsil is often the only brand that is stocked.  Historically, this was because Johns Manville's calsil was the only product on the market, but now it continues to be the case in great measure because of Johns Manville's exclusionary conduct.  (The one exception among the five largest distributors is Bay Insulation, which stocks both brands of calsil in two of its 28 locations, both in California.)

**Fiberglass Pipe Insulation**

82.     Further, because contractors want to buy most of their mechanical insulation needs (including calsil, fiberglass pipe insulation, and expanded perlite) from distributors in one single transaction in order to leverage incentive rebate programs as well as convenience, distributors must be able to provide the full range of products that their customers require. If a distributor is unable to supply even just one product that a customer requires, that distributor would lose sales of that and other products to the customer, who would buy its products in one transaction from a competing distributor that is able to act as a "one-stop shop"

83.     One such necessary product for every mechanical insulation distributor in the country is fiberglass pipe insulation. The Johns Manville product is called Micro-Lok® and is generally recognized as the best fiberglass pipe insulation in the market.

84.     Johns Manville's fiberglass pipe insulation amounts to over $2 billion of sales per year, out of Johns Manville's total sales of over $3 billion.

85.     Johns Manville is one of only three manufacturers of fiberglass pipe insulation in the United States and it is believed to have at least a 60% share of the fiberglass pipe insulation market. Johns Manville has market power nationally for this product because, among other reasons, it is recognized as the best fiberglass pipe insulation product and they have more than half of the market share. Distributors large and small widely consider it an essential product. The other two manufacturers are Owens Corning and Knauf Insulation. The fiberglass pipe insulation market is national in that distributors from all over the country purchase their product from these three manufacturers.

86.     All three manufacturers sell fiberglass pipe insulation to large, national distributors and smaller, independent distributors. Sales to the five largest national distributors account for approximately 85% of all fiberglass pipe insulation sold by the three manufacturers.

87.     The remaining 15% of fiberglass pipe insulation sales are made to approximately ten or fewer smaller, independent distributors that tend to distribute only to smaller, independent distributors with one or more locations that focus on a concentrated regional market.  Therefore, in many areas, there is no independent distributor and contractors' only source of fiberglass pipe insulation is one of the five large, national distributors.

88.     These five distributors purchase fiberglass pipe insulation throughout the United States in a total of 218 locations. Each of these five distributors purchases fiberglass pipe insulation in at least 28 different locations, and some purchase fiberglass pipe insulation in as many as 66 locations.

89.     The smaller, independent distributors purchase fiberglass pipe insulation for their respective regional markets, which are spread out across the United States.

90.     Because fiberglass pipe insulation is so widely used in so many commercial applications—it is used in every state in the United States—and is considered a "must-have" product, end-users' demand for it exceeds the three suppliers' capacity to produce it.

91.     Consequently, distributors constantly struggle to procure adequate supply of fiberglass pipe insulation to meet customers' demand and distributors' survival depends on manufacturers' ability and willingness to supply it to them. Losing supply and therefore being unable to meet contractors' demand would be catastrophic to any distributor.  Further, because of marketplace dynamics and the important role of manufacturer-distributor relationships, it is not easy for distributors to commence purchases from a new manufacturer quickly or efficiently.

92.     Neither is it easy or practical for a new manufacturer to enter the market due to the high costs associated with, and technical expertise required for, building a plant, manufacturing product, establishing relationships with customers, and shipping product.

93.     Johns Manville has threatened to cut off sales or extend lead times of Micro-Lok® fiberglass pipe insulation to distributors (both large or small) that buy calsil from Thermal Pipe Shields.

94.     Because, as stated previously, calsil represents less than 2% of Johns Manville's annual sales, but fiberglass pipe insulation represents over 67%, Johns Manville's threat makes no economic sense except as a means to monopolize the calsil market. It would be more logical to use calsil sales to boost fiberglass sales because the fiberglass market is more lucrative, but Johns Manville is doing the opposite—using fiberglass sales to boost calsil sales. If a distributor did not cave in to this demand, Johns Manville would have the power and stated incentive to withhold the relatively large volume (in dollar value) of fiberglass pipe insulation sales as a sanction for not purchasing the relatively small volume (in dollar value) of calsil.

95.     To make such a threat, Johns Manville had to be confident that it had enough economic power in the fiberglass pipe insulation market that it could tie calsil sales to fiberglass pipe insulation sales without risk of any customer calling its bluff. Johns Manville, in fact, has significant economic and market power in the market for fiberglass pipe insulation. It has economic and market power because distributors must carry its product to offer to their customers because it is the leading product in the market and its customers demand it. It has economic and market power because there is insufficient supply to meet demand for fiberglass pipe insulation and Johns Manville is one of only three suppliers in this market. So if Johns Manville withholds its product from a distributor, that distributor will not be able to meet the volume needs of its customers as it is not able to obtain enough product (or be able to buy at all) from other manufacturers in sufficient time to satisfy demand from its customers. Finally, Johns Manville has a share of the fiberglass pipe insulation market which is believed to be not less than 60%, which is above the standard threshold for market power, even absent supply constraints and distributor needs to carry certain or multiple

products in a market. So Johns Manville has market power in the market for fiberglass pipe insulation and has actually exercised that market power by tying distributor purchases of calsil from Johns Manville only to the purchase of its fiberglass pipe insulation.

### Expanded Perlite

96.     Johns Manville is also one of only two suppliers of expanded perlite pipe and block insulation, sold under the brand name Sproule WR-1200®, which is used throughout the country, and in particular, in the Gulf Coast region and the Southeastern United States.

97.     Johns Manville has a share of the perlite market which is believed to be not less than 50%, which is above the standard threshold for market power, even absent supply constraints and distributor needs to carry certain or multiple products in a market.

98.     Expanded perlite is used throughout the entire country—in increasing quantities outside the Gulf Coast and Southeastern United States regions—for applications where conditions (such as humidity) or compatibility (in particular, with stainless steel piping) command its use.

