IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC., d/b/a Thermal Pipe Shields,

     Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**

     Before the Court is Defendant's Motion to Dismiss Plaintiff's First Amended Complaint ("FAC") (ECF 36). Defendant seeks dismissal of the FAC for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons, the Court will grant in part and deny in part Defendant's motion.

## BACKGROUND

### I.    Procedural History

     Plaintiff filed its original Complaint on March 22, 2019, asserting five claims for relief against Defendants Industrial Insulation Group, LLC and Johns Manville Corporation for alleged violations of the Sherman Act, the Lanham Act, and the common law. On May 15, 2019, Defendants filed a motion to dismiss all of Plaintiff's claims under Fed. R. Civ. P. 12(b)(6). Plaintiff filed its response on June 5, 2019, in which it voluntarily withdrew its two common law claims but contested the dismissal of its three statutory claims. The Court held a hearing on the motion on June 18, 2019.

1

On July 3, 2019, the Court granted the motion to dismiss without prejudice and with leave to refile finding one or more of Plaintiff's claims may be stated with sufficient particularity that justice required leave to amend. Plaintiff filed its FAC on July 24, 2019, dropping Industrial Insulation Group, LLC but reasserting its three statutory claims against Defendant Johns Manville Corporation for: (1) tying in violation Sections 1 and 2 of the Sherman Act; (2) monopolization in violation of Section 2 of the Sherman Act; and (3) false advertising in violation of Section 43(a) of the Lanham Act. Defendant filed the present motion to dismiss on August 21, 2019. After the matter was fully briefed, Defendant filed a notice of supplemental authority in support of its motion on November 12, 2019 and the Court held oral argument on November 19, 2019.

## II.    Statement of Facts

The following are relevant factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by Plaintiff in the Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendant manufactures and sells construction products, including mechanical insulation products. Plaintiff is a mechanical insulation supplier. Both Defendant and Plaintiff sell calcium silicate thermal insulation, referred to as "calsil," which is designed to encapsulate pipes, tanks, and other equipment in industrial facilities. Defendant has at least a 98% share of the domestic calsil market, which is approximately $50 million in sales per year. This accounts for only approximately 2% of Defendant's $3 billion annual sales for all products.

Because of calsil's unique characteristics and uses, customers who purchase it demand that the product meet or exceed the requirements set forth in ASTM C533 Type I, a standard developed by an international standards organization that publishes material specifications relied on by

engineers to qualify generic product types. Only three factories in the world produce calsil that meets the ASTM C533 Type I standard and fits North American sizing norms: two in the United States owned and operated by Defendant, and one in Shanghai, China. The Shanghai factory, now known as BEC Industrial (Shanghai) Co., Ltd. ("BEC"), previously produced calsil for Defendant but now sells its calsil in North America exclusively through Plaintiff.

In 2017, BEC approached Plaintiff and offered it the opportunity to be the exclusive United States importer of BEC calsil. At the time, Defendant was the sole supplier of calsil in the United States and was also trying to persuade Plaintiff to purchase its calsil. To win Plaintiff's business, Defendant offered to test the BEC calsil against Defendant's calsil to determine which product was superior. The test results showed that BEC's calsil met or exceeded the ASTM allowable thresholds. Based on these results and other independent tests, Plaintiff and BEC signed an exclusive agreement in March 2018.

Plaintiff began marketing BEC's calsil under the brand-name TPSX-12™. As part of its marketing strategy, Plaintiff arranged for its calsil to be tested side-by-side with Defendant's calsil. Those results indicated that BEC's calsil met or exceeded the requirements of ASTM C533 Type I, never contained asbestos, and outperformed Defendant's calsil in several categories.

Both Defendant and Plaintiff sell their mechanical insulation products, including calsil, almost exclusively to distributors who, in turn, resell those products to industrial customers or plant operators. A limited, and decreasing, portion of Defendant's sales is direct to customers. There are five major mechanical insulation distributors that dominate the country, operating in at least twenty-eight, and as many as sixty-six, different locations across the United States. The five largest distributors are: Distribution International, Inc. ("DI"); Specialty Products & Insulation Co. ("SPI"); General Insulation Company, Inc. ("GI"); MacArthur Co. ("MacArthur"); and Bay

Insulation Supply Inc. ("Bay Insulation"). Between them, they operate in 218 locations nationwide and account for approximately 85% of calsil sales. Plaintiff estimates that "approximately ten or fewer" smaller, independent distributors account for the remaining 15% of the calsil market.

Customers require the distributors to carry other construction products made by Defendant, including, as relevant to this case, Defendant's fiberglass pipe insulation and expanded perlite products. Defendant is one of only three fiberglass pipe insulation manufacturers in the United States, and Plaintiff alleges it has at least a 60% share of that market. Defendant is also one of only two North American suppliers of expanded perlite pipe and block insulation, and Plaintiff alleges it has not less than a 50% share of that market.

According to Plaintiff, Defendant has threatened to cut off sales, extend lead times, or alter rebate programs for fiberglass pipe insulation and/or expanded perlite as punitive measures to both large and small distributors who buy calsil from Plaintiff. It has also threatened to refuse to supply its own calsil to both large and small distributors who purchase calsil from Plaintiff. Plaintiff further alleges that Defendant has made comments to its customers regarding the quality and safety of Plaintiff's calsil. As stated in the FAC, Defendant's sales managers told customers that Plaintiff's calsil was "poor quality" and "cannot be trusted to meet 'specifications,'" "'may have asbestos,'" and was "Chinese," referring to where it was produced. The "Frequently Asked Questions" page on Defendant's website states, in part: "[Defendant] is the only insulation manufacturer in North America to produce water resistant calcium silicate. While we are aware of one other manufacturer in Asia that produces [calsil], it is an expensive, custom-order product that is not readily available."

According to Plaintiff, because TPSX-12™ is of equal, if not superior, quality to Defendant's calsil but is priced lower, Plaintiff should have a "sizeable" share of the calsil market.

Plaintiff has approximately 2% of the calsil market and sold less than $1 million of TPSX-12™ from March 2018 through March 2019. Only two of the largest distributor's 218 locations purchase calsil from Plaintiff. Plaintiff claims that it would have sold substantially more but for Defendant's threats and other anti-competitive conduct, and that Defendant's actions were intended to perpetuate their monopoly and to eliminate the only competitor in the domestic calsil market.

## LEGAL STANDARDS

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 680. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679.

Plausibility refers "'to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th

Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1192.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.* (quotation marks and citation omitted).

## DISCUSSION

In its FAC, Plaintiff reasserts three statutory claims against Defendant: (1) tying and (2) monopolization in violation of the Sherman Act, and (3) false advertising in violation of the Lanham Act. Defendant contends the FAC fails to address the deficiencies of the original Complaint and argues that dismissal of all of Plaintiffs claims is warranted because: (1) Plaintiff has not alleged facts sufficient to support three of the necessary elements of a per se tying claim; (2) Plaintiff fails to state a tying claim under the rule of reason; (3) Plaintiff fails to allege actionable exclusionary conduct or injury in support of its monopolization claim; and (4) Plaintiff

fails to allege facts to support a false advertising claim. The Court will discuss each of Plaintiff's claims in turn.

