IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00872-MEH

CHASE MANUFACTURING, INC., d/b/a
THERMAL PIPE SHIELDS,

Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

Defendant.

---

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
REJECTING PLAINTIFF'S ARGUMENT TO EXCLUDE END-USERS OF
INSULATION FROM THE PRODUCT MARKET
RELEVANT TO ITS ANTITRUST CLAIMS**

---

Gregory J. Kerwin
Ryan Bergsieker
Allison Kostecka
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO  80202-2642
Telephone:    303.298.5700

Email:  GKerwin@gibsondunn.com
RBergsieker@gibsondunn.com
AKostecka@gibsondunn.com

*Attorneys for Defendant Johns Manville Corporation*

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................. 1

II.     STATEMENT OF UNDISPUTED FACTS ...................................... 2

     A.     Johns Manville And TPS Compete For Sales Of Calsil. ...................................... 2

     B.     Structure Of Johns Manville's Calsil Sales In The United States. ....................... 3

     C.     Downstream Competition For Sales Of Calsil And Other Industrial Insulation Materials In The United States. ............................................. 5

III.    LEGAL STANDARD ...................................................................... 6

IV.     ARGUMENT ................................................................................... 7

     A.     The Court Cannot Adjudicate TPS's Antitrust Claims Based On TPS's Proposed Upstream Product Market Definition.................................... 8

     B.     Courts Regularly Reject, As A Matter of Law, Unreasonably Narrow Product Markets Like The Product Market Proposed Here................................ 11

     C.     TPS Cannot Rely On The Concept Of A "Cluster" Market, Which Requires Analysis Of Consumers' Downstream Purchasing Requirements, While Presenting Claims Premised On An Upstream Calsil Market. ................. 16

V.      CONCLUSION ............................................................................... 17

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
   300 F.3d 620 (5th Cir. 2002) ...............................................................................12

*Auraria Student Hous. v. Campus Villiage Apts.*,
   843 F.3d 1225 (10th Cir. 2016) ..................................................................7, 11, 13

*Beyer Laser Center, LLC v. Polomsky*,
   No. 16-cv-03099-MEH, 2019 WL 5556082 (D. Colo. Oct. 25, 2019)......................6

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
   532 F.3d 1111 (10th Cir. 2008) ..................................................................9, 11, 13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................6

*Chase Mfg., Inc. v. Johns Manville Corp.*,
   No. 19-cv-00872, 2020 WL 1433504 (D. Colo. Mar. 23, 2020).............................7

*Chase Mfg., Inc. v. Johns Manville Corp.*,
   No. 19-cv-00872, 2019 WL 2866700 (D. Colo. July 3, 2019) ................................7

*Chrisco v. Sgt. John R. Goodrick*,
   No. 17-cv-00073-CMA-MEH, 2018 WL 4242921 (D. Colo. Sept. 6, 2018)...........7

*Christy Sports, LLC v. Deer Valley Resort Co.*,
   555 F.3d 1188 (10th Cir. 2013) ...........................................................................12

*Compliance Mktg., Inc. v. Drugtest, Inc.*,
   No. 09-cv-01241-JLK, 2010 WL 1416823 (D. Colo. Apr. 7, 2010) ......................12

*Fed. Trade Comm'n v. Advocate Health Care Network*,
   841 F.3d 460 (7th Cir. 2016) ...............................................................................17

*Flovac, Inc. v. Airvac, Inc.*,
   817 F.3d 849 (1st Cir. 2016)................................................................................11

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC*,
   371 F.3d 1275 (10th Cir. 2004) ..................................................................9, 16, 17

*Heideman v. South Salt Lake City*,
   348 F.3d 1182 (10th Cir. 2003) .............................................................................6

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ...................................................................................11

*Hysten v. Burlington N. & Santa Fe Ry.*,
    296 F.3d 1177 (10th Cir. 2002) ...................................................................................6

*IGT v. Alliance Gaming Corp.*,
    702 F.3d 1338 (Fed. Cir. 2012) ..................................................................................11

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ....................................................................................12

*Nobody in Particular Presents, Inc. v. Clear Channel Comm., Inc.*,
    311 F.Supp. 2d 1048 (D. Colo. 2004) .........................................................................15

*Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*,
    431 F.3d 1241(10th Cir. 2005) ..................................................................................6,7

*SCFC ILC, Inc. v. VISA USA, Inc.*,
    36 F.3d 958 (10th Cir. 1994) ........................................................................................9

*Scott v. Harris*, 550 U.S. 372 (2007) ...................................................................................6

*Sharif Pharm., Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) ......................................................................................17

*Smalley & Co. v. Emerson & Cuming, Inc.*,
    808 F. Supp. 1503 (D. Colo. 1992) .............................................................................12

*Telecor Comm., Inc. v. Southwestern Bell Telephone Co.*,
    305 F.3d 1124 (10th Cir. 2002) ................................................................9, 14, 15, 16

*Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976 (10th Cir. 2002) .......................6

*U.S. v. Bethlehem Steel Corp.*,
    168 F. Supp. 576 (S.D.N.Y. 1958) .............................................................................14

*U.S. v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) .....................................................................................................9

*Westman Commission Company v. Hobart International, Inc.*,
    796 F.2d 1216 (10th Cir. 1986) .................................................................13, 14, 16

**Rules and Statutes**

Federal Rule of Civil Procedure 56 ......................................................................................6

## I.  INTRODUCTION

Johns Manville Corporation moves  for partial summary judgment because a fundamental flaw undermines Plaintiff's antitrust claims.[1]  Plaintiff Thermal Pipe Shields ("TPS") bases its monopolization and tying claims on a contrived, incomplete upstream product market, which leaves out the consumers who actually use and install calsil in their industrial facilities.  TPS's proposed product market fails as a matter of law because of this conscious effort to disconnect calsil supply from the complete product market demand.

TPS's proposed calsil product market would encompass only the upstream sale of calsil from manufacturers Johns Manville and BEC (through its  sales agent, TPS) to insulation distributors.  To avoid discussing the many reasonable substitutes for calsil available to end-user industrial facility owners, which undercuts TPS's argument that Johns Manville has monopoly power selling calsil, TPS specifically *excludes* from its proposed calsil product market those facility owners.  Yet, TPS cannot reasonably dispute the market structure here.  Industrial facility owners, the engineers that design industrial insulation systems, and the contractors who install insulation at such facilities decide what insulation materials including calsil to purchase from distributors.  It is meaningless, and a legal error, for the Court to analyze only a portion of the market—manufacturers' calsil sales to distributors—without considering the other significant portion—the consumers who drive demand for the calsil and other insulation materials that distributors sell.

It is better for the Court and the parties to address this fundamental flaw now, before the

---

[1]  Judge Hegarty authorized this motion for partial summary judgment before the conclusion of discovery in response to Defendant's counsel's request at the May 19, 2020 Discovery Conference.  Dkt. 64 (Hr'g Tr.) at 4:4–11.

parties invest substantial resources conducting further discovery and preparing expert reports based on TPS's invalid, upstream-only product market.  To grant this partial summary judgment motion, the Court does not need to affirmatively define a correct product market for TPS's claims.  Instead, it merely needs to decide as a matter of law that TPS cannot exclude end-user facility owners and contractors from its proposed calsil product market because such entities drive the demand in the marketplace.  If TPS has failed to present a valid product market for its monopolization and tying claims, the Court must dismiss those claims.[2]

## II.      STATEMENT OF UNDISPUTED FACTS

In accordance with D.C. Colo. LCivR 56.1 and Section III.F of Judge Hegarty's Civil Practice Standards, Johns Manville provides the following Statement of Undisputed Facts relevant to this motion, together with specific references to evidence in the record establishing these facts:

**A.      Johns Manville And TPS Compete For Sales Of Calsil.**

1.      Chase Manufacturing, Inc. d/b/a Thermal Pipe Shields is in the business of supplying mechanical insulation products for construction contractors.

Supporting Evidence:  Scheduling Order, Dkt. 23 at 10 ("Undisputed Fact No. 1").

2.      Johns Manville Corporation manufactures and sells construction products, including industrial insulation products.

---

[2]  It would be futile for TPS to return with a second amended complaint that proposes a calsil-only combined upstream/downstream market, which includes manufacturers, distributors, and facility owners and contractors, because the end-user customers have readily available substitutes for calsil.  *See* Ex. A (Skelly Decl.) ¶¶ 2, 13 & 15; Ex. A-1 (NIA Specification Chart).  A revised product market would have to encompass all types of comparable industrial insulation materials, including calsil, expanded perlite, mineral wool, cellular glass, polyisocyanurate, and aerogel.  TPS cannot plausibly allege that facility owners have no reasonable substitutes for calsil.  And TPS would have no basis to allege Johns Manville has market power in such a revised product market.

Supporting Evidence:  Scheduling Order, Dkt. 23 at 10 ("Undisputed Fact No. 2).

3.      Both Johns Manville and TPS sell calcium silicate ("calsil") pipe and block

insulation and other industrial insulation materials in the United States.

Supporting Evidence:  Exhibit A:  Declaration of David Skelly ¶ 4 ("Skelly Decl.");

Exhibits B-1 and B-2 (TPS website information about its sales of calsil and expanded perlite).

4.      The calsil pipe and block insulation at issue in this lawsuit constitutes a type of

mechanical insulation that is installed primarily in industrial facilities that operate at temperatures

up to 1200° Fahrenheit.

Supporting Evidence:  Exhibit A-1 to Skelly Decl. (NIA Specification Chart); Amended

Complaint, Dkt. 30 ¶¶ 7, 8, 9.

5.      TPS started selling calsil pipe and block insulation in the United States in March

2018.

Supporting evidence:  Exhibit B-1 (TPS news release)

**B.      Structure Of Johns Manville's Calsil Sales In The United States.**

6.      Johns Manville sells the majority of its industrial insulation materials in the United

States, including calsil, to insulation distributors, who resell the insulation to insulation contractors

and facility owners.  But, of note, Johns Manville also sells, on an annual basis, millions of dollars

worth of calsil and other industrial insulation directly to contractors in the United States without

selling through an insulation distributor.

Supporting evidence:  Exhibit A:  Skelly Decl. ¶¶ 6, 7.

7.      Insulation distributors in the United States do not use or install industrial insulation

themselves; instead, insulation distributors resell industrial insulation to insulation contractors and

industrial facility owners for use in industrial facilities such as oil refineries, chemical and power generation plants, pulp and paper mills, where the owners enjoy the benefits of the insulation as end-users.

Supporting evidence:  Exhibit A:  Skelly Decl. ¶¶ 2, 7, 8; Scheduling Order, Dkt. 23 at 10 ("Undisputed Fact No. 1) (TPS "is in the business of supplying mechanical insulation products for construction contractors."); Amended Complaint, Dkt. 30 at ¶ 4 ("TPS is in the business of supplying mechanical insulation products, including calcium silicate thermal insulation, *for distributors that sell to construction contractors . . . .*") (emphasis added); Amended Complaint, Dkt. 30 at ¶ 20 (TPS admits that insulation distributors "resell those [mechanical insulation] products to industrial customers, sometimes referred to as 'contractors' or plant operators").

8.      The owners of industrial facilities, where industrial insulation is used and installed, constitute the end-users for the industrial insulation Johns Manville and TPS sells.  Contractors install the insulation material.  The engineer is the specifier.  The distributors serve as logistics providers.

Supporting evidence:  Exhibit A:  Skelly Decl. ¶ 8.

9.      In selling its calsil and other types of industrial insulation in the United States, Johns Manville representatives frequently communicate directly with representatives of the end-user/industrial facility owners, and the engineering firms and contractors working with them, about what type of industrial insulation the end-user will select for a particular facility.  The end-user facility owner or contractor decides the volume, type, and source of the industrial insulation they purchase from insulation distributors.

Supporting evidence:  Exhibit A:  Skelly Decl. ¶¶ 4, 10.

4

10.     The type and volume of industrial insulation material that distributors sell depends on the purchasing decisions of the contractors, engineers, and industrial facility owners who purchase, specify, and/or install industrial insulation in industrial facilities.

Supporting evidence:  Exhibit A:  Skelly Decl. ¶ 11.

## C.     Downstream Competition For Sales Of Calsil And Other Industrial Insulation Materials In The United States.

11.     Insulation manufacturers compete with each other in selling industrial insulation in the United States by: a) seeking to have particular distributors stock, promote, and sell the manufacturer's insulation materials; and b) seeking to influence the type of insulation material that contractors and industrial facility owners decide to purchase.

Supporting evidence:  Exhibit A:  Skelly Decl. ¶ 12.

12.     Insulation manufacturers compete with each other to persuade the facility owner, contractor, or engineer, who will decide what types and volumes of insulation materials to purchase, to use particular insulation materials, including—potentially—different insulation materials than those called for in the end-user's initial written specification.

Supporting evidence:  Exhibit A:  Skelly Decl. ¶¶ 10, 13.

13.     After the industrial facility owner, contractor, or engineer makes a decision on what type of insulation materials to purchase, the facility owner's or contractor's representatives work with an insulation distributor to order the requested insulation materials.

Supporting evidence:  Exhibit A:  Skelly Decl. ¶ 14.

14.     Attached as Exhibit A-1 is an "Insulation Materials Specification Chart" published by the National Insulation Association ("NIA") trade association and used with the NIA Insulation Training Program, which compares and describes the attributes of different types of industrial and

5

commercial insulation materials sold in the United States, including the material properties and performance characteristics.

Supporting evidence:   Exhibit A: Skelly Decl. ¶ 15; Exhibit A-1 to Skelly Decl. (NIA Specification Chart).

### III.      LEGAL STANDARD

A motion for summary judgment tests whether a trial is required on certain claims. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003); *see generally Beyer Laser Center, LLC v. Polomsky*, No. 16-cv-03099-MEH, 2019 WL 5556082, at *2 (D. Colo. Oct. 25, 2019) (summarizing summary judgment standard).   Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).   Then, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322 (1986).   "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002).   "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola*

*Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).   But "conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence." *Chrisco v. Sgt. John R. Goodrick*, No. 17-cv-00073-CMA-MEH, 2018 WL 4242921, at *2 (D. Colo. Sept. 6, 2018).

## IV.        ARGUMENT

TPS asserts federal antitrust claims for "tying" and "monopolization."   Dkt. 30 ¶¶ 190–200, 201–217.   Both claims require that TPS define "'an appropriate product market.'"   *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872, 2020 WL 1433504, at *4 (D. Colo. Mar. 23, 2020) (quoting *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872, 2019 WL 2866700, at *5 (D. Colo. July 3, 2019)).   TPS's attempt to define a relevant product market fails as a matter of law, and warrants dismissal of its antitrust claims on this motion for summary judgment.   *See Auraria Student Hous. v. Campus Villiage Apts.*, 843 F.3d 1225, 1245 (10th Cir. 2016).

Correctly defining the relevant product market is a threshold requirement in antitrust actions.   *See, e.g.*, *Auraria Student Hous.*, 843 F.3d at 1245.   The proposed product market must represent a "true economic market," or be defined wide enough to encompass all products that have "reasonable interchangeability."   *Id.* at 1245–46.   TPS's proposed upstream product market definition fails to include the end-users and their representatives who drive calsil demand.   TPS cannot reasonably dispute that the distributors who purchase calsil from Johns Manville and TPS, resell it downstream to industrial facility owners and contractors, who create the demand for calsil and other industrial insulation materials.   Yet, TPS tries to manipulate this Court's analysis of competition by declaring that "this downstream link in the chain of commerce is not at issue in

this action." Dkt. 30 at ¶ 20. Without including the end-users who create the demand for calsil, TPS's proposed product market does not a represent a "true economic market."

TPS defines the relevant product market for both its monopolization and tying claims to encompass only calsil sales from insulation manufacturers to distributors, specifically excluding "downstream" sales from distributors to end-user consumers (industrial facility owners and contractors). Dkt. 30 at ¶¶ 11, 20; ¶¶ 193, 196 (alleging calsil is "tied product"); ¶ 202 (alleging monopolization of "national calsil market"). But undisputed facts establish that those "downstream" sales create the demand for calsil. Therefore, TPS cannot exclude the "downstream" sales when defining the relevant product market to evaluate whether Johns Manville has monopolized a U.S. market for calsil or engaged in unlawful tying. As explained below, courts deciding the appropriate boundaries of relevant antitrust product markets reject attempts like what TPS is doing here to define an artificially narrow, partial product market that does not reflect the actual conduct by buyers and sellers that drives demand in the marketplace. Because TPS's product market definition fails as a matter of law, Johns Manville is entitled to summary judgment on both of TPS's antitrust claims.

## A. The Court Cannot Adjudicate TPS's Antitrust Claims Based On TPS's Proposed Upstream Product Market Definition.

TPS contends the Court should evaluate competition for calsil by considering only calsil sales from insulation manufacturers or marketers (Johns Manville and TPS) to insulation distributors. Dkt. 30 at ¶¶ 17–20. Despite acknowledging that distributors resell industrial insulation materials like calsil to industrial "customers" like "contractors" or "plant operators," TPS defines the relevant product market to exclude this "downstream link in the chain of commerce." *Id.* ¶ 20 ("downstream" sales to calsil consumers or end-users are "not at issue in this

action"); ¶ 156 (contending that distributors "sell that calsil [which they purchase from Johns Manville or TPS] to contractors . . ."). Undisputed facts, however, demonstrate that this proposed relevant product market does not provide a framework against which economic power can be measured. This definition, therefore, fails as a matter of law and warrants the dismissal of TPS's antitrust claims on this motion for summary judgment. *See Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008).

The Tenth Circuit has recognized that defining the market relevant to antitrust claims represents a deliberate attempt to simplify, for working purposes, the complex economic interactions between differently situated buyers and sellers, each of whom has different costs, needs, and substitutes. *See, e.g., SCFC ILC, Inc. v. VISA USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994); *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002) (quoting *SCFC ILC, Inc.*, 36 F.3d at 966). The Tenth Circuit has explained that by defining the relevant market, the court identifies "the firms that compete with each other" so that "[p]lugged into the market power inquiry we may then determine whether the alleged anticompetitive activity restrained trade, that is, raised price or reduced output." *Telecor*, 305 F.3d at 1131 (quoting *SCFC ILC, Inc.*, 36 F.3d at 966). To properly define a product market, all products in that market that are reasonably interchangeable must be identified. Courts describe the process of evaluating "reasonable interchangeability" as evaluating "the purposes for which [products] are produced—price, use, and qualities considered." *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004) (quoting *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)). The interchangeability of products "is measured by, and is substantially synonymous with, cross-elasticity." *Id.* (citing *Telecor*, 305 F.3d at 1131).

Here, for the Court to consider what industrial insulation materials are interchangeable, it must be able to examine the consumers who purchase, use, and drive the demand for those insulation materials. Johns Manville sells the majority of its industrial insulation materials, including calsil, through insulation distributors, although it also sells millions of dollars' worth of calsil and other industrial insulation directly to contractors. Statement of Undisputed Material Facts ("SUMF") ¶ 6. Insulation distributors do not use or install industrial insulation materials themselves, but resell the materials to insulation contractors and industrial facility owners for use in industrial facilities such as oil refineries, chemical and power generation plants, pulp and paper mills, where the owners enjoy the benefits of the insulation as end-users. SUMF ¶ 7. The demand for calsil is driven by end-user facility owners, engineers, and contractors, who ultimately decide what insulation materials to use at particular industrial facilities. SUMF ¶¶ 7, 8, 9, 10, 12, 13.

Although TPS attempts to exclude the ultimate consumers from its product market definition, it cannot reasonably contest the relevance of these "downstream" end-user calsil purchasers. TPS's own allegations, in fact, acknowledge that end-users facility owners and contractors installing insulation for them drive the total demand for calsil and other insulation materials in the market. *See* Dkt. 30 ¶ 4 ("TPS is in the business of supplying mechanical insulation products, including calcium silicate thermal insulation, *for distributors that sell to construction contractors* . . . ." (emphasis added)); *id.* ¶ 20 ("These and other smaller *distributors then resell those products to industrial customers, sometimes referred to as 'contractors,' or plant operators*." (emphasis added)); *id.* ¶ 91 ("Losing supply and therefore *being unable to meet contractors' demand would be catastrophic to any distributor*." (emphasis added)); *id.* ¶ 165 (Because of alleged disparaging statements "the [Wyoming] contractors did not order calsil from

Thermal Pipe Shields.").

TPS may argue that the "downstream" link is irrelevant because once facility owners and contractors indicate that they want to purchase calsil, insulation distributors have no choice but to supply calsil. *See* Dkt. 30 ¶¶ 6, 8, 9. But, as noted above, to properly define the relevant product market, TPS must define a market that "reflects the total market demand" for all reasonably interchangeable substitutes, not just the demand for a single product at one stage in the stream of commerce. *Campfield*, 532 F.3d at 1118 (internal quotation marks omitted). Competition among industrial insulation manufacturers often occurs at the "downstream" stage in this chain of commerce, when manufacturers promote their insulation materials to facility owners, or the engineers or contractors working on their behalf, and seek to influence the project plans or "specifications" that outline the types of insulation materials a facility owner, engineer, or contractor plans to use for a particular project. SUMF ¶¶ 7, 9, 10, 11, 12, 13. The Court cannot evaluate competition for calsil or among industrial insulation materials by limiting its analysis to sales from manufacturers to distributors only, ignoring the ultimate consumers of these materials.

**B.      Courts Regularly Reject, As A Matter of Law, Unreasonably Narrow Product Markets Like The Product Market Proposed Here.**

Although defining the relevant market often presents an issue of fact, courts routinely evaluate the legal issues involving definition of a relevant antitrust product market in the context of motions for summary judgment. *See, e.g.*, *Auraria Student Hous.*, 843 F.3d at 1245; *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 851 (1st Cir. 2016) (affirming a grant of summary judgment based on plaintiff's failure to sufficiently define the relevant product market); *IGT v. Alliance Gaming Corp.*, 702 F.3d 1338, 1343 (Fed. Cir. 2012) (affirming a grant of summary judgment for failure to include reasonable substitutes in the relevant product market); *cf. Hicks v. PGA Tour,*

*Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (noting that "[t]here are … some legal principles that govern the definition of an antitrust 'relevant market'" (quoting *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (alterations in original))); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) (indicating that "in some circumstances, the issue [of the relevant market] may be determined as a matter of law" and that such circumstances include when "the plaintiff fails to define its relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products").

Courts regularly reject attempts to define artificially narrow, partial product markets, which do not reflect the actual conduct by buyers and sellers that drives demand in the marketplace. For example, in the Tenth Circuit, a plaintiff's failure to encompass the full scope of relevant economic substitutes renders a proposed product market definition invalid as a matter of law. "To define one small component of the overall product as the relevant product market is simply implausible." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1193–94 & n.2 (10th Cir. 2013) (affirming the dismissal of claims based on a proposed product market of rental skis for destination skiers "disaggregated from the full destination ski experience"). A plaintiff "cannot artificially create antitrust claims by narrowly defining the relevant product market to create the appearance of an antitrust injury." *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *8 (D. Colo. Apr. 7, 2010) (citing *Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F. Supp. 1503, 1512 (D. Colo. 1992) (internal quotation marks omitted)).

Instead, the relevant product market must reflect the total market demand for the product or products at issue and, "[w]hen there are numerous sources of interchangeable demand, the

plaintiff cannot circumscribe the market around a few buyers in an effort to manipulate those buyers' market share." *Campfield*, 532 F.3d at 1119.  In *Campfield*, the Tenth Circuit rejected a proposed product market limited to auto-glass shops that compete to provide windshield repair or replacement services to individuals with State Farm automobile insurance. *Id*. at 1118.  The Tenth Circuit held that this proposed product market was underinclusive because it failed to consider total market demand for the services at issue, including services provided to consumers without State Farm insurance. *Id*.  The Tenth Circuit later applied *Campfield* to reject a proposed product market in litigation involving student housing.  The proposed product market "failed to define a true economic market" by focusing only on a "contractually created class of consumers" rather than on "other segments of the broader Denver rental market." *Auraria Student Hous.*, 843 F.3d at 1245 (internal quotation marks omitted).

In a case with a proposed narrow product market similar to the one TPS advocates for here, the Tenth Circuit rejected an upstream product market limited to kitchen equipment distributors that excluded the ultimate consumers of that equipment.  In *Westman Commission Company v. Hobart International, Inc.*, the Tenth Circuit rejected the argument that the relevant market for sale of kitchen equipment was "one-stop shopping" for kitchen equipment from full-line equipment distributors offering "a package of goods." 796 F.2d 1216, 1220–22 (10th Cir. 1986).  In *Westman*, the plaintiff argued that because the defendant kitchen equipment manufacturer was considered the preeminent kitchen equipment manufacturer, the relevant product market was "one-stop shopping" from restaurant equipment dealers who carried a full-line of equipment including the defendant's products. *Id*. at 1220.  The Tenth Circuit rejected that argument and held the correct perspective for defining the relevant antitrust market was the "market facing the consumer of

13

restaurant equipment," not the "system of product distribution."  *Id.*  The Tenth Circuit explained the fact that "one-stop distribution" may be an effective or superior way to compete does not mean the relevant market is limited to those who use that one-stop distribution method of competition. *Id.* at 1220–21.

In *Westman*, the Tenth Circuit went on to hold that a definition of a line of commerce that "ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful." *Id.* at 1221 (quoting *U.S. v. Bethlehem Steel Corp.*, 168 F.Supp. 576 (S.D.N.Y. 1958)).  It held the relevant product market must encompass products that consumers purchase from restaurant equipment dealers, regardless whether those dealers carried a wide enough range of products and brands to be "one-stop shopping" distributors.  *Id.* at 1221.  The Tenth Circuit reversed as "clearly erroneous" the trial court's fact finding that the product market consisted of less than this market. *Id.*  Applying the Tenth Circuit's holding in *Westman* to TPS's claims here, the relevant market must include the downstream end-user consumers (contractors and industrial facility owners) who purchase calsil and other insulation materials from distributors.  Like the product market definition proposed by the plaintiff in *Westman*, TPS's proposed upstream-only market is too narrow.

The Tenth Circuit's decision *in Telecor Communications, Inc. v. Southwestern Bell Telephone Company* further supports the argument that TPS's proposed project market definition is invalid.  305 F.3d 1124 (10th Cir. 2002).  *Telecor* illustrates how courts focus on *consumer* demand and how that demand shapes what products can be considered reasonably interchangeable when evaluating proposed product market definitions.  In *Telecor*, the Tenth Circuit considered whether cell phone services should be considered reasonable interchangeable substitutes with pay phones in a case that challenged a telephone company's alleged monopoly over *pay phone*

*locations. See id.* at 1132.  The Tenth Circuit found "regardless of the interchangeability of pay phones and cell phones at the end-user level, there is no doubt that pay phones and cell phones are not interchangeable at the location-owner level [i.e. if the defendant raised prices for pay phone locations, the location-owners would not consider cell phones a reasonable substitute], and that is the level where Plaintiffs argued that Southwestern Bell has monopolized competition." *Id.*  Here, TPS cannot reasonably dispute that facility owners and the contractors or engineers working on their behalf—and not distributors—are the ultimate consumers for calsil and other industrial insulation materials.  SUMF ¶¶ 7, 8, 9, 10, 11, 12, 13.  Thus, the product market relevant to TPS's antitrust claims cannot be appropriately considered separate from the downstream customers who create the demand for calsil.

In *Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*, this Court analyzed *Telecor* and recognized that the Tenth Circuit's product market analysis was based on competition for physical payphone locations, not telephone services.  311 F.Supp. 2d 1048 (D. Colo. 2004).  "[B]ecause Southwestern Bell competed with Telecor for pay-telephone locations, the owners of those locations, not the end-users of telephones, constituted the relevant market, even though this market was only one component or input to the universe of end-consumers of telephones." *Id.* at 1076.  When defining a relevant product market, the Court focuses on the defendant's conduct as a whole, not compartmentalized conduct, to consider the cumulative impact of the alleged conduct on consumers.  The Court explained:

> In an antitrust case, when evaluating many different instances of conduct by defendant, the conduct as a whole must always be analyzed, rather than compartmentalized, because it is the cumulative impact of the conduct on consumers which is the relevant inquiry in a monopolization claim. . . .

> [Thus,] [a]lthough compartmentalized examination of the separate input market would be proper if only one input were implicated [as in *Telecor*], when many different instances of conduct allegedly affect different inputs and collectively injure competition in a downstream output market, the relevant market is the downstream market, which is the only level of commerce at which the behavior can be examined collectively."

*Id.* at 1078 (defining the relevant market where the parties compete as the output market for live music concert tickets, not the "input markets" for promotional services, radio air play, advertising, and promotional support).   Similarly here, the cumulative impact of Johns Manville's alleged conduct on consumers for calsil—facility owners and contractors, not distributors—must be analyzed.  TPS proposed product market definition is therefore legally untenable.

## C.   TPS Cannot Rely On The Concept Of A "Cluster" Market, Which Requires Analysis Of Consumers' Downstream Purchasing Requirements, While Presenting Claims Premised On An Upstream Calsil Market.

Finally, TPS's choice to rely on an upstream-only product market for calsil, which excludes consideration of the end-user customers who purchase calsil from distributors, prevents TPS from contending insulation distributors' sales of calsil and other insulation constitute a "cluster" market. The Court cannot evaluate whether insulation distributors meet the specific requirements for such a "cluster" market without considering the purchasing preferences for those distributors' downstream customers, whom TPS seeks to exclude from the relevant product market.

The concept of "cluster markets" is defined in case law as markets in which "a seller provides a full line of products or services that create a separate product market consisting of that 'cluster' of products or services."  *See, e.g., Green Country Food*, 371 F.3d at 1283–84.  But, as the Tenth Circuit has explained, "[a] cluster market exists only when the "cluster" is *itself* an object of consumer demand."  *Id.* at 1284 (citing *Westman Comm'n Co.*, 796 F.2d at 1221).  In *Green Country Food*, the Tenth Circuit indicated that the plaintiff's proposed cluster market

fundamentally misunderstood "the significance of a cluster market." 371 F.3d at 1284–85. The Tenth Circuit explained that "the fact that an entity distributes a number of different products does not itself give it monopoly power in a 'cluster market'; it merely defines the product(s)/service(s) offered by the distributor as a package and then limits the relevant product market to those entities that can offer a competitive package." *Id.*

Because "consumer demand" defines a cluster market, to the extent the analysis of a proposed "cluster market" could be relevant here, it would concern downstream end-user/consumers (facility owners and contractors) who ultimately determine the demand for distributors' sale of insulation. *See Sharif Pharm., Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 918 (7th Cir. 2020) (quoting *Fed. Trade Comm'n v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016)). Yet, TPS seeks to exclude from its proposed market these end-user/consumers who purchase calsil and other insulation materials from distributors. To contend insulation distributors constitute a cluster market, TPS would have to demonstrate that industrial insulation end-users require distributors to offer a "cluster" of insulation products, where the cluster itself is the object of consumer demand. While TPS includes some allegations in its Amended Complaint where it alleges insulation distributors need to carry a range of insulation materials (*see, e.g.*, Dkt 30 ¶¶ 78, 79, 82, 125), TPS cannot have it both ways. It cannot exclude end-users from its proposed calsil product market (because it knows those end-users have readily available substitutes for calsil), while purporting to protect those end-users' supposed desire to purchase from distributors who offer a full "cluster" of insulation materials.

## V.       CONCLUSION

For the reasons explained above, TPS's proposed product market for upstream sales of

calsil from manufacturers to distributors is too narrow as a matter of law because it excludes the end-user consumers and their representatives who drive demand for the insulation materials that distributors sell.  As a result, TPS has not defined a valid product market for calsil to support its antitrust claims and those claims must be dismissed.

Johns Manville requests that the Court hold oral argument concerning this motion once it is fully briefed.

Dated:   August 14, 2020

Respectfully submitted,

_ s/ Gregory J. Kerwin_
Gregory J. Kerwin
Ryan Bergsieker
Allison Kostecka
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO  80202-2642
Telephone:     303.298.5700
Email:  GKerwin@gibsondunn.com
RBergsieker@gibsondunn.com
AKostecka@gibsondunn.com

*Attorneys for Defendant Johns Manville Corporation*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2020, I electronically filed the foregoing DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT REJECTING PLAINTIFF'S ARGUMENT TO EXCLUDE END-USERS OF INSULATION FROM THE PRODUCT MARKET RELEVANT TO ITS ANTITRUST CLAIMS with the Clerk of Court using the CM/ECF system. A copy of this document was served on the following counsel of record for Plaintiff through the Court's ECF system:

Alexandra H. Shear
Jarod M. Bona
Luke Hasskamp
Bona Law PC
375 Park Avenue, Suite 2607
New York, NY   10152
Emails:  alex.shear@bonalawpc.com
jarod.bona@bonalawpc.com
luke.hasskamp@bonalawpc.com


Geoffrey N. Blue
7350 E Progress Pl., Suite 100
Greenwood Village, CO 80111
Email:  gblue@gbluelaw.com


*s/ Loretta Howard*
Loretta Howard