# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:19-cv-00872-MEH**

CHASE MANUFACTURING, INC., d/b/a
THERMAL PIPE SHIELDS,

*Plaintiff*,

v.

JOHNS MANVILLE CORPORATION,

*Defendant.*

---

# PLAINTIFF'S OPPOSITION TO
# DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

THERMAL PIPE SHIELDS'S RESPONSE TO JOHNS MANVILLE'S

     STATEMENT OF UNDISPUTED MATERIAL FACTS ................................ 3

THERMAL PIPE SHIELDS'S STATEMENT OF ADDITIONAL MATERIAL FACTS ........... 9

     A.    The mechanical insulation industry ...................................................... 9

     B.    The design and construction process of industrial facilities and
         commercial buildings.......................................................................... 11

     C.    The importance of distributors............................................................ 14

     D.    Distributors need to be able to carry numerous products to meet
         their customers' demand ..................................................................... 14

     E.    Engineers' written specifications........................................................ 15

LEGAL STANDARD.......................................................................................... 16

ARGUMENT .................................................................................................... 18

    I.    TPS's Product Market Definition Reflects the Realities of the Calsil Market ............. 19

     A.    TPS's market definition properly focuses on the sale of calsil from
         manufacturers to direct purchasers .................................................... 20

     B.    Any argument that TPS could try to bypass the distributor market
         and attempt to sell directly to end-users fails..................................... 23

    II.    TPS's Market Definition Correctly Focuses on the Level of Commerce
    Where the Defendant Targets Its Anticompetitive Conduct ......................................... 24

     A.    Johns Manville monopolized the market for direct sales of calsil........................ 25

     B.    It is unnecessary to include end-users or downstream activity in
         a direct sales market definition ........................................................... 27

     C.    It is appropriate to focus on a single level of commerce when
         end-users have different elasticities of demand ................................... 28

    III.    Courts Have Repeatedly Approved Product Markets that Focus on
    Specific Segments or Levels of Commerce, Such as Intermediate Markets.................. 30

    IV.    No Case Cited by Johns Manville Forbids a Market Definition Limited
    to a Single Level of Commerce ...................................................................... 33

CONCLUSION.................................................................................................. 36

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ad-Vantage Tel. Directory Consultants v. GTE Directories Corp.*,
  849 F.2d 1336 (11th Cir. 1987) .......................................................................27

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................17

*Ansell Inc. v. Schmid Lab'y, Inc.*,
  757 F. Supp. 467 (D.N.J. 1991) ......................................................................32

*Auraria Student Hous. v. Campus Vill. Apts.*,
  843 F.3d 1225 (10th Cir. 2016) .......................................................................35

*In re Auto. Parts Antitrust Litig.*,
  2:12-md-02311 (E.D. Mich.) ...........................................................................19

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)............................................................................... *passim*

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
  532 F.3d 1111 (10th Cir. 2008) .................................................................34, 35

*In re Capacitors Antitrust Litig.*,
  3:17-md-2801 (N.D. Cal.).................................................................................19

*CBS, Inc. v. FTC*,
  414 F.2d 974 (7th Cir. 1969) ...........................................................................31

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...................................................................................16, 17

*Cinetopia, LLC v. AMC Ent. Holdings, Inc.*,
  No. 18-2222-CM-KGG, 2018 U.S. Dist. LEXIS 216600 (D. Kan. Dec. 27,
  2018) ................................................................................................................31

*Compliance Mktg. v. Drugtest, Inc.*,
  Civil Action No. 09-cv-01241-JLK, 2010 U.S. Dist. LEXIS 34315 (D. Colo.
  Apr. 7, 2010)...............................................................................................35, 36

*Dauro Advert., Inc. v. GMC*,
  75 F. Supp. 2d 1165 (D. Colo. 1999)...............................................................32

*Flash Elecs. v. Universal Music*,
  312 F. Supp. 2d 379 (E.D.N.Y. 2004) ...................................................................31

*FTC v. Cardinal Health*,
  12 F. Supp. 2d 34 (D.D.C. 1998) .........................................................................32

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ..............................................................................30

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986)...............................................................................................21

*FTC v. Staples*,
  970 F. Supp. 1066 (D.D.C. 1997) .........................................................................32

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC*,
  371 F.3d 1275 (10th Cir. 2004) .............................................................................35

*Greyhound Comput. Corp. v. IBM Corp.*,
  559 F.2d 488 (9th Cir. 1977) .................................................................................31

*Henry v. Chloride, Inc.*,
  809 F.2d 1334 (8th Cir. 1987) ...............................................................................31

*Ill. Brick Co. v. Illinois*,
  431 U.S. 720 (1977)...............................................................................................19

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984)...................................................................................................25

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
  762 F.3d 1114 (10th Cir. 2014) .............................................................................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...............................................................................................17

*McWane, Inc.*,
  2014 FTC LEXIS 28 (F.T.C. Jan. 30, 2014)..........................................................29

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) .................................................................28, 29, 30

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*
  311 F. Supp. 2d 1048 (D. Colo. 2004).......................................................25, 27, 33

*In re Processed Egg Prods. Antitrust Litig.*,
    2:08-md-02002-GP (E.D. Pa.) ...............................................................19

*SCFC ILC, Inc. v. Visa USA, Inc.*,
    36 F.3d 958 (10th Cir. 1994) ...............................................................33

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) ...............................................................35

*Smalley & Co. v. Emerson & Cuming, Inc.*,
    808 F. Supp. 1503 (D. Colo. 1992)........................................................36

*Sterling Merch., Inc. v. Nestle, S.A.*,
    724 F. Supp. 2d 245 (D.P.R. 2010)........................................................28

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
    305 F.3d 1124 (10th Cir. 2002) ............................................... *passim*

*U.S. Postal Serv. v. Postal Regul. Comm'n*,
    816 F.3d 883 (D.C. Cir. 2016)...............................................................27

*United States v. Dentsply, Int'l Inc.*,
    399 F.3d 181 (3d Cir. 2005)..................................................... *passim*

*United States v. E. I. du Pont de Nemours & Co.*,
    353 U.S. 586 (1957)..............................................................................25

*Westman Comm'n Co. v. Hobart Int'l, Inc.*,
    796 F.2d 1216 (10th Cir. 1986) ............................................................34

**Rules and Statutes**

15 U.S.C. § 2.......................................................................................25, 27, 31

**Other Authorities**

7 Phillip E. Areeda, *Antitrust Law* ¶ 1511 (1986) ........................................21

ABA Section of Antitrust Law, Antitrust Law Developments (8th ed. 2017) ............................18

Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2020 Cum. Supp. 2013–2019.) ...............................................................................17, 29

U.S. DOJ & FTC, Horizontal Merger Guidelines (2010) § 4 .......................17

Vertical Merger Guidelines,
https://www.ftc.gov/system/files/documents/reports/us-department-justice-
federal-trade-commission-vertical-merger-
guidelines/vertical_merger_guidelines_6-30-20.pdf ...........................................................27

## INTRODUCTION

Ignoring the fact that defining a relevant product market is a highly fact-intensive inquiry, Johns Manville ("JM") seeks summary judgment based on a flawed, purely legal premise: that a product market must include, ***as a matter of law***, all upstream and all downstream activity. JM argues that this is so, regardless of the level of commerce within—or specific link of—the chain of distribution at which the anticompetitive conduct occurs (i.e., where conduct is directed and its impact is felt), and regardless of whether there is even any transaction between the constituents JM lumps together. JM's argument is legally incorrect, economically unsound, and disregards the factual realities of the market in which Thermal Pipe Shields ("TPS") and JM compete.

The product market that TPS defines is appropriate because it reflects the realities of the calsil market, namely that JM and TPS (collectively, the "Calsil Manufacturers") sell primarily to distributors, with some limited sales to contractors, but not to end-users (who do not purchase calsil at all) and not to purchasers who buy calsil from distributors in downstream resale markets. Importantly, JM has not produced evidence of any calsil sales to end-users.

That ***distributors*** resell calsil in downstream markets to contractors hired by end-users does not affect the analysis. The analysis must focus on whether certain sales were affected by anticompetitive conduct, and so begins with the threshold exercise of identifying a relevant set of sales. End-users' demand may relate to the reason those sales are made or to what occurs after the sales are made, but not to whether they were tainted by anticompetitive conduct.

Despite JM's suggestion otherwise, TPS has not excluded any purchaser from its market definition. TPS defines the product market to include ***all*** calsil sales made by Calsil Manufacturers. If a customer purchases calsil from one of the two Calsil Manufacturers, it is included, i.e., no

direct purchaser is excluded. It just so happens that these purchasers are only of two types: distributors or contractors. Under TPS's broad definition, no end-user qualifies only because no end-user purchases calsil directly from one of the two manufacturers.

No case cited by JM, nor found by TPS, has held that, as a matter of law, a market definition must include all levels of commerce—from manufacturer all the way through retail to all end-users. To the contrary, numerous courts have affirmed market definitions that address a single link of the supply chain, including distribution or other intermediate markets, particularly when the anticompetitive conduct at issue taints that specific level of commerce.

In essence, JM is insisting—without support—that TPS define its product market in a way that conflates multiple distinct markets simply because they involve the same product. Even more remarkably, JM implicitly asks the Court to hold that a market definition focused on a single tier of commerce can ***never*** pass muster as a matter of law and that ***every*** market definition must collapse all vertical levels of commerce into one sprawling multi-channel market. Such a broad holding would be a radical departure from established antitrust law and contrary to the realities of markets, such as the market for calsil. Moreover, to the extent JM argues that such a conclusion is only necessary with respect to this particular market, that necessarily implicates questions of disputed fact about the particularities of the calsil market that preclude summary judgment.

Just as JM argues that the Court should not adjudicate claims on the basis of an artificially narrow market definition, neither should it adopt a definition that is artificially broad. Moreover, the risk of doing here so is to unreasonably dilute and disguise the effects of JM's anticompetitive conduct. Because JM's motion lacks foundation in law or fact, JM has failed to carry its burden. Accordingly, the Court should deny JM's motion.

**THERMAL PIPE SHIELDS'S RESPONSE TO**
**JOHNS MANVILLE'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Thermal Pipe Shields does not deny Paragraphs 1–2, and 5 of Johns Manville's Statement of Undisputed Facts. Thermal Pipe Shields does deny Paragraphs 3–4 and 6–14.

**3.** **Both Johns Manville and TPS sell calcium silicate ("calsil") pipe and block insulation and other industrial insulation materials in the United States.**

<u>TPS response</u>: Denied in part. TPS agrees that both JM and TPS sell calsil pipe and block insulation in the United States, but TPS disputes the term "industrial insulation" as a distinction without a difference. Shong Decl. ¶ 13. The insulation at issue in this litigation is mechanical insulation, which may be used in either industrial or commercial facilities. *Id.* Mechanical insulation is the exact same product and performs the same function whether it is installed in an industrial or commercial facility. *Id.* ¶¶ 13–14.

**4.** **The calsil pipe and block insulation at issue in this lawsuit constitutes a type of mechanical insulation that is installed primarily in industrial facilities that operate at temperatures up to 1200° Fahrenheit.**

<u>TPS response</u>: Denied in part. TPS agrees that calsil is an excellent option for an industrial facility requiring mechanical insulation operating at temperatures up to 1200° Fahrenheit. Yet, calsil has many other unique and important characteristics that make it an attractive and must-have option in other types of facilities and in contexts with lower maximum operating temperatures. Shong Decl. ¶ 15. Calsil has a very high compressive strength, which allows it to resist damage and physical abuse much better than other products, making it exceptionally durable. *Id.* ¶ 16. Calsil's extreme durability provides long service life by preventing crushing due to on-site foot traffic and abuse. *Id.* ¶ 17. Calsil is also inherently non-combustible and generates no smoke when exposed to flame, which provides passive fire protection. *Id.* ¶ 18. Calsil also contains integral

3

corrosion-inhibiting chemistry and offers low thermal conductivity to prevent heat loss and reduce the surface temperature of insulated surfaces, which protect workers from burn injuries. *Id.* ¶ 19.

Further, the National Insulation Association chart attached to Mr. Skelly's declaration does not state or even suggest when or where calsil "is installed primarily," nor does TPS's First Amended Complaint with Jury Demand (Dkt. 30) ("FAC"), which are the only two sources cited for this factual assertion.

**6.      Johns Manville sells the majority of its industrial insulation materials in the United States, including calsil, to insulation distributors, who resell the insulation to insulation contractors and facility owners. But, of note, Johns Manville also sells, on an annual basis, millions of dollars worth of calsil and other industrial insulation directly to contractors in the United States without selling through an insulation distributor.**

TPS response: Denied in part. TPS does not contest that JM sells the majority of its insulation materials to insulation distributors, who then resell those materials. However, while distributors do resell insulation materials to insulation contractors, they rarely sell anything to facility owners, who instead pay contractors to complete a job, which necessarily includes the contractor's furnishing needed materials. Shong Decl. ¶ 46. TPS disputes JM's use of the term "industrial insulation materials" and incorporates its response to JM Fact #3. *See id.* ¶¶ 13–14.

Further, JM's assertion that "Johns Manville also sells, on an annual basis, millions of dollars' worth of calsil and other industrial insulation directly to contractors in the United States without selling through an insulation distributor," is an opaque description that appears to be an intentional choice to obscure the small proportion of direct calsil sales to contractors, otherwise such sales would be specifically quantified and not lumped in with "other industrial insulation." The vast majority of mechanical insulation sold by manufacturers, including calsil, is sold to distributors. *Id.* ¶¶ 9-10, 57.

7.    **Insulation distributors in the United States do not use or install industrial insulation themselves; instead, insulation distributors resell industrial insulation to insulation contractors and industrial facility owners for use in industrial facilities such as oil refineries, chemical and power generation plants, pulp and paper mills, where the owners enjoy the benefits of the insulation as end-users.**

TPS response: Denied in part. TPS disputes JM's use of the term "industrial insulation" and incorporates its response to JM Fact #3. *See* Shong Decl. ¶¶ 13–14. Additionally, insulation distributors resell mechanical insulation to insulation contractors for use in commercial facilities as well as for use in industrial facilities. *Id*. ¶ 45.

8.    **The owners of industrial facilities, where industrial insulation is used and installed, constitute the end-users for the industrial insulation Johns Manville and TPS sells. Contractors install the insulation material. The engineer is the specifier. The distributors serve as logistics providers.**

TPS response: Denied in part. TPS agrees that the owners of industrial facilities are end-users of mechanical insulation and that insulation contractors install insulation materials in accordance with engineers' specifications. Yet, JM's suggestion that distributors are mere "logistics providers" is wholly inaccurate and misleading. Distributors perform an essential function in the industry and serve as a critical conduit between manufacturers and downstream consumers. Shong Decl. ¶¶ 49–54. The distributor's primary role is to sell to the insulation contractor what the contractor needs to supply a project in accordance with the written and contractually binding specifications for a given job. *Id.* ¶ 50. The sale is an arms'-length transaction, but the distributor will advise the customer about the cost, availability, or other features of one branded product relative to another. *Id.* This advice is informed to some extent by the distributor's relationship with the manufacturers whose brands it carries. *Id.* In other words, the distributor helps the contractor decide whose product to buy—from the distributor, not the manufacturer. *Id.* ¶ 51. The distributor then sells that product to the contractor, after having

purchased it from the manufacturer. *Id.* The distributor severs the link between the contractor (and further downstream users) and the manufacturer by itself making the first, direct purchase from the manufacturer. *Id.* In some limited circumstances, manufacturers sell directly to contractors. *Id.*

Distributors also help supply the many and varied products that are commonly needed for construction projects requiring mechanical insulation, including the accessories and ancillary products that are critical to the installation of mechanical insulation, as it is essential that insulation contractors have access to a wide range of products given the diverse needs on nearly all projects. *Id.* ¶ 52. Distributors further help to ensure that products are delivered to projects sites in compliance with project timelines and requirements. *Id.* ¶ 53. Distributors also play an important role in financing projects by providing payment terms that give insulation contractors 60–120 days to pay for materials without interest. *Id.* ¶ 54.

Further, TPS disputes JM's use of the term "industrial insulation" and incorporates its response to JM Fact #3. *See id.* ¶¶ 13–14.

**9.     In selling its calsil and other types of industrial insulation in the United States, Johns Manville representatives frequently communicate directly with representatives of the end-user/industrial facility owners, and the engineering firms and contractors working with them, about what type of industrial insulation the end-user will select for a particular facility. The end-user facility owner or contractor decides the volume, type, and source of the industrial insulation they purchase from insulation distributors.**

<u>TPS response</u>: Denied in part. Insulation contractors do not determine which generic type or thickness of insulation to order for a given project. Shong Decl. ¶ 40. The insulation contractor will only furnish and install the exact type, thickness, and volume of material the engineer demands in the written specifications contained within the legally binding contract that the contractor has a professional responsibility to execute. *Id.* Insulation contractors do not issue written specifications for mechanical insulation because they are not licensed engineers and, therefore, are not qualified

6

to design mechanical systems or specify the type or thickness of insulation. *Id.* ¶ 41. A contractor cannot assume the legal liability of designing mechanical systems, and its bond insurance policies will not cover losses associated with a failure due to a contractor's faulty design. *Id.* It is the contractor's responsibility to purchase the specified insulation materials. *Id.* ¶ 42. The insulation contractor and the distributor work together to determine which manufacturer's brand name product the contractor will purchase after the engineer's specifications have been codified in the contract. *Id.* The purchase decision will depend on cost, availability, and perhaps other factors, but in all cases is limited to the product or products that satisfy the engineer's specification. *Id.*

Further, TPS disputes JM's use of the term "industrial insulation" and incorporates its response to JM Fact #3. *See id.* ¶¶ 13–14.

**10.  The type and volume of industrial insulation material that distributors sell depends on the purchasing decisions of the contractors, engineers, and industrial facility owners who purchase, specify, and/or install industrial insulation in industrial facilities.**

TPS response: Denied as misleading and incomplete. Engineers and facility owners do not make purchasing decisions with respect to insulation materials, nor do they install materials. Shong Decl. ¶ 48. Only insulation contractors make purchasing decisions with respect to mechanical insulation, and they are obligated to purchase the insulation that is specified by the engineer as it is codified in the insulation contractor's contract with the facility owner. *Id.* Moreover, insulation contractors are the only ones who install mechanical insulation. *Id.*

Further, TPS disputes JM's use of the term "industrial insulation" and incorporates its response to JM Fact #3. *See id.* ¶¶ 13–14.

**11.  Insulation manufacturers compete with each other in selling industrial insulation in the United States by: a) seeking to have particular distributors stock, promote, and sell the manufacturer's insulation materials; and b) seeking to influence the type of insulation material that contractors and industrial facility owners decide to purchase.**

TPS response: Denied in part. Insulation manufacturers do attempt to influence decision makers at all levels of the supply chain, but the type of influence varies at different levels and with respect to different actors who have varying degrees of discretion (or none at all) with respect to which insulation materials will be installed or purchased. Shong Decl. ¶¶ 23–24, 26, 31. Only distributors and insulation contractors purchase mechanical insulation—the former from manufacturers, the latter from manufacturers or distributors—and purchasing decisions are made in accordance with insulation contractors' contracts with facility owners, which incorporate the engineer's written and binding specifications. *Id.* ¶¶ 36, 40, 48, 50–51.

Further, TPS disputes JM's use of the term "industrial insulation" and incorporates its response to JM Fact #3. *See id.* ¶¶ 13–14.

**12.    Insulation manufacturers compete with each other to persuade the facility owner, contractor, or engineer, who will decide what types and volumes of insulation materials to purchase, to use particular insulation materials, including—potentially— different insulation materials than those called for in the end-user's initial written specification.**

TPS response: Denied in part as misleading and incomplete. Distributors seek to purchase what they are able to resell, which is another way of saying what their customers want to purchase. Shong Decl. ¶¶ 11, 29–30. The fact that TPS and JM seek to influence end-users' preferences means only that they recognize that the downstream end-users' preferences influence the preferences of the direct calsil purchasers. *Id.* ¶ 23.

**13.    After the industrial facility owner, contractor, or engineer makes a decision on what type of insulation materials to purchase, the facility owner's or contractor's representatives work with an insulation distributor to order the requested insulation materials.**

TPS response: Denied in part. JM does not define the terms "facility owner's representatives" or "contractor's representatives," but only insulation contractors make purchasing

decisions, i.e., purchase insulation materials, from distributors. Shong Decl. ¶ 48. Further, their purchasing decisions are limited to the choices permitted by—that will comply with—the engineer's specifications. *Id.* ¶¶ 41–43. Facility owners and engineers do not make decisions about what type of insulation materials to purchase. *Id.* ¶ 48.

**14.   Attached as Exhibit A-1 is an "Insulation Materials Specification Chart" published by the National Insulation Association ("NIA") trade association and used with the NIA Insulation Training Program, which compares and describes the attributes of different types of industrial and commercial insulation materials sold in the United States, including the material properties and performance characteristics.**

TPS response: Denied in part. The Insulation Materials Specification Chart does not use or define the terms "industrial insulation" or "commercial insulation." and TPS disputes JM's use of the term "industrial insulation" and incorporates its response to JM Fact #3. *See* Shong Decl. ¶¶ 13–14. Further, TPS notes that the Insulation Materials Specification Chart classifies insulation products by their unique ASTM Material Standard numbers, including calsil (C533 Type I), which is the typical means of reference in the mechanical insulation industry. *Id.* ¶ 33.

## THERMAL PIPE SHIELDS'S STATEMENT OF ADDITIONAL MATERIAL FACTS

In accordance with Section III.F of Judge Hegarty's Civil Practice Standards, TPS provides the following Statement of Additional Material Facts ("SAMF"):

### A.   The mechanical insulation industry

1.   Calsil is a shorthand term for hydrous calcium silicate thermal insulation—a type of mechanical insulation—that is factory formed into flat blocks or curved sections designed to encapsulate pipes, tanks, pressure vessels and other equipment that operate at temperatures from 80º up to 1200º Fahrenheit within large industrial facilities, such as oil refineries, chemical and

power generation plants, pulp and paper mills, and within commercial buildings such as hospitals, schools, multi-family housing and shopping and data storage centers.

Supporting evidence: Shong Decl. ¶ 5.

2.      The calsil sold by TPS and JM is manufactured in accordance with ASTM C533 Type I, an international material standard that is the typical reference used by those in the mechanical insulation industry to classify generic product types that satisfy certain performance criteria.

Supporting evidence: Shong Decl. ¶ 6.

3.      TPS and JM sell calsil to distributors and, to a lesser extent, to contractors. They do not sell directly to other types of customers, such as end-users.

Supporting evidence: Shong Decl. ¶ 7.

4.      Insulation distributors resell mechanical insulation products, including calsil, in downstream markets, primarily to insulation contractors and, more rarely, to other types of customers, including, in some cases, end-users.

Supporting evidence: Shong Decl. ¶ 8.

5.      These distributors are able to resell mechanical insulation products, including calsil, and all of the required accessories needed to install the insulation system to their customers in a manner that is more efficient, and at a greater scale, than TPS could achieve through direct sales. As a result, access to distribution is critically important to TPS's ability to compete effectively in the calsil market.

Supporting evidence: Shong Decl. ¶ 12.

**B.     The design and construction process of industrial facilities and commercial buildings**

6.     The design and construction process begins when an owner decides to build the relevant site—an industrial facility, a commercial building, or any type of physical structure that requires mechanical systems that must be insulated in order to function properly.

Supporting evidence: Shong Decl. ¶ 20.

7.     The owner will hire an architect (who designs the commercial building) or an Engineering/Procurement/Construction ("EPC") firm (which designs the industrial facility). The architect hires a third-party mechanical engineering firm, or the EPC firm's internal engineers are tasked with designing the mechanical systems within that facility. This includes specifying materials and methods for all piping, fixed and rotating equipment, and all other needed accessory materials—including mechanical insulation—and then overseeing the construction process to ensure that the system is installed in accordance with the plans and specifications.[1]

Supporting evidence: Shong Decl. ¶ 21.

8.     The mechanical engineer of record will evaluate the design criteria and needs of the project and consider the many fit-for-use requirements along with total cost, lead time, and labor rates to specify a material for use that satisfies these requirements. The decision regarding which distinct type of mechanical insulation to specify is at the sole discretion of the engineer of record and is codified during the design phase.

---

1.     New industrial facilities or major expansions within existing facilities are often designed and constructed by EPC firms, which are vertically integrated entities that perform all functions from design and engineering through material procurement through construction, and furnish turn-key facilities to owners that the EPC warrantees for a limited time (typically one to two years) in exchange for a lump-sum payment.

<u>Supporting evidence</u>: Shong Decl. ¶ 22.

9.      Because engineers do not purchase insulation or make purchasing decisions, they do not dictate which distributor will supply the specified type of insulation to the contractor. Nor do they choose the manufacturer of the insulation that the contractor will purchase from the distributor.

<u>Supporting evidence</u>: Shong Decl. ¶ 39.

10.     If the specifications call for calsil anywhere in the project, calsil must be installed there. The contractor has no discretion to ignore or overrule the engineer's specifications, nor does the distributor from whom the contractor purchases the product. In all cases, the engineer of record alone determines which generic types of insulation that "shall be installed" in each area duly noted on the plans, drawings, piping schedules, and material specifications.

<u>Supporting evidence</u>: Shong Decl. ¶ 31.

11.     Once the design documents are finalized, the various bid packages will be "let" to a group of general or mechanical contractors who submit them to various insulation contractors (who are sub-contractors) to obtain competitive bids in order to tender a legally binding bid for the project in strict accordance with the plans, drawings, and material specifications in the project documents.

<u>Supporting evidence</u>: Shong Decl. ¶ 24.

12.     The owner then reviews the bid proposals and awards the job to the winning contracting firm based on the low bid or other predetermined criteria. At this point, the design phase is complete, and no changes can be made to the material specifications without a formal written process called a change order.

Supporting evidence: Shong Decl. ¶¶ 25–26.

13.    The winning contractor will then award a sub-contract to an insulation contractor with a schedule to complete the project. That insulation contractor then compiles a "submittal package" which includes a comprehensive list of all the materials to be installed by brand name including, product data sheets, safety data sheets, technical bulletins, and other product literature while highlighting the information required to demonstrate compliance with the material specifications.

Supporting evidence: Shong Decl. ¶¶ 27–28.

14.    To determine which branded products to include in the submittal package, the contractor will consult with distributors to determine the availability and cost of various branded products that will comply with the specifications in the contract.

Supporting evidence: Shong Decl. ¶ 29.

15.    Once the submittal package is approved, the insulation contractor then makes the purchasing decision as to which distributor it will purchase from based on which products were submitted and which distributor carries which brand in its local area.

Supporting evidence: Shong Decl. ¶ 30.

16.    Contractors provide the end-users that hire them with a package of services that includes procurement of materials and provision of labor. They do not resell the materials that they purchase from distributors to their end-user clients. Rather, they are paid a fixed amount to purchase and install materials and the amount spent on materials does not affect what the end-user pays the contractor.

Supporting evidence: Shong Decl. ¶ 44.

17.   While facility owners communicate their opinions, preferences, and requirements to the professionals that they hire, they do not decide which type, thickness or brand of insulation materials or even which distributor to purchase from because they do not purchase insulation and are not qualified to dictate these decisions to those who do purchase insulation.

Supporting evidence: Shong Decl. ¶ 47.

**C.     The importance of distributors**

18.   For pipe insulation, there are hundreds of different combinations of pipe size and thickness available, making it impractical for an insulation contractor to inventory large quantities of these insulation materials. For all existing (i.e., maintenance) projects, use of insulation distributors is the only realistic option. In addition to providing the different pipe insulation sizes necessary in the quantities necessary, insulation distributors maintain inventories of block and board insulation products as well as insulation accessories such as facings, protective jacketing, mastics, adhesives, and tapes.

Supporting evidence: Shong Decl. ¶ 55.

19.   In addition to this efficiency, distributors account for the vast majority of insulation sales by manufacturers. Due to this structure of the industry and the essential role served by distributors, it is virtually impossible for TPS to bypass the distributor network by selling directly to insulation contractors or end-users.

Supporting evidence: Shong Decl. ¶ 57.

**D.     Distributors need to be able to carry numerous products to meet their customers' demand**

20.   When insulation contractors purchase materials from distributors, they generally seek to satisfy all project needs from a single distributor, which allows contractors to leverage incentive

rebate programs as well as convenience and requires the distributor to be able to supply a large selection of insulation products, accessories, and ancillary supplies.

Supporting evidence: Shong Decl. ¶ 59.

21.   If a manufacturer is unable to have a distributor sell its products, the distributors' customers are unlikely to turn elsewhere to buy that product separately and so instead the customer would likely buy another qualifying product that the distributor sells.

Supporting evidence: Shong Decl. ¶ 60.

22.   From a manufacturer standpoint, it is essential to be included among a distributor's offerings. If a distributor cannot buy a manufacturer's product, it cannot resell it. And if a distributor cannot sell TPS's calsil to contractors, there is no alternative sales channel in which the contractors can buy it, because TPS does not have a practical alternative means of selling it.

Supporting evidence: Shong Decl. ¶ 61.

**E.      Engineers' written specifications**

23.   In Paragraph 13 of his declaration, Mr. Skelly suggests three types of written specifications used by engineers to specify insulation needs. The second type of written specification identified by Mr. Skelly—specifying generic ASTM material standards—is by far the most common and straightforward means used by an engineer to specify any construction material, including calsil. ASTM standards allow contractors to exercise judgment and discretion in evaluating a distributor's offerings where multiple branded products may exist that meet the required performance criteria identified by the engineer.

Supporting evidence: Shong Decl. ¶¶ 32–33.

24.   Mr. Skelly's first type of written specification—specifying "insulation materials using a material's name"—is incomplete because it fails to mention essential subsequent qualifiers always included in these types of brand name specific specifications. Namely, whether the engineer will accept an "or equal" brand name product if the alternative product meets or exceeds the same performance criteria as the listed brand name product.

Supporting evidence: Shong Decl. ¶ 34.

25.   Finally, Mr. Skelly's third type of written specification—that an engineer's written specifications may simply identify "certain design and performance criteria"—is never used because it would result in no meaningful specification at all, and uncertainty would plague the design process from bid stage through completion.

Supporting evidence: Shong Decl. ¶ 35.

26.   Importantly, Mr. Skelly's declaration omits a fourth type of written specification that is very common among industrial facility owners known as "maintenance and repair operations" ("MRO") contracts. This specification type requires a contractor to "replace insulation in kind." This means that any insulation must be replaced with the same type and thickness that is removed, and the only choice concerns the brand and from which distributor the contractor will purchase. A significant portion of installation work in industrial facilities is MRO work, not new construction.

Supporting evidence: Shong Decl. ¶ 36.

### LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477

U.S. 317, 321–23, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986).

However, identifying the correct contours of a product market is generally a question of fact.[2] *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1120 (10th Cir. 2014). This question can concern any one of a number of a market's features, including the composition of its participants and the products that fall within it. *See, e.g.*, U.S. DOJ & FTC, Horizontal Merger Guidelines (2010) § 4 ("[M]arket definition allows the Agencies to *identify market participants* and measure market shares and market concentration.") (emphasis added). Such a market must include reasonable product substitutes. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* Subchapter C ¶ 530a. (4th ed. 2020 Cum. Supp. 2013–2019) ("Areeda & Hovenkamp") ("To define a market is to identify those producers providing customers of a defendant firm (or firms) with alternative sources for the defendant's product or service . . . . Thus, a market is the arena within which significant substitution in consumption or production occurs.").

---

2.     JM's motion is no more than a motion to dismiss in the guise of a summary judgment motion. In its third attempt to have the Court dismiss TPS's case without meaningful discovery, JM now challenges TPS's product market allegations with respect to the tied product. However, in both of its decisions on JM's two motions to dismiss, this Court found those allegations to be adequate. *See* Order (Dkt. 28) (granting, without prejudice, motion to dismiss the Complaint because of deficient geographic market allegations concerning the tying products); Order (Dkt. 50) (denying motion to dismiss the FAC, finding all antitrust allegations sufficient). This Court's holding, in the context of Rule 12, that TPS's claimed product market is *plausible*, necessarily rejected then— and precludes now—a holding that that product market is not, as a matter of law, *possible*.

In other words, the product market is defined by the cross-elasticity of demand, which "measures the extent to which the quantity demanded of the first product will change in response to a change in the price of the second product—'the extent to which consumers will change their consumption of one product in response to a price change in another, all else being equal.'" ABA Section of Antitrust Law, Antitrust Law Developments § 6.B.1.b. (8th ed. 2017).

## ARGUMENT

JM has engaged in anticompetitive conduct affecting a specific link of the supply chain. Specifically, it has taken steps to exclude TPS from selling to direct purchasers, mainly distributors, in the calsil market.[3] Accordingly, TPS logically focuses its product market definition at that level of commerce—all direct calsil sales by Calsil Manufacturers. This is a legally sound product market definition, as courts typically recognize product markets as encompassing a single step in the chain of commerce, and the scope of the market definition should of course reflect where the defendant caused competitive harm.

JM criticizes TPS for not including "end-users" in its product market definition, even though those end-users do not purchase calsil from either Calsil Manufacturer. In essence, JM urges adoption of a radical requirement that a relevant product market must include all levels of commerce—including all downstream resale markets. JM argues this, even though, as an abstract proposition, it is contrary to law and, in the instant context, there is no factual basis for it.

---

3.    TPS defines the relevant product market as all sales by the Calsil Manufacturers to direct purchasers. *See* FAC ¶ 17 (alleging direct sales to distributors and contractors). As noted, the vast majority of these sales are to distributors. If, however, the Court were to limit the market definition to direct sales to distributors only, that would not matter for purposes of this motion or for the ultimate determination of whether JM's conduct harmed competition in the relevant market.

Further, JM's reasoning for including these downstream entities raises disputed fact questions, including:

- whether the end-users at issue here purchase calsil from the Calsil Manufacturers—or purchase it at all;

- whether end-users' demand for calsil is reflected in the demand of the Calsil Manufacturers' customers, or to do so in the way that JM suggests would be to double-count it; and

- whether it is a viable or practical alternative for TPS to sell to end-users instead of to the Calsil Manufacturers' direct customers.

## I.    TPS's Product Market Definition Reflects the Realities of the Calsil Market

The relevant market in this case is the direct sales market for calsil, and, appropriately, TPS has defined its product market at that level of commerce—i.e., the sale of calsil from the Calsil Manufacturers to distributors and other direct customers. The simple reality is that both JM and TPS sell to certain types of customers (direct purchasers) and not to others (end-users).[4] The direct purchasers are primarily distributors, along with some direct sales to contractors. Of course, distributors resell insulation products, including calsil, in downstream markets to indirect purchasers. SAMF ¶¶ 3–5. The fact that further downstream markets may exist does not change

---

4.    An established body of antitrust law recognizes distinct harms suffered by direct and indirect purchasers harmed by the same upstream conduct. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977) (holding that indirect purchasers cannot seek damages from a manufacturer from whom they did not purchase). This doctrine undermines JM's attempt to ignore direct competitive harm at the direct purchaser level (mostly distributors) in favor of the indirect purchaser level (end-users). Additionally, courts commonly certify distinct classes of direct and indirect purchaser plaintiffs in connection with the same underlying antitrust violations. *See, e.g.*, *In re Capacitors Antitrust Litig.*, 3:17-md-2801 (N.D. Cal.); *In re Auto. Parts Antitrust Litig.*, 2:12-md-02311 (E.D. Mich.); *In re Processed Egg Prods. Antitrust Litig.*, 2:08-md-02002-GP (E.D. Pa.).

the answer to the question of which market or markets JM monopolized. Courts routinely recognize that market definitions can and should be limited to a single level of commerce: that which a plaintiff claims the defendant has monopolized.

### A. TPS's market definition properly focuses on the sale of calsil from manufacturers to direct purchasers

JM advocates for a product market definition that is artificially distorted, thereby failing to reflect the realities of the marketplace. JM's assertion that "[t]he proposed product market must represent a 'true economic market'" is of course correct. *See* Defendant's Motion for Partial Summary Judgment (Dkt. 76) at 7. Yet, just as a market definition should not be gerrymandered to narrow the market, it also should not inappropriately enlarge it.

And, JM's brief dances around its own logical flaw. By arguing that, "[w]ithout including the end-users who create the demand for calsil, TPS's proposed market definition does not a (sic) represent a 'true economic market,'" *id.* at 8, JM's omission is glaring: JM does not—because it cannot—explain how end-users' demand is improperly excluded or why it should be included. The lack of proximity between end-users and the Calsil Manufacturers precludes their inclusion in the same product market. Whether end-users' demand is nonetheless reflected in direct purchasers' demand, which the end-users' demand to some extent creates, is a question of fact raised by the motion that the Court cannot resolve in JM's favor on summary judgment.

By defining the product market as it does, TPS correctly includes only those customers to whom the Calsil Manufacturers actually sell, i.e., direct purchasers. That definition provides the

proper context in which to assess whether JM monopolized such sales.[5] To include end-users would be to ask the Court to determine that JM has market power over entities with whom it does not deal and that JM has monopolized sales that it does not make. Of course, as discussed below, the product market must be defined to include potential suppliers and consumers who could easily enter the market, but end-users are not potential direct customers.

JM is promoting the illogical notion that elasticity of demand can be evaluated among differently situated consumers (direct purchasers vs. end-users) who occupy different stations in the chain of commerce, and who do—and always will—transact with differently situated suppliers. Such an approach makes no sense and is without support in legal precedent or economics literature.

Importantly, JM's motion completely fails to address the Third Circuit's decision in *United States v. Dentsply, International Inc.*, a seminal case on product market definition and distribution markets with uncannily similar facts to those presented here. 399 F.3d 181 (3d Cir. 2005). In *Dentsply*, the defendant-manufacturer had approximately 80% of the market for artificial teeth sales to laboratories and dealers, while the next largest competitor had a 5% market share. *Id.* at 188. The defendant-manufacturer made strategic exclusive dealing arrangements with product distributors, such that the only way for competitor manufacturers to enter the market was by selling

---

5.    Market definition is not a required element of either of TPS's antitrust claims. Rather, it is a tool used to determine the required element of monopoly (or market) power. TPS could prove the actual exercise of monopoly power, which would obviate the need to define a relevant market, because the sole purpose of doing so is to aid in the inquiry into monopoly power. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'") (quoting 7 P. Areeda, Antitrust Law para. 1511, p. 429 (1986)). Whether JM has actually exercised monopoly power is a fact question which the Court does not have the record to decide.

directly to end-users. *Id.* The district court had determined that the government had failed to properly define the product market because other manufacturers could still sell directly to end-users and, thus, the market was not foreclosed. *Id.*

The Third Circuit reversed, holding that the district court erred in defining the relevant market by failing to recognize that the mode of business in the market was to work through distributors, and that direct selling to end-users was not a practical alternative. *Id.* at 189–90 ("[T]he Court's scrutiny should have been applied ***not*** to the 'ultimate consumers' who used the [product], but to the 'customers' who purchased the [product].") (emphasis added). The Third Circuit reasoned that the defendant "had supremacy over the dealer network and ***it was at that crucial point in the distribution chain*** that monopoly power over the market for artificial teeth was established." *Id.* at 190 (emphasis added). Thus, the government's product market definition, which addressed the defendant-manufacturer's sales to distributors (but did include the limited amount of sales in other channels), was entirely proper.

The same is true here, where JM has monopolized a "crucial point in the distribution chain"—sales to distributors. As *Dentsply* commands, it is "the customers who purchased" calsil, i.e., direct purchasers, who matter for purposes of market definition, not the "ultimate consumers who used" the product, in other words, end-users. *Id.* at 189.

The reason JM urges the Court to look to end-users is simple: JM believes that introducing cohorts with supposedly more elastic demand will allow the Court to conclude there are products that end-users will reasonably accept as substitutes for calsil, and, thus, distributors would not even need to purchase calsil at all. And more to the point, that there is no market which JM can be held to have monopolized. In other words, JM seeks to enlarge the denominator against which its

anticompetitive conduct is measured. This Court should not indulge JM's attempt to shift the focus to entities not involved in the relevant market—end-users and downstream participants who do not purchase calsil from Calsil Manufacturers—in a blatant attempt to deflect attention from the area in which the effects of its anticompetitive conduct are most concentrated.

To be clear, whether any other product, including any of those listed in footnote 2 of JM's motion, is reasonably interchangeable with calsil is a pure fact question that ***is not*** before the Court. Obviously aware that a factual dispute necessitates denial of a summary judgment motion, JM offers absolutely no evidence that there are reasonable substitutes for calsil but argues that it should win as a matter of law. On the other hand, TPS offers evidence of calsil's unique attributes, which highlights the distributors' need to stock calsil for its resale customers. Shong Decl. ¶¶ 15–19. JM's motion does not address the issue of whether there are substitutes for calsil because there has not been adequate discovery on that question, and that question is secondary to the only one raised by the motion: whether TPS correctly defined the participants to be included in its market definition. Nonetheless, TPS disputes that including end-users in the product market definition would necessarily establish that other products have reasonable interchangeability with calsil. To the contrary, calsil is uniquely functional and adaptable to uses for which no other product will suffice. Shong Decl. ¶¶ 15–19.

### B.  Any argument that TPS could try to bypass the distributor market and attempt to sell directly to end-users fails

Moreover, *Dentsply* confirms that any argument that TPS could try to bypass the direct purchaser market and sell to end-users (because JM has foreclosed TPS from distributors) would necessarily fail. Access to the distributor network by Calsil Manufacturers is essential in the insulation materials industry, and it would be neither practical nor effective to attempt to compete

with by attempting to sell to end-users. SAMF ¶¶ 18–22; Shong Decl. ¶¶ 56–58. This reality aligns with the extensive discussion in *Dentsply* on the "Benefits of Dealers" and expressly questioning the "viability" of direct sales that had been argued by the defendant. 399 F.3d at 191–93 (discussing the numerous benefits of selling products through dealers as opposed to direct sales).

At the very least, whether sales to end-users would be a sufficient or even "viable" alternative to unimpeded access to direct purchasers is a disputed question that cannot be resolved at this stage. *See id.* at 196 ("This case does not involve . . . a proven alternative distribution channel. The mere existence of other avenues of distribution is insufficient without an assessment of their overall significance to the market."). Here, JM has made no showing as to the overall significance of sales to end-users relative to sales to and by distributors, and TPS has offered evidence demonstrating that such sales are not a practical alternative. SAMF ¶¶ 18–22. Accordingly, these disputed questions of fact preclude summary judgment in JM's favor.[6]

## II.   TPS's Market Definition Correctly Focuses on the Level of Commerce Where the Defendant Targets Its Anticompetitive Conduct

The many cases holding that relevant product markets limited to specific links of the supply chain are appropriate flow from the Supreme Court's decision in *Brown Shoe*, which recognized that a plaintiff is not required to include all levels of commerce in a market definition:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined

---

6.    The argument that TPS cannot "rely on the concept of a cluster market" misunderstands TPS's claims. TPS alleges that distributors' need to carry other JM products gives JM market power in the calsil market. *Cf. Dentsply*, 399 F.3d at 195–96 (noting that distributors' need to carry defendant's other products indicates market power). Those allegations pertain to the exercise of market power, not to the definition of the market in which such power is exercised. Accordingly, they are not implicated by the motion and the argument need not be addressed now.

> submarkets may exist which, in themselves, constitute product markets for antitrust purposes.

370 U.S. at 325 (citing *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593–95 (1957)). The *Brown Shoe* court reasoned that because the antitrust laws prohibit conduct "which may substantially lessen competition 'in *any* line of commerce', it is necessary to examine the effects . . . in each such economically significant submarket to determine if there is a reasonable probability that [it] will substantially lessen competition." 370 U.S. at 325.

Indeed, Section 2 of the Sherman Act proscribes efforts "to monopolize *any part of the trade or commerce*." 15 U.S.C. § 2 (emphasis added). It logically follows that a relevant product market can be defined by and limited to "any part" of trade or commerce. This is particularly true where the monopolist's conduct is confined to a specific part of commerce, such as the case here where JM has monopolized sales to direct purchasers, in other words, from manufacturers to distributors and the limited set of other direct customers.

## A.    Johns Manville monopolized the market for direct sales of calsil

Following the guidance of *Brown Shoe* and the clear language of the Sherman Act, numerous courts, including those in the Tenth Circuit, have repeatedly confirmed that "[t]he identity of the relevant product to be studied to determine the market *varies based on the level of commerce where the plaintiffs argue the defendants have monopolized competition*." *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns*, *Inc.*, 311 F. Supp. 2d 1048, 1076 (D. Colo. 2004) (citing *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1132 (10th Cir. 2002)) (emphasis added); *see also Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 18 (1984) ("[A]ny inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact."). For example,

in *Dentsply*, it did not matter that product sales occurred at other levels in the chain of commerce (e.g., the retail level). Here, TPS has accused JM of monopolizing a specific level of commerce: the supply of calsil by Calsil Manufacturers to direct purchasers.

JM's citation to *Telecor* is very instructive, as the Tenth Circuit affirmed the district court's grant of the plaintiffs' summary judgment motion on the issue of product market definition in a factually analogous matter. There, the plaintiffs argued that the relevant market was limited to pay phones, while the defendant argued the market should include both pay phones and cell phones because end-users could reasonably substitute the two. *Telecor*, 305 F.3d at 1132. In rejecting the defendant's argument, the Tenth Circuit held, "regardless of the interchangeability of pay phones and cell phones at the end-user level, there is no doubt that pay phones and cell phones are not interchangeable ***at the location–owner level, and that is the level where the Plaintiffs argued that Southwestern Bell has monopolized competition***." *Id.* (emphasis added). The Tenth Circuit added:

> Southwestern Bell's interchangeability argument is wrongly directed at showing that cell phones and pay phones are interchangeable for end-users, but that is not the market where the Plaintiffs are complaining of Southwestern Bell's anti-competitive behavior. ***Rather, it is the location owners who define the market where the anti-competitive behavior took place*** – that is, the Plaintiff's claim that they compete with Southwestern Bell for locations upon which to place their pay phones, and that is the market Southwestern Bell has monopolized.

*Id.* at 1132–33 (emphasis added). The court expressly rejected the defendant's argument that "the end–user market for telephone services must still be considered." *Id.* at 1133.

Here, the relevant product market is the sale of calsil by Calsil Manufacturers, and TPS's market definition does not exclude any of those sales, nor has TPS excluded any ***products*** from its market definition (and JM does not argue otherwise). Thus, because the Tenth Circuit directed

plaintiffs to "define the market where the anti-competitive behavior took place," and because JM has monopolized direct sales of calsil, TPS's market definition is legally sufficient and appropriate.

### B.     It is unnecessary to include end-users or downstream activity in a direct sales market definition

Courts have repeatedly rejected JM's argument that end-users or downstream sales must be included in a proposed market. *See Nobody in Particular*, 311 F. Supp. 2d at 1076 ("Similarly, the identity of the relevant consumer for the purposes of determining market definition i*s **not necessarily the end-user of the product, but, rather, is also determined based on the level of commerce effected (sic) by defendant's behavior***.") (emphasis added) (citations omitted); *Ad-Vantage Tel. Directory Consultants v. GTE Directories Corp.*, 849 F.2d 1336, 1345 (11th Cir. 1987) ("***A Section 2 claim can be supported by limiting the market definition to a single level of distribution*** where a vertically integrated manufacturer uses his dominant position at one level of competitive activity (manufacturing) to eliminate competition at another level (retailing).") (emphasis added); *U.S. Postal Serv. v. Postal Regul. Comm'n*, 816 F.3d 883, 887 n.4 (D.C. Cir. 2016) ("Court precedent, and antitrust doctrine generally, recognize that ***market power may be exercised upstream, even where there is a competitive market downstream***.") (emphasis added); *see also Telecor*, 305 F.3d at 1132; *Dentsply*, 399 F.3d at 189–90.

Moreover, the DOJ and FTC have jointly issued Vertical Merger Guidelines which declare that "**Relevant markets can be upstream or downstream**."[7] The very fact that these Guidelines exist confirms that discrete markets can exist at different levels of the chain of commerce. These authorities reflect the realities of markets, such as the calsil market, where products are often sold

---

7.     https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf

in multiple distinct markets in a supply chain, as well as the common sense proposition that market definitions should include the parties that actually deal with one another.

This point was illustrated in *Sterling Merchandise, Inc. v. Nestle, S.A.*, which found a properly defined product market of "a secondary market for the distribution and sale of ice cream, which is a market for distribution services and wholesale marketing to intermediaries, and not for the sale of ice cream directly to its end consumers." 724 F. Supp. 2d 245, 257 (D.P.R. 2010). The defendants had contested the proposed product market, arguing that "excluding retailers from the relevant market definition is a fatal flaw," but the court rejected that argument. *Id.* Specifically, the court reasoned that all parties had engaged in distribution services to intermediaries, while none had "engage[d] in significant retail activity." *Id.* at 258. Further, the court noted that the "consumers in this market are the retailers, ***not the end customers for the product***." *Id.* (emphasis added). It made legal and economic sense to define the product market in such a manner.

The same is true here. The consumers in this market are direct purchasers—the distributors and other customers that purchase calsil directly from the Calsil Manufacturers. SAMF ¶ 3. Those manufacturers—JM and TPS—do not engage in significant retail activity. Indeed, neither manufacturer makes any direct sales to end-users. *Id.*

### C.     It is appropriate to focus on a single level of commerce when end-users have different elasticities of demand

Courts recognize that end-users are often irrelevant because they are differently situated, and have different elasticities of demand, than purchasers at other levels of commerce. For example, in *McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015), the Eleventh Circuit affirmed the FTC's determination that the defendant had exercised monopoly power in a properly–defined relevant product market "'for the supply of domestically-manufactured [pipe] fittings for use in

projects with domestic–only specifications.'" *Id.* at 828–29 (quoting *McWane, Inc.*, 2014 FTC LEXIS 28, *34 (F.T.C. Jan. 30, 2014)). Although foreign-manufactured pipe fittings were functional substitutes—indeed, identical products—certain projects specified that only domestically-manufactured pipe fittings could be used, due to "various laws and end-user preferences." *Id.*

Accordingly, foreign-supplied fittings were not regarded as "reasonable substitutes" on "those projects, even though the fittings themselves [were] functionally identical." *Id.* at 829. Further, even though the products were the same, the defendant "charged approximately 20%-95% more for its domestic fittings for domestic-only projects than for open specific projects" that permitted foreign-made parts. *Id.* In affirming the finding of a separate product market for domestic-only fittings, the *McWane* court cited *Brown Shoe*, reasoning that "[t]his price differentiation reflected [the defendant's] ***ability to target customers with domestic-only project specifications who could not avoid the higher prices by substituting imported fittings***." *Id.*; *see also* Areeda & Hovenkamp, ¶ 562b.

Similarly, here, it is perfectly appropriate to define a relevant product market of calsil sales by Calsil Manufacturers; indeed, it would be illogical to define the market differently. Applying the *McWane* court's reasoning, JM was able to target its customers who have orders to fill based on certain project specifications and, thus, could not avoid JM's anticompetitive conduct and higher prices by substituting other products. SAMF ¶¶ 6–17, 23–26. This is because, after an engineer specifies that a particular product be used for a job, neither the distributor nor insulation contractor that buys from the distributor has the ability to overrule the engineer's specifications

and substitute a different product. SAMF ¶¶ 8, 10–13, 17. To the contrary, they are obligated to adhere to those specifications. SAMF ¶¶ 8, 10–13, 17.

And, as in *McWane*, it is irrelevant that end-users or other downstream participants may have other substitutes available to them (not only because TPS does not accuse JM of monopolizing sales to those customers but also because there are in fact no sales to those customers that JM could have monopolized).[8] Once the specification is set, the distributor has no choice but to supply it (or lose the sale), and the insulation contractor has no choice but to install it. SAMF ¶¶ 8, 10–13, 17. Thus, the appropriate focus is on the calsil sales made by Calsil Manufacturers for that is where JM was able to effectuate its anticompetitive scheme.

## III.   Courts Have Repeatedly Approved Product Markets that Focus on Specific Segments or Levels of Commerce, Such as Intermediate Markets

JM's argument boils down to a straightforward question: whether a product market must always include all levels of the chain of commerce as a matter of law. The answer is a definitive no. To the contrary, courts around the country, including in the Tenth Circuit, have repeatedly recognized the propriety of limiting a relevant product market to a specific level of commerce. In addition to *Dentsply*, *McWane*, and *Telecor*, and others discussed above, these cases include:

- *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C. Cir. 2001) ("[N]o court has ever held that a reduction in competition for wholesale purchasers is not relevant unless the plaintiff can prove impact at the consumer level.");

---

8.   Notably, JM's motion does not support the argument that there are no reasonable substitutes for calsil. And TPS offers evidence that calsil has important, unique properties that makes it an essential product for many industry projects with no reasonable substitutes. Shong Decl. ¶¶ 15–19.

- *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1342 (8th Cir. 1987) (sales of automobile batteries through route salespersons distinct from sales of such batteries through retail stores even though "the batteries sold by route salespersons are not different in character, creation or use from those sold from a warehouse or store");

- *Greyhound Comput. Corp. v. IBM Corp.*, 559 F.2d 488, 494 (9th Cir. 1977) ("No rule of law or economic principle bars application of section 2 of the Sherman Act to one of several alternative means of distributing a product. The statute prohibits monopolization of 'any part' of interstate or foreign commerce. Accordingly, the Sherman Act and other antitrust statutes have been applied to protect competition in one of alternate channels of distribution.");

- *CBS, Inc. v. FTC*, 414 F.2d 974, 978–79 (7th Cir. 1969) (records sold through record clubs comprised relevant market even though records delivered by clubs were identical to those sold in record stores and other outlets);

- *Cinetopia, LLC v. AMC Ent. Holdings, Inc.*, No. 18-2222-CM-KGG, 2018 U.S. Dist. LEXIS 216600, at *17–18 (D. Kan. Dec. 27, 2018) (defining relevant market as "upstream purchases" of film licenses and excluding "downstream sales" of tickets to view the movies);

- *Flash Elecs. v. Universal Music*, 312 F. Supp. 2d 379, 392–93 (E.D.N.Y. 2004) (rejecting defendants' argument that direct marketing of films must be included and defining market as wholesale distribution for sell-through and rental movie videos and DVDs);

- *Dauro Advert., Inc. v. GMC*, 75 F. Supp. 2d 1165, 1169 (D. Colo. 1999) (finding GM dealers were the consumers adversely affected by defendants' conduct and therefore plaintiffs adequately alleged a relevant product market of GM cars and trucks);

- *FTC v. Cardinal Health*, 12 F. Supp. 2d 34, 36 (D.D.C. 1998) (holding that wholesale distribution of pharmaceutical products to customers who demanded such distribution was a relevant market, even though products so delivered were identical to those delivered through other modes of distribution);

- *FTC v. Staples*, 970 F. Supp. 1066, 1080 (D.D.C. 1997) (sales of consumable office supplies through office supply superstores constituted relevant market, even though the office supplies sold in those outlets were physically identical to those sold elsewhere); and

- *Ansell Inc. v. Schmid Lab'ys, Inc.*, 757 F. Supp. 467, 470–75 (D.N.J. 1991) (sales of condoms "to retail distributors does constitute an 'economically significant submarket'" even though manufacturers "may sell their products through a number of different channels of distribution").

In sum, courts have repeatedly and routinely recognized an approach to market definition that focuses on the economic realities of the market and its participants, as TPS's definition does. The realities of the market in which the Calsil Manufacturers operate confirms the propriety of TPS's product market definition. SAMF ¶¶ 1–5. JM's anticompetitive conduct was intended to, and did, target a specific level of commerce. It makes no sense to include purchasers from other stations of the supply chain to ascertain the effects of that conduct, and case law does not require it.

**IV.    No Case Cited by Johns Manville Forbids a Market Definition Limited to a Single Level of Commerce**

Finally, none of the cases cited by JM can even arguably be read to require that end-users or downstream actors be included in a product market definition. Indeed, none of the cases even implies that an antitrust market must include all levels of commerce as a matter of law. JM's suggestion that these cases support its argument is simply incorrect.

To the contrary, several cases cited by JM confirm that it is appropriate to define a product market to a single segment or level of commerce. *See Telecor*, 305 F.3d at 1132 ("[R]egardless of the interchangeability of pay phones and cell phones at the end–user level, there is no doubt that pay phones and cell phones are not interchangeable at the location–owner level, and that is the level where the Plaintiffs argued that Southwestern Bell has monopolized competition."); *Nobody in Particular*, 311 F. Supp. 2d at 1076 ("[T]he identity of the relevant consumer for the purposes of determining market definition is not necessarily the end-user of the product, but, rather, is also determined based on the level of commerce effected by defendant's behavior."); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994) ("The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration.").

Beyond this, the other cases cited by JM are largely irrelevant and at most, stand for the uncontroversial proposition that a relevant product market should not be artificially narrowed to exclude obvious ***product*** substitutes. TPS does not disagree. That simply has nothing to do with the question before the Court here; indeed, JM does not argue that TPS excluded any reasonable product substitutes from its market definition (presumably because no reasonable substitutes for calsil exist). JM's argument is limited to claiming that all market participants—upstream,

downstream, distributors, end-users, even those who do not purchase calsil from the Calsil Manufacturers—should inexplicably be lumped together and collapsed into a single market.

In particular, JM's reliance on *Westman Commission Co. v. Hobart International, Inc.*, 796 F.2d 1216 (10th Cir. 1986), is misplaced, and certainly does not stand for the proposition that end-users must be included as a matter of law. In *Westman*, the proposed product market definition failed because the plaintiff attempted to improperly segment the product market by products sold as "one-stop shopping," even though reasonably interchangeable products were sold via other methods and available to the same consumers. Further, *Westman* turned on a robust factual record with explicit findings that other products with "extremely elastic" cross-elasticity of demand had been excluded from the product market. Here, by contrast, there are no such factual findings nor even any argument that relevant products have been excluded. Further, no relevant purchaser has been excluded—anyone who buys calsil from the manufacturers is included in the market definition. That other end-users exist—some of whom buy in downstream resale markets and others who do not purchase calsil at all—is not material.

Similarly, *Campfield v. State Farm Mutual Automobile Insurance Co.*, 532 F.3d 1111 (10th Cir. 2008), is unavailing, as that case did not involve any end-users or downstream activity. Instead, this was a monopsony case where the plaintiff artificially limited the product market definition to consumers who were insured by State Farm, while excluding other consumers who were insured by other insurance companies or not insured at all. *Id.* at 1118. The court held that the market definition was "under-inclusive" because it failed to include the other similarly situated consumers to whom he could sell his services. *Id.* Here, by contrast, TPS has not excluded any consumers—every direct purchaser of calsil is included in its market definition. (By way of

example, the analogous scenario would be TPS attempting to limit its market definition to a single distributor while excluding all other distributors, which, presumably, would not satisfy the *Campfield* test. Of course, that is not how TPS defined its product market.)

No other case cited by JM supports its novel argument that a product market definition must collapse all levels of commerce into a single market as a matter of law:

- *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 918 (7th Cir. 2020) (finding that the plaintiff's assertion that a five-block radius around its location constituted the relevant geographic market was not plausible based on the factual record, but adding that there was no "fatal flaw in treating that bundle or cluster of [products] . . . as a relevant product market");

- *Auraria Student Hous. v. Campus Vill. Apts.*, 843 F.3d 1225, 1233 (10th Cir. 2016) (remanding because the plaintiff failed to offer ***any*** proposed definition for the relevant market because it mistakenly relied on outdated and unclear Tenth Circuit precedent);

- *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004) (rejecting the plaintiff's attempt to limit the relevant market to Pepsi products, distinct from other soft drinks, and noting a line of cases that find "a manufacturer's own products do not themselves comprise a relevant product market");

- *Compliance Mktg. v. Drugtest, Inc.*, Civil Action No. 09-cv-01241-JLK, 2010 U.S. Dist. LEXIS 34315 (D. Colo. Apr. 7, 2010) (product market definition failed because it did not reference the rule of interchangeable substitute products by attempting to limit the market to drug and alcohol testing services ***provided to the energy industry***, while failing to

explain why those testing services were not interchangeable with drug and alcohol testing services provided to other industries); and

- *Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F. Supp. 1503 (D. Colo. 1992) (finding that, given uncontested evidence, a single product sold to a single customer cannot represent the relevant product market. Importantly, there were no allegations that the product market should be confined to a particular distribution channel.

Ultimately, the authorities on which JM relies all turned on either undisputed factual issues or cases where clear, reasonable substitutes for the ***product*** at issue were excluded. None of these cases held, as a matter of law (or a matter of fact, for that matter), that a market limited to a single level of commerce fails.

## CONCLUSION

For the foregoing reasons, Thermal Pipe Shields respectfully requests that the Court deny Johns Manville's Motion for Partial Summary Judgment and enter summary judgment in its favor as to the participants in the product market for calsil.

DATED:  September 25, 2020 

Respectfully submitted,

s/Alexandra Shear
BONA LAW PC

s/Geoffrey N. Blue
THE GEOFFREY BLUE LAW FIRM, LLC
Geoffrey N. Blue
7350 E. Progress Place, Suite 100
Greenwood Village, CO 80111
Telephone: (720) 647-5320
Email: gblue@gbluelaw.com

Local Attorney for Plaintiff
Chase Manufacturing, Inc.

Alexandra Shear
Luke Hasskamp
Jarod Bona*
 *Admitted only in California
4275 Executive Square, Suite 200
La Jolla, CA 92037
Telephone: (858) 964-4589
alex.shear@bonalawpc.com
luke.hasskamp@bonalawpc.com
jarod.bona@bonalawpc.com

Attorneys for Plaintiff Chase Manufacturing, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2020, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following persons:

Gregory J. Kerwin, Esq. (gkerwin@gibsondunn.com)
Allison Kostecka, Esq. (akostecka@gibsondunn.com)
GIBSON, DUNN, CRUTHER LLP
1801 California Street, Suite 4200
Denver, CO 80202


  *s/Joanna Bila*
Joanna Bila, Paralegal