IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00872-MEH

CHASE MANUFACTURING, INC., d/b/a
THERMAL PIPE SHIELDS,

Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

Defendant.

---

**JOHNS MANVILLE'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT REJECTING PLAINTIFF'S
ARGUMENT TO EXCLUDE END-USERS OF INSULATION FROM THE PRODUCT
MARKET RELEVANT TO ITS ANTITRUST CLAIMS (ECF 76)**

---

Gregory J. Kerwin
Ryan Bergsieker
Allison Kostecka
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO  80202-2642
Telephone:    303.298.5700

Email:  GKerwin@gibsondunn.com
RBergsieker@gibsondunn.com
AKostecka@gibsondunn.com

*Attorneys for Defendant Johns Manville Corporation*

**Johns Manville requests the Court hold oral argument on this Motion**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................ 1

II.     REPLY IN SUPPORT OF UNDISPUTED FACTS AND TO  TPS'S ADDITIONAL
        ALLEGED MATERIAL FACTS .................................................................. 3

        A.      Johns Manville's Factual Reply Concerning Undisputed Facts. .......................... 3

        B.      Johns Manville's Response To TPS's "Statement of Additional Material
                Facts." ........................................................................................... 9

III.    ARGUMENT .............................................................................................. 27

        A.      TPS Does Not Identify Material Disputed Facts, and the Details TPS
                Offers About How Facility Owners, Engineers, and Contractors Select
                And Purchase Insulation Only Underscore The Flaw With TPS's Proposed
                Market. ........................................................................................... 27

                1.      TPS concedes distributors do not use or consume calsil, and end-
                        user/facility owners, and their engineers and contractors, drive the
                        demand for it. .............................................................................. 27

                2.      TPS's attempt to expand its product market to encompass all
                        "direct purchasers" does not cure its defective antitrust claims. ............. 30

                3.      TPS's use of the "direct purchaser" label borrowed from antitrust
                        standing concepts does not validate its proposed upstream product
                        market. ....................................................................................... 31

        B.      TPS's Proposed Product Market Does Not Qualify As A Valid
                "Submarket." .................................................................................. 34

                1.      TPS fails to analyze the seven practical indicia the Supreme Court
                        evaluates to define a valid submarket. ............................................. 35

                2.      The Supreme Court's seven practical indicia do not support TPS's
                        proposed upstream submarket. ...................................................... 37

        C.      TPS's Case Law Analysis Ignores Its Failure To Prove A Valid
                Submarket, And Does Not Justify Its Attempt To Leave End-Users Out Of
                The Proposed Product Market Analysis. ............................................... 39

IV.     CONCLUSION ......................................................................................... 48

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Ad-Vantage Telephone Directory Consultants, Inc. v. GTE*,
    849 F.2d 1336 (11th Cir. 1987) ................................................................42

*Ansell Inc. v. Schmid Lab'ys, Inc.*,
    757 F.Supp. 467 (D.N.J. 1991) ...............................................34, 43, 46

*Apple Inc. v. Pepper*,
    __ U.S. __, 139 S.Ct. 1514 (2019) .........................................................31, 32

*Auraria Student Hous. v. Campus Villiage Apts.*,
    843 F.3d 1225 (10th Cir. 2016) ...............................................................47

*Brown Shoe Co. v. United States*
    370 U.S. 294 (1962).............................................1, 34, 35, 36, 38, 40, 44, 45, 46

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
    532 F.3d 1111 (10th Cir. 2008) ...............................................................47

*CBS, Inc. v. FTC*
    414 F.2d 974 (7th Cir. 1969) ................................................................43, 44

*Cinetopia, LLC v. AMC Entertainment Holdings, Inc.*,
    2018 WL 6804776 (D. Kan. Dec. 27, 2018) ..........................................44, 45

*Compliance Mktg., Inc. v. Drugtest, Inc.*,
    No. 09-cv-01241-JLK, 2010 WL 1416823 (D. Colo. Apr. 7, 2010) ...............47, 48

*Dauro Advert., Inc. v. GMC*,
    75 F.Supp.2d 1165 (D. Colo. 1999).........................................................45

*FTC v. Cardinal Health*,
    12 F.Supp.2d 34 (D.D.C. 1998)...........................................................43, 45

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ................................................................44

*FTC v. Staples*,
    970 F.Supp. 1066 (D.D.C. 1997) .........................................................43, 45

*Flovac, Inc. v. Airvac, Inc.*,
817 F.3d 849 (1st Cir. 2016) .......................................................................33, 34

*Flash Elecs. v. Universal Music*,
312 F.Supp.2d 379 (E.D.N.Y. 2004) .....................................................................45

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC*,
371 F.3d 1275 (10th Cir. 2004) .........................................33, 35, 36, 37, 47

*Greyhound Comput. Corp. v. IBM Corp.*,
559 F.2d 488 (9th Cir. 1977) ......................................................................43, 44

*Henry v. Chloride, Inc.*,
809 F.2d 1334 (8th Cir. 1987) ....................................................................43, 44

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ...............................................................................36

*IGT v. Alliance Gaming Corp.*,
702 F.3d 1338 (Fed. Cir. 2012)..............................................................................36

*Illinois Brick v. Illinois*,
431 U.S. 720 (1977)..............................................................................30, 31, 32

*Jefferson Parish Hospital Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)..................................................................................................41

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015) ......................................................................41, 42

*Nobody in Particular Presents, Inc. v. Clear Channel Comm., Inc.*,
311 F.Supp. 2d 1048 (D. Colo. 2004)..........................................................40, 46

*PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*,
615 F.3d 412(5th Cir. 2010) ....................................................................................33

*SCFC ILC, Inc. v. VISA USA, Inc.*,
36 F.3d 958 (10th Cir. 1994) ................................................................................46

*Sharif Pharm., Inc. v. Prime Therapeutics, LLC*,
950 F.3d 911 (7th Cir. 2020) ................................................................................47

*Smalley & Co. v. Emerson & Cuming, Inc.*,
808 F. Supp. 1503 (D. Colo. 1992) ......................................................................47

*Sterling Merchandise, Inc. v. Nestle, S.A.*,
   724 F.Supp.2d 245 (D. P.R. 2010) ........................................................43

*Telecor Comm., Inc. v. Southwestern Bell Telephone Co.*,
   305 F.3d 1124 (10th Cir. 2002) .....................................................40, 41

*U.S. v. Dentsply*,
   399 F.3d 181 (3d Cir. 2005)....................................................32, 39, 40

*U.S. Postal Serv. v. Postal Regulatory Comm'n*,
   816 F.3d 883 (D.C. Cir. 2016)...............................................................43

*Westman Commission Company v. Hobart International, Inc.*,
   796 F.2d 1216 (10th Cir. 1986) ...........................................................47

**Rules and Statutes**

Federal Rule of Civil Procedure 56 ...............................................................2

**Other**

• DOJ-FTC "Vertical Merger Guidelines" (June 30, 2020) .....................................43

## I.  INTRODUCTION

TPS's response to Johns Manville's motion for partial summary judgment fails to demonstrate why the Court should evaluate competition for calsil using TPS's contrived upstream product market.  TPS's proposed product market omits end-user consumers, who—as TPS admits—drive the demand for calsil, and fails as a matter of law.

The facts relevant to Johns Manville's Motion are simple and undisputed.  TPS attempts to cloud the issues with irrelevant factual details and alleged disputes, quibbling about terms like "industrial" insulation and the precise role of facility owners, engineers, and contractors in decisions they (not distributors) make to select, specify, and purchase calsil and other insulation materials.  But even taking TPS's factual arguments at face value, it cannot deny or obscure the core undisputed facts that undermine its proposed, upstream-only market definition.

TPS's legal argument rests on its unsupported conclusions about the "realities" of the calsil market, using labels like "single level of commerce" and "direct purchaser."  While TPS calls for the Court to hold that so-called "direct" calsil sales constitute a separate and distinct submarket (ECF 87 at 24), TPS does not discuss, much less attempt to show, the seven practical indicia necessary to establish a valid antitrust submarket under *Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962).  And for obvious reason.  As TPS acknowledges, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability or use or the cross-elasticity of demand between the product itself and substitutes for it."  ECF 87 at 25-25 (quoting *Brown Shoe*, 370 U.S. at 325).  Here, there is no way to analyze reasonable interchangeability without considering the source of the demand for calsil, which—undisputedly—is driven by end-user facility owners or their contractor or engineer representatives.  In light of the material, undisputed

1

facts here, the Court cannot as a matter of law hold that it is appropriate to accept TPS's upstream calsil market.  TPS's own description of the demand for calsil demonstrates the Court must consider the downstream decisions of end-user facility owners / calsil users, and the contractors and engineers who represent them, because they drive demand for the types of insulation that distributors sell.

To grant this motion, the Court does not need to define the contours of the correct product market.  Moreover, contrary to TPS's assertion, Johns Manville is not advocating, as a matter of law, that every "product market must include . . . all upstream and downstream activity."  ECF 87 at 1.  Instead, Johns Manville argues that based on the undisputed facts here, TPS cannot, as a matter of law, rely on its proposed upstream-only product market.  When the relevant facts about an antitrust plaintiff's proposed product market are undisputed, the Court can reject, as a matter of law, that proposed market because it excludes the entities who buy and use the product and whose market conduct and purchase decisions are essential to evaluating whether consumers have reasonable substitutes for the product at issue.

There is no reason for the Court to let TPS's defective antitrust claims continue any further.  TPS does not demonstrate under Rule 56(d) that it needs discovery to present essential facts.  In response to Johns Manville's argument that further amendment would be futile, TPS says nothing to request leave to amend again (*cf.* ECF 76 at 6 n.2).  Therefore the Court should grant summary judgment and dismiss TPS's antitrust claims with prejudice.

2

## II.      REPLY IN SUPPORT OF UNDISPUTED FACTS AND TO
## TPS'S ADDITIONAL ALLEGED MATERIAL FACTS

In accordance with Section III.F of Judge Hegarty's Civil Practice Standards, Johns
Manville provides both (1) a factual reply to TPS's attempt to deny "in part" certain undisputed
facts; and (2) a response to TPS's alleged "[a]dditional material facts."

**A.      Johns Manville's Factual Reply Concerning Undisputed Facts.**

TPS concedes Undisputed Fact Nos. 1, 2, and 5.  Although TPS attempts to "deny in part"
other undisputed facts, its denials are either immaterial or inaccurate based on undisputed
evidence.

> *Undisputed Fact 3*.  *Both Johns Manville and TPS sell calcium silicate ("calsil")
> pipe and block insulation and other industrial insulation materials in the United
> States.*

Reply:  TPS does not deny anything material or relevant to the motion.

TPS's attempt to discredit the term "industrial insulation" is not only immaterial to the
motion for summary judgment, it contradicts the Amended Complaint, which contends calsil is
used "within large industrial facilities" for "industrial applications," as specified by "industrial
project engineers," and sold to "industrial customers" by "major industrial distributors" for use "in
industrial plants."  ECF 30 ¶¶ 7, 9, 10, 20, 48, 58, 106.  The fact that calsil can also be described
as a type of "mechanical insulation" (based on the function of the insulation, rather than the type
of facility where it is installed), and installed in "commercial facilities," does not disprove that
industrial facility owners use calsil as one type of insulation in their facilities.

TPS's argument misses the point that industrial insulation describes the type of facility
(i.e., industrial) where certain types of mechanical insulation are commonly installed.
Emphasizing that its attempt to deny Undisputed Fact 3 is not material to this motion, TPS calls

the phrase "industrial insulation" a "distinction without a difference."  TPS, however, does not explain why that term is not accurate or useful to identify the types of facilities where insulation will be installed, ECF 87 at 9; ECF 87-1 at 3.  In its marketing materials, Johns Manville—like TPS—considers the term "industrial insulation" helpful to explain to its customers the insulation it sells "for high and low-temperature industrial applications."  *See* Industrial Insulation, Johns Manville (last visited Oct. 8, 2020), https://www.jm.com/en/industrial-insulation/; s*ee* Ex. C (Supp. Skelly Decl.) ¶¶ 6-8 (discussing insulation terms).  In addition, TPS's own website distinguishes between "commercial" and "industrial" insulation products in describing its "nationwide partner network" of "mechanical insulation distributors."



Where to Buy, TPS: Thermal Pipe Shields (last visited October 8, 2020)*,* https://www.thermalpipeshields.com/where-to-buy/; *see also* Industrial Insulation Products, TPS: Thermal Pipe Shields (last visited Oct. 8, 2020), https://tps-industrial-insulations.com/products/ (listing calsil, expanded perlite, and phenolic foam insulation as "industrial" insulation products).

> <u>*Undisputed Fact 4*</u>.  *The calsil pipe and block insulation at issue in this lawsuit constitutes a type of mechanical insulation that is installed primarily in industrial facilities that operate at temperatures up to 1200° Fahrenheit.*

Reply:  TPS does not deny anything material or relevant to the motion.

TPS admits the core facts in Undisputed Fact No. 4, but argues calsil can be used in facilities with lower temperatures than 1,200° Fahrenheit (an allegation that only increases the number of reasonable substitutes for calsil at the end-user level, which reinforces the importance of taking the economic conduct and preferences of end-users into account when analyzing the product market), and exalts the other qualities of calsil.  TPS's additional factual arguments about calsil are not material to this motion.

> *Undisputed Fact 6*.  *Johns Manville sells the majority of its industrial insulation materials in the United States, including calsil, to insulation distributors, who resell the insulation to insulation contractors and facility owners.  But, of note, Johns Manville also sells, on an annual basis, millions of dollars worth of calsil and other industrial insulation directly to contractors in the United States without selling through an insulation distributor.*

Reply:  TPS does not deny anything material or relevant to the motion.

TPS admits the core facts in Undisputed Fact No. 6, including that distributors resell the insulation they purchase.  TPS argues about: (a) whether facility owners purchase insulation (in fact they do, s*ee* Ex. C (Supp. Skelly Decl.) ¶¶ 9, 10); (b) Johns Manville's undisputed sales of calsil and other materials directly to contractors—TPS offers no facts to contest that; and (c) the "vast majority" of calsil being sold to distributors (the Undisputed Fact uses the term "majority").  TPS does not, and cannot, disprove the facts that Johns Manville sells calsil directly to contractors and distributors who then sell directly to industrial facility owners.  Nor does TPS offer facts to contest that it is the facility owners or their representatives—contractors or engineers—who drive the demand for calsil.  These facts undermine TPS's proposed upstream calsil market.  The precise volume of sales to distributors versus contractors is not relevant to this motion.  *See also* Johns Manville Ex. D (filed under seal) (content explained in exhibit).

*Undisputed Fact 7.  Insulation distributors in the United States do not use or install industrial insulation themselves; instead, insulation distributors resell industrial insulation to insulation contractors and industrial facility owners for use in industrial facilities such as oil refineries, chemical and power generation plants, pulp and paper mills, where the owners enjoy the benefits of the insulation as end-users.*

Reply:  TPS does not deny anything material or relevant to the motion.

TPS does not deny the core facts in Undisputed Fact No. 7, including that distributors do not use insulation themselves and instead resell it.  TPS's factual argument that distributors also sell mechanical insulation to contractors for use in commercial facilities is irrelevant to the motion. *See supra* reply to Undisputed Fact No. 3.

*Undisputed Fact 8.  The owners of industrial facilities, where industrial insulation is used and installed, constitute the end-users for the industrial insulation Johns Manville and TPS sells.  Contractors install the insulation material.  The engineer is the specifier.  The distributors serve as logistics providers.*

Reply:  TPS does not deny anything material or relevant to the motion.

TPS admits the core facts that (1) facility owners are the end-users of calsil or any mechanical insulation, including insulation used in industrial facilities (i.e. "industrial insulation"); (2) insulation contractors install insulation materials; and (3) the installation is generally done in accordance with engineers' specifications.  TPS takes issue with the description of distributors as "logistics providers," although its own description of the services distributors provide support that label.  Nonetheless, TPS's additional factual allegations do not raise a material fact dispute and do not support excluding the ultimate end-users of calsil—or their representatives—from the relevant product market.

*Undisputed Fact 9.  In selling its calsil and other types of industrial insulation in the United States, Johns Manville representatives frequently communicate directly with representatives of the end-user/industrial facility owners, and the engineering firms and contractors working with them, about what type of industrial insulation*

*the end-user will select for a particular facility.  The end-user facility owner or contractor decides the volume, type, and source of the industrial insulation they purchase from insulation distributors.*

Reply:  TPS does not deny anything material or relevant to the motion.

In purporting to deny in part, TPS comments on the work that contractors and engineering firms do, without disputing the key premise that Johns Manville communicates with end-users, who ultimately decide the type and volume of insulation to purchase.

*Undisputed Fact 10.  The type and volume of industrial insulation material that distributors sell depends on the purchasing decisions of the contractors, engineers, and industrial facility owners who purchase, specify, and/or install industrial insulation in industrial facilities.*

Reply:  TPS does not deny anything material or relevant to the motion.

TPS denies Undisputed Fact No. 10 based on semantics about what it means to "make" purchasing decisions.  TPS contends that only contractors make insulation purchasing decisions, and engineers and facility owners do not.  TPS cites Para. 48 of the Shong Declaration (ECF 87-1 at 11), which does not say that, and instead contends that engineers and facility owners "do not purchase mechanical insulation."  Shong admits there that contractors' purchase decisions "reflect[] the input of downstream entities, including facility owners."  Thus, TPS does not challenge with evidence the accurate statement in Undisputed Fact No. 10, including that contractors, engineers, and industrial facility owners "purchase, specify and/or install industrial insulation in industrial facilities."  In addition, although not relevant to the motion, TPS is mistaken in contending facility owners do not themselves purchase industrial insulation.  They do.  Ex. C (Supp. Skelly Decl.) ¶ 9, 10); Johns Manville Ex. D (filed under seal).

*Undisputed Fact 11.  Insulation manufacturers compete with each other in selling industrial insulation in the United States by: a) seeking to have particular distributors stock, promote, and sell the manufacturer's insulation materials; and*

*b) seeking to influence the type of insulation material that contractors and industrial facility owners decide to purchase.*

Reply:  TPS does not deny anything material or relevant to the motion.

TPS admits the core fact that "[i]nsulation manufacturers attempt to influence decisionmakers at all levels," but says the influence varies.  TPS then reiterates that only distributors and contractors purchase insulation, which overlooks both industrial facility owners and their representatives' influence over those decisions and facility owners' direct purchasing of insulation.  Ex. C (Supp. Skelly Decl.) ¶ 9, 10).

*Undisputed Fact 12.  Insulation manufacturers compete with each other to persuade the facility owner, contractor, or engineer, who will decide what types and volumes of insulation materials to purchase, to use particular insulation materials, including—potentially—different insulation materials than those called for in the end-user's initial written specification.*

Reply:  TPS does not deny anything material or relevant to the motion.

TPS admits the core concept in Undisputed Fact No. 12 that: "Distributors seek to purchase what they are able to resell," ECF 87 at 14, which concedes the importance of the end-users to whom distributors resell.

Shong's cited assertions in Paras. 11, 23, 29, and 30 of his Declaration, ECF 87-1, *see* ECF 87 at 14, do not create a material fact dispute, and do not contradict the explanation in Undisputed Fact No. 12 about how insulation manufacturers compete with each other to persuade facility owners, contractors, and engineers to use particular insulation materials including ones that may be different than the initial written specifications.  Indeed, Shong admits in Para. 23 that part of his job at Johns Manville was to seek to "influence engineers to specify the products that they manufacture."  ECF 87-1 at 5.

*Undisputed Fact 13.  After the industrial facility owner, contractor, or engineer*

8

*makes a decision on what type of insulation materials to purchase, the facility owner's or contractor's representatives work with an insulation distributor to order the requested insulation materials.*

Reply:  TPS does not deny anything material or relevant to the motion.

TPS tries to create a fact dispute by reiterating its semantic conclusions from Undisputed Fact No. 10, where it contends facility owners and engineers do not make purchase decisions because contractors actually "purchase"—or give money to the distributors—for the insulation.  Semantics aside, TPS does not dispute the core fact that facility owners, contractors, and engineers are all pivotal in deciding what insulation materials to purchase and install in a facility, and its additional alleged facts do not raise a material disputed fact.

*Undisputed Fact 14*.   *Attached as Exhibit A-1 is an "Insulation Materials Specification Chart" published by the National Insulation Association ("NIA") trade association and used with the NIA Insulation Training Program, which compares and describes the attributes of different types of industrial and commercial insulation materials sold in the United States, including the material properties and performance characteristics.*

Reply:  TPS does not deny anything material or relevant to the motion.

TPS's Response does not dispute the accuracy of the NIA Chart, but takes issue once again with the terms "industrial" and "commercial" to describe the types of facilities where mechanical insulation materials are typically installed.  *See supra* reply to Undisputed Fact No. 3.

**B.     Johns Manville's Response To TPS's "Statement of Additional Material Facts."**

In an attempt to save space, Johns Manville responds to TPS's 26 paragraphs of "Additional Material Facts" using the following abbreviated responses below:

(1)    Not Material:  Nearly all of TPS's "additional facts" are not material (or relevant) to Johns Manville's motion for summary judgment, and are designated below as "Not Material."

(2)    Not Supported:  Some of TPS's numbered paragraphs do not match the

9

sworn statements in the accompanying Shong Declaration, and are therefore designated below as "Not Supported."

(3)   <u>Admitted Only for Purposes of This Motion</u>:   To simplify the Court's review of the Motion, Johns Manville admits TPS's statements, whenever possible, for purposes of this Motion only and <u>not</u> for any other purpose including later proceedings and a trial in this case.   Such admissions in this context do not endorse or agree with the language TPS's response uses, and Johns Manville would not necessarily use that language in its own statements.

(4)   <u>Denied</u>:   Johns Manville disagrees and denies some of the alleged facts, most notably those that purport to represent what occurs in *all* instances of calsil or mechanical insulation sales.

(5)   <u>Unqualified Opinion Testimony</u>:   The Shong Declaration includes opinions without establishing that Shong has the qualifications and experience to offer such opinion testimony under Fed. R. Evid. 702 and 703.

**<u>*TPS Additional Fact 1*</u>**.   *Calsil is a shorthand term for hydrous calcium silicate thermal insulation—a type of mechanical insulation—that is factory formed into flat blocks or curved sections designed to encapsulate pipes, tanks, pressure vessels and other equipment that operate at temperatures from 80° up to 1200° Fahrenheit within large industrial facilities, such as oil refineries, chemical and power generation plants, pulp and paper mills, and within commercial buildings such as hospitals, schools, multi-family housing and shopping and data storage centers.*

1.   **<u>Johns Manville Response</u>:**   Admitted Only for Purposes of This Motion, but Not Material.

<u>*Explanation*</u>:   The details about calsil's physical properties and the fact that calsil can also be installed in commercial buildings are not relevant to the Motion.   TPS's claims about calsil in its Amended Complaint focus on large industrial facilities with high temperature ranges, where calsil is used for temperatures up to 1,200° F, not commercial buildings with low temperature ranges.   ECF 30 at 3 (¶¶ 7-8).   The Amended Complaint only refers to "commercial applications" where it discusses a different insulation material, fiberglass pipe insulation.   *Id.* ¶ 90.

The term "mechanical insulation" refers to the function of insulation, i.e., insulation that

10

is used to reduce heat loss or gain from piping, duct work, equipment, tanks and vessels. Mechanical insulation is used in both industrial and commercial facilities.  Ex. C (Supp. Skelly Decl.) ¶ 7.

> ***TPS Additional Fact 2***.  *The calsil sold by TPS and JM is manufactured in accordance with ASTM C533 Type I, an international material standard that is the typical reference used by those in the mechanical insulation industry to classify generic product types that satisfy certain performance criteria.*

    **2.**    **Johns Manville Response:**  Denied in part as explained below.  Otherwise, Admitted Only for Purposes of This Motion, but Not Material.

*Explanation*:  Johns Manville has no way to verify whether TPS's calsil currently is manufactured by BEC according to ASTM specifications, but that alleged fact is irrelevant for the current motion.

> ***TPS Additional Fact 3***.  *TPS and JM sell calsil to distributors and, to a lesser extent, to contractors.  They do not sell directly to other types of customers, such as end-users.*

    **3.**    **Johns Manville Response:**  Admitted for Johns Manville if contractors are not treated as a type of "end-user" in this context, *see* Ex. A (Skelly Decl.) ECF 76-1 ¶ 6, but Not Material.  For TPS:  s*ee* Ex. D (filed under seal) (content explained in exhibit).

*Explanation*:  The fact that manufacturers sell calsil to distributors and contractors does not change the undisputed facts that distributors resell the insulation to end-users and their representatives (including contractors), who drive demand for industrial insulation, and insulation contractors install calsil for end-users.  Ex. A (Skelly Decl.) ECF 76-1 ¶¶ 7-14.

> ***TPS Additional Fact 4***.  *Insulation distributors resell mechanical insulation products, including calsil, in downstream markets, primarily to insulation contractors and, more rarely, to other types of customers, including, in some cases, end-users.*

4.    **Johns Manville Response**:  Admitted in Part Only for Purposes of This Motion.

Not Material.

*Explanation*:  TPS's explanation of contractor purchases of calsil and other insulation

materials, Shong Decl., ECF 87-1 ¶ 11, is incomplete and omits the relevant fact that contractors

purchase calsil and other insulation to install in industrial facilities at the request and for the benefit

of the facility owner / end-users or their representatives.  Ex. A (Skelly Decl.) ECF 76-1 ¶ 8.

> ***TPS Additional Fact 5***.  *These distributors are able to resell mechanical insulation products, including calsil, and all of the required accessories needed to install the insulation system to their customers in a manner that is more efficient, and at a greater scale, than TPS could achieve through direct sales. As a result, access to distribution is critically important to TPS's ability to compete effectively in the calsil market.*

5.    **Johns Manville Response**:  Admitted in Part Only for Purposes of This Motion,

and Denied in Part as explained below.  Not Material.  Unqualified Opinion Testimony.

*Explanation*:  This proposed additional fact includes two opinion statements that go beyond

"simple declarative statements" capable of verification as undisputed facts:  (1) TPS's assertion

that sales through distributors are "more efficient, and at a greater scale, than TPS could achieve

through direct sales"; and (2) "access to distribution is critically important to TPS's ability to

compete effectively in the calsil market."  The Shong Declaration does not establish he has the

expertise to offer such opinion testimony.  Therefore, Johns Manville does not admit those

statements.  Despite multiple requests, TPS still has not produced most of the documents about its

business identified in its June 4, 2019 Rule 26(a)(1) initial disclosures, and the documents TPS's

counsel agreed to produce in response to Johns Manville's June 16, 2020 First Set of document

requests.  Issues about what is "more efficient" and what is needed to "compete effectively"

involve opinions that require specialized expertise under Fed. R. Evid. 702 and 703.  The Shong

Declaration does not provide a sufficient foundation to establish Mr. Shong has such economic expertise.

In addition, public information posted on TPS's own website undermines any inference in TPS's proposed Additional Fact 5 that TPS lacks access to a distribution network.  *See also* Ex. D (filed under seal) (content explained in exhibit).  TPS's website includes a map (copied above under Undisputed Fact #3) showing its "nationwide partner network" of distributors in the United States:  *See* Where to Buy, TPS: Thermal Pipe Shields (last visited October 8, 2020)*,* https://www.thermalpipeshields.com/where-to-buy/.  TPS's distributor map shows it is currently working with each of what it calls the five "largest" insulation distributors in the United States in Paragraph 19 of the Amended Complaint to sell what it calls "commercial" insulation, "industrial" insulation, or both.  *See also* Ex. D (filed under seal) (content explained in exhibit).

> **_TPS Additional Fact 6_**.  *The design and construction process begins when an owner decides to build the relevant site—an industrial facility, a commercial building, or any type of physical structure that requires mechanical systems that must be insulated in order to function properly.*

**6.**     **Johns Manville Response:**  Admitted Only for Purposes of This Motion.

*Explanation*:  This proposed additional fact supports the argument that the Court must include in a relevant market the end-user facility owners who use calsil and other types of insulation in their facilities, built or renovated through what TPS calls the "design and construction process."

> **_TPS Additional Fact 7_**.  *The owner will hire an architect (who designs the commercial building) or an Engineering/Procurement/Construction ("EPC") firm (which designs the industrial facility). The architect hires a third-party mechanical engineering firm, or the EPC firm's internal engineers are tasked with designing the mechanical systems within that facility. This includes specifying materials and methods for all piping, fixed and rotating equipment, and all other needed accessory materials—including mechanical insulation—and then overseeing the*

*construction process to ensure that the system is installed in accordance with the plans and specifications.*

*TPS Footnote 1:   New industrial facilities or major expansions within existing facilities are often designed and constructed by EPC firms, which are vertically integrated entities that perform all functions from design and engineering through material procurement through construction, and furnish turn-key facilities to owners that the EPC warrantees for a limited time (typically one to two years) in exchange for a lump-sum payment.*

7.   **Johns Manville Response**:   Admitted Only for Purposes of This Motion.   Not Material in part as explained below.

*Explanation*:   This proposed additional fact includes irrelevant details about the design process, but it nevertheless supports the argument that the Court must include in the relevant product market the end-user facility owners, who use calsil and other types of insulation in their industrial facilities, and their representatives including contractors and engineers, who may specify, influence the specification for, install, or purchase those materials.   This proposed fact emphasizes the role that engineers (including "EPC firms") working for the end-user facility owners play in selecting industrial insulation through the designs they prepare for their industrial facility clients.

*TPS Additional Fact 8*.   *The mechanical engineer of record will evaluate the design criteria and needs of the project and consider the many fit-for-use requirements along with total cost, lead time, and labor rates to specify a material for use that satisfies these requirements.   The decision regarding which distinct type of mechanical insulation to specify is at the sole discretion of the engineer of record and is codified during the design phase.*

8.   **Johns Manville Response**:   Admitted Only for Purposes of This Motion, subject to the explanation below.   Not Material in part as explained below.

*Explanation*:   This proposed additional fact   inaccurately implies that selection of insulation materials is at the "sole discretion of the engineer" and "codified" during the design

14

phase and therefore not subject to further revision, which is not accurate. *See* Ex. A (Skelly Decl.) ECF 76-1 ¶ 13; Ex. C (Supp. Skelly Decl.) ¶ 13 (describing changes to insulation materials and "value engineering").

This proposed additional fact also includes irrelevant details about the engineers' work process, but it nevertheless supports the argument that the Court must include in the relevant product market the end-user facility owners who use calsil and other types of insulation in their industrial facilities, and their representatives including contractors and engineers. This proposed fact emphasizes the role that the engineers working for the end-user facility owners play in selecting the industrial insulation material "to specify."

> ***TPS Additional Fact 9***. *Because engineers do not purchase insulation or make purchasing decisions, they do not dictate which distributor will supply the specified type of insulation to the contractor. Nor do they choose the manufacturer of the insulation that the contractor will purchase from the distributor.*

9.   **Johns Manville Response**: Denied in part, but Not Material. Unqualified Opinion Testimony.

*Explanation*: This proposed additional fact includes opinions without establishing that Mr. Shong has the qualifications and experience to offer such opinion testimony under Federal Rules of Evidence 702 and 703. Mr. Shong does not provide foundation in his Declaration to give an opinion for *all* circumstances in the industrial insulation market on what decisions engineers may make or not make in connection with the purchase of industrial insulation.

In addition, TPS's own proposed facts disprove its argument that engineers do not "make purchasing decisions." An engineer's selection of insulation material for an industrial facility represents an important part of decision to purchase such material. *See, e.g.*, TPS Additional Facts 8, 10 (arguing engineers specify the insulation material to use). TPS's arguments in Additional

Fact 9 about the general role of engineers are not relevant to the Motion.  The division of responsibility among facility owners and the engineers and contractors who represent them varies among facilities and owners and does not change the necessity of including downstream end-users who drive calsil demand in any evaluation of a proposed calsil product market.

> ***TPS Additional Fact 10***.  *If the specifications call for calsil anywhere in the project, calsil must be installed there. The contractor has no discretion to ignore or overrule the engineer's specifications, nor does the distributor from whom the contractor purchases the product. In all cases, the engineer of record alone determines which generic types of insulation that "shall be installed" in each area duly noted on the plans, drawings, piping schedules, and material specifications.*

10.    **Johns Manville Response**:  Denied.  Not Material.  Unqualified Opinion Testimony.

*Explanation*:  This proposed additional fact includes opinions without establishing that Mr. Shong has the qualifications and experience to offer such opinion testimony under Federal Rules of Evidence 702 and 703.  Mr. Shong does not provide a foundation in his Declaration to give an opinion for *all* circumstances in the industrial insulation market about how contracts to purchase industrial insulation may be written or enforced.

Johns Manville nonetheless denies the unsupported opinions from Mr. Shong about what he believes happens with *all* sales of industrial insulation in the United States.  The specifics about how engineers and contractors, representing industrial facility owners, may change their insulation purchase requirements after initial specifications are prepared, are not material to the Motion.

David Skelly of Johns Manville explained the competitive process Johns Manville sees with the sale of *its* industrial insulation in his Declaration, and that conflicts with Shong's opinion. Ex. A (Skelly Decl.) ECF 76-1 ¶¶ 12, 13; *see also* Ex. C (Supp. Skelly Decl.) ¶ 13.  As Mr. Skelly explained, the competitive process continues to occur after initial engineering specifications are

prepared, including through "value engineering." *See id.* Mr. Skelly is in a better position than Mr. Shong to describe *for Johns Manville* how competition occurs for the sale of its industrial insulation, including how specifications may not specify the particular insulation material to be used (contrary to Shong's statement that in "all cases" the engineer specifies the type of insulation material to be installed) and how facility owners (and the engineers and contractors working with them) may decide to use insulation materials different than those called for in an initial written specification.  Ex. A (Skelly Decl.) ¶ 13; Ex. C (Supp. Skelly Decl.) ¶ 13.

> ***TPS Additional Fact 11***.  *Once the design documents are finalized, the various bid packages will be "let" to a group of general or mechanical contractors who submit them to various insulation contractors (who are sub-contractors) to obtain competitive bids in order to tender a legally binding bid for the project in strict accordance with the plans, drawings, and material specifications in the project documents.*

11.     **Johns Manville Response:**   Admitted only for purposes of this Motion, subject to the explanations in response to Additional Facts 8 and 10.  Not Material.  Unqualified Opinion Testimony.

*Explanation*:   This proposed additional fact includes opinions without establishing that Mr. Shong has the qualifications and experience to offer such opinion testimony under Federal Rules of Evidence 702 and 703.  Mr. Shong does not provide a foundation in his Declaration to give an opinion for *all* circumstances in the industrial insulation market about how contracts to purchase industrial insulation may be written or enforced.

Regardless, the specifics about how contractors bid to install insulation for industrial facility owners are not material to the Motion.

> ***TPS Additional Fact 12***.  *The owner then reviews the bid proposals and awards the job to the winning contracting firm based on the low bid or other predetermined criteria.  At this point, the design phase is complete, and no changes can be made*

*to the material specifications without a formal written process called a change order.*

  12. **Johns Manville Response**:  Admitted only for purposes of this Motion, but Not Material.  Unqualified Opinion Testimony.

  *Explanation*:  This proposed additional fact includes opinions without establishing that Mr. Shong has the qualifications and experience to offer such opinion testimony under Federal Rules of Evidence 702 and 703.  Mr. Shong does not provide a foundation in his Declaration to give an opinion for *all* circumstances in the industrial insulation market about how contracts to purchase industrial insulation may be written or enforced.

  Regardless, the specifics about how industrial facility owners review and award contractors' bids to install insulation are not material to the Motion.

  ***TPS Additional Fact 13***.  *The winning contractor will then award a sub-contract to an insulation contractor with a schedule to complete the project. That insulation contractor then compiles a "submittal package" which includes a comprehensive list of all the materials to be installed by brand name including, product data sheets, safety data sheets, technical bulletins, and other product literature while highlighting the information required to demonstrate compliance with the material specifications.*

  13. **Johns Manville Response**:  Admitted only for purposes of this Motion subject to Explanation in response to TPS Additional Facts 8 and 10.  Not Material.  Unqualified Opinion Testimony.

  *Explanation*:  This proposed additional fact includes opinions without establishing that Mr. Shong has the qualifications and experience to offer such opinion testimony under Federal Rules of Evidence 702 and 703.  Mr. Shong does not provide a foundation in his Declaration to give an opinion for *all* circumstances in the industrial insulation market about how contracts to purchase industrial insulation may be written or enforced.

Regardless, the specifics about how contractors and subcontractors working for an industrial facility owner prepare documents to document the insulation they will install are not material to the Motion.

> ***TPS Additional Fact 14***. *To determine which branded products to include in the submittal package, the contractor will consult with distributors to determine the availability and cost of various branded products that will comply with the specifications in the contract.*

14. **Johns Manville Response:** Admitted Only for Purposes of This Motion, subject to the explanation below.

*Explanation*: This proposed additional fact leaves out the communications between insulation manufacturers and industrial facility owners, engineers, and contractors, where manufacturers sell their particular brand and try to influence the type of insulation to select for a particular facility or project, and the direct sales of insulation materials from manufacturers to contractors. *See* Ex. A (Skelly Decl.) ECF 76-1 ¶¶ 6, 10, 12; Ex. C (Supp. Skelly Decl.) ¶ 11.

> ***TPS Additional Fact 15***. *Once the submittal package is approved, the insulation contractor then makes the purchasing decision as to which distributor it will purchase from based on which products were submitted and which distributor carries which brand in its local area.*

15. **Johns Manville Response:** Admitted only for purposes of this Motion, subject to the explanation for Additional Fact 14 and the explanation below.

*Explanation*: This proposed additional fact concedes that a distributor may not carry every brand of every type of insulation that it sells in each of its locations, or at all. In addition, this proposed additional fact leaves out the fact that contractors often work with multiple distributors. Ex. C (Supp. Skelly Decl.) ¶ 14. *See also supra* Explanation for Additional Fact 14.

> ***TPS Additional Fact 16***. *Contractors provide the end-users that hire them with a package of services that includes procurement of materials and provision of labor.*

19

*They do not resell the materials that they purchase from distributors to their end-user clients.  Rather, they are paid a fixed amount to purchase and install materials and the amount spent on materials does not affect what the end-user pays the contractor.*

16.   **Johns Manville Response**:   Denied.   Not Material.   Unqualified Opinion Testimony.

*Explanation*:   This proposed additional fact includes opinions without establishing that Mr. Shong has the qualifications and experience to offer such opinion testimony under Federal Rules of Evidence 702 and 703.  Mr. Shong does not provide foundation in his Declaration to give an opinion for all circumstances in the industrial insulation market about how contractors work with industrial facility owners to purchase and install industrial insulation.  In addition, Johns Manville denies the unsupported opinions from Mr. Shong about what he believes happens with all sales of industrial insulation in the United States, including his characterization of the services contractors provide when they install insulation.   Shong's unsupported opinion ignores the flexibility that exists in the competitive process even after an industrial facility owner's engineers or contractors have prepared written specifications including with "value engineering."  Ex. A (Skelly Decl.), ECF 76-1 ¶ 13; *see also id*. at 2-3 (¶ 8) (describing contractors' role); Ex. C (Supp. Skelly Decl.) ¶ 13.

This proposed additional fact also fails to acknowledge time and materials contracts, where industrial facility end-users purchase insulation materials along with the contractor's services.  Ex. C (Supp. Skelly Decl.) ¶ 10.  Nevertheless, the specifics about how contractors, representing industrial facility owners, charge the facility owners for their services are not material to the Motion.

***TPS Additional Fact 17***.   *While facility owners communicate their opinions,*

*preferences, and requirements to the professionals that they hire, they do not decide which type, thickness or brand of insulation materials or even which distributor to purchase from because they do not purchase insulation and are not qualified to dictate these decisions to those who do purchase insulation.*

17.    **Johns Manville Response:**  Denied in part.  Not Material.  Unqualified Opinion Testimony.

*Explanation*:  This proposed additional fact includes opinions without establishing that Mr. Shong has the qualifications and experience to offer such opinion testimony under Federal Rules of Evidence 702 and 703.  Mr. Shong does not provide foundation in his Declaration to give an opinion for all circumstances in the industrial insulation market about how industrial facility owners, including large companies with their own in-house engineers, communicate with the contractors they hire about the insulation materials that will be installed in their facilities.  In addition, Johns Manville denies the unsupported opinions from Mr. Shong about what he believes happens in communications between all industrial facility owners and the contractors they hire.  Industrial facility owners, and the engineers and contractors who work for them, play an active role in considering, evaluating, and making the final decisions about what insulation materials to purchase for their facilities.  Ex. A (Skelly Decl.) ECF 76-1 ¶¶ 8, 10, 11, 13.

Regardless, this proposed additional fact ignores the in-house engineering specifications that large industrial facility owners like ExxonMobil use to communicate their insulation material preferences, and facility owners' direct purchase of insulation materials under blanket material contracts.  Ex. C (Supp. Skelly Decl.) ¶¶ 9, 12.  It also ignores the obvious fact that the facility owner is the ultimate end-user of the insulation materials, so its "preferences" frequently dictate the choices that are made by the contractor and engineer representatives that it hires.  Nevertheless, the specific details and allocation of decisionmaking roles among engineers, contractors, and the

industrial facility owners they represent, when they decide what insulation material to purchase

and install for their facility, is not material to the Motion.

> ***TPS Additional Fact 18***.  *For pipe insulation, there are hundreds of different combinations of pipe size and thickness available, making it impractical for an insulation contractor to inventory large quantities of these insulation materials. For all existing (i.e., maintenance) projects, use of insulation distributors is the only realistic option.  In addition to providing the different pipe insulation sizes necessary in the quantities necessary, insulation distributors maintain inventories of block and board insulation products as well as insulation accessories such as facings, protective jacketing, mastics, adhesives, and tapes.*

18.   **Johns Manville Response:** Admitted Only for Purposes of This Motion, but Not

Material.

*Explanation*:  The details about how insulation contractors work with distributors to obtain

particular insulation materials and accessories are not relevant to the Motion.

> ***TPS Additional Fact 19***.  *In addition to this efficiency, distributors account for the vast majority of insulation sales by manufacturers.  Due to this structure of the industry and the essential role served by distributors, it is virtually impossible for TPS to bypass the distributor network by selling directly to insulation contractors or end-users.*

19.   **Johns Manville Response:**  Denied in part, but Not Material.

*Explanation*:  Johns Manville admits that it sells the majority of its industrial insulation

materials, including calsil, to insulation distributors, although it also sells millions of dollars, on

an annual basis, worth of calsil and other industrial insulation, directly to contractors.  Ex. A

(Skelly Decl.) ECF 76-1 ¶ 6. Johns Manville denies the rest of Additional Fact 19, which contends

that it is "virtually impossible" to TPS to bypass the distributor network and sell directly to

contractors or end-users.  *See supra* Johns Manville Response to Additional Fact 5; Johns Manville

Ex. D (filed under seal) (content explained in exhibit).

Regardless, this "alleged" industry structure is not material to a decision on the Motion as

it is undisputed that facility owners, and their engineer and contractor representatives, drive the

demand for calsil and other mechanical insulation products.

> ***TPS Additional Fact 20***.  *When insulation contractors purchase materials from distributors, they generally seek to satisfy all project needs from a single distributor, which allows contractors to leverage incentive rebate programs as well as convenience and requires the distributor to be able to supply a large selection of insulation products, accessories, and ancillary supplies.*

20.   **Johns Manville Response**:  Denied.  Not Material.

*Explanation*:  Insulation contractors regularly work with multiple distributors, including

on the same project.  *See* Ex. C (Supp. Skelly Decl.) ¶ 14.

> ***TPS Additional Fact 21***.  *If a manufacturer is unable to have a distributor sell its products, the distributors' customers are unlikely to turn elsewhere to buy that product separately and so instead the customer would likely buy another qualifying product that the distributor sells.*

21.   **Johns Manville Response**:  Denied.  Not Material.

*Explanation*:  *See supra* Explanation for TPS Additional Facts 5, 19, and 20.

> ***TPS Additional Fact 22***.  *From a manufacturer standpoint, it is essential to be included among a distributor's offerings.  If a distributor cannot buy a manufacturer's product, it cannot resell it.  And if a distributor cannot sell TPS's calsil to contractors, there is no alternative sales channel in which the contractors can buy it, because TPS does not have a practical alternative means of selling it.*

22.   **Johns Manville Response**:   Denied.   Not Material.   Unqualified Opinion

Testimony.

*Explanation*:  This proposed additional fact includes opinions without establishing that

Mr. Shong has the qualifications and experience to offer such opinion testimony under Federal

Rules of Evidence 702 and 703.  Proposed Additional Fact 22 includes two opinion statements

from Mr. Shong that go beyond "simple declarative statements" capable of verification as

undisputed facts: (1) TPS's assertion that "it is essential to be included among a distributor's

offerings" [implying, but not stating TPS must sell its products through every insulation distributor]; and (2) TPS has no "alternative sales channel" and no "practical alternative" to sell its calsil to contractors other than through distributors. The Shong Declaration does not establish he has the expertise to offer such opinion testimony. Johns Manville does not admit those statements and incorporates its explanation above to Additional Fact 5, and undisputed evidence about TPS's access to insulation distributors. *See supra* Explanation for TPS Additional Facts 5, 19, and 20; s*ee also* Johns Manville Ex. D (filed under seal) (content explained in exhibit).

In addition, distributors carry the insulation materials that their customers want to purchase, which may involve carrying insulation materials made by multiple manufacturers. *See* Ex. C (Supp. Skelly Decl.) ¶ 15. Regardless, the details about how TPS interacts with particular insulation distributors are not material to the Motion and the importance of having the Court include end-users for industrial insulation, and their contractor and engineer representatives, in a relevant product market encompassing calsil.

> **_TPS Additional Fact 23_**. *In Paragraph 13 of his declaration, Mr. Skelly suggests three types of written specifications used by engineers to specify insulation needs. The second type of written specification identified by Mr. Skelly—specifying generic ASTM material standards—is by far the most common and straightforward means used by an engineer to specify any construction material, including calsil. ASTM standards allow contractors to exercise judgment and discretion in evaluating a distributor's offerings where multiple branded products may exist that meet the required performance criteria identified by the engineer.*

23. **Johns Manville Response**: Denied. Not Material. Unqualified Opinion Testimony.

*Explanation*: This proposed additional fact includes opinions without establishing that Shong has the qualifications and experience to offer such opinion testimony under Federal Rules of Evidence 702 and 703. Proposed Additional Fact 23 includes an opinion statement from

Mr. Shong that goes beyond a "simple declarative statement" capable of verification as undisputed facts.  Here, Mr. Shong contends that an engineer's written specification specifying the ASTM standards is "by far the most common and straightforward means."  The Shong Declaration does not establish he has the expertise to offer such opinion testimony.

Johns Manville stands by Mr. Skelly's description of different methods for issuing written specifications, without the editorial comments and judgments Mr. Shong seeks to add.  *See* Ex. A (Skelly Decl.) ECF 76-1 ¶ 13.

> ***TPS Additional Fact 24****.  Mr. Skelly's first type of written specification—specifying "insulation materials using a material's name"—is incomplete because it fails to mention essential subsequent qualifiers always included in these types of brand name specific specifications. Namely, whether the engineer will accept an "or equal" brand name product if the alternative product meets or exceeds the same performance criteria as the listed brand name product.*

24.   **Johns Manville Response**:   Denied.   Not Material.   Unqualified Opinion Testimony.

*Explanation*:  *See supra* Explanation for Additional Fact 23.  Johns Manville stands by Mr. Skelly's description of different methods for issuing written specifications, without the editorial comments and judgments Mr. Shong seeks to add.  *See* Ex. A (Skelly Decl.) ECF 76-1 ¶ 13.

> ***TPS Additional Fact 25****.  Finally, Mr. Skelly's third type of written specification— that an engineer's written specifications may simply identify "certain design and performance criteria"—is never used because it would result in no meaningful specification at all, and uncertainty would plague the design process from bid stage through completion.*

25.   **Johns Manville Response**:  Denied.  Not Material.  Not Supported.  Unqualified Opinion Testimony.

*Explanation*:  *See supra* Explanation for Additional Fact 23.  Johns Manville stands by

Mr. Skelly's description of different methods for issuing written specifications, without the editorial comments and judgments Mr. Shong seeks to add.  *See* Ex. A (Skelly Decl.) ECF 76-1 ¶ 13.

> ***TPS Additional Fact 26***.  *Importantly, Mr. Skelly's declaration omits a fourth type of written specification that is very common among industrial facility owners known as "maintenance and repair operations" ("MRO") contracts. This specification type requires a contractor to "replace insulation in kind." This means that any insulation must be replaced with the same type and thickness that is removed, and the only choice concerns the brand and from which distributor the contractor will purchase. A significant portion of installation work in industrial facilities is MRO work, not new construction.*

26.    **Johns Manville Response:**  Denied.    Not  Material.    Unqualified  Opinion Testimony.

*Explanation*:  *See supra* Explanation for Additional Fact 23.  Johns Manville stands by Mr. Skelly's description of different methods for issuing written specifications, without the editorial comments and judgments Mr. Shong seeks to add.  *See* Ex. A (Skelly Decl.) ECF 76-1 ¶ 13, except that Mr. Skelly provides information about industrial facility owners' blanket material contracts and time and materials contracts in his Supplemental Declaration.  Ex. C (Supp. Skelly Decl.) ¶¶ 9, 10.

### III.     ARGUMENT

**A.    TPS Does Not Identify Material Disputed Facts, and the Details TPS Offers About How Facility Owners, Engineers, and Contractors Select And Purchase Insulation Only Underscore The Flaw With TPS's Proposed Market.**

TPS's Response presents a barrage of "additional facts" with unnecessary details about how industrial facility end-users, and their engineers and contractors, select and purchase insulation materials.[1]  While TPS purports to teach the Court about the "economic realities of the market and its participants," ECF 87 at 38, TPS's explanation about the role of industrial facility owners, and the engineers, and contractors who assist them, only emphasizes how the Court cannot evaluate competition for sale of calsil to distributors without considering the purchasing behavior and preferences of the end-users who drive distributor demand.  Indeed, TPS's alleged facts do not obscure, much less raise a disputed fact material to, the central theme of Johns Manville's motion: as a matter of law, the Court cannot evaluate demand for calsil sales, or any alleged anticompetitive behavior related to such sales, without considering the consumers who actually use and drive the demand for calsil.

**1.     TPS concedes distributors do not use or consume calsil, and end-user/facility owners, and their engineers and contractors, drive the demand for it.**

TPS's Response quibbles with trivial details to deny, in part, many of Johns Manville's Undisputed Facts.  *See* ECF 87 at 9-15.  But TPS's quibbling does not contradict the core,

---

[1]  As required by Judge Hegarty's Practice Standards, Johns Manville responded in Section II, above to TPS's proposed "additional facts" to correct the record or further explain nuances TPS either obscures or omits about: (1) how large industrial facilities have their own in-house engineering specifications, and buy insulation directly from distributors including for their repair and annual maintenance work; and (2) contractors may purchase insulation directly from manufacturers including Johns Manville in certain circumstances.  These factual corrections do not create a material fact dispute because the facts corrected are not material to a decision on the legal issue presented in Johns Manville's motion for summary judgment.

undisputed facts that undermine TPS's proposed product market:

> **a.     TPS admits end-users (facility owners, engineers, and contractors) drive demand for calsil.**

TPS concedes the following material facts:

(1)  "Insulation manufacturers do attempt to influence decisionmakers at all levels of the supply chain . . . " *Id.* at 14.

(2)  "the owners of industrial facilities are end-users of mechanical insulation" and "insulation contractors install insulation materials in accordance with engineers' specifications . . . ." *Id.* at 11.

(3)  "In some limited circumstances, manufacturers sell directly to contractors." *Id.* at 12.

(4)  "The insulation contractor and the distributor work together to determine which manufacturer's brand name product the contractor will purchase . . . ." *Id.* at 13.

(5)  "The [contractor's] purchase decision will depend on cost, availability, and perhaps other factors, but in all cases is limited to the product or products that satisfy the engineer's specification." *Id.* at 13.

These undisputed facts demonstrate that it is facility owners—along with the contractors and engineers that represent them—who drive the demand for calsil sales. And, as discussed below, the Court cannot as a matter of law evaluate the product market for calsil sales without analyzing the source of the demand for calsil.

> **b.     TPS admits distributors resell calsil and only purchase what they expect to be able to resell.**

TPS also concedes:

(1)  "Distributors seek to purchase what they are able to resell, . . . ." *Id.* at 14.

(2)  "downstream end-users' preferences influence the preferences of the direct calsil purchasers." *Id.* at 14.

(3)  "insulation distributors resell mechanical insulation to insulation contractors . . . for use in industrial facilities." *Id.* at 11; *see also id.* at 10.

(4)  "insulation distributors do resell insulation materials to insulation contractors." *Id.*

These undisputed facts demonstrate the Court cannot consider reasonable substitutes for calsil that distributors purchase without understanding the factors that drive calsil consumers to purchase from distributors and what substitutes those consumers consider. TPS's "simple reality" argument evades discussion of what reasonable substitutes exist for calsil for the end-users (facility owners and the engineers and contractors they hire) who TPS admits drive calsil demand.

TPS tries to deflect the Court from focusing on these undisputed facts by contending its recitation of additional facts raises three relevant factual disputes. ECF 87 at 25. But none of the fact disputes TPS describes are material and they certainly do not prevent the Court from rejecting TPS's upstream-only calsil product market.

First, TPS disputes whether end-user facility owners purchase calsil from manufacturers or purchase it all. TPS's factual premise is mistaken because contractors and facility owners do purchase calsil directly. *See* Ex. C (Skelly Supp. Decl.) at ¶¶ 9, 10, 11; Ex. D (filed under seal) (content explained in exhibit). But TPS's factual dispute, if one exists, is irrelevant to the Motion. What matters is that contractors and facility owners, not distributors, install and use calsil and (with engineers) drive the demand for it. Regardless of whether those end-users purchase calsil directly from manufacturers, or only from distributors, those end-users are in a position to evaluate reasonable substitutes for calsil in a properly defined product market.

Second, TPS disputes whether end-users' demand for calsil "is reflected in the demand" of calsil manufacturers' "customers," and TPS professes a concern about double-counting. *Id.* TPS does not explain these unfocused concerns with alleged overlapping demand and "double-counting," but this argument appears to be tied to TPS's flawed attempt to import *Illinois Brick*/direct purchaser standing concepts into the separate process of defining a relevant market.

*See infra* Section III.A.3.  (*Illinois Brick*'s direct purchaser standing limitations address concerns about potential "conflicting claims to a common fund."  *Illinois Brick v. Illinois*, 431 U.S. 720, 737 (1977)).  In evaluating TPS's proposed product market (not who has standing to sue), the undisputed facts here demonstrate the only use that exists for calsil is as insulation, and distributors have no use for calsil beyond reselling it.  Therefore, the calsil that manufacturers sell ends up installed in end-users' facilities except if it is discarded.  Both calsil supply and demand should be included in a relevant product market, and doing so does not require calculating demand or sales volumes, or deciding who can recover damages, or in what amount.  Thus, TPS's overlapping demand/double-counting concern is misplaced.

Third, TPS disputes whether it is viable or practical for TPS to sell to end-users instead of distributors.  *Id.*  It is undisputed that Johns Manville sells some of its calsil directly to contractors. *See* Undisputed Fact No. 6; Ex. A (Skelly Decl.) ECF 76-1 ¶ 6; *see also* Ex. D (filed under seal) (content explained in exhibit).  But this Court's rejection of TPS's proposed product market does not depend on whether TPS believes it cannot sell calsil directly to any end-users or the contractors who install it for them.  At the risk of repetition, the point is that the Court cannot evaluate a product market for calsil without considering the conduct and preferences of the end-users who consider reasonable substitutes and drive calsil demand.

Thus, TPS concedes the core undisputed facts that justify rejecting its upstream-only product market.  TPS's proposed fact disputes are not relevant to that decision.

## 2.      TPS's attempt to expand its product market to encompass all "direct purchasers" does not cure its defective antitrust claims.

Recognizing the flaws with its proposed upstream-only calsil market, TPS tries in its Response to broaden the defective product market to encompass direct downstream sales of calsil

to contractors.  *See* ECF 87 at 24 n.3 (inaccurately stating "TPS defines the relevant product market as ***all*** sales by the Calsil Manufacturers to ***direct purchasers***" (emphasis added) (citing paragraph 17 of the First Amended Complaint (ECF 30) but using two terms that do not appear in that complaint, "Calsil Manufacturers" and "direct purchasers")).

Adding direct sales of calsil from a manufacturer to a contractor or other end-user does not cure TPS's defective product market.  As explained here and in the Motion, TPS's exclusion of distributors' downstream calsil sales to end-users/consumers would create an incomplete product market that prevents the Court from evaluating reasonable substitutes for calsil for the end-users/consumers who drive distributors' calsil purchases.  In addition, TPS's upstream-only distributor market does not meet the requirements in *Brown Shoe* and its progeny for a valid antitrust submarket.  *See infra* Section III.B.

### 3.   TPS's use of the "direct purchaser" label borrowed from antitrust standing concepts does not validate its proposed upstream product market.

TPS uses the term "direct purchaser" in an apparent (but legally inept) attempt to import into an evaluation of its proposed product market common law antitrust standing limitations that bar indirect purchaser claims.  Citing in a footnote *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), TPS labels distributors "direct purchasers" of calsil.  ECF 87 at 25 n.4.  But the Supreme Court's "direct purchaser" limits on standing in *Illinois Brick* and its progeny have nothing to do with how this Court should define a proposed relevant product market.

Under *Illinois Brick*'s "bright-line" direct purchaser *standing* requirement, an immediate buyer from the alleged antitrust violator may sue for an antitrust violation, but indirect purchasers "who are two or more steps removed from the violator in a distribution chain may not sue." *Apple Inc. v. Pepper*, __ U.S. __, 139 S. Ct. 1514, 1520 (2019).  In *Apple*, the Court held that iPhone

owners who purchase apps directly from Apple could bring antitrust claims against Apple contending it has monopoly power in the sale of apps to iPhone owners/consumers. *Id.* at 1521. The majority opinion in *Apple* emphasizes that "'protecting consumers from monopoly prices' has been 'the central concern of antitrust,'" *id*. at 1525, and maintains a remedy for consumers against Apple even though it does not set retail prices for iPhone apps and only receives a percentage of the sale price, *id.*at 1519.

For purposes relevant to this litigation, TPS does not purchase calsil—it sells it. TPS does not have standing to claim damages for distributors. Therefore, the *Illinois Brick* bright-line rule limiting claims by indirect purchaser has no bearing on TPS's claims, and does not support an argument that end-users should be excluded from the relevant product market. TPS does not cite cases that apply *Illinois Brick*'s standing limitation to define a product market because the two concepts are analytically distinct.[2] In addition, as explained in Section III.B below, TPS does not satisfy the separate requirements for asserting a relevant "submarket."

The correct way to define a relevant product market is to focus on the purpose for which the product is produced and identify reasonable substitutes in that context. Judge Ebel recently explained this concept for the Tenth Circuit: a relevant product market "consists of products that

---

[2] TPS implies that *U.S. v. Dentsply Int'l*, 399 F.3d 181 (3d Cir. 2005), supports its "direct purchaser" semantic argument. *See* ECF 87 at 27-28. But *Dentsply* does not use the term "direct purchaser" or cite *Illinois Brick*. *Dentsply*'s ruling on the relevant product market involved circumstances unique to the sale of artificial teeth, where the Third Circuit held the relevant market was the "sale of artificial teeth in the United States both to laboratories and to the dental dealers." *Id.* at 188. This product market included the end-user laboratories, which constitute "the ultimate consumers" for artificial teeth "because they buy the teeth at the point in the process where they are incorporated into another product." *Id.* The Third Circuit's description of three channels for selling artificial teeth (to dental labs, through dental dealers, and through direct sales and dealers), *id.*, does not resemble the sale of calsil to distributors who resell to end-user contractors and industrial facility owners, and directly to contractors.

have reasonable interchangeability **for the purposes for which they are produced**—price, use, and qualities considered." *Green  Country Food Market, Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004) (emphasis added; quotations omitted).  TPS contends it can cherry-pick the level of commerce where it wants to discuss product substitution, but the Fifth Circuit has explained that market definition must focus on the product, rather than the distribution level.  *See PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) ("'Wholesale sale' does not adequately define the relevant market, because the relevant market definition must focus on the product rather than the distribution level.").

The only purpose for which calsil is produced is not to stock shelves in a distributor's warehouse awaiting resale, but rather to serve as thermal insulation in industrial facilities.  If end-user contractors and industrial facility owners decide to buy less calsil or none (e.g., because it is too expensive, or for any other reason), distributors will correspondingly reduce or eliminate their calsil purchases and consider reasonable alternatives.  This is because the *only* purpose for producing calsil is for use as insulation in an industrial facility.  The Court cannot analyze reasonable substitutes for calsil at the distributor level because distributors do not use calsil for the purpose it is produced.  Thus, applying the Tenth Circuit's approach to defining a relevant market, this Court must look at reasonable interchangeability for calsil in the downstream market where industrial facilities install calsil (the purpose for which it is created), not in some upstream distribution market.

Courts defining relevant product markets focus on the consumer's perspective for the product, not the antitrust plaintiff/seller's perspective.  "It is the consumer's options and the consumer's choices among them on which relevant market analysis ultimately demands." *Flovac,*

*Inc. v. Airvac, Inc.*, 817 F.3d 849, 855 (1st Cir. 2016).  In *Flovac*, the plaintiff "offered only a single definition of the relevant product market: a product restricted to vacuum sewer systems [just one type of sewer system available to consumers]." *Id.* at 854.  Nevertheless, the defendant argued, and the First Circuit agreed, that the relevant market had to be comprised of all sewer systems because of "uncontested evidence that [these sewer systems] all serve the same basic purpose; that prospective customers routinely consider those systems (along with vacuum systems) when deciding what system to purchase; and that, in virtually every instance in which [the defendant] bid for a project, it competed against these alternatives." *Id.* at 854.  Thus, the First Circuit concluded the relevant product market must be defined from "the perspective of consumers," not the perspective of sellers.  *Id.* at 855.  Similarly here, the Court cannot evaluate distributors' demand to purchase calsil without considering the corresponding demand from downstream end-user contractors and facility owners—the only calsil consumers.

**B.     TPS's Proposed Product Market Does Not Qualify As A Valid "Submarket."**

Despite citing to multiple largely irrelevant cases, TPS fails to explain how it meets the specific legal requirements to rely on an economically significant product "submarket."  TPS, in fact, dodges a discussion of the specific elements for proving a valid submarket, mentioning the term "submarket" in only three places in its Response, where it quotes or paraphrases certain cases, ECF 87 at 31 (quoting *Brown Shoe*), 38 (describing *Ansell Inc. v. Schmid Lab'ys, Inc.*, 757 F.Supp. 467 (D.N.J. 1991)).  Instead, TPS argues it can choose the "level of commerce" where it claims to be harmed, and the Court must accept that construct as a valid product market.  This argument fails and warrants summary judgment dismissing TPS's antitrust claims.

1.      **TPS fails to analyze the seven practical indicia the Supreme Court evaluates to define a valid submarket.**

Nearly 60 years ago, in explaining how to define the outer boundaries of a product market based on the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," the Supreme Court noted that "within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962).  The Court then explained the boundaries of such a submarket may be determined by examining seven practical indicia:

(1)      industry or public recognition of the submarket as a separate economic entity;
(2)      the product's peculiar characteristics and uses;
(3)      unique production facilities;
(4)      distinct customers;
(5)      distinct prices;
(6)      sensitivity to price changes; and
(7)      specialized vendors.

*Id.*  TPS quotes the first part of the *Brown Shoe* holding about submarkets, but leaves out the second part—the list of seven practical indicia to determine the boundaries of a valid submarket.  ECF 87 at 30-31.  Not surprisingly, these seven elements do not support TPS's proposed upstream product market.

As an example of valid submarkets, in *Brown Shoe* the Supreme Court recognized three submarkets within the product market for shoes:  men's shoes, women's shoes, children's shoes.  *Id.* at 326.  Illustrating how the Court applied the seven indicia, it explained:  "These product lines are recognized by the public; each line is manufactured in separate plants; each has characteristics peculiar to itself rendering it generally noncompetitive with the others; and each is, of course, directed toward a distinct class of customers."  *Id.*  The Court rejected an argument to further subdivide the market on the basis of "price/quality" and "age/sex" distinctions, holding [in a

merger context] that "the boundaries of the relevant market must be drawn with sufficient breadth to include the competing products of each of the merging companies and to recognize competition where, in fact, competition exists." *Id.* at 326.

The Tenth Circuit discussed the *Brown Shoe* factors and the concept of a submarket in *Green Country Food Market, Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004). The Tenth Circuit rejected a proposed submarket limited to Pepsi branded products, noting the plaintiff did not offer any evidence about the seven *Brown Shoe* factors such as evidence that Pepsi prices are insensitive to price changes in other branded soft drinks. *Id.* at 1278, 1283.[3]  Courts, in fact, regularly reject proposed submarkets that are "not natural, artificial, and contorted to meet [the plaintiffs'] litigation needs." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (internal quotation marks omitted) (proposed advertising submarkets limited to a single form of golf-related advertising omitted many economic substitutes); *see also IGT v. Alliance Gaming Corp.*, 702 F.3d 1338, 1344, 1346-47 (Fed. Cir. 2012) (reviewing *Brown Shoe* indicia and rejecting argument that "wheel games" constitute a relevant submarket of the broader relevant market for all gaming machines; court noted wheel games still compete with non-wheel games in terms of a casino's decisionmaking process "to accommodate the spectrum of player preferences"—the

---

[3]  In *Green Country Food Market*, the Tenth Circuit also held the plaintiff failed to establish a "cluster market," which exists "where a seller provides a full line of products or services that create a separate product market consisting of that 'cluster' of products or services." 371 F.3d at 1283-84.  The Tenth Circuit's description of a cluster market matches TPS's argument here that insulation distributors need to be offer a full line or "cluster" of insulation products including calsil, regardless of reasonable substitutes for calsil among end-user insulation contractors and industrial facility owners.  But TPS denies it is advocating a cluster market here, ECF 87 at 30 n.6, so the Court does not need to consider that concept.  *Cf.* ECF 76 at 20-21 (explaining TPS cannot prove a cluster market without including distributors' downstream customers, who TPS seeks to exclude from the market).

consumers who use casino games).

**2.    The Supreme Court's seven practical indicia do not support TPS's proposed upstream submarket.**

As in *Green Country Food Market*, the Court should reject TPS's proposed submarket because TPS's fails to argue how the seven *Brown Shoe* indicia support it.  Even if TPS had made such an argument, however, it would fail as none of these indicia fit TPS's proposed upstream-only submarket.

(1)    Calsil sales to distributors are not recognized as a separate economic entity.  TPS's 26 proposed "additional facts" do not purport to establish industry or public recognition of sales from calsil manufacturers to insulation distributors as a separate economic entity.  TPS contends such sales are important, but its litigation position does not equate to industry or public recognition. The correct way for TPS to contend distributors must carry all types (a full range) of insulation material including calsil (which is how TPS contends there are no substitutes for calsil) would be to present a properly supported "cluster market" argument.  *See* ECF 76 at 20 (but that argument would require analysis of consumers' downstream purchasing requirements); *see also supra* note 3.  Yet TPS disclaims any cluster market argument.  *See* ECF 87 at 30 n.6.

(2)    The product's peculiar characteristics and uses.  While TPS argues calsil has special characteristics as insulation installed in industrial facilities, *see* ECF 30 ¶¶ 7-9, it does not contend calsil has peculiar characteristics or uses in distributors' warehouses—apart from TPS's theory that distributors "must carry" calsil in their inventory to be able to sell it when asked, ECF 87 at 36 (distributor has no choice but to supply it (or lose the sale).")  Thus, TPS cannot prove this indicia.  In addition, the NIA insulation chart Johns Manville provided demonstrates that several other types of insulation material also can be used for extreme temperatures ranging up to 1,200°

F.  ECF 76-2 at 3 (including expanded perlite, aerogel, and mineral fiber).

(3)     Calsil sold to distributors is not manufactured at unique production facilities.  TPS does not contend calsil sold to distributors is manufactured at unique production facilities, separate from those facilities that manufacture calsil eventually sold to contractors and industrial facility owners.  Instead, the undisputed facts show distributors resell to end-users the very *same* calsil material they purchase.  ECF 76 at 7-8 (Undisputed Fact No. 7).

(4)     There are not "distinct customers" for calsil sold to distributors.  Unlike shoes sold to men, women, and children (the distinct customers in *Brown Shoe*), TPS does not contend there are distinct customers for the calsil that distributors purchase versus the calsil contractors and facility owners purchase.

(5)     There are not "distinct prices" sufficient to assert a valid submarket here.  Similarly, unlike distinct prices charged for women's shoes versus children's shoes—two submarkets in *Brown Shoe*—TPS does not contend the calsil distributors pay distinct prices in an alleged submarket, different from calsil prices contractors and facility owners pay.  The fact that distributors mark-up the cost of calsil for the logistics services and stocking of inventory they provide does not show "distinct prices" for such calsil—analogous to unique submarket products like women's shoes and children's shoes.

(6)     TPS does not contend distributors purchasing calsil are more sensitive to price changes than calsil end-users:  This price sensitivity indicia is not relevant here.  TPS does not identify through any proposed Additional Facts price differences between the price of calsil distributors purchase (from Johns Manville or TPS/BEC) compared to the price of the calsil end-users purchase from distributors or manufacturers.  And it does not offer facts to suggest

38

distributors are more sensitive to calsil price changes than their end-user customers.  Indeed, the undisputed evidence that distributors function as calsil resellers indicates that distributors resell calsil to end-users with a mark-up to cover the distributors' services and a profit.  So no submarket is appropriate to take account of price differences or sensitivity between TPS's proposed distributor submarket and the entire market for calsil encompassing end-users.

(7)   <u>There are no specialized vendors selling the calsil distributors purchase</u>:  This specialized vendor indicia also is not relevant here.  Unlike shoe stores, which may specialize in women's shoes or children's shoes, there is no evidence of specialized vendors who sell the calsil that distributors purchase compared to the calsil end-users purchase.  Instead, the undisputed facts are that insulation distributors resell insulation to end-users and seek to carry the types of insulation their customers want to purchase.  ECF 76 at 7-8 (Undisputed Fact No. 7); Ex. C (Supp. Skelly Decl.) ¶ 15.  So no submarket is appropriate to take account of specialized calsil vendors.

**C.    TPS's Case Law Analysis Ignores Its Failure To Prove A Valid Submarket, And Does Not Justify Its Attempt To Leave End-Users Out Of The Proposed Product Market Analysis.**

The remaining cases cited by TPS do not support its proposed upstream-only product market.  TPS discusses four cases it contends support its narrow product market, but those cases do not support TPS's attempt to exclude the calsil end-users who drive distributors' demand for calsil and other insulation materials.

(1)   <u>U.S. v. Dentsply Int'l, 399 F.3d 181 (3d Cir. 2005)</u>.  TPS argues that *Dentsply*, which as noted above involved the sales of artificial teeth to labs and dental dealers, supports TPS's proposed calsil product market, which excludes calsil consumers/end-users. ECF 87 at 27-30.  But *Dentsply* did not involve similar product market definition issues.  The court held dental labs were

the ultimate consumer for artificial teeth because they incorporate the teeth into another product that was then sold downstream, and ultimately approved a relevant market that considered "sales both to the final consumer and a middleman." 399 F.3d at 181, 187-88. TPS argues that in *Dentsply* the Third Circuit evaluated the power to exclude competitors and held that the manufacturer defendant was able to exclude competitors from the dealer network. *Id.* at 188-90. But this holding has nothing to do with the court's definition of the relevant product market based on who purchased the artificial teeth at issue. The Third Circuit rejected the narrow product market definition Dentsply advocated (excluding dealers) and approved a broader market covering "the total sales of artificial teeth to the laboratories and dealers combined." *Id.* at 188.

(2)   *Telecor Comm., Inc. v. Southwestern Bell Telephone Co.*, 305 F.3d 1124 (10th Cir. 2002). Relying on *Telecor*, TPS contends it can focus on the "specific level of commerce" it says Johns Manville has monopolized. ECF 87 at 32. But TPS's "specific level of commerce" argument fails to explain how Johns Manville could have monopoly power over calsil sales to insulation distributors if those distributors' end-user customers can purchase other types of industrial insulation that function as reasonable substitutes for calsil. If monopoly prices were charged for calsil, the distributors and end-users would just switch to different insulation materials.

Johns Manville discusses *Telecor* at length in the Motion. *See* ECF 76 at 18-20. In *Telecor*, the Tenth Circuit viewed the relevant consumer or customer driving demand for Southwestern Bell's payphone locations to be location owners, not telephone users—and that drove the Court's market definition there. *See* 305 F.3d at 1133-37 (rejecting the idea that cell phones were reasonable substitutes when it comes to sales of payphone locations). TPS notes that *Telecor* was cited by this Court in *Nobody in Particular Presents, Inc. v. Clear Channel*, 311 F.Supp.2d 1048,

1076 (D. Colo. 2004), for the proposition that the market varies based on the level of commerce where the plaintiffs argue the defendants have monopolized competition.  ECF 87 at 31.  But TPS neglects to explain this Court's statement applying *Telecor* involved applying the *Brown Shoe* requirements for a submarket.  The very next sentence beyond what TPS quoted is: "Within the universe of a product market, therefore, they may exist a submarket—a portion of the product market that, for purposes of the specific antitrust case, is considered a separate market."  311 F.Supp.2d at 1076.  Here, TPS makes no attempt to show a valid submarket exists under the *Brown Shoe* factors.

       (3)     *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 18 (1984).  To support its argument that it can just pick the "level of commerce" it wants to challenge, TPS cites the Supreme Court statement in *Jefferson Parish* that "any inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact."  ECF 87 at 32.  But this approach supports including insulation end-users within the product market because they constitute the market into which calsil (the alleged "tying product") and other types of insulation are sold, and the consumers who would pay any monopolistic price if one existed.  Thus, in *Jefferson Parish*, the Supreme Court focused on the hospital's sales of services to its patients (the relevant consumers) to evaluate if patients were forced to accept the tying arrangement (alleged tying of hospital services to the use of just one firm of anesthesiologists).  *Id*. at 4-5, 18.  The Court then found the hospital's exclusive contract with anesthesiologists *did not* constitute unlawful tying that restrained competition.  *Id.* at 32.

       (4)     *McWane, Inc. v. FTC*, 783 F.3d 814, 828-829 (11th Cir. 2015).  TPS argues that

*McWane* demonstrates end-users "are often irrelevant because they are differently situated" and "may have other substitutes available to them."  ECF 87 at 34-36.  This argument that end-users are "differently situated" does not make sense here because the undisputed facts show insulation distributors just resell calsil and other materials to end-users, who would be equally harmed by any monopoly prices.  In *McWane*, the Eleventh Circuit quoted and applied the seven *Brown Shoe* indicia for a valid submarket, which TPS avoids discussing here, *see supra* Section III.B.1, and concludes the FTC had sufficient evidence to regard sales of domestic and imported fittings as separate product markets.  In arguing *McWane* should govern the instant case, TPS borrows from the submarket and cluster market concepts:  "Once the specification is set, the distributor has no choice but to supply it (or lose the sale) and the insulation contractor has no choice but to install it."  ECF 87 at 36.  Yet, as explained above, TPS does not even discuss, much less prove, the indicia for a proper submarket, and it expressly disclaims a cluster market argument where the distributor must carry a full range of products.

TPS also cites several irrelevant cases and an example from DOJ/FTC guidelines to support its "straw-man" argument that courts do not always hold that end-users or downstream sales "must" be include in a proposed market.  ECF 87 at 33-34.  But Johns Manville's argument here is based on the specific undisputed facts concerning the sale of industrial insulation and it does not make the all-purpose straw-man argument TPS attributes to it.  In addition, these cases and the DOJ/FTC guideline example that TPS relies upon do not concern product market definition issues comparable to the one presented here, and one of the cases (*Sterling Merchandise*) involves the rigorous analysis of a submarket that TPS avoids:

- *Ad-Vantage Telephone Directory Consultants, Inc. v. GTE*, 849 F.2d 1336, 1345 (11th Cir. 1987):  TPS cites the statement that market definition can be limited to a single level of

distribution "where a vertically integrated manufacturer uses his dominant position at one level of competitive activity (manufacturing) to eliminate competition at another level (retailing)." TPS does not contend Johns Manville is a vertically integrated manufacturer also engaged in retailing.

- *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 816 F.3d 883, 887 n.4 (D.C. Cir. 2016): TPS cites a footnote stating that "market power may be exercised upstream, even where there is a competitive market downstream."): This case did not involve product market definition for a civil antitrust case. It involved the Postal Service's regulatory claim concerning the combination of an upstream market where the Postal Service does not face competition for its distribution of Netflix DVD mail envelopes, with a competitive downstream market for streaming services.

- *DOJ-FTC "Vertical Merger Guidelines"* (June 30, 2020), ECF 87 at 33. TPS cites "Example 1" from these guidelines, but TPS neglects to explain that the guidelines' example involves merger review of an instance where a retail chain buys the manufacturer of cleaning products. *Id.* at 3. In that instance, the agencies may focus on either harm to downstream competition among retailers or competition between manufacturers.

- *Sterling Merchandise, Inc. v. Nestle, S.A.*, 724 F.Supp.2d 245, 257 (D. P.R. 2010): TPS cites this case's use of a "secondary market" for the distribution and sale of ice cream. TPS neglects to mention that the plaintiff was an ice cream distributor suing an ice cream manufacturer (facts not parallel to those here) and the plaintiff used the seven *Brown Shoe* practical indicia of a valid submarket to support its claim for the secondary market. Here, as noted above, TPS does not discuss those seven indicia, much less prove they apply.

TPS also presents a string-cite of ten cases to support its superficial "specific line of commerce"/economic "realities" argument, ECF 87 at 36-38, even though it fails to discuss, much less prove, the seven *Brown Shoe* indicia necessary for the Court to approve a valid submarket. Six of the cases TPS cites (*Henry, Greyhound, CBS, Cardinal Health, Staples, Ansell*) illustrate the detailed analysis of the *Brown Shoe* indicia that TPS fails to provide. The rest of TPS's string-cited cases do not involve undisputed facts comparable to the circumstances here, where downstream end-users drive distributor sales of insulation, and do not include antitrust analysis relevant to the Motion:

| | |
|---|---|
| *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C. Cir. 2001) | In this merger challenge case, TPS's misleading quotation of the court's statement about the value of competition for wholesale purchasers omits the court's conclusion, which rejected the FTC's argument "that the 'wholesale competition' between Heinz and Beech–Nut is an entirely distinct 'line of commerce' [product market] within the meaning of section 7 of the Clayton Act such that it must be analyzed independently from 'retail competition.'" 246 F.3d at 719 n. 17.  The court held the proper "line of commerce" or product market "is the overall market for jarred baby food, which includes both retail and wholesale levels." *Id.* |
| *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1342 (8th Cir. 1987) | TPS neglects to explain the Eighth Circuit analyzed the seven *Brown Shoe* indicia supporting a well-defined submarket to agree that "route sales" represent distinct customers with special prices and specialized sellers and industry recognition as a separate entity.   809 F.2d at 1341-43.   This case illustrates the kind of detailed submarket analysis that TPS avoids with its superficial argument about a "specific level of commerce." |
| *Greyhound Comput. Corp. v. IBM Corp.*, 559 F.2d 488, 494 (9th Cir. 1977) | TPS fails to explain this case involved a submarket (for leasing general purpose digital computers for commercial application), which the Ninth Circuit held satisfied the *Brown Shoe* indicia.  Citing *Brown Shoe*, the court explained the evidence showed "the industry and its customers recognized these categories of computers" and the categories "have distinct prices and distinct sets of competitors employing different marketing techniques." 559 F.2d at 493-94.  Again, this case illustrates the difference between TPS's superficial argument and careful analysis of the indicia to establish a submarket. |
| *CBS, Inc. v. FTC*, 414 F.2d 974, 978–79 (7th Cir. 1969) | TPS fails to explain the Seventh Circuit quoted and applied the *Brown Shoe* indicia for establishing a valid submarket to hold that: "While all record sales constitute an industry-wide product market, within this market the record clubs constitute a 'well-defined submarket.'" 414 F.2d at 978-79. Again, this case illustrates the detailed analysis of submarkets that TPS avoids. |
| *Cinetopia, LLC v. AMC Entertainment Holdings, Inc.*, | In this case involving competing movie theaters' access to movie distribution rights, the District Court in Kansas |

| | |
|---|---|
| No. 18-2222-CM-KGG, 2018 WL 6804776 (D. Kan. Dec. 27, 2018). | defined the relevant product market as the market for licensing of first run, high-grossing, wide release commercial films (which it called an "upstream" market) instead of the sale of tickets to movies (a "downstream" market).   It explained:  "it is not the movies themselves that are being bought or sold here. It is the right—or the license—to exhibit the movies and view the movies." 2018 WL 6804776, at *6.  This case is not analogous and does not support TPS's proposed calsil product market. |
| *Flash Elecs. v. Universal Music*, 312 F.Supp.2d 379, 392–93 (E.D.N.Y. 2004) | In this case involving claims by wholesale video distributors against a movie studio and two competing distributors, the court merely described the product market the plaintiffs were asserting and said it: "expresses no opinion as to whether the market, as alleged by plaintiffs, is ultimately viable or not." 312 F.Supp.2d at 393.   This case does not provide any relevant guidance here. |
| *Dauro Advert., Inc. v. GMC*, 75 F.Supp.2d 1165, 1169 (D. Colo. 1999) | This Colorado case involved tying claims by a local advertising agency that handled advertising for individual GM auto dealers against General Motors.   The agency challenged GM's initiative to centralize advertising so all ads would "speak with one voice," contending it unlawfully tied GM cars/trucks (the tying product) to advertising for GM cars/trucks. 75 F.Supp.2d at 1166-67.  In denying a motion to dismiss, Judge Daniel identified the non-party GM auto dealers as "the consumers adversely affected" by GM's advertising program.  He concluded that "GM dealers have no interest in purchasing cars or trucks from any other manufacturer." *Id.* at 1169.  Based on these facts, it made sense to define a product market limited to GM cars and trucks.  *Dauro* is not relevant here. |
| *FTC v. Cardinal Health*, 12 F. Supp. 2d 34, 36 (D.D.C. 1998) | TPS neglects to explain that the court quoted and analyzed the seven *Brown Shoe* indicia for a valid submarket to find that services provided by wholesalers "comprise a distinct submarket within the larger market of drug delivery."  12 F.Supp.2d at 45-49.  This case illustrates the detailed analysis of submarkets that TPS avoids. |
| *FTC v. Staples*, 970 F. Supp. 1066, 1080 (D.D.C. 1997) ( | TPS fails to explain that the court quoted and analyzed in great detail the seven *Brown Shoe* indicia for a valid submarket to approve "a narrow submarket or relevant product market within a larger market." 970 F.Supp. at 1075-81.  This case illustrates the detailed analysis of submarkets that TPS avoids. |

| *Ansell Inc. v. Schmid Lab'ys, Inc.*, 757 F.Supp. 467, 470–75 (D.N.J. 1991) | Once again, TPS neglects to explain that the court quoted and analyzed the seven *Brown Shoe* indicia for a valid submarket to find that the sale of branded latex condoms to retail distributors constituted an economically significant submarket. 757 F.Supp. at 470-75. This case illustrates the detailed analysis of submarkets that TPS avoids. |

TPS's argument that no case "forbids" the narrow upstream market definition it proposes, ECF 87 at 39, misses the point. As explained in Section III.B above, a court *can* approve an antitrust submarket in the appropriate circumstances outlined in the *Brown Shoe* seven indicia. Indeed, Johns Manville does not argue that any case "forbids" a properly framed submarket, just that such a proper submarket does not exist based on the undisputed facts here. In fact, six of the cases TPS cites that are discussed in the table above involved instances where the court analyzed a claim for a submarket under *Brown Shoe*. Therefore TPS's argument about whether cases "forbid" such a submarket is irrelevant.

Finally, TPS does not offer any meaningful analysis to explain or distinguish the Tenth Circuit and District of Colorado cases that Johns Manville cites in the Motion (along with one Seventh Circuit case). *See* ECF 87 at 39-42. To avoid the import of these cases, TPS contends they do not support the strawman legal argument TPS offers ("that a product market definition must collapse all levels of commerce into a single market as a matter of a law"). But Johns Manville's Motion does not make that all-encompassing strawman argument. TPS's analysis of these cases provides no relevant guidance to the Court here:

- *Nobody in Particular Presents, Inc. v. Clear Channel Comm., Inc.*, 311 F.Supp. 2d 1048, 1076, 1081, 1083, 1085, 1090 (D. Colo. 2004) (the court quoted and analyzed *Brown Shoe* submarket indicia and noted that a submarket may exist within the universe of a product market).

- *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994) (TPS quotes the Tenth Circuit's general statement that the relevant market "will vary with the part of commerce under

46

consideration"; but the court's discussion of the specific market definition issues in that case provides no guidance relevant here.).

- *Westman Commission Co. v. Hobart International, Inc.*, 796 F.2d 1216 (10th Cir. 1986) (TPS seeks to distinguish *Westman* because it involved a "robust factual record," ECF 87 at 40, but the undisputed facts discussed above suffice to disallow TPS's proposed upstream market here based on *Westman* and other cases, *see* Motion, ECF 76 at 17-18. *Westman* also explains why the "cluster market" concept requires proof that the cluster or package is the object of consumer demand—a factor that, if analyzed here, would require the Court to consider whether insulation end-users require distributors to carry a full line of products—an inquiry TPS's proposed narrow upstream market precludes. *See* 796 F.2d at 1221).

- *Campfield v. State Farm Mutual Automobile Insurance Co.*, 532 F.3d 1111 (10th Cir. 2008) (TPS seeks to distinguish *Campfield* arguing it did not involve any end-users or downstream activity, ECF 87 at 40. The fact that the dispute in *Campfield* did not involve a downstream/upstream distinction does not make the Tenth Circuit's guidance there irrelevant. *See* Motion, ECF 76 at 16-17. The Court should reject TPS's hollow argument that its proposed product market "has not excluded any consumers," ECF 87 at 40. Insulation distributor/resellers do not qualify as consumers of calsil or other insulation).

- *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 918 (7th Cir. 2020) (*Sharif* involves "cluster markets"—a concept TPS disavows, ECF 87 at 30 n.6. TPS cannot have it both ways and contend it is proper for the Court to consider whether insulation distributors must offer "a bundle or cluster of products," ECF 87 at 41, without engaging in the cluster market analysis that would require the Court to consider insulation end-user preferences and end-users' substitutes for calsil insulation, *see* Motion, ECF 76 at 20-21).

- *Auraria Student Hous. v. Campus Vill. Apts.*, 843 F.3d 1225, 1233 (10th Cir. 2016) (TPS tries to distinguish *Auraria Student Housing* because the Tenth Circuit remanded the case—a meaningless distinction that does not detract from the court's direction that an antitrust plaintiff must define a true economic market that encompasses the "total market demand" for the plaintiff's product, not some underinclusive market, 843 F.3d at 1245).

- *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004) (TPS's description of *Green Country Food Mkt.* provides no meaningful insights)

- *Compliance Mktg. v. Drugtest, Inc.*, Civil Action No. 09-cv-01241-JLK, 2010 WL 1416823 (D. Colo. Apr. 7, 2010) (TPS's description of *Compliance Mktg.* provides no meaningful insights).

- *Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F. Supp. 1503 (D. Colo. 1992) (*Smalley* is only mentioned in Johns Manville's motion because Judge Kane cited *Smalley* in *Compliance Mktg.* when noting that an antitrust plaintiff cannot artificially create an antitrust claim with a narrowly defined market meant to create the appearance of an antitrust injury, *see* Motion, ECF

76 at 16; *Compliance Mktg.*, 2010 WL 1416823 at *8.  Judge Kane's observation about an artificially narrow product market is relevant here, and TPS's observations about *Smalley* are irrelevant.)

Thus, the lengthy string cites and superficial analysis of cases in TPS's response do not provide meaningful assistance to the Court in evaluating the Motion.

## IV.        CONCLUSION

The Court should grant summary judgment rejecting TPS's proposed upstream product market.  The Court should also reject TPS's request for affirmative relief (granting summary judgment in its favor "as to the participants in the product market for calsil") in its Conclusion, ECF 87 at 42.  TPS's Response does not present a proper claim for summary judgment establishing an undisputed relevant product market under Rule 56.

Johns Manville requests that the Court hold oral argument concerning this motion.

Dated:    October 9, 2020.

Respectfully submitted,

  s/ Gregory J. Kerwin
Gregory J. Kerwin
Ryan Bergsieker
Allison Kostecka
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO  80202-2642
Telephone:      303.298.5700
Email:  GKerwin@gibsondunn.com
RBergsieker@gibsondunn.com
AKostecka@gibsondunn.com

*Attorneys for Defendant Johns Manville Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2020, I electronically filed the foregoing Johns Manville's Reply In Support Of Its Motion For Partial Summary Judgment Rejecting Plaintiff's Argument To Exclude End-Users Of Insulation From The Product Market Relevant To Its Antitrust Claims (ECF 76) with the Clerk of Court using the CM/ECF system.  A copy of this document was served on the following counsel of record for Plaintiff through the Court's ECF system:

Alexandra H. Shear
Jarod M. Bona
Luke Hasskamp
Bona Law PC
375 Park Avenue, Suite 2607
New York, NY   10152
Emails:  alex.shear@bonalawpc.com
jarod.bona@bonalawpc.com
luke.hasskamp@bonalawpc.com


Geoffrey N. Blue
7350 E Progress Pl., Suite 100
Greenwood Village, CO 80111
Email:  gblue@gbluelaw.com


*s/ Loretta Howard*
Loretta Howard