IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC.,

      Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

      Defendant.

---

## AMENDED ORDER
---

**Michael E. Hegarty, United States Magistrate Judge.**

Before the Court is Defendant's Motion for Partial Summary Judgment. ECF 76. The matter is fully briefed, and the Court heard oral argument on November 9, 2020. For the following reasons and based on the submitted record, Defendant's motion is **denied**.

## BACKGROUND

### I.    Procedural History

In its First Amended Complaint ("FAC") (ECF 30), Plaintiff brings claims for tying and monopolization in violation of the Sherman Act, 15 U.S.C. § 2. The Court discussed Plaintiff's allegations of anticompetitive conduct in its Fed. R. Civ. P. 12(b)(6) ruling at *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH, 2020 WL 1433504 (D. Colo. 2020). In short, Plaintiff alleges that Defendant's conduct in the sale of the insulation product calsil violates the Sherman Act.

Defendant moves for summary judgment on the issue of how the relevant market for the subject product should be defined for purposes of resolving the antitrust claims. Plaintiff defines the relevant product market as all product sales by the product's manufacturers to the usual direct

purchasers who it contends are distributors and, to a lesser extent, contractors. Plaintiff thereby limits the relevant product market to the first link in the supply chain, *i.e.*, the upstream product market. Defendant argues that the relevant product market is broader and should also include the product's downstream end users, in which case certain substitutes for calsil would be included. Defendant contends that because Plaintiff has not properly defined the valid product market, its Sherman Act claims must be dismissed.

## II.     Material Undisputed Facts

Both parties present statements of material fact to describe the product, how it is used, and how it is bought and obtained. The parties rely primarily on their respective witness's declarations. Defendant relies on the declarations of David C. Skelly. ECF 76-1 and ECF 88-1. Mr. Skelly works for Defendant as its General Manager of Performance Materials and is familiar with its industrial insulation business. Plaintiff relies on the declaration of David Shong. ECF 87-1. Like Mr. Skelly, Mr. Shong has many years of experience with mechanical insulation. Mr. Shong once worked for Defendant. He now serves as Plaintiff's president. Also proffered into evidence is Plaintiff's press releases and marketing materials (ECF 76-4) as well as a document filed under seal (ECF 89). Most of the parties' objections consist of supplementing the other side's statements with additional or clarifying comments.

The Court finds the following material undisputed facts viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter.

1.     Defendant manufactures calsil. Skelly Decl., ¶ 1, ECF 76-1. Both Plaintiff and Defendant sell calsil in the United States. Shong Decl., ¶ 8, ECF 87-1; Skelly Decl., ¶ 1, ECF 76-1; TPS Calsil News Releases, ECF 76-4. The parties identify no other maker or seller of calsil presently

in the United States. Before Plaintiff began importing calsil from China in 2018, Defendant was the sole supplier of calsil in the United States. Shong Decl., ¶ 8, ECF 87-1.

2.  Calsil is a mechanical insulation material used in industrial or equivalent commercial settings where extreme temperatures are present. Shong Decl., ¶ 5, ECF 87-1; Skelly Decl., ¶ 2, ECF 76-1; Skelly Supplemental Decl., ¶¶ 6-7, ECF 88-1. It has other attributes that may cause it to be chosen for use in a particular setting. Shong Decl., ¶¶ 15-19, ECF 87-1.

3.  Calsil itself is a generic commodity. The type of calsil that is sold in North America must be of a specific grade as set by industry standards. Skelly Decl., ¶¶ 13, 15, ECF 76-1. For purposes of this ruling, the word "calsil" refers to ASTM C533 Type I, which is the kind that Plaintiff sells in the United States. Shong Decl., ¶ 6, ECF 87-1.

4.  There are some other materials that may be used as a mechanical insulator. Skelly Decl., ¶ 13, ECF 76-1. Ultimately, it is the engineer who decides what type of insulation, including calsil, is best suited for a particular function or need. Shong Decl., ¶¶ 12, 38, ECF 87-1; Skelly Decl., ¶ 8, ECF 76-1. Product price may play a role in the "value engineering" situation as an overall cost-saving strategy at the end of a project. Skelly Supplemental Decl., ¶ 13, ECF 88-1

5.  Often the engineer specifies the insulator by reference to its ASTM number. Shong Decl., ¶ 33, ECF 87-1.

6.  The contractor then obtains the specified insulating material from the distributor. Shong Decl., ¶¶ 29, 30, 39-44, ECF 87-1.

7.  The contractor installs the calsil at the project site in compliance with the engineer's specifications. Shong Decl., ¶ 31, ECF 87-1, Skelly Decl., ¶ 8, ECF 76-1.

8.  Distributors provide the primary conduit through which calsil moves from manufacturer to project site. Shong Decl., ¶¶ 9, 12, ECF 87-1. Both Plaintiff and Defendant sell the majority of

their calsil to distributors, Skelly Decl., ¶ 6, ECF 76-1; ECF 89, although both sell to contractors on occasion. Shong Decl., ¶¶ 7, 10, 11, ECF 87-1. *See* FAC ¶ 17, ECF 30 at 5. Distributors, in turn, sell calsil to contractors. Skelly Decl., ¶ 7, ECF 76-1; Shong Decl., ¶ 11, ECF 87-1.[1]

9.      Distributors serve an important intermediary role in supplying calsil to contractors. Distributors provide warehouse and logistics services. Skelly Decl., ¶¶ 8-9, 14, ECF 76-1. They source the needed product, advise in the decision of which brand to obtain, and provide financing. They provide complementary products and sometimes fabrication services. Shong Decl., ¶¶ 45, 50-55, ECF 87-1; Skelly Decl., ¶¶ 8-9, ECF 76-1. Contractors maintain relationships with multiple distributors by which to hedge product availability and price. That dynamic serves to lower product price. Skelly Supplemental Decl., ¶ 14, ECF 88-1.

10.     Defendant seeks to influence downstream actors' product choices. Shong Decl., ¶ 23, ECF 87-1; Skelly Decl., ¶¶ 4, 10, 12, ECF 76-1. Manufacturers also compete at the distributor level. Skelly Decl., ¶ 12, ECF 76-1.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).   A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c).   A fact is material if it might affect the outcome of the suit under the governing substantive law.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[1] The Court notes here that Defendant alleges there are direct sales of "industrial insulation" from a distributor to a facility owner. Skelly Supplemental Decl., ¶ 9, ECF 88-1.   Mr. Skelly does not state that calsil is one such product, nor is this fact undisputed, because it was raised in the reply.

4

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—the showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id.* at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)). Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment. *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in its complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324); *see also Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant

"must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Defining the "relevant product market" is a threshold inquiry in an antitrust case. It helps to identify the framework within which the antitrust claims will be considered. *Auraria Student Hous. at the Regency, LLC v. Campus Village Apartments, LLC*, 843 F.3d 1225, 1244 (10th Cir. 2016); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1074-75 (D. Colo. 2004) (citing *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124 (10th Cir. 2002)). Product market definition is a question of fact for the factfinder; it also is an issue for which Plaintiff has the burden of proof. *Nobody*, 311 F. Supp. 2d at 1075. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1120 (10th Cir. 2014) ("The differing definitions create a fact question on the product market, precluding summary judgment."). Plaintiff must propose a relevant product market that comports with the legal standard and is supported by evidence. *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275 (10th Cir. 2004) (considering the issue under the Fed. R. Civ. P. 56(c) standard); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) (considering the issue under the Fed. R. Civ. P. 12(b)(6) standard).

**I.      Concept of the "Relevant Product Market"**

The "product market" consists of the full range of products that are reasonably interchangeable for the purpose for which they are produced in terms of price, use, and qualities.

*Auraria*, 843 F.3d at 1245. It includes not only the product at issue in the case but also those products that are its equivalent. It means those products for which "cross-elasticity of demand" exists, that is, those products for which a change in price for one will affect the demand of the other. *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *7 (D. Colo. Apr. 7, 2010). The focus of inquiry is on demand and thus the relevant set of customers. *Nobody*, 311 F. Supp. 2d at 1076. An antitrust plaintiff must define a product market that is broad enough to reflect the real economic market at issue. *Auraria*, 843 F.3d at 1245. The "relevant" product market, in turn, is the product market that is relevant to the antitrust claims. It may consist of a sub-market that focuses on the level of commerce where the anticompetitive practices allegedly occur. Therefore, it is possible that the relevant product market may exclude the end user[2] of the product. *Nobody*, 311 F. Supp. 2d at 1076.   Plaintiff does not seek to assert a sub-market here.

## II.     Competing Product Market Definitions

Defendant's motion makes good points.  Its briefing is persuasive but, ultimately in my view, not dispositive at the summary judgment stage.   Plaintiff has moved the needle sufficiently to create a fact issue for the jury, based on the following discussion

At the oral argument in this case, in response to the Court's inquiry, Plaintiff defined the relevant product market as all sales of calsil by calsil manufacturers (which in North America are only Plaintiff and Defendant). Defendant argued that this definition is a modification of the FAC. Construing the record and drawing all inferences in the light most favorable to the non-moving party, here the Plaintiff, this market definition is supported by the FAC and the exhibits to the

---

[2] An "end user" for this ruling is the owner of the industrial or commercial facility where the calsil will be installed. Shong Decl., ¶ 46, ECF 87-1; Skelly Decl., ¶ 8, ECF 76-1.

summary judgment briefing. The buyers in the proposed relevant product market are those who buy calsil from the manufacturers "directly," by which Plaintiff means the distributors (who are the predominate purchasers) and also contractors (to a lesser extent). Defendant argues that Plaintiff's proposed relevant product market is too narrowly defined as a matter of law. At this summary judgment stage, the Court finds that the defined product market passes muster.

First, Defendant does not demonstrate the product market that is relevant to this case must include calsil's "end users." Defendant is correct that those end users are the ultimate destination of the product. However, regular market forces such as price do not necessarily affect end user demand. Instead, the primary direct sources of "demand" for calsil are the project engineers who choose it based on range of factors including technical ones. Once an engineer specifies calsil for a particular project, the contractor is obligated to obtain it absent some later project plan change. Although an industrial or commercial facility owner may be the "end user" of the product in the sense of owing the property where it is installed, the record establishes that this end user does not directly select calsil; on rare occasion, when calsil has been selected for a project by the engineer, the end user may purchase additional supply for future repair/replacement purposes.

Second, Defendant does not show how Plaintiff's primary focus on the distributor link of the supply chain is artificially too narrow. It is undisputed that distributors play an important role in supplying calsil to projects. While some calsil sales may bypass the distributors, most do not. That implies that the distributor model is overall more efficient than the direct sale alternative. The cases of *McWane, Inc. v. F.T.C.*, 783 F.3d 814 (11th Cir. 2015), *Sterling Merch., Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245 (D.P.R. 2010), and *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) address similar distribution models where the relevant product market properly excluded end customers. In *McWane*, for example, the plaintiff entered the market as a new maker of the

product, and the defendant sought to protect its position as the established, predominate seller by coercing distributors to avoid the new entrant. Distributors provided a range of services that coordinated the provision of the product to its end use. *McWane* also involved a marketplace where product demand was inelastic to price. *McWane* affirmed an order directing the established seller not to require exclusivity from distributors. *See McWane*, 783 F.3d at 819. In that respect, the fact background of *McWane* shows an example of a supply model that relies heavily on distributors as well as a product that lacked price elasticity or interchangeability. Distributors in the calsil market likewise have a heightened importance. Plaintiff alleges that Defendant focused its anticompetitive acts at the distributor level as its means to defend its position as the primary seller of calsil.

Limiting the "customers" of calsil to distributors (and to a lesser extent, contractors), *i.e.*, all direct purchasers of calsil from a manufacturer, is not artificial or too narrow. Defendant does proffer evidence of some sales of "insulation materials" that bypass distributors and contractors. Defendant also proffers evidence that it communicates with end users. However, Defendant fails to establish a material undisputed fact that such sales activity is a material exception to what is otherwise a distributor-dominated structure.

As the Court perceives Defendant's argument, it is quite similar to that rejected in *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1132 (10th Cir. 2002). In that case, which involved competitive access to the installation of pay (landline) telephones in storefront locations, the court stated:

> [T]he Plaintiffs argue that Southwestern Bell's interchangeability argument is wrongly directed at showing that cell phones and pay phones are interchangeable for end-users, but that is not the market where the Plaintiffs are complaining of Southwestern Bell's anti-competitive behavior. Rather, it is the location owners who define the market where the anti-competitive behavior took place—that is, the Plaintiffs claim that they compete with Southwestern Bell for locations upon which to place their pay phones, and that is the market Southwestern Bell has monopolized.

*Id.* at 1132-33. In *Telecor*, as here, plaintiffs complained of defendant's anticompetitive conduct at the intermediate level, while defendant wanted to focus on the ultimate consumer. Also in *Telecor,* as here, plaintiffs used *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377 (1956) to justify a focus on the ultimate consumer. The court stated in *Telecor* that *du Pont* involved an indisputably "consumer market" (cellophane wrap and other flexible wrapping material) and, thus, justified a focus on that end user. Plaintiff's theory here focuses on the ability to market the product to the distributor (the middleman, of sorts). Here, as in *Telecor*, the plaintiffs' antitrust theory was that "distributors" (the location owners) were consumers of the "product" (placement of pay phone facilities on their locations), and that ability to sell to distributors (in *Telecor*, the price for such location placements) was affected by defendant's monopolistic conduct. Of the cases upon which the parties rely, *Telecor*'s analysis is the most persuasive.

Lastly, Defendant fails to establish as an undisputed fact that calsil is reasonably interchangeable with other insulators. Plaintiff proffers evidence that calsil is a product with unique technical characteristics. While there may be some other products similarly usable, the criteria by which an engineer may choose one over calsil appears on the available record to be a complicated, technical matter. The degree to which the insulation products are interchangeable remains a question of fact. Consequently, Defendant fails to show how limiting the relevant product market to just calsil is erroneous as a matter of law. If the relevant product market is limited to just calsil, then expanding it to include end users has no practical effect. It does not expand the range of sellers. Nor does it expand in any significant way end users' options for obtaining calsil for use in their projects.

## **CONCLUSION**

Defendant fails to show on the undisputed fact record how Plaintiff's definition of the relevant product market is factually and legally inadequate. The facts show that calsil is a product that is used to meet highly technical needs in industrial or equivalent settings, and that the choice to use it is likewise technical in nature. The processes for obtaining and installing it at a project site involve many actors, and distributors play the critical role in providing calsil to contractors and to others who seek it for project needs. Moreover, the record shows that calsil far more often flows through distributors rather than bypasses them, although that is not inevitably the case. There may be times when calsil does bypass the distributors, and the Defendant may attempt to influence those actors further downstream into choosing its brand of calsil. However, Defendant fails to show as an undisputed fact that the exception to the general rule is significant enough to make Plaintiff's focus on the distributor level legally inadequate.

Accordingly, the Court **denies** Defendant's Motion for Partial Summary Judgment [filed August 14, 2020; ECF 76].

Entered this 6th day of January, 2021, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge