THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00872-MEH

CHASE MANUFACTURING, INC., d/b/a
THERMAL PIPE SHIELDS,

Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

Defendant.

---

**DEFENDANT'S "*DAUBERT*" MOTION TO EXCLUDE OPINIONS FROM
PLAINTIFF'S RETAINED ECONOMIST, FREDERICK WARREN-BOULTON**

---

Gregory J. Kerwin
Ryan Bergsieker
Allison Kostecka
Lydia Lulkin
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO  80202-2642
Telephone:    303.298.5700

Email:  GKerwin@gibsondunn.com
RBergsieker@gibsondunn.com
AKostecka@gibsondunn.com
LLulkin@gibsondunn.com

*Attorneys for Defendant Johns Manville Corporation*

## TABLE OF CONTENTS

                **Page**

I.      INTRODUCTION ........................................................................................... 1

II.     THE *DAUBERT* STANDARD AND CASES EXCLUDING WARREN-BOULTON UNDER THAT STANDARD ........................................................................ 5

     A.     General Principles Governing the Review of Expert Testimony.......................... 5

     B.     Courts Routinely Exclude and Reject Warren-Boulton's Analysis Under *Daubert* For Flaws Similar to His Conclusory, Unsupported, Legally Erroneous Report Here. ...................................................................... 7

          1.     "Garbage In, Garbage Out" Market Analysis: Providing a Market Definition that Only "Assumes What Is to Be Established."..................... 7

          2.     "Devoid Of Analysis": Rejecting Unsupported Opinion On Antitrust Impact And Damages. ................................................... 8

          3.     Excluding Flawed Regression Analysis.................................................... 9

          4.     Entire Damage Analysis Excluded Based on Unsupported Assumptions and Contrary to Established Fact. ..................................... 10

          5.     Rejecting Market Power Assertion For Tobacco Sales. ......................... 11

          6.     Rejecting Proposed Narrow Market Definition. ..................................... 12

          7.     Rejecting Analysis of Substitutes in Proposed Product Market. ............. 12

          8.     Court Rejected Conclusory, Legally Erroneous Analysis Challenging Proposed Settlement. ........................................................ 13

III.    ARGUMENT .................................................................................................. 14

     A.     The Court Should Exclude Warren-Boulton's Opinions About TPS's Alleged Relevant Product and Geographic Markets Because His Report Offers Conclusions, With No Analysis, About Evaluating Market Power in Any Relevant Market........................................................................... 14

          1.     The Court's Previous Rulings Clearly Require TPS to Prove Market Power in Some Relevant Product and Geographic Market........ 14

2.      Despite Clear Direction from the Court, Warren-Boulton's Report Offers Only Unsupported Conclusions About Market Power and TPS's Proposed Relevant Product and Geographic Market. .................. 15

3.      Warren-Boulton's Lack of Reasoned Analysis about Market Power Reflects TPS's Lack of Admissible Evidence to Prove Its Market Definition Allegations.............................................................. 19

B.    TPS Cannot Show Market Power Through "Direct Evidence," Which the Supreme Court Held Does Not Apply to Alleged Vertical Restraints................ 20

C.    The Court Also Should Bar Warren-Boulton's Opinions Because They Are Unreliable, Unsupported, Contrary to Undisputed Evidence, and Not Based on a Proper Methodology ......................................................................... 24

1.      Warren-Boulton's Unsupported Conclusions About Market Power in Alleged Relevant Markets Are Not Reliable. ...................................... 24

2.      Warren-Boulton's Opinion Purporting to Discern "Direct Evidence" of Market Power from Johns Manville's Calsil Pricing Lacks a Reasonable Generally Accepted Methodology. ........................ 26

        a.      Warren-Boulton Lacks an Accepted Methodology for His Analysis of Johns Manville's Calsil Prices and Accounting Margins. ............................................................................................... 27

        b.      Warren-Boulton's Analysis of Purported "Supra-Competitive" Prices Without Proof of Restricted Output Is Not Reliable..................... 30

        c.      The Comparison to TPS's Pricing Does Not Reflect a Reliable Methodology.............................................................................. 31

        d.      The Parties Did Not Conduct Discovery on Competitive Conditions Outside the United States and Warren-Boulton's Comparison to Sales Outside the United States Is Not Reliable. ........... 33

3.      Warren-Boulton's Damage Estimate Fails to Disaggregate Harm to TPS From Lawful Competition and Filter Out the Effects of Other Factors That Harmed TPS's Business..................................................... 35

4.      Warren-Boulton's Damage Estimate Fails to Identify Any Specific Damages Attributable to Alleged False Advertising. .............................. 40

5.      The Court Should Exclude Warren-Boulton's But-For Damage Estimate as Too Speculative. ................................................................. 41

        6.      The Court Should Disallow Warren-Boulton's Claim for Prejudgment Interest. ............................................................................. 43

    D.     TPS Cannot Supply Missing Expert Opinions for Its Case-in-Chief Elements Through Deposition Testimony or A "Rebuttal" Report .................... 44

IV.    BECAUSE TPS LACKS COMPETENT EXPERT OPINIONS DEFINING PLAUSIBLE RELEVANT PRODUCT AND GEOGRAPHIC MARKETS AND MARKET POWER WITHIN THEM, THE COURT MUST DISMISS TPS'S CLAIMS ........................................................................................... 46

V.     CONCLUSION ............................................................................................. 50

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Auraria Student Housing v. Campus Village Apartments,*
No. 10-cv-02516-WJM-KLM, 2014 WL 4651643 (D. Colo. Sept. 18, 2014) ......................44

*Auraria Student Hous. v. Campus Villiage Apts.,*
843 F.3d 1225 (10th Cir. 2016) ................................................................................15

*Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.,*
9 F.4th 1102 (9th Cir. 2021) ....................................................................................23

*Beller ex rel. Beller v. United States,*
221 F.R.D. 689 (D. N.M. 2003) ................................................................................45

*Beltran v. InterExchange, Inc.,*
No. 14-cv-03074-CMA-KMT, 2018 WL 526907 (D. Colo. Jan. 24, 2018) ...........................6

*Bepco v. Allied-Signal,*
106 F. Supp. 2d 814 (M.D.N.C. 2000) ...........................................................12, 26

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.,*
846 F.3d 1297 (10th Cir. 2017) ...........................................................................30, 31

*Business Electronics Corp. v. Sharp Electronics Corp.,*
485 U.S. 717 (1988) ................................................................................................21

*Chase Mfg., Inc. v. Johns Manville Corp.,*
No. 19-cv-00872, 2019 WL 2866700 (D. Colo. July 3, 2019) ...............................15

*Chase Mfg., Inc. v. Johns Manville Corp.,*
No. 19-cv-00872, 2020 WL 1433504 (D. Colo. Mar. 23, 2020) .....................15, 36

*Chase Manufacturing, Inc. v. Johns Manville Corp.,*
2021 WL 50871 (D. Colo. Jan. 6, 2021) ................................................................15

*Christy Sports, LLC v. Deer Valley Resort Co., Ltd.,*
555 F.3d 1188 (10th Cir. 2009) ..............................................................................23

*Colsa Corp. v. Martin Marietta Services, Inc.,*
133 F.3d 853 (11th Cir. 1998) ................................................................................48

*Comcast v. Behrend,*
    569 U.S. 27 (2013)................................................................................28, 36, 37, 38

*Cook v. Rockwell Intern. Corp.,*
    580 F.Supp.2d 1071 (D. Colo. 2006)...........................................................19, 44, 45

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993).......................................................................... *passim*

*Epic Games, Inc. v. Apple Inc.,*
    No. 4:20-cv-05640-YGR, 2021 WL 4128925 (N.D. Cal. Sept. 10, 2021)..............................28

*FTC v. Indiana Fed'n. of Dentists,* 476 U.S. 447 (1986) .......................................................21, 22

*Henderson v. Nat'l R.R. Passenger Corp.,* 412 Fed. App'x 74 (10th Cir. 2011) ........................45

*Home Placement Service, Inc. v. Providence Journal Co.,*
    819 F.2d 1199, 1212 (1st Cir. 1987)........................................................................41

*In Re Auction Houses Litigation,*
    No. 00 CIV. 0648 (LAK), 2001 WL 170792 (S.D.N.Y. Feb. 22, 2001),
     *aff'd,* 42 Fed. App'x 511 (2d Cir. 2002)................................................................13, 14

*In re Independent Serv. Org. Antitrust Litig.,*
    85 F.Supp.2d 1130 (D. Kan. 2000).....................................................................37

*In re Local TV Advertising Antitrust Litig.,*
    2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) .........................................................21

*Jacobsen v. Deseret Book Co.,*
    287 F. 3d 936 (10th Cir. 2002) .........................................................................45

*Jorgensen v. Ritz-Carlton Hotel Co.,*
    No. 16-cv-00795-MEH, 2017 WL 3390582 (D. Colo. August 8, 2017) ..............................47

*Kentucky Speedway, LLC v. NASCAR,*
    588 F.3d 908 (6th Cir. 2009) .........................................................................47, 48

*Knapp Logistics & Automation, Inc. v. R/X Automation Solutions, Inc.,*
    No. 14-cv-00319-RBJ, 2015 WL 5608124 (D. Colo. September 24, 2015) ........................46

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999)................................................................................4, 5

*Lantec v. Novell,*
    146 F. Supp. 2d 1140 (D. Utah 2001)..................................................................48

*Lantec v. Novell,*
   306 F.3d 1003 (10th Cir. 2002) ............................................48

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014) ............................40

*Luke v. Family Care and Urgent Medical Clinics,*
   330 Fed. App'x 496 (9th Cir. 2009) .......................................45, 46

*Material Tech., Inc. v. Carpenter Tech. Corp.,*
   No. 01-2965 (SRC), Slip Op. (D.N.J. June 28, 2005) (copy attached as
   Defendant's Exhibit 2 to Motion)....................................10, 11, 41

*McGlinchy v. Shell Chemical Co.,*
   845 F.2d 802 (9th Cir. 1988) ...............................................41

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.,*
   354 F.3d 661 (7th Cir. 2004) ......................3, 7, 8, 18, 26, 27, 28

*Mylan Pharmaceuticals v. Warner/Chilcott,*
   838 F.3d 421 (3d Cir. 2016)..........................................21, 31

*Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.,*
   311 F. Supp.2d 1048 (D. Colo. 2004)...............................48, 49

*Ohio v. Am. Express Co.,*
   138 S.Ct. 2274 (2018)...........................2, 20, 21, 22, 23, 25, 29

*Pacific Steel Group v. Commercial Metals Co.,*
   2021 WL 2037961 (N.D. Cal. May 21, 2021)..............................23

*Pertile v. Gen. Motors, LLC,*
   No. 15-CV-0518-WJM-NYW, 2017 WL 4099895 (D. Colo. Sept. 15, 2017). .............6

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.,*
   199 F. Supp.2d 362 (M.D.N.C. 2002),
   *aff'd,* 67 Fed. App'x 810 (4th Cir. 2003).............................. 11, 26, 31

*Rebel Oil Co. v. Atlantic Richfield Co.,*
   51 F.3d 1421 (9th Cir. 1995) .............................................30

*Reed Construction Data v. McGraw-Hill,*
   49 F. Supp. 3d 385 (S.D.N.Y. 2014), aff'd, 638 Fed. App'x 43 (2d Cir. 2016)......9, 10, 26, 27

*Richter v. Commerce City,*
   185 F. Supp. 3d 1274 (D. Colo. 2016)................................6, 28

*Safeway Inc. v. Abbott Labs.,*
  761 F.Supp.2d 874 (N.D. Cal. 2011 ..................................................................28

*S.E.C. v. Nacchio,*
  *No. 05-cv-00480-MSK-CBS,* 2008 WL 4587240 (D. Colo. Oct. 15, 2008) ..........................46

*Specht v. Jensen,*
  853 F.2d 805 (10th Cir. 1988)) ..................................................................6

*State v. Deutsche Telekom AG,*
  419 F.Supp.3d 783 (S.D.N.Y. 2019)...................................................................34

*United States v. Engelhard,*
  970 F. Supp. 1463 (M.D. Ga.), *aff'd,* 126 F.3d 1302 (11th Cir. 1997).......................12, 13, 27

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001).................................................................15, 18, 21

*Vitamins Online, Inc. v. HeartWISE, Inc.,*
  No. 2:13-cv-00982-DAK, 2019 WL 6682313 (D.Utah Sept. 24, 2019) ..............................40

*Ward v. Apple,*
  *No. 12-CV-05404-YGR,* 2018 WL 934544 (N.D. Cal. Feb. 16, 2018), *aff'd,*
  784 F. App'x 539 (9th Cir. 2019) ...............................................................9, 14

**Statutes and Rules**

15 U.S.C. § 15(a) ..............................................................................43, 44

Federal Rule of Civil Procedure 26(a)(2) ......................................................44

Federal Rule of Evidence 702...................................................................5

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and*
  *Their Application* (5th ed. 2021)...................................................25, 29, 34,, 35, 41

R. Bork & J. Sidak, *The Misuse of Profit Margins to Infer Market Power,*
  9 Journal of Competition Law & Economics 511 (2013)..................................28, 29

Defendant Johns Manville hereby moves to exclude the opinions of Plaintiff Thermal Pipe Shields' ("TPS") economic expert, Frederick Warren-Boulton.[1]

## I.        INTRODUCTION

For nearly three years, TPS has been touting baseless allegations of unfair competition in this Court and with its customers.  To prevail on these allegations, TPS must present competent, expert testimony that supports its antitrust and false advertising claims.  Yet, after an extended 18-month discovery period, TPS remains empty-handed on both the facts and expert opinions necessary to support its claims.  For the reasons explained below, the Court should exclude any and all expert opinions from economist Frederick Warren-Boulton and dismiss TPS's claims, which TPS cannot prove without valid expert testimony.

The expert opinions at issue were disclosed in Warren-Boulton's September 27, 2021 Expert Report (hereinafter, the "Report").[2]  Def. Ex. 1.  At the most basic level, the Report skips

---

1  This dispositive "*Daubert*" motion is comparable to motions under Fed. R. Civ. P. 12 & 56, for which it is not necessary to confer with opposing counsel before filing the motion, under D.C.COLO.LCivR 7.1(a). Nevertheless the parties conferred by email on December 3, 2021 and TPS's counsel confirmed TPS will oppose this motion.

2  On Monday, November 29, 2021, TPS served what it titled an "Updated" Expert Report for Warren-Boulton.  TPS waited to serve this "Updated" report until nine days <u>after</u> Johns Manville served its expert reports responding to Warren-Boulton's Report  (attached to this motion as Def. Ex. 4 & 5).  The "Updated" Report does not fix the flaws identified in this *Daubert* Motion, but it purports to change many of Warren-Boulton's calculations for time periods dating back to 2016 (i.e., it is not just an update using recent 2021 data).

Johns Manville will ask Judge Hegarty for leave to file a separate motion to strike parts of TPS's improper "updated" report.  TPS tries to justify this update as a supplement, based on TPS sales data and documents, which TPS produced to Johns Manville several weeks before the Warren-Boulton Report (i.e., information that Warren-Boulton could have reviewed and incorporated into the September 27, 2021 Report, served on the day the Court set for TPS to disclose its expert opinions), and Johns Manville 2021 sales data.  But the "update" goes well beyond what is allowed for a supplement.  It is largely based on data that TPS could and should

the economist's traditional task in an antitrust case of analyzing evidence of how competition works in a proposed relevant product and geographic market in order to quantify Johns Manville's alleged market power.  While he offers plenty of unsupported conclusions about market definition and market power—citing to TPS's allegations in its complaint as opposed to any actual evidence produced in this case—Warren-Boulton avoids analyzing any evidence about customers and competition in the industrial insulation marketplace, or quantifying any purported harm to competition in any relevant product or geographic market.  Instead, Warren-Boulton attempts to invoke the rarely used "direct evidence" shortcut to proving market power.  But, in cases involving alleged vertical restraints (like this one), the Supreme Court has rejected this alternative approach to proving market power as invalid as a matter of law.  *See, e.g.*, *Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2284 & n.7 (2018).

Warren-Boulton's failure to analyze evidence in the discovery record about the market for distribution and sale of high-temperature industrial insulation including calsil and calsil substitutes to quantify Johns Manville's alleged market power, if any, and his reliance on the legally invalid "direct evidence" shortcut ***alone*** provide sufficient grounds to exclude all of Warren-Boulton's opinions and dismiss TPS's claims.  But the faults in Warren-Boulton's analyses do not end there. Warren-Boulton's opinions should also be excluded under *Daubert* principles because—following what appears to be a pattern for Warren-Boulton—they rest on unsupported assumptions, rather than any accepted methodology, and are inherently unreliable in evaluating Johns Manville's market power in any market or TPS's alleged damages.

---

have made available to Warren-Boulton before he completed the September 27, 2021 Report.  *See infra* Section III.D.

To begin, it is worth noting that Warren-Boulton has a long history of having federal courts exclude his expert analyses.  His expert opinions have been excluded under *Daubert* in at least **eight** prior actions.  Commenting on his frequent use of unsupported assumptions and allegations, Judge Frank Easterbook of the U.S. Court of Appeals for the Seventh Circuit described Warren-Boulton's economic analysis as "garbage in, garbage out."  *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 666 (7th Cir. 2004).  Warren-Boulton's practice of tendering faulty and unreliable analyses is evident here too, and his opinions should similarly be excluded.

Moreover, although not required because of the legal error with his invoking the "direct evidence" theory, a close examination of Warren-Boulton's "direct evidence" calculations (his only analysis of alleged market power apart from his unsupported conclusions) demonstrates that his result-driven comparison of the gap between TPS and Johns Manville calsil sale prices and his analysis of Johns Manville's accounting margins rely on unreliable, unsupported assumptions and lack an accepted methodology.  For example, Warren-Boulton simply assumes that, because Johns Manville has been charging customers more for its calsil since 2018 than TPS charges, it is a monopolist.  That argument ignores the reasons why a customer would prefer—and be willing to pay more for—Johns Manville's calsil than TPS's imported calsil.  For example, a customer who purchases large quantities of calsil from TPS may face long and uncertain lead times due to the calsil shipping across the Pacific Ocean, and some customers prefer to purchase mission-critical insulation materials for their industrial facility from an established, reputable U.S. manufacturer rather than a small start-up importer with no infrastructure beyond a 1-2 person sales team and no track record of customer support.

Warren-Boulton's opinions on TPS's alleged damages suffer from the same type of significant flaws. Warren-Boulton's damage model fails to disaggregate harm to TPS from specific unlawful actions separately for each of TPS's claims versus harm from lawful competition, and fails to filter out the effects of other factors that harmed TPS's business. Warren-Boulton's damage model also fails to identify any specific damages attributable to any alleged false advertising, which similarly requires dismissal of TPS's Lanham Act/false advertising claim. More generally, Warren-Boulton's "but-for" damage estimate is too speculative, projecting extraordinarily rapid growth for TPS calsil sales not tied to any benchmark for a similar start-up business that faces inherent challenges importing material from China.

Finally, TPS cannot fill in the gaps with Warren-Boulton's flawed analysis in any "updated" or "rebuttal" report. Under the Scheduling Order entered by this Court, as plaintiff, TPS was required to disclose the expert opinions to support its case-in-chief by September 27, 2021, with Johns Manville's expert opinions disclosed in response due by November 24, 2021. *See* ECF No. 130. While Warren-Boulton can certainly defend his analyses and respond to specific criticisms from Johns Manville's experts stated in their reports served on November 20, 2021, he cannot redo the opinions in his Report or offer new opinions to support TPS's case-in-chief through an "updated" or "rebuttal" report. Allowing a rebuttal report to be used in such a manner would only promote sandbagging and unfairly prolong the trial preparation process for expert testimony.

\* \* \* \* \*

Warren-Boulton's opinions rely entirely on inadmissible legal conclusions and speculation. The defects with Warren-Boulton's analysis are clear on the face of his Report. These flaws are so significant that the only proper remedy is to exclude the opinions now, in advance of trial, in

accordance with the Court's "basic gatekeeping obligation." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  This gatekeeping role is especially important in jury actions like this one, because unreliable expert opinions "can be both powerful and quite misleading." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) (quotation marks omitted).  Johns Manville, therefore, asks this Court to exclude all of Warren-Boulton's testimony under Federal Rule of Evidence 702 and governing precedents.

    No Evidentiary Hearing Requested; Just Oral Argument.  Under Section III.G of Judge Hegarty's Civil Practice Standards, Johns Manville does not request an evidentiary hearing with testimony from Warren-Boulton.  The defects with Warren-Boulton's analysis are clear on the face of his Report.  But Johns Manville does request a hearing to discuss the arguments in this Motion.

## II.      THE *DAUBERT* STANDARD AND CASES EXCLUDING WARREN-BOULTON UNDER THAT STANDARD

### A.      General Principles Governing the Review of Expert Testimony

    Federal Rule of Evidence 702 assigns district courts "a gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  This "gatekeeping obligation . . . applies to all expert testimony," *Kumho Tire*, 526 U.S. at 147, which must be "help[ful]" to the factfinder, "based on sufficient facts or data," and "the product of reliable principles and methods,"  Fed. R. Evid. 702.  In applying this standard, the court must look beyond labels and conclusions to ensure that the expert has "reliably applied" his claimed "principles and methods" "to the facts of the case." *Id.*  The proponent of an expert bears the burden of demonstrating that the expert has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used, and that the methodology was otherwise

reliably applied. *See, e.g.*, *Richter v. Commerce City*, 185 F. Supp. 3d 1274, 1278 (D. Colo. 2016) (Hegarty, J.).

To fulfill its gatekeeping function, this Court performs a two-step analysis: First, it ensures the expert is qualified to render the proffered opinions, and second, it assesses those opinions for reliability and fit. *See, e.g.*, *Richter*, 185 F. Supp. 3d at 1278. It is well-established that reliable expert opinions cannot be based on subjective belief or unsupported speculation; experts must have "good grounds" for their beliefs. *See, e.g.*, *Beltran v. InterExchange, Inc.*, No. 14-cv-03074-CMA-KMT, 2018 WL 526907, at *5 (D. Colo. Jan. 24, 2018). This Court regularly excludes expert opinions that represent conclusory or circular opinions, an *ipse dixit* conclusion, or unsupported speculation. *See, e.g.*, *Pertile v. Gen. Motors*, LLC, No. 15-CV-0518-WJM-NYW, 2017 WL 4099895, at *5, *7–8 (D. Colo. Sept. 15, 2017). Important to the review of Warren-Boulton's opinions here, in assessing the reliability of expert testimony, the Court considers: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community. *Richter,* 185 F. Supp. 3d at 1274 (quotations omitted). In addition, a retained expert cannot state his or her views of the law that governs the case and opine on whether the defendant's conduct would violate the law. *See id.* at 1278 (quoting *Specht v. Jensen*, 853 F.2d 805, 806 (10th Cir. 1988)). The expert cannot "discours[e] broadly about the entire range of applicable law," and instead must focus on" specific question[s] of fact." *Id.* (quoting *Specht*, 853 F.2d at 8009–10). An expert also cannot "pass[] upon the weight or credibility of the evidence." *Id.* (quoting *United States v. Jensen*, 608 F.2d 1349, 1356 (10th Cir. 1979)).

**B.**     **Courts Routinely Exclude and Reject Warren-Boulton's Analysis Under *Daubert* For Flaws Similar to His Conclusory, Unsupported, Legally Erroneous Report Here.**

The inadmissibility of Warren-Boulton's opinions is evident from his own work in this matter, which follows a pattern of unreliability that has been recognized by multiple federal courts. In eight different decisions, federal judges have barred and rejected the reliability of Warren-Boulton's expert opinions, each time also granting summary judgment dismissing or rejecting the claims he advocated.   Warren-Boulton's proffered opinions have been rejected as being "devoid of analysis," "garbage in, garbage out," based on unreliable calculations and result-driven assumptions, and entirely contrary to record evidence and undisputed facts.   Discussion of each of these decisions is warranted as they demonstrate the unreliable, result-driven opinions that have come to mark Warren-Boulton's career as a hired expert and raise a host of red flags concerning the lack of rigor in his analysis.

**1.**     **"Garbage In, Garbage Out" Market Analysis: Providing a Market Definition that Only "Assumes What Is to Be Established."**

In an opinion by antitrust scholar, Judge Frank Easterbrook, the Seventh Circuit summarized Warren-Boulton's expert opinion purporting to define grocery store shelf coupon dispensers as a separate market with no substitutes as "garbage in, garbage out."   *Menasha Corp.*, 354 F.3d at 666.   The court dismissed the econometric analysis Warren-Boulton supervised as "a potpourri of survey research and armchair economics."   *Id.* at 664.   The court faulted Warren-Boulton for only looking at the output for at-shelf grocery coupon dispensers and not considering the output for "other promotional devices" during the relevant period when defining the market. *Id.* at 665-666   The court explained that Warren-Boulton could arrive at his opinion that at-shelf coupons are their own market "[o]nly by *assuming* that at-shelf coupons are a market."   *Id.* at 665–

66 ("[I]t is the assumption, and not the events under study, that ends up 'defining' the market."). The court also explained that Warren-Boulton's purported analysis that the defendant (NAMIS) was consistently able to sell its dispensers "for more than marginal cost" was not evidence of the defendant's market power because the analysis of "marginal cost" overlooked relevant costs such as the wages and commissions of large sales and service staffs and other expenses of doing business reflected in the capital invested in this business. *Id.* at 666. The "marginal cost" the analysis used amounted to the manufacturing cost, and as the Seventh Circuit noted: "Well *of course* NAMIS's price exceeds *that* measure of cost." *Id.* The Seventh Circuit also affirmed the trial court's grant of summary judgment dismissing the claims.

### 2. "Devoid Of Analysis": Rejecting Unsupported Opinion On Antitrust Impact And Damages.

A plaintiff seeking class certification challenging exclusivity agreements between Apple and AT&T presented Warren-Boulton's opinions on antitrust impact and damages. *Ward v. Apple*, No. 12-CV-05404-YGR, 2018 WL 934544, at *1 (N.D. Cal. Feb. 16, 2018), *aff'd*, 784 F. App'x 539 (9th Cir. 2019). Warren-Boulton offered two proposed theories based on "but-for" worlds. The court rejected both theories, holding that "[b]eyond the two articulated theories, the expert's declaration is devoid of analysis." *Id.* at *2. The court found Warren-Boulton's opinions "lack[ed] any data-driven analysis" and that he "failed to submit any semblance of a 'functioning model that is tailored to market facts in the case at hand.'" *Id.* at *3 (citation omitted).

The Ninth Circuit affirmed, noting Warren-Boulton omitted information from his report that he said he could provide at some point in the future: "Plaintiffs' expert did not provide a workable method for classwide determination of the impact of the alleged antitrust violation.

Instead, he merely asserted that he would be able to develop a model at some point in the future." 784 F. App'x at 540.

### 3.      Excluding Flawed Regression Analysis.

The U.S. District Court for the Southern District of New York similarly excluded all of Warren-Boulton's opinions analyzing causation of damages in a case involving antitrust, false advertising, and state law claims. *See Reed Construction Data v. McGraw-Hill*, 49 F. Supp. 3d 385, 396–407 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016).

In *McGraw-Hill*, the court held a two-day *Daubert* hearing to review Warren-Boulton's attempts to: (a) define a purported national market for construction product information (CPI), which are newsletters with information on construction projects; (b) contend the defendant exercised and retained market power in that market; and (c) estimate damages. *Id.* at 396. Warren-Boulton used regression analysis, which is a statistical method for analyzing variables to "convert an observation of correlation" into "a statement of causation," similar to drawing the most accurate line to fit a plot of data points. *Id.* at 397. Warren-Boulton used local sales of construction information as a competitive benchmark to analyze purported price effects on national sales of construction information; he assumed national pricing would be more affected than local pricing by the defendant McGraw-Hill's alleged misconduct. *Id.* Similar to his assignment for TPS here, although the plaintiff (Reed) failed to identify in fact discovery more than a handful of customers who relied on the defendant's (McGraw-Hill) allegedly false product comparisons, Warren-Boulton tried to prove with data analysis that McGraw-Hill's conduct had damaged Reed. *Id.* at 396–97. He purported to find what he called a "price effect" to support his hypothesis that

9

customers paid more for McGraw-Hill's service than what they would normally pay, absent misconduct. *Id.*

The court excluded all of Warren-Boulton's opinions and granted the defendant's motion for summary judgment. Specific to the report, the court rejected Warren-Boulton's unstated, illogical, and unsupported assumptions; analysis that overlooked a major variable; non-expert judgments that drove the conclusions; and a model for which minor changes altered the conclusions.[3]

### 4. Entire Damage Analysis Excluded Based on Unsupported Assumptions and Contrary to Established Fact.

In 2005, a court excluded all of Warren-Boulton's expert opinions in a case where he prepared five "but-for" damage scenarios for a plaintiff asserting unfair competition and breach of fiduciary duty claims. *See Material Tech., Inc. v. Carpenter Tech. Corp.*, No. 01-2965 (SRC), Slip Op. at 3, 36–41 (D.N.J. June 28, 2005) (not available on Westlaw) (copy attached as Def. Ex. 2). The court rejected four of Warren-Boulton's five proposed damage scenarios because they relied on an unsupported assumption that the plaintiff's product (Scanpac powder) could achieve the

---

[3] ***First,*** the court noted flaws with how Warren-Boulton constructed a regression analysis methodology to evaluate the proposed price effect, in which Warren-Boulton made unstated assumptions that the court found were illogical and unsupported by evidence in the case. *Id.* at 402–03. ***Second,*** it held Warren-Boulton's regression analysis was flawed because it failed to consider the "major" variable that could affect its conclusions: construction volume. *Id.* at 403–04. ***Third,*** when Warren-Boulton then purported to consider construction volume, that created severe ("multicollinearity," which occurs when an "independent variable is correlated with one of the control variables") problems for his regression model. *Id.* at 404–05. ***Fourth,*** the court rejected as "insufficiently 'scientific'" non-expert "judgments" that Warren-Boulton purported to make as a matter of common sense to pool certain national and local pricing data in a way that drove the conclusions his model reached. *Id.* at 405–07. ***Fifth,*** the court held that because "very minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions," Warren-Boulton's methodology was not reliable and must be excluded under *Daubert*. *Id.* at 407.

properties required by stainless steel manufacturers (i.e., whether "Scanpac parts are a viable replacement for wrought"). *Id.* at 38–39 (stating Warren-Boulton's scenarios "rely on an unsupported assumption"). It excluded the fifth damage scenario because "it [wa]s contrary to established fact." *Id.* at 39 ("Warren-Boulton's third 'but for' scenario depends on disproving established facts that will not be open to dispute at trial. Warren-Boulton's third scenario, and the analysis that flows therefrom, would be unhelpful to the jury and is, therefore, irrelevant.").

### 5. Rejecting Market Power Assertion For Tobacco Sales.

In 2003, the U.S. District Court for the Middle District of North Carolina rejected Warren-Boulton's expert testimony on market power in support of several tobacco companies that initiated monopolization claims against Philip Morris. *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp.2d 362 (M.D.N.C. 2002), *aff'd*, 67 F. App'x 810 (4th Cir. 2003). The plaintiffs contended the Philip Morris "Retail Leaders" program gave it advantageous display space with retailers for what Warren-Boulton called "premium communication space." *Id.* at 365, 385. Warren-Boulton disregarded undisputed testimony about declining tobacco sales and the plaintiffs' excess capacity, contending the limited premium communication space constrained the ability of the plaintiffs to compete. *Id.* at 385. The court rejected Warren-Boulton's opinion supporting the plaintiffs' assertions of market power because it "ignores the relevant evidence" that plaintiffs "have the ability to communicate with adult smokers via in-store merchandising contracts as well as other media." *Id.* at 385–86. The court also found the plaintiffs' excess capacity prevented Philip Morris from charging prices substantially above the competitive level. *Id.* at 385–86 & n.16. After rejecting the plaintiffs' expert opinions, the court granted the defendant's motion for summary judgment on all claims. *Id.* at 397.

6.      **Rejecting Proposed Narrow Market Definition.**

In a case involving compressors for truck airbrakes, the U.S. District Court for the Middle District of North Carolina  rejected Warren-Boulton's proposed market definition, criticizing his narrow view of product substitutes, contrary to undisputed facts about competition across "different styles of replacement compressors and valves." *Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 824 (M.D.N.C. 2000).  In this case, Warren-Boulton offered opinions on the proposed market definition for the plaintiffs, who had a small market share in the aftermarket for compressors and valves used in truck airbrake systems.  *See id.*  The complaint alleged monopoly, "monopoly leveraging," and unlawful non-price vertical restraints in the defendant's distribution agreements.  *Id.* at 823.  Warren-Boulton advocated a narrow market definition with minimal product substitution, contending that customers for compressors rarely would substitute purchases of non-Bendix compressor replacement parts for Bendix parts.  *Id.*  The court criticized the plaintiffs for proposing a market that does not encompass all interchangeable substitute products. *Id.* at 823–24.  Warren-Boulton also failed to offer any analysis of market share for the proposed market he advocated.  *Id.* at 825.  Based in part on the plaintiffs' failure to present reliable expert opinions, including market power in a relevant market, the court granted summary judgment dismissing the antitrust claims.  *Id.* at 830–33.

7.      **Rejecting Analysis of Substitutes in Proposed Product Market.**

In the 1990s, Warren-Boulton testified on behalf of the U.S. Department of Justice when it challenged a proposed acquisition involving the manufacture and distribution of several types of clay.  *United States v. Engelhard*, 970 F. Supp. 1463, 1465 (M.D. Ga.), *aff'd,* 126 F.3d 1302 (11th Cir. 1997).  The U.S. District Court for the Middle District of Georgia held Warren-Boulton's

market analysis was unreliable for two reasons: (a) he failed to do his own analysis of elasticity of demand, instead relying on another expert; and (b) he analyzed relative prices for substitute products in "both competitive and non-competitive applications," and thus failed to present reliable analysis of reasonably interchangeable alternatives to the clay material at issue. *Id.* at 1483–84.

### 8. Court Rejected Conclusory, Legally Erroneous Analysis Challenging Proposed Settlement.

In *In re Auction Houses Antitrust Litigation*, the court rejected the Getty Trust's objection, which relied on Warren-Boulton's opinions offered in an affidavit submitted with the objection, to a class action settlement arising from price-fixing by fine art auction houses. No. 00 CIV. 0648 (LAK), 2001 WL 170792 (S.D.N.Y. Feb. 22, 2001), *aff'd*, 42 F. App'x 511 (2d Cir. 2002). The court dismissed as just "an *ipse dixit*" Warren-Boulton's unsupported argument for an equal division of the settlement proceeds between buyers and sellers and the court noted that Warren-Boulton ignored that liability was "virtually conceded" on the art-seller side and hotly disputed on the art-buyer side. *Id.* . The court determined that Warren-Boulton offered an empty argument about the "relative elasticities of supply of and demand for art works" when he offered no reasoned alternative "because he acknowledges there is no evidence of the relative elasticities of supply and demand." *Id.* at *14. Instead, Warren-Boulton offered just a conclusion: "he simply asserts that, in the absence of such evidence," estimated damages should be divided equally between buyers and sellers. *Id.* The court also noted that Warren-Boulton's "argument is problematic as a matter of law" because it ran contrary to established Supreme Court precedents about who should recover for price-fixing harm. *Id.* at *15.

* * * * *

13

As explained in the arguments below, the same lack of intellectual rigor described in these eight decisions infects Warren-Boulton's analysis here, and requires the exclusion of Warren-Boulton's testimony in its entirety.

## III.      ARGUMENT

### A.   The Court Should Exclude Warren-Boulton's Opinions About TPS's Alleged Relevant Product and Geographic Markets Because His Report Offers Conclusions, With No Analysis, About Evaluating Market Power in Any Relevant Market.

Warren-Boulton's Report provides only conclusions, not analysis, on market power and relevant markets.  Therefore, because these opinions are conclusory, devoid of analysis, assume what is to be established, and contrary to undisputed facts, the Court should bar Warren-Boulton from offering any testimony on relevant product or geographic markets or Johns Manville's alleged power in such markets.  The empty arguments and lack of substantive analysis here is comparable to the defects that prompted federal courts in California and New York to exclude Warren-Boulton's opinions in two other cases.  *See Ward*, 2018 WL 934544 at *2 (excluding Warren-Boulton's proposed "but for" theories on antitrust impact and damages as "devoid of analysis" and finding Warren-Boulton failed to submit "any semblance of a functioning model that is tailored to market facts"); *In re Auction Houses*, 2001 WL 170792, at *14–15 (dismissing Warren-Boulton's opinion as just "an *ipse dixit*" that ignored facts of the dispute and offered just a conclusion rather than analysis of supply and demand).

### 1.   The Court's Previous Rulings Clearly Require TPS to Prove Market Power in Some Relevant Product and Geographic Market.

The Court's previous rulings in this case hold that, in order to proceed to trial on its "tying" and "monopolization" claims, TPS must define and present competent proof of an appropriate

product market and geographic market.  That lens allows the Court to evaluate whether TPS can

prove any unlawful harm to competition in some relevant market.  For example:

- <u>Defining relevant market</u>:  "Defining the 'relevant product market' is *a threshold inquiry* in an antitrust case.  It helps to identify the framework within which the antitrust claims will be considered."  *Chase Manufacturing, Inc. v. Johns Manville Corp.*, 2021 WL 50871, at *3 (D. Colo. Jan. 6, 2021) (emphasis added) "The Tenth Circuit has also stated that defining the relevant product market is a threshold requirement in antitrust actions."  *Auraria Student Hous. v. Campus Villiage Apts.*, 843 F.3d 1225, 1244–45 (10th Cir. 2016).  The proposed product market must represent a "true economic market," or be defined broad enough to encompass all products that have "reasonable interchangeability."  Id. at 1245.

- <u>Tying</u>:  "[T]he market power of the tying product is important," and "[e]valuating the relevant tying market requires an appropriate product market and geographic market." *Chase Manufacturing, Inc. v. Johns Manville Corp.*, 2019 WL 2866700, at *5 (D. Colo. July 3, 2019).

- <u>Monopolization</u>:  The first element for a monopolization claim is proof of "'monopoly power in the relevant market.'"  *Id.* at *4; *Chase Manufacturing, Inc. v. Johns Manville Corp.*, 2020 WL 1433504, at *11 (D. Colo. Mar. 23, 2020).

- <u>Exclusive dealing</u>:  A plaintiff must show "anticompetitive effects resulting from 'a substantial foreclosure of their ability to compete in the relevant market.'"  *Chase*, 2019 WL 2866700, at *7; 2020 WL 1433504, at *11.  For exclusive dealing, "in all cases *the plaintiff must define the relevant market and prove the degree of foreclosure*."  2019 WL 2866700, at *8 (emphasis added) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001)).

### 2. Despite Clear Direction from the Court, Warren-Boulton's Report Offers Only Unsupported Conclusions About Market Power and TPS's Proposed Relevant Product and Geographic Market.

What the Court would normally see (and expects to see) from an antitrust plaintiff's

retained economist is detailed analysis of the product and geographic market where the plaintiff

claims competition has been suppressed through alleged anticompetitive conduct, such as tying

and monopolization.  Warren-Boulton dismisses as unnecessary such traditional analysis of

"indirect evidence" while sprinkling unsupported conclusions about markets and market power

throughout his Report.  The Report uses a convoluted structure to mask the lack of actual analysis

15

of market definition concepts.  But a review of the Report, section-by-section and page-by-page, exposes the missing analysis.

Introductory statement of "economic principles" (Ex. 1 at 1–8):  In his introductory summary about "economic principles" for market definition, Warren-Boulton tries to create the illusion that the Report will actually address market definition.  *See id.* at 2–4.  The Report recites the test courts apply for defining relevant markets and evaluating proof of market power, if any, within such markets, and calls this "indirect evidence" of anticompetitive conduct.  *Id.* at 2–4, 7–8.  Yet, after outlining the test and relevant questions, Warren-Boulton fails to analyze any evidence from the discovery record about competition for high-temperature industrial insulation to answer those questions.

Unsupported conclusions about "market" (Ex. 1 at 5–7):  Next, rather than define a relevant market in the way required by the legal and economic principles he just recited, Warren-Boulton states the unsupported conclusion that:  "In this case, a relevant market **can be** defined as all calsil sold in the U.S. . . ." to distributors or other customers including contractors.  *Id.* at 6 (emphasis added).  Warren-Boulton cites TPS's complaint as his support for this proposition, rather than applying the "economic principles" he just cited, to define a relevant product and geographic market and quantify power in those markets.  *Id.*  The allegations in TPS's complaint cannot serve as the foundation for Warren-Boulton's opinions on market definition and market power.

Invalid "direct evidence" theory (Ex. 1 at 6):  The Report quickly shifts to Warren-Boulton's preferred "direct evidence" theory to justify his lack of analysis of relevant markets:

> Only in the absence of such [direct] evidence would one need to examine indirect (usually structural) evidence as to whether that was even possible.

*Id.* at 6.   Warren-Boulton buries in a footnote his core assertion of law, not economics, that: "Market definition is not a required element" of TPS's claims.   *Id.* at 3 n.8.   He is mistaken on that legal conclusion, *see infra* Section III.B.   The core of the Report then argues this "direct evidence" theory.   *Id.* at 8–13.

No analysis of alleged "indirect evidence" of market power in a properly defined product market (Ex. 1 at 7–8):   Warren-Boulton devotes only three paragraphs to the central issue of defining market power in a relevant product and geographic market.   These paragraphs contain the sum total of his discussion of the supposed "indirect evidence" of monopoly power in a purported national calsil market.   But there is no analysis.   Instead, Warren-Boulton quickly doubles back to his "direct evidence" theme.[4]

Alleged tying—no tying markets defined or market power quantified (Ex. 1 at 3):   The Report admits that for TPS to prove its tying claim, "Johns Manville must possess meaningful economic power in the market for the alleged tying products, expanded perlite and fiberglass pipe insulation."   *Id.*   But the Report dispenses with any pretense of analyzing some relevant market for expanded perlite or fiberglass pipe insulation.   Warren-Boulton inexplicably asserts that he *could* offer such analysis although he has not done so, claiming:  "There is no need, however, to establish that any of these must-have products is a relevant market . . . (though that would not seem to be much of a lift)."   *Id.* at 15.

---

[4]   He argues: "Here, however, the direct evidence is more than sufficient to establish a clear presumption that Johns Manville has monopoly power in the in the sale of calsil in the U.S."   Ex. 1 at 8.   Based on that circular analysis, Warren-Boulton tries to declare "a strong presumption of Johns Manville's monopoly power . . . simply by using indirect evidence."   *Id.*   The jury must base its decision at trial on actual *evidence* of monopoly power, not some hypothesized "presumption."

Alleged exclusive dealing—no analysis of degree of foreclosure in a relevant distribution market (Ex. 1 at 14–15):  Warren-Boulton purports to conclude Johns Manville has economic power over insulation distributors and contractors without identifying *a single* insulation distributor or contractor to which TPS has been foreclosed from selling its calsil.  *Id.*[5]  Warren-Boulton dodges the Court's direction that, in order to prove unlawful exclusive dealing, TPS "must define the relevant market and prove the degree of foreclosure."  *See Chase*, 2019 WL 2866700 at *8 (quoting *Microsoft*).  Rather than state how TPS has been blocked from distributing its calsil, Warren-Boulton speculates that there is "potential harm to competition" because distributors have a "strong incentive" to continue purchasing Johns Manville calsil.  *Id.* at 15.

* * * * *

In sum, Warren-Boulton elected not to provide the economic analysis necessary to properly define relevant markets and assess market power using the tests recited in this Court's rulings. Instead, consistent with the lack of rigor in many other cases in which his opinions were excluded, Warren-Boulton offers only unsupported conclusions that TPS's alleged market definitions seem plausible.   The Court cannot let Warren-Boulton present to the jury on this central issue unsupported conclusions, dressed up as "expert" opinions, about TPS's allegations of market power in some unidentified relevant product and undefined geographic market.  *Cf. Menasha Corp.*, 354 F.3d at 665–66 (Warren-Boulton's opinions excluded because his assumption defined the market).  TPS has thus forfeited the chance to use that traditional method to prove such market power, a core element of all of TPS's antitrust claims.

---

[5]  The undisputed evidence shows TPS has been able to sell its calsil to all of the "large" distributors it identified in the Amended Complaint.  *See, e.g.*, ECF 89 (TPS sales data filed under seal on Oct. 9, 2020).

As discussed below, TPS cannot fix this gap by having Warren-Boulton come back and fill in the missing market power analysis in a purported "rebuttal report."  The Court does not allow a plaintiff or its retained expert to sandbag its adversary by leaving necessary case-in-chief analysis out of the expert's report and then try to fill in the missing analysis in a rebuttal report or deposition testimony.  Warren-Boulton has missed the opportunity to offer a timely opinion properly defining any relevant market—an essential element of TPS's case-in-chief.  *See, e.g.*, *Cook v. Rockwell Intern. Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006) (expert cannot present untimely supplement) (*infra* Section III.D).  The Court extended the discovery and disclosure deadlines multiple times and ultimately set September 27, 2021 as the deadline for initial Rule 26(a)(2) disclosures.  August 3, 2021 Minute Order (ECF 130).  Trial is scheduled to begin April 18, 2022.  The time has run out for TPS to disclose core expert opinions.

### 3.    Warren-Boulton's Lack of Reasoned Analysis about Market Power Reflects TPS's Lack of Admissible Evidence to Prove Its Market Definition Allegations.

Warren-Boulton's failure to present a reasoned analysis calculating market power in the proposed nationwide calsil market, or either alleged tying market, is no accident.  This omission reflects the fact that TPS lacks evidence to prove its market definition allegations.

Calsil substitutes:  The discovery record does not support TPS's allegations that insulation distributors who receive an order for calsil cannot, and do not, help their customers obtain substitutes for calsil, when, for example, there are long lead-times for calsil or a customer wants to consider less expensive alternatives.  Instead, the discovery record—including admissions from TPS's President, David Shong, and the only two insulation distributors whom TPS chose to depose—confirms that insulation distributors, EPC firms and insulation contractors, and the

facility owners who use industrial insulation regard other high-temperature insulation materials (including mineral wool, expanded perlite, and aerogel) as substitutes for calsil, and that insulation distributors regularly assist their customers with obtaining alternative insulation materials as substitutes for calsil.  *See* Ex. 3 (deposition testimony on calsil substitutes from Shong and distributor witnesses).

Substitutes for expanded perlite and fiberglass pipe insulation:  TPS and Warren-Boulton have no evidence that insulation customers lack substitutes for either of TPS's alleged "tying" products of expanded perlite and fiberglass pipe insulation, or that Johns Manville has market power in selling those insulation materials.  TPS did not even attempt to obtain such evidence during discovery and TPS has been importing expanded perlite to sell in the United States.

Local and regional markets, not national markets:  The discovery record includes admissions by TPS executives and distributor witnesses that competition for high-temperature industrial insulation occurs in local and regional markets, not a nationwide U.S. market.  *See* Ex. 3. Johns Manville's sales data also demonstrates that prices vary significantly across different regions of the United States.  *See* Ex. 4 at 38–42.

**B.**     **TPS Cannot Show Market Power Through "Direct Evidence," Which the Supreme Court Held Does Not Apply to Alleged Vertical Restraints**

The core of Warren-Boulton's Report is his contention that: "Thermal Pipe Shields's proof of Johns Manville's actual exercise of monopoly power obviates the need to define a relevant market . . . ."  Ex. 1 at 3 n.8.  As gatekeeper, the Court should bar Warren-Boulton's attempt to prove monopoly power through so-called "direct evidence" as a matter of law.  Recent case law from the Supreme Court undermines TPS's reliance on this rarely applied concept for bypassing

traditional analysis of market power in a properly defined relevant market here.[6]

In support of their attempt to bypass the traditional analysis of market power, Warren-Boulton and TPS cite the Supreme Court's explanation of the "direct evidence" theory in *Indiana Dentists*, a case decided thirty-five years ago.[7]   Warren-Boulton and TPS fail to mention the Supreme Court's guidance on this theory in *American Express*, 138 S.Ct. 2274, a case decided just three years ago.   And for good reason.   In *American Express*, the Supreme Court rejected the "direct evidence" theory as a basis to bypass market definition for a plaintiff challenging vertical restraints.   *Id.* at 2285 n.7.   Like in *American Express*, TPS's claims concern alleged "vertical restraints" supposedly restricting TPS's distribution of calsil through distributors.[8]

In *American Express*,  the Supreme Court explained:  "Direct evidence of anticompetitive effects would be 'proof of actual detrimental effects [on competition],' [citing *Indiana Fed'n of Dentists*], such as reduced output, increased prices, or decreased quality in the relevant market[.]"

---

[6]  Even before the Supreme Court's *American Express* decision, courts recognized that "direct evidence of monopoly power to prove one's claims is only 'rarely available.'"   *Mylan Pharmaceuticals v. Warner/Chilcott*, 838 F.3d 421, 434 (3d Cir. 2016) (quotation and citation omitted); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (*en banc*) ("Because such direct proof is only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power."); *In re Local TV Advertising Antitrust Litig.*, 2020 WL 6557665, at *7 (N.D. Ill. Nov. 6, 2020) ("Direct evidence is equivalent to a 'smoking gun,' and it is quite rare.").

[7]  The Report cites *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986).  Ex. 1 at 3 n.8.  But the evidence of the exercise of monopoly power by dentists in that case (a horizontal agreement among competing dentists to not share X-rays with insurance companies) does not resemble the supposed "direct evidence" asserted here.

[8]  "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints."  *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 730, 735–36 (1988) (holding vertical restraints are not illegal per se unless they include some agreement on price or price levels).

138 S. Ct. at 2284. The Supreme Court rejected the plaintiff's reliance on "direct evidence" and held that defining a relevant market was necessary because the claims concerned alleged vertical restraints, which "often pose no risk to competition unless the entity imposing them has market power." *Id.* at 2285 & n.9.[9] In *American Express*, the Court also confirmed the importance of accurately defining the relevant market:

> Because "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law," . . . courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market. . . . Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.

138 S. Ct. at 2285 (citation and quotations omitted).

---

[9] Distinguishing the *Indiana Dentists* case on which Warren-Boulton relies, and relying on Judge Easterbrook's antitrust analysis of vertical restraints, the Supreme Court explained the reason for the distinction between horizontal and vertical restraints:

**The plaintiffs argue that we need not define the relevant market in this case because they have offered actual evidence of adverse effects on competition**—namely, increased merchant fees. . . . **We disagree.** The cases that the plaintiffs cite for this proposition evaluated whether horizontal restraints had an adverse effect on competition. . . . *See Indiana Federation of Dentists, supra*, at 450–451, 459 [ ] (agreement between competing dentists not to share X rays with insurance companies); *Catalano, supra*, at 644–645, 650 [ ] (agreement among competing wholesalers not to compete on extending credit to retailers). **Given that horizontal restraints involve agreements between competitors not to compete in some way, this Court concluded that it did not need to precisely define the relevant market to conclude that these agreements were anticompetitive.** *See Indiana Federation of Dentists, supra*, at 460–461, [ ]; *Catalano, supra*, at 648–649 [ ]. **But vertical restraints are different.** . . . **Vertical restraints often pose no risk to competition unless the entity imposing them has market power**, which cannot be evaluated unless the Court first defines the relevant market. *See id.*, at 898, [ ] (noting that a vertical restraint "may not be a serious concern unless the relevant entity has market power"); Easterbrook*, Vertical Arrangements and the Rule of Reason*, 53 Antitrust L.J. 135, 160 (1984) ("[T]he possibly anticompetitive manifestations of vertical arrangements can occur only if there is market power").

138 S.Ct. at 2285 n.7 (emphases added; citations omitted).

Courts applying *American Express* have held that, consistent with the Rule of Reason, definition of a relevant market is essential for a claim involving alleged vertical restraints.[10]  Just recently, for example, the U.S. District Court for the Northern District of California rejected a plaintiff's argument that "direct evidence" excused the plaintiff from proving defendant's market power, holding "the Supreme Court has made clear that a market power analysis is required for antitrust claims based on vertical restraints." *See, e.g.*, *Pacific Steel Grp. v. Com. Metals Co.*, 2021 WL 2037961, at *5 n.3 (N.D. Cal. May 21, 2021) (citing *American Express*); *see also Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108, 1112 (9th Cir. 2021) (noting that "vertical restraints are 'restraints "imposed by agreement between firms at different levels of distribution"'" and "'[n]early every [ ] vertical restraint' is 'assessed under the rule of reason'") (quoting *American Express*).[11]

The Supreme Court's ruling in *American Express* prevents Warren-Boulton and TPS from relying on so-called "direct evidence" to avoid proving market power in a properly defined relevant market.  The Court should therefore exclude Warren-Boulton's "direct evidence" opinions.

---

[10]  The Supreme Court in *American Express* reiterated a practical approach to defining relevant markets tied to commercial realities:  "Thus, the relevant market is defined as 'the area of effective competition.' . . . . Typically this is the 'arena within which significant substitution in consumption or production occurs.'  [citations omitted]  But courts should 'combin[e]' different products or services into 'a single market' when 'that combination reflects commercial realities.'" 138 S. Ct. at 2285 (citations omitted).

[11]  Before the Supreme Court's *American Express* ruling rejecting the "direct evidence" approach for vertical restraints, the Tenth Circuit questioned whether a plaintiff pursuing Sherman Act Section 2 monopolization claims (which do not involve horizontal agreements between competing firms) can bypass analysis of a relevant market based on alleged "direct evidence" of "actual anticompetitive effects."  *See Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1198 (10th Cir. 2009) ("This circuit has neither accepted nor rejected the theory.").  *American Express* moots that issue.

23

**C.**     **The Court Also Should Bar Warren-Boulton's Opinions Because They Are Unreliable, Unsupported, Contrary to Undisputed Evidence, and Not Based on a Proper Methodology**

If the Court does not bar Warren-Boulton's conclusions about alleged market power and market definition and "direct evidence" because of his lack of analysis and legal error, it should still deem those opinions as unreliable for the same reasons that courts have excluded Warren-Boulton's opinions in at least eight other cases.

**1.     Warren-Boulton's Unsupported Conclusions About Market Power in Alleged Relevant Markets Are Not Reliable.**

The Court should exclude Warren-Boulton's conclusions about alleged market power in the product markets TPS alleges due to his failure to conduct any reasoned analysis of substitutes for the product markets he hypothesizes: calsil, expanded perlite, and fiberglass pipe insulation. Warren-Boulton disregards calsil substitutes as "irrelevant," and his report contains no analysis of possible calsil substitutes. Ex. 1 at 5. Warren-Boulton's market definition conclusions ignore undisputed evidence about how distributors and insulation end-users view the relevant product as high-temperature insulation, in which calsil, expanded perlite, aerogel, and mineral wool (among other materials) serve as substitutes for each other depending on the purchaser's preference for things like material type, brand, durability, availability, and cost.

Examples of testimony from the only two insulation distributors whom TPS elected to depose, concerning substitution of high-temperature insulation materials, which Warren-Boulton ignores, are included in Def. Ex. 3. For example:

- Robert Hlavenka of Distribution International (the largest U.S. insulation distributor with 84 warehouse locations, and TPS's largest calsil customer): Ex. 7a (Depo. Excerpts):
  - Calsil substitutes: Hlavenka listed the high-temperature industrial insulation materials that can serve as substitutes for each other up to 1,200 degrees: mineral wool, calsil, perlite, aerogel and ceramic fiber. Hlavenka Depo. at 51:4-11.

24

- <u>Distributors assist with substitution of materials</u>:  He undermined TPS's proposed "upstream only" manufacturer-to-distributor calsil market, in which TPS contends distributors do not sell substitute insulation materials in place of calsil, and in which TPS seeks to exclude from the market the downstream facility owner/end-user purchasers who drive distributors' demand for insulation materials.  Hlavenka explained that distributors work with contractors and end-users to give them options for a substitute material required on short notice, such as expanded perlite or mineral wool in place of calsil, based on availability and get an exception to a specification, if there are longer lead times or material shortages.  Hlavenka Depo. at 50:8-51:16.

- <u>Value engineering</u>:  He explained the process that occurs frequently of value engineering where contractors seek to save money late in the construction process by substituting a less expensive alternative insulation material in place of the original material that was specified, such as calsil.  Hlavenka Depo. at 54:5-55:8.

- <u>DI expects lower price for TPS calsil</u>:  Undermining Warren-Boulton's "direct evidence" comparison of TPS and Johns Manville calsil prices, Hlavenka also explained that TPS calsil is viewed as a brand new product that must be imported from China with long-lead times for substantial volumes and that will take some time to obtain customer acceptance, and that DI expects TPS calsil to be priced significantly lower than Johns Manville calsil.  Hlavenka Depo. 82:14-85:5.

- <u>Joe Guest of 4-State Supply</u> (regional Midwest distributor with warehouses in Omaha, Lenexa, and Wichita):  Ex. 7b (Depo. Excerpts):

  - <u>Declining calsil demand and calsil substitutes</u>:  Guest explained that 4-State has seen declining calsil demand since 2006 in favor of other materials including mineral wool and thin blanket (aerogel), which serve as alternatives to calsil.  Guest Depo. at 146:1-147:25.

  - <u>4-State Supply assisted industrial facility with substitute insulation material</u>:  Uundermining TPS's proposed upstream-only market in which distributors supposedly do not help customers find alternative insulation materials, Guest explained in detail an example summarized in Depo. Ex. 234, where he worked with a cogeneration facility to obtain an alternative insulation material at the last minute (fiberglass in place of mineral wool) because of  long-lead time for mineral wool, and a tight project deadline.  Guest Depo. at 159:3-165:9.

An expert purporting to define a relevant product market must consider "the 'arena within which significant substitution in consumption or production occurs'" in a single market that "reflects commercial realities."  *American Express*, 138 S.Ct. at 2285 (quoting Areeda & Hovenkamp, §5.02).  Warren-Boulton's failure to consider substitutes for calsil, and failure to even

discuss the parameters of any alleged tying product market, result in "garbage in, garbage out" opinions about relevant markets. *See Menasha Corp.*, 354 F.3d at 665–66 (Seventh Circuit affirmed exclusion of Warren-Boulton's proposed relevant market because "it is the assumption, and not the events under study, that ends up 'defining' the market"). The *Daubert* defect here is also comparable to Warren-Boulton's flawed analysis of proposed markets that ignored relevant evidence, which prompted the federal courts in New York and North Carolina to exclude his opinions. *See Reed Construction Data*, 49 F. Supp. 3d at 405–07 (excluding Warren-Boulton's "insufficiently scientific" non-expert "judgments" that he purported to make as a matter of common sense; he tried to pool national and local pricing data in a way that drove the conclusions his model reached); *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 385–86 (excluding Warren-Boulton's opinion contending the tobacco company defendant had market power because it "ignores the relevant evidence" about declining tobacco sales, the plaintiffs' ability to compete, and their excess capacity, which prevented the defendant from charging prices above a competitive level); *Bepco*, 106 F. Supp. 2d at 824 (excluding Warren-Boulton's proposed narrow market, which did not encompass all interchangeable substitutes; Warren-Boulton also failed to offer any analysis of market share in the proposed market; court held his opinions about market power were unreliable).

### 2. Warren-Boulton's Opinion Purporting to Discern "Direct Evidence" of Market Power from Johns Manville's Calsil Pricing Lacks a Reasonable Generally Accepted Methodology.

Warren-Boulton's opinion purporting to discern "direct evidence" of market power by Johns Manville should also be excluded as unsupported and unreliable. His contention that Johns Manville's current calsil prices prove the existence of monopoly power was not formulated based

on a reasonable, widely accepted methodology.  The *Daubert* defect with Warren-Boulton's purported calculations of "direct evidence" is comparable to his inaccurate, unsupported analysis of pricing and price effects to attempt to prove market power, which prompted the Seventh Circuit and federal courts in Georgia and New York to exclude his opinions.  *See, e.g.*, *Menasha Corp.*, 354 F.3d at 666 (Warren-Boulton's marginal-cost analysis "proved nothing" because he made unreasonable assumptions to try to measure the defendant's costs, which overlooked relevant costs including wages and commissions of a large sales and service force and other expenses tied to the capital invested in the business); *Engelhard*, 970 F. Supp. at 1465 (excluding Warren-Boulton's market analysis for proposed merger as unreliable because he analyzed relative prices for substitute products in both competitive and non-competitive applications, and failed to present a reliable analysis of reasonably interchangeable alternatives); *Reed Construction Data*, 49 F. Supp. 3d at 397, 405–07 (excluding Warren-Boulton's "price effect" hypothesis, and non-expert "judgments" and analysis of pricing data, which he manipulated to drive the conclusions in his model).

Here, Warren-Boulton claims to discern such "direct evidence" from three assertions:

- The fact that TPS decided from 2018–2020 to sell its calsil imported from China for 25–32% less than Johns Manville's American-made calsil,  Ex. 1 at 9–10;

- Johns Manville's accounting margins on calsil are higher than some insulation materials it sells,  Ex. 1 at 10–12; and,

- Because (as Warren-Boulton contends) Johns Manville has earned higher accounting margins on certain sales for calsil delivered to outside the United States,  Ex. 1 at 12–13.

      a.      **Warren-Boulton Lacks an Accepted Methodology for His Analysis of Johns Manville's Calsil Prices and Accounting Margins.**

The Court should exclude Warren-Boulton's result-driven assessment of Johns Manville's accounting margins and supposed profitability as an inherently unreliable methodology under

*Daubert* because it is not generally accepted among courts and antitrust experts.  *See, e.g., Richter*, 185 F. Supp. 3d at 1274.

There is no consensus among courts or antitrust experts accepting Warren-Boulton's proposed methodology to discern so-called "direct evidence" of market power from accounting margins compared to other products, or based on a comparison to prices charged for American-made materials vs. those imported from China.  Instead, the opposite is true.  In a recent decision from the Northern District of California, for example, the court held that it cannot find that Apple is a monopolist based on its "considerable market share" or its "extraordinarily high profit margins," noting "these factors alone do not show antitrust conduct" and that "[s]uccess is not illegal."  *See Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR, 2021 WL 4128925, at *2; *see also id.* at *95 (N.D. Cal. Sept. 10, 2021) (quoting *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011)).  Courts, in fact, have long recognized that a high profit margin standing alone does not prove monopoly power.  *See, e.g.*, *Comcast v. Behrend*, 569 U.S. 27, 38 (2013) (supracompetitive pricing may not be attributable to anticompetitive conduct); *see also Menasha Corp.*, 354 F.3d at 665–66 (Seventh Circuit holding Warren-Boulton's price analysis proves nothing because the assumption ends up defining the market).

Antitrust experts similarly caution that "[accounting] profit margins do not reliably indicate market power."  *See* R. Bork & J. Sidak, *The Misuse of Profit Margins to Infer Market Power*, 9 Journal of Competition Law & Economics 511, 512 & n.6, 513 (2013) ("most jurisdictions do *not* consider high profit margins to constitute evidence of market power"; "[d]irect evidence of substantial market power, such as a firm's profitability, is not frequently used in single firm conduct cases").  The late Judge Robert Bork explained in his article how "supracompetitive"

profits may result from numerous factors other than market power, such as superior management and industries with high sunk investments. *Id.* at 512.[12]   Judge Bork notes that high profit margins are consistent with a dynamically competitive market. *Id.*

The Areeda antitrust treatise explains that economists seeking to infer power from excess returns or accounting data seek to measure *economic* returns, not accounting returns, and such returns are difficult to detect. *See* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 516 (5th ed. 2021).   As a result, "[t]he strictness of these requirements greatly limits the usefulness of such methodologies." *Id.* ¶ 516a.   Areeda explains that, although some economists historically sought to infer market power from accounting data, other economists "believe 'examination of absolute or relative accounting rates of return to draw conclusions about monopoly profits is a totally misleading enterprise.'" *Id.* ¶ 516f.1.   Commenting on use of a price-cost margin ("Lerner Index") the Areeda treatise notes that:

> If market power were to be measured by price-cost margins, we suggest particular caution to ensure that apparent high margins do not include a merely competitive return on fixed-cost investments that is necessary if the firm is to stay in business.

*Id.* ¶ 516g.

Warren-Boulton's analysis purporting to evaluate Johns Manville's profit margins on calsil, including through a comparison of other insulation materials it sells—materials he contends are in a separate "product market" and do not compete with calsil, Ex. 1 at 10–12—does not provide reliable proof from which the jury could find that Johns Manville has monopoly power selling its calsil.   Warren-Boulton makes no attempt to control for differences that might affect the

---

[12]   With two old factories manufacturing calsil in Fruita, Colorado and Ruston, Louisiana, Johns Manville's calsil business represents a business with high sunk costs. *E.g.,* Ex. 7.c: D. Skelly (Johns Manville corp. rep.) Dep. at 67:16-68:4.

cost and accounting margins for the benchmark materials he uses for his comparison. Instead, Warren-Boulton makes unreasonable assumptions that drive his conclusions—just like he did in the many cases where courts have rejected his opinions. The report from Johns Manville's expert economist, Mark Israel, explains why Warren-Boulton's comparisons of accounting margins do not prove Johns Manville is charging supracompetitive prices for calsil or has market power. *See* Def. Ex. 4 at 23–28, 29–36.

Warren-Boulton's comparisons of Johns Manville calsil prices with TPS calsil prices, and his comments about price margins for sales outside the United States, suffer from the same lack of a generally accepted methodology and should similarly be excluded.

### b.    Warren-Boulton's Analysis of Purported "Supra-Competitive" Prices Without Proof of Restricted Output Is Not Reliable.

The type of "direct evidence" the Supreme Court says can serve as evidence of market power (in matters involving horizontal restraints) is proof of actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market. *American Express*, 138 S. Ct. at 2284. Warren-Boulton's Report does not analyze either reduced output or decreased quality for calsil. He claims to analyze current calsil prices (not "increased prices") based on TPS's selling price and Johns Manville's accounting margins.

Courts hold that a plaintiff purporting to prove "supracompetitive" prices must also demonstrate restricted output because a seller cannot charge an excessive price unless output is also restricted. "Indeed, to prove monopoly power directly, supracompetitive pricing must be accompanied by restricted output." *Epic Games, Inc.*, 2021 WL 4128925, at *1, *94–95; *see also Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (direct evidence requires "evidence of restricted output and supracompetitive prices"); *Buccaneer Energy (USA)*

*Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1312 (10th Cir. 2017) (evidence from plaintiff's expert that gas output actually increased during the years following its exclusion disproved alleged "direct evidence of actual anticompetitive effects"); *Mylan Pharm. Inc. v. Warner Chilcott Public Ltd.*, 838 F.3d 421, 434 (3d Cir. 2016) (to support claims of direct evidence of supracompetitive prices, a plaintiff must show that defendant had both abnormally high price-cost margin and that it restricted output). Thus, Warren-Boulton's methodology to study Johns Manville's calsil prices fails to identify any restricted calsil output. *Cf.* Ex. 7.c: D. Skelly (Johns Manville corp. rep.) Dep. at 22:16-26:5 (describing "long gradual decline" in calsil sales since 1980 because of decline with petrochemical refining, trend away from coal and oil-fueled power plants, and competition from other insulation materials including mineral wool and aerogel; "there are two North American plants that produce calcium silicate today that are not fully utilized" (23:2-4).

This particular flaw with Warren-Boulton's analysis is comparable to the reason the court excluded Warren-Boulton's opinions in *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 386. In that case, the court excluded Warren-Boulton's opinions because of his failure to recognize how excess capacity in the tobacco market prevented R.J. Reynolds from charging supracompetitive prices. *See id.* This Court should similarly exclude Warren-Boulton's opinions because of the lack of reasoned analysis of so-called "direct evidence" based on calsil pricing.

### c. The Comparison to TPS's Pricing Does Not Reflect a Reliable Methodology.

Warren-Boulton's contention that the price difference between Johns Manville and TPS calsil sale prices provides "direct evidence" Johns Manville has monopoly power, Ex. 1 at 9–10, lacks a reasonable methodology. Warren-Boulton's conclusion is driven by the mistaken, unstated assumption that customers should be willing to pay nearly the same price for the calsil TPS imports

31

from China.  That assumption overlooks rational reasons why customers would pay less for, or be less willing to purchase, unfamiliar imported insulation material marketed by a start-up entity (TPS) with almost no infrastructure, and limited customer support and U.S. warehouse capacity (where large quantities must be shipped from China with uncertain shipping and delivery times). As TPS President, David Shong, succinctly explained at his deposition:

> TPS also has a motto.  We say, "Fast and cheap don't ride on the same truck."  So you can't get the best price on three truckloads of three-by-two unless you're willing to wait for it.  We can get you a small amount of three-by-two to get you started but I'm not going to carry three truckloads in stock.

Ex. 7.d D. Shong (TPS Corp. Rep. Dep.) at 236:25–237:6.

The fact that the BEC factory in China where TPS purchases its calsil has been shut down for nearly all of 2021 illustrates the unreliability of TPS's start-up business.  Distribution International, the large insulation distributor TPS signed up to purchase TPS calsil put a "pause" on promoting TPS calsil and has stopped purchasing it while the factory ahs been closed down. Ex. 7.a (Hlavenka/DI Dep.) at 70:6-17 (BEC closing its factory "limited our ability to sell the TPS product and take projects"; "we would no longer take projects with TPS until they opened a new factory"; "we put it on pause, basically").  Given TPS's demonstrated lack of a reliable calsil supply for an entire year during 2021, how can it be reasonable for Warren-Boulton to assume customers would not expect a discount when buying TPS calsil?

Warren-Boulton's Report ignores these inherent differences between TPS's imported calsil and Johns Manville's domestic calsil.  The alternative assumption is that customers expect to pay less for TPS's imported calsil than the American-made calsil, manufactured and stockpiled in Colorado and Louisiana by Johns Manville, a well-established, trusted, reputable company with nationwide infrastructure, a strong sales team and marketing group and large customer support

team, which sells a range of industrial insulation materials.  *See* Ex. 4 at 28–29.  Warren-Boulton assumes a false equivalence.

In addition, Warren-Boulton's conclusion seeks to declare Johns Manville a monopolist based on factors that have nothing do with actions it has taken.  Why should the fact that BEC can manufacture, and TPS can import, "cheap" calsil from China prove that Johns Manville has monopoly power for calsil it manufactures in Colorado and Louisiana in legacy plants paying American wage rates?  Warren-Boulton cannot contend U.S. customers have no substitutes for Johns Manville's calsil when he refuses to analyze possible substitutes.  If TPS had decided to charge the same price for its calsil that Johns Manville charges (allegedly 25–32% more), or if TPS's cost of bringing shipping containers across the Pacific Ocean rose dramatically (as it has during 2020-21 during the current "supply chain" crisis, then the alleged proof of monopoly power Warren-Boulton observes goes away.  Direct evidence of monopoly power by Johns Manville should not depend on random factors like the cost of manufacturing calsil in China, or shipping it from China, or the price or profit margin TPS chooses to set for its sales of an unreliable supply of imported calsil.

> **d.**    **The Parties Did Not Conduct Discovery on Competitive Conditions Outside the United States and Warren-Boulton's Comparison to Sales Outside the United States Is Not Reliable.**

The Court also should exclude as unreliable Warren-Boulton's speculative attempt: a) to calculate Johns Manville's accounting margins on sales of calsil in the United States compared to selected sales exported to other countries; and b then point to that speculative calculation as supposed direct evidence of monopoly power.  Ex. 1 at 12–13.  A number of reasons support excluding this "analysis."  First, Warren-Boulton does not purport to analyze factors affecting

calsil sales in other countries.  Second, TPS's complaint alleges nothing about sales outside the U.S.  In general, actions that affect only U.S. exports and cause little or no injury within the U.S. fall outside the reach of the Sherman Act.  Areeda & Hovenkamp, *supra*, ¶ 272h.  And third, the parties did not conduct discovery about competitive conditions for sale of American-made industrial insulation exported to other countries.  Therefore, neither TPS nor Warren-Boulton can base their antitrust liability arguments on actions involving Johns Manville's calsil exports, which fall outside this Court's jurisdiction.

Warren-Boulton's analysis makes no effort to investigate or control for differences in competition among different countries compared to the United States.  *See* Ex. 5 at 21–22.  This lack of analysis marks a flawed, unreliable methodology where conclusions are based on Warren-Boulton's assumptions, not facts.

A federal court in New York recently excluded under *Daubert* testimony from an economist about a proposed merger seeking to offer opinions comparing U.S. and foreign markets, including in Canada and Europe.  *State v. Deutsche Telekom AG*, 419 F.Supp.3d 783, 787–88 (S.D.N.Y. 2019).  The court agreed with the defendant's argument that evidence of mergers in foreign markets would risk time-consuming mini-trials regarding the comparability and relevance of those foreign mergers.  It held that "numerous salient factors, including market structure, consumer demographics, regulatory frameworks, and infrastructure may differ significantly and likely yield only an apples-to-oranges comparison."  *Id.* at 788.

In addition, Warren-Boulton has misrepresented the actual data about Johns Manville's sales of calsil delivered outside the United States.  The data shows the opposite of his conclusion—

that Johns Manville's accounting margins for calsil delivered to other countries often are higher than margins for sales within the U.S.  *See* Ex. 4 at 23 (Figure A).

Because of the lack of discovery on sales outside the United States, and because Warren-Boulton conducted an unreliable analysis of the small amount of export data he received from Johns Manville, the Court should exclude all Warren-Boulton opinions about insulation sales outside the United States.

3.     **Warren-Boulton's Damage Estimate Fails to Disaggregate Harm to TPS From Lawful Competition and Filter Out the Effects of Other Factors That Harmed TPS's Business.**

TPS must limit its antitrust damage claim only to damages attributable to specific anticompetitive conduct.  Yet the Warren-Boulton damage model does not identify each specific unlawful action on which damages are claimed (e.g., specific lost TPS sale(s) of calsil because of specific instances of tying products to block a sale, or lost TPS sales to Distributor X in 2018 because of alleged unlawful threats).  The model ignores TPS's mandatory obligation to disaggregate alleged antitrust damages.  The failure makes Warren-Boulton's task easier because he can base TPS's damage claim on vague unstated assumptions and fuzzy analysis—the same problems that warranted excluding his opinions in other cases, *see supra* Section II.B—rather than address the reality that TPS lacks evidence to prove any specific antitrust violation.

The jury cannot award damages for the results of lawful competition or other factors that harmed TPS's business.  "[A]ny part of the plaintiff's loss that is due to the lawful business practices of the defendant should not be part of the damages award."  Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 392g (5th ed. 2021) ("[It is] useful to view the disaggregation requirement as flowing from the fact that the defendant

engaged in multidimensional conduct that adversely affected the plaintiff's fortunes, but that some of that conduct was lawful.")   The only way disaggregation is not necessary is "if all the defendant's conduct is unlawful."   *Id.*   But it is risky for a plaintiff not to disaggregate "because that creates an all-or-none situation with respect to recovering damages.   Plaintiffs that cannot meet that burden may simply be out of luck."   *Id.*   In addition, disaggregation requires a damage model that attributes damages to each count.   *Id.*   Here, that would require Warren-Boulton to provide the jury with tools in his model to assess damages for each of TPS's four separate antitrust theories:   tying, "refusal to supply," exclusive dealing, and product disparagement.   *See Chase Mfg.*, 2020 WL 1433504 at *10–13.   But that level of precision in the damage model would only draw attention to TPS's lack of evidence to prove any of those antitrust theories.

Conceptually separate from disaggregation, an antitrust plaintiff's damage calculation also "must control for exogenous factors that also have an adverse impact on the plaintiff's economic condition."   Areeda ¶ 392g.   The damage estimate must "filter out the effects of the plaintiff's own inefficiencies."   *Id.*   This principle bars "speculation due to a failure to control for factors that are extraneous to the antitrust dispute.   This is a failure to satisfactorily estimate the plaintiff's 'but for' condition rather than a failure to disaggregate."   *Id.*

The Supreme Court recently addressed the disaggregation obligation in *Comcast v. Behrend*, 569 U.S. 27, 36–38 (2013), and rejected a damage model that failed to disaggregate.   An antitrust damage model based on multiple liability injury theories must allow the jury to measure damages, if any, for each separate theory of antitrust injury, rather than conflate damages for all injury theories.   *See id.* ("the model failed to measure damages resulting from the particular antitrust injury" on which the defendant's liability is premised; it did not "tie each theory of

antitrust impact to a calculation of damages").  In *Comcast*, the plaintiff asserted four theories of antitrust impact, and the plaintiff's "but for" damage model assumed "a market that contained none of the four distortions" attributed to the defendant's unlawful actions.  *Id.* at 36.  The damage expert admitted his "model calculated damages resulting from 'the alleged anticompetitive conduct as a whole' and did not attribute damages to any one particular theory of anticompetitive impact." *Id.* at 36–37.  The expert's model purported to calculate "supra-competitive prices" but failed to "bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to" the one valid antitrust theory.  *Id.* at 38.  Rejecting that approach, the Court explained:  "Prices whose level above what an expert deems 'competitive' has been caused by factors unrelated to an accepted theory of antitrust harm are not 'anticompetitive' in any sense relevant here."  *Id.* at 38.

Thus, an antitrust plaintiff has the "initial burden to show that its injuries are due to unlawful anticompetitive conduct," which includes "the duty to disaggregate damages which are attributable to lawful conduct. . . ."  *In re Independent Serv. Org. Antitrust Litig.*, 85 F. Supp. 2d 1130, 1153, 1157 (D. Kan. 2000) (granting summary judgment for failure to disaggregate damages)).  "To meet its burden to disaggregate, plaintiff must provide the fact finder a reasonable basis upon which to estimate the amount of losses caused by lawful factors."  *Id.* at 1153.

The Report opted <u>not</u> to present a disaggregated damage model that attributes damages to specific (alleged) unlawful actions by Johns Manville.  The model also fails to take into account the many problems TPS has faced selling calsil, which have nothing to do with Johns Manville. Warren-Boulton claims to base liability on so-called "direct evidence" of supra-competitive prices by Johns Manville.  *See supra* Sections III.C, III.D.2.  But that approach runs afoul of the same

problem highlighted in *Comcast*.   Warren-Boulton has no way to attribute Johns Manville's alleged supra-competitive prices for calsil to any specific anticompetitive action.   Instead, he defers to TPS's counsel to "provide direct evidence [i.e., different "direct evidence" than pricing] of Johns Manville's taking adverse action against customers" who did business with TPS, and offers no guidance for the jury in his damage model about which damages are attributable to such unidentified direct evidence.   Ex. 1 at 15.

Thus, the Court must exclude the Warren-Boulton damage model for failure to disaggregate damages flowing only from anticompetitive conduct, and failing to account for the weaknesses with TPS's business model, which have nothing to do with Johns Manville's actions. Because Warren-Boulton's model takes an all-or-nothing approach to damages, TPS gets nothing. The Report purports to hold Johns Manville responsible for the entire difference between TPS's actual sales since 2018 and Warren-Boulton's unsupported projection that TPS should have grown rapidly to be selling 29% of calsil in the U.S. by January 2021, continued at 29% during 2021 even with the BEC factory in China closed for nearly all of 2021, and then climbed even higher to 40% by 2023.   *See* Ex. 1, Figure 18 (TPS "But-For" Market Share on which damage calculation is based).   In the real world, TPS's actual sales were limited by marketing mistakes and self-inflicted wounds for which TPS cannot blame Johns Manville.[13]   Warren-Boulton's selection of the

---

[13]   A few examples of TPS's business weaknesses that limited its sales include:

TPS's "naïve" exclusive distribution strategy:   TPS adopted a "go to market" strategy in 2018 where it rushed to sign exclusive distribution agreements within the first six weeks with insulation distributors, ultimately enlisting some distributors for large territories who did not promote or sell effectively.   David Shong of TPS admitted this strategy was "a little bit naïve."   Ex. 7.d: D. Shong (TPS Corp. Rep.) Depo. at 271:10–273:24.

projected sales levels of 29% and 40% represent extreme speculation and arbitrary guesswork untethered to any analysis of market power in a properly defined relevant market or specific anticompetitive actions based on foreclosure of a certain portion of a properly defined industrial insulation distribution market.

TPS cannot simply elect to take the risk of going to trial on an all-or-nothing damage claim because TPS cannot credibly claim that all of Johns Manville's actions in the industrial insulation market since 2018 have been unlawful.  Indeed, on the basis of this *Daubert* motion, TPS cannot proceed to trial on any of its four theories, much less all of them.  It cannot prove:  (1) tying (without proper definition of a tying product market or market power within that market), (2) "refusal to supply" (without proper definition of a relevant market in which a "refusal to supply" would be unlawful); (3) exclusive dealing (without identification of a relevant market and significant foreclosure of competition within that market); or (4) disparagement (without

---

BEC factory in China closed for 2021:  TPS lost a full year of calsil sales during 2021 because it had no factory in China to produce calsil.  TPS knew from 2018 that BEC would have to close its existing calsil factory in Shanghai.  BEC closed that factory in early 2021 but had not opened its new factory and resumed calsil shipments to the U.S. as of November 2021.

Largest U.S. distributor put TPS sales on "pause" for 2021:  During 2021 with the BEC factory closed, the largest U.S. distributor, Distribution International, which started stocking TPS calsil in the middle of 2020, stopped taking projects with TPS calsil for its customers.  Ex. 7.a: Hlavenka Depo at 70:2–17 ("we put it on pause, basically").

TPS's one-person calsil sales force (David Shong) lacked resources to market some regions; TPS focused its calsil marketing efforts on the western U.S. where it had historically sold its pipe supports.  Ex: 7.d: D.Shong (TPS Corp. Rep.) Depo. at 175:7–176:3.

Built-in delays for large orders because of limited TPS warehouse capacity:  Customers seeking large quantities of TPS calsil must plan for long shipping times from China.  TPS lacks warehouse capacity to stockpile calsil for sale in the United States except for limited warehouse space (totaling 21,050 square feet) in Stanwood, WA and Las Vegas, NV.  TPS Response to Interrogatory No. 17, at 12–13 (Jan. 28, 2021).  This limits its ability to fill large quantity orders.  *See* Def. Ex. 4 at 68–74 (discussing limitations on TPS growth from  market factors unrelated to Johns Manville).

explanation of specific unlawful disparaging statements that caused TPS harm in some relevant market).

Instead, the cases requiring disaggregation, including *Comcast*, require a damage expert to provide specific guidance to the jury on how to calculate damages attributable to specific anticompetitive actions that the jury decides are unlawful, and exclude damages from flaws with the plaintiff's business.  Thus, Warren-Boulton cannot simply declare that Johns Manville calsil prices are above what he deems to be a "competitive" level and then seek damages for TPS without connecting specific unlawful actions with particular harm to TPS.  Warren-Boulton's model does not allow the jury to reduce the damage calculation in a principled way to take account of lawful, competitive factors.

Therefore, the Court should bar Warren-Boulton's opinions about TPS's alleged damages.

### 4. Warren-Boulton's Damage Estimate Fails to Identify Any Specific Damages Attributable to Alleged False Advertising.

Similar reasoning applies to  limit damages for TPS's Lanham Act/false advertising claim. "To establish the injury element of a false advertising claim under the Lanham Act, a plaintiff 'must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff.'"  *Vitamins Online, Inc. v. HeartWISE, Inc.,* No. 2:13-cv-00982-DAK, 2019 WL 6682313, at *12 (D.Utah Sept. 24, 2019)  (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)).

Warren-Boulton's damage calculation makes no attempt to identify damages attributable to any specific false or misleading statements by Johns Manville.  Therefore, the Court should bar Warren-Boulton from offering any opinion about damages for that claim, and dismiss the claim.

5.     **The Court Should Exclude Warren-Boulton's But-For Damage Estimate as Too Speculative.**

Besides the failure to disaggregate damages from lawful and anticompetitive actions, the Warren-Boulton damage model also should be excluded as too speculative to present any rational damage claim to the jury.  Warren-Boulton's Report does not cite any evidence that Johns Manville took any adverse action against any insulation distributor that prevented it from purchasing TPS insulation, and instead, the evidence shows TPS sold its imported calsil to all the distributors it targeted as potential customers during the timeframe of the alleged threats.  *See* Ex. 4 (Israel Report) at 56- (Paras. 110-127 & Fig. G1-G6).   Thus, Warren-Boulton lacks a reasonable foundation to support any damages.

The *Daubert* defect here is comparable to Warren-Boulton's inaccurate, unsupported analysis of damages, which prompted the federal court in New Jersey to exclude his opinions.  *See Material Technologies, Inc.*, Slip Opinion at 38-39 (attached as Ex. 2) (excluding four of Warren-Boulton's damage scenarios because they relied on unsupported assumptions about what the plaintiff's product could achieve; court also excluded fifth damage scenario because it was "contrary to established fact" that will not be open to dispute at trial).

Although court decisions tolerate lack of mathematical certainty in estimating the amount of antitrust damages, the jury cannot be asked to speculate on damages.  *See* Areeda & Hovenkamp, ¶ 392a.  If a plaintiff's damage evidence "permits no more than pure speculation and guesswork," the damage evidence is insufficient as a matter of law.  *Home Placement Service, Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1205, 1212 (1st Cir. 1987) (quotations omitted) (evidence insufficient to support more than nominal damages); *see, e.g.*, *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 806–07 (9th Cir. 1988) (trial court properly excluded expert's damage

studies as too speculative, based on unwarranted assumptions with little or no basis in the record).

Warren-Boulton uses what courts call a "before-and-after model" to estimate TPS damages in a so-called "but for" world absent unlawful conduct. While that method can be valid, Warren-Boulton's model is not. It suffers from assumptions that are unsupported and contrary to record evidence.

Unsupported Projected Calsil Sales: Warren-Boulton does not cite a reasonable factual basis or benchmark for his projection that TPS would have reached 29% or 40% of U.S. calsil sales in a "but-for" world absent the unlawful conduct by Johns Manville (that Warren-Boulton fails to identify). Ex. 5 at 4–13. These projections represent unsupported assumptions detached from the facts of this industry or dispute. Warren-Boulton does not identify any company that started importing insulation material to the United States from China or any other country, which achieved such substantial sales within five years, much less 29% or 40% of total U.S. sales for that material. That level of success for a new broker-type entrant in the industrial insulation industry is unprecedented.

TPS's Projected Calsil Price and Profit Margin: Warren-Boulton's damage model makes unreasonable assumptions that TPS would be selling its calsil at only 10% less than Johns Manville's price, ignoring the factors, including long lead-times from an unreliable start-up seller, and lack of customer support, that make TPS calsil less attractive to customers. This assumption contradicts the price difference of 25–32% Warren-Boulton calculates in the actual world. *See* Ex. 5 (Orszag Report) at 13.

Warren-Boulton also makes unreasonable assumptions about the pricing and profit margin for Johns Manville calsil in the "but-for" world, which supposedly would allow TPS to earn a

substantial profit margin as well.  Talking out of "both sides of his mouth," to manufacture a large TPS damage claim, Warren-Boulton pegs TPS's future calsil sale prices and profit margins in a competitive "but for" market to slightly below the supposedly excessive/"supracompetitive" calsil prices and profit margins Johns Manville currently charges in the real world.  Warren-Boulton also assumes TPS will not incur substantial additional warehouse, transportation, and marketing expenses to ramp up from its current sales volumes to meet 29% or 40% of U.S. calsil demand selling imported insulation from China.

Thus, Warren-Boulton's unsupported assumptions drive his large damage calculation but conflict with his conclusions elsewhere in his report.  Correcting these unsupported assumptions substantially reduces Warren-Boulton's damage calculation.  *See* Ex. 5 (Orszag Report) at 17 (table).  This demonstrates that his calculation is speculative, unreliable, and tied to unsupported assumptions—a common theme for his expert opinions.  The Court should exclude the model to prevent jury speculation.

TPS Fails to Account for Its Costs to Achieve the Projected Sales:  The Court also should bar Warren-Boulton's damage model because he fails to account for the substantial, additional TPS variable costs for sales and warehousing that would necessarily accompany the dramatic increase in calsil sales he projects.  The missing extra costs that Warren-Boulton ignores are summarized in detail by Johns Manville's expert.  *See* Ex. 5 (Orszag Report) at 18–30.  Correcting these errors reduces his damage estimate by at least 37%, demonstrating his report does not provide a reliable, nonspeculative tool for the jury to estimate actual damages.  *See id.* at 30.

### 6.  The Court Should Disallow Warren-Boulton's Claim for Prejudgment Interest.

The Clayton Act, 15 U.S.C. § 15(a), does not allow prejudgment interest in addition to

treble damages in the circumstances present here.  *See Auraria Student Housing v. Campus Village Apartment*s, No. 10-cv-02516-WJM-KLM, 2014 WL 4651643 at *3–4 (D. Colo. Sept. 18, 2014) (barring prejudgment claim labeled as present value calculation).  To obtain prejudgment interest, TPS would have to file a motion demonstrating that Johns Manville asserted defenses lacking in merit, for delay or in bad faith; engaged in conduct warranting sanctions for dilatory behavior; or engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost.  15 U.S.C. § 15(a).  TPS has not made, and cannot make, those assertions in good faith.  Therefore, the Court should bar Warren-Boulton's claim for prejudgment interest (labeled as a "present value" calculation).

**D.     TPS Cannot Supply Missing Expert Opinions for Its Case-in-Chief Elements Through Deposition Testimony or A "Rebuttal" Report**

TPS gets one shot in its expert report to support its case-in-chief.  Warren-Boulton cannot come back and fill in the many critical gaps in his analysis noted in this motion in a "rebuttal" report or in future deposition testimony.  It was extremely costly (over one million dollars) for Johns Manville's experts to prepare their timely two reports in response to the Warren-Boulton Report, which were served on TPS on November 20, 2021.  Another round of expert disclosures would add enormous costs to defending against TPS's claims and merely stall the dismissal of claims that TPS cannot prove with either expert opinions or facts in the discovery record.

Rule 26(a)(2) expert reports "'must be detailed and complete' and state 'the testimony the witness is expected to present during direct examination.'"  *See, e.g.*, *Cook v. Rockwell Intern. Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006) (quoting Fed. R. Civ. P. 26 1993 advisory committee's note).  The expert report must be produced by the court-ordered deadline.  *Id.* "Permissible supplementation under the Rules [ ] means correcting inaccuracies, or filling the

interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Id.* (quotations and citations omitted).  "A supplemental expert report that states additional opinions or rationales or seeks to 'strengthen' or 'deepen' opinions expressed in the original expert report exceeds the bounds of permissible supplementation and is subject to exclusion under Rule 37(c)." *Id.* (citations omitted).  To allow otherwise would add enormous litigation costs and challenges to trial preparation, with successive supplements and responses shortly before trial, and would prejudice parties who were not able to timely review and respond to an opposing experts' opinions. *See Beller ex rel. Beller v. United States*, 221 F.R.D. 689, 695 (D. N.M. 2003) (reasoning that allowing supplements that expand on prior reports "would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given"); *Cook*, 580 F. Supp. 2d at 1169 (citing *Beller* and adding "[t]his result would be the antithesis of the full expert disclosure requirements stated in Rule 26(a)").  For example, in *Jacobsen v. Deseret Book Co.*, 287 F. 3d 936, 953–54 (10th Cir. 2002), the Tenth Circuit affirmed the decision to exclude incomplete, preliminary expert reports because the reports did not provide the plaintiff with notice of the substance of the experts' testimony, and "it appears likely the experts' testimony at trial will contain substantially more information than was presented in the expert reports."  *See also Henderson v. Nat'l R.R. Passenger Corp.*, 412 F. App'x 74, 81 (10th Cir. 2011) (excluding an expert's 197-page "supplemental" report as untimely because it was filed "eight days before the discovery deadline, six months after the Rule 26 deadline, and on the same date that [the defendant] moved for summary judgment"); *Luke v. Family Care and Urgent Medical Clinics*, 323 F. App'x

496, 500 (9th Cir. 2009) ("Rule 26(e) [does not] create a loophole through which a party who submits partial expert witness disclosures, or who wishes to revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein, can add to them to her advantage after the court's deadline for doing so has passed.").

In addition, experts are limited to testifying at trial about opinions disclosed in their report. "[E]very expert will be strictly limited to what has been disclosed in his report.  The fact that an opinion might have been given in a deposition or otherwise does not change this.  If it's not in the report, it will not be permitted." *Knapp Logistics & Automation, Inc. v. R/X Automation Solutions, Inc.*, No. 14-cv-00319-RBJ, 2015 WL 5608124, at *1 (D. Colo. Sept. 24, 2015).  This rule allows parties to forgo expert depositions because all the expert's opinions need to be disclosed in the report.  *See, e.g., S.E.C. v. Nacchio*, No. 05-cv-00480-MSK-CBS, 2008 WL 4587240, at *3 (D. Colo. Oct. 15, 2008) (noting that Rule 26(a)(2) Advisory Committee notes suggest a comprehensive expert report may result in an abbreviated expert deposition and in many cases eliminate the need for a deposition).

IV.     **BECAUSE TPS LACKS COMPETENT EXPERT OPINIONS DEFINING PLAUSIBLE RELEVANT PRODUCT AND GEOGRAPHIC MARKETS AND MARKET POWER WITHIN THEM, THE COURT MUST DISMISS TPS'S CLAIMS**

If the Court excludes Warren-Boulton's opinions, it also must dismiss all of TPS's claims because TPS lacks competent expert testimony to establish the core elements of its antitrust and Lanham Act/false advertising claims, and did not timely disclose any witness qualified to present lay opinions necessary to opine on the technical market definition, market power, and damages issues.

46

The Court already confirmed that TPS's tying and monopolization claims require proof of market power in properly defined relevant product and geographic markets.  In addition, TPS's antitrust claims require proof of properly defined, disaggregated antitrust damages and its Lanham Act claim requires proof of particularized damages flowing from specific instances of unlawful disparagement.  *See supra* Section III.C.3 & 4.

The only witness besides Warren-Boulton whom TPS disclosed to present opinion testimony is TPS's President, David Shong.  TPS's September 27, 2021 Rule 26(a)(2) disclosure for Shong did not timely disclose some attempt to have him present opinion testimony about how to measure market power in some relevant product and geographic market.  *See* Ex. 6.  The time has passed for TPS to expand that disclosure of lay opinions.  Nor is Shong competent to offer economic opinions about measuring market power and defining relevant markets.  *See, e.g., Jorgensen v. Ritz-Carlton Hotel Co.*, No. 16-cv-00795-MEH, 2017 WL 3390582 at *3 (D. Colo. Aug. 8, 2017) (a person with experience working as a hotel plumber is not qualified to offer expert opinions about hotel management and maintenance).

Shong has a two-year "AAS" associates degree from Weber State University in "technical sales," took some remote courses in business between 2015–18, and has not finished a bachelor's degree.  *See* Ex. 7.d.1: (Depo. Ex. 114: Shong resume); Shong (Corp. Rep.) Depo. at 13:1–14 (8/16/21).  There is nothing about Shong's education or experience that qualifies him to present lay opinion testimony to the jury about specialized economic issues, including how to measure market power in some relevant product and geographic market.

At least two circuit courts have rejected plaintiffs' attempts to prove relevant markets and market power without presenting competent expert testimony.  *See Kentucky Speedway, LLC v.*

*NASCAR*, 588 F.3d 908, 919 (6th Cir. 2009); *Colsa Corp. v. Martin Marietta Services, Inc.*, 133 F.3d 853, 855 n.4 (11th Cir. 1998).

Courts in the Tenth Circuit recognize the importance of competent expert testimony on market definition in antitrust cases, but they have left open the possibility for qualified lay opinion testimony on market definition. *See Lantec v. Novell*, 146 F. Supp. 2d 1140, 1143 (D. Utah 2001), *aff'd*, 306 F.3d 1003, 1025 (10th Cir. 2002). In *Lantec*, the district court excluded testimony from the plaintiff's economist on the core market definition issues and then evaluated whether the plaintiff had presented competent lay testimony on market definition. *See id.* at 1147–48. It held the non-expert evidence was insufficient. *Id.* at 1148–49 ("[T]here was an absence of evidence from which a reasonable jury could find that a reasonable market, as described by [the plaintiff] exists."). The little evidence the plaintiff's employees presented focused on how they "viewed their own products' market." *Id.* at 1149. The court rejected such "skimpy evidence of the plaintiff's own experiences" as insufficient to establish their alleged relevant world-wide product market. *Id.* at 1149. In addition, the plaintiffs' evidence failed to address issues needed to determine substitutability in the proposed worldwide market. *Id.*

On appeal, the Tenth Circuit in *Lantec* affirmed the district court's decision, holding that if the issue had been preserved for appellate review, the district court properly excluded the plaintiff's expert's testimony. 306 F.3d 1003, 1025 (10th Cir. 2002). The Tenth Circuit also reasoned that, even if the plaintiffs had properly raised the district court's ruling on their failure to establish the relevant geographic market, the plaintiffs had failed to point to any evidence in the record that establishes a geographic market (i.e., price data, or the location and facilities of other producers). *Id.* at 1026–27. *See also Nobody in Particular Presents, Inc. v. Clear Channel*

*Communications, Inc.*, 311 F. Supp. 2d 1048, 1082–83 (D. Colo. 2004) (citing *Lantec*, court concluded that "a plaintiff may, through sufficient evidence of other indicia of market definition, define a relevant market without economic study of cross-elasticity of demand, especially when economic analysis of cross-elasticity of demand is infeasible based on pricing data").

TPS has not timely designated any lay opinion testimony on relevant market power, and TPS therefore cannot establish a key element to its antitrust claims.  Thus, excluding Warren-Boulton's opinions also requires dismissing TPS's claims.

### V.      CONCLUSION

For the reasons explained above, the Court should exclude all of Warren-Boulton's opinions.  Because TPS lacks essential expert testimony to prove its antitrust claims, and failed to identify any specific damages tied to its Lanham Act/false advertising claim, the Court should now dismiss with prejudice all of TPS's claims.

Dated:   December 6, 2021.

Respectfully submitted,

  *s/ Gregory J. Kerwin*
Gregory J. Kerwin
Ryan Bergsieker
Allison Kostecka
Lydia Lulkin

GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO  80202-2642
Telephone:      303.298.5700

Email:  GKerwin@gibsondunn.com
RBergsieker@gibsondunn.com
AKostecka@gibsondunn.com
LLulkin@gibsondunn.com

*Attorneys for Defendant Johns Manville Corporation*

**Defendant's Exhibits**

1.    Warren-Boulton Report (September 27, 2021) (filed as Restricted Level 1).

2.    Unpublished Decision: *Material Technologies, Inc. v. Carpenter Technology Corp.*, No. 01-2965 (SRC), Slip Op. at 3, 36-41 (D.N.J. June 28, 2005) (not available on Westlaw)

3.    Deposition testimony excerpts from Shong and distributor witnesses on calsil substitutes and local and regional, not national, market for calsil (filed as Restricted Level 1).

4.    Mark Israel Expert Report (November 20, 2021) (filed as Restricted Level 1).

5.    Jonathan Orszag Expert Report (November 19, 2021) filed as Restricted Level 1).

6.    TPS Rule 26(a)(2) disclosure (September 27, 2021).

7.    Deposition Excerpts cited in motion and Def. Exhibit 3

    a.    Robert Hlavenka (Distribution International) Depo. excerpts

        Pages 15-16, 44-45, 50-51, 54-55, 65-66, 70, 76-77, 82-85

    b.    Joseph Guest (4-State Supply) Depo. excerpts

        Pages 21-22, 25, 93-94, 102-04, 116-20, 140-42, 146-47, 159-165

        *[4-State designated pp. 21, 94, 103-04, 117-20, 140-42, 146-47, 156-59, 161-65 as Confidential Attorneys Eyes Only" under Stipulated Protective Order, ECF 67].*

        1.    Guest Depo. Ex. 234:  Knauf-4-State CaseStudy

    c.    David Skelly (Johns Manville Corp. Rep.) Depo. excerpts

        Pages 22-26; 67-68

    d.    David Shong (TPS Corp. Rep.) 8/16/21 Depo. excerpts

        Pages 13-14, 165, 175-76; 236-37; 271-73, 368-71

        *[TPS designated pp. 175 lines 20-25, 176 lines 1-15  as Confidential Attorneys Eyes Only" under Stipulated Protective Order, ECF 67].*

        1.    Shong Depo. Ex. 114:  Shong Resume

    e.    David Shong (TPS:  Individual Depo.) 8/17/21 Depo. excerpts

        Pages 35-36, 70-71, 75-76, 258-60, 267-72, 405-09, 429-31

        *[TPS designated pp. 405 line 13, 407 line 13-18, 408 lines 2-8, 20-25, and 409 lines 1-22 as Confidential Attorneys Eyes Only" under Stipulated Protective Order, ECF 67].*

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2021, I electronically filed the foregoing DEFENDANT'S "*DAUBERT*" MOTION TO EXCLUDE OPINIONS FROM PLAINTIFF'S RETAINED ECONOMIST, FREDERICK WARREN-BOULTON with the Clerk of Court using the CM/ECF system.  A copy of this document was served on the following counsel of record for Plaintiff through the Court's ECF system:

Alexandra H. Shear
James Lerner
Jarod M. Bona
Luke Hasskamp
Bona Law PC
375 Park Avenue, Suite 2607
New York, NY   10152
Emails:  Alex.Shear@bonalawpc.com
James.Lerner@bonalawpc.com
Jarod.Bona@bonalawpc.com
Luke.Hasskamp@bonalawpc.com


Geoffrey N. Blue
7350 E Progress Pl., Suite 100
Greenwood Village, CO 80111
Email:  gblue@gesslerblue.com


                              *s/ Loretta Howard*
                              Loretta Howard