THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00872-MEH

CHASE MANUFACTURING, INC., d/b/a
THERMAL PIPE SHIELDS,

Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

Defendant.

---

## JOHNS MANVILLE'S MOTION FOR SUMMARY JUDGMENT DISMISSING ALL PLAINTIFF'S CLAIMS

---

Gregory J. Kerwin
Ryan Bergsieker
Allison Kostecka
Lydia Lulkin
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO  80202-2642
Telephone:    303.298.5700

Email:  GKerwin@gibsondunn.com
RBergsieker@gibsondunn.com
AKostecka@gibsondunn.com
LLulkin@gibsondunn.com

*Attorneys for Defendant Johns Manville Corporation*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF UNDISPUTED FACTS ...................................................... 3

        A.      Tying ....................................................................................................... 3

        B.      False Advertising / Disparagement ...................................................... 6

        C.      Refusal to Supply ................................................................................... 8

        D.      Exclusive Dealing .................................................................................. 9

        E.      Seven Documents Purporting to Establish TPS's *Prima Facie* Case ................. 11

III.    SUMMARY JUDGMENT STANDARD ......................................................... 11

IV.     ARGUMENT ...................................................................................................... 13

        A.      TPS's Tying Claim Fails as a Matter of Law Because TPS Cannot Point to
                Any Admissible Evidence Proving an Actual or Threatened "Tie." ................... 13

                1.      The legal standard for tying under Sections 1 and 2 of the Sherman
                        Act. ........................................................................................... 13

                2.      There is no admissible evidence to support the tying claim plead in
                        the Amended Complaint. ........................................................ 15

                3.      TPS's alternate argument that Johns Manville unlawfully tied calsil
                        to sales of any or all other products fails as a matter of fact and
                        law. ........................................................................................... 17

        B.      TPS's False Advertising Claim Fails as a Matter of Law Because TPS
                Cannot Establish Critical Elements Required for a Lanham Act Claim. ............. 20

                1.      The legal standard for false advertising under the Lanham Act. ............. 20

                2.      There is no admissible evidence that Johns Manville made
                        actionable false statements. .................................................. 21

3.      TPS cannot prove that any allegedly false comments about TPSX-12 were made in connection with "commercial advertising" or "promotion." ................................................................................ 26

4.      There is no evidence that TPS was injured by any alleged false advertising. ................................................................................ 29

C.    TPS's Monopolization Claim Fails as a Matter of Law Because TPS Cannot Prove Actionable Exclusionary Conduct. ............................... 32

1.      The legal standard for monopolization under Section 2 of the Sherman Act ................................................................................ 32

2.      No admissible evidence supports TPS's exclusionary conduct allegations. ................................................................................ 33

        a.      Tying ................................................................................ 33

        b.      Refusal to "Supply" ....................................................... 33

        c.      Exclusive Dealing ........................................................... 38

        d.      Allegedly disparaging comments ..................................... 41

D.    TPS Cannot Prove Any Long-Term Anticompetitive Effects to Competition, an Essential Part of Proving Antitrust Injury at Trial. ................... 45

V.    CONCLUSION ............................................................................ 48

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aerotec Intern'l, Inc. v. Honeywell Intern'l, Inc.,*
   836 F.3d 1171 (9th Cir. 2016) ...............................................................40

*A.L.S. Enterprises, Inc. v. Robinson Outdoor Products, LLC,*
   2017 WL 393307 (W.D. Mich. Jan. 30, 2017) ...........................30, 31, 32

*American Professional Testing Service v. Harcourt Brace Jovanovich Legal And*
   *Professional Publications, Inc.,*
   108 F.3d 1147 (9th Cir. 1997) ...................................................41, 42, 43

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
   472 U.S. 585 (1985) ............................................................................34, 35

*Beal Corp. Liquidating Trust v. Valleylab, Inc.,*
   927 F. Supp. 1350 (D. Colo. 1996) ......................................................15

*Belnap v. Steward Health Care System LLC,*
   2020 WL 619402 (D. Utah Feb. 10, 2020) ..........................................47

*Berken v. Jude,*
   2013 WL 6152347 (D. Colo. Nov. 22, 2013) .......................................21

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.,*
   846 F.3d 1297 (10th Cir. 2017) ...........................................................46

*Buetow v. A.L.S. Enterprises, Inc.,*
   650 F.3d 1178 (8th Cir. 2011) .............................................................22

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ............................................................................12

*Chase Mfg., Inc. v. Johns Manville Corp.,*
   No. 19-cv-00872, 2020 WL 1433504 (D. Colo. Mar. 23, 2020) ...............16, 21, 32, 34, 39, 42

*Cottrell, Ltd. v. Biotrol Intern., Inc.,*
   191 F.3d 1248 (10th Cir. 1999) ........................................................25, 26

*Crocs, Inc. v. Effervescent, Inc.,*
   248 F. Supp. 3d 1040, (D. Colo. 2017)................................................39

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
    504 U.S. 451 (1992)................................................................13, 17, 19

*Fortt v. Artistic Beauty College,*
    2007 WL 2572356 (D. Colo. Sept. 6, 2007) ....................................12, 13

*Four Corners Nephrology Associates, P.C. v. Mercy Medical Center of Durango,*
    2008 WL 2355533 (D. Colo. May 22, 2008)............................................17

*General Steel Domestic Sales LLC v. Chumley,*
    129 F. Supp. 3d 1158 (D. Colo. 2015)....................................................27

*General Steel Domestic Sales, LLC v. Chumley,*
    627 F. App'x 682 (10th Cir. 2015) .........................................................21

*Guidance Endodontics, LLC v. Dentsply Intern., Inc.,*
    663 F. Supp. 2d 1138 (D.N.M. 2009) ...................................................23

*Heideman v. South Salt Lake City,*
    348 F.3d 1182 (10th Cir. 2003) .............................................................12

*Hoffmeister v. Navient,*
    2019 WL 1200812 (D. Colo. Mar. 14, 2019) .......................................12

*Illinois Tool Works Inc. v. Independent Ink, Inc.,*
    547 U.S. 28 (2006)................................................................................14

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.,*
    638 F. App'x. 778 (10th Cir. 2016) .......................................................21

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.,*
    507 F. Supp. 3d 1289 (D. Kan. 2020) ....................................26, 29, 31

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.,*
    --- F. Supp. 3d ---, 2021 WL 2585065 (D. Kan. June 23, 2021) ...............38, 39, 40

*In re: Cox Enterprises,*
    871 F.3d 1093 (10th Cir. 2017) ............................................................14

*Jaramillo v. Colo. Judicial Dep't.,*
    427 F.3d 1303 (10th Cir. 2005) ............................................................18

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde,*
    466 U.S. 2 (1984)................................................14, 15, 17, 19, 46

*JetAway Aviation, LLC v. Board of County Comm.,*
   2012 WL 1044304 (D. Colo. Mar. 28, 2012) ........................................................45

*JetAway Aviation, LLC v. Board of County Com'rs of Cty. of Montrose, Colo.,*
   754 F.3d 824 (10th Cir. 2014) ...................................................................33, 46, 47

*Leegin Creative Leather Prod. Inc. v. PSKS, Inc.*
   551 U.S. 877 (2007) ................................................................................................37

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.,*
   762 F.3d 1114 (10th Cir. 2014) ........................................................................32, 42

*Lexmark Int'l v. Static Control Components, Inc.,*
   572 U.S. 118 (2014)................................................................................................30

*Lorain Journal v. United States,*
   342 U.S. 143 (1951)................................................................................................35

*Marts v. Xerox, Inc.,*
   77 F.3d 1109 (8th Cir. 1996) .................................................................................18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ...............................................................................................12

*New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian*
   *Healthcare Servs.,*
   994 F.3d 1166 (10th Cir. 2021) ............................................................................36

*Nobody in Particular Presents, Inc. v. Clear Channel Comm'ns,*
   311 F. Supp. 2d 1048 (D. Colo. 2004)...................................................................17

*Northern Pacific R. Co. v. United States,*
   356 U.S. 1 (1958) .......................................................................................13, 14, 16

*Novell, Inc. v. Microsoft Corp.,*
   731 F.3d 1064 (10th Cir. 2013) ...........................................................33, 34, 35, 39

*Proctor & Gamble Co. v. Haugen,*
   222 F.3d 1262 (10th Cir. 2000) .................................................................26, 27, 29

*SolidFX, LLC v. Jeppesen Sanderson, Inc.,*
   935 F. Supp. 2d 1069 (D. Colo. 2013), ................................................................15

*SolidFX, LLC v. Jeppesen Sanderson, Inc.,*
   841 F.3d 827 (10th Cir. 2016) ...............................................................................36

*Soucy v. Nova Guides, Inc.,*
   2015 WL 5545347 (D. Colo. Sept. 21, 2015) ...............................................................11, 48

*Sports Unlimited Inc. v. Lankford Enters. Inc.,*
   275 F.3d 996 (10th Cir. 2002) ........................................................................................27, 29

*Suture Express, Inc. v. Owens & Minor Distribution, Inc.,*
   851 F.3d 1029 (10th Cir. 2017) ..........................................................................14, 19, 45, 47

*Thomas v. International Business Machines,*
   48 F.3d 478 (10th Cir. 1995) ....................................................................................................12

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.,*
   709 F. Supp. 2d 821 (C.D. Cal. 2010) ....................................................................................44

*Unijax, Inc. v. Champion Intern., Inc.,*
   516 F. Supp. 941 (S.D.N.Y. 1981).............................................................................................17

*United States v. Microsoft Corp.,*
   253 F.3d 34 (D.C. Cir. 2001)..................................................................................39, 40, 41

*Verisign, Inc. v. XYZ.COM LLC,*
   848 F. 3d 292 (4th Cir. 2017) ...................................................................................................31

*Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004).....................................................................................................................35

*Viamedia, Inc. v. Comcast Corp.,*
   951 F.3d 429 (7th Cir. 2020) ....................................................................................................14

*Vincent v. Utah Plastic Surgery Soc.,*
   621 F. App'x 546 (10th Cir. 2015) ..........................................................................................25

*Vitamins Online, Inc. v. Heartwise, Inc.,*
   2019 WL 6682313 (D. Utah Sept. 24, 2019) ...........................................................22, 24, 30

*Wilco Trading LLC v. Shabat,*
   2021 WL 1146634 (M.D. Fla. Mar. 8, 2021) .........................................................................24

*Wilson v. AdvisorLaw LLC,*
   2018 WL 4932088 (D. Colo. Oct. 11, 2018).......................................................21, 27, 28, 29

*Wilson v. AdvisorLaw LLC,*
   780 F. App'x 649 (10th Cir. Aug. 15, 2019) ........................................................21, 27, 28

*ZF Meritor, LLC v. Eaton Corp.,*
    696 F.3d 254 (3rd Cir. 2012) ....................................................................................38, 39, 40

**Statutes, Rules**

Fed. R. Civ. P. 56 ...........................................................................................................12

Lanham Act, Section 43(a), 15 U.S.C. § 1125(a) ................................................................20, 26

**Treatises**

Areeda & Hovenkamp, *Fundamentals of Antitrust Law* (4th ed. 2021) .........................14, 15, 16

P. Areeda & D. Turner, *Antitrust Law*, (1978) ............................................................41

## I.   INTRODUCTION

Plaintiff Thermal Pipe Shields ("TPS") filed this lawsuit alleging its competitor, Johns Manville prevented TPS from selling calcium silicate insulation in the United States.  But after two and a half years of costly discovery, TPS has *zero* evidence of unlawful, anticompetitive conduct.  The evidence, instead, demonstrates legitimate and robust competition for sales of calsil and other industrial insulation materials in the United States.  The evidence also demonstrates that TPS obtained access to distribution to sell its calsil, but that its own business strategies and BEC's lack of an operating calsil factory in China during 2021 hindered such sales.

The three main groups of exhibits accompanying this motion demonstrate that TPS cannot prove its claims with: 1) internal TPS communications that report or repeat inadmissible hearsay; 2) seven Johns Manville documents that do not prove unlawful actions; and 3) deposition testimony that undercuts TPS's claims.

The bottom line is that Johns Manville did not engage in any illegal, anticompetitive conduct.  Federal antitrust laws do not require Johns Manville to assist a new competitor to gain a foothold in any market.  To the contrary, these laws ensure fair but vigorous competition.  When TPS started selling calsil in the United States in 2018, Johns Manville responded in a manner consistent with those laws.  Johns Manville has now produced more than 100,000 pages of documents in this litigation, and six of its current or former employees testified at depositions. None of the documents or testimony indicates Johns Manville engaged in unlawful conduct.

TPS's allegations focus on its access to insulation distributors and alleged "threats" made to distributors.  TPS received documents from four distributors, and deposed two distributor-representatives.  The scant third-party evidence TPS collected fails to support the allegations in

TPS's Amended Complaint.  Many distributors have been selling TPS calsil and TPS cannot prove its claims despite essentially unlimited discovery from Johns Manville and nonparties.

The time has come to call TPS's bluff.  This litigation should not proceed to trial when TPS lacks admissible evidence to prove key elements for each of its three claims.

**Tying.**  TPS's Amended Complaint alleged Johns Manville "tied" sales of fiberglass pipe insulation and expanded perlite to sales of calsil.  Not a single document or deposition has substantiated these allegations.  In fact, in response to an interrogatory asking TPS to point to specific evidence supporting any alleged "tie," TPS admitted no evidence shows any attempt to tie sales of either fiberglass pipe insulation or expanded perlite to sales of calsil.  Instead, TPS changed its claim to argue Johns Manville tied sales of "any/all of its products" or "any product other than calsil" to sales of calsil.  But TPS still lacks evidence of such a tie, and a tying claim requires two distinct and separate products.  In addition, TPS made no effort to quantify Johns Manville's alleged market power in some tying product markets.

**False Advertising.**  TPS's false advertising claim under the Lanham Act fails for at least four reasons.  First, TPS lacks any admissible evidence indicating that Johns Manville made actionable false or disparaging comments.  Second, the statements that TPS contends were false or misleading are not actionable under the Lanham Act.  Third, TPS's allegations of false and disparaging statements still hinge on a few, sporadic disparaging comments, which does not constitute  commercial advertising or promotion under the Lanham Act.  And fourth, TPS has no evidence that any customer refused to purchase its calsil due to the alleged disparaging comments by TPS.

2

**Monopolization**.  TPS similarly lacks admissible evidence to prove unlawful exclusionary conduct necessary to sustain its monopolization claim.  It alleged four categories of exclusionary conduct: tying, "refusal to supply," exclusive dealing, and trade disparagement.  It cannot point to any evidence of Johns Manville tying sales of fiberglass pipe insulation or expanded perlite to sales of calsil.  TPS's tortured "refusal to supply" allegations do not meet the narrow exception in *Aspen Highlands/Trinko* to pursue a "refusal to deal" claim.  Nor can TPS point to evidence showing Johns Manville ever cut off sales to distributors that purchased calsil from TPS.  There is also no evidence that Johns Manville entered into any express or implied exclusive dealing arrangements with distributors.  And TPS's purported evidence of disparagement fails to overcome the *de minimis* presumption that disparaging comments do not impact competition.  With no evidence to prove exclusionary conduct, TPS's monopolization claim should be dismissed.

**Antitrust injury**. Finally, TPS also lacks evidence of any actual long-term harm to competition, which is necessary to prove the essential element of antitrust injury.

TPS cannot prove its claims with unsubstantiated allegations and inadmissible hearsay.  Accordingly, the Court should grant summary judgment dismissing each of TPS's claims.

## II.     STATEMENT OF UNDISPUTED FACTS

Under D.C. Colo. LCivR 56.1 and Section III.F of Judge Hegarty's Civil Practice Standards, Johns Manville provides the following Statement of Undisputed Facts.

### A.  Tying

1.      There is no admissible evidence that Johns Manville tied sales of its expanded perlite to sales of calsil.

3

<u>Supporting Evidence</u>: Ex. 1-A: Plaintiff's Second Supp. Responses and Objections to Defendant's Interrog. Nos. 8-10, 13, 18 and 21-22, at 8–9 (hereinafter "TPS's 2d. Supp. Resp."); *see also* Ex. 3-H: Johns Manville 30(b)(6) Depo. [Skelly] 229:16–230:10.

2.      There is no admissible evidence that Johns Manville tied sales of its fiberglass pipe insulation to sales of calsil.

<u>Supporting Evidence</u>: Ex. 1-A. TPS's 2d. Supp. Resp., at 8–9; *see also* Ex. 3-H. Johns Manville 30(b)(6) Depo. [Skelly] 230:11–231:5.

3.      There is no admissible evidence that Johns Manville tied sales of *any* or *all* of its insulation materials other than calsil to sales of calsil.

<u>Supporting Evidence</u>: Ex. 1-A: TPS's 2d. Supp. Resp., at 8–9; Ex. 1-B: Chart.

4.      TPS did not disclose expert opinions purporting to quantify Johns Manville's alleged market power in the alleged tying products:  expanded perlite, fiberglass pipe insulation, or any and all of Johns Manville's insulation materials other than calsil.

<u>Supporting Evidence</u>: TPS did not timely disclose expert opinions that establish Johns Manville's alleged market power for either expanded perlite, fiberglass pipe insulation, or any/all of Johns Manville's insulation materials other than calsil.  TPS's retained expert, Warren-Boulton, did not engage in the economic analysis necessary to define a relevant market for expanded perlite or fiberglass pipe insulation, much less market power within a properly defined market, contending that task is unnecessary for his "direct evidence" shortcut.  ECF 136 at 19 ("This is no need, however, to establish that any of these must-have products is a relevant market . . . .").

4

5.      Robert Hlavenka, Senior Vice President of Strategic Sourcing of Distribution International ("DI"), testified that Johns Manville did not threaten to refuse to sell either expanded perlite or fiberglass pipe insulation to DI.

Supporting Evidence:  Mr. Hlavenka was asked whether Johns Manville ever threatened to refuse to sell perlite to DI and he responded "[n]o."  Ex. 3-C: Hlavenka Depo. 85:25–86:16.  Mr. Hlavenka was asked whether Johns Manville ever threatened to not sell fiberglass pipe insulation to DI, and he responded "[n]o, it never did."  *Id.* at 90:23–91:13.

6.      Joe Guest, regional sales manager for 4-State Supply ("4-State") based at its Omaha warehouse, testified that 4-State tries to stock calsil at its Omaha warehouse, not Wichita; and 4-State did not buy either Johns Manville's expanded perlite or fiberglass pipe insulation; instead 4-State's main supplier for fiberglass pipe insulation is Knauf, and its suppliers for expanded perlite have been TPS and SMC.

Supporting Evidence:  Ex. 3-A: Guest Depo. 14:9–16, 26:3–10, 27:21–23, 36:25–37:12, 87:7–13, 142:4–143:15, 217:7–9.

7.      There is no admissible evidence that Johns Manville threatened to not sell its calsil to Specialty Products & Insulation ("SPI") locations that purchased TPS's calsil.

Supporting Evidence:  TPS relies on hearsay about what it was supposedly told by Kyle Romney of SPI.  There is no deposition testimony establishing that this threat occurred.  TPS did not depose Mr. Romney or anyone from SPI.  The documents that TPS cites as proving this incident occurred are inadmissible hearsay.  *See* Ex. 1-B: Chart (citing TPS_0011469) .

8.  There is no admissible evidence that "an unidentified JM representative(s)" told General Insulation that Johns Manville would not sell General Insulation its calsil if General Insulation purchased TPS's calsil.  Ex. 1-A: TPS's 2d. Supp. Resp., at 10–11.

Supporting Evidence:  TPS relies on hearsay about what it was supposedly told by Richard Goupille from Rand Construction about what he heard from Curtis Marmaduke from General Insulation.  *See id.*  There is no deposition testimony establishing that this incident occurred.  TPS did not depose either Mr. Goupille or Mr. Marmaduke, or anyone from either Rand Construction or General Insulation.  The documents that TPS cites as proving this incident occurred are either inadmissible hearsay or do not mention this alleged incident and therefore are not relevant.  *See* Ex. 1-B: Chart (citing TPS_FTC_0000108 and TPS_0031748 through -0031773).

**B.  False Advertising / Disparagement**

9.  TPSX-12 calcium silicate is manufactured by BEC Industrial (Shanghai) Co., Ltd., a Chinese company that manufactured calsil in its factory in Shanghai, China until early 2021 when the factory was permanently closed.  BEC's replacement calsil factory was not completed until December 30, 2021 at the earliest.

Supporting Evidence: Ex. 3-E.i: Depo. Ex. 6 (TPSX-12 Launch Announcement); Ex. 3-F: TPS 30(b)(6) [Shong] Depo. 26:3–11, 95:25–96:3; Ex. 4-B.i: *New BEC Calsil Factory Now Open*, http://calsil-insulation.com/new-bec-calsil-factory-now-open/ (Dec. 30, 2021).

10.  Four of the five alleged instances of "false advertising" or disparagement identified in TPS's Supplemental Interrogatory Responses concern statements purportedly made to representatives from APi; and there is no admissible evidence that proves these four alleged instances occurred.

Supporting Evidence: The documents that TPS cites as proving this incident occurred are either inadmissible hearsay or do not mention this alleged incident and therefore are not relevant. Ex. 1-A: TPS's 2d. Supp. Resp., at 5–6; Ex. 1-B: Chart.  There is no deposition testimony establishing that this incident occurred.  TPS did not depose anyone from APi.

11.    4-State's representative, Mr. Guest, did not report hearing any disparaging comments about TPS calsil from Johns Manville representatives.

Supporting Evidence:  Mr. Guest (4-State) testified that Mr. Meyer did not make "any comments about TPS's product," "suggest the quality of TPS's Calsil was inferior," or "that TPS Calsil may contain asbestos;" and Mr. Guest did not hear concerns about "Chinese materials specifically" from customers.  Ex. 3-A: Guest Depo. 44:11–25.

12.    Mr. Meyer testified that, at the MICA trade show in 2018, he suggested Mr. Guest confirm that the calsil 4-State purchases meets ASTM specifications.

Supporting Evidence: Ex. 3-D: Meyer Depo. 133:1–138:10.

13.    TPS conducted independent testing of TPSX-12, the calsil it purchases from BEC, to assess compliance with the ASTM standards.  TPS also conducted independent testing comparing TPSX-12 to Johns Manville's calsil, Thermo-1200.  TPS prepared data sheets with these results to distribute to prospective customers.

Supporting Evidence: Ex. 3-F.1: Depo. Ex. 127 (TPSX-12 Data Sheet); Ex. 4-B-ii & B-iii.

14.    TPS provided customers and prospective customers copies of independent testing data and ASTM data for its TPSX-12 calsil including to address potential concerns about asbestos.

Supporting Evidence:  Ex. 3-E: Revesz Depo. 194:11–197:14; Ex. 3-F: TPS Rule 30(b)(6) [D. Shong] Depo. 241:15–242:3; Ex. 3-C: Hlavenka Depo. 82:6–13.

15.     Before TPS's owner, Jeff Heckman, began importing calsil from BEC in 2018, he wanted to see test results confirming the amount of silica BEC's calsil manufactured in China because he knew the silica test was important for the calsil to meet Occupational Safety and Health Administration ("OSHA") safety standards in the United States arising from concerns about calsil dust workers could inhale.

Supporting Evidence: Ex. 3-B: Heckman Depo. 225:18–227:2.

16.     Mr. Hlavenka of DI testified that Hal Shapiro of Johns Manville told him that the amount of free silica in TPS's calsil could be an issue, that Mr. Shong sent him copies of TPS's "spec sheets showing that it met all the ASTMs and everything else," and that DI went ahead and purchased TPS calsil.

Supporting Evidence: Ex. 3-C: Hlavenka Depo. 41:9–24, 42:15–25, 72:8–73:19.

**C. Refusal to Supply**

17.     Johns Manville does not support every branch or geographic location of every distributor it works with, typically because Johns Manville already works with one or more distributor in the geographic area, or the distributor does not promote Johns Manville materials.

Supporting Evidence: Ex. 3-H: Johns Manville 30(b)(6) [Skelly] Depo. 185:18–186:6, 226:22–228:19.

18.     4-State has three warehouse locations: (1) Omaha, Nebraska; (2) Lenexa, Kansas; and (3) Wichita, Kansas, and primarily purchases and stocks calsil in its Omaha, Nebraska location.

Supporting Evidence: Ex. 3-A: Guest Depo. 16:6–13, 191:16–25, 196:17–20, 205:23–25, 217:7–9.

8

19.     From 2018 to the present, 4-State has been able to purchase calsil from Johns Manville without interruption, while also purchasing from TPS during that time, although Johns Manville ships purchases for 4-State's Wichita warehouse to 4-State's Lenexa location because it already has other distributors in Wichita, and compensates 4-State for the extra shipping cost.

Supporting Evidence: Ex. 3-A: Guest Depo. 40:2–41:4, 154:15–20, 216:18–218:18.

20.     There is no admissible evidence proving that Johns Manville refused to supply calsil or any other products to DI for anticompetitive reasons.

Supporting Evidence: Ex. 3-C: Hlavenka Depo. 85:25–86:16, 90:23–91:13, 92:4–22; *see also* Ex. 3-H: Johns Manville 30(b)(6) [Skelly] Depo. 184:23–186:6.

21.     There is no admissible evidence proving that Johns Manville refused to supply calsil or any other products to SPI, Bay, MacArthur, General Insulation, APi, or Metro Supply for anticompetitive reasons.

Supporting Evidence: TPS did not depose any representatives from SPI, Bay, MacArthur, General Insulation, or APi.  There is no admissible documentary evidence proving that Johns Manville refused to supply calsil or other products to SPI, Bay, MacArthur, General Insulation, APi, or Metro Supply.  *See* Ex. 1-B: Chart; *see also* Ex. 3-H: Johns Manville 30(b)(6) [Skelly] Depo. 184:23–186:6; Ex. 3-G: Skelly Depo. 99:11–101:6.

**D.  Exclusive Dealing**

22.     Johns Manville did not enter into any written contracts for an exclusive dealing arrangement with any of its distributor customers.

Supporting Evidence: Ex. 4-A: Declaration of David C. Skelly of Johns Manville.

23.     There is no admissible evidence that Johns Manville had implied exclusive dealing arrangements with any distributor-customers, or that it required its distributor-customers to only purchase its calsil.

Supporting Evidence: *See infra* SUF ¶ 27 (TPS "Prima Facie Case" Documents).

24.     There is no admissible evidence proving that a substantial portion of the industry was foreclosed from TPS due to any alleged exclusive dealing arrangements.

Supporting Evidence: TPS's retained economist (Warren-Boulton) did not do the economic analysis necessary to analyze this question.  ECF 135 at 23–26.

25.     TPS's "go-to-market" strategy consisted of inviting five distributors, DI, SPI, Bay Insulation, MacArthur, and General Insulation, to enter into exclusive partnerships.

Supporting Evidence: Ex. 3-E.i: Depo. Ex. 6 (TPSX-12 Product Launch Announcement).

26.     TPS's corporate representative and President, David Shong, admitted that the "go-to-market" strategy in hindsight was "a little bit naïve," and that by the April 16, 2018 deadline listed in the product launch announcement, only one of the five distributors agreed to an exclusive territory with TPS—Bay signed up for the two territories in California, so TPS moved to the second step of its strategy.

Supporting Evidence:  Ex. 3-F: TPS Rule 30(b)(6) [Shong] Depo. at 273:22–24, 282:7–25. Mr. Hlavenka (DI) testified that the level of customer interest in TPS's calsil was "moderate" in part because it was "a new product" and it takes time to get customer acceptance.  Ex. 3-C: Hlavenka Depo. 82:23–83:20.

### E.  Seven Documents Purporting to Establish TPS's *Prima Facie* Case

27.  The seven Johns Manville documents TPS identified as providing proof of Johns Manville either "taking" or "threatening" adverse action against TPS customers or potential customers, viewed in the light most favorable to TPS, do not provide *prima facie* evidence necessary for TPS to prove either unlawful exclusive dealing or an unlawful "refusal to supply."

Supporting Evidence: In both its economist's 9/27/21 Report and with its response opposing Johns Manville's *Daubert* motion, TPS identified a set of 7 Johns Manville documents that it contends are sufficient to prove Johns Manville either took or threatened unlawful "adverse action" against TPS customers or potential customers (the "TPS *Prima Facie* Case" documents). *See* ECF 136 at 19 & nn. 33–39 (Warren-Boulton Report listing documents JM-3324, -28748, -1451, -3503, 11469, -34501, -18081 as evidence TPS will present at trial of "Johns Manville's taking adverse action against customers who did business with" TPS or "threatening adverse action against those who contemplated doing business with" TPS); *see also* Pl. Ex. 17–23 opposing *Daubert* motion, ECF 166 to 172 ([JM-3324 [Ex.17], -28748 [Ex.18], -1451 [Ex.19], -3503 [Ex.20], -11469 [Ex.21]; -34501 [Ex.22]; -18081 [Ex.23]).   As shown in the attached Chart, Ex. 2, none of these documents, standing alone without any admissible testimony (and TPS has none), suffice to prove the elements of TPS's antitrust or false advertising claims.  *See* Ex. 2: Chart.  The Court would have to direct a verdict against TPS based on this insufficient *prima facie* case; therefore it should grant summary judgment now based on this evidence.

### III.  SUMMARY JUDGMENT STANDARD

"A motion for summary judgment serves the purpose of testing whether a trial is required." *Soucy v. Nova Guides, Inc.*, 2015 WL 5535347, at *3 (D. Colo. Sept. 21, 2015) (Hegarty, J.) (citing

*Heideman v. South Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003)).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  A motion for summary judgment should be granted if the moving party demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  The moving party need not produce evidence affirmatively "*negating* the opponent's claim," but need only show an absence of evidence to support an essential element of the claim.  *Id.* at 323.  The non-moving party must then "respond with specific facts showing a genuine factual issue for trial."  *Id.* at 324.

TPS's opposition must point to ***specific facts*** showing "that there is a genuine issue for trial" (Fed. R. Civ. P. 56(e), advisory committee's note to 1963 amendment), and not merely "that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The substance of the evidentiary material supporting these specific facts must be admissible at trial.  *See Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995).  Summary judgment is warranted if a non-moving party fails to direct the court to admissible evidence that shows the existence of a genuine issue of material fact. *See Hoffmeister v. Navient*, 2019 WL 1200812, at *7 (D. Colo. Mar. 14, 2019) (Hegarty, J.) (granting summary judgment because "[p]laintiff has failed to respond with specific facts showing a genuine factual issue for trial"); *see also Fortt v. Artistic Beauty Coll.*, 2007 WL 2572356, at *3–

4 (D. Colo. Sept. 6, 2007) (Hegarty, J.) ("In the absence of any properly supported issues of material fact, summary judgment is required.").

## IV.   ARGUMENT

### A.   TPS's Tying Claim Fails as a Matter of Law Because TPS Cannot Point to Any Admissible Evidence Proving an Actual or Threatened "Tie."

TPS contends Johns Manville used its fiberglass pipe insulation or expanded perlite insulation as tying products to tie or threaten to tie sales of its calsil, the tied product.  But TPS has no admissible evidence to prove these alleged tying arrangements existed.

Recognizing this undisputed fact, TPS tries to dodge the structure for maintaining a proper tying claim, now arguing Johns Manville unlawfully tied sales of "any product other than calsil" or "any/all of its products" to sales of its calsil.  Ex.1-A: TPS's 2d. Supp. Resp. p. 9.  This argument fails for three reasons: (1) a tying arrangement must involve two distinct products—vaguely claiming sales of "any" or "all" of Johns Manville's products were tied to sales of calsil does not suffice; (2) there is no admissible evidence that Johns Manville tied sales of "any" or "all" of its products other than calsil to sales of its calsil (or on the condition that customers refrain from buying TPS's calsil); and, (3) there is no admissible evidence showing that Johns Manville had market power in the markets for "any/all" of its products other than calsil.

The Court should grant summary judgment dismissing TPS's tying claim.

### 1.   The legal standard for tying under Sections 1 and 2 of the Sherman Act.

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'"  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992) (quoting *Northern Pacific R. Co. v. United States*, 356 U.S. 1,

13

5–6 (1958)).   Tying arrangements do not necessarily run afoul of the Sherman Act—"the arrangement itself is only problematic when it is used to unreasonably restrain trade." *See Suture Express, Inc. v. Owens & Minor Distribution, Inc.*, 851 F.3d 1029, 1036 (10th Cir. 2017).   "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.* (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 31 (2006)).

Tying claims can be analyzed as either *per se* or rule of reason claims.[1]   To establish a *per se* tying claim, the plaintiff must show:

> (1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a "not insubstantial" amount of interstate commerce in the tied product is affected.

*Suture Express, Inc.*, 851 F.3d at 1037.   If a tying claim fails under a *per se* analysis, a court may— but does not have to—analyze the tying allegations under a rule of reason analysis, which requires that a plaintiff "prove 'the actual effect of the [tying arrangement] on competition.'"   *In re: Cox Enterprises*, 871 F.3d 1093, 1097 & n.2 (10th Cir. 2017) (quoting *Jefferson Par.*, 466 U.S. at 29).

---

[1] Tying cases have evolved and courts now recognize tying can have procompetitive effects. *See, e.g., Jefferson Par.*, 466 U.S. at 12 ("Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act.").   Thus, *per se* treatment of a tying claim is "a most peculiar *per se* rule" where the elements of the claim "capture much of what must be demonstrated in a rule of reason case."   *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (7th Cir. 2020); *see also* Areeda & Hovenkamp, *Fundamentals of Antitrust Law* § 17.06[A] (4th ed. 2021) (describing the "Highly Idiosyncratic Per Se Rule" for tying).

As the Tenth Circuit has recognized, if a tying claim fails under "the more plaintiff-friendly *per se* analysis, it would also likely fail under the more demanding rule-of-reason analysis." *Id.* at 1112 & n.13.

To prove a tying claim, a plaintiff must establish there was actually a "tying arrangement" between *two* distinct and separate products. *See SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1079 (D. Colo. 2013), *aff'd,* 841 F.3d 827 (10th Cir. 2016) ("For an illegal tie-in to exist, 'purchases of the tying product must be conditioned upon purchases of a distinct tied product.'"); *see also Jefferson Par.*, 466 U.S. at 18–19 (discussing the need to determine whether two separate products are involved in an alleged tie). "Showing that two products have been tied together is part of the plaintiff's *prima facie* tying case under the *per se* rule as well as under the rule of reason." Areeda & Hovenkamp, *Fundamentals of Antitrust Law* § 17.11[D] (2021).

A tying claim cannot survive a summary judgment motion if there is no admissible evidence of a "tie" between two distinct products. For example, in *SolidFX, LLC*, the court granted summary judgment on a tying claim "[b]ecause [the p]laintiff has not shown that a purchaser was required to obtain the tied product . . . in order to be able to purchase the tying product." 935 F. Supp. 2d at 1079. Likewise, in *Beal Corp. Liquidating Trust v. Valleylab, Inc.*, 927 F. Supp. 1350, 1368 (D. Colo. 1996), the court granted summary judgment, in part, because the plaintiff failed to put forth evidence that the defendant actually tied sales of its products.

### 2. There is no admissible evidence to support the tying claim plead in the Amended Complaint.

TPS has alleged that Johns Manville threatened or actually "tied" sales of fiberglass pipe insulation and expanded perlite (the "tying" products) to sales of its calsil (the "tied" product) by threatening to refuse to sell the "tying" products if distributors purchased calsil from TPS. *See*

15

ECF 30  ¶¶ 193, 196.  But there is no admissible evidence that Johns Manville tied sales of either fiberglass pipe insulation or expanded perlite to sales of calsil.  Tying requires proof of an agreement to tie; "no tie exists unless the customer was 'coerced' into taking both products." Areeda & Hovenkamp, *supra*, § 17.01[D][1][I]; *Chase Mfg., Inc. v. Johns Manville Corp.*, 2020 WL 1433504, at *3 (D. Colo. Mar. 23, 2020) (noting agreement element).  TPS has no claim for attempted or threatened tying.

TPS has not pointed to a single document where Johns Manville conditions a sale of either fiberglass pipe insulation or expanded perlite on the purchase of Johns Manville's calsil (or the refusal to purchase TPS calsil).  And the depositions TPS took of two distributor representatives affirmatively refute any allegations of tying with respect to DI and 4 State.  Mr. Hlavenka (DI) testified that Johns Manville did not threaten to refuse to sell either expanded perlite or fiberglass pipe insulation to DI.  Statement of Undisputed Facts ("SUF") ¶ 5.  Mr. Guest (4-State) did not corroborate the existence of a tie—he testified that 4 State's Omaha location did not buy perlite or fiberglass pipe insulation from Johns Manville.  SUF ¶ 6.  "[W]here the buyer is free to take either product by itself there is no tying problem . . . ."  *Northern Pacific Ry.*, 356 U.S. at 6 n.4.

TPS has essentially conceded that it does not have any evidence that Johns Manville tied or threatened to tie sales of its fiberglass pipe insulation or expanded perlite to sales of calsil.  In Johns Manville's Interrogatory No. 9, TPS was asked to identify and describe each instance where Johns Manville allegedly threatened to not sell expanded perlite or fiberglass pipe insulation if a customer bought TPSX-12.  *See* Ex. 1-A: TPS's 2d. Supp. Resp., at 7.  But TPS did not respond to that straightforward question about its own allegations, contending instead "the reality is that the nature of Johns Manville's threats—and of the reports that TPS received of those threats—is

less explicit than the wording of this Interrogatory." *Id.* at 8–9.  That evasive response does not describe an unlawful tie-in, and TPS has yet to identify any instance when Johns Manville tied sales of its fiberglass pipe insulation or expanded perlite to its calsil. *Id.*

### 3. TPS's alternate argument that Johns Manville unlawfully tied calsil to sales of any or all other products fails as a matter of fact and law.

Because TPS cannot support the tying claim it plead, it changed its tune.  TPS now argues Johns Manville threatened to tie sales of "*any* product other than calsil—or its agreement to sell *any/all* of its products—on the condition that the customer purchase JM calsil or refrain from purchasing TPS calsil." Ex. 1-A: TPS's 2d. Supp. Resp., at 9 (emphases added).  But that is not a tie.  It is axiomatic that unlawful tying requires *two* separate and distinct products. *See, e.g.*, *Eastman Kodak Co.*, 504 U .S. at 462 (to defeat summary judgment motion in tying claim, plaintiff must show that two separate products were tied); *Jefferson Par.*, 466 U.S. at 21 ("[A] tying arrangement cannot exist unless two separate product markets have been linked."); *Nobody in Particular Presents, Inc. v. Clear Channel Comm'ns*, 311 F. Supp. 2d 1048, 1093–94 (D. Colo. 2004) (two products—radio air play and concert promotion services); *Four Corners Nephrology Assoc., P.C. v. Mercy Med. Ctr. of Durango*, 2008 WL 2355533, at *3 (D. Colo. May 22, 2008) (two products—inpatient hospital dialysis services and nephrology physician services).  TPS's alternate argument fails as a matter of law because TPS has not pointed to two separate products involved in any alleged tying arrangement. *See, e.g.*, *Unijax, Inc. v. Champion Intern., Inc.*, 516 F. Supp. 941, 949 (S.D.N.Y. 1981) ("Champion's threat to Unijax that it would terminate all relationship [sic] with Unijax unless more Champion products were bought is not an illegal tying agreement.").

Even if TPS could base its tying claim on the vague contention that Johns Manville impermissibly tied sales of "any" or "all" of its products to sales of calsil, there is no admissible evidence of such a "tie."   TPS identifies three instances of alleged "tying" in its interrogatory response, but cannot prove unlawful tying based on those instances.  *See* Ex. 1-A: TPS's 2d. Supp. Resp., at 9–11; SUF ¶¶ 6–8; Ex. 1-B: Chart.   <u>First</u>, the documents do not indicate that Johns Manville refused to sell products to a distributor *because* it purchased from TPS, much less that any alleged threat or action by TPS had any impact on the purchasing decisions by the distributor. These documents, therefore, do not raise any disputed material fact regarding whether there was any actual or threatened tie.   <u>Second</u>, the documents that TPS relies on contain inadmissible hearsay.  *See, e.g.*, Ex. 1-B: Chart; SUF ¶¶ 6–8.  "Hearsay testimony that would not be admissible at trial is not sufficient to defeat a motion for summary judgment."  *See Jaramillo v. Colo. Judicial Dep't.*, 427 F.3d 1303, 1314 (10th Cir. 2005)*.*   <u>Third</u>, TPS failed to obtain deposition testimony from any of the distributors involved in the communications it relies upon, so there is no reliable record of what actually occurred.

In addition, TPS cannot prove market power (economic power) in any tying product—an essential element of any claim for unlawful tying.  TPS cannot (and has made no attempt to) show that Johns Manville had market power in the vaguely described market for "any product other than calsil" or "any/all of its products."  *Cf. Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir. 1996) (analyzing whether there was a tie of warranties to the purchase of Xerox cartridges and stating "the identity of the tying product is somewhat unclear and assessing any anticompetitive effects of a warranty may be difficult").  TPS must prove Johns Manville has "sufficient economic power in the tying product ["any / all of its products"] to enable it to restrain trade in the tied product market

[calsil]." *Suture Express, Inc.*, 851 F.3d at 1037 (discussing the elements of a *per se* tying claim); *Chase Mfg., Inc.*, 2020 WL 1433504 at *3 (quoting *Suture Express, Inc.*).  As the Supreme Court has stated, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its *control over the tying product* to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Par.*, 466 U.S. at 12 (emphasis added).  This requires showing that the seller has "market power" in the tying market.

"Market power is the power 'to force a purchaser to do something that he would not do in a competitive market' and it "has been defined as 'the ability of a single seller to raise price and restrict output.'"  *Eastman Kodak Co.*, 504 U.S. at 464 (citations omitted).  Thus, under TPS's vague theory that fails to define specific tying products, it must prove Johns Manville has market power over "any/all of its products" or "any product other than calsil."  *See id*.  But TPS made no effort to establish that Johns Manville has market power in "any / all of its products."  Its economic expert (Warren-Boulton) failed to define any relevant product and geographic market *at all*, much less for any specific tying product.  ECF 135 at 23–26.

* * * * *

TPS cannot prove the existence of a "tie" involving two distinct products, including expanded perlite or fiberglass pipe insulation.  TPS's alternative "any/all" argument also fails because TPS does not identify the tying products.  Even if TPS could maintain this creative tying claim, there is no admissible evidence that any such "tie" occurred or proof that Johns Manville has market power in the relevant markets for "any/all of its products" or "any product other than calsil" (as the tying products) to be able to force customers to purchase its calsil (the tied product).

Thus, no trial is warranted on TPS's tying claim, and the Court should enter summary judgment for Johns Manville.

**B. TPS's False Advertising Claim Fails as a Matter of Law Because TPS Cannot Establish Critical Elements Required for a Lanham Act Claim.**

TPS alleges that Johns Manville violated the Lanham Act by falsely claiming that TPSX-12 is "poor quality," "Chinese," may not meet specifications, and that it may have "asbestos." ECF 30 ¶¶ 163, 164, 173. There are at least four reasons why TPS's Lanham Act claim fails, any one of which would be sufficient for summary judgment: (1) TPS has no admissible evidence that Johns Manville even made such statements; (2) statements like those TPS alleges are ***not*** actionable under the Lanham Act; (3) TPS cannot prove that any false or disparaging statement was disseminated to a sufficient portion of the relevant purchasing public to constitute "commercial advertising" or "promotion" under the Lanham Act; and (4) even if TPS could show false statements in commercial advertising or promotion (which it cannot), TPS cannot prove it was injured by any allegedly false statements.

**1.     The legal standard for false advertising under the Lanham Act.**

To sustain its false advertising claim under Section 43(a) of the Lanham Act, TPS must point to specific admissible evidence to support the following four elements:

> (1) that [the] defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product;
>
> (2) in commerce;
>
> (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; *and*
>
> (4) injure the plaintiff.

*Chase Mfg., Inc.,* 2020 WL 1433504 at *15 (alteration in original) (emphasis added) (quoting *Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.,* 638 F. App'x. 778, 784 (10th Cir. 2016)).   In other words, a plaintiff "generally must establish . . . that the defendant's commercial advertising contained a false or misleading representation of fact that was likely to cause confusion about the defendant's products or services *and* that injured the plaintiff." *Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 684 (10th Cir. 2015) (emphasis added). Summary judgment is warranted if the plaintiff does not have sufficient evidence to establish even one of these elements. *See, e.g.*, *Wilson v. AdvisorLaw LLC*, 2018 WL 4932088, at *4–5 (D. Colo. Oct. 11, 2018), *aff'd*, 780 F. App'x 649 (10th Cir. 2019) (granting summary judgment because plaintiffs failed to prove that the alleged false statements constituted "commercial advertising or promotion"); *Berken v. Jude*, 2013 WL 6152347, at *2 (D. Colo. Nov. 22, 2013) (granting summary judgment because plaintiff "failed to show that he has been or is likely to be injured as a result of Defendants' misrepresentations").

### 2. There is no admissible evidence that Johns Manville made actionable false statements.

TPS contends that Johns Manville made false statements about TPSX-12's quality and how the product is manufactured in China, but this claim fails for at least two reasons.  First, TPS has no admissible evidence to prove that *any* of the alleged false statements about TPSX-12's origin, quality, or ability to meet specifications were even made.  Second, TPS cannot prove that alleged comments regarding TPSX-12's (true) origin are actionable under the Lanham Act.

In order "[t]o show a qualifying false or misleading statement, a plaintiff must demonstrate that the defendant's statement was either (1) literally false or (2) literally true or ambiguous but implicitly false, misleading in context, or likely to deceive." *Gen. Steel Domestic Sales, LLC*, 627

21

F. App'x at 684. A statement is "literally false" if "it states that a product 'has certain qualities that it in fact does not actually have,'" and it is "impliedly false" if it is "literally true or ambiguous" but "convey[s] a false impression or [is] misleading in context, as demonstrated by actual consumer confusion." *Vitamins Online, Inc. v. Heartwise, Inc.*, 2019 WL 6682313, at *9 (D. Utah Sept. 24, 2019) (citation omitted). Plaintiffs face a high burden when attempting to show that a statement is literally false "because '[o]nly an *unambiguous* message can be literally false.'" *Id.* (quoting *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011)). And as for implied falsity, to sustain a claim for false advertising under the Lanham Act plaintiffs must demonstrate there was *actual* consumer deception by identifying extrinsic evidence establishing that consumers were misled or confused by the statement. *Id.*

***No admissible evidence that these alleged statements were made.*** TPS has no admissible evidence that proves Johns Manville made *any* false or misleading statements about TPSX-12, including about where it is from or about its quality. In response to an interrogatory asking TPS to point to specific evidence supporting its Lanham Act claim, TPS cited email communications and text messages that repeat unreliable hearsay and vague recitations of statements purportedly made to two regional distributors. Ex.1-A: TPS's 2d. Supp. Resp., at 5–7; Ex. 1-B: Chart. This "evidence" does not amount to commercial advertising. Ex.1-B: Chart.

A trial is not warranted on TPS's Lanham Act claim when its only "evidence" is unsubstantiated rumors. Indeed, three of the five instances of alleged disparagement that TPS describes in its interrogatory responses remain entirely speculative. For example, TPS contends that it was told by Mike Erhart (APi) that two *unidentified* contractors said that a Johns Manville representative suggested TPSX-12 might contain asbestos; that Kirk Chalmers (also APi)

"reported that an *unidentified* JM representative(s) was disparaging TPS" with *unidentified* comments on a project; and, that "*unidentified* JM representative(s) communicated to API that TPS calsil contains asbestos." Ex.1-A: TPS's 2d. Supp. Resp., at 5–7 (emphases added); Ex. 1-B: Chart, at rows 1, 3, 5.[2]

Hearsay cannot "defeat summary judgment because '[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill.'" *Thomas,*, 48 F.3d at 487 (alterations in original) (citation omitted).  And for good reason.  TPS contends that Mr. Erhart told Mr. Shong that Mr. Erhart heard from "two unidentified contractors" that Evan Stone (Johns Manville) suggested to "various unidentified market participants" that TPSX-12 might have asbestos.  Ex. 1-A: TPS's 2d. Supp. Resp., at 5.  This type of multi-layered hearsay— where the purported "source" of the statement is unknown—is *precisely* the type of hearsay that the Rules of Evidence has deemed unreliable, and therefore, inadmissible.  *See Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 663 F. Supp. 2d 1138, 1146–47 (D.N.M. 2009).  The rest of TPS's documentary evidence of Lanham Act violations fares no better.  *See* Ex. 1-B: Chart, at rows 1–5.

Additionally, neither Mr. Guest's (4-State) nor Mr. Hlavenka's (DI) testimony provide proof of an actionable false statement about TPSX-12.  Mr. Hlavenka's testimony regarding a comment to check the amount of "free silica" in TPSX-12 does not establish a valid false advertising claim.  SUF ¶ 16.  Mr. Guest testified that he did not hear any disparaging statements

---

[2]  As explained in Ex. 1-B, it appears that the alleged event described in row 1 is the same as the alleged event described in row 5.  It thus seems that TPS's interrogatory responses describe only four instances of alleged disparagement, rather than five.

from Mr. Meyer (Johns Manville), and a suggestion that Johns Manville customers confirm new products met specifications does not suffice.  SUF ¶¶ 11–12; *see also Wilco Trading LLC v. Shabat*, 2021 WL 1146634, at *5 (M.D. Fla. Mar. 8, 2021) (rejecting Lanham Act claim for failing to adequately allege that that a defendant's warning to its customers about possible counterfeits was "not false so long as any unauthorized dealer sold counterfeit . . . products" reasoning "the warning would only be literally false if *no* unauthorized dealers sold counterfeit . . . products"). Even TPS's owner, Jeff Heckman recognized the importance of seeing silica tests for BEC's calsil—to make sure it complied with OSHA worker safety standards—before he began importing calsil from BEC.  *See* SUF ¶ 15.

> ***Statements that TPS calsil is from China are true and not actionable.***  In addition, any statements that TPS's calsil is manufactured in China were true and are not actionable.  TPS alleged that two representatives from Johns Manville, Mr. Meyer and Mr. Alley, called TPSX-12 "Chinese."  *See* ECF 30 ¶ 173; Ex. 1-A: TPS's 2d. Supp. Resp., at 5.  Such statements, if made, were literally true.  *See* SUF ¶ 9.  There is nothing false or misleading about stating that TPSX-12 is "Chinese."  TPS can only maintain a claim for false advertising if it can show these alleged comments were impliedly false, which requires extrinsic evidence to demonstrate that consumers were misled or confused by the allegedly false statement.  *See Vitamins Online, Inc.*, 2019 WL 6682313, at *9–10.

TPS has *no* extrinsic evidence that proves that customers were confused or misled by any (alleged) comments that TPSX-12 is a Chinese product.[3]   Such evidence is typically presented in the form of consumer survey evidence, and "[p]laintiffs can make this showing by presenting extrinsic evidence that demonstrates a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement."   *Vincent v. Utah Plastic Surgery Soc'y*, 621 F. App'x 546, 550 (10th Cir. 2015) (internal quotation marks omitted). TPS did not timely disclose expert opinions to support this argument.   *See* ECF 135-6 (TPS Rule 26(a)(2) disclosure).   Indeed, the only expert retained by TPS does not even discuss the alleged Lanham Act violations.   ECF 136 (Warren-Boulton report).   Therefore, TPS cannot prove that "a statistically significant" portion of customers in the industrial insulation market held any false beliefs about TPSX-12 because of statements about its origin.   *See Vincent*, 621 Fed. App'x at 550. Nor does TPS have any other admissible extrinsic evidence, such as documentary evidence or deposition testimony, to demonstrate that customers were confused or misled by true statements that TPSX-12 is "Chinese."[4]   *See Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999) ("To assess the truth or falsity of these latter, more amorphous, misleading statements,

---

[3]   TPS cannot argue that the "free silica" comment was impliedly false because it does not have any admissible survey evidence to prove that this statement caused customer confusion.   Instead, and as discussed in Section IV.B.2, *infra*, the only evidence of such a statement came from Mr. Hlavenka and his testimony suggests that he was not confused or misled by the (alleged) statement, and that he also did not view it as credible.   Similarly, TPS did not disclose expert survey evidence to prove that customers were confused by any comments suggesting they confirm the calsil they purchase meets specifications, so such statements also cannot form the basis for a Lanham Act claim based on implied falsity.

[4]   In response to questions from TPS's counsel, Mr. Guest of 4-State even testified that he does not "hear concerns about foreign made products" or "concerns about Chinese materials specifically."   SUF ¶ 11.

'the courts favor testing by consumer reaction surveys, but have also found falsity based on their own independent reaction and the reaction of witnesses testifying before the court, including testimony based on test results, consumer surveys, complaints received, allegations of more than a few instances of misrepresentation, and otherwise.'") (citation omitted)).

Without any evidence proving that a statistically significant number of the industrial insulation customers falsely believed that there were negative implications associated with TPSX-12 being manufactured in China, TPS cannot prove that these statements were impliedly false. The Court should therefore grant summary judgment dismissing TPS's Lanham Act claims relating to allegedly false statements about TPSX-12's origin. *See, e.g.*, *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 507 F. Supp. 3d 1289, 1376–77 (D. Kan. 2020) (granting summary judgment because "Mylan has failed to come forward with evidence presenting a triable issue about actual customer confusion").

### 3. TPS cannot prove that any allegedly false comments about TPSX-12 were made in connection with "commercial advertising" or "promotion."

Summary judgment is also warranted on TPS's Lanham Act claim because TPS cannot establish that any allegedly disparaging statements were made in connection with "commercial advertising or promotion." TPS has no evidence that any statements were disseminated to a sufficient portion of the relevant purchasing public.

To be actionable under the Lanham Act, a statement must be made in connection with "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). The Tenth Circuit applies a four-part test to determine whether alleged false statements are "commercial advertising or promotion." The statements must be: "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy

defendant's goods or services;" and, "while the representations need not be made in a 'classic advertising campaign,' they "(4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273–74 (10th Cir. 2000); *see also Wilson*, 780 F. App'x at 651 (10th Cir. 2019) (same). The plaintiff must point to evidence demonstrating that the dissemination of the purportedly disparaging information "reach[ed] some significant number of actual or potential customers of the parties' product" and cannot rest on vague contentions "as to how many human beings might have encountered the published material." *Wilson*, 2018 WL 4932088, at *3 (citing *Sports Unlimited Inc. v. Lankford Enters. Inc.*, 275 F.3d 996, 1003–04 (10th Cir. 2002) and *Gen. Steel Domestic Sales LLC v. Chumley*, 129 F. Supp. 3d 1158, 1175 (D. Colo. 2015)).

The district court's decision in *Wilson* is instructive. There, the plaintiffs, an attorney and his law firm, alleged a competitor violated the Lanham Act's prohibition on false advertising by posting a false review about the plaintiffs on the website "ripoffreport.com." 2018 WL 4932088, at *1. The defendants moved for summary judgment, contending the review was not "commercial advertising or promotion as a matter of law" because there is "no evidence that would establish that the [r]eview was sufficiently disseminated to the relevant purchasing public such that the industry would consider it advertising." *Id.* at *3. The plaintiffs countered that the review was widely disseminated because ripoffreport.com had "millions of customers," and the review was "quickly absorbed by search engines." *Id.* at *4. The court agreed with the defendants. It rejected as conclusory the attorney's testimony that it "*seemed*" like the plaintiffs had less new clients after the review was posted. *Id.* ("[T]he mere articulation of [the attorney's] own conclusory assertion that the [r]eview was the cause of the [p]laintiffs' client-acquisition woes is not sufficient to

demonstrate a triable issue of fact regarding the dissemination of the [r]eview."). The court held "the [p]laintiffs have only come forward with a *theory* that the [r]eview was broadly disseminated to the [p]laintiffs['] prospective customers and that it had a tendency to discourage those customers from retaining the [p]laintiffs, but they have not come forward with any particular *proof* that this is indeed what occurred." *Id.* at *5. The Tenth Circuit affirmed, echoing the district court's conclusions. *See Wilson*, 780 Fed. App'x at 653 ("Other than noting Ripoff Report's general popularity and referring to general statistics about customers reading online reviews, . . . plaintiffs offer no evidence that the Review was disseminated in a manner that would reach prospective customers for their specific legal services or others within the industry . . . .").

Here, there is no admissible evidence in the discovery record confirming that a sufficient amount of the relevant purchasing public heard allegedly false statements from Johns Manville about TPS calsil. While TPS alleged that the "false and misleading statements were widely disseminated to multiple distributors in a market where five distributors control 85 percent of the market" and that it was "aware of multiple contractors to whom Johns Manville made these false and misleading statements, because those contractors raised the issue with their distributors" (ECF 30 ¶ 223), TPS has not substantiated those claims. There is, for example, no admissible evidence confirming that "multiple contractors" or "multiple distributors" heard false comments from Johns Manville about TPS calsil. *See, e.g.*, SUF ¶¶ 10–11.[5] TPS cannot fall back on

---

[5]   Indeed, all five of the alleged instances of false advertising TPS identified in its interrogatory response concerned only two small regional distributors—APi and 4-State—and four of the five instances relate to APi. SUF ¶¶ 10–11. Notably, TPS has not identified any instances of alleged false advertising involving representatives from SPI, General Insulation, Bay, or MacArthur. *See, e.g.*, Ex. 1-A: TPS. 2d. Supp. Resp., at 5–7. And as discussed, (*see* Section IV.B.2 *supra*), neither

allegations in its complaint this late in the game.  *See Sports Unlimited, Inc.*, 275 F.3d at 1004 (affirming grant of summary judgment and commenting "Plaintiff's reliance on mere allegations at this stage of the litigation is ineffective"); *In re EpiPen*, 507 F. Supp. 3d at 1379 (granting summary judgment for failure to present a "triable issue of the widespread dissemination needed" and holding "[l]ike the Utah and Colorado courts, the court can't find a genuine issue of dissemination based simply on speculation").[6]

At bottom, TPS only has a "theory" that the disparaging comments were circulated to a sufficient portion of the relevant market, but that is insufficient to withstand summary judgment.  *See Wilson*, 2018 WL 4932088, at *3.  Because TPS has not—and cannot—prove that any false statements were widely disseminated to a sufficient portion of the relevant purchasing public, TPS cannot establish that any false statements were made in connection with commercial advertising or promotion.  TPS, therefore, cannot carry its burden of proving a critical element of the Lanham Act claim.

### 4.   There is no evidence that TPS was injured by any alleged false advertising.

Even if a plaintiff establishes false or misleading statements that constituted commercial advertising or promotion, it must also demonstrate it was injured by the alleged disparagement.

---

the comment regarding "free silica" to Mr. Hlavenka (DI) nor any suggestions that customers confirm calsil meets specifications is actionable.

[6] Even though false statements "need not be made in a 'classic advertising campaign'" to be deemed "commercial advertising" or "promotion," the plaintiff still has to prove sufficient dissemination of the statements to the relevant purchasing public.  *Proctor & Gamble Co.*, 222 F.3d at 1273–73.  Here, the degree of formality of the alleged statements does not alter the analysis because TPS does not have any admissible evidence to establish that any false statements were sufficiently disseminated.

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014) ("To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations.").  There is no evidence that TPS was injured or lost any sales as a result of Johns Manville's purported false advertising, which provides another basis to dismiss TPS's Lanham Act claim.

"To establish the injury element of a false advertising claim under the Lanham Act, a plaintiff 'must show economic or reputational injury *flowing directly* from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff.'"  *Vitamins Online, Inc.*, 2019 WL 6682313, at *12 (citations omitted).  Accordingly, a "plaintiff must provide evidence of 'an injury proximately caused by the defendant's misrepresentations.'"  *Id.*  Moreover, where, as here, the plaintiff is seeking monetary damages from alleged Lanham Act violations, there is a "'heightened level of . . . proof of causation and specific injury' . . . in order to 'prevent the plaintiffs from receiving a windfall unrelated to their own damages.'"  *Id.* (citations omitted).

For example, in *A.L.S. Enterprises, Inc. v. Robinson Outdoor Products, LLC*, 2017 WL 393307, at *3 (W.D. Mich. Jan. 30, 2017), the court granted judgment as a matter of law on a plaintiff's false advertising claims in part due to the plaintiff's failure to prove "that there was a causal link between th[e false advertising] and some harm."  In *A.L.S. Enterprises*, the plaintiff, a manufacturer of clothing designed to mask odors when hunting, alleged that the defendant, its competitor, made false statements about both parties' products.  *Id.*  The court determined that the plaintiff failed to prove that it was harmed by either defendant's literally false statements or its

literally true, but misleading statements. *Id.* at *3 n.4, 7. For both types of statements, the court concluded that the plaintiff's proof of harm amounted to "inferences of causation based solely on the chronology of events" that "cannot alone establish a link to harm 'where the record contains . . . other equally credible theories of causation.'" *Id.* at *3 n.4, *8 (citation omitted). The court also faulted the plaintiff for failing to obtain evidence from its customers—the retailers who bought and sold plaintiff's products in their stores—regarding whether the defendant's false advertising caused the retailers to refrain from purchasing plaintiff's products. *See id.* at *8.

Similarly, in *In re EpiPen*, the District of Kansas granted summary judgment on false advertising claims because the summary judgment record contained no evidence indicating the plaintiff sustained any harm from the alleged false advertising conduct. 507 F. Supp. 3d at 1381. In *In re EpiPen* (like here), the plaintiff's experts did not undertake any analysis to determine the harm allegedly caused by the false or misleading statements. *Id.* at 1379–80. The plaintiff argued that it was entitled to a presumption of injury because the defendant made false comparative claims. *Id.* at 1380. The District of Kansas rejected that argument because the alleged false claims in that action—like the alleged false claims here—were not explicitly comparative. *See id.*

TPS has failed to establish that any purported false representations proximately caused it any injury. Like the plaintiffs in *A.L.S. Enterprises* and *In re EpiPen*, TPS cannot point to any evidence in the record—including from the only two distributor-representatives to testify—proving that specific customers refused to buy TPSX-12 because of the alleged false advertising. *See, e.g.*, SUF ¶¶ 11, 16; *see also Verisign, Inc. v. XYZ.COM LLC*, 848 F. 3d 292, 299 (4th Cir. 2017) (upholding summary judgment dismissal because plaintiff "failed to establish . . . that it suffered an injury flowing directly from the challenged statements"). Similarly, TPS's theory—

that its sales did not increase due to Johns Manville's alleged misstatements several months after it entered the market—also suffers from the fatal flaw of relying on chronology to infer causation. The record contains "equally credible theories of causation," *A.L.S Enters.*, 2017 WL 393307, at *3 n.4, including that TPS's initial sales strategy was flawed and that customers were hesitant to buy imported calsil from a small new entity.  *See* SUF ¶ 26.

*  *  *  *  *

In sum, because TPS cannot establish the elements required to maintain a Lanham Act claim, the Court should enter summary judgment dismissing it.

### C. TPS's Monopolization Claim Fails as a Matter of Law Because TPS Cannot Prove Actionable Exclusionary Conduct.

TPS claims that Johns Manville has maintained a monopoly in an alleged calsil product market that it has maintained through "exclusionary tactics" such as tying, refusals to supply calsil to customers who purchase from TPS, exclusive dealing, and product disparagement.  ECF 30 ¶ 204.  The undisputed material facts, however, demonstrate that Johns Manville did not engage in any actionable exclusionary conduct.   Summary judgment should therefore be granted dismissing TPS's monopolization claim.

### 1. The legal standard for monopolization under Section 2 of the Sherman Act.

A plaintiff alleging a monopolization claim must prove three elements:  "the first element is a 'monopoly power in the relevant market'; the second is 'willful acquisition or maintenance of this power through exclusionary conduct'; and the final element is 'harm to competition.'"  *Chase Mfg, Inc.*, 2020 WL 1433504, at *9 (quoting *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1119 (10th Cir. 2014)).  When assessing whether a business has engaged in exclusionary conduct, the Tenth Circuit considers whether "the conduct at issue before [the court]

has little or no value beyond the capacity to protect the monopolist's market power—bearing in mind the risk of false positives (and negatives) any determination on the question of liability might invite, and the limits on the administrative capacities of courts to police market terms and transactions." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013); *cf. JetAway Aviation, LLC v. Board of County Com'rs of Cty. of Montrose, Colo.*, 754 F.3d 824, 835 (10th Cir. 2014) (Holmes, J., concurring) ("[T]he Sherman Act is not concerned with overly aggressive business practices . . . so as long as it does not unfairly harm competition.").

The federal antitrust laws are designed to protect—not foreclose—robust competition. As the material, undisputed facts show, TPS's monopolization allegations seek to penalize Johns Manville for TPS's own choice of business strategies and for doing nothing more than competing against TPS.

### 2. No admissible evidence supports TPS's exclusionary conduct allegations.

#### a. Tying

TPS has not distinguished the tying allegations in support of its monopoly claim and those in support of its stand-alone tying claim. As discussed in Section IV.A.2, *supra*, there is no admissible evidence that Johns Manville tied sales of expanded perlite, fiberglass pipe insulation, or *any* or *all* of its products to sales of calsil. Therefore, TPS's tying allegations cannot support either TPS's standalone tying claim or its monopolization claim.

#### b. Refusal to "Supply"

TPS alleges that Johns Manville refused to supply distributors who purchased calsil from TPS, and that this constitutes exclusionary conduct. But refusals to supply (just a semantic

variation on refusals to deal) are only actionable in limited circumstances not present here, and there is no evidence that Johns Manville actually refused to supply calsil to any distributor.

TPS made it clear to the Court that it is not pursuing a "refusal to deal" claim against Johns Manville, (*see* ECF 30 ¶ 125), and instead is arguing Johns Manville engaged in anticompetitive conduct by refusing to "supply" certain distributors.  In its March 23, 2020 Order, the Court noted how, even though TPS identified the allegedly exclusionary conduct as a "refusal to supply," it did not provide citations to case law discussing this type of exclusionary conduct. *Chase Mfg., Inc.*, 2020 WL 1433504, at *11.  The Court determined that "[b]ecause the alleged conduct appears as a variation on the traditional refusal to deal conduct," it would look to the "refusal to deal" case law. *Id.* ("[T]he Court borrows from traditional refusal to deal case law in evaluating Plaintiff's allegations.").  The same analysis should apply now as well.

As a general rule, it is "rare" for liability to be imposed "when the monopolist engages in 'purely unilateral' conduct." *Novell, Inc.*, 731 F.3d at 1073 (quotations and citation omitted) (identifying predatory pricing as "notable and easy example").  That's because "the proper focus of section 2 isn't on protecting competitors but on protecting the process of competition with the interests of consumers, not competitors, in mind." *See id.* at 1072.  So, businesses generally have the right to choose which customers to deal with, or in this case, supply. *Id.* at 1074 ("[T]his sort of unilateral behavior—choosing whom to deal with and on what terms—is protected by the antitrust laws.").

There is a narrow exception to the general rule that a business is free to deal with, or sell to, whomever it wants, but TPS's claims do not fit that exception.  The Supreme Court summarized that exception in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). *See*

*Novell*, 731 F.3d at 1074 ("Refusal to deal doctrine's high water mark came in *Aspen*."); *Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004) ("*Aspen Skiing* is at or near the outer boundary of § 2 liability.").  In *Aspen Skiing*, the Court held that Aspen Skiing Co., which operated three of the four Aspen ski areas, violated Section 2 by refusing to continue working with the fourth ski area operator, Aspen Highlands, to sell a joint lift ticket providing access to all four areas that had been profitable for both parties.  472 U.S. at 593–94, 609–10.  In *Trinko*, the Court explained that, in *Aspen*, this "unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing [that] suggested a willingness to forsake short-term profits to achieve an anticompetitive end" *and* the "defendant's unwillingness to renew the ticket *even if compensated at retail price* [that] revealed a distinctly anticompetitive bent."  540 U.S. at 409.

Interpreting these cases, the Tenth Circuit has held that there must be "at least two features present" for *Aspen*'s "limited exception" to the general rule against imposing liability for unilateral conduct to apply:  (1) "there must be a preexisting voluntary and presumably profitable course of dealing between the monopolist and rival," or customer; and, (2) "the monopolist's discontinuation of the preexisting course of dealing must 'suggest[] a willingness to forsake short-term profits to achieve an anti-competitive end.'"  *Novell*, 731 F.3d at 1074–75 (quoting *Trinko*, 540 U.S. at 407).

The limited and dated antitrust case law concerning a unilateral refusal to sell or supply to customers reflects similar reasoning as the refusal to deal cases.  In *Lorain Journal v. United States*, 342 U.S. 143, 152–55 (1951), the Supreme Court held that a newspaper violated Section 2 by refusing to sell advertising space to its (preexisting) customers if they purchased advertising space from the newspaper's competitor, a radio station.  As the Tenth Circuit recently recognized, "[i]t

35

[was] that refusal to sell advertising space 'even if compensated at retail price' that makes the conduct in *Lorain Journal* anticompetitive." *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1174 (10th Cir. 2021) (rejecting contention that defendant engaged in "'coercive conduct against customers that the Supreme Court condemned in' *Lorain Journal*").

Thus, for TPS to demonstrate Johns Manville engaged in exclusionary conduct by refusing to supply calsil to distributors, it must show that Johns Manville discontinued preexisting and profitable courses of dealing, *and* that Johns Manville did so for an anticompetitive purpose. *See SOLIDFX, LLC v. Jeppersen Sanderson, Inc.*, 841 F.3d 827, 841 (10th Cir. 2016) (analyzing whether a refusal to deal violates Section 2 by applying "a two-part test": "[f]irst we look at the effects of the monopolist's conduct" and "[s]econd, we look at its motivation" (citation and quotations omitted)).

The facts revealed through discovery do not support TPS's refusal to supply claim. For example, TPS seeks to advocate for 4-State, a distributor with three warehouse locations in Nebraska and Kansas (Omaha, Lenexa/Kansas City, and Wichita), (SUF ¶ 18), that was allegedly "cut off" by Johns Manville. However, Mr. Guest of 4-State did not testify that Johns Manville refused to supply insulation materials to 4-State after discontinuing a pre-existing profitable relationship. Mr. Guest explained that 4-State has been able to purchase calsil from both TPS and Johns Manville since 2018. SUF ¶ 19. This does not qualify as an unlawful refusal to supply under *Aspen* and *Trinko*.

The antitrust laws do not require Johns Manville to sell insulation materials to every branch of every distributor who seeks to deal with it. *See Novell*, 731 F.3d at 1072–73 (businesses are

free to choose with whom to deal).  Indeed, it is procompetitive for manufacturers to work with a select group of distributors who agree to promote their brand or product.  *Cf. Leegin Creative Leather Prod. Inc. v. PSKS, Inc.,* 551 U.S. 877, 882 (2007) (no per se prohibition on vertical restraints between manufacturer and distributors; vertical price restraints can have procompetitive effects).  As discussed in the undisputed facts, Johns Manville does not supply all of the branches or geographic locations of each distributor it works with.  SUF ¶ 17.  Instead, Johns Manville partners with a few distributors that will promote its insulation materials.  *Id.*  If a distributor is no longer promoting Johns Manville's insulation materials, then Johns Manville may choose to partner with a different distributor in order to sell these products—and it has nothing to do with trying to keep other suppliers out of the market.  *Id.*

Nor does TPS have any admissible evidence that Johns Manville gave up short-term profits by discontinuing *any* of its preexisting and profitable relationships with distributors for the anticompetitive purpose of hurting TPS.  *See, e.g.*, SUF ¶¶ 19–21.  And the communications that TPS cites as evidence of other purported instances of Johns Manville threatening to or actually refusing to sell calsil to various distributors only contain inadmissible hearsay, including from TPS's *own* employees repeating these stories as part of their sales pitch to customers.  *See, e.g.*, *id.*; Ex. 1-B.  Likewise, the Johns Manville documents that TPS cited as proof of Johns Manville's exclusionary conduct in its Opposition to Johns Manville's *Daubert* motion do not establish that Johns Manville engaged in any unlawful refusals to supply distributors.  SUF ¶ 27.  Six of the seven documents cited are either internal Johns Manville documents or communications between Johns Manville representatives or its outside sales agent that do not prove that any distributor was actually "cut off" from accessing Johns Manville's products.  *See id.* (citing Ex. 2).  As for the

37

email exchange between Evan Stone (Johns Manville) and DI representatives, Mr. Stone apologizes in a later email for the aggressive tone, which undercuts the conceivability of any "threats" to DI. *See id.* (citing TPS Ex. 23, ECF 172). TPS cannot rely on this evidence to prove that Johns Manville engaged in exclusionary conduct by refusing to supply any distributors when these documents contain either inadmissible hearsay or do not prove that exclusionary conduct actually occurred, and the evidence shows that Johns Manville continued to sell its calsil and other products to distributors. *See id.* at ¶¶ 19–21, 27.

### c. **Exclusive Dealing**

TPS contends Johns Manville engaged in exclusionary conduct by entering into exclusive dealing arrangements with distributors. This claim also fails. TPS has no evidence that Johns Manville had any express or implied exclusive dealing arrangements with any distributors, nor can TPS point to any evidence indicating it was substantially foreclosed from a relevant market by some implied exclusive dealing arrangement.

"An exclusive dealing arrangement is 'a contract between a manufacturer and a buyer that forbids the buyer from purchasing the contracted good from any other seller or that requires the buyer to take all of its needs in the contract good from that manufacturer.'" *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.,* --- F. Supp. 3d ---, 2021 WL 2585065, at *61 (D. Kan. June 23, 2021) (citation omitted). This type of arrangement "doesn't violate the antitrust laws simply because it excludes competitors." *Id.* "Indeed, '[e]xclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition.'" *Id.* (alteration in original) (citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3rd Cir. 2012)). Because exclusive dealing

38

arrangements can advance competition in a market, they are not *per se* illegal and are analyzed under the rule of reason. *Id.* "Exclusive dealing arrangements are not unlawful in the absence of anticompetitive effects." *Crocs, Inc. v. Effervescent, Inc.*, 248 F. Supp. 3d 1040, 1057 (D. Colo. 2017); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) ("Permitting an antitrust action to proceed any time a firm enters into an exclusive deal would both discourage a presumptively legitimate business practice and encourage costly antitrust actions.").

For an exclusive dealing arrangement to be unlawful the plaintiff must prove the "'exclusive dealing arrangements foreclose competition in a substantial share of the line of commerce affected'" and there are "anticompetitive effects resulting from 'a substantial foreclosure of their ability to compete in the relevant market.'" *Chase Mfg.*, 2020 WL 1433504, at *11 (citations omitted). A plaintiff must demonstrate that a significant share of the market is foreclosed, "because, for the contract to have an adverse effect upon competition, 'the opportunities for other traders to enter into or remain in that market must be significantly limited.'" *Microsoft*, 253 F.3d at 69. In *ZF Meritor*, the Third Circuit identified a number of factors that courts consider when assessing the legality of an exclusive dealing arrangement: (1) "a showing of significant market power by the defendant," (2) "substantial foreclosure," (3) "contracts of sufficient duration to prevent meaningful competition by rivals," (4) "an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects," (5) whether the defendant "engaged in coercive behavior," (6) "the ability of customers to terminate the agreements," and (7) whether the defendant's competitors also utilize exclusive dealing. 696 F.3d at 271–72 (citations omitted); *see also In re EpiPen*, 2021 WL 2585065, at *62 n. 59 (recognizing that the Tenth Circuit has not "articulated" its own factors to analyze an exclusive dealing

arrangement and "predict[ing] that the Tenth Circuit, if presented with this question, would apply the *ZF Meritor* factors" to the arrangements at issue).

Johns Manville does not have written exclusive contracts with distributors, so TPS cannot identify any.  SUF ¶ 22.  Though a plaintiff may not necessarily have to prove an actual agreement for exclusive dealing under Section 2, (*ZF Meritor*, 696 F.3d at 270 n.10), that does not relieve plaintiffs from their burden of establishing that the defendant required third-parties to deal exclusively.  There is also no admissible evidence that Johns Manville required distributors to *only* purchase its calsil through implied or *de facto* exclusive dealing, or what the conditions of such an implied arrangement even were.  *See* SUF ¶¶ 23, 27; *see also* Section IV.C.2.b *supra*.  Without this evidence, the Court cannot assess the legality of any (alleged) *de facto* exclusive dealing arrangement.  *Cf. Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181–83 (9th Cir. 2016) (affirming summary judgment on a Section 1 exclusive dealing claim and noting "[t]he 'de facto' exclusive dealing theory does not provide [Plaintiff] an end run around the obligation to first show that express or implied contractual terms in fact substantially foreclosed dealing with a competitor for the same good or service").

Furthermore, as explained in Johns Manville's *Daubert* motion, TPS's economist, Warren-Boulton, did not define any relevant product or geographic market, much less calculate a substantial degree of foreclosure in some relevant market; instead Warren-Boulton just asserts conclusion of "potential harm to competition" arguing distributors have a "strong incentive" to purchase from Johns Manville.  *See* ECF 135 at 23–26.  Without a properly defined product or geographic market, the jury here cannot assess whether there was "substantial foreclosure" of competition in a relevant market.  "Though what is 'significant' may vary depending upon the

antitrust provision under which an exclusive deal is challenged, it is clear that *in all cases* the plaintiff *must* both *define* the relevant market and *prove* the degree of foreclosure." *Microsoft*, 253 F.3d at 69 (emphases added).

Without any admissible evidence to prove that Johns Manville required distributors to enter into any exclusive dealing arrangements, and without a properly defined relevant product or geographic market or proof of substantial foreclosure in a relevant market, TPS's exclusive dealing claim necessarily fails as a matter of law.

### d. Allegedly disparaging comments.

TPS relies on the same allegations of false advertising to contend Johns Manville engaged in exclusionary conduct by making disparaging statements about TPS calsil. *See supra* Section IV.B. This theory of Section 2 liability fails for two reasons. First, TPS has no admissible evidence to establish that the instances of product disparagement described in its Complaint and responses to Johns Manville's interrogatories even happened. And second, TPS cannot overcome the presumption that the effect of any allegedly disparaging comments on competition is *de minimis* because TPS was able to easily neutralize any (alleged) statements with its own product data and testing, and because there is no evidence that the statements were clearly likely to induce reasonable customer reliance or continued for a prolonged period of time.

For disparaging statements to prove monopolization, there must be "'a preliminary showing of significant and more-than-temporary harmful effects on *competition* (and not merely upon a competitor or customer)' before these practices can rise to the level of exclusionary conduct." *See Am. Pro. Testing Serv. v. Harcourt Brace Jovanovich Legal & Pro. Publications, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997) (quoting 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 737b

at 278 (1978)). Therefore, "[t]o prove that product disparagement rises to the level of exclusionary conduct, the disparagement must overcome the presumption that the effect on competition is de minimis.'" *Chase Mfg.,* 2020 WL 1433504, at *12 (quoting *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1127 (10th Cir. 2014)).  To "rebut this presumption," TPS must "satisfy[] a six-factor test, showing that the disparagement was: (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals." *Lenox*, 762 F.3d at 1127.  Where, like here, the plaintiff claims that disparaging comments were directed at a single competitor, findings of an antitrust violation are strongly disfavored and "should presumptively be ignored."  *See Harcourt Brace*, 108 F.3d at 1152 (quotations and citation omitted).

First, and as discussed *supra* Section IV.B.2, TPS lacks admissible evidence to support its claims that Johns Manville made false or misleading statements about TPS or its calsil. Additionally, and as discussed, several alleged misstatements are missing crucial information that would allow the factfinder to assess whether these statements were even made, let alone whether they satisfy the six-part test to rebut the *de minimis* presumption.

Second, even if TPS could establish that Johns Manville made disparaging comments about it or its calsil, TPS cannot rebut the *de minimis* standard that applies to disparaging statements. The record shows that any purportedly disparaging comments about TPS's calsil were readily susceptible to neutralization, as Jesse Revesz of TPS explained.  *See* SUF ¶ 14 (citing Ex. 3-E: Revesz Depo. 197:4–9).  Mr. Revesz was asked directly whether "once you sent the testing records, was it easy to neutralize any alleged rumor about your product having asbestos?" to which he

responded "Absolutely." *Id.* (citing Ex. 3-E: Revesz Depo. 197:10–14). Mr. Hlavenka's (DI) testimony was similar. He testified that he was warned that there could be an issue with the amount of "free silica" (not asbestos) in TPSX-12, but he then spoke with Mr. Shong about TPSX-12 who provided "spec sheets showing that it met all the ASTMs and everything else" and after confirming this, DI purchased TPS's calsil. SUF ¶ 16 (citing Ex. 3-C: Hlavenka Depo. 41:9–24, 42:20–25, 72:8–73:19). The TPSX-12 data sheet explains that it is "[t]hird party verified to meet or exceed all physical property requirements in accordance with ASTM C533 Type 1"; it "does not contain asbestos, mercury, or lead,"; and it "is produced with amorphous silica, not crystalline silica which is subject to OSHA exposure limits." *See* SUF ¶ 13 (citing Ex. 3-F.i: Shong Depo. Exhibit 127 (TPSX-12 Data Sheet)).

In addition, there is no evidence that the allegedly disparaging statements were likely to induce customers to reasonably rely on these statements. For one, these alleged comments came from TPS's competitor, Johns Manville, and there is no evidence that prospective customers attached much (if any) credibility to Johns Manville's statements about TPSX-12. *Cf. Harcourt Brace*, 108 F.3d at 1151 ("[B]uyer distrust of a seller's disparaging comments about a rival seller should caution us against attaching much weight to isolated examples of disparagement . . . ." (citation omitted)). Mr. Hlavenka's testimony suggests that he put little stock in the warning he purportedly received about the possibility of TPS's calsil having free silica. Mr. Hlavenka recalled that he "thought [the comment] was kind of funny because JM – the TPS plant is the old JM plant that they were importing from for years. So, I mean, I didn't really understand it, you know." *See* SUF ¶ 16 (citing Ex. 3-D: Hlavenka Depo. 41:11–18). And as discussed, any alleged effect of this

statement was neutralized by Mr. Shong providing Mr. Hlavenka with TPSX-12's data sheet.  *Id.* (citing Ex. 3-D: Hlavenka Depo. 42:20–25, 72:8–73:19).

TPS also has no evidence that any of these allegedly disparaging statements continued for prolonged periods and affected demand for a prolonged period.  It is not clear when TPS contends the alleged disparaging comments were made.  But based on TPS's supplemental interrogatory response and the dates of the documents cited therein and Mr. Hlavenka's testimony, the alleged instances of disparaging statements occurred between March and October 2018.  SUF ¶¶ 10–11, 16.  Actionable disparagement cannot be sporadic like this.  In *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 837 (C.D. Cal. 2010), the district court rejected the plaintiff's claim that disparaging comments constituted exclusionary conduct, reasoning that even if the five alleged false statements were deemed actionable, the plaintiff failed to prove the statements occurred for a prolonged period.  The court reasoned "[f]ive sporadic statements spread out over the course of more than a year are not the sort of systematic advertising capable of significantly affecting competition."  *Id.* at 838.  Likewise, the allegations here—which amount to four "sporadic statements" over the course of several months to two regional distributors and one alleged statement that was easily neutralized—do not meet the (onerous) standard of establishing disparaging comments constituted exclusionary conduct.  SUF ¶¶ 10–11, 16.

In sum, TPS has no admissible evidence that any disparaging comments were made, and also cannot overcome the presumption that any allegedly disparaging comments about its calsil had a *de minimis* effect on competition to constitute exclusionary conduct.  Therefore, allegedly disparaging comments about TPS's calsil cannot support TPS's monopolization claim.

44

**D. TPS Cannot Prove Any Long-Term Anticompetitive Effects to Competition, an Essential Part of Proving Antitrust Injury at Trial.**

TPS lacks evidence to prove antitrust injury—an essential element of its antitrust claims. TPS and its retained economist cannot point to any specific instance in which competition was actually harmed as a result of any unlawful action by Johns Manville. They cannot even identify a specific instance in which an insulation distributor or contractor refused to purchase TPS calsil—which might support economic harm to TPS (a competitor), but not actual, sustained harm to competition. Rather than identify actual harm to competition, TPS's retained expert (Warren-Boulton) speculates only that future harm could occur, stating that he thinks "[i]t is reasonable to think that, prior to trial, market participants . . . anticipate that Johns Manville will resume the challenged conduct if it prevails at trial." ECF 136 at 22. Warren-Boulton specifically declines to analyze any specific unlawful actions. Instead, he says he "understand[s]" TPS will provide evidence at trial of "Johns Manville's taking adverse action against customers who did business with" TPS, which he "understand[s]" will show "that this action caused customers to abstain from doing business with" TPS. ECF 136 at 19.

To prove antitrust injury at trial, TPS "must show the challenged restraint actually injured competition, not merely a competitor." *Suture Express, Inc.*, 851 F.3d at 1044. As part of that inquiry, the court must look carefully at the plaintiff's evidence to see "whether it was really competition that was harmed instead of simply one competitor." *Id.* at 1045.

"It is well established law that the anti-competitive conduct that violates the Sherman Act must have more than a temporary effect on the market." *JetAway Aviation, LLC v. Board of County Comm.*, 2012 WL 1044304 (D. Colo. Mar. 28, 2012) (Matsch, J.) at *4, 6 (granting summary judgment dismissing monopolization claim), *aff'd in part, appeal dismissed in part*, 754 F.3d at

45

825–26 (*per curiam*) ("[B]oth judges conclude that the district court's decision should be affirmed on the ground that JetAway [the plaintiff] has failed to establish an antitrust injury and, consequently, lacks antitrust standing to bring this action.").[7]   Accordingly, an antitrust plaintiff has the "burden of demonstrating significant anticompetitive effect" in the alleged market. *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1317, 1319–20 (10th Cir. 2017) (affirming district court's grant of summary judgment dismissing claims for lack of facts from which jury could find harm to competition in a defined market); *see also Jefferson Par.*, 466 U.S. at 16 ("[A]s a threshold matter there must be a substantial potential for impact on competition in order to justify per se condemnation. If only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law.").

Circuit Judge Holmes' concurring opinion in *JetAway* summarized in detail the case law holding that isolated, short-term instances of lost business by a competitor do not suffice to prove antitrust injury.   754 F.3d at 840–42.   Citing Ninth and Tenth Circuit decisions, he explained that courts have "disregarded temporary anticompetitive effects" and there must be "significant and more-than-temporary harmful effects on competition."   754 F.3d at 841 (Holmes, J. concurring) (quotations and citations omitted).   Relying on the Supreme Court and other cases, his concurring opinion further explained that the Sherman Act "is concerned only with conduct that has long-run

---

[7]   Circuit Judge Holloway was part of the *JetAway* panel reviewing Judge Matsch's dismissal of antitrust claims in part due to the lack of antitrust injury, but he died after the case was argued. 754 F.3d at 825 & n.*–826.   The two remaining judges agreed on a joint *per curiam* decision, with each writing separately to discuss their reasons for finding no antitrust injury.   753 F.3d at 827–55 (Holmes, J. concurring); *Id.* at 855–63 (Tymkovich, J. concurring).

anti-competitive effects" and "if the effect on competition is not more than temporary or transitory, it is of no concern to the antitrust laws." *Id.* at 841–42 (quotations and citations omitted). While Judge Tymkovich's separate concurrence disagreed with how Judge Holmes applied these principles to the facts at issue (e.g., substituting one monopoly for another), Judge Tymkovich agreed with affirming the district court's opinion that the plaintiff failed to state a valid antitrust injury. *Id.* at 855–56, 859–63 (Tymkovich, J. concurring).

"The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Suture Express, Inc.*, 851 F.3d at 1045 (quotations omitted). As part of proving antitrust injury, the antitrust plaintiff must show a direct causal connection between that injury and a defendant's violation of the antitrust laws. *See Belnap v. Steward Health Care System LLC*, 2020 WL 619402 at *3–4 (D. Utah Feb. 10, 2020) (dismissing an antitrust claim arising from denial of privileges of one surgeon at one hospital because it will not have anticompetitive effect on the relevant market).

To date, TPS has relied on mere allegations of alleged threats and lost business. But the Undisputed Facts above show that TPS cannot prove any actual long-term harm to competition. Instead, TPS succeeded with getting distributors to purchase TPS calsil between 2018–2020 despite TPS's mistakes, including its aggressive go-to-market strategy, which incorrectly assumed large distributors would immediately sign its exclusive distribution—a strategy TPS's President (Mr. Shong) admitted was "naïve." SUF ¶¶ 25–26. TPS's progress selling to distributors was stopped by the closure of its supplier's factory in China, with no replacement factory in place, for virtually all of 2021. SUF ¶ 10. TPS cannot blame Johns Manville for that significant problem.

TPS's theory of injury is too remote to constitute long-term anticompetitive effects to competition. Any actual long-term impact on competition is speculative. Therefore, the Court should also dismiss TPS's antitrust claims because it cannot prove antitrust injury.

## V.   CONCLUSION

If the purpose of a summary judgment motion is to "test[] whether a trial is required," then TPS's claims have failed. *Soucy*, 2015 WL 5535347, at *3 (D. Colo. Sept. 21, 2015). After over two years of fact and expert discovery, the production of more than 100,000 pages of documents, and 15 depositions of party and non-party witnesses, TPS still cannot prove its antitrust and Lanham Act claims. The Court should grant summary judgment dismissing all of TPS's claims: for tying, false advertising, and monopolization.

Dated: February 1, 2022.

Respectfully submitted,

   *s/ Gregory J. Kerwin*
Gregory J. Kerwin
Ryan Bergsieker
Allison Kostecka
Lydia Lulkin
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO  80202-2642
Telephone:    303.298.5700
Email:  GKerwin@gibsondunn.com
RBergsieker@gibsondunn.com
AKostecka@gibsondunn.com
LLulkin@gibsondunn.com

*Attorneys for Defendant Johns Manville Corporation*

48

**Defendant's Exhibits**

1.   **TPS Hearsay Documents**

    A.   TPS Second Supplemental Interrogatory Responses to Interrogatory Nos. 8, 9, 10 (highlighted) (August 13, 2021):  providing court-ordered narrative explaining some of TPS's claims.

    B.   Chart (explaining why documents TPS identifies in interrogatory responses all constitute inadmissible hearsay) :  **Restricted Level 1** because TPS designated these documents as "Confidential-Attorneys Eyes Only."

    C.   Compilation of TPS documents cited in its interrogatory responses, which are reviewed in Chart:  **Restricted Level 1** because TPS designated these documents as "Confidential-Attorneys Eyes Only."

        Starting Bates number of TPS documents are:
TPS-4338, -5012, -8515, -10896, -10949, -10967, -11468, -11469, -11837, -13532, -14550, -15169, -31748;
TPS_FTC-24, -29,-38, -39, -41, -49, -51, 108.

2.   **TPS *Prima Facie* Case Chart** (chart summarizing seven Johns Manville documents TPS relies on for its *prima facie* case:  TPS previously filed the underlying documents in opposition to Johns Manville's *Daubert* motion as TPS Ex. 17–23, ECF 166–172).

3.   **Deposition Excerpts** for:

    A.   **Joseph Guest** (4-State Supply distributor): **Restricted Level 1**: because 4-State's counsel designated some pages as "Confidential-Attorneys Eyes Only."

    B.   **Jeffrey Heckman** (TPS)

    C.   **Robert Hlavenka** (Distribution International):  Certain information on page 90 lines:5, 12-14, 19 redacted to omit confidential information.

    D.   **Chad Meyer** (Johns Manville).

    E.   **Jesse Revesz** (TPS):  **Restricted Level 1**: because TPS's counsel designated pages 194:1–21, 195:4–11, 20–24, 197:5–9 as "Confidential-Attorneys Eyes Only."

        i.   Depo. Ex. 6 (Revesz exhibit): TPSX-12 Launch Announcement.

    F.   **David Shong** (TPS):  August 16, 2021, as TPS corporate representative: Certain information on page  96 lines 16–18, 21–23 redacted to omit information TPS designated as "Confidential—Attorneys Eyes Only."

        i.   Depo. Ex. 127 (Shong exhibit): TPSX-12 Data Sheet data sheet on TPS calsil.

    G.   **David Skelly** (Johns Manville);  July 23, 2021:

H.  **David Skelly** (Johns Manville):  August 25, 2021, as Johns Manville corporate representative:

4.  <u>**Other Exhibits**</u>:

A.  Declaration of David C. Skelly (Johns Manville) dated January 29, 2022.

B.  TPS and BEC website posts.

  i.  TPS Blog Post: New BEC Calsil Factory Now Open,  http://calsil-insulation.com/new-bec-calsil-factory-now-open/ (Dec. 30, 2021).

  ii.  BEC Industrial Insulation, Safety Data Sheet, Material Name: Calcium Silicate Insulation, https://tps-industrial-insulations.com/wp-content/uploads/2020/05/SDS-TPSX-12-Calcium-Silicate-Insulation.pdf (May 30, 2017).

  iii.  TPS Technical Bulletin/Industrial Data Sheet: TPSX-12 Calcium Silicate-Third Party Test Results (comparing TPSX-12 to the "incumbent North American brand" calsil)  https://tps-industrial-insulations.com/wp-content/uploads/2020/07/TPS-Technical-Bulletin-100-7-20.pdf (July 2020).

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2022, I electronically filed JOHNS MANVILLE'S MOTION FOR SUMMARY JUDGMENT DISMISSING ALL PLAINTIFF'S CLAIMS with the Clerk of Court using the CM/ECF system. A copy of this document was served on the following counsel of record for Plaintiff through the Court's ECF system:

Alexandra H. Shear
Jarod M. Bona
Luke Hasskamp
Bona Law PC
375 Park Avenue, Suite 2607
New York, NY   10152
Emails:  alex.shear@bonalawpc.com
jarod.bona@bonalawpc.com
luke.hasskamp@bonalawpc.com


Geoffrey N. Blue
Gessler Blue LLC
7350 E. Progress Pl., Suite 100
Greenwood Village, CO 80111
gblue@gesslerblue.com

*s/ Loretta Howard*
Loretta Howard