**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**DISMISSING ALL PLAINTIFF'S CLAIMS**
February 1, 2022
Civil Action No. 1:19-cv-00872-MEH
# Defendant's Exhibit 3-C
# Robert Hlavenka-DI 09/21/21-Excerpts

Robert Hlavenka Volume I
September 22, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CHASE MANUFACTURING,           )
INC. D/B/A THERMAL             )
PIPE SHIELDS,                  )
                               )  Civil Action No.
            Plaintiff,         )  1:19-cv-00872-MEH
                               )
VS.                            )
                               )
JOHNS MANVILLE                 )
CORPORATION                    )
                               )
            Defendant.         )

_ _ _ _ _ _ _ _ _ _

VIDEO-RECORDED DEPOSITION OF ROBERT HLAVENKA
Wednesday, September 22, 2021, 8:03 a.m.
Location of the witness: Friendswood, Texas
Volume I of I - Pages 1 - 94
(REPORTED REMOTELY)

_ _ _ _ _ _ _ _ _ _

Stenographic Reporter:
DENYCE M. SANDERS, TX CSR, RDR, CRR, CCR (LA)
dsanderscsr@gmail.com

```
 1            R E M O T E   A P P E A R A N C E S
 3    ON BEHALF OF PLAINTIFF:
 4     BONA LAW, PC
          BY:  Mr. Luke A. Hasskamp
 5              luke.hasskamp@bonalawpc.com
                Ms. Alexandra Shear
 6     4275 Executive Square, Suite 200
       La Jolla, California  92037
 7     858.964.4589
 8    ***
 9    ON BEHALF OF DEFENDANT:
10     GIBSON, DUNN & CRUTCHER, LLP
          BY:  Mr. Greogry J. Kerwin
11              gkerwin@gibsondunn.com
                Ms. Allison Kostecka
12              Ms. Lydia Lulkin
       1801 California Street, Suite 4200
13     Denver, Colorado  80202
       303.298.5700
14
      ***
15
16    VIDEOGRAPHER:
17         Corey LaBorde
18
      ALSO PRESENT:
19
           Sharla Frenzel - GC for DI
20         Taylor Hines
21
22
23
24
25
```

```
 1                        INDEX

 2              ORAL AND VIDEO DEPOSITION OF

 3           ROBERT HLAVENKA, SEPTEMBER 22, 2021

 4                                                   Page

 5    REMOTE APPEARANCES.......................     2

 6    BY MR. HASSKAMP..........................     6

 7    BY MR. KERWIN............................    43

 8

 9

10   Start time - 8:03 a.m. End time - 10:18 a.m.

11   Total pages: 94

12

13    REPORTER CERTIFICATION...................    94
```

Robert Hlavenka Volume I
September 22, 2021

EXHIBIT INDEX

ORAL AND VIDEO DEPOSITION OF

ROBERT HLAVENKA, SEPTEMBER 22, 2021

| Description | Page |
|---|---|
| Exhibit 240   Press release | 45 |
| Exhibit 241   Hlavenka to Shong email chain 1/7/2020 | 74 |
| Exhibit 242   Johns Manville Purchases by Year | 89 |

1      THE VIDEOGRAPHER:  We are now on the
2    record.  Participants should be aware that
3    this proceeding is being recorded, and, as
4    such, all conversations held will be
5    recorded unless there's a request and
6    agreement to go off the record.
7           Private conversations and/or
8    attorney-client interactions should be
9    held outside the presence of the remote
10   interface.
11          This is the remote video-recorded
12   deposition of Mr. Robert Hlavenka.  Today
13   is the 22nd of September, 2021, and the
14   time now is approximately 8:03 a.m.
15   Central Time where I am.
16          We are here in the matter of Chase
17   Manufacturing, Inc., d/b/a Thermal Pipe
18   Shields versus Johns Manville Corporation.
19          And my name is Corey LaBorde, remote
20   video technician on behalf of U.S. Legal
21   Support.
22          This now concludes my portion.  I
23   will now pass it over to our court
24   reporter, Ms. Denyce Sanders.
25            ROBERT HLAVENKA,

1   having been first duly sworn, testified as follows:
2               E X A M I N A T I O N
3   BY MR. HASSKAMP:
4       Q.   Okay.  Good morning, Mr. Hlavenka.  My
5   name is Luke Hasskamp.  I am one of the attorneys
6   for Thermal Pipe Shields in its dispute with Johns
7   Manville.
8               We really do appreciate you being
9   here this morning.  We know this is really more than
10  an imposition.  You've got other stuff going on, and
11  it's very helpful for the parties that you're able
12  to talk with us today.  So thank you, again.
13              Have you ever been deposed before?
14      A.   No.
15      Q.   Okay.  Well, that's lucky for you,
16  although unlucky today.
17              I'll just quickly go over some of
18  the stuff.  You've already seen how the sausage is
19  made a little bit on this.  It's being videotaped,
20  audio-recorded, and transcribed.  Okay?
21              And this is meant to be testimony
22  that can be used in our legal proceedings.  So this
23  could be shown to the jury; could be shown to the
24  judge in other stages.  You understand that; right?
25      A.   I do.

```
 1      Q.      Okay.  And so do you know if Evan Stone
 2  had a conversation with either of them about Johns
 3  Manville's concerns about DI selling and stocking
 4  TPS calsil?
 5      A.      I don't.
 6      Q.      Did you ever have a conversation with
 7  Dave Skelly about TPS calsil?
 8      A.      Not that I can recall.
 9      Q.      Did you ever hear any criticism of TPS's
10  calsil by any Johns Manville personnel?
11      A.      What we -- what we heard was -- and
12  I'll -- I'm not saying verbatim.  But that you have
13  to be real careful with Chinese calsil because the
14  amount of free silica in their product could be a
15  huge issue.  Which I thought was kind of funny
16  because JM -- the TPS plant is the old JM plant that
17  they were importing from for years.  So, I mean, I
18  didn't really understand it, you know.
19              And then it was told to me, well,
20  "You know that we were shipping raw -- all the raw
21  materials from the U.S. into that plant to make sure
22  that when we had the plant, it was -- it was meeting
23  all the standards; but you can't believe that now."
24  So that's definitely been said.
25              MR. KERWIN:  Mr. Hasskamp --
```

```
 1          Mr. Hasskamp, your time is up under the
 2     rules that DI's general counsel negotiated
 3     with you.  We weren't part of it.  You've
 4     used one hour.  We had advocated more
 5     time, but you're finished.
 6          MR. HASSKAMP:  Greg, my math says
 7     I've got 48 seconds; and we were
 8     interrupted by window washers.  So if I
 9     can just -- I --
10          MR. KERWIN:  Take your 48 seconds,
11     please.
12          MR. HASSKAMP:  I'll do it.  I'll do
13     it.
14          Perfect.  There's my countdown.
15     Q.   (BY MR. HASSKAMP)  Do you recall who --
16  who said this to you from JM?
17     A.   Al Shapiro.
18     Q.   I'm sorry.  Who was that?
19     A.   Al Shapiro.
20     Q.   Okay.  And did you have any
21  conversations with Dave Shong, then, about the
22  product?
23     A.   Yes.  And he sent spec sheets showing
24  that it met all the ASTMs and everything else.
25  Correct.
```

```
 1     A.     Yeah, but he -- he continued to do that
 2  anyway.  We bought from -- we're buying from TPS,
 3  and we still don't have Heckman's business, right,
 4  because he refuses to buy JM product.
 5     Q.     Okay.  But the threat got your
 6  attention, didn't it?
 7     A.     Sure.
 8     Q.     So you initially asked David Shong for
 9  proof that the calcium silicate from China didn't
10  have any silica issues or other quality issues;
11  right?
12     A.     Right.
13     Q.     You wanted proof of that?
14     A.     Yes.  I wanted him to address it.
15     Q.     And you're familiar with other companies
16  in China that make calcium silicate, like ASK;
17  correct?
18     A.     Correct.
19     Q.     And sometimes that shows up on insulated
20  material that's shipped on equipment that's already
21  preinsulated; right?
22     A.     The ASK product, you mean.
23     Q.     Yes.
24     A.     I didn't.
25     Q.     And you know there have been products in
```

```
 1  the United States with certain types of calsil from
 2  China not meeting ASTM specifications; right?
 3       A.    I don't have knowledge of that.  It's a
 4  rumor.
 5       Q.    Okay.  And so you wanted to satisfy
 6  yourself with the TPS calcium silicate that it met
 7  specifications; right?
 8       A.    I was told from JM that it -- that I
 9  needed to watch out for -- for free silica in the
10  TPS product.  And so once -- once I was told that, I
11  felt an obligation, fiduciary obligation to reach
12  out to the manufacturer and have them address it, so
13  it wasn't a liability on DI's part.
14       Q.    And you satisfied yourself with TPS's
15  calcium silicate that its silica content is okay?
16       A.    Correct.
17       Q.    And based on that, DI went ahead and
18  purchased TPS calcium silicate; right?
19       A.    Right.
20       Q.    Another disadvantage for DI in
21  purchasing TPS calcium silicate was the stocking
22  space in the DI warehouses; right?
23       A.    Yes.  With any dual stocked product,
24  correct.
25       Q.    Okay.  DI doesn't always dual stock the
```

1  it at that stage.
2      Q.    Okay.
3      A.    So, at some point, GLT, yeah, you know,
4  became known that, you know, that GLT was stocking
5  it; but it wasn't foremost in my mind.
6      Q.    Okay.  The reason that DI wasn't
7  purchasing TPS's calcium silicate initially wasn't
8  because of concerns about silica content or
9  something like that, was it?
10     A.    No.
11     Q.    You could have satisfied those concerns
12 at any time by seeking test information?
13     A.    Correct.
14     Q.    So very briefly, then, how has the TPS
15 relationship worked out for DI?
16     A.    It's fine.  I mean, the only issue that
17 we have with TPS now is we're waiting on them to
18 commission their new factory and be able to supply
19 materials again.
20     Q.    So that makes it hard to promote the TPS
21 calcium silicate to your customers?
22     A.    At this stage, correct.
23     Q.    Has there been strong customer interest
24 for DI in the TPS calcium silicate?
25     A.    I would not say "strong," no.  I would

```
 1  say "moderate."
 2       Q.     Okay.  Why moderate?
 3       A.     Because it's a -- it's a new product;
 4  right?  It's a product that, like any product, has
 5  to be seen in the -- and delivered and get people up
 6  to speed to what it is; right?  So any product
 7  that's brand-new is going to take some time to kick
 8  off.
 9                [Simultaneous speaking.] --
10       A.     Go ahead.
11       Q.     (BY MR. KERWIN)  Go ahead.  Please
12  finish.
13       A.     I was going to say, in the fact that,
14  you know, during this particular time, as you said,
15  BEC closed the factory, and they're moving it, put,
16  say, a pause on that -- on that acceptance from the
17  customer.
18       Q.     Okay.  And then the long lead times are
19  a problem when you need substantial volumes; right?
20       A.     Correct.
21       Q.     You know TPS doesn't stock large volumes
22  in its two warehouses in Washington and Nevada?
23       A.     I'm not certain what they're stocking at
24  this stage.
25       Q.     Okay.  But typically for DI, you need
```

```
 1  silicate below the Johns Manville calcium silicate?
 2       A.    Correct.
 3       Q.    Would you offer it at 20 percent less?
 4       A.    You know, it would depend on exactly
 5  what the market would bear.
 6       Q.    So on the TPS quality, have any of the
 7  DI customers, the facility owners, the contractors,
 8  or the engineers raised any of their own quality
 9  concerns about TPS calcium silicate?
10       A.    Yes.  We've had a -- we've had a few ad
11  hoc concerns with the products.
12       Q.    Tell us about those.
13       A.    We had one customer who said that the
14  product wouldn't -- they were making elbows out of
15  it.  It wouldn't glue correctly.  Ultimately, we
16  found out that they were using the wrong adhesive.
17  So once we did work in our own factory with the
18  right adhesive, it quelled that issue.
19                 So we've had some of those type of
20  things; but generally speaking, though...
21       Q.    So you mentioned that DI purchases
22  expanded perlite from Johns Manville and from two
23  other companies, right, SMC and Howred?
24       A.    Yes, sir.
25       Q.    Johns Manville has never threatened to
```

1  not sell perlite to DI, has it?
2       A.      No.
3       Q.      That would be kind of stupid, wouldn't
4  it?
5       A.      I would think so.
6       Q.      They would want to sell their material
7  through you if they can?
8       A.      Right.
9       Q.      If they were to refuse to supply DI with
10 perlite, could DI satisfy its needs for perlite
11 through SMC or Howred if it had to?
12      A.      Maybe not.  There may not be enough
13 capacity to do that.
14      Q.      Okay.  But there's never been a threat
15 or a suggestion that it would do that?
16      A.      Correct.
17      Q.      So in the roughly ten minutes we have, I
18 wonder if you could help the jury in Denver
19 understand a little bit more at a high level, of how
20 a large insulation distributor works.
21              So an insulation distributor like DI
22 tries to sell the materials that it carries -- that
23 customers want to purchase from it; right?
24      A.      Correct.
25      Q.      A distributor is, in effect, a

REDACTED

Case No. 1:19-cv-00872-MEH Document 193-7 filed 02/01/22 USDC Colorado pg 16 of 19

Robert Hlavenka Volume I
September 22, 2021

```
 1  year.
 2              And what I wanted to ask you is:
 3  Does this remind you that the increase in sales
 4  combined of calcium silicate and expanded perlite
 5
 6  see, in fact, the calcium silicate declined by 1.5
 7  million?
 8       A.    Sure.
 9       Q.    And the increase in expanded perlite
10  didn't make up for that decline; right?
11       A.    Correct.
12
13
14
15  triggered; right?
16       A.    Yeah, that's what this is showing, I
17  believe; yes.
18       Q.    Okay.  And regardless, DI could have
19
20  calcium silicate or entirely expanded perlite;
21  right?
22       A.    Right.
23       Q.    And then finally, I was asking you about
24  whether Johns Manville ever threatened not to sell
25  expanded perlite, and your answer was "no."
```

```
 1                Johns Manville never threatened to
 2   not sell DI fiberglass pipe insulation; correct?
 3        A.      Say that again, sir.
 4        Q.      Did Johns Manville ever threaten DI to
 5   not sell fiberglass pipe insulation to it?
 6        A.      No, it never did.
 7        Q.      That would have been foolish for Johns
 8   Manville, again, wouldn't it?
 9        A.      Correct.
10        Q.      DI sells a great deal of fiberglass pipe
11   insulation for Johns Manville, and that's a benefit
12   to it?
13        A.      That's correct.
14                MR. KERWIN:  I'm going to take a
15        one-minute break just to ask my colleagues
16        of any last minute questions.  I think
17        I've got about four minutes or so.  Let's
18        go off the record.
19                THE VIDEOGRAPHER:  Okay.  We are off
20        the record at 10:15 a.m. Central Time.
21                (Off the record.)
22                THE VIDEOGRAPHER:  We're back on the
23        record at 10:16 a.m. Central Time.
24        Q.      (BY MR. KERWIN)  Mr. Hlavenka, before I
25   ask a couple more questions, is there any of your
```

```
 1  testimony so far today that you want to go back and
 2  correct or clarify?
 3       A.    Not that I know of.
 4       Q.    Okay.  And did Johns Manville ever
 5  refuse to sell calcium silicate to DI at any time?
 6       A.    In particular markets, yes.
 7       Q.    Like Pittsburgh?
 8       A.    Correct.
 9       Q.    With -- with DI distribution warehouses
10  where Johns Manville doesn't support the warehouse
11  at all?
12       A.    Well, they were supporting us with
13  mineral wool but not with calsil.
14       Q.    Because of existing commitments to other
15  distributors?
16       A.    That's correct.
17       Q.    Okay.  Do you have something else in
18  mind besides Pittsburgh?
19       A.    I can't give you examples.  I'm certain
20  that there are one or two out there.
21       Q.    Okay.  But nothing specific in mind?
22       A.    That's right.
23       Q.    And with Pittsburgh, you know that David
24  Shong tried to pitch the DI warehouse in Pittsburgh
25  with the TPS calcium silicate?
```

```
 1                REPORTER CERTIFICATION
 2    THE STATE OF TEXAS :
      COUNTY  OF  HARRIS :
 3
            I, DENYCE SANDERS, a Certified Shorthand
 4    Reporter and Notary Public in and for the State of
      Texas, do hereby certify that the facts as stated by
 5    me in the caption hereto are true; that the above and
      foregoing answers of the witness, ROBERT HLAVENKA, to
 6    the interrogatories as indicated were made before me
      by the said witness after being first duly sworn to
 7    testify the truth, and same were reduced to
      typewriting under my direction; that the above and
 8    foregoing deposition as set forth in typewriting is a
      full, true, and correct transcript of the proceedings
 9    had at the time of taking of said deposition.
10            I further certify that I am not, in any
      capacity, a regular employee of the party in whose
11    behalf this deposition is taken, nor in the regular
      employ of his attorney; and I certify that I am not
12    interested in the cause, nor of kin or counsel to
      either of the parties;
13
            That the amount of time used by each party at
14    the deposition is as follows:
15          MR. HASSKAMP - 01:15:31
            MR. KERWIN - 00:58:13
16
            GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
17      this, the 23rd day of September, 2021.
18
19      _____
            DENYCE SANDERS, CSR, RDR, CRR, TCRR
20          Notary Public in and for
            Harris County, T E X A S
21
       My Commission Expires:  4-14-25
22     Certification No.:  4038
       Expiration Date:  04-30-22
23     U.S. Legal Support, Inc./Firm No. 122
       16825 Northchase Drive, Suite 800,
24     Houston, Texas  77060; 713.653.7100
       JOB NO. 1-398733
25
```