99.     Furthermore, many large corporations, including virtually every significant oil and gas company—such as Exxon Mobil, Marathon, and BP—and global engineering, procurement, and construction firms—such as CB&I, Fluor, and Jacob—operate centralized corporate engineering offices in the Gulf Coast region.  These corporations specify the use of expanded perlite there because of the local humidity, but also have incorporated its use into their corporate specifications such that expanded perlite is used uniformly in those corporations' operations throughout the entire country and the world.

100.     For certain applications—in particular, for use in humid or wet climates or in plants using large amounts of high-cost stainless steel piping—expanded perlite is a must-have product

with no reasonable substitute due to its durable, water-shedding ability and chemistry that prevents external stress corrosion cracking on austenitic stainless steel. Even so, the size of the national calsil market exceeds the size of the national market for expanded perlite by a ratio of approximately three to one.

101.    Johns Manville is one of only two North American suppliers of expanded perlite pipe and block insulation produced in accordance with ASTM C612 specifications.  The other is Howred Corporation, a United States company which operates a single manufacturing plant in Nuevo Laredo, Mexico.

102.    Both suppliers of expanded perlite sell to the same national and smaller, independent distributors that distribute calsil and fiberglass pipe insulation. As with calsil and fiberglass pipe insulation, the five largest distributors account for approximately 85% of expanded perlite sales, with the remaining 15% of sales being made to smaller, independent distributors.

103.    Where the use of expanded perlite is most widespread, the distributors stock all three products (calsil, fiberglass pipe insulation, and expanded perlite). In other regions, distributors may stock calsil and fiberglass pipe insulation, but will order any specified product as needed that is not stocked in inventory, such as expanded perlite, in order to meet a customer's demand for a specific project. Thus, because expanded perlite market is used throughout the country, the geographic market for the purchase of perlite from distributors is national in scope. The expanded perlite market is national in that distributors from all over the country purchase their product from these two manufacturers.

104.     As with fiberglass pipe insulation, the market for expanded perlite is capacity con-
strained and distributors struggle to meet their customers' demand with supply from both manu-
facturers.

105.     At least three different distributors have reported to Thermal Pipe Shields that they
risk losing sales of expanded perlite to their customers if Johns Manville cuts off their supply.
Specifically, Bay Insulation, one of the five largest national distributors, has told Thermal Pipe
Shields that it cannot afford to lose Johns Manville's expanded perlite because they need to be able
to buy from both suppliers in order to satisfy customers' demand. Bay Insulation told Thermal
Pipe Shields that the market is so capacity constrained that neither supplier could supply the entire
market demand on its own.

106.     Loss of supply from either manufacturer would be devastating to any mechanical
insulation distributor.  Nearly every industrial plant in the United States uses multiple distinct types
of mechanical insulation, including calsil, fiberglass pipe insulation, expanded perlite, and mineral
wool.  Engineers specify each product by application, service temperature, piping metallurgy,
abuse conditions, life cycle cost, and other fit-for-service requirements.  For these reasons, all
distributors must have access to purchase all commonly specified materials from multiple suppli-
ers.

107.     Johns Manville has threatened to cut off sales of expanded perlite to any distributor
that buys calsil from Thermal Pipe Shields

108.     Such a threat has real consequences to distributors' abilities to compete. As an il-
lustration, in April 2019, Chad Meyer, Johns Manville Industrial Insulation Group Midwest Re-
gional Sales Manager, did in fact refuse to sell both Johns Manville calsil and expanded perlite to

distributor 4 State Supply's Wichita, Kansas location after 4 State Supply purchased TPSX-12™. This punitive action by Johns Manville has destroyed 4 State Supply's ability to compete in the Wichita market (where demand is high), because it must pay additional costs and take additional time to obtain the products from one of its other two locations.

109.    4 State Supply's Wichita location has previously accounted for most of that distributor's calsil sales and operates in a market with high demand for both calsil and expanded perlite.

110.    Johns Manville has threatened multiple other distributors to cut off sales, extend lead times or alter rebate programs for other Johns Manville mechanical insulation product lines—in addition to fiberglass pipe insulation and expanded perlite—many other distinct types of mechanical insulations commonly specified and purchased throughout the United States (such as mineral wool pipe and board, calcium silicate fireproofing board, high temperature cements, microporous thin blanket and aerogel sub-sea insulations) as a punitive measure to any distributor that buys calsil from Thermal Pipe Shields.

111.    By threatening to withhold its other essential products unless customers also buy calsil exclusively from Johns Manville, Johns Manville can—and has sought to—maintain its monopoly in the calsil market.

112.    After Johns Manville's threats to withhold essential products that its customers needed, as related below, Johns Manville continued to tie its sale of calsil to its sale of fiberglass pipe insulation and expanded perlite in a series of exclusionary actions designed to intimidate and threaten customers who wanted to benefit from the competition in calsil that Thermal Pipe Shields was trying to offer.

113.    As an illustration of Johns Manville's threats, Mark Hernandez, the El Paso, Texas Business Manager of the largest national distributor, DI, called his district manager, for "permission" to seek a price quote for TPSX-12™. Mr. Hernandez was told that if he bought calsil from Thermal Pipe Shields, then DI would risk losing their ability to buy *any* products (including fiberglass pipe insulation and expanded perlite) from Johns Manville, who had threatened it. Consequently, Mr. Hernandez was told he was not allowed to quote or sell TPSX-12™ because DI did not feel it was worth losing Johns Manville's entire vast product line just to be able to save money on its calsil orders.

114.    As a result of this threat, DI's El Paso branch did not purchase any calsil from Thermal Pipe Shields.  In fact, none of the 66 DI locations anywhere in the United States has agreed to stock TPSX-12™ calsil.

115.    Consequently, Johns Manville effectively restrained competition from Thermal Pipe Shields with the effects of limiting consumer choice of suppliers, raising prices, and reducing output.

116.    In mid-January 2019, Thermal Pipe Shields learned that Mr. Meyer and Eric Alley, Johns Manville Industrial Insulation Group's Industrial and Canadian Sales Leader, told Kirk Chalmers, Operations Leader at APi Distribution (APi) in Minnesota, that if they continued to buy calsil from Thermal Pipe Shields, it would endanger their ability to purchase any Johns Manville products—including, most notably, fiberglass pipe insulation and expanded perlite, which they needed to serve their customers.

117.   APi had purchased two containers of TPSX-12™ for their branches in Billings, Montana and Arden Hills, Minnesota but has not purchased any more calsil from Thermal Pipe Shields because of this threat from Johns Manville by Mr. Meyer and Mr. Alley.

118.   Consequently, Johns Manville effectively restrained competition from Thermal Pipe Shields with the effects of limiting consumer choice of suppliers, raising prices, and reducing output.

119.   On information and belief, Johns Manville regularly sells to customers who buy other mechanical insulation product types from competing manufacturers such as mineral wool, fiberglass pipe insulation, expanded perlite, fireproofing board, adhesives, thin blankets and PVC jacketing products. To Thermal Pipe Shields' knowledge, Thermal Pipe Shields is the only supplier that Johns Manville has blackballed, with threats that customers will no longer be able to buy Johns Manville calsil, and that lead times or rebates for other products could be adversely harmed if they buy calsil from Thermal Pipe Shields.

### Johns Manville Engages in Other Exclusionary Conduct in Addition to Tying Calsil Sales to Sales of Fiberglass Pipe Insulation and Expanded Perlite

120.   A seller's monopolization is unlawful when there is (1) monopoly power, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

121.   The alternative to a superior product, business acumen, or historic accident is exclusionary conduct, which can take many forms including, among others, tying, refusal to supply a customer who purchases from a seller's competitor, exclusive dealing, and other improper business practices.

122.    Johns Manville has engaged in each of these forms of exclusionary conduct, which individually and taken together as a multi-pronged attack, were intended to, and did, prevent Thermal Pipe Shields from competing more successfully in the market for calsil.

### Johns Manville Refuses to Supply
### Its Calsil to Customers Who Buy from Thermal Pipe Shields

123.    In addition to tying its sale of calsil to sales of fiberglass pipe insulation and expanded perlite to extend its monopoly in the calsil market, Johns Manville also threatened to refuse to supply its calsil to distributors who purchase calsil from Thermal Pipe Shields.

124.    While it is of course true that a supplier may in most instances choose which firms it does business with, it may not withhold supply for the purpose of acquiring or maintaining a monopoly.  But Johns Manville did exactly that.

125.    To be clear, Thermal Pipe Shields is not alleging that Johns Manville refused to deal with Thermal Pipe Shields, which could invoke the refusal to deal with a rival antitrust doctrine. Instead, Thermal Pipe Shields, among other claims, is alleging that Johns Manville, who has monopoly power in the calsil market, is refusing to supply calsil to any distributors (large and small) that also purchase calsil from Thermal Pipe Shields. Johns Manville's refusal to supply calsil to distributors is an effective threat that allows Johns Manville to maintain or extend its calsil monopoly because distributors must be able to offer calsil to their purchasers in order for the distributor to effectively compete. So a rational distributor, faced with the threat of losing Johns Manville calsil if they purchase Thermal Pipe Shields calsil will decline to purchase Thermal Pipe Shields calsil as they have no choice but to carry the calsil that has 98 percent share in the market. Their customers demand it. These same distributors, however, would prefer to purchase and sell both calsil products as the competition would lower prices, improve quality, and allow them to

offer more choice to their customers. So the direct result of Johns Manville's threats are that dis-
tributors will carry only Johns Manville calsil, which will allow Johns Manville to maintain or
increase its monopoly share of 98 percent. Thermal Pipe Shields is, by these threats, effectively
precluded from competing in the market for calsil.

126.    As Mr. Meyer and Mr. Alley told Mr. Chalmers, "Johns Manville is not interested
in supporting distributors who support our competition."

127.    For one example, in April 2018, Jack Bittner, Johns Manville Industrial Insulation
Group's Senior Industrial Product Manager, threatened Kyle Romney, Mountain States Regional
Sales Manager with SPI (and former Johns Manville employee), warning him that "You don't
want to be the first to switch [to Thermal Pipe Shields calsil]. We [Johns Manville] have a plan."

128.    Responding to this threat, SPI, the second largest mechanical insulation distributor
in the United States with 49 locations, did not purchase any calsil from Thermal Pipe Shields and
was forced to acquire it only from the only remaining competitor in the market, Johns Manville.

129.    Consequently, Johns Manville effectively restrained competition from Thermal
Pipe Shields with the effects of limiting consumer choice of suppliers, raising prices, and reducing
output.

130.    In early January 2019, Johns Manville told several distributor customers that, if
they bought calsil from Thermal Pipe Shields, Johns Manville would refuse to sell them the other
essential Johns Manville products—such as fiberglass pipe insulation and expanded perlite—that
the distributors needed to stay in business as well as, of course, Johns Manville's calsil.

131.    The first known time Johns Manville threatened to refuse to supply calsil to a dis-
tributor that bought calsil from Thermal Pipe Shields, Johns Manville's only competitor, occurred

in late 2017 (before Thermal Pipe Shields publicly announced its agreement to exclusively import calsil from BEC), when Hal Shapiro, Johns Manville Industrial Insulation Group Senior Product Manager, told Mike Eggers, former Director of Strategic Sourcing Manager for DI (Johns Manville's largest customer), who had shown interest in buying calsil from BEC after they met at the IEX tradeshow in Houston, Texas, that Johns Manville had received "approval from legal" to refuse to sell them any Johns Manville calsil product if they bought calsil from BEC or anyone else.

132.    Mr. Shapiro even volunteered that the Johns Manville legal "justification" for this behavior was that, since Johns Manville's monopoly would be broken, they no longer had to play by the rules surrounding their "very high market share paradigm."

133.    Because of this threat, DI did not purchase any calsil from Thermal Pipe Shields and was forced to acquire it only from the only remaining competitor in the market, Johns Manville.

134.    Consequently, Johns Manville effectively restrained competition from Thermal Pipe Shields with the effect of limiting consumer choice of suppliers, raising prices, and reducing output.

135.    Later, in September 2018, Mr. Meyer and Mr. Alley met with another customer, Mr. Chalmers of APi, in Arden Hills, Minnesota.

136.    Mr. Meyer and Mr. Alley told Mr. Chalmers that "We know you have been buying from Thermal Pipe Shields because we track their import records," and then directly threatened APi's future ability to buy calsil from Johns Manville if it continued to buy Thermal Pipe Shields calsil.

137.    Because of this threat, Mr. Chalmers did not buy any more calsil from Thermal Pipe Shields and was forced to acquire it only from the only remaining competitor in the market, Johns Manville.

138.    Consequently, Johns Manville effectively restrained competition from Thermal Pipe Shields with the effects of limiting consumer choice of suppliers, raising prices, and reducing output.

139.    Johns Manville continued its attempts to deter or threaten current and potential Thermal Pipe Shields customers. In October 2018, Mr. Meyer approached Joe Guest, a branch manager of distributor 4 State Supply in Omaha, Nebraska at the Midwest Insulation Contractor Association trade show, and made threats that Johns Manville might stop selling to them unless the customer stopped buying Thermal Pipe Shields calsil.

140.    Mr. Meyer also warned Mr. Guest that Johns Manville was "monitoring" import records and knew what Thermal Pipe Shields was doing.

141.    Consequently, Johns Manville effectively restrained competition from Thermal Pipe Shields with the effects of limiting consumer choice of suppliers, raising prices, and reducing output.

142.    In January 2019, Mr. Alley informed both Mark Duppler, Vice President (retired as of July 2019), and Russ Huff, Western Region Manager, of Bay Insulation that, if Bay Insulation continued to stock Thermal Pipe Shields calsil in the two California locations where it had already done so, Johns Manville would not only stop selling them calsil in those specific locations but would also refuse to sell them calsil at any of their locations anywhere in the country.

143.    Contrary to Johns Manville's false claim, this threat does not "open up the market to Thermal Pipe Shields to sell more," because distributors want alternative sources of supply and, more importantly, will not rely *exclusively* on a new market entrant.  As a result, Johns Manville's threats to cut off customers do not "open up" any markets to Thermal Pipe Shields, but rather foreclose them completely.

144.    Mr. Huff told Mr. Shong that this threat put Bay Insulation's calsil business at great risk and that the only reason Bay Insulation buys calsil from Johns Mansville is because there was no other choice in the market, given the supply that he needs to obtain.  Bay Insulation's Houston, Texas branch buys more calsil and perlite than all of their nationwide locations combined, and it cannot risk losing Johns Manville calsil or perlite in the strongest industrial market in the country.

145.    Consequently, Johns Manville effectively restrained competition from Thermal Pipe Shields with the effects of limiting consumer choice of suppliers, raising prices, and reducing output.

146.    In mid-January 2019, Johns Manville senior executives met with top executives of the second largest distributor, SPI, in Florida and made similar threats. The Johns Manville executives included:

    a.    Mr. Alley: Industrial and Canadian Sales Leader (who replaced Hal Shapiro);

    b.    David Benjamin: Johns Manville Performance Materials—National Accounts Manager;

    c.    Jeff Semkowski: Johns Manville Portfolio Leader—Industrial Insulation; and

    d.    Dave Skelly: Johns Manville General Manager Performance Materials.

147.    During this meeting, these Johns Manville senior executives warned SPI execu-

tives, including Supply Chain Leader Brian Blazek, that:

      a.      Johns Manville would stop selling calsil to the customer in markets where they purchased TPSX-12™;

      b.      Johns Manville would punish the customer by changing their rebates if it purchased TPSX-12™ (the Thermal Pipe Shields calsil product);

      c.      Johns Manville would punish the customer by creating longer lead times for all JM products if it purchased TPSX-12™;

      d.      And, if the customer remained loyal to Johns Manville, then Johns Manville would provide price concessions in markets that compete against TPSX-12™.

148.    Following and because of these threats, SPI, the second largest mechanical insula-

tion distributor in the country, did not purchase any calsil from Thermal Pipe Shields and was

forced to acquire it exclusively from the only remaining competitor in the market, Johns Manville.

149.    Specifically, Mr. Blazek subsequently contacted Mr. Shong by phone and told him

that SPI's corporate office would not allow any of SPI's 49 branches to purchase TPSX-12™.  Mr.

Blazek also told Mr. Shong that he should stop attempting to contact any locations to market

TPSX-12™.  When Mr. Shong asked him if SPI would continue to purchase Thermal Pipe Shields'

pipe support products that are cut from the same TPSX-12™ calsil, Mr. Blazek said that SPI would

absolutely continue buying pipe supports and that Thermal Pipe Shields could continue to market

those commercial products, but for the foreseeable future no SPI branch in North America was

authorized to purchase TPSX-12™.  SPI's willingness to purchase the commercial products fab-

ricated from the same calsil as TPSX-12™ calsil, but not three-foot-long TPSX-12™ itself, indi-

cates that SPI's corporate office that issued that mandate did not do so because of concern about

the quality, service, or pricing of Thermal Pipe Shields' calsil, but rather only because it was compelled to submit to Johns Manville's threats.

150.   Consequently, Johns Manville effectively restrained competition from Thermal Pipe Shields with the effects of limiting consumer choice of suppliers, raising prices, and reducing output.

151.   In February 2019, Carl Prichard, Regional Industrial Sales Manager from GI told Jesse Revesz, Thermal Pipe Shields' Commercial Sales representative, that Johns Manville made explicit threats to keep Thermal Pipe Shields calsil out of the market.  Mr. Prichard told Mr. Revesz that Johns Manville threatened GI's corporate executives that if any GI location purchased TPSX-12™, that location and possible other GI locations as well, will be cut off from Johns Manville's line of calsil.

152.   As a result of Johns Manville's threats, not one of GI's 46 locations has since agreed to evaluate, quote, or buy TPSX-12™ and Thermal Pipe Shields has not even been able to secure a meeting with any GI executive despite numerous attempts since March 2018.

153.   Consequently, Johns Manville effectively restrained competition from Thermal Pipe Shields with the effects of limiting consumer choice of suppliers, raising prices, and reducing output.

### By Causing Customers Not to Purchase Calsil from Thermal Pipe Shields, Johns Manville Forced Customers into *De Facto* Exclusive Dealing Arrangements

154.   Because Thermal Pipe Shields is the only supplier of calsil besides Johns Manville, conduct that prevents customers from purchasing calsil from Thermal Pipe Shields forces those customers into purchasing calsil exclusively from Johns Manville.  This is true for all purchasers of calsil, regardless of size or location.

155.    As stated previously, calsil represents approximately 2% of Johns Manville's $3 billion total sales and that $50 million in sales accounts for 98% of the total market.  But because, as stated previously, TPSX-12™ is of at least equal, if not superior, quality to Johns Manville's calsil, yet priced lower, in a competitive market including these two suppliers, Thermal Pipe Shields could be expected to have a sizable share of the market.

156.    Apart from Johns Manville's exclusionary conduct, there are no reasons that Thermal Pipe Shields should not be able to compete effectively in the manufacture and sale of calsil due to its exclusive supply agreement with BEC and the vast domestic inventories of calsil it has available in stock around the country ready for immediate shipment.  If allowed to compete, Thermal Pipe Shields would sell calsil to the same distributors who purchase calsil from Johns Manville, who would then sell that calsil to contractors in the same volume and manner that they resell Johns Manville's calsil.

157.    Further, because the use of calsil is so prevalent and demand for it is high, Thermal Pipe Shields's unhindered entry into the market could be expected to grow that market, increasing output overall.

158.    Yet Johns Manville's threats and other exclusionary conduct, combined with its 98% market share of the United States calsil market, have foreclosed Thermal Pipe Shields and any other potential competitor from being able to sell calsil to otherwise willing customers throughout the country.  Indeed, 216 of the five largest distributors' combined 218 locations nationwide do not purchase calsil from Thermal Pipe Shields, but all of them would be willing to evaluate it on the merits in a competitive market because TPSX-12™ is of at least equal, if not superior, quality to Johns Manville's calsil, yet is priced lower.

159.    Johns Manville has engaged in the same conduct with respect to the smaller, independent distributors who account for the remaining 15% of calsil purchases in the United States and has likewise foreclosed Thermal Pipe Shields from competing for calsil sales to those distributors. Two examples of smaller distributors who have faced Johns Manville's threats are 4 State Supply and APi, as alleged in this First Amended Complaint.  Prior to discovery, Thermal Pipe Shields would not know of other threats that have not been brought to its attention.

160.    From a dollar and volume standpoint, Johns Manville has foreclosed 100% percent of the market for calsil, having targeted both large, national distributors and smaller, independent ones.  It could be expected that a two-supplier market for these customers' purchases would be split evenly among those suppliers, without accounting for the superior quality and lower cost of Thermal Pipe Shields' product, which likely means that Thermal Pipe Shields would have a greater than 50% market share over time in an unrestrained market.

161.    Thermal Pipe Shields sells calsil exclusively to distributors, and Johns Manville is decreasing the small amount of sales it makes to customers that are not distributors. Direct sales to end users are not a practical alternative channel to compensate for Johns Manville's market control of the industry's distributors.  Selling calsil directly to customers entails significant risk, including extended payment cycles, cash flow issues, problems with material availability, and jeopardizing relationships with distributors who would compete for sales to those same customers, but are necessary to distribute a manufacturer's products to other customers. It is not a practical alternative for Thermal Pipe Shields or others similarly situated in the mechanical insulation markets.

162.    There is no legitimate business justification for Johns Manville's forcing distribu-

tors into *de facto* exclusive dealing arrangements other than excluding all competition from the

calsil market.  Indeed, the denial to Thermal Pipe Shields of access to distributors—without which

it cannot make sufficient sales to survive—eliminates the only company that currently even at-

tempts to compete against Johns Manville's 98% market share. Johns Manville's actions were

intended to perpetuate its monopoly and destroy potential or emerging competition.

**Johns Manville Disparages Thermal Pipe Shields' Product**
**and Falsely Claims It Never Sold Chinese Calsil**

163.    In the September 2018 meeting described above with Mr. Chalmers, Mr. Meyer

also disparaged the Thermal Pipe Shields product, claiming, without any substantiation, that it was

poor quality and cannot be trusted to meet the "specifications."

164.    Similarly, in Spring 2018, Evan Stone, Johns Manville's former Western Regional

Sales Manager, along with Jim Bittner, a Manager at GI (and Jack Bittner's brother), made calls

on two Wyoming contractors.  These incidents were reported to Thermal Pipe Shields by Mike

Erhart, APi's Rapid City, South Dakota branch manager, after he made sales calls on the two

contractors to introduce TPSX-12™ for what he thought was the first time. Both contractors con-

firmed to Mr. Erhart that Mr. Stone and Mr. Bittner had already visited and stated that the Thermal

Pipe Shields calsil "may have asbestos and may put your customers and employees at risk." These

statements were and are false.

165.    Because of these statements, the contractors did not order calsil from Thermal Pipe

Shields.

166.    Furthermore, those statements were somewhat ironic considering that Johns Man-

ville was once a leading producer of asbestos products that caused mesothelioma and asbestos-

related diseases, not only to workers but also to their families as a result of secondhand exposure. In 1982, Johns Manville declared bankruptcy to escape its asbestos liabilities. A trust was established in 1988 to pay claims directly to asbestos victims and their families that is currently valued at $2.5 billion.

167.    In 1988, David T. Austern, then general counsel of the Manville Personal Injury Settlement Trust, wrote to the Trustees concerning a series of Manville corporate documents:

> The documents noted above, however, show corporate knowledge of the dangers associated with exposure to asbestos dating back to 1934. In addition, the plaintiffs' bar will probably take the position-not unreasonably-that the documents are evidence of a corporate conspiracy to prevent asbestos workers from learning that their exposure to asbestos could kill them.

168.    Following false claims about asbestos made by Johns Manville, Thermal Pipe Shields immediately paid a United States laboratory to test for both crystalline silica and asbestos. The independent results showed below detectable limits for crystalline silica and negative for asbestos.

169.    Johns Manville, however, has a high degree of credibility in the industry and distributors have no reason to believe that what it claims is not true.

170.    Neither distributors nor contractors have the level of knowledge or sophistication to be able to judge accurately for themselves whether these claims are true or not.

171.    Potential liability from possible asbestos exposure is so great that no reasonable customer would buy a product where there was any question about the presence of asbestos, no matter how much the seller assures them that the product does not contain asbestos.

172.    Furthermore, as stated above, the factory that supplies Thermal Pipe Shields has never used any asbestos from the time it was built in 1987, including the time period in which the Johns Manville calsil was produced at the factory known as "IIG Shanghai."

173.    Finally, Mr. Meyer continued to disparage Thermal Pipe Shields calsil to other customers, telling Mr. Guest of 4 State Supply at the Midwest Insulation Contractor Association trade show in October 2018 that TPSX-12™ was "Chinese," and asking why the customer would want to "risk buying an unproven product that may not meet the specifications." While it is true that the product is from China, Johns Manville's statements were meant to and did imply that because it is from China it may not meet specifications, or may have other defects, like—for example—asbestos. Indeed, to effectively perpetuate the false claims about the quality of Thermal Pipe Shield's product by both calling it "Chinese," and implying that Chinese products are flawed, Johns Manville went so far as to falsely deny that it ever sold product from China.

174.    Johns Manville disparaged TPSX-12™ to other individual customers at other times, but Thermal Pipe Shields would have no way to know of every such instance, especially before discovery, and so is unable to respond to or otherwise neutralize all such disparagement. Johns Manville also knew that like many industry communities, "word gets around," and making false statements to some distributors and end-users that Thermal Pipe Shield's calsil contains asbestos or is defective is an explosive enough claim that the vast majority of potential purchasers of calsil—both distribution and contractor—would hear of and believe these false claims.

175.    Even if Thermal Pipe Shields knew of each disparaging comment made about TPSX-12™ and had the opportunity to correct it, the effect of such comments, once made, cannot effectively be undone.  For example, during a group webinar in March 2018 with more than twelve

decisionmakers at SPI, Kent Revard, Gulf Coast Industrial Sales representative with SPI, stated that he believed "Chinese" calsil could contain asbestos and SPI should not risk buying calsil from Thermal Pipe Shields. These concerns no doubt originated from Johns Manville false statements and it has been corroborated by other large Gulf Coast contractors that these statements were widely disseminated by Johns Manville salespeople.  In a follow-up email exchange with Kyle Romney of SPI in Denver and other webinar attendees dated March 15, 2018, Mr. Shong provided the third-party test data proving the absence of asbestos in a failed attempt to dispel that false notion. Such rumors, once started, are not easy to dispel and it could take many years to do so. But Thermal Pipe Shields could not stay in business for many years if its potential sales are eviscerated by false claims that it is selling asbestos-laden products, and Johns Manville knows that perfectly well.  And SPI has not purchased TPSX-12™.

176.    In addition to individual comments made to individual customers, Johns Manville published a "Frequently Asked Questions" page on its website containing false statements about TPSX-12™ (although it did not identify the product by name).  That document says:

> Does anyone else manufacture water resistant calcium silicate?
>
> Johns Manville Industrial Insulation Group is the only insulation manufacturer in North America to produce water resistant calcium silicate. While we are aware of one other manufacturer in Asia that produces water resistant calcium silicate, it is an expensive, custom-order product that is not readily available.

177.    Contrary to the explicit claims of this widely available marketing document currently posted on Johns Manville's website, TPSX-12™ is in fact less expensive that Johns Manville's calsil, water resistant in its standard formulation, and in stock and ready to ship. Johns Manville could only have been referring to TPSX-12™ on its website because it is the only other

calsil on the market. These claims are literally false and important and material facts in the decision-making for contractors that could demand TPSX-12™ from their distributors that could supply the product.

178.    Further, as part of his attempt to disparage Thermal Pipe Shields products, Mr. Meyer also falsely represented to Mr. Guest that Johns Manville had never sold calsil produced in China, stating:

> JM/IIG has never bought calsil from any Chinese factory and if Mr. Shong continues to make that false claim in the market, he will be hearing from the JM Legal Department!

179.    In fact, as related above, Johns Manville continued to buy and resell the Chinese calsil known as Thermo-12 Gold® until at least 2014. The following pictures taken at 4 State Supply's warehouse in Omaha, Nebraska show a Johns Manville branded box of Thermo-12 Gold®, with the designation of origin as "Made in China." The photographs were taken by Joe Guest in October 2018.





**Johns Manville Visits the Chinese Factory It Disparaged,
and Tries to Induce BEC to Breach Its Contract with Thermal Pipe Shields**

180.    Furthermore, even while Johns Manville was denying that it had ever bought Chinese calsil, and even while it was disparaging the BEC product as "Chinese," claiming it was "substandard," claiming it possibly was "unable to meet specifications," and claiming it possibly "ha[s] asbestos," Johns Manville tried to open discussions with BEC to explore the possibility of a buying relationship. Had it succeeded, this would have violated Thermal Pipe Shields' contractual rights of exclusivity with BEC to distribute its products in the United States calsil market.

181.    To this end, in July 2018, three Johns Manville executives, including Mr. (Jack) Bittner, travelled to China and, on July 30, 2018, met with the owner and staff of BEC.

182.    In this picture, taken July 30, 2018, Mr. Bittner, Mr. Semkowski, and Robert Price, Johns Manville International Supply Chain Leader, is standing on the left, surrounding the owner and next to the engineering and production staff of the BEC factory that it claims produced sub-standard and unproven Chinese products; that it claims might be unable to meet United States specifications; and that it claims possibly have contained asbestos. The marketing poster hanging on the right side of the wall, with a man standing on calsil pipe insulation, was in fact, modeled by Mr. Bittner himself.



183.    During Mr. Bittner's discussions with BEC, he specifically raised the possibility of Johns Manville restarting a buying relationship with BEC. This offer was conditional upon BEC providing samples for Johns Manville to test that would meet/exceed ASTM C533 Type I require-ments.

184.    If Johns Manville had succeeded in obtaining any agreement for calsil from the BEC factory, it would inevitably have caused a breach of BEC's exclusive agreement with Thermal Pipe Shields, an agreement that Johns Manville knew existed.

## INJURY TO COMPETITION

185.    In early March 2018, Thermal Pipe Shields began to market TPSX-12™. But in the last year, it has sold less than $1 million of this product because of Johns Manville's threats and intimidation of potential customers. But for Johns Manville's threats, intimidation, and other anticompetitive conduct, Thermal Pipe Shields would have sold substantially more than $1 million of this product.

186.    Thermal Pipe Shields TPSX-12™ is priced below the Johns Manville product, fully complies with all relevant ASTM standards, and is at least as good, if not better than, the Johns Manville product. But for Johns Manville's threats, intimidation, and other anticompetitive conduct, customers that purchased from either or both Thermal Pipe Shields and/or Johns Manville would have paid less for their calsil because of additional competition, as well as Thermal Pipe Shields' lower prices.

187.    Johns Manville's actions hurt competition, not merely a competitor. Thermal Pipe Shields is the only company that currently even attempts to compete against Johns Manville's 98% market share. Johns Manville's actions were intended to perpetuate its monopoly and destroy potential or emerging competition in the United States calsil market. But for Johns Manville's threats, intimidation, and other anticompetitive conduct, calsil consumers would have a legitimate choice of suppliers.

188.     Johns Manville's threats, intimidation, and other anticompetitive conduct caused customers to purchase substantially less calsil from Thermal Pipe Shields than they would have without these actions, which had the effect of keeping Thermal Pipe Shields from achieving suffi- cient economies of scale to further reduce its prices and/or improve its product and service relating to calsil.

189.     By using these illegal actions to maintain its monopoly, Johns Manville deprived customers of a competitive choice and also customers of the benefits of a lower-priced alternative for the same quality product. If Johns Manville is permitted to continue these threats, intimidation, and anticompetitive conduct, Thermal Pipe Shields will be completely excluded from the calsil market, a result that would—once again—leave Johns Manville as the only company serving this market. On information and belief, this is Johns Manville's plan, which they have begun imple- menting, and will continue to do so unless this Court stops them.

## FIRST CLAIM
### TYING

190.     Thermal Pipe Shields realleges all previous paragraphs.

191.     Calsil, fiberglass pipe insulation, and expanded perlite are three separate products and customers want the freedom to buy those separate products from different manufacturers.

192.     As related above, Johns Manville repeatedly threatened to refuse to sell fiberglass pipe insulation that customers wanted to buy if they bought calsil from Thermal Pipe Shields in- stead of from Johns Manville.

193.     Johns Manville has economic power in the national market for fiberglass pipe in- sulation (the first tying product), and it consistently used that power to coerce customers to buy

Johns Manville calsil (the tied product), even though customers wanted to buy TPSX-12™ from Thermal Pipe Shields instead.

194.    By tying sales of calsil to sales of fiberglass pipe insulation, Johns Manville restrained competition from Thermal Pipe Shields in the national market for calsil, affecting a not insubstantial amount of interstate commerce.

195.    As related above, Johns Manville repeatedly threatened to refuse to sell expanded perlite pipe that customers wanted to buy if they bought calsil from Thermal Pipe Shields instead of from Johns Manville.  And Johns Manville did in fact refuse to sell expanded perlite to at least one existing customer after that customer purchased TPSX-12™, which demonstrated to other distributors that Johns Manville will enforce its threats.

196.    Johns Manville has economic power in the national market for expanded perlite (the second tying product), and it consistently used that power to coerce national customers that have their highest volume locations in Houston, in addition to many other locations all around the country, to buy Johns Manville calsil only (the tied product), even though customers wanted to buy TPSX-12™ from Thermal Pipe Shields.

197.    By tying sales of calsil to sales of expanded perlite, Johns Manville restrained competition from Thermal Pipe Shields in the national market for calsil, affecting a not insubstantial amount of interstate commerce.

198.    By each of these two separate acts of tying, Johns Manville appreciably restrained free competition in the market for calsil and a not-insubstantial amount of commerce in the tied market is restrained.

199.    Johns Manville thus violated Sections 1 and 2 of the Sherman Act.

200.    As a result of the foregoing, Thermal Pipe Shields has been damaged in an amount to be determined at trial, but which is expected to be no less than $20 million.

### SECOND CLAIM
### MONOPOLIZATION

201.    Thermal Pipe Shields realleges all previous paragraphs.

202.    Johns Manville has a market share in calsil of at least 98% and has no existing United States competitor other than Thermal Pipe Shields. As a result, Johns Manville possesses monopoly power in the national calsil market.

203.    The barriers to entry are high because any factory capable of making calsil requires major capital investment, but the market size for calsil has declined over time. As a result, the cost of a new factory is effectively prohibitive and the return on such an investment is unreasonably long, and there is no potential entrant for this market.

204.    Johns Manville has maintained its monopoly by a host of exclusionary tactics, including, among others, tying (as alleged above), refusals to supply customers who purchase from Thermal Pipe Shields, exclusive dealing, and product disparagement, all with the purpose of becoming the sole supplier in the market and preventing Thermal Pipe Shields from entering the calsil market, providing competition where none existed.

205.    In addition, Johns Manville's legal department threatened Thermal Pipe Shields with phony charges of "misappropriation," which they knew were not true, and tried to get Thermal Pipe Shields to agree not to compete for any Johns Manville customers who were not listed on Thermal Pipe Shields' own website.

206.    Johns Manville also traveled to China and attempted to interfere with Thermal Pipe Shield's exclusive import contract with BEC, who manufacturers the only product that can compete with Johns Manville's calsil.

207.    These exclusionary actions demonstrate a willful intent to maintain Johns Manville's monopoly other than by consequence of a superior product, business acumen, or historic accident.

208.    Johns Manville's anticompetitive conduct and monopolization affected interstate commerce because calsil is routinely bought and sold and transported across state lines. In addition, Johns Manville's executives travelled from city to city across state lines to intimidate and threaten customers in person to not purchase calsil from Thermal Pipe Shields.

209.    Furthermore, these exclusionary actions are not the result of any unauthorized "rogue" action, but were, instead, developed, engineered and methodically and consistently carried out by senior executives of Johns Manville.

210.    There are no legitimate or procompetitive business reasons for these acts other than to eliminate the only company that currently even attempts to compete against Johns Manville's 98% market share.

211.    Indeed, Johns Manville's actions were intended to perpetuate its monopoly and destroy any potential or emerging competition in the calsil market.

212.    Johns Manville's acts of monopolization have injured Thermal Pipe Shields in its business and property, by intimidating or threatening customers and thereby severely restricting or destroying the potential sales that Thermal Pipe Shields could have made to otherwise willing distributors.

213.     Johns Manville's acts of monopolization also harmed competition, as Thermal Pipe Shields offers the only competition and alternative source of supply of calsil for customers.

214.     Furthermore, Johns Manville has a 98% share of the calsil market; its actions were specifically designed to exclude the only potential competitor and ensure that competition in the calsil market would be injured or destroyed.

215.     Johns Manville's actions had their intended effect, and Thermal Pipe Shields was substantially foreclosed from competing in the calsil market.

216.     Johns Manville has thus violated Section 2 of the Sherman Act.

217.     As a result of the foregoing, Thermal Pipe Shields has been damaged in an amount to be determined at trial, but which is expected to be no less than $20 million.

## THIRD CLAIM
## LANHAM ACT VIOLATIONS

218.     Thermal Pipe Shields realleges all previous paragraphs.

219.     Johns Manville has repeatedly, consistently, and falsely disparaged the quality of Thermal Pipe Shields calsil to customers, including multiple distributors that control a substantial part of the calsil market, falsely claiming that it is defective, that it is an "unknown" factor, that it fails to meet "specifications," that it may not be acceptable to contractors, and that it may "contain asbestos."

220.     Johns Manville has also falsely disparaged Thermal Pipe Shields product as sub-standard because they are "Chinese," which it suggested meant that the product is defective or dangerous, whereas in fact, Johns Manville itself tested Thermal Pipe Shields' calsil and deter-mined that it is not sub-standard. Johns Manville also falsely claimed that it had never sold "Chinese" product, when in fact, it had.

221.     Johns Manville itself bought calsil from the identical Chinese factory and sold it in the United States under its brand name Thermo-12 Gold®.

222.     Johns Manville's statements were literally false and misleading and either deceived consumers, or at least had the capacity to deceive them.

223.     Johns Manville's false and misleading statements were widely disseminated to the customer base for calsil because they were made to multiple distributors in a market where five distributors control 85 percent of the market. Such dissemination, even in a less concentrated market, would be substantial, probably greater than a television commercial. In addition, Thermal Pipe Shields is aware of multiple contractors to whom Johns Manville made these false and misleading statements, because those contractors raised the issue with their distributors. It is a reasonable inference that Johns Manville made these false and misleading statements to other distributors and contractors, but that Thermal Pipe Shields, the victim of the statements, did not have them reported to them. In any event, even without that inference, Johns Manville was certainly aware when it made the false and misleading statements, particularly relating to asbestos, that they would ultimately be heard by a substantial percentage of the prospective purchasers of calsil.

224.     Some of Johns Manville's false and misleading statements were widely disseminated through Johns Manville's website.

225.     Johns Manville's deception had a material effect on the consumers' purchasing decision.

226.     The misrepresentation affects interstate commerce.

227.     Thermal Pipe Shields has been, and likely will be, injured as a result of the false or misleading statements.

228.    Due to Johns Manville's false statements, Thermal Pipe Shields has suffered, and will suffer, ongoing injury to its commercial interest, both in loss of sales and damage to its business reputation, all proximately caused by Johns Manville's misrepresentations, in violation of the Lanham Act.

229.    Johns Manville has thus violated Section 43(a) of the Lanham Act.

230.    As a result of the foregoing, Thermal Pipe Shields has been damaged in an amount to be determined at trial, but which is expected to be no less than $20 million.

**FOR THE FOREGOING REASONS PLAINTIFF REQUESTS FOR JUDGMENT AS FOLLOWS:**

(a)    An injunction barring Johns Manville from engaging in any anti-competitive or defamatory behavior, or false statements, including, but not limited to:

    i.    tying;

    ii.    refusing to supply customers who buy, or wish to buy, products from Thermal Pipe Shields;

    iii.    forcing customers to deal exclusively with Johns Manville for the sole purpose of foreclosing competition from Thermal Pipe Shields;

    iv.    falsely disparaging any product manufactured by Thermal Pipe Shields;

(b)    Actual damages in an amount to be determined at trial but believed to be not less than $20 million;

(c)    Trebling of the actual damages;

(d)    Reasonable attorneys' fees;

(e)    Together with the costs and expenses of this action; and

      (f)       Thermal Pipe Shields reserves all rights to amend this First Amended Complaint to include any additional claims that arise as more facts are discovered, including but not limited to claims for trade libel or disparagement and tortious interference with business relationships.

Plaintiff requests a trial by jury.

DATED: July 24, 2019             KLENDA GESSER & BLUE LLC

*s/Geoffrey N. Blue*
Geoffrey N. Blue
1624 Market Street, Suite 202
Denver, CO 80202
Telephone: (720) 432-5705
Facsimile: (720) 379-9214
Email: gblue@klendagesslerblue.com

Local Attorney for Plaintiff
Chase Manufacturing, Inc.

Jarod Bona
Steven Levitsky*
 *Admitted only in New York
Alexandra Shear**
 **Admitted only in New York
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
Telephone: (858) 964-4589
jarod.bona@bonalawpc.com
steven.levitsky@bonalawpc.com
alex.shear@bonalawpc.com

Attorneys for Plaintiff
Chase Manufacturing, Inc

**Address of Plaintiff:**
29020 40th Ave NW
Stanwood, WA 98292

**Certificate of Service**

I hereby certify that on July 24, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following persons:

Gregory J. Kerwin, Esq. (gkerwin@gibsondunn.com)
Richard H. Cunningham, Esq. (rhcunningham@gibsondunn.com)
Allison Kostecka, Esq. (akostecka@gibsondunn.com)
GIBSON, DUNN, CRUTHER LLP
1801 California Street, Suite 4200
Denver, CO  80202

*s/Joanna Bila*
Joanna Bila, Paralegal