## I.      Tying

A tying arrangement under the Sherman Act "is an agreement by a party to sell one product—the 'tying product'—only on condition that the buyer also purchase a second product—the 'tied product'—or at least agree not to buy that product from another supplier." *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1078 (D. Colo. 2013) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992)), *aff'd*, 841 F.3d 827 (10th Cir. 2016). Tying arrangements can be analyzed using a per se rule or a rule of reason. *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1037 (10th Cir. 2017). In the Tenth Circuit, to succeed on a per se tying claim a plaintiff must show that "(1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a 'not insubstantial' amount of interstate commerce in the tied product is affected." *Id.* (quoting *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 886 (10th Cir. 1997)). "If a plaintiff fails to prove an element, the court will not apply the per se rule to the tie, but then may choose to analyze the merits of the claim under the rule of reason." *In re: Cox Enterprises, Inc.*, 871 F.3d 1093, 1098 (10th Cir. 2017). Under the rule of reason, a plaintiff must prove "the actual effect of the [tying arrangement] on competition." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984), a*brogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

A.     Plaintiff's Original and Amended Tying Claims

Plaintiff's original tying claim alleged that "Johns Manville has economic power in the market for fiberglass and expanded perlite (the tying products), and it consistently used that power to coerce customers to buy [its] calsil (the tied product), even though customers wanted to buy TPSX-12™ from [Plaintiff] instead." Compl. ¶ 135, ECF 1. In ruling on the first motion to dismiss, the Court noted that under either a per se or rule of reason analysis, "the market power of the tying product is important," and "[e]valuating the relevant tying market requires an appropriate product market and geographic market." *Chase Mfg., Inc. v. Johns Manville Corp.* (*First Order*), No. 19-CV-00872-MEH, 2019 WL 2866700, at *5 (D. Colo. July 3, 2019). The Court found that "[t]he Complaint sufficiently alleges two product markets—the markets for fiberglass and expanded perlite—but does not adequately allege a geographic market" for those products. *First Order* at *6. Accordingly, the Court held that Plaintiff failed to adequately state either a monopoly claim based on tying or a stand-alone tying claim under the Sherman Act. *Id*. at *7.

Generally, the FAC reasserts the same tying claim as in the original Complaint: that Defendant unlawfully tied sales of calsil to sales of fiberglass pipe insulation and expanded perlite. FAC ¶¶ 193, 196, ECF 30. As in the original tying claim, fiberglass pipe insulation and expanded perlite are the tying products and calsil is the tied product in Plaintiff's amended claim. Plaintiff alleges that fiberglass pipe insulation and expanded perlite are "must-have" products for distributors, *id*. at ¶¶ 89, 100, and that Defendant uses its economic power in those product markets to "coerce" customers to buy its calsil by threatening to cut off sales and actually refusing to sell those "must-have" products to customers who bought calsil from Plaintiff. *Id*. at ¶ 93, 107, 110.

Defendant argues the FAC fails to adequately plead the second, third, and fourth elements of a per se tying claim and does not state a tying claim under the rule of reason. For the reasons

discussed below, the Court finds Plaintiff plausibly alleged a per se tying claim and, therefore, does not analyze the merits of Plaintiff's claim under the rule of reason.

B.      Sale or Agreement to Sell One Product Is Conditioned on Purchase of Another

The second element of a per se tying claim is "the sale or agreement to sell one product or service is conditioned on the purchase of another." *Sports Racing Servs., Inc.*, 131 F.3d at 886. Defendant argues Plaintiff's allegations—that it threatened, or actually engaged in, tying with respect to three distributors—are ambiguous, pertain to actions Defendant *might* take rather than actions Defendant was actually taking, and fail to show that any distributor refused to purchase Plaintiff's calsil because of Defendant's threats. Defendant contends that the Court "previously dismissed nearly identical allegations due to a lack of 'specificity, because it [was] unclear whether the customer declined to purchase Plaintiff's calsil for fear of losing the ability to buy the tying products or any one of Defendants' other products." Mot. 7 (quoting *First Order* at *7). Plaintiff responds that its allegation that Defendant told a distributor it would risk losing its ability to buy any of Defendant's products if it bought calsil from Plaintiff is enough to defeat Defendant's argument, because "this is a clear-cut allegation that the sale of [Defendant's] other products is conditioned on the purchase of calsil." Resp. 7, ECF 38. Plaintiff also argues that an outright refusal to sell is not necessary to state a claim. *Id.*

The FAC includes three specific instances when a sale or potential calsil sale was affected by Defendant's alleged tying conduct. First, Plaintiff alleges that Defendant's sales manager "did in fact refuse to sell both [Defendant's] calsil and expanded perlite to distributor 4 State Supply's Wichita, Kansas location after 4 State Supply purchased TPSX-12™." FAC ¶ 108. Second, Plaintiff alleges that,

> Mark Hernandez, the El Paso, Texas Business Manager of the largest national distributor, DI, called his district manager, for 'permission' to seek a price quote for TPSX-12™. Mr. Hernandez was told that if he bought calsil from [Plaintiff], then DI would risk losing their ability to buy any products (including fiberglass pipe insulation and expanded perlite) from [Defendant], who had threatened it. Consequently, Mr. Hernandez was told he was not allowed to quote or sell TPSX-12™ because DI did not feel it was worth losing [Defendant]'s entire vast product line just to be able to save money on its calsil orders. As a result of this threat, DI's El Paso branch did not purchase any calsil from [Plaintiff].

*Id*. at ¶¶ 113-14. Third, in mid-January 2019, Plaintiff learned that two of Defendant's sales leaders "told Kirk Chalmers, Operations Leader at APi Distribution (APi) in Minnesota, that if they continued to buy calsil from [Plaintiff], it would endanger their ability to purchase any [of Defendant's] products—including, most notably, fiberglass pipe insulation and expanded perlite . . . APi had purchased two containers of TPSX-12™ for their branches in Billings, Montana and Arden Hills, Minnesota but has not purchased any more calsil from [Plaintiff] because of this threat from [Defendant]." *Id*. at ¶¶ 116-17. In addition to these three specific allegations, Plaintiff generally alleges that Defendant threatened to cut off sales of fiberglass insulation and expanded perlite "to distributors (both large or small)" or "to any distributor" that bought calsil from Plaintiff. FAC ¶¶ 93, 107, 110.

Plaintiff's allegations plausibly allege the second element of a tying claim. The Court disagrees with Defendant that Plaintiff's allegations are ambiguous. Plaintiff alleges three specific instances in which Defendant threatened to refuse, or did in fact refuse, to sell fiberglass pipe insulation or expanded perlite to distributors that purchased calsil from Plaintiff. Plaintiff further alleges these instances are exemplary of a broader pattern of behavior and conduct, Resp. 5, and that such threats were made to any distributor that bought calsil from Plaintiff, not just the three distributors identified in its examples, FAC ¶¶ 93, 107, 110. Defendant mistakenly relies on the First Order's reasoning regarding whether Defendant "actually exerted the power to coerce

customers into not buying from [Plaintiff]," which is not a component of the second element of Plaintiff's tying claim. Considering both the specific and general allegations regarding Defendant's agreement to sell fiberglass pipe insulation or expanded perlite only if a distributor does not purchase calsil from Plaintiff—and thus purchases calsil from the only other supplier, itself—Plaintiff plausibly alleges the second element of a tying claim.

C.     Defendant's Economic Power in the Tying Product Markets

The third element of a per se tying claim is that the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market. *Suture Express, Inc.*, 851 F.3d at 1037. Evaluating the relevant tying market requires an appropriate product market and geographic market. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1024 (10th Cir. 2002); *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, No. 10-cv-02516-WJM-KLM, 2014 WL 4412529, at *3 (D. Colo. Sept. 8, 2014).

In the first motion to dismiss, the Defendants argued Plaintiff had failed to allege a valid tying claim because it had not alleged their market power in the tying products. ECF 18 at 13. Elaborating on this argument in their reply, Defendants contended Plaintiff's allegations provided only "guesses about market share for an undefined, unexplained product market" and "unsupported attempts at asserting market share for the tying products, using undefined products and geographic areas." ECF 25 at 4. Defendants further proffered that Plaintiff's references to "unspecific 'fiberglass products' are insufficient." *Id*. at 5. In the First Order, the Court found that "[t]he Complaint sufficiently alleges two product markets—the markets for fiberglass and expanded perlite—but does not adequately allege a geographic market." ECF 28 at 11. The Court understood Plaintiff's allegations as arguing the geographic markets for fiberglass insulation and expanded perlite products are regional but determined the appropriate geographic market is national. *Id*. at

12. Accordingly, the Court held that Plaintiff failed to adequately state either a monopoly claim based on tying or a stand-alone tying claim under the Sherman Act. *Id*. at 14.

In the FAC, Plaintiff identifies the fiberglass pipe insulation and expanded perlite markets as the tying product markets for its reasserted tying claim and alleges that the geographic scope for these markets is national. FAC ¶¶ 85, 103. In the current motion, Defendant raises no issues with the Plaintiff's allegations as to geographic scope; rather, Defendant turns it attention to the other components of the third element, product market and market power.

Defendant argues that Plaintiff fails to adequately define the relevant product markets for either tying product—fiberglass pipe insulation or expanded perlite—because Plaintiff did not allege economic substitutes for the products. Defendant notes the FAC "contains no allegations whatsoever regarding the unique characteristics of fiberglass pipe insulation . . . or whether there are any other insulation products that can be used as substitutes," Mot. 8, and "does not allege any facts suggesting that there are not close or reasonable substitutes for expanded perlite generally, or that expanded perlite demand and/or pricing is not impacted and constrained by the pricing for other types of industrial insulation," *id*. at 8-9.

Plaintiff responds that "this Court found [its] product market allegations sufficient even before the FAC, which expanded on those allegations." Resp. 8. It continues that Defendant's argument regarding Plaintiff's failure to allege a lack of reasonable substitutes for the tying products "is neither correct nor relevant," and concludes that because market definition is fact-bound and often requires expert testimony, it is ill-suited for resolution on a motion to dismiss. *Id*.

The Court understands Plaintiff as asserting the "law of the case" doctrine and agrees on the effect of the First Order on product market definition. Under the law of the case doctrine, when a court rules on an issue, the ruling should continue to govern the same issues in subsequent stages

in the same case. *Arizona v. California*, 460 U.S. 605, 618 (1983); *see also Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th Cir. 2016) ("Law of the case doctrine . . . preclude[es] the relitigation of issues either expressly or implicitly resolved in prior proceedings in the same court."). While the decision whether to apply the law of the case doctrine remains a matter of judicial discretion, a court may "exercise the discretion to entertain relitigation of settled issues when the failure to do so would work 'a manifest injustice.'" *Id.* at 1242 (quoting *White v. Murtha*, 377 F.2d 428, 431-32 (5th Cir. 1967)). In this case, the Court found the original Complaint "sufficiently allege[d] two product markets—the markets for fiberglass and expanded perlite." ECF 28 at 11. The FAC reiterates the same two tying product markets and expands upon the allegations contained with the original Complaint. Further, declining to relitigate this issue does not present a "manifest injustice," as Defendant can always revisit this issue at summary judgment, if necessary. Accordingly, the Court finds Plaintiff sufficiently alleged tying markets for fiberglass pipe insulation and expanded perlite that are national in scope.

This determination does not end the inquiry as to the third element of Plaintiff's tying claim; the question now becomes whether Plaintiff sufficiently alleged Defendant's economic power in the identified tying markets, the national markets for fiberglass pipe insulation and expanded perlite. "[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works*, 547 U.S. at 46. Market power is the ability to force a purchaser to do something that he would not do in a competitive market, *Jefferson Par.*, 466 U.S. at 13-14, and "has been defined as 'the ability of a single seller to raise price and restrict output.'" *Eastman Kodak Co.*, 504 U.S. at 464 (quoting *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969)).

In determining the existence of market power, a court closely examines the economic reality of the market at issue. *Eastman Kodak Co.*, 504 U.S. at 467. While market share is relevant to the determination of the existence of market or monopoly power, market share alone is not dispositive to establish market power. *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 968 (10th Cir. 1990) ("[M]arket share percentages may give rise to presumptions, but will rarely conclusively establish or eliminate market or monopoly power."); *see also Fortner*, 394 U.S. at 502-03 ("The standard of 'sufficient economic power' does not . . . require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market."). "Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes." *Fortner*, 394 U.S. at 503 (internal quotation omitted).

"To demonstrate market power, a plaintiff 'may show evidence of either power to control prices or the power to exclude competition.'" *Suture Express, Inc.*, 851 F.3d at 1039 (quoting *Reazin*, 899 F.2d at 966). Power over price and power over competition may depend on various market characteristics, including the existence and intensity of entry barriers, elasticity of supply and demand, the number of firms in the market, and market trends. *Reazin*, 899 F.2d at 967. "[P]ower over price can take the form of a tying arrangement if the price could have been raised but the tie was demanded instead." *Suture Express, Inc.*, 851 F.3d at 1039.

Defendant argues Plaintiff's bare allegations regarding Defendant's percentage share of the fiber glass pipe insulation and expanded perlite markets are conclusory and are insufficient to

establish market power.  Mot. 9.  Plaintiff responds that its allegations present an "entirely plausible" scenario of unlawful tying.  Resp. 10.  It notes it alleged that the markets for both fiberglass pipe insulation and expanded perlite are capacity constrained, with few other competitors besides Defendant, and that it is "essential" that distributors can offer their customers Defendant's products in order to service demand.  *Id*. at 10-11.  Plaintiff further notes that it alleged at least one instance in which Defendant refused to sell calsil and expanded perlite to a small distributer who had purchased calsil from Plaintiff.  *Id.* at 11 (citing FAC ¶ 108).  Finally, Plaintiff emphasizes that it alleged Defendant has a predominant share of both the fiberglass pipe insulation and expanded perlite markets.  Defendant replies that Plaintiff's assertions of percentages of market share and the claim that carrying Defendant's products is "essential" for distributors are conclusory and without factual support.  Reply 9 n.6, ECF 41.

The Court agrees with Defendant that Plaintiff's bare assertions regarding Defendant's market share are conclusory.  Plaintiff states, "[Defendant] is one of only three manufacturers of fiberglass pipe insulation in the United States and *it is believed to have* at least a 60% share of the fiberglass pipe insulation market."  FAC ¶ 85 (emphasis added).  As to Defendant's market share percentage in expanded perlite, Plaintiff states, "[Defendant] has a share of the perlite market *which is believed to be* not less than 50%, which is above the standard threshold for market power."  *Id*. at ¶ 97 (emphasis added).  Plaintiff provides no further information as to how it came to form these beliefs, which could be simply Plaintiff's best guesses and far from Defendant's actual market share.

Even without considering Plaintiff's allegations as to Defendant's market share in the tying product markets, however, Plaintiff's other allegations plausibly allege Defendant has market power in the fiberglass pipe insulation and expanded perlite markets.  Plaintiff alleges Defendant

is one of only three manufacturers of fiberglass pipe insulation in the United States and is one of only two North American suppliers of expanded perlite pipe and block insulation. FAC ¶¶ 85, 101. It further alleges that both markets are capacity constrained, with end-user demand for both exceeding suppliers' capacity to produce it, *id*. at ¶¶ 90, 104, and that distributors must be able to carry Defendant's products in order to meet their customers' needs. *Id.* at ¶¶ 82, 91 ("Distributors constantly struggle to procure adequate supply of fiberglass pipe insulation to meet customers' demand and distributors' survival depends on manufacturers' ability and willingness to supply it to them."), ¶ 95 ("[I]f [Defendant] withholds its product from a distributor, that distributor will not be able to meet the volume needs of its customers as it is not able to obtain enough product (or be able to buy at all) from other manufacturers in sufficient time to satisfy demand from its customers."), ¶ 105 ("At least three different distributors have reported to [Plaintiff] that they risk losing sales of expanded perlite to their customers if [Defendant] cuts off their supply."). In addition to these allegations, Plaintiff notes that "neither is it easy or practical for a new manufacturer to enter the market due to the high costs associated with, and technical expertise required for, building a plant, manufacturing product, establishing relationships with customers, and shipping product." *Id*. at ¶ 92. Even if a new manufacturer could start production, "because of marketplace dynamics and the important role of manufacturer-distributor relationships, it is not easy for distributors to commence purchases from a new manufacturer quickly or efficiently." *Id*. at ¶ 91.

Taken together, the Court agrees with Plaintiff that it presents an "entirely plausible" scenario. Given the high demand for fiberglass pipe insulation and expanded perlite generally and Defendant's products specifically, the very limited number of suppliers, the high barriers to entry for new manufacturers, and the dynamics of the manufacturer-supplier-customer relationship, it is

plausible that Defendant has either power to control price, power to exclude competition, or both. Based on Plaintiff's allegations, rather than demand distributors purchase its calsil, Defendant could raise its prices for fiberglass pipe insulation or expanded perlite. Given the dynamics of those markets, distributors would have to pay the increase or loose sales from customers who demand those products. *Suture Express, Inc.*, 851 F.3d at 1039 ("[P]ower over price can take the form of a tying arrangement if the price could have been raised but the tie was demanded instead."). Taking all reasonable inferences in Plaintiff's favor, Plaintiff has plausibly alleged that Defendant has the ability to force distributors to do something they would not do in a competitive market and, thus, sufficiently alleges Defendant has market power.

   D.    A Not Insubstantial Amount of Affected Commerce

The fourth element of a per se tying claim requires that "a not insubstantial amount of interstate commerce in the tied product is affected." *Sports Racing Servs., Inc.*, 131 F.3d at 886. "Normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie." *Fortner*, 394 U.S. at 501. In addition, the fourth element "requires proof of actual or potential anticompetitive effects in the tied-product market." *In re: Cox Enterprises, Inc.*, 871 F.3d 1093, 1104 (10th Cir. 2017); *see also id.* at 1107 ("Because tying claims often present little or no potential to harm competition—and thus, no antitrust concerns—plaintiffs alleging per se unlawful tying arrangements must do more to meet the foreclosure element than point to a dollar amount. They must show that the alleged tying arrangement had the potential to or actually did injure competition." (citation omitted)).

Defendant argues that Plaintiff has not alleged a dollar volume of calsil that was sold or foreclosed because of Defendant's alleged tying. Mot. 10. It notes that while Plaintiff alleged

sales to one of the five major distributors and two of the approximate ten "smaller" distributers were potently affected by tying conduct, Plaintiff does not define the scope of these sales. *Id*. at 10-11. Plaintiff responds that "[f]rom a dollar and volume standpoint, [Defendant] has foreclosed nearly 100% of the market for calsil, alleged to be $50 million per year." Resp. 14. It continues that it "cites examples of conduct pertaining to DI, SPI, Bay Insulation, GI, Apes [sic], and 4 State Supply, but also specifically alleges that [Defendant] threatened all actual and potential calsil customers, including both larger, national distributors and smaller, independent ones." *Id*. (emphasis added). Defendant replies that it is insufficient for Plaintiff to merely allege the calsil market's total value and that Defendant controls it. Reply 9. It reiterated that the FAC includes no facts from which the Court could infer the volume of commerce foreclosed to rivals, including Plaintiff, by the alleged tying. *Id*. at 10.

Although Plaintiff does not define the scope of the three specific calsil sales affected by Defendant's alleged tying, its allegations provide a sufficient basis from which the Court can reasonably infer that more than a "de minimis" amount of business in calsil was affected. Plaintiff emphases that "[t]o accurately convey the realities of the calsil market . . . certain . . . allegations refer to specific locations or certain distributors. But, . . . these specific allegations do not imply that they are the only instances in which [Defendant]'s conduct has foreclosed competition in the calsil market." Resp. 16; *see also* ECF 45 at 21:22-22:2 ("Additionally, we specifically allege that the same conduct was addressed to both larger and smaller distributors. So where we may give an instance of conduct that was addressed to a small distributor, it's not meant to suggest that . . . that conduct only was directed toward that distributor."). Taken as a whole, Plaintiff alleges Defendant was threatening any and all distributors that they would be unable to acquire fiberglass pipe insulation and/or expanded perlite from Defendant if they bought calsil from Plaintiff and it

provides three specific examples of such conduct. Taking reasonable inferences in Plaintiff's favor, it is reasonable to believe that not only was a "not insignificant" amount of commerce affected, but quite plausibly a significant amount of commerce was foreclosed.

In addition to alleging Plaintiff also plausibly alleges actual or potential anticompetitive effects in the calsil market. *In re: Cox Enterprises, Inc.*, 871 F.3d at 1104. Plaintiff contends that Defendant restrained competition with its tying conduct, resulting in limitation of customer choice of suppliers, increased prices, and reduction in calsil output. FAC ¶¶ 115, 118, 125, 187, 189. Plaintiff also related Defendant's tying action to the sale of calsil by distributors, noting that Defendants threats to cut off sales of expanded perlite "has real consequences to distributors' abilities to compete." *Id*. at ¶ 108. As an example, Plaintiff alleged that Defendant's refusal to sell 4 State Supply expanded perlite or calsil "destroyed 4 State Supply's ability to compete in the Wichita market (where demand is high), because it must pay additional costs and take additional time to obtain the products from one of its other two locations." *Id*.

Because Plaintiff plausibly alleges a per se tying claim, it should not be dismissed under Fed. R. Civ. P. 12(b)(6), and Defendant's motion as to Plaintiff's standalone tying claim is denied. The Court does not consider whether Plaintiff's allegations state a tying claim under the rule of reason.

## II.    Monopolization

Plaintiff asserts a monopolization claim under Section 2 of the Sherman Act, alleging Defendant created and maintains an unlawful monopoly in the calsil market. There are three elements to a Section 2 monopolization claim: the first element is a "monopoly power in the relevant market"; the second is "willful acquisition or maintenance of this power through

exclusionary conduct"; and the final element is "harm to competition." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.* (*Lenox I*), 762 F.3d 1114, 1119 (10th Cir. 2014).

Plaintiff's original monopolization claim alleged that then-Defendants created and maintained a monopoly in the calsil market through exclusionary conduct, including tying, exclusive dealing, refusal to deal, spying, and product disparagement. First Order *4. In the first motion to dismiss, Defendants argued Plaintiff failed to sufficiently plead both specific facts showing it acquired or maintained monopoly power through unlawful exclusionary conduct, the second element, and antitrust injury, the third element. ECF 18 at 4, 5 n.5. The Court found that Plaintiff's allegations of exclusionary conduct failed to support a monopolization claim and dismissed.

In its renewed monopolization claim Plaintiff alleges that Defendant possess and maintains monopoly power in the national calsil market through "a host of exclusionary tactics, including, among others, tying (as alleged above), refusals to supply customers who purchase from [Plaintiff], exclusive dealing, and product disparagement." FAC ¶ 204.[1] Defendant again moves to dismiss Plaintiff's amended monopolization claim on the basis that Plaintiff failed to sufficiently plead actionable exclusionary conduct or antitrust injury. The Court disagrees with Defendant and finds that Plaintiff has now pleaded a plausible monopolization claim based on tying, refusal to supply, exclusive dealing, and product disparagement.

---

[1] Plaintiff also alleges that "[Defendant]'s legal department threatened [Plaintiff] with phony charges of 'misappropriation,' which they knew were not true, and tried to get [Plaintiff] to agree not to compete for any [of Defendant's] customers who were not listed on [Plaintiff]'s own website." FAC ¶ 205. However, Plaintiff does not rely on either allegation in its response to Defendant's motion.

A.    Defendant's Alleged Exclusionary Conduct

Plaintiff alleges Defendant maintains an unlawful monopoly in the calsil market through the following forms of exclusionary conduct: (1) tying, (2) refusal to supply, (3) exclusive dealing, and (4) product disparagement.  Defendant argues that Plaintiff's allegations as to each category of exclusionary conduct "do not meet the applicable and well-established legal standards."  Mot. 12.  Plaintiff responds that each and all of the types of exclusionary conduct alleged, taken individually and together, constitute exclusionary conduct that demonstrate exclusionary intent.  Resp. 14 n.7. As in the First Order, the Court will discuss each form of exclusionary conduct in turn.

1.    *Tying*

The parties do not distinguish between Plaintiff's tying allegations in support of its monopoly claim and Plaintiff's stand-alone tying claim.  *See* Mot. 12 n.5 ("In [FAC], [Plaintiff] does not distinguish between its tying allegations in support of its monopoly claim and its standalone tying claim.  Therefore, for all of the reasons stated in Section II.A., *supra*, [Plaintiff]'s tying allegations fail to support its monopolization claim."); Resp. 14.  Because Plaintiff plausibly states a stand-alone tying claim, Plaintiff plausibly alleges Defendant engaged in tying as exclusionary conduct in support of its monopolization claim.

2.    *Refusal to Supply*

Plaintiff next identifies Defendant's threats to refuse to sell its calsil to distributors who purchase calsil from Plaintiff, termed "refusal to supply," as exclusionary conduct supporting a monopolization claim.  FAC ¶¶ 121, 123-25.  Relevant to the parties' arguments on this category of alleged exclusionary conduct is the Plaintiff's previous allegations of "refusal to deal" as a category of exclusionary conduct in support of its original monopolization claim.

In the First Order, the Court noted that Plaintiff's refusal to deal allegations "could be read as advancing a refusal to deal theory on Defendants' threats to refuse to sell products to its customers if those customers purchased calsil from Plaintiff." *First Order* at *8. The Court determined, however, that Plaintiff distanced itself from this theory in its briefing and at oral argument. The Court found Plaintiff waived a monopoly claim based on Defendants' refusal to deal with its customers, because Plaintiff argued that refusals to deal only apply when a company refuses to deal with a competitor, not when a company refuses to deal with customers, and reiterated that this case did not involve Defendants' refusal to deal with Plaintiff. *Id*. at *8-9. The Court further noted that, even if Plaintiff had not waived, the Complaint would have failed to allege plausible exclusionary conduct based on the Defendants' alleged refusal to deal with its customers because businesses are free to choose whether or not to do business with others and the Complaint did not allege facts that Defendants threatened to discontinue preexisting courses of dealing or forsake short-term profits to achieve an anti-competitive end. *Id*. at *9 n.4.

In the current motion, Defendant argues that the Court's previous finding as to waiver and the inapplicability of the refusal to deal doctrine remains applicable because the FAC states, "[t]o be clear, [Plaintiff] is not alleging that [Defendant] refused to deal with [Plaintiff], which could invoke the refusal to deal with a rival antitrust doctrine." Mot. 12-13 (quoting FAC ¶ 125). It also contends that the FAC does not provide any facts indicating that Defendant's unilateral refusals to deal demonstrate a willingness to sacrifice short-term profits for an anticompetitive end. *Id*. at 13 n.8. Plaintiff responds that Defendant mischaracterizes its actual allegations and, thus, does not properly challenge them. Plaintiff continues that that the First Order is directed at an "inoperative pleading" and has no force on the FAC. Plaintiff further argues that the FAC "was filed afterward and clarifies the confusion—which [Defendant] exploits here—as to which theory is being

advanced." Resp. 16.  Defendant replies that Plaintiff's recasting of its allegations as "refusal to supply" is "inconsequential semantics" as it does not state any legal standard for its "refusal to supply" claim.  Reply 11.  Defendant continues that there is no difference between refusal to deal or exclusive dealing or "refusal to supply," and Plaintiff "does not contest that its [FAC] lacks facts alleging [Defendant]'s willingness to forsake short-term profits for an anticompetitive end." *Id*.

The Court agrees with Plaintiff that the First Order's finding of waiver has no force on the FAC.  In granting the first motion to dismiss, the Court found "one or more claims may be stated with sufficient particularity and, therefore, justice requires that leave to amend be granted to the Plaintiff."  *First Order* at *13.  Here, Plaintiff used the Court's leave to assert a new monopolization claim based on Defendant's refusal to sell or supply its calsil to customers with additional facts and a clarified the theory for the claim it is advancing.  Since the filing of the FAC, Plaintiff has done nothing to abandon this new claim and has only further clarified its position in its response brief and at oral argument.

"It's been said that anticompetitive conduct comes in too many forms and shapes to permit a comprehensive taxonomy."  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013).  Although Plaintiff calls this category of exclusionary conduct "refusal to supply," it provides no case law about a separate or distinct category of exclusionary conduct about refusing to supply or sell to customers.  Because the alleged conduct appears as a variation on the traditional refusal to deal conduct, which entails an alleged monopolist's refusal to deal with its rivals, the Court borrows from traditional refusal to deal case law in evaluating Plaintiff's allegations.

"'[A]s a general rule . . . purely unilateral conduct' does not run afoul of section 2— 'businesses are free to choose' whether or not to do business with others and free to assign what

prices they hope to secure for their own products." *Novell, Inc.*, 731 F.3d at 1072 (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns*, 555 U.S. 438, 448 (2009)). An exception to this "general rule of firm independence" occurs when there is a preexisting voluntary and presumably profitable course of dealing and the monopolist's discontinuation of the preexisting course of dealing "suggests a willingness to forsake short-term profits to achieve an anti-competitive end." *Id.* at 1075-75 (quoting *Verizon Commc'ns v. Law Offices of Curtis v. Trinko*, 540 U.S. 398, 409 (2004)).

Plaintiff's allegations provide a plausible basis to infer Defendant's refusal to sell to customers runs afoul of Section 2 of the Sherman Act. Plaintiff's allegations relating to Defendant's course of dealing with 4 State Supply suggest Defendant discontinued selling expanded perlite and calsil to that distributor to prevent future sales of Plaintiff's calsil. FAC ¶¶ 108, 195 ("[Defendant] did in fact refuse to sell expanded perlite to at least one existing customer after that customer purchased TPSX-12™."). Taken with Plaintiff's other allegations about Defendant's threats to distributors, *e.g., id.* at ¶ 146, a reasonable inference is that Defendant was willing to discontinue and did discontinue sales in order to prevent competition in calsil.

Defendant is free to provide a legitimate business justification for its refusals to sell its products to its customers. However, at this stage Plaintiff has plausibly alleged Defendant's action, in effectively holding its products ransom from customers, constitutes a form of exclusionary conduct. *See Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1105 (D. Colo. 2004) ("Anticompetitive or exclusionary conduct under section 2 is 'conduct constituting an abnormal response to market opportunities.'" (quoting *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 63 F.3d 1540, 1550 (10th Cir. 1995))).

3. *Exclusive Dealing*

The third type of exclusionary conduct Plaintiff alleges Defendant engaged in is exclusive dealing. An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012). Exclusive dealing arrangements are not unlawful in the absence of anticompetitive effects. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). To state a claim for unlawful use of exclusionary agreements under the Sherman Act, a plaintiff must show that a defendant's "exclusive dealing arrangements foreclose competition in a substantial share of the line of commerce affected." *Crocs, Inc. v. Effervescent, Inc.*, 248 F. Supp. 3d 1040, 1058 (D. Colo. 2017) (citing *Id.*). A plaintiff must also show anticompetitive effects resulting from "a substantial foreclosure of their ability to compete in the relevant market." *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *8 (D. Colo. Apr. 7, 2010) (citing *Tampa Elec. Co.*, 365 U.S. at 328).

In the First Order, the Court found that "[t]he Complaint does not allege sufficient facts suggesting that Defendants' actions have foreclosed a substantial share in the calsil market or Plaintiff's ability to compete in that market." *First Order* at *7. The Court noted that the threats Plaintiff based its argument on were made to unidentified subjects in undefined areas of the country; therefore, it found, it could not determine the size of the allegedly foreclosed calsil markets or how much of the calsil market was involved in the exclusive dealing agreements. *Id.*

Defendant contends that the FAC did not cure the deficiency of Plaintiff's original exclusive dealing allegations. Specifically, Defendant argues that the FAC does not allege the broad foreclosure of calsil sales through implied or express exclusive dealing contracts. Mot. 14. It continues that Plaintiff's allegation that Defendant has foreclosed nearly 100% of the calsil

market is conclusory and that the alleged threats were made to only certain locations of a small number of distributors. Plaintiff responds that, "[t]o accurately convey the realities of the calsil market . . . certain of [its] exclusive dealing allegations refer to specific locations of certain distributors. But, as with the tying allegations, these specific allegations do not imply that they are the only instances in which [Defendant]'s conduct has foreclosed competition in the calsil market." Resp. 16. Defendant replies that Plaintiff's "wholly conclusory" assertion of "near-total foreclosure" are not supported by the facts in the FAC. Reply. 12

The Court disagrees with Defendant. As noted in Section I.D., *supra*, while Plaintiff alleges a handful of specific instances when Defendant threatened distributors, it also alleges that those instances are exemplary of a broader pattern of conduct Defendant exhibited towards all distributors. *See* Resp. 5; ECF 45 21:25-22:2 (Plaintiff noting that the specific examples are "not meant to suggest that . . . that conduct only was directed toward that distributor.") Plaintiff alleges that

> "[Defendant]'s threats and other exclusionary conduct . . . have foreclosed [Plaintiff] and any other potential competitor from being able to sell calsil to otherwise willing customers throughout the country. Indeed, 216 of the five largest distributors' combined 218 locations nationwide do not purchase calsil from [Plaintiff] . . . . [Defendant] has engaged in the same conduct with respect to the smaller, independent distributors . . . and has likewise foreclosed [Plaintiff] from competing for calsil sales to those distributors."

FAC ¶¶ 158-59. Examining Plaintiff's specific and general allegations together, and taking all reasonable inferences in Plaintiff's favor, the FAC plausibly alleges that Defendant's actions have foreclosed a substantial share of the calsil market or Plaintiff's ability to compete in that market.

### 4. *Product Disparagement*

The final form of exclusionary conduct Plaintiff alleges Defendant engaged in is product disparagement. "To prove that product disparagement rises to the level of exclusionary conduct,

the disparagement must overcome the presumption that the effect on competition is de minimis." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1127 (10th Cir. 2014). To rebut the de minimis presumption, Plaintiff must plausibly allege the disparagement was "(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals." *Id*. The Court determined that Plaintiff's original product disparagement allegations failed to meet the third, fourth, fifth, and sixth factors. *First Order* *10-11.

In the FAC, Plaintiff alleges product disparagement on four statement attributed Defendant's sales representatives. First, in Spring 2018, a sales manager for Defendant and a manager at GI, told two Wyoming contractors that Plaintiff's calsil "may have asbestos and may put your customers and employees at risk." FAC ¶ 164. Next, in September 2018, Chad Meyer, a sales manager for Defendant, told the operations leader at APi that Plaintiff's calsil was "poor quality and cannot be trusted to meet 'specifications.'" *Id*. at ¶ 163. The third and fourth, at an unspecified times, Mr. Meyer told a branch manager for 4 State Supply that Plaintiff's calsil was "Chinese," asked why 4 State Supply "would want to 'risk buying an unproven product that may not meet the specifications.'" *Id*. ¶ 173. Plaintiff also alleges two of the five large distributors, GI and SPI, have heard Defendant's comments and "word gets around" a market with such concentrated buyers. ECF 45 at 30:24-31:5 (citing FAC ¶¶ 164, 174).

Defendant contends that these are "essentially the same statements the Court rejected" in the First Order and argues that these renewed allegations again fail to meet the third, fourth, fifth, and sixth factors. Mot. 16. Plaintiff devotes only a single paragraph of its response to its disparagement allegations. *See* Resp. 18. It argues that it alleged the disparaging remarks had

more than a de minimis effect because it claimed, "that these comments were catastrophic to its business." *Id.* It continues that "because many of the disparaging comments about [its] calsil were made directly to customers outside of [its] presence, [it] could not, at this stage, allege with specificity each disparaging statement." *Id.* Defendant replies that Plaintiff has effectively conceded its disparagement claims because it made such a short response that did not address the six-factor test required to overcome the presumption that the effect of disparaging remarks on competition is de minimis. Reply. 13.

Reviewing the FAC, the Court can reasonably infer that Plaintiff's allegations plausibly overcome the presumption that the effect on competition of Defendant's disparagement is de minimis. As to the third factor, Plaintiff alleges that Defendant "has a high degree of credibility in the industry," and notes Defendant's experience with asbestos liability. FAC ¶¶ 166-169. It is reasonable that Defendant's history with asbestos would give it credibility when discussing asbestos, products that could put buyers "at risk," or products fail to meet safety specifications. Additionally, and importantly, given the scope of potential liability related to asbestos, buyers are very likely to rely on statements regarding its presence or related safety concerns rather than make a potentially business-ending purchase. *See id.* at ¶ 166 (nothing Defendant's asbestos liabilities caused it to declare bankruptcy).

As to the fourth factor, Plaintiff alleges that Defendant targeted its disparagement to distributors that are its existing customers, all of whom but one have never purchased calsil from Plaintiff. Because the vast majority of the audience were and are not present customers of Plaintiff, they do not have firsthand knowledge of Plaintiff's calsil. As alleged misrepresentations bear on the quality and safety of Plaintiff's goods, firsthand knowledge is critical, particularly in a market where much of the sales and product information are conveyed through individualized

relationships with distributors. Defendant cites the fact that Plaintiff included TPSX-12<sup>TM</sup> "test results" as part of its initial marketing materials to support the contention that the buyers who heard the remarks had knowledge of the subject matter. Mot. 17 (citing FAC ¶ 42). However, the test results Defendant refers to confirmed TPSX-12<sup>TM</sup> "meets or exceeds all physical property requirements of ASTM C533 Type I." FAC ¶ 44. It is not clear that that testing addressed asbestos or what specific information from the test results were included in the marketing materials. It is also unclear how widely disseminated Plaintiff's marketing launch was. Taking reasonable inference in Plaintiff's favor, it is reasonable the distributors that heard the disparaging remarks had no knowledge of TPSX-12<sup>TM</sup>'s safety or quality.

As to the fifth factor, Plaintiff specifically alleges disparaging remarks were made throughout 2018. Plaintiff alleges that in March of 2018, a sales representative for SPI stated, "that he believed 'Chinese' calsil could contain asbestos and SPI should not risk buying calsil from [Plaintiff]." FAC ¶ 175. Plaintiff continues that "these concerns no doubt originated from [Defendant's] false statements and it has been corroborated by other large Gulf Coast contractors that these statements were widely disseminated by [Defendant's] salespeople. *Id*. It also provides examples from Spring 2018 and from September 2018. *Id*. at ¶¶ 135, 164. Nothing in the FAC indicates that these specific examples are the only instances of Defendant's disparaging remarks. Plaintiff alleges that "[Defendant] disparaged TPSX-12™ to other individual customers at other times, but [it] would have no way to know of every such instance, especially before discovery." *Id*. at ¶ 174. Limiting the assessment of Plaintiff's disparagement allegations to those few examples is inappropriate as a reasonable inference in Plaintiff's favor is that Defendant made disparaging remarks about Plaintiff's calsil throughout 2018, as Plaintiff was launching its calsil into the market.

Finally, Plaintiff plausibly alleges that Defendant's disparagement is not readily susceptible to neutralization or other offset by rivals. Defendant's disparagement includes that Plaintiff's calsil "may have asbestos and may put [] customers and employees at risk." *Id*. ¶ 164. Plaintiff claims that "[p]otential liability from possible asbestos exposure is so great that no reasonable customer would buy a product where there was any question about the presence of asbestos, no matter how much the seller assures them that the product does not contain asbestos." *Id*. at ¶ 171. It also provides some context on asbestos liability, noting that asbestos products cause mesothelioma and other disease in workers and their families and that "[i]n 1982, [Defendant] declared bankruptcy to escape its asbestos liabilities. A trust was established in 1988 to pay claims directly to asbestos victims and their families that is currently valued at $2.5 billion." *Id*. at ¶ 166. Plaintiff also alleges a specific example of a "failed attempt" to assuage a potential buyer's asbestos concerns, that "[s]uch rumors, once started, are not easy to dispel," and that "it could take many years to do so." *Id*. at ¶ 175. Given the seriousness of allegations of asbestos, especially in the industrial insulation community, and the fact that all of Defendant's disparagement relates to the safety and quality of Plaintiff's calsil, it is more than plausible that such statements are not readily susceptible to neutralization.

Taking Plaintiff's allegations together, the Court finds that it plausibly pleads exclusionary conduct under theories of tying, refusal to supply, exclusive dealing, and product disparagement. Accordingly, Plaintiff has sufficiently supported the second element of its monopolization claim.

B.     Harm to Competition

Defendant also argues that Plaintiff's monopolization claims fails because Plaintiff does not plead an antitrust injury, which requires allegations of harm to competition, not just harm to a plaintiff competitor. Mot. 12 n.7. It contends that Plaintiff's alleged injury is that it failed to

quickly gain market share. Defendant's minimal argument overlooks Plaintiff's numerous allegations of injury to competition alleged throughout the FAC. As noted in Section I.D., *supra*, Plaintiff contends that Defendant's exclusionary and anticompetitive conduct caused limitation of customer choice of suppliers, increased prices, and reduction in calsil output. FAC ¶¶ 115, 118. Plaintiff also alleged "consequences for distributors' abilities to compete." *Id*. at ¶ 108.

Because Plaintiff sufficiently alleged exclusionary conduct and harm to competition as a result of Defendant's actions, Plaintiff states a plausible claim for monopolization. Defendant's motion as to Plaintiff's monopolization claim is denied.

## III.    False Advertising

Finally, Plaintiff reasserts a claim for false advertising in violation of Section 43(a) of the Lanham Act. To state a false advertising claim under this provision, a plaintiff must allege: "(1) that [the] defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff." *Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 784 (10th Cir. 2016) (internal quotation marks omitted). For misrepresentations to constitute "commercial advertising" or product promotion, the misrepresentations must, among other things, "be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Proctor & Gamble Co. v. Haugen* (*P & G*), 222 F.3d 1262, 1274 (10th Cir. 2000) (quoting *Gordon & Breach Science Publishers, S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994)).

A.    <u>Dismissal of Plaintiff's Original Claim and Plaintiff's Amended Claim</u>

Plaintiff relied on five alleged misrepresentations—mostly statements by Defendant's sales managers to unidentified calsil customers—to support its original false advertising claim.[2]  In the First Order, the Court found that Plaintiff failed to specifically allege that the representations were sufficiently disseminated to constitute commercial advertising or promotion.  The Court determined that, because Plaintiff did not specify the number of calsil purchasers in the market or the identity of the customers told the representations, Plaintiff's allegations required an unreasonable "double-layered" inference to reach the conclusion that the statements were sufficiently disseminated in the relevant market.

In its FAC, Plaintiff makes allegations that address both of the original claim's informational shortcomings identified by the Court.  As to the number of purchasers in the calsil market, Plaintiff alleges that five major distributors account for 85 percent of calsil sales, FAC ¶¶ 17-19, and estimates that "approximately ten or fewer" smaller, independent distributors account for the remaining 15 percent, *id*. at ¶¶ 87, 102.  Noted below, Plaintiff identifies APi and 4 State Supply, two of the smaller distributors, as the recipients of the alleged misrepresentations by Defendant's sales managers.

Plaintiff's current Lanham Act claim is based on six alleged misrepresentations,[3] the first four of which are the statements recounted in Section II.A.4., *supra*, that Plaintiff relies on for its

---

[2]  First, in Spring 2018, an unidentified sales representative told two Wyoming contractors that Plaintiff's calsil "'may have asbestos.'"  Compl. ¶ 89.  Second, in September 2018, Chad Meyer, a sales manager for Defendant, told an unidentified customer that Plaintiff's calsil was "poor quality and cannot be trusted to meet 'specifications.'"  *Id.* ¶¶ 85-88.  In October 2018, Mr. Meyer told a different customer that Plaintiff's calsil was "Chinese."  *Id.* ¶ 96.  He also asked that customer why it "would want to 'risk buying an unproven product that may not meet the specifications.'"  *Id.* ¶¶ 94-96.  Lastly, the fifth statement was that at some unspecified time to an unidentified entity, Defendants claimed TPSX-12™ was "substandard."  *Id.* ¶ 99.

[3] In addition to these six statements, Plaintiff also alleges that Defendant claimed Plaintiff's calsil was "substandard" and "an 'unknown' factor."  FAC ¶¶ 180, 182, 219, 220.  Neither party

product disparagement argument. In addition to those four statements, at an unspecified time Mr. Meyer represented to a branch manager for 4 State Supply that Defendant had never sold calsil produced in China. FAC ¶ 178. Sixth, Plaintiff identifies a statement on the "Frequently Asked Questions" ("FAQ") page of Defendant's website which reads:

> Does anyone else manufacture water resistant calcium silicate?
> Johns Manville Industrial Insulation Group is the only insulation manufacturer in North America to produce water resistant calcium silicate. While we are aware of one other manufacturer in Asia that produces water resistant calcium silicate, it is an expensive, custom-order product that is not readily available.

*Id.* at ¶ 176.

In their briefing, the parties addressed the representations attributed to Defendant's sales managers collectively, and separately addressed the representation on Defendant's FAQ webpage. The Court, therefore, does the same.

B.    Whether Plaintiff States a Claim Based on the Representations by Defendant's Sales Managers

In its motion, Defendant only disputes the sufficiency of Plaintiff's allegations with regard to the first element of its Lanham Act claim, that the Defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product. Specifically, Defendant contends that Plaintiff's renewed allegations regarding its sales managers' misrepresentations still fail to show the disparaging comments were widely publicized within the calsil industry to constitute commercial advertising or promotion. Defendant makes no argument that Plaintiff fails to plausibly allege the remaining three elements.

Defendant argues that Plaintiff alleges only two of an unspecified number of smaller distributors were told disparaging remarks, and that Plaintiff does not specify how much of the

---

addresses these statements and Plaintiff does not rely on them in its response to Defendant's motion.

calsil market is control by those two distributors. Mot. 19-20. Therefore, Defendant concludes, these allegations still fail to show the disparaging comments were widely publicized within the calsil industry. Plaintiff responds that the sales managers' misrepresentations constitute commercial advertising or promotion because "informal" means of communication—like in-person meetings, social gatherings, social media, and email—as opposed to traditional media are the primary means of commercial promotion in the calsil market. Resp. 19. In support, Plaintiff relies on *Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 801 (6th Cir. 2015), for the proposition that "commercial advertising" includes "targeted communications to a substantial portion of a company's existing . . . client base." Plaintiff continues that because only five distributors account for 85 percent of sales, a relatively small number of comments can reach wide dissemination in the market. Defendant replies that Plaintiff's argument that unidentified and informal private communications constitute commercial advertising is unsupported by case law. Reply 14. It further contends that *Grubbs* fails to support Plaintiff's argument because the facts in that case, in which an email sent to all twenty-three of the plaintiff's customers was deemed commercial promotion, "are nothing like" the facts alleged by Plaintiff here. *Id*. at 14-15.

At oral argument, Defendant reiterated its contention that *Grubbs* does not support Plaintiff's position and stated that *Grubbs* requires alleged misrepresentations to be part of an organized campaign to penetrate the market in order to meet the public dissemination test for commercial advertising. ECF 45 at 19:3-8. Plaintiff responded that *Grubbs* is "squarely on point," *id*. at 30:13, and that the case "basically held for the proposition that . . . commercial advertising doesn't just look like TV ads . . . it's e-mail, it's in-person communication, and in this particular instance, personal contacts are the primary method of advertising," *id*. at 30:13-20. As was noted above, Plaintiff also alleges GI and SPI have heard Defendant's comments and "word gets

around." *Id.* at 30:24-31:5 (citing FAC ¶¶ 164, 174). Plaintiff maintains that Defendant's comments were part of an organized campaign, "although it may look informal or behind the scenes." *Id.* at 31:11.

The Court agrees with Plaintiff and finds that, based on the allegations in the FAC, it can reasonably infer that the alleged misrepresentations attributed to Defendant's sales managers were sufficiently disseminated to the relevant purchasing public to constitute commercial advertising or promotion in the calsil market. Therefore, as discussed below, Plaintiff states a plausible claim for false advertising under the Lanham Act based on the misrepresentations attributed to Defendant's sales managers.

First, the fact that Plaintiff alleges that the misrepresentations were made through "informal" means of communication, like in-person meetings and email, does not automatically defeat Plaintiff's claim. Despite Defendant's contention that Plaintiff "attempts to redefine the meaning of commercial advertising or promotion," Reply 14, it has been long recognized that misrepresentations "need not be made in a 'classical advertising campaign'" to constitute commercial advertising or promotion under Section 43(a), "but may consist instead of more informal types of 'promotion.'" *Gordon & Breach Science Publishers, S.A.*, 859 F. Supp. at 1535-36; *P & G*, 222 F.3d 1262, 1273-74 (10th Cir. 2000); *Coastal Abstract Serv., Inc. v. First Am. Tit. Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999); *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996). Plaintiff's reliance on *Grubbs*, in which the Sixth Circuit held that the plaintiff stated a claim for false advertising based on an email sent to twenty-three customers, is justified in so far as that case also supports the proposition that informal means of communication can support a false advertising claim under the Lanham Act.

For purposes of the Lanham Act's definition of "commercial advertising or promotion," the level of circulation required for a misrepresentation to be sufficiently disseminated "will vary according to the specifics of the industry." *Seven-Up Co.*, 86 F.3d at 1385. In a particularly small or concentrated market, a misrepresentation made to a single member of the relevant purchasing public could support a false advertising claim. *See id.* at 1386 ("Where the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Act."); *see also Coastal Abstract Serv., Inc.*, 173 F.3d 725, 735 (9th Cir. 1999) (concluding the district court was correct that a representation to a single institution was disseminated sufficiently that is could constitute a "promotion" when the evidence showed that there were only two or three institutions involved in the same kind of operation); *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1121 (8th Cir. 1999) (affirming a jury verdict for the plaintiff when the facts showed defendant sent misrepresentations to "only five recipients" but the relevant market had a "concentrated structure" and was dominated by a small number of companies.); *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012) ("We agree . . . that where the customer market is particularly small, courts may find a statement to be sufficiently disseminated to constitute 'commercial advertising or promotion,' even though only distributed to a few customers (or even one)." (internal quotations omitted)); *LidoChem, Inc. v. Stoller Enterprises, Inc.*, 500 F. App'x 373, 381 (6th Cir. 2012) (concluding a reasonable factfinder could determine that the defendant's statements to a single farmer and a single distributor were disseminated widely enough to the relevant purchasing public to constitute promotion within the "relatively small" western-Michigan farm-chemical industry).

In the FAC, Plaintiff alleges the purchasers in the calsil market are five large, national distributors and "approximately ten or fewer" smaller, independent distributors. Plaintiff explicitly alleges that Defendant's sales managers made misrepresentations to APi and 4 State Supply, two of the smaller calsil distributors. Plaintiff also mentions that two of the five larger distributors, GI and SI, have heard the misrepresentations regarding Plaintiff's calsil from Defendant's salespeople. FAC ¶¶ 164, 175. Plaintiff continues that "other Gulf Coast contractors" have corroborated the suspicion "that these statements were widely disseminated by Johns Manville salespeople." *Id.* at ¶ 175. This allegation comports with Plaintiff's contention that the efforts to spread these misrepresentations were part of an organized campaign by Defendant, despite the statements' informal or behind the scenes methods of communication. *See id.* at 174 ("[Defendant] also knew that like many industry communities, 'word gets around,' and making false statements to some distributors and end-users that [Plaintiff']'s calsil contains asbestos or is defective is an explosive enough claim that the vast majority of potential purchasers of calsil—both distribution and contractor—would hear of and believe these false claims.")

Taking all reasonable inferences in Plaintiff's favor, it is sufficiently plausible that the misrepresentations were effectively disseminated to the relevant purchasing public to constitute 'advertising' or 'promotion' within the calsil industry. The statements were conveyed to at least two large and two small distributors out of a population of only fifteen or so. The industry is structured around distributer-manufacturer relationships and relies on informal means of communication as the primary means of commercial promotion. While the Court is not saying these misrepresentations were sufficiently disseminated in fact, the operative question at this stage is whether Plaintiff plausibly alleges they were. The Court finds it has done this. Therefore,

Plaintiff states a plausible claim for false advertising under the Lanham Act based on misrepresentations attributed to Defendant's sales managers.

      C.    <u>Whether Plaintiff States a Claim Based on Defendant's Frequently Asked Questions Webpage</u>

Defendant makes three arguments as to why Plaintiff fails to state a Lanham Act claim based on the representation on Defendant's FAQ webpage. First, Defendant notes that the FAQ statement does not refer to Plaintiff or Plaintiff's calsil by name. Second, Defendant continues that Plaintiff fails to provide any non-conclusory facts that the FAQ statement is false or material. Lastly, Defendant argues Plaintiff fails to allege that is has been injured by the state on the FAQ webpage. Plaintiff responds that Defendant's contention that the FAQ statement does not identify Plaintiff by name is "specious," because there is no other calsil in the market, so any visitor to the website would know the statement is referring to Plaintiff. Resp. 20. In reply, Defendant notes that Plaintiff does not respond to Defendant's arguments regarding the statement's falsity and materiality or Plaintiff's injury.

The Court agrees with Defendant that Plaintiff fails to plausibly allege the statement on Defendant's FAQ webpage caused Plaintiff injury, as required to state a false advertising claim. Plaintiff's sole allegation as to injury caused by the FAQ statement is that "[t]hese claims are literally false and important and material facts in the decision-making for contractors that *could* demand TPSX-12™ from their distributors that *could* supply the product." FAC ¶ 177 (emphasis added). Plaintiff does not allege, for example, that any of its customers or potential customers viewed this webpage or that Plaintiff lost sales because of the FAQ statement. This allegation is too speculative for the Court to reasonably infer the misrepresentation injured Plaintiff. Accordingly, the statement made on the FAQ webpage does not plausibly support a false advertising claim under the Lanham Act.

## **CONCLUSION**

In sum, after reviewing the Complaint, the parties' briefing, and the oral argument, the Court concludes that Plaintiff has stated plausible claims for tying and monopolization under the Sherman Act, and false advertising under the Lanham Act based on the alleged misrepresentations attributed to Defendant's sales agents. Accordingly, Defendants' Motion to Dismiss Plaintiff's First Amended Complaint [filed August 21, 2019; ECF 36] is **granted in part and denied in part**.

Dated at Denver, Colorado, this 23rd of March, 2020.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge