IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:19-cv-00872-MEH**

CHASE MANUFACTURING, INC., d/b/a
THERMAL PIPE SHIELDS,

*Plaintiff*,

v.

JOHNS MANVILLE CORPORATION,

*Defendant.*

---

# PLAINTIFF'S OPPOSITION TO
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

THERMAL PIPE SHIELDS'S RESPONSE TO JOHNS MANVILLE'S STATEMENT
OF UNDISPUTED MATERIAL FACTS ................................................................ 3

LEGAL STANDARD ............................................................................................. 31

ARGUMENT .......................................................................................................... 33

   I.    Thermal Pipe Shields's Monopolization Claim Is Supported by Sufficient and
       Admissible Evidence of Johns Manville's Exclusionary Conduct. ...................... 33

       A.   The legal standard for a monopolization claim under the Sherman Act............. 33

       B.   There is admissible evidence of Johns Manville's exclusionary conduct. .......... 34

            1.    Johns Manville's Refusal to Supply…………………………………...……34

            2.    Johns Manville's Exclusive Dealing…………………………………………44

            3.    Johns Manville's Disparagement of Thermal Pipe Shields's Product……………51

            4.    Johns Manville's Unlawful Tying……………………………………………55

   II.   Thermal Pipe Shields's Tying Claim Is Supported by Sufficient and Admissible
       Evidence of an Actual or Threatened "Tie" by Johns Manville................................... 56

       A.   Thermal Pipe Shields can prove a per se tying claim. ..................................... 56

       B.   Admissible evidence supports Thermal Pipe Shields's rule of reason
           tying claim. ...................................................................................................... 61

  III.  Thermal Pipe Shields Can Prove Antitrust Injury Stemming from Johns
       Manville's Unlawful Conduct. ............................................................................. 62

  IV.  The Court Should Not Be Misled to Think that Johns Manville's Artificially
       Narrow Excerpt of the Discovery Record Is Representative. ...................................... 65

       A.   Thermal Pipe Shields's Interrogatory Responses do not consider the
           most relevant sources of information.................................................................. 66

       B.   Thermal Pipe Shields has not yet had occasion to prove its case
           affirmatively; it has only provided a brief preview of the evidence
           that supports its claims. .................................................................................... 68

       C.   Deposition testimony from two distributors alone proves most of the
           elements of Thermal Pipe Shields's two antitrust claims. ................................. 69

CONCLUSION....................................................................................................... 72

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abraham v. Intermountain Health Care, Inc.*,
   461 F.3d 1249 (10th Cir. 2006) ........................................................................32, 33

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..........................................................................................31

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
   No. 1:17-cv-00598, 2018 U.S. Dist. LEXIS 131206 (N.D.N.Y. Aug. 6, 2018).....................57

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 525 (1985)......................................................................................34, 43

*Breaux Bros. Farms, Inc. v. Teche Sugar Co.*,
   21 F.3d 83 (5th Cir. 1994) .............................................................................59, 60

*Brokerage Concepts v. U.S. Healthcare*,
   No. 95-1698, 1995 U.S. Dist. LEXIS 10807 (E.D. Pa. July 25, 1995)...................................59

*Brown v. May*,
   No. 2:16-cv-01873, 2019 U.S. Dist. LEXIS 183681 (E.D. Pa. Oct. 23, 2019) ........................3

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)..........................................................................................63

*Caldera, Inc. v. Microsoft Corp.*,
   72 F. Supp. 2d 1295 (D. Utah 1999)......................................................................34

*Caldera, Inc. v. Microsoft Corp.*,
   87 F. Supp. 2d 1244 (D. Utah 1999)......................................................................51

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) ............................................................................60

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..........................................................................................31

*Cohlmia v. St. John Med. Ctr.*,
   693 F.3d 1269 (10th Cir. 2012) ..........................................................................63

*Crocs, Inc. v. Effervescent, Inc.*,
  248 F. Supp. 3d 1040 (D. Colo. 2017)......................................................................45

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)................................................................................ *passim*

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
  MDL No. 2785, 2017 U.S. Dist. LEXIS 209710 (D. Kan. Dec. 21, 2017)...........................34

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
  394 U.S. 495 (1969)........................................................................................58

*Fox Motors, Inc. v. Mazda Distribs. (Gulf), Inc.*,
  806 F.2d 953 (10th Cir. 1986) ............................................................................61

*FTC v. Rocky Mountain Circulation*,
  No. 86-F-798, 1987 U.S. Dist. LEXIS 15935 (D. Colo. Jan. 23, 1987)................................32

*Green Country Food Mkt., Inc. v. Bottling Grp.*,
  371 F.3d 1275 (10th Cir. 2004) ..........................................................................32

*Healy v. Cox Commc'ns, Inc. (In re Cox Enters.)*,
  871 F.3d 1093 (10th Cir. 2017) ..........................................................................61

*Image Tech. Servs. v. Eastman Kodak Co.*,
  903 F.2d 612 (9th Cir. 1990) .............................................................................59

*JetAway Aviation, LLC. v. Bd. of Cnty. Comm'rs*
  No. 07-cv-02563-RPM, 2012 U.S. Dist. LEXIS 42377 (D. Colo. Mar. 28,
  2012) .............................................................................................64, 65

*Law v. NCAA*,
  134 F.3d 1010 (10th Circ. 1998)..........................................................................62

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
  762 F.3d 1114 (10th Cir. 2014) ......................................................................52, 54

*LePage's, Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003)......................................................................45, 46, 49

*Lorain Journal v. United States*,
  342 U.S. 143 (1951)......................................................................................35

*Lucas v. Off. of the Colo. State Pub. Def.*,
  No. 15-cv-00713-CBS, 2016 U.S. Dist. LEXIS 193956 (D. Colo. Aug. 25,
  2016) ...................................................................................................3

*Mathews v. Lancaster Gen. Hosp.*,
   87 F.3d 624 (3d Cir. 1996) ................................................................................63

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ..........................................................................................32

*McGill v. Am. Land & Expl. Co.*,
   776 F.2d 923 (10th Cir. 1985) ..........................................................................32

*McWane, Inc. v. FTC*,
   783 F.3d 814 (11th Cir. 2015) .....................................................................46, 48

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ..........................................................................................49

*Multistate Legal Stud. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns*,
   63 F.3d 1540 (10th Cir. 1995) .............................................................32, 33, 34, 35

*NCAA v. Bd. of Regents*,
   468 U.S. 85 (1984) ............................................................................................63

*N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*,
   994 F.3d 1166 (10th Cir. 2021) ........................................................................44

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
   311 F. Supp. 2d 1048 (D. Colo. 2004) ..............................................................35

*Norton v. Liddell*,
   620 F.2d 1375 (10th Cir. 1980) ........................................................................32

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ...................................................................33, 43

*Osborn v. Sinclair Refin. Co.*,
   286 F.2d 832 (4th Cir. 1960) ............................................................................59

*Palmyra Park Hosp. v. Phoebe Putney Mem'l Hosp.*,
   604 F.3d 1291 (11th Cir. 2010) ........................................................................57

*In re Pool Corp.*,
   FTC, Dkt. No. C-4345 .......................................................................................35

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
   614 F.3d 57 (3d Cir. 2010) ...............................................................................45

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*,
    899 F.2d 951 (10th Cir. 1990) ............................................................63

*Rodgers v. Beechcraft Corp.*,
    759 F. App'x 646 (10th Cir. 2018) ......................................................32

*Rossi v. Standard Roofing*,
    156 F.3d 452 (3d Cir. 1998)...............................................................33

*Sidibe v. Sutter Health*,
    No. 12-cv-04854-LB, 2021 U.S. Dist. LEXIS 45221 (N.D. Cal. Mar. 9, 2021) ....................58

*SolidFX, LLC v. Jeppesen Sanderson, Inc.*,
    841 F.3d 827 (10th Cir. 2016) .............................................43, 44, 56

*SolidFX, LLC v. Jeppesen Sanderson, Inc.*,
    935 F. Supp. 2d 1069 (D. Colo. 2013), *aff'd*, 841 F.3d 827 (10th Cir. 2016) ........................56

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*,
    131 F.3d 874 (10th Cir. 1997) ............................................................56

*Suture Express, Inc. v. Owens & Minor Distrib., Inc.*,
    851 F.3d 1029 (10th Cir. 2017) ................................................. *passim*

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961).............................................................45, 46, 49

*United States v. Dentsply*,
    399 F.3d 181, 189-90 (3d Cir. 2005.............................................. *passim*

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)...........................................................................33

*United States v. Griffith*,
    334 U.S. 100 (1948)...........................................................................33

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)...........................................................................33

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001).........................................................46, 47

*Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko*,
    540 U.S. 398 (2004)....................................................34, 43, 44

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ........................................................................58

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010)............................................................................51

*Whitesel v. Sengenberger*,
  222 F.3d 861 (10th Cir. 2000) ......................................................................32

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)....................................................................*passim*

## Statutes and Rules

15 U.S.C. § 1 ..............................................................................................*passim*

15 U.S.C. § 1051 *et seq.*............................................................................3, 66

Fed. R. Civ. P. 26 ...........................................................................................66

Fed. R. Civ. P. 56 .....................................................................................31, 68

Fed. R. Evid. 801 ...........................................................................................69

Fed. R. Evid. 803 ...........................................................................................69

## Other Authorities

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
  Principles and Their Application* (2d ed. 2002) ......................................46

Jonathan M. Jacobson, *Exclusive Dealing, 'Foreclosure,' and Consumer Harm*,
  70 Antitrust L.J. 311, 362 (2002)............................................................46, 47

## INTRODUCTION

Johns Manville ("JM") boldly begins its brief by stating that Thermal Pipe Shields ("TPS") "has *zero* evidence of unlawful, anticompetitive conduct" ECF 193 at 1. But to support this "zero evidence" hyperbole, JM must ignore its own documents which show that JM threatened to, and did in fact, retaliate against customers who bought calsil from TPS. And they depict a pattern evident throughout the discovery record.

Indeed, just days after TPS entered the calsil market, JM developed its "



" for customers, which ominously warned: "

" The evidence shows that JM personnel carried out that policy, following the directives of "                    " and repeatedly threatening that JM would

with any customers who bought TPS calsil.

To claim "zero evidence," JM must also ignore the admissions of its own witnesses—and consistent deposition testimony of third-party distributors—who described JM's threats. This includes testimony from JM's Chad Meyer that

if they dealt with TPS. This also includes testimony from Robert Hlavenka, from distributor Distribution International ("DI"), who testified that DI did not stock TPS calsil despite believing it to be higher quality and sold at a 20% discount because DI "didn't want to get on JM's bad side." Mr. Hlavenka described being threatened by JM personnel about repercussions (e.g., that JM might begin to sell through DI's Houston-area competitor

instead of DI) if DI did further business with TPS. To this day, DI—the largest distributor in the calsil market—purchases 99% of its calsil from JM.

Likewise, Joseph Guest of distributor 4 State Supply ("4 State") testified about a conversation he had with Mr. Meyer, who told Mr. Guest "that if [4 State] continued to buy TPS's Calsil, [4 State] would no longer be able to purchase Johns Manville Calsil," a threat that Mr. Meyer confirmed "was coming from [JM's] upper management." Mr. Guest was "concerned" about JM's threat because ███████████████████████████████████████

███████████████████████████████████████████████████████

█████████ Indeed, Mr. Guest testified that ████████████████████████████

████████████████████. And that threat was realized—JM stopped selling to 4 State's Wichita location after it started buying TPS calsil.

Further, given the highly concentrated nature of the industrial insulation market, particularly for calsil, JM succeeded at quickly foreclosing the calsil market to TPS. The evidence shows that just four distributors—DI, Specialty Products & Insulation ("SPI," formerly known as Foundation Building Materials ("FBM")), Bay Insulation ("Bay"), and General Insulation ("GI")—account for more than ████ of all calsil sales in the distributor market, with DI alone accounting for ████

On summary judgment, the Court construes all facts and reasonable inferences in favor of TPS, the non-moving party. And the Court should consider the facts in their full context, not just as isolated snippets narrowed to obscure their real significance. Because the evidence is sufficient for a reasonable juror to conclude that (1) JM has monopoly power in the calsil market—the relevant market for analyzing TPS's claims, and (2) JM engaged in four types of unlawful

exclusionary conduct—refusing to supply JM products to customers, entering into unlawful exclusive dealing arrangements, tying the sale of JM calsil to its other products, and disparaging TPS and its calsil—the Court should allow TPS to present its monopolization and tying claims to a jury.[1]

## THERMAL PIPE SHIELDS'S RESPONSE TO
## JOHNS MANVILLE'S STATEMENT OF UNDISPUTED MATERIAL FACTS

TPS does not deny the factual statements in Paragraphs 13 and 14 of JM's Statement of Undisputed Facts. TPS does deny the factual statements in Paragraphs 1–12 and 15–27. Much of JM's Statement of Undisputed Facts goes beyond its mandate to provide factual bases for the Court's decision and instead offers legal conclusions that are not appropriate for JM to make. TPS disputes these legal conclusions and does not offer a competing legal conclusion for the Court's consideration for the same reason that JM should not have done so. *See Brown v. May*, No. 2:16-cv-01873, 2019 U.S. Dist. LEXIS 183681, at *6–7 (E.D. Pa. Oct. 23, 2019) ("Defendants' Statement of Undisputed Material Facts contains legal conclusions that the Court is not required to accept as undisputed."); *Lucas v. Off. of the Colo. State Pub. Def.*, No. 15-cv-00713-CBS, 2016 U.S. Dist. LEXIS 193956, at *10 (D. Colo. Aug. 25, 2016) ("legal conclusions" are not facts "that would be admissible in evidence").

Without limitation, because JM's use of the term "admissible evidence" is a legal conclusion, not a statement of fact, TPS disputes but does not otherwise respond to that term. Additionally, JM's Statement of Undisputed Facts improperly offers legal conclusions about: (1)

---

1.     Notwithstanding that there is evidence from which a reasonable juror could conclude that TPS succeeds on all elements of its claim for violations of Section 43(a) of the Lanham Act, TPS withdraws that claim as unnecessary because it is redundant of its treble damages Sherman Act claims, especially given that JM's disparagement of TPS calsil constitutes exclusionary conduct.

the "anticompetitive reasons" animating JM's conduct; (2) what constitutes an "exclusive dealing" arrangement or any element or elements of a claim for express or implied exclusive dealing; and (3) what constitutes an unlawful "refusal to supply" a customer or any element or elements of a claim for unlawful refusal to supply. The Court should disregard these statements for the same reasons it should reject JM's attempt to usurp its function by characterizing TPS's evidence as "inadmissible."

Finally, the Court also should ignore JM's characterization of ECF 152-1, the September 27, 2021 Expert Report of Dr. Frederick R. Warren-Boulton ("Warren-Boulton Report"). TPS incorporates all of Dr. Warren-Boulton's conclusions as explained in the Warren-Boulton Report and his February 10, 2022 testimony.

**1.    There is no admissible evidence that Johns Manville tied sales of its expanded perlite to sales of calsil.**

<u>TPS response</u>: Denied. Documentary evidence and deposition testimony from the parties and their distributor customers show that JM's reaction to TPS's anticipated (and actual) entry into the calsil market was to threaten customers who contemplated straying. Specifically, JM threatened them with being denied access to JM's products, including perlite, as a consequence of those customers' purchase of calsil from TPS. In this context, "denied access" means either or both of "denied access altogether" or "provided access, but only on less favorable terms or conditions." The evidence also shows that these threats were effective and JM's customers acquiesced to them, accomplishing the purpose of the threatened tie.

To the extent that any JM language does not specifically refer to perlite—but merely refers to ██████████████████████████████████████████████████ —

those customers who purchased perlite from JM assumed that being "cut off" by JM would include

being denied the ability to purchase, or having the terms of purchase revised for, perlite.

| Citation | Relevant Text |
|---|---|
| JM 30(b)(6) Tr. at 145:4-147:12 | JM's corporate representative testified that JM's share is about ███ in both the perlite and fiberglass markets. |
| ECF 152-1 at Table 5 | Sales data and chart reflecting amount of JM sales by distributor. |
| JM00074261 | In developing "███████ to respond to the ███████ JM made clear among themselves that: ███████ |
| Hlavenka Tr. at 18:7-13; 33:18-36:2 | DI pays a premium for JM products because of JM's "brand name" and stated that "I don't think that we can do without JM" because, without JM's products, DI could not compete in "a lot of markets." |
| Hlavenka Tr. at 28:21-29:23 | Mr. Hlavenka estimated that DI purchases annually:<br>- ███████ of calsil, of which "traditionally, ███ now" is from JM<br>- ███ of perlite, of which ███ is from JM<br>- ███ of fiberglass, of which ███ is from JM |
| Hlavenka Tr. at 23:6-17; 24:16-25:13; 28:21-29:23; 84:13-20 | Even though, "I believe that the TPS product is a superior product, in my opinion, than the JM product," and DI buys TPS calsil for roughly 20% less than JM calsil, DI continues to buy 99% of its calsil from JM. |
| Hlavenka Tr. at 37:6-38:19 | JM's Eric Alley was "being very careful about what they said" to Mr. Hlavenka in a conversation in which Mr. Alley expressed his disappointment at DI's having bought TPS calsil. |
| Hlavenka Tr. at 38:20-39:25; 79:16-80:24 | JM's Hal Shapiro warned Mr. Hlavenka that "if somebody were to start stocking TPS," then JM would have to "relook" at its relationship with DI and instead possibly support DI's competitor, GI. Because JM had said that it already had adequate distribution in that area—"[c]urrently, Johns Manville does not sell General Insulation calsil in Houston. And they—they say, between Bay and SPI and DI, which are competitors in Houston, that's a big enough market"—DI understood this to mean that JM would support GI instead of—not in addition to—DI. Mr. Hlavenka testified that JM's telling him, "'If you don't buy'—you know, 'If you don't upset the |

| | |
|---|---|
| Hlavenka Tr. at 38:20-39:25; 79:16-80:24 (Continued) | apple cart, so to speak, and distribute our [competitor's] products, we won't set up General [Insulation]'" was a "perceived threat." |
| JM00018081 at JM00018082-83 | ███████████████████████████████████████ ███████████████████████████████████████ ██████████████ DI responded that ██████████ ███████████████████████████████████████ |
| Hlavenka Tr. at 66:21-67:16 | "[W]e need to have a relationship with JM . . . . We didn't—you know, we didn't want to get on JM's bad side either, by stocking TPS, in that regard." |
| JM00023086 | JM learned that Bay ██████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████ |
| JM00007814 | ███████████████████████████████████████ |
| JM00011469 | █████████████████████████████ |
| Mark Duppler email ("Duppler email") | "Did we have an agreement with JM to use as a sole source?" "I hope TPS plans on supporting Bay at any location since it sounds pretty likely that JM will be cutting [us] off from cal sil"; "I doubt that you will be stocking both. They are taking a hard line against selling [to] anyone who is stocking a 'different' brand. The problem is that they will simply raise the price to put it out of reach. We all know the game. They can't cut us off, but they can make it pretty hard to do business with them"; and "Will they now be cutting off all their distribution that sells OC or Knauf on the fiberglass side? Same argument." |
| JM00029809 | ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ |
| Meyer Tr. at 131:17-132:24 | Mr. Meyer "told [4 State] that we have visibility into things that are imported," but denies knowing the purpose of sharing that statement. |
| JM00003324 | Referring to 4 State and API Distribution ("API") as ███████ ███████████████████████████████████ |

| | |
|---|---|
| JM00028748-749 | |
| JM00003503 | |
| JM00003499 | |
| Meyer Tr. at 109:9-111:25 | Mr. Meyer testified that he and Mr. Alley |
| JM00001451 | |
| JM00028748-749 | |
| TPS 30(b)(6) Tr. at 295:7-19 | "API really didn't buy anything after those first two containers because of Chad Meyer and Eric Alley's threats after they received them." |
| JM00003854 (spelling mistake corrected) | An internal JM email with the subject, |
| JM00034501 | |
| JM00004024 | |

| | |
|---|---|
| TPS0003876 | "Today (10/22) I met with Rand Industrial in Romulus, Michigan. At lunch, Richard Goupille (part owner) told me about an interaction that he had 'a few months ago'. Curtis Marmaduke is with General Insulation and he is listed as the Midwest Industrial Sales Manager out of Indianapolis, Indiana. Curtis came to visit Rand and during this meeting Richard Goupille asked Curtis if Rand could purchase TPSX-12 calsil from General. Curtis said 'JM has told us that if we purchase TPSX-12 that they will not sell us any other products'. For this reason, Rand never ended up purchasing our calsil through General." |
| JM00001394; Hlavenka Tr. at 24:15-25:13; Guest Tr. at 25:6-15; Hlavenka Tr. at 23:6-13; ECF 152 at 48, citing TPS 30(b)(6) Tr. at 103:6-12; Guest Tr. 171:13-173:2; and JM00039166 | These statements all show just how feared JM is in the industry, and why customers would stick with JM, despite that TPS's calsil is better quality, lower priced, and arrives just as quickly. |
| Hlavenka Tr. at 34:1-35:1 | Referring to JM's practice of "bundling the calsil/perlite together for added incentive" as a "recent strategy" that "began probably in 2018." |
| ECF 152-1 | Warren-Boulton Report |

**2. There is no admissible evidence that Johns Manville tied sales of its fiberglass pipe insulation to sales of calsil.**

TPS response: Denied. Documentary evidence and deposition testimony from the parties and their distributor customers show that JM's response to TPS's anticipated (and actual) entry into the calsil market was to threaten customers. Specifically, JM threatened to deny access to its products, including fiberglass, as a consequence of those customers' purchase of calsil from TPS. In this context, "denied access" means either or both of "denied access altogether" or "provided access, but only on less favorable terms or conditions." The evidence also shows that these threats were effective and JM's customers acquiesced to them, accomplishing the purpose of the threatened tie.

To the extent that any JM language does not specifically refer to fiberglass—but merely refers to █████████████████████████████ █████—those customers who purchased fiberglass from JM assumed that being "cut off" by JM would include being denied the ability to purchase, or having the terms of purchase revised for, fiberglass.

| Citation | Relevant Text |
|---|---|
| *See* documents cited in TPS's Response to JM Fact # 1. ||

**3.      There is no admissible evidence that Johns Manville tied sales of any or all of its insulation materials other than calsil to sales of calsil.**

TPS response: Denied. Documentary evidence and deposition testimony from the parties and their distributor customers show that JM's response to TPS's anticipated (and actual) entry into the calsil market was to threaten customers. Specifically, JM threatened being denied access to JM's products, including individual products and JM's entire line of products, as a consequence of those customers' purchase of calsil from TPS. In this context, "denied access" means either or both of "denied access altogether" or "provided access, but only on less favorable terms or conditions." The evidence also shows that these threats were effective and JM's customers acquiesced to them, accomplishing the purpose of the threatened tie.

To the extent that any JM language does not specifically refer to any individual product—but merely refers █████████████████████████████████ ███████—those customers who purchased any products other than calsil from JM assumed that being "cut off" by JM would include being denied the ability to purchase, or having the terms of purchase revised for, those products.

| Citation | Relevant Text |
|---|---|
| *See* documents cited in TPS's Response to JM Facts # 1-2. ||

    4.    **TPS did not disclose expert opinions purporting to quantify Johns Manville's alleged market power in the alleged tying products: expanded perlite, fiberglass pipe insulation, or any and all of Johns Manville's insulation materials other than calsil.**

    TPS response: Denied. Dr. Warren-Boulton's opinions are documented in his Report.

| Citation | Relevant Text |
|---|---|
| *See* documents cited in TPS's Response to JM Facts # 1-3. ||
| ECF 152-1 | Warren-Boulton Report |

    5.    **Robert Hlavenka, Senior Vice President of Strategic Sourcing of Distribution International ("DI"), testified that Johns Manville did not threaten to refuse to sell either expanded perlite or fiberglass pipe insulation to DI.**

    TPS response: Denied.

| Citation | Relevant Text |
|---|---|
| *See* documents cited in TPS's Response to JM Facts # 1-3. ||

    6.    **Joe Guest, regional sales manager for 4-State Supply ("4-State") based at its Omaha warehouse, testified that 4-State tries to stock calsil at its Omaha warehouse, not Wichita; and 4- State did not buy either Johns Manville's expanded perlite or fiberglass pipe insulation; instead 4- State's main supplier for fiberglass pipe insulation is Knauf, and its suppliers for expanded perlite have been Thermal Pipe Shields and SMC.**

    TPS response: Denied as misleading. Mr. Guest testified that not all 4 State locations have been able to purchase calsil continuously from JM. Specifically, JM cut off 4 State's Wichita location in retaliation for 4 State's purchase of TPS calsil. This testimony, and the consistent documentary evidence, prove that JM's Mr. Meyer was not truthful when he testified that JM had never sold calsil to 4 State's Wichita location. The truth is that JM used to sell to 4 State's Wichita location but stopped doing so after 4 State bought TPS calsil.

10

| Citation | Relevant Text |
|---|---|
| Meyer Tr. at 153:8-155:20 | Mr. Meyer repeatedly denied that JM had ever sold calsil to 4 State's Wichita location, testifying that "[w]e have not supported [4 State's] Wichita location from the inception date," "we have not supported that Wichita branch from the moment they opened it and have told Four States from the moment they opened that branch that shipments would have to go to Lenexa," and "[m]y testimony is that Johns Manville was up front with Four States and told them that we would not support that branch from the moment they opened it. . . . Not supporting that branch means we would not direct ship CalSil to that branch . . . . I don't believe there are any products that we sold to that location." |
| Guest Tr. at 48:6-24; 77:11-78:9 | Mr. Guest repeatedly insisted that 4 State's Wichita location had, in fact, purchased calsil from JM until it was cut off. He answered "Yes" to "Has Johns Manville ever sold product to 4 State['s] Wichita location?," "Has it ever sold Calsil to 4 State['s] Wichita location," and "So if a JM salesperson had said that JM never sold product to 4 State['s] Wichita location, would that be incorrect?" |
| Guest Tr. at 40:11-16 | "[W]e learned that we were no longer able to purchase Calsil in Wichita." |
| 4 State Supply 00001-00050 | 4 State produced purchase orders reflecting shipments of JM calsil to 4 State's Wichita location, confirming the truth of Mr. Guest's testimony. |
| JM00029809 | █████████████████████████ |
| Meyer Tr. at 131:17-132:24 | Mr. Meyer "told [4 State] that we have visibility into things that are imported," but denies knowing the purpose of sharing that statement. |
| Guest Tr. at 32:2-7; 201:1-6; 33:11-15; 201:1-14; 35:10-13; 36:1-11 | JM's Mr. Meyer warned Mr. Guest "that if [4 State] continued to buy Thermal Pipe Shield's, TPS's Calsil, [4 State] would no longer be able to purchase Johns Manville Calsil." Mr. Meyer made clear that this threat "was coming from upper management." |
| JM00003324 | 4 State is ███████████████ |
| JM00028748-749 | █████████████████████████ |

| Guest Tr. at 33:23-34:6; 35:10-13; 36:1-11 | Mr. Guest was "concerned" about JM's threat ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ |
| --- | --- |
| Guest Tr. at 35:10-36:11 | Mr. Guest answered ████████████████████████████████████████ |
| Guest Tr. at 82:16-24 | In response to the question, "Why did you think that Johns Manville had made this decision to stop shipping to the Wichita location?," Mr. Guest responded, "Only due to the fact that I had been approached by Chad Meyer at that MICA meeting we had previously talked about stating they would cut us off if we continued to buy TPS." |
| Guest Tr. at 40:25-41:4 | However, Mr. Guest explained that JM told 4 State that the reason it would no longer sell to their Wichita branch was ████████████████████████████████████████ |
| Meyer 133:19-135:11 | Mr. Meyer "may have 'ask[ed] Mr. Guest why he would want to risk buying a product that may not meet the specifications' and his comment 'was make sure that the product that you buy meets the ASTM specifications.' He also 'relayed a story that have been circulated around the industry that in the past there was a sample of CalSil that came in from China that may have contained trace amounts of asbestos.'" |
| Meyer 137:1-138:10 | Customers' "[t]ypical concerns" about materials imported from China pertain to "whether or not imported product would conform to the ASTM standards." |

7.     There is no admissible evidence that Johns Manville threatened to not sell its calsil to Specialty Products & Insulation ("SPI") locations that purchased Thermal Pipe Shield's calsil.

TPS response: Denied. TPS also expects to present at least one SPI witness at trial to testify

about JM's threats to SPI.

8.     There is no admissible evidence that "an unidentified" Johns Manville "representative(s)" told General Insulation that Johns Manville would not sell General Insulation its calsil if General Insulation purchased Thermal Pipe Shields's calsil.

TPS response: Denied.

| Citation | Relevant Text |
|---|---|
| TPS0003876 | "Today (10/22) I met with Rand Industrial in Romulus, Michigan. At lunch, Richard Goupille (part owner) told me about an interaction that he had 'a few months ago'. Curtis Marmaduke is with General Insulation and he is listed as the Midwest Industrial Sales Manager out of Indianapolis, Indiana. Curtis came to visit Rand and during this meeting Richard Goupille asked Curtis if Rand could purchase TPSX-12 calsil from General. Curtis said 'JM has told us that if we purchase TPSX-12 that they will not sell us any other products'. For this reason, Rand never ended up purchasing our calsil through General." |

**9.     TPSX-12 calcium silicate is manufactured by BEC Industrial (Shanghai) Co., Ltd., a Chinese company that manufactured calsil in its factory in Shanghai, China until early 2021 when the factory was permanently closed. BEC's replacement calsil factory was not completed until December 30, 2021 at the earliest.**

TPS response: Denied in part as misleading. BEC Industrial completed construction of a new, state-of-the-art updated manufacturing and warehousing facility in place of its former facility in Shanghai at the end of 2021. At no point during the interval between the old facility's closure and the new facility's opening was there any interruption of TPS's United States calsil supply.

In anticipation of the closure of BEC's Shanghai factory, TPS pre-ordered calsil to avoid a supply interruption. TPS typically fulfills large calsil orders by placing an order with BEC for the requested calsil and having BEC manufacture and ship that calsil from China to TPS's customer once it is ready. But for all of 2021, TPS had already ordered calsil from BEC and was storing it in TPS's United States warehouses because TPS understood that BEC would be unable to manufacture calsil on order while the factory was closed. As a result, during the BEC factory closure, TPS was able to fill all orders by shipping already-manufactured calsil from the United States, thereby avoiding any supply interruption and, indeed, reducing its lead times for large

13

orders. Additionally, TPS incurred no costs to acquire calsil from BEC during this time, having

already incurred those costs up front.

| Citation | Relevant Text |
|---|---|
| Shong Tr. at 427:11–429:2 | Explaining that the BEC factory "continue[d] producing [calsil] through February 1, 2021" and to "stay in stock while the factory is closed" TPS "came up with a plan . . . so that the factory could produce all of those orders prior to it closing." |
| TPS 30(b)(6) Tr. at 96:4–99:1; 102:1–103:12 | TPS's corporate representative, David Shong, testified that "BEC stockpiled some materials so it could ship even though the factory is closed" because TPS "placed orders for 35 shipping containers of material," which "that would allow [TPS] to . . . have inventory flowing in despite the fact that the factory was closed." Mr. Shong also testified that "the closure of the BEC factory during 2021" did not cause problems for TPS and that TPS has been "able to fulfill all of the orders that we've been . . . working with" and that "Johns Manville's lead time is farther out than [TPS's] new factory opening." |
| TPS 30(b)(6) Tr. at 311:4–313:22 | TPS's corporate representative, Mr. Shong, testified that BEC was "discussing building a new factory in early 2019; and because of the failure, for [TPS] to gain significant market share, BEC actually went through a period where they seriously contemplated exiting the market and just folding up shop and leaving, because they weren't getting enough business from us. We were literally on the precipice of losing our supply forever and it would have destroyed our business." |
| Shong Tr. at 306:18–309:10 (same). | JM also ignores evidence showing that its unlawful conduct is the reason the new BEC factory was delayed. Because of JM's conduct, BEC was "really struggling with cashflow. And they were considering closing their factory"—which would have caused TPS to do the same—and, in this time, BEC held off on beginning construction on the new factory. |
| ECF 152-1 | Warren-Boulton Report |

**10. Four of the five alleged instances of "false advertising" or disparagement identified in Thermal Pipe's Supplemental Interrogatory Responses concern statements purportedly made to representatives from APi; and there is no admissible evidence that proves these four alleged instances occurred.**

TPS response: Denied in part as misleading because, among other reasons, the

Supplemental Interrogatory Responses are not representative of the entire record.

| Citation | Relevant Text |
|---|---|
| JM00011680 | ███████████████████████ |
| JM00017011 | ███████████████████████ |
| JM00018081 | ███████████████████████ |
| JM00003652 | ███████████████████████ |
| JM00011941 | ███████████████████████ |
| JM00030937 at 17 | ███████████████████████ |
| JM00011700 | ███████████████████████ |
| Hlavenka Tr. at 41:9-24; 42:15-25 | "What we—what we heard [from JM personnel] was—and I'll—I'm not saying verbatim. But that you have to be real careful with Chinese calsil because the amount of free silica in their product could be a huge issue. Which I thought was kind of funny because JM—the TPS plant is the old JM plant that they were importing from for years. So, I mean, I didn't really understand it, you know. And then it was told to me, well, 'You know that we were shipping raw—all the raw materials from the U.S. into that plant to make sure that when we had the plant, it was—it was meeting all the standards; but you can't believe that now.' So that's definitely been said." Mr. Hlavenka testified that he tried to push back on Mr. Shapiro's comments because he understood that JM had previously acquired calsil from the same factory from which TPS sources its calsil and Mr. Shapiro responded by claiming that JM was shipping "all the raw materials from the U.S. into that plant to make sure that when |

| | we had the plant, it was—it was meeting all the standards; but you can't believe that now." |
|---|---|
| Meyer 133:19-135:11 | Mr. Meyer "may have 'ask[ed] Mr. Guest why he would want to risk buying a product that may not meet the specifications' and his comment 'was make sure that the product that you buy meets the ASTM specifications.' He also 'relayed a story that have been circulated around the industry that in the past there was a sample of CalSil that came in from China that may have contained trace amounts of asbestos.'" |
| Meyer 137:1-138:10 | Customers' "[t]ypical concerns" about materials imported from China pertain to "whether or not imported product would conform to the ASTM standards," including "asbestos content." |

**11.    4-State's representative, Mr. Guest, did not report hearing any disparaging comments about Thermal Pipe Shield's calsil from Johns Manville representatives.**

TPS response: Denied in part as misleading. Mr. Meyer testified that he made disparaging comments about TPS calsil to Mr. Guest.

| Citation | Relevant Text |
|---|---|
| Meyer 133:19-135:11 | Mr. Meyer "may have" "ask[ed] Mr. why he would want to risk buying a product that may not meet the specifications" and his comment "was make sure that the product that you buy meets the ASTM specifications." He also "relayed a story that have been circulated around the industry that in the past there was a sample of CalSil that came in from China that may have contained trace amounts of asbestos." |
| Meyer 137:1-138:10 | Customers' "[t]ypical concerns" about materials imported from China pertain to "whether or not imported product would conform to the ASTM standards." |

**12.    Mr. Meyer testified that, at the MICA trade show in 2018, he suggested Mr. Guest confirm that the calsil 4-State purchases meets ASTM specifications.**

TPS response: Denied in part as misleading. Mr. Meyer suggested to Mr. Guest that TPS calsil, and Chinese materials generally, may contain asbestos, fail to meet the relevant ASTM standards for other reasons, or both. More significantly, the primary takeaway from Mr. Meyer's

comments during this conversation was that JM would stop selling calsil to 4 State if 4 State continued to buy calsil from TPS.

| Citation | Relevant Text |
|---|---|
| *See* documents cited in TPS's Response to JM Fact # 11. | |
| Guest Tr. at 32:2-7; 201:1-6; 33:11-15; 201:1-14; 35:10-13; 36:1-11 | JM's Mr. Meyer warned Mr. Guest "that if [4 State] continued to buy Thermal Pipe Shield's, TPS's Calsil, [4 State] would no longer be able to purchase Johns Manville Calsil." Mr. Meyer made clear that this threat "was coming from upper management." |
| Guest Tr. at 33:23-34:6; 35:10-13; 36:1-11 | Mr. Guest was "concerned" about JM's threat ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ |
| Guest Tr. at 82:16-24 | In response to the question, "Why did you think that Johns Manville had made this decision to stop shipping to the Wichita location?," Mr. Guest responded, "Only due to the fact that I had been approached by Chad Meyer at that MICA meeting we had previously talked about stating they would cut us off if we continued to buy TPS." |
| Meyer Tr. at 134:19-135:3 | Regarding his conversation with Mr. Guest, Mr. Meyer testified that he "relayed a story that had been circulated around the industry that in the past there was a sample of CalSil that came in from China that may have contained trace amounts of asbestos." |

13.   **Thermal Pipe Shields conducted independent testing of TPSX-12, the calsil it purchases from BEC, to assess compliance with the ASTM standards. TPS also conducted independent testing comparing TPSX-12 to Johns Manville's calsil, Thermo-1200. Thermal Pipe Shields prepared data sheets with these results to distribute to prospective customers.**

TPS response: Admitted.

14.   **Thermal Pipe Shields provided customers and prospective customers copies of independent testing data and ASTM data for its TPSX-12 calsil including to address potential concerns about asbestos.**

TPS response: Admitted.

15.   **Before Thermal Pipe Shields's owner, Jeff Heckman, began importing calsil from BEC in 2018, he wanted to see test results confirming the amount of silica BEC's calsil manufactured in China because he knew the silica test was important for the calsil to meet**

Occupational Safety and Health Administration ("OSHA") safety standards in the United States arising from concerns about calsil dust workers could inhale.

TPS response: Denied in part. Mr. Heckman testified that he had purchased both BEC and JM calsil prior to 2018, before ultimately concluding that BEC's calsil was "the best stuff in the world."

| Citation | Relevant Text |
|---|---|
| TPS 30(b)(6) Tr. at 25:18-26:15 | TPS's corporate representative, Mr. Shong, testified that Mr. Heckman "went through several vendors" of calsil before he began procuring calsil "from the plant in China then known as IIG Shanghai" now known as BEC Industrial and Mr. Heckman "was very happy with the quality and the service and the pricing." Mr. Shong added that BEC asked if Mr. Heckman "would be interested in becoming the exclusive import broker for BEC calsil in the United States" and "By January 2018, Jeff made the decision to move forward with that." |
| Heckman Tr. at 112:12-22; 132:22-134:8; 135:2-136:3 | Mr. Heckman testified that he ordered JM/IIG calsil prior to his relationship with BEC. Mr. Heckman added that Mr. Shong wanted to sell JM calcium silicate to Mr. Heckman, which led Mr. Shong to test the BEC calsil in the fall of 2017 finding that "the Johns Manville testing of the BEC calsil indicated it passed the ASTM tests." Mr. Heckman determined that BEC calsil is "the best stuff in the world and I'm paying far less" so he agreed to an exclusive distribution agreement with BEC. |

16.    Mr. Hlavenka of DI testified that Hal Shapiro of Johns Manville told him that the amount of free silica in Thermal Pipe Shields's calsil could be an issue, that Mr. Shong sent him copies of Thermal Pipe Shields's "spec sheets showing that it met all the ASTMs and everything else," and that DI went ahead and purchased Thermal Pipe Shields's calsil.

TPS response: Denied in part as misleading. When Mr. Hlavenka questioned Mr. Shapiro about his assertions, Mr. Shapiro assured him that JM had shipped all raw materials from the U.S. to the BEC factory to make sure it "was meeting all the standards; but you can't believe that now."

| Citation | Relevant Text |
|---|---|
| Hlavenka Tr. at 41:9-24; 42:15-25 | "What we—what we heard [from JM personnel] was—and I'll— I'm not saying verbatim. But that you have to be real careful with Chinese calsil because the amount of free silica in their product could be a huge issue. Which I thought was kind of funny because |

| | |
|---|---|
| Hlavenka Tr. at 41:9-24; 42:15-25 (Continued) | JM—the TPS plant is the old JM plant that they were importing from for years. So, I mean, I didn't really understand it, you know. And then it was told to me, well, 'You know that we were shipping raw—all the raw materials from the U.S. into that plant to make sure that when we had the plant, it was—it was meeting all the standards; but you can't believe that now.' So that's definitely been said." Mr. Hlavenka testified that he tried to push back on Mr. Shapiro's comments because he understood that JM had previously acquired calsil from the same factory from which TPS sources its calsil and Mr. Shapiro responded by claiming that JM was shipping "all the raw materials from the U.S. into that plant to make sure that when we had the plant, it was—it was meeting all the standards; but you can't believe that now." |

**17.     Johns Manville does not support every branch or geographic location of every distributor it works with, typically because Johns Manville already works with one or more distributor in the geographic area, or the distributor does not promote Johns Manville materials.**

TPS response: Denied in part as misleading. TPS does not know, in all circumstances, the reasons why JM decides not to support a specific location of a specific distributor. But TPS is aware of JM ending support—or threatening to do so—for a specific location of a distributor that bought TPS calsil. Moreover, in at least one instance in which JM testified that it did not support a specific location of a specific distributor only because JM already had another distributor in that location, such testimony was false. For this reason, TPS does not credit this explanation in other circumstances. Finally, to the extent that it is true that JM only seeks to have one distributor per geography, that shows that JM's threat to DI that it might begin supporting a GI location in Houston is tantamount to a threat that JM might stop supporting DI's location there.

| Citation | Relevant Text |
|---|---|
| Meyer Tr. at 153:8-155:20 | Mr. Meyer repeatedly denied that JM had ever sold calsil to 4 State's Wichita location, testifying that "[w]e have not supported [4 State's] Wichita location from the inception date," "we have not supported that Wichita branch from the moment they opened it and have told Four States from the moment they opened that branch that shipments would have to go to Lenexa," and "my testimony is that Johns Manville was up front with Four States and told them that we would |

| | |
|---|---|
| Meyer Tr. at 153:8-155:20 (Continued) | not support that branch from the moment they opened it . . . . Not supporting that branch means we would not direct ship CalSil to that branch . . . . I don't believe there are any products that we sold to that location." |
| Guest Tr. at 48:6-24; 77:11-78:9 | Mr. Guest repeatedly insisted that 4 State's Wichita location had, in fact, purchased calsil from JM until it was cut off. He answered "Yes" to "Has Johns Manville ever sold product to 4 State['s] Wichita location?," "Has it ever sold Calsil to 4 State['s] Wichita location?," and "So if a JM salesperson had said that JM never sold product to 4 State['s] Wichita location, would that be incorrect?" |
| Guest Tr. at 40:11-16 | "[W]e learned that we were no longer able to purchase Calsil in Wichita." |
| 4 State Supply 00001-00050 | 4 State produced purchase orders reflecting shipments of JM calsil to 4 State's Wichita location, confirming the truth of Mr. Guest's testimony. |
| Guest Tr. at 82:16-24 | In response to the question, "Why did you think that Johns Manville had made this decision to stop shipping to the Wichita location?," Mr. Guest responded, "Only due to the fact that I had been approached by Chad Meyer at that MICA meeting we had previously talked about stating they would cut us off if we continued to buy TPS." |
| Guest Tr. at 40:25-41█ | However, Mr. Guest explained that JM told 4 State that the reason it would no longer sell to their Wichita branch was █████████████ ████████████████ |
| Guest Tr. at 41:8-19 | Mr. Guest testified that ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ |
| Hlavenka Tr. at 38:20-39:25; 79:16-80:24 | JM's Mr. Shapiro warned Mr. Hlavenka that "if somebody were to start stocking TPS," then JM would have to "relook" at its relationship with DI and instead possibly support DI's competitor, General Insulation. Because JM had indicated that it already had adequate distribution in that area—"[c]urrently, Johns Manville does not sell General Insulation calsil in Houston. And they—they say, between Bay and SPI and DI, which are competitors in Houston, that's a big enough market"—DI understood this to mean that JM would support GI instead of—not in addition to—DI. Mr. Hlavenka testified that JM's telling him, "'If you don't buy'—you know, 'If you don't upset the apple cart, so to speak, and distribute |

| Hlavenka Tr. at 38:20-39:25; 79:16-80:24 (Continued) | our [competitor's] products, we won't set up General [Insulation]'" was a "perceived threat." |
|---|---|
| JM00074261 | |

18.   4-State has three warehouse locations: (1) Omaha, Nebraska; (2) Lenexa, Kansas; and (3) Wichita, Kansas, and primarily purchases and stocks calsil in its Omaha, Nebraska location.

TPS response: Denied in part as misleading to the extent that it omits JM's discontinuation

of support of 4 State's Wichita branch, claiming falsely that JM had never supported that branch.

| Citation | Relevant Text |
|---|---|
| See documents cited in TPS's Response to JM Fact # 6, 17. | |

19.   From 2018 to the present, 4-State has been able to purchase calsil from Johns Manville without interruption, while also purchasing from Thermal Pipe Shields during that time, although Johns Manville ships purchases for 4-State's Wichita warehouse to 4-State's Lenexa location because it already has other distributors in Wichita, and compensates 4-State for the extra shipping cost.

TPS response: Denied in part as misleading to the extent that it omits JM's discontinuation

of support of 4 State's Wichita branch, claiming falsely that JM had never supported that branch.

| Citation | Relevant Text |
|---|---|
| See documents cited in TPS's Response to JM Fact # 6, 17, and 18. | |

20.   There is no admissible evidence proving that Johns Manville refused to supply calsil or any other products to DI for anticompetitive reasons.

TPS response: Denied.

| | |
|---|---|
| JM 30(b)(6) Tr. at 145:4-147: 12 | JM's corporate representative testified that JM's share is about ███ in both the perlite and fiberglass markets. |
| ECF 152-1 at Table 5 | Sales data and chart reflecting amount of JM sales by distributor. |
| JM00074261 | ███████████████████████ |
| Hlavenka Tr. at 18:7-13; 33:18-36:2 | DI pays a premium for JM products because of JM's "brand name" and stated that "I don't think that we can do without JM" because, without JM's products, DI could not compete in "a lot of markets." |
| Hlavenka Tr. at 28:21-29:23 | Mr. Hlavenka estimated that DI purchases annually:<br>- ███████ of calsil, of which "traditionally, ███ now" is from JM<br>- ████ of perlite, of which ███ is from JM<br>- ████ of fiberglass, of which ████ is from JM |
| Hlavenka Tr. at 23:6-17; 24:16-25:13;    28:21-29:23; 84:13-20 | Even though, "I believe that the TPS product is a superior product, in my opinion, than the JM product," and DI purchases TPS calsil for roughly ███ less than JM calsil, DI continues to buy ███ of its calsil from JM. |
| Hlavenka  Tr.  at  37:6-38:19. | JM's Mr. Alley was "being very careful about what they said" to Mr. Hlavenka in a conversation in which Mr. Alley expressed his disappointment at DI's having bought TPS calsil. |
| Hlavenka  Tr.  at  38:20-39:25; 79:16-80:24 | JM's Mr. Shapiro warned Mr. Hlavenka that "if somebody were to start stocking TPS," then JM would have to "relook" at its relationship with DI and instead possibly support DI's competitor, General Insulation. Because JM had said that it already had adequate distribution in that area—"[c]urrently, Johns Manville does not sell General Insulation calsil in Houston. And they—they say, between Bay and SPI and DI, which are competitors in Houston, that's a big enough market"—DI understood this to mean that JM would support GI instead of—not in addition to—DI. Mr. Hlavenka testified that JM's telling him, "'If you don't buy'—you know, 'If you don't upset the apple cart, so to speak, and distribute our [competitor's] products, we won't set up General [Insulation]'" was a "perceived threat." |
| JM00018081 at JM00018082-83 | ███████████████████████ |

| | |
|---|---|
| JM00018081 at JM00018082-83 (Continued) | ██████████████████████████ |
| Hlavenka Tr. at 66:21-67:16 | "[W]e need to have a relationship with JM . . . . We didn't—you know, we didn't want to get on JM's bad side either, by stocking TPS, in that regard." |
| JM00001394; Hlavenka Tr. at 24:15-25:13; Guest Tr. at 25:6-15; Hlavenka Tr. at 23:6-13; ECF 152 at 48, citing TPS 30(b)(6) Tr. at 103:6-12; Guest Tr. 171:13-173:2; and JM00039166 | These statements all show just how feared JM is in the industry, and why customers would stick with JM, despite that TPS's calsil is better quality, lower priced, and arrives just as quickly. |
| ECF 152-1 | Warren-Boulton Report |

**21.   There is no admissible evidence proving that Johns Manville refused to supply calsil or any other products to SPI, Bay, MacArthur, General Insulation, APi, or Metro Supply for anticompetitive reasons.**

<u>TPS response</u>: Denied. Along with the evidence cited below, TPS notes that JM does not claim "a lack of admissible evidence proving that Johns Manville refused to supply calsil or any other products" to 4 State.

| Citation | Relevant Text |
|---|---|
| JM 30(b)(6) Tr. at 145:4-147: 12 | JM's corporate representative testified that JM's share is about ████ in both the perlite and fiberglass markets. |
| ECF 152-1 at Table 5 | Sales data and chart reflecting amount of JM sales by distributor. |
| JM00074261 | ████████████████████████████████ |
| JM00023086 | JM learned that ████████████████ |

| | |
|---|---|
| JM00023086 (Continued) | ████████████████████████████ |
| JM00007814 | ████████████████████████████ |
| JM00011469 | ████████████████████████████ |
| Duppler email | "Did we have an agreement with JM to use as a sole source?" "I hope TPS plans on supporting Bay at any location since it sounds pretty likely that JM will be cutting [us] off from cal sil;" "I doubt that you will be stocking both. They are taking a hard line against selling [to] anyone who is stocking a 'different' brand. The problem is that they will simply raise the price to put it out of reach. We all know the game. They can't cut us off, but they can make it pretty hard to do business with them"; and "Will they now be cutting off all their distribution that sells OC or Knauf on the fiberglass side? Same argument." |
| JM00003324 | Referring to 4 State and API as ██████████████████ |
| JM00003503 | ████████████████████████████ |
| JM00003499 | ████████████████████████████ |
| Meyer Tr. at 109:9-111:25 | Mr. Meyer testified that he and Mr. Alley ████████████████████████████ |
| JM00001451 | ████████████████████████████ |
| JM00028748-749 | ████████████████████████████ |

| TPS 30(b)(6) Tr. at 295:7-19 | "API really didn't buy anything after those first two containers because of Chad Meyer and Eric Alley's threats after they received them." |
| --- | --- |
| TPS00010989 at TPS00010991 | Distributor Metro Supply had agreed to become a TPS stocking distributor but never placed an order to activate the agreement. Charlie Leesa of Metro Supply later explained: "Unfortunately not long after we spoke the 'other guys' in this business became extremely sensitive to anyone that sells their product stocking your product. That situation is still working itself out slowly. I do believe your material to be of superior strength and quality so I would like to see if we couldn't place some LTL orders on an as needed basis. I'm sure you understand the difficult situation we are in." |
| TPS 30(b)(6) Tr. at 249:2-250:3 | "One example of a distributor who refused to purchase calsil from TPS is not far from here, Metro Supply in Clifton, New Jersey. I went there to visit Charlie Lizza, Jr., who is the owner of Metro Supply, in December of 2018. And he liked our product, he wanted to stock it. And he signed our stocking distributor exclusivity agreement, he was provided with pricing and his discount, and never placed his first order. Ten months later in October of 2019, I contacted Mr. Lizza, Jr., and I asked him how things were going, that we're stocking large amounts of calsil, and that we'd be happy to service any of his existing or LTL orders. He responded to me via e-mail, which I don't have the exact copy written down . . . . But basically, to the effect that, 'After you left, the other guys in the industry became "very sensitive" to any distributor stocking your product along with stocking their product. I'm sure you can understand how difficult this situation was for us. It's working itself out slowly, and I will start buying from you when I can. I believe that your product is of superior quality and I want to carry it but you can understand why I can't, or why I wasn't able to stock it.'" |
| JM00003854 (spelling mistake corrected) | An internal JM email with the subject, ███████████████████████████████████████████████████████████████████████████████████████████████████ |
| JM00004024 | ████████████████████████████████████████████████████████████████████ |

| | |
|---|---|
| JM00001394; Hlavenka Tr. at 24:15-25:13; Guest Tr. at 25:6-15; Hlavenka Tr. at 23:6-13; ECF 152 at 48, citing TPS 30(b)(6) Tr. at 103:6-12; Guest Tr. 171:13-173:2; and JM00039166 | These statements all show just how feared JM is in the industry, and why customers would stick with JM, despite that TPS's calsil is better quality, lower priced, and arrives just as quickly. |
| TPS0003876 | "Today (10/22) I met with Rand Industrial in Romulus, Michigan. At lunch, Richard Goupille (part owner) told me about an interaction that he had 'a few months ago'. Curtis Marmaduke is with General Insulation and he is listed as the Midwest Industrial Sales Manager out of Indianapolis, Indiana. Curtis came to visit Rand and during this meeting Richard Goupille asked Curtis if Rand could purchase TPSX-12 calsil from General. Curtis said 'JM has told us that if we purchase TPSX-12 that they will not sell us any other products'. For this reason, Rand never ended up purchasing our calsil through General." |
| ECF 152-1 | Warren-Boulton Report |

**22.   Johns Manville did not enter into any written contracts for an exclusive dealing arrangement with any of its distributor customers.**

<u>TPS response</u>: Denied. First, there is no significance to whether an exclusive dealing arrangement is documented in writing or otherwise, or whether such an agreement is explicit or implicit. Second, it is important that TPS and JM are the only suppliers of calsil in the U.S., so any conduct by JM that deters customers from purchasing calsil from TPS causes those customers to purchase calsil exclusively from JM.

Additionally, JM's ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Further, the market for calsil is highly concentrated. All told, the ███████████ agreements locked in just shy of ████ of all calsil sold in the distributor market in 2018 and 2019. Dr. Warren-Boulton's Report explains how these rebate agreements can constitute exclusive dealing, particularly when they are entered into by a monopolist, which JM is in the calsil market.

| Citation | Relevant Text |
|---|---|
| *See* documents cited in TPS's Response to JM Facts # 1-3, 5-6, 12, 17-21. | |
| JM00031378; JM00031381 | 2018 and 2019 agreements with ████ |
| JM00015905; JM00061014 | 2018 and 2019 agreements with ████ |
| JM00058167; JM00003856 | 2018 and 2019 agreements with ████ |
| JM00000127 | 2019 agreement with ████ |
| JM 30(b)(6) Tr. 34:1-4 | ████████████████ ███████ has got 5 percent or maybe a little bit more of the market." |
| ECF 152-1 | Warren-Boulton Report |

**23.   There is no admissible evidence that Johns Manville had implied exclusive dealing arrangements with any distributor-customers, or that it required its distributor-customers to only purchase its calsil.**

TPS response: Denied. It is important that TPS and JM are the only suppliers of calsil in the U.S., so any conduct by JM that deters customers from purchasing calsil from TPS causes those customers to purchase calsil exclusively from JM.

Additionally, JM's ██████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████



Further, the market for calsil is highly concentrated. All told, the ████████████ agreements locked in just shy of ████ of all calsil sold in the distributor market in 2018 and 2019. Dr. Warren-Boulton's Report explains how these rebate agreements can constitute exclusive dealing, particularly when they are entered into by a monopolist, which JM is in the calsil market.

| Citation | Relevant Text |
|---|---|
| *See* documents cited in TPS's Response to JM Facts # 1-3, 5-6, 12, 17-22. | |

**24.    There is no admissible evidence proving that a substantial portion of the industry was foreclosed from TPS due to any alleged exclusive dealing arrangements.**

<u>TPS response</u>: Denied. It is important that TPS and JM are the only suppliers of calsil in the U.S., so any conduct by JM that deters customers from purchasing calsil from TPS causes those customers to purchase calsil exclusively from JM.

Additionally, JM's ████████████████



Further, the market for calsil is highly concentrated. All told, the ████████████ agreements locked in just shy of ████ of all calsil sold in the distributor market in 2018 and 2019. Dr. Warren-Boulton's Report explains how these rebate agreements can constitute exclusive dealing, particularly when they are entered into by a monopolist, which JM is in the calsil market.

| Citation | Relevant Text |
|---|---|
| *See* documents cited in TPS's Response to JM Facts # 1-3, 5-6, 12, 17-23. ||

25.   **Thermal Pipe Shields's "go-to-market" strategy consisted of inviting five distributors, DI, SPI, Bay Insulation, MacArthur, and General Insulation, to enter into exclusive partnerships.**

<u>TPS response</u>: Denied in part as misleading. TPS admits that its initial strategy including approaching the five largest distributors in the market. But, as Mr. Shong testified, the so-called "exclusive" partnerships in specific territories that were part of TPS's go-to-market strategy are misnomers. At no point ever did TPS refuse to sell its calsil to any customer, or even consider doing so. The "exclusive" benefit that TPS offered upon initially entering the market is exclusive access to discounted pricing, which was offered to incentivize distributors to stock TPS calsil. However, due to JM's conduct, only two of Bay's 28 locations agreed to stock TPS calsil. Of the other 216 locations of these five distributors, no one else dared.

| Citation | Relevant Text |
|---|---|
| TPS 30(b)(6) Tr. at 276:4-23 | Mr. Shong testified that the exclusivity TPS was offering would give distributors "the ability exclusively to buy at the stocking distributor price," which is a "preferential price" and that "[TPS was] willing to sell everyone, it's just at a different price." |
| TPS 30(b)(6) Tr. at 85:6-17 | TPS's corporate representative, Mr. Shong, testified that TPS's plan was to give "one company within a certain state . . . preferential pricing compared to other distributors." |
| Shong Tr. at 315:5-9 | Explaining that TPS's "strategy for CalSil was still that we were going to offer an exclusive discount for the stocking distributors in up to 52 different states." |
| TPS 30(b)(6) Tr. at 248:4-250:3 | Mr. Shong testified that "the only two primary distributors that started stocking our [TPS] product was API Distribution, and then also Bay Insulation" because "distributors did refuse" to buy from TPS because of JM's conduct. |
| TPS 30(b)(6) Tr. at 282:7-19 | Mr. Shong testified that JM's conduct caused TPS to be "relegated to really only work with" Bay, API, and GLT. |

26.   **Thermal Pipe Shields's corporate representative and President, David Shong, admitted that the "go-to-market" strategy in hindsight was "a little bit naïve," and that by the April 16, 2018 deadline listed in the product launch announcement, only one of the five distributors agreed to an exclusive territory with Thermal Pipe Shields—Bay signed up for the two territories in California, so Thermal Pipe Shields moved to the second step of its strategy.**

TPS response: Denied as misleading. As Mr. Shong testified, the so-called "exclusive" partnerships in specific territories that were part of TPS's go-to-market strategy are misnomers. At no point ever did TPS refuse to sell its calsil to any customer, or even consider doing so. The "exclusive" benefit that TPS offered upon initially entering the market is exclusive access to discounted pricing, which was offered to incentivize distributors to stock TPS calsil. However, due to JM's conduct, only two of Bay's 28 locations agreed to stock TPS calsil. Of the other 216 locations of these five distributors, no one else dared.

Further, Dr. Warren-Boulton's damages analysis considers the failure of this strategy and accounts for it in both the "actual" and "but for" worlds, so it does not affect his damages calculus.

| Citation | Relevant Text |
|---|---|
| *See* **documents cited in TPS's Response to JM Fact # 25.** ||
| ECF 152-1 | Warren-Boulton Report |

27.   **The seven Johns Manville documents Thermal Pipe Shields identified as providing proof of Johns Manville either "taking" or "threatening" adverse action against Thermal Pipe Shields customers or potential customers, viewed in the light most favorable to Thermal Pipe Shields, do not provide prima facie evidence necessary for Thermal Pipe Shields to prove either unlawful exclusive dealing or an unlawful "refusal to supply."**

TPS response: Denied. These seven documents account only for a sliver of the evidence in the record which proves TPS's claims.

| Citation | Relevant Text |
|---|---|
| *See* **documents cited in TPS's Response to JM Fact # 1-26.** ||



## LEGAL STANDARD

Summary judgment is appropriate only when "there is no genuine issue as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 321-23, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-

48 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). At this stage, "evidence must be liberally construed in favor of the party opposing the motion and if the facts support an inference that would permit the non-movant to prevail, summary judgment is inappropriate." *McGill v. Am. Land & Expl. Co.*, 776 F.2d 923, 926 n.5 (10th Cir. 1985) (citations omitted). In essence, the movant "must show entitlement to summary judgment beyond a reasonable doubt." *FTC v. Rocky Mountain Circulation*, No. 86-F-798, 1987 U.S. Dist. LEXIS 15935, at *2-3 (D. Colo. Jan. 23, 1987) (citing *Norton v. Liddell*, 620 F.2d 1375, 1381 (10th Cir. 1980)). The Tenth Circuit views summary judgment as "a drastic remedy that should be granted only with caution." *McGill*, 776 F.2d at 926 n.5 (citations omitted). The Tenth Circuit has further cautioned that "[s]ummary judgment in antitrust cases should be used sparingly because motive and intent play leading roles in the analysis." *Green Country Food Mkt., Inc. v. Bottling Grp.*, 371 F.3d 1275, 1278 n.1 (10th Cir. 2004) (citations omitted).

JM, as the moving party, "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact." *Whitesel v. Sengenberger*, 222 F.3d 861, 867 (10th Cir. 2000) (citation omitted). As the non-moving party, TPS's "evidence is to be believed; all justifiable inferences are to be drawn in its favor; its nonconclusory version of any disputed issue of fact is assumed to be correct." *Multistate Legal Stud. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns*, 63 F.3d 1540, 1545 (10th Cir. 1995) (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992)). A fact is material if it could affect the outcome of the lawsuit and a dispute over a material fact is genuine "if a rational jury could find in favor of the nonmoving party on the evidence presented." *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 675 (10th Cir. 2018) (citation omitted). The Tenth Circuit has also explained that "in evaluating

whether a genuine issue for trial exists, the antitrust defendants' economic motive is highly relevant." *Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1257 (10th Cir. 2006) (citing *Rossi v. Standard Roofing*, 156 F.3d 452, 466 (3d Cir. 1998)).

## ARGUMENT

**I.     Thermal Pipe Shields's Monopolization Claim Is Supported by Sufficient and Admissible Evidence of Johns Manville's Exclusionary Conduct.**

JM's exclusionary conduct took many forms, including (1) refusing to supply its products to customers who bought calsil from TPS; (2) entering exclusive dealing agreements with multiple distributors, foreclosing a significant share of the calsil market; (3) disparaging TPS and TPS calsil in the market; and (4) tying its other products to customers' purchase of JM calsil as well. *Cf.* ECF 50 at 23 ("'It's been said that anticompetitive conduct comes in too many forms and shapes to permit a comprehensive taxonomy.'") quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013). Considering the complete record in its full context, there is sufficient evidence for a reasonable juror to conclude that JM engaged in unlawful exclusionary conduct.

### A.     The legal standard for a monopolization claim under the Sherman Act.

A monopolization claim under Section 2 of the Sherman Act "has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The Supreme Court defines monopoly power as "the power to control prices or exclude competition." *Id.* at 571 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). "The second element of a § 2 claim is the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Eastman Kodak*, 504 U.S. at 482-83 (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)). The Tenth Circuit has defined

anticompetitive or exclusionary conduct as "conduct constituting an abnormal response to market opportunities." *Multistate Legal Studies*, 63 F.3d at 1550. Courts have also routinely found that Section 2 of the Sherman Act "prohibits a monopolist from engaging in anticompetitive practices that are designed to deter potential rivals from entering the market or from preventing existing rivals from increasing their output, no matter how flagrant or subtle the violation." *Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295, 1306 (D. Utah 1999); *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, MDL No. 2785, 2017 U.S. Dist. LEXIS 209710, at *52 (D. Kan. Dec. 21, 2017) (citation omitted) (recognizing that "deceptive speech can support Sherman Act claims because 'in some cases, such defamation, which plainly is not competition on the merits, can give rise to antitrust liability, especially when it is combined with other anticompetitive acts'") (citations omitted).

### B.  There is admissible evidence of Johns Manville's exclusionary conduct.

#### 1.     Johns Manville's Refusal to Supply

JM continues to argue against an argument that TPS does not make: that JM has violated the law on unilateral refusals to deal with its rivals. Before TPS's entry, JM had no rivals. And TPS has not sought to deal with JM. As JM understands, TPS does not claim that JM refused to sell its calsil ***to TPS***, in violation of the doctrine that the Supreme Court set out in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 525 (1985) and *Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko*, 540 U.S. 398 (2004). Rather, TPS claims that JM refused to sell calsil ***to customers*** who bought from JM's competitor. The only explanation for JM's feigned confusion about the relevant area of law is that JM cannot dispute that it made customers understand that: "***if***

***we continued to buy Thermal Pipe Shield's, TPS's Calsil, we would no longer be able to purchase Johns Manville Calsil.***" Guest Tr. at 31:24-32:4 (emphasis added).

The nature of TPS's claim is clear. As TPS's counsel stated at oral argument on JM's failed Motion to Dismiss the First Amended Complaint: "[W]e're talking about allegations that say if you buy from our [competitor], you're not going to be able to buy from us." Nov. 19, 2019 Hr'g Tr. at 26:22-27:24. Counsel cited relevant authority at the hearing, and emailed the Court and JM's counsel enclosing that same authority. *Id.* at 27:8-11; Nov. 20, 2019 email from A. Shear ("Nov. 20, 2019 Shear email") enclosing *Lorain Journal v. United States*, 342 U.S. 143 (1951) and a copy of the Federal Trade Commission's consent decree in *In re Pool Corp.*, https://www.ftc.gov/enforcement/cases-proceedings/1010115/pool-corporation.

The Court understood the essence of TPS's refusal to supply claim, describing the claimed conduct—in a manner perhaps pithier than TPS did—as, "effectively holding its products ransom from customers." ECF 50 at 24 (citing *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1105 (D. Colo. 2004)) ("Anticompetitive or exclusionary conduct under section 2 is 'conduct constituting an abnormal response to market opportunities.'") (quoting *Multistate Legal*, 63 F.3d at 1550). The Court's ruling dispelled any basis for the confusion to which JM now professes in holding that:

> Plaintiff's allegations provide a plausible basis to infer Defendant's ***refusal to sell to customers*** runs afoul of Section 2 of the Sherman Act. Plaintiff's allegations relating to Defendant's course of dealing with 4 State Supply suggest Defendant discontinued selling [] calsil to that distributor to prevent future sales of Plaintiff's calsil . . . . Taken with Plaintiff's other allegations about Defendant's threats to distributors, . . . a reasonable inference is that Defendant was willing to discontinue and did discontinue sales in order to prevent competition in calsil.

ECF 50 at 24 (emphasis added). In the nearly two years since that decision, this is exactly the type of conduct about which TPS has sought discovery. And it has obtained plenty of evidence about JM's ███████████ to do precisely that. JM00018081 at JM00018082.

In fact, the evidence shows that JM adopted a corporate policy of punishing customers who purchased calsil from TPS almost immediately. Indeed, on March 8, 2018—just days after TPS announced it was entering the calsil market—JM personnel, including Mr. Shapiro, Mr. Skelly, and Mr. Bittner, were developing ███████████ to respond to TPS entry as they ███████████ *See* JM00074261. JM made clear: ███████████ *Id.* And JM noted it was keeping ███████████ *Id.*

### a.   4 State

As described above, JM's statement that, "[f]rom 2018 to the present, 4-State has been able to purchase calsil from Johns Manville without interruption, while also purchasing from TPS" is misleading. ECF 193 at 9. While JM may not have cut off the distributor altogether, JM did stop selling calsil to 4 State's Wichita branch, which it had previously done. Guest Tr. at 48:6–24 (answering "Yes" to "Has Johns Manville ever sold product to 4 State['s] Wichita location?," "Has it ever sold Calsil to 4 State['s] Wichita location?," and "So if a JM salesperson had said that JM never sold product to 4 State['s] Wichita location, would that be incorrect?"); 4 State Supply 00001-00050; *see also* Guest Tr. at 77:11–78:9 ███████████

JM's statement that the reason it ships to Lenexa, rather than Wichita, is "because [JM] already has other distributors in Wichita," is more than misleading; it is untrue. ECF 193 at 17. The reason that JM stopped selling its calsil to 4 State's Wichita location is that Mr. Meyer meant what he said to Mr. Guest: "that if [4 State] continued to buy Thermal Pipe Shield's, TPS's Calsil, [4 State] would no longer be able to purchase Johns Manville Calsil." Guest Tr. at 31:24–32:4.

It might ordinarily be plausible that JM does not sell calsil to 4 State's Wichita branch because "because [JM] already has other distributors in Wichita." ECF 193 at 9. Indeed, this is the "party line." *Cf.* Guest Tr. at 40:25-41:4 █████████████████████████████ ████████████████████████████████████████████████ But JM does not—and cannot—explain why its relationship with another distributor did not prevent JM from selling to 4 State's Wichita branch in the first place. 4 State Supply 00001-00050 (all calsil Purchase Orders shipping JM calsil to Wichita); *accord* Guest Tr. at 40:11-16 ("[w]e learned that we were ***no longer able*** to purchase Calsil in Wichita") (emphasis added).

Additionally, Mr. Meyer took this "party line" too far at his deposition, entirely undermining JM's credibility in telling this story. Mr. Meyer falsely ***denied that JM ever sold*** calsil to 4 State in Wichita. Meyer Tr. at 153:8-155:20 ("We have not supported [4 State's] Wichita location from the inception date" and "we have not supported that Wichita branch from the moment they opened it and have told Four States from the moment they opened that branch that shipments would have to go to Lenexa" and "My testimony is that Johns Manville was up front with Four States and told them that we would not support that branch from the moment they opened it. . . . Not supporting that branch means we would not direct ship CalSil to that branch. . . . I don't believe there are any products that we sold to that location."). Mr. Meyer's repeated statements at

his deposition are definitive and unambiguous. And they are disproved by Mr. Guest's testimony and the purchase orders that 4 State produced—which are also definitive and unambiguous, but, unlike Mr. Meyer's testimony, they are credible.

At the very least a factual dispute exists on two issues: (1) whether JM never did sell, or stopped selling, calsil to 4 State's Wichita location and (2) whether JM indeed had a procompetitive reason for doing so that is more than just pretext. *Cf.* Guest Tr. at 48:6-24; 4 State Supply 00001-00050; *see also* Guest Tr. at 77:11-78:█

This punitive discontinuation of JM's previous relationship with 4 State in Wichita is exactly the sort of exclusionary conduct that this Court referred to when it held:

> Taken with Plaintiff's other allegations about Defendant's threats to distributors, . . . a reasonable inference is that Defendant was willing to discontinue and did discontinue sales in order to prevent competition in calsil. Defendant is free to provide a legitimate business justification for its refusals to sell its products to its customers. However, at this stage Plaintiff has plausibly alleged Defendant's action, in effectively holding its products ransom from customers, constitutes a form of exclusionary conduct.

ECF 50 at 24 (citations omitted). Further, this interpretation is more consistent with Mr. Meyer and Mr. Alley's statements that ██████████████████████████████████████████████ Whereas JM's position on API was that ████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ JM 00028748-749; *see also* Guest Tr. at 82:16-24 (in response to the question, "Why did you think that Johns Manville had made this decision to stop shipping to the Wichita location?," Mr. Guest responded, "Only due to the fact that I had been approached by Chad Meyer at that MICA meeting we had previously talked about stating they would cut us off if we continued to buy TPS.").

From this evidence, a reasonable juror could conclude that JM did indeed threaten to "cut off" customers from its own calsil as a sanction for daring to transact with JM's competitor. And, of course, JM's threats were often effective in preventing customers from buying calsil from TPS, thereby not requiring JM to cut that customer off (or implement whatever other sanction JM threatened). But these instances are just as anticompetitive as those in which the customer did not acquiesce and so JM did, in fact, execute the promised punishment.

### b. API Distribution

One example of a customer who backed away from a relationship with TPS is distributor API. API had initially purchased two containers of TPS calsil, but



On October 12, 2018, Mr. Alley said to Mr. Meyer,

JM00028748. Mr. Meyer testified that he and Mr. Alley

Meyer Tr. at 109:9-111:25

Then, soon after, Mr. Alley said to Mr. Elsey,

JM00001451.

This sequence of events raises a genuine factual question about whether—and permits more than just a reasonable inference that—Mr. Alley and Mr. Meyer

notwithstanding Mr. Meyer's characterization of that October meeting. Indeed, Mr. Alley's statement to Mr. Elsey is unambiguous that they did so, and his statement that

reports the natural result of that threat. Further, Mr. Shong's testimony reveals how

API made the decision they had to make: "API really didn't buy anything after those first two containers because of Chad Meyer and Eric Alley's threats after they received them." JM00028748; TPS 30(b)(6) Tr. at 295:7-19. This follows JM's prediction: "[API] told us that they wanted to remain a JM distributor so I would be surprised if they are pressing the Chinese calsil." JM00001451.

4 State and API were not the only distributors threatened about buying TPS calsil. Other JM customers were alarmed by similar threats and indeed believed that JM would follow through.

- **DI**: "We didn't—you know, we didn't want to get on JM's bad side either, by stocking TPS, in that regard." Hlavenka Tr. at 66:21-67:16.

  - o This was DI's response to both:

    - o Mr. Shapiro's threat to support GI in Houston *instead of* DI. Hlavenka Tr. at 38:20-39:25; 79:16-80:24 ("Currently, Johns Manville does not sell General Insulation calsil in Houston. And they—they say, between Bay and SPI and DI, which are competitors in Houston, that's a big enough market."). This shows that JM was not searching for *additional* distribution in Houston; GI would serve as *replacement* distribution if DI were to "upset the apple cart," meaning if DI "were to start stocking TPS." *Id.*

    - o Mr. Stone's threat that 

      JM00018081 at JM00018083.

- **Bay:**

  JM00007814 (emphasis added).

o Bay understood that its limited dealings with TPS might be enough to sever the relationship with JM. *See* Duppler email at 2 ("I hope TPS plans on supporting Bay at any location since it sounds pretty likely that JM will be cutting us off from cal sil.").

- **SPI (formerly known as FBM):** ███████████████████████████

████████████████████████████████████████

███████████ JM00004024.

- **Macarthur:** An email with the subject, ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

JM00003854.

(emphasis added in all.)

These statements all show just how feared JM is in the industry, and why customers would stick with JM, despite that TPS's calsil is better quality, lower priced, and arrives just as quickly. *See* JM00001394; Hlavenka Tr. at 24:15-25:13; Guest Tr. at 25:6-15; Hlavenka Tr. at 23:6-13; ECF 152 at 48, citing TPS 30(b)(6) Tr. at 103:6-12; Guest Tr. 171:13-173:2; and JM00039166.

Mr. Guest summed these fears up, testifying that Mr. Meyer's threat to cut off 4 State "concerned" him because ████████████████████████████████████

████████████████████████████████████████ Guest Tr. at 33:23-34:6.

Indeed, ████████████████████████████████

Guest Tr. at 35:10-13; 36:1-11. Nor did he have reason to believe that Mr. Meyer's threat might be an empty one. Mr. Meyer made clear that this threat "was coming from [JM's] upper management." Guest Tr. at 33:11-15; 201:1-14. Mr. Hlavenka likewise stated that he did not "think that we can do without JM" as a supplier because without JM's products DI, the country's largest insulation distributor, could not compete. Hlavenka Tr. at 33:18-25.

### c. Others

In *United States* v. *Dentsply*, without evaluating the comparative quality or price of competing products, the Third Circuit concluded that Dentsply monopolized the market based solely on (1) the "paltry" level of rival competition, (2) the failure of any dealer to drop the Dentsply product-line in favor of a rival's pre-fabricated teeth, and (3) Dentsply's intent to keep competition from gaining a "toehold" with the dealers, finding "clear expressions of a plan to maintain monopolistic power." 399 F.3d 181, 189-90 (3d Cir. 2005). All three factors apply here as well. JM coerced customers into buying its more expensive, lesser quality calsil with its threat to end the relationship. Because most acquiesced, JM was not forced to sanction many customers by refusing to sell to them, but in the few instances when it did so, the message was received loud and clear. Indeed, it spread quickly through the close-knit, interconnected mechanical insulation industry. *See* Duppler email ("They are taking a hard line against selling anyone who is stocking a 'different' brand. The problem is that they will simply raise the price to put it out of reach. We all know the game. They can't cut us off, but they can make it pretty hard to do business with them.").

JM may believe that it can convince the factfinder that there is some procompetitive benefit that justifies this conduct, which would shift the burden to TPS to show that such a benefit might

have been achieved in a less harmful way. *See, e.g.*, ECF 193 at 37 ("it is procompetitive for manufacturers to work with a select group of distributors who agree to promote their brand or product" and "[i]f a distributor is no longer promoting Johns Manville's insulation materials, then Johns Manville may choose to partner with a different distributor").[2] But such arguments are rife with factual disputes over whether the purported procompetitive benefits have been realized (incidentally, JM does not identify them) and whether they are sincere. And it is a stretch to argue that Mr. Stone's apology eliminates any genuine question about the "conceivability" of JM's threats to DI. ECF 193 at 38. These factual disputes preclude summary judgment.

Nor does JM cite any legal authority which would permit the Court to conclude that it may halt sales to "disloyal" customers. In *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, which JM relies on, the Tenth Circuit applied *Aspen Skiing* and *Trinko* to find no liablity for a refusal to license intellectual property rights to a competitor. 841 F.3d 827, 842-43 (10th Cir. 2016). That case does not consider a claim that a supplier refused to sell to a customer with whom it had a preexisting relationship. But even if the Court were to apply the 10th Circuit's reasoning to JM's decision to cut off its own customers, the Court could only conclude that JM's conduct is "irrational but for its anticompetitive effect." *Id.* (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013)). Indeed, JM's conduct towards its customers typifies the paradigm of an

---

2.    There is an implicit understanding in all of JM's discussion of its distribution relationships that JM will not permit "dual sourcing" of calsil. So, to JM, a distributor's stocking TPS calsil is tantamount to "no longer promoting" JM calsil. *See, e.g.*, JM00003499 ████████████████████ ████████████████████████████████████████████████████████ Duppler email (showing that its decision to stock TPS calsil was not meant to be a repudiation of JM, "Did we have an agreement with JM to use as a sole source? . . . . We would be stocking both to help make sure we had material at all times and quicker lead times with dual sources.").

anticompetitive refusal to deal that the Court recognized. *SolidFX,* 841 F.3d. at 843 ("The 'limited exception' [where a unilateral refusal to deal ***will*** violate Section 2] applies only where the plaintiff can establish the parties had 'a preexisting voluntary and presumably profitable course of dealing,' and 'the monopolist's discontinuation of the preexisting course of dealing must suggest a willingness to forsake short-term profits to achieve an anti-competitive end.'") (quoting *Trinko*, 540 U.S. at 407).

Similarly, in *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Services*, 994 F.3d 1166, 1173-74 (10th Cir. 2021), the court found that the challenged unilateral conduct was not anticompetitive precisely for the reasons that distinguish that conduct from JM's. Here, JM had preexising, voluntary, and presumably profitable relationships with its distributors, the profitability of which it threatened to forsake for no apparent purpose other than the anticompetitive objective of excluding TPS.

### 2.  Johns Manville's Exclusive Dealing

JM offers two arguments in the face of TPS's contention that JM entered into unlawful exclusive dealing agreements: (1) that TPS lacks evidence of the exclusive arrangements, and (2) that TPS lacks evidence that JM substantially foreclosed competition in the calsil market. *See* ECF 193 at 46-49. JM is incorrect on both points.

***First***, JM entered into ████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████ (And a written agreement is not required to find an unlawful exclusive dealing arrangement.) Further, evidence shows that JM engaged in significant coercive activity,

threatening to retaliate against its customers if they bought calsil from TPS, which consolidated the exclusive arrangements considering that JM and TPS are the only two suppliers of calsil.

**Second**, these agreements foreclosed a substantial portion of the calsil market. The calsil market is highly concentrated, with the top four distributors accounting for more than ▮▮ of all calsil sales to distributors. And JM's Annual Incentive Agreements alone locked in nearly ▮▮ of that market, well above the standard 40% threshold typically required. And given that JM is a monopolist in the calsil market, such agreements are subject to additional scrutiny.

**Legal standard**

"To state a claim for unlawful use of exclusionary agreements under the Sherman Act, a plaintiff must show that a defendant's 'exclusive dealing arrangements foreclose competition in a substantial share of the line of commerce affected.'" ECF 50 at 25 (quoting *Crocs, Inc. v. Effervescent, Inc.*, 248 F. Supp. 3d 1040, 1058 (D. Colo. 2017)).

"Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) (citing *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 329 (1961); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 77-78 (3d Cir. 2010); *LePage's, Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003)). "For example, if the defendant occupies a dominant position in the market, its exclusive dealing arrangements invariably have the power to exclude rivals." *ZF Meritor*, 696 F.3d at 284. Indeed, "[e]xclusive dealing arrangements ***are of special concern when imposed by a monopolist***." *Id. a*t 270-71 (citing *Dentsply*, 399 F.3d at 187) (emphasis added) ("Behavior that

otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist."). For example:

> Suppose an established manufacturer has long held a dominant position but is starting to lose market share to an aggressive young rival. A set of strategically planned exclusive-dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its product, or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.

Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1802c, at 64 (2d ed. 2002). "In some cases, a dominant firm may be able to foreclose rival suppliers from a large enough portion of the market to deprive such rivals of the opportunity to achieve the minimum economies of scale necessary to compete." *ZF Meritor*, 696 F.3d at 271 (citing *LePage's*, 324 F.3d at 159).

"The test [for determining anticompetitive effect] is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *Dentsply*, 399 F.3d at 191. This type of foreclosure occurs when "the opportunities for other traders to enter into or remain in [the] market [are] significantly limited" by the exclusive dealing arrangements. *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) (quoting *Tampa Elec.*, 365 U.S. at 328). "Traditionally a foreclosure percentage of at least 40% has been a threshold for liability in exclusive dealing cases." *McWane, Inc. v. FTC*, 783 F.3d 814, 837 (11th Cir. 2015); *see also* Jonathan M. Jacobson, *Exclusive Dealing, "Foreclosure," and Consumer Harm*, 70 Antitrust L.J. 311, 362 (2002) ("The recent decisions uniformly favor defendants where foreclosure levels are 40 percent or less, and so it is fair to say that foreclosure in excess of that amount is a threshold requirement where foreclosure is the asserted basis of the antitrust violation."). But "some courts have found that a lesser degree of foreclosure is required when the defendant is a monopolist." *McWane*, 783 F.3d at 837 (citing *Microsoft*, 253 F.3d at 70); *see also*

*Microsoft*, 253 F.3d at 70 (a "monopolist's use of exclusive contracts may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation"); Jacobson, 70 Antitrust L.J. at 311-12, 362-63 ("Courts have found liability in some cases even when the amount of 'foreclosure' is zero" and "if price, output, quality, choice, or innovation have been harmed, the lack of percentage foreclosure is no defense.").

### Analysis

There is sufficient evidence for a reasonable juror to find that JM entered into unlawful exclusive dealing arrangements which foreclosed a substantial portion of the calsil market.

***First***, the industrial insulation market is highly concentrated, particularly for distributor purchases of calsil. Based on sales data produced by JM and TPS—the only two suppliers of calsil in the U.S.—DI alone accounts for nearly ███ of the calsil market, and the top four distributors account for more than ███ of all calsil bought by distributors:

| Distributor | Calsil purchases in dollars | % of total calsil purchases in distributor market |
|---|---|---|
| Distribution International | ███ | ███ |
| Specialty Products & Insulation | | |
| Bay Insulation | | |
| General Insulation | | |
| All other distributors | | |
| **Total** | ███ | 100% |

*See* ECF 152-1 at Table 5.

***Second***, JM possesses significant power in the calsil market. *ZF Meritor*, 696 F.3d at 284. Indeed, it possess monopoly power in the calsil market, making its agreements "of special concern." *See id.* at 270; *Dentsply*, 399 F.3d at 187. JM concedes that it accounted for ███ of

47

calsil sales before TPS's entry into the market, and more than ▮ after TPS's entry. *See* JM

30(b)(6) Tr. 34:1-4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *see also* Hlavenka Tr.

29:2-8 (testifying that DI buys 99% of its calsil from JM and 1% from TPS). Further, TPS's

economics expert, Dr. Warren-Boulton, provided extensive direct evidence showing that JM

possesses significant market power in the calsil market.

And the highly concentrated industrial insulation industry—one in which JM possessed

market power—allowed it to foreclose much of the calsil market. Indeed, locking in ▮ alone

foreclosed nearly ▮ of the market, and ▮ added another ▮▮ This well exceeds the 40%

threshold that some courts have held in exclusive dealing cases. *See McWane*, 783 F.3d at 837.

But, as discussed, courts have also found less than 40% foreclosure sufficient "when the defendant

is a monopolist." *Id.* These factors show that the calsil market is "highly concentrated." *ZF*

*Meritor*, 696 F.3d at 284; *see also Dentsply*, 399 F.3d at 184 (noting that the relevant market was

"marked by a low or no-growth potential" and the defendant had long dominated the industry with

a 75-80% market share).

Here, as part of its effort of locking up the market, JM entered ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Those

agreements ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████ All told, the ██████████

██ agreements locked in nearly ███ of all calsil sold in the distributor market.

And "the law is clear that an express exclusivity requirement is not necessary because *de facto* exclusive dealing may be unlawful." *ZF Meritor*, 696 F.3d at 282 (citing *Tampa Elec.*, 365 U.S. at 326); *Dentsply*, 399 F.3d at 193; *LePage's*, 324 F.3d at 157. In *LePage's*, the Third Circuit held that bundled rebates and discounts offered to major suppliers were meant to and did operate as exclusive dealing arrangements, even with no express exclusivity term. 324 F.3d at 157-58. Thus, simply because JM's annual incentive agreements may not include a written exclusivity provision does not foreclose an exclusive dealing claim. This is particularly true given the other indicia of coercion—that is, JM threats to customers who bought TPS calsil. And when JM threatened customers who did business with TPS, this led to a de facto exclusivity arrangement given that JM and TPS were the only two sources of calsil in the market. Excluding the only other supplier of calsil in the market, by definition, meant that JM was the exclusive supplier.

Nor is a written contract a requirement. In *Dentsply*, the Third Circuit held that transactions which were "technically only a series of independent sales" could support an exclusive dealing claim because the large share of the market held by the defendant and its conduct in excluding competitors, "realistically made the arrangements . . . as effective as those in written contracts." 399 F.3d at 193 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 n.9 (1984)). Thus, all of JM's sales can be considered in this context, particularly given JM's broad coercion.

**Third**, JM secured this substantial foreclosure through coercion. For example, as has been detailed, Mr. Hlavenka testified that DI did not "think that we can do without JM" as a supplier because without JM's products DI could not compete in "a lot of markets . . . ." (Hlavenka Tr.

33:18-25.) This concern stemmed from the threat Mr. Hlavenka received from Mr. Shapiro, who noted that if DI "were to start stocking TPS, we may have to relook at setting up General [Insulation]," a competitor of DI's in the Gulf Coast region. Hlavenka Tr. 38:21-39:17. JM was not currently supplying GI, but JM's threat was clear: Do business with TPS, and we'll turn to your competitor instead. (And given that JM has repeatedly admitted that it does not always do business with every distributor in a geographic region, it is reasonable to infer that supplying GI could mean cutting off supply to DI. *See* JM Fact No. 17.) And Mr. Shapiro's threat tracked the threat previously levied by JM's Evan Stone that ████████████████████████████ ████████████████████████████████████████ JM00018081 at JM00018083.

Bay also was the victim of JM's coercive tactics. JM's documents note that it learned that

████████████████████████████████████████

████████████████████████████████████████

████████████████ JM00023086. JM was displeased because, while ████████████

████████████████████████████ *Id.* As a result, JM

████████████████ as it had done with other distributors. Internally, JM noted that ████████

████████████████████ JM00011469. And Bay immediately recognized what being

████████ meant: that Bay would be cut off from JM's products if Bay continued to do business with TPS. *See* Duppler email ("They are taking a hard line against selling anyone who is stocking a 'different' brand . . . . I hope TPS plans on supporting Bay at any location since it sounds pretty likely that JM will be cutting us off from cal sil.").

Just these examples for DI and Bay cover a significant portion of the calsil market. And these examples are bolstered by the other evidence of JM's threats of punishment and retaliation with other customers. Thus, when viewed in its full context, this evidence is more than enough to create a dispute of material facts that preclude a finding of summary judgment in JM's favor on TPS's claim relating to exclusive dealing.

### 3. Johns Manville's Disparagement of Thermal Pipe Shields's Product

Contrary to JM's argument, its disparagement was not limited solely to referring to TPS calsil as "Chinese." Instead, JM's goal was to use the Chinese origin to bolster its claims that TPS calsil would not pass safety and performance standards, would not meet ASTM specifications, and may even contain asbestos, even though JM knew that TPS's calsil meets all required standards and specifications and contained no asbestos.

This disparagement, when combined with JM's other exclusionary conduct, is sufficient to give rise to antitrust liability.

### a. Legal Standard

Deceptive speech about a rival "without more, rarely interferes with competition enough to violate the antitrust laws," but "in some cases, such defamation, which plainly is not competition on the merits, can give rise to antitrust liability, especially when it is combined with other anticompetitive acts." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 n.14 (3d Cir. 2010); *see also Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244, 1249 (D. Utah 1999) ("misleading statements may not amount to a finding of Section 2 liability standing alone" but "[t]he statements viewed with other behavior may, however, support a Section 2 violation").

The Tenth Circuit has cited a six-factor test by which a plaintiff may rebut this presumption by showing that the disparagement was: "(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1127 (10th Cir. 2014) (citation). But the Tenth Circuit has not decided whether a plaintiff must establish all six factors to overcome the *de minimis* presumption. *Id.* at 1128 & n.9 (declining to decide whether a plaintiff needs to satisfy all six factors when the summary judgment record presented "sufficient evidence to create a question of material fact on each prong of the trade-disparagement test").

### b. Analysis

JM begins by arguing that TPS lacks evidence of disparagement. This is incorrect. Instead, JM disparaged both TPS's business and its calsil. Just days after TPS announced it was entering the calsil market, JM developed ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ all of which it knew was untrue.

Specifically, ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ JM00017011 at JM00017012. JM warned that ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ *Id.* JM also questioned whether ████████████████████████████████████████████ ████████████████████████████████████████████████████████████



*Id.* at JM00017013.

And JM personnel eagerly brought this subtle (and not-so-subtle) innuendo to the market.

*See* JM00011680 ████████████████████████████████████████

████████████████████ Indeed, JM sales personnel ████████████████

████████████████████████████████████████ JM00011700 ████████

████████████████████████████████████████████████

DI's Mr. Hlavenka testified that Mr. Shapiro warned him about TPS's product, claiming that "'you have to be real careful with Chinese calsil because the amount of free silica in their product could be a huge issue.'" Hlavenka Tr. 41:11-15. Mr. Hlavenka questioned Mr. Shapiro's comments because he understood that JM had previously acquired calsil from the same factory from TPS sourced its calsil. *Id.* at 41:18. But Mr. Shapiro claimed that JM was shipping "all the raw materials from the U.S. into that plant to make sure that when we had the plant, it was—it was meeting all the standards; but you can't believe that now." *Id.* at 41:19-23.

JM's Evan Stone also brought this message to distributors, ████████████████



JM00018081 at JM00018082. JM's other marketing materials also perpetuated this false narrative, warning that ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ JM00030937 at 17; JM00030867.

Of course, JM knew that any suggestion that TPS's calsil failed tests or specifications was false as JM had conducted its own internal testing. *See* JM00011941 

). Indeed, customers had told JM that

*See* JM00003652

Moreover, JM cites deposition testimony from Mr. Meyer explaining that he simply suggested that a customer confirm that the calsil it was buying from TPS met ASTM specifications. But Mr. Meyer went a step further to suggest that TPS calsil might contain asbestos, stating that he "relayed a story that had been circulated around the industry that in the past there was a sample of CalSil that came in from China that may have contained trace amounts of asbestos." Meyer Tr. 134:19-135:3. And as JM is well aware, linking a product to asbestos can have devastating consequences.[3]

JM's other argument is that TPS has failed to rebut the *de minimis* presumption about the effect on competition, citing the six-factor test in *Lenox*, though JM challenges only three of these factors: the third (clearly likely to induce reasonable reliance), fifth (continued for prolonged periods), and sixth (not readily susceptible to neutralization) factors.[4]

On the third factor, whether the statements were clearly likely to induce reliance, the evidence shows that product quality was an important factor for customers to consider. Indeed, products that did not meet ASTM specifications could not be used on most projects. *See* Hlavenka

---

3.      https://www.asbestos.com/companies/johns-manville/
4.      TPS does not address the first, second, and fourth factors, which JM does not challenge.

Tr. 31:1-7 (noting that some of the "most important factors" for customers buying insulation material are "quality" and "meeting a particular spec[ification]"). And using products that may contain asbestos would have been a non-starter. Thus, it is reasonable to infer that statements suggesting that TPS calsil is inferior could affect a customer's decision. Further, JM held itself out as an expert on these topics in the industry. Indeed, JM's 30(b)(6) witness testified about the extensive "education" that they provide to market actors. JM 30(b)(6) Tr. 173:13-174:9; 213:18-214:4. And the fact that customers approached TPS with these concerns shows that the customers found them at least somewhat plausible.

On the fifth factor, the evidence shows that the disparagement began almost immediately, in March 2018, just days after TPS entered the calsil market. *See* JM00074261. And it shows that this messaging persisted for months, if not years. *See* JM00030867 (July 2020 presentation). This is more than enough to conclude it was not temporary or sporadic.

On the sixth factor, whether the disparagement is not readily susceptible to neutralization, the evidence shows that TPS needed to respond to disparaging comments. But disparaging statements are not readily susceptible if they are hidden from TPS. Put another way, while TPS may have succeeded in some cases in neutralizing disparaging statements, it was only able to do so when the comments were affirmatively brought to their attention by prospective customers.

Particularly when viewed in context with JM's other anticompetitive conduct, JM's disparagement supports a finding of unlawful exclusionary conduct.

### 4.  Johns Manville's Unlawful Tying

For the reasons stated in Section II, *infra*, JM's exclusionary conduct included tying the purchase of its other insulation materials to customer's purchase of JM calsil as well.

**II.**    **Thermal Pipe Shields's Tying Claim Is Supported by Sufficient and Admissible Evidence of an Actual or Threatened "Tie" by Johns Manville.**

A tying arrangement under the Sherman Act "is an agreement by a party to sell one product—the 'tying product'—only on condition that the buyer also purchase a second product—the 'tied product'—or at least agree not to buy that product from another supplier." *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1078 (D. Colo. 2013), *aff'd*, 841 F.3d 827 (10th Cir. 2016) (D. Colo. 2013) (quoting *Eastman Kodak*, 504 U.S. at 461-62). Tying arrangements can be analyzed using a per se rule or a rule of reason. *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1037 (10th Cir. 2017). TPS can prove that JM engaged in an illegal tying arrangement under *both* the per se and rule of reason standard.

**A.  Thermal Pipe Shields can prove a per se tying claim.**

In the Tenth Circuit, to succeed on a per se tying claim a plaintiff must show that "(1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a 'not insubstantial' amount of interstate commerce in the tied product is affected." *Id.* (quoting *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 886 (10th Cir. 1997)). ECF 50 at 7.

**1.  The tied product, calsil, is separate from the tying products**

JM argues that TPS cannot prove that there are "two separate products involved in any alleged tying arrangement." ECF 193 at 17. But there ***are*** separate products involved, and substantial evidence showing that to be true.

On the one hand, there is calsil, the tied product. On the other hand, there are other products that JM sells to distributors that give it economic power over them, the tying products. These

include, at least, fiberglass, perlite, mineral wool, and InsulThin. ECF 152-1 at 15-17. Calsil is separate from these tying products, as evidenced by Dr. Warren-Boulton's conclusion that "the sale of calsil in the US is a relevant antitrust market." ECF 152-1 at 2. This necessarily means that calsil is a distinct product from other types of industrial insulation. *Id*. Indeed, the Court already found that there is at least a factual dispute about whether sales of calsil constitute a relevant antitrust market, and accordingly whether calsil is a distinct product. ECF 101 at 10. ("Defendant fails to establish as an undisputed fact that calsil is reasonably interchangeable with other insulators.").

To the extent that JM argues that a tying arrangement must be limited to just two distinct products—i.e., a single tying product and a single tied product—it is wrong. Courts routinely permit tying claims to proceed where there are multiple tying products. *See, e.g.*, *Palmyra Park Hosp. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1297 (11th Cir. 2010); *AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 1:17-cv-00598 (BKS/CFH), 2018 U.S. Dist. LEXIS 131206, at *14 (N.D.N.Y. Aug. 6, 2018). Indeed, one of the foundational tying cases—*Eastman Kodak*—involved multiple products in the tying product market. *See* 504 U.S. at 458 (alleging that Kodak tied repair services to the sale of *parts*).

### 2. Johns Manville tied its sale of calsil to other products

JM next claims that there is no evidence of a tie between calsil and the tying products. Again, JM is wrong because it takes an artificially narrow view of the evidence. As detailed throughout this brief, JM threatened multiple distributors—including DI, 4 State, API, and Bay— that it would stop making the tying products available if they purchased or stocked TPS's calsil. This is classic tying behavior, and it succeeded.

"On review of summary judgment, of course, [the non-moving party] is entitled to the benefit of reasonable inferences and interpretations in its favor." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 470-71 (7th Cir. 2020). In similar circumstances, courts have denied motions for summary judgment where comparable evidence was enough, at the very least, to create a factual dispute. *See, e.g.*, *id.* (documents and testimony from defendant and third party was sufficient evidence that defendant forced third parties to buy ad rep services using monopoly in separate market); *Sidibe v. Sutter Health*, No. 12-cv-04854-LB, 2021 U.S. Dist. LEXIS 45221, at *15-17 (N.D. Cal. Mar. 9, 2021) (denying summary judgment where facts about whether customers were coerced into purchasing tied product were disputed). The Court should likewise deny JM's motion for summary judgment.

### 3. Johns Manville has "sufficient economic power" in the tying products

Contrary to JM's assertions, TPS need not prove that JM meets a specific threshold of "market power" to prove its tying claim. Rather, the law only requires a showing that JM has "sufficient economic power" in the tying products. *Suture Express*, 851 F.3d at 1037; *see also Eastman Kodak*, 504 U.S. at 462 (a tying claim only requires "'appreciable economic power' in the tying product market") (citing *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969)).

Given the economics of the industrial insulation markets at issue, "sufficient economic power" is easily found. ECF 152-1 at 2. JM's sales of calsil to its distributors account for just ▮ of its total sales of five products: calsil, fiberglass, perlite, mineral wool, and InsulThin. *Id.* at 14. Accordingly, avoiding even small changes to the terms of sale for the other ▮ of products—

much less losing access to them altogether as JM threatened—provide strong incentives for distributors to continue buying JM's calsil. *Id.* at 14-15. As Dr. Warren-Boulton explains,

> Establishing the potential for harm to competition and consumers does not require that Johns Manville have any defined measure or amount of market power in the market for each of these products. Rather, what is needed is that a sufficient number of distributors or other customers value access to Johns Manville's products (as opposed to the product generally) at Johns Manville's current terms such that a revision of those terms or reduction in access could impose significant costs on those distributors. For the threat of such a revision or reduction to be effective, all that is necessary is that the resultant additional costs on the Johns Manville products would exceed the distributor's likely cost savings from purchasing some of its calsil requirements from Thermal Pipe Shields.

*Id.* at 15.

Other evidence supports a finding of "sufficient economic power" as well. ***First***, JM has significant market shares in both the perlite and mineral wool markets; it testified that it has about ▮ of both the perlite and fiberglass markets. *See* JM 30(b)(6) Tr. 145:4-10; 146:5-12. Because courts often find that market shares well below 40% can support a finding of "market power"—a higher threshold than what is required here—JM's approximately ▮ market shares in the tying product markets is strong evidence of "sufficient economic power." *See, e.g.*, *Image Tech. Servs. v. Eastman Kodak Co.*, 903 F.2d 612, 618 (9th Cir. 1990) (holding that because defendant's share of the relevant markets "may approach as much as twenty-three percent," plaintiffs' evidence was sufficient to raise a material issue of fact on market power); *Osborn v. Sinclair Refin. Co.*, 286 F.2d 832, 841 (4th Cir. 1960) (an oil company whose market share was "more than 10%" was sufficient to show market power); *Brokerage Concepts v. U.S. Healthcare*, No. 95-1698, 1995 U.S. Dist. LEXIS 10807, at *11 (E.D. Pa. July 25, 1995) (rejecting defendant's argument "that as a matter of law a seller with a 14 percent market share has insufficient market power to be held liable in a *per se* tying case"); *Breaux Bros. Farms, Inc. v. Teche Sugar Co.*, 21 F.3d 83, 87-88

(5th Cir. 1994) (allowing plaintiff to proceed when it showed that defendant controlled 17.5% of the tying market).

*Second*, distributors testified about the importance of JM to their businesses. For example, Mr. Hlavenka from DI—which itself accounts for about ▮▮ of the distribution market—testified that "I don't think that [DI] can do without JM." Hlavenka Tr. at 33:20. Similarly, 4 State's Mr. Guest responded in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This dependence gives JM "sufficient economic power" to tie its calsil to the other products it sells by forcing distributors to do something they "would not do in a competitive market," i.e., forego purchases of TPS's calsil. *Cf. Suture Express*, 851 F.3d at 1037 ("The Supreme Court has explained that illicit tying arrangements occur "when the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market.").

*Third*, TPS has direct evidence of JM's "sufficient economic power" in the tying product markets through anticompetitive effects in the calsil (tied product) market. "[T]ied market effects can be appropriate evidence of tying market power." *Id.* at 1040; *see also Eastman Kodak*, 504 U.S. at 477 ("It is clearly reasonable to infer that Kodak has market power to raise prices and drive out competition in the aftermarkets, since respondents offer direct evidence that Kodak did so."); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 915 (9th Cir. 2008) ("it is a permissible inference that a rational customer would not purchase [defendant's] allegedly overpriced product in the absence of a tie") (citations omitted).

Here, the evidence shows that distributors declined to purchase or stock TPS calsil even though they were interested in the product, understanding it to be less expensive and of higher

quality. This evidence is similar to what the Supreme Court found was sufficient to defeat a summary judgment motion in *Eastman Kodak*: that "consumers have switched to Kodak service even though they preferred ISO service, that Kodak service was of higher price and lower quality than the preferred ISO service, and that ISO's were driven out of business by Kodak's policies." 504 U.S. at 465. Thus, in line with the Supreme Court's holding, TPS's "evidence would be sufficient to entitle [it] to a trial on their claim of market power." *Id.*

### 4. Johns Manville's anticompetitive conduct affects a "not insubstantial" amount of commerce

JM does not dispute that the tying arrangement foreclosed a "not insubstantial" amount of commerce. *Healy v. Cox Commc'ns, Inc. (In re Cox Enters.)*, 871 F.3d 1093, 1102 (10th Cir. 2017) ("tying arrangements must 'foreclose *to competitors* of the tied market a "not insubstantial" volume of commerce'") (quoting *Fox Motors, Inc. v. Mazda Distribs. (Gulf), Inc.*, 806 F.2d 953, 957 (10th Cir. 1986)). With good reason. Dr. Warren-Boulton calculates that TPS suffered single damages of ███████, which could not be deemed "insubstantial" by any measure.

### B. Admissible evidence supports Thermal Pipe Shields's rule of reason tying claim.

"If a plaintiff fails to prove an element [of a per se claim], the court will not apply the per se rule to the tie, but then may choose to analyze the merits of the claim under the rule of reason." *Cox Enters.*, 871 F.3d at 1098. "Under the rule of reason, the plaintiff has the burden of showing that the defendant 'unreasonably restrained competition' in violation of the Sherman Act." *Suture Express,* 851 F.3d at 1037 (citations omitted). "Thus, the per se 'elements' are in fact more akin to 'factors' under this analysis, useful for providing a framework forward but perhaps not themselves actual requirements for a plaintiff to establish a prima facie case." *Id.* at 1038 n.4 (citations omitted).

The same evidence that supports TPS's per se tying claim—that JM used its economic power provided by its sale of industrial insulation products to coerce distributors not to buy TPS's calsil—also supports a rule of reason claim and shows that JM's actions "unreasonably restrained competition." This is sufficient to deny JM's summary judgment motion.

This is particularly true because JM does not raise any procompetitive justifications for tying sales of calsil to other insulation products. *Cf. Law v. NCAA*, 134 F.3d 1010, 1017 (10th Cir. 1998) ("A rule of reason analysis first requires a determination of whether the challenged restraint has a substantially adverse effect on competition. The inquiry then shifts to an evaluation of whether the procompetitive virtues of the alleged wrongful conduct justifies the otherwise anticompetitive impacts.") (citations omitted). TPS has carried its burden to show that "the challenged restraint has a substantially adverse effect on competition." *Id.* (citation omitted); *see, e.g.*, ECF 152-1. Because JM has not presented evidence or argument on its burden to show "procompetitive virtues," the Court's analysis is complete and it should deny JM's summary judgment motion.

### III.   Thermal Pipe Shields Can Prove Antitrust Injury Stemming from Johns Manville's Unlawful Conduct.

To prove antitrust injury, TPS must show harm to competition. And TPS has evidence of harm to competition in the form of: (1) supracompetitive prices for calsil; (2) reduced market output; (3) reduced innovation and the use of JM's inferior product; and (4) reduced consumer choice in calsil products. And while JM tries to invent a "long-term" effect requirement with no support in the case law, regardless, the evidence reflects higher prices, reduced output, and the use of inferior products spanning years.

**Legal Standard**

To establish an antitrust injury, a plaintiff must show harm to competition. *See 78 Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (stating that the "antitrust laws . . . were enacted for 'the protection of **competition** not **competitors**'") (citation omitted)); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 960 (10th Cir. 1990) (same). A plaintiff can establish harm to competition in several ways, including showing higher prices, reduced output, reduced innovation, or inferior products. *See Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1281 (10th Cir. 2012) ("An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare.") (quoting *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)). The Supreme Court has described raised prices and reduced output as the "hallmarks of anticompetitive behavior." *NCAA v. Bd. of Regents*, 468 U.S. 85, 113 (1984).

**Analysis**

TPS shows that JM raised the price of calsil above competitive levels, that it reduced output and choice in the calsil market, and that it stifled innovation in the industrial insulation market by foreclosing a superior quality calsil (TPS calsil) from a substantial portion of the market.

Dr. Warren-Boulton's analysis shows that JM raised prices above the competitive level. Dr. Warren-Boulton compared various measures of JM's profits from domestic calsil sales to various relevant benchmarks designed to act as a "proxy" for a competitive marketplace, and these comparisons consistently showed that JM's calsil prices are ███ above the competitive level. *See* ECF 152-1 at 8 n.17; *id.* at Figs. 1-4, 15-16; Tables 3-4; *see also* ECF 152-24 ¶ 14. And Dr. Warren-Boulton shows that JM's anticompetitive conduct reduced output and stifled innovation

by suppressing TPS's ability to bring its calsil to a substantial portion of the market. *See* 152-1 at 8 n.17; *id.* at Figs. 18, 21-22. Thus, Dr. Warren-Boulton's analysis is more than enough to create a question of material fact as to antitrust injury. Moreover, distributor testimony reflects this analysis. *See., e.g.*, Hlavenka Tr. at 23:6-13 ("Generally speaking, the TPS product would be roughly 20 percent cheaper than JM.").

JM incorrectly suggests that TPS must also show "long-term harm to competition." ECF 193 at 47. JM largely relies on *JetAway Aviation, LLC. v. Board of County Commissioners* to support this contention. No. 07-cv-02563-RPM, 2012 U.S. Dist. LEXIS 42377, at *10 (D. Colo. Mar. 28, 2012). But *JetAway* is irrelevant. There, the plaintiff provided airport-related services and defendants included a Colorado county board and another provider of airport-related services. *Id.* at *1-2. The plaintiff lost a bid for a lease to provide its services after the county issued a Request for Proposals and selected a competing bidder. *Id.* at *7. The plaintiff attempted to show that defendants colluded anticompetitively "to preserve an illegal monopoly." *Id.* at *10. The weakness in the plaintiff's case was that its own forensic witness concluded that "the market can sustain only one operator." *Id.* at *11. Thus, the court found that the "temporary effect" of excluding the plaintiff from the market was not a cognizable antitrust injury because without the exclusion "the result would have been that [defendant's] business would fail and [plaintiff] would be the sole survivor" and "antitrust law does not criminalize the protection of one monopolist from the aggressive efforts of another seeking to replace it." *Id.*

Here, in contrast, there is no reason to conclude that the market for calsil can only sustain one manufacturer. Indeed, JM's internal analysis showed that ████████████████████ ████████████████████████████████  *See* JM00001394 at 4-5 ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████   And after TPS' entry into that market, the reason JM continued to dominate the market was its dramatic efforts to preserve its monopoly through threats and retaliatory actions, not because the calsil market is limited to one provider. *JetAway* is thus not instructive because there the plaintiff's defined market could sustain only one provider.

Further, JM's actions had more than the kind of "temporary effect" the court found in *JetAway*. Indeed, Dr. Warren-Boulton's analysis shows that these supracompetitive prices, reduced output, and reduced innovation lasted for years (and the effects persist to this day). *See* ECF 152-1 at 8 n.17; *id.* at Figs. 1-4, 15-16; Tables 3-4.

## IV.   The Court Should Not Be Misled to Think that Johns Manville's Artificially Narrow Excerpt of the Discovery Record Is Representative.

Discovery has generated a significant body of factual evidence that supports TPS's claims. Because TPS has not yet had occasion to prove its case affirmatively, TPS has not presented any comprehensive collection of supporting evidence—to the Court *or* to JM. Thus, the Court cannot do what JM seeks to have it do: determine—based on nothing more than JM's representation—that there is not even a genuine question about whether TPS has adequate evidence. Such a ruling would be premature and unfounded.

To create this misimpression, JM selects a limited and unrepresentative sample of the discovery record—which, contrary to JM's claim, is competent evidence—and urges the Court to conclude that (1) the narrow slice of the record is representative and comprehensive; and (2) this evidence cannot support TPS's claims. But neither is true.

The cherry-picked sample to which JM directs the Court provides no indication—which, of course, is not by accident—of the extent to which JM and distributor documents and testimony corroborate TPS's allegations. (Also, TPS may use different pieces of evidence to prove different elements of the same claim.) Nor does JM offer any principled explanation of why the Court should adopt JM's artificially myopic view of the record. The only reason to focus on this small fragment is to avoid contradictory evidence. Finally, the limited portion of the record to which JM refers does not suffer from the fatal evidentiary concerns that JM insists. Even if this issue were ripe, before TPS has sought to admit a single document, many exceptions to the rule prohibiting hearsay testimony would lead the Court to admit these documents, along with the other compelling evidence that will establish TPS's claims against JM.

### A. Thermal Pipe Shields's Interrogatory Responses do not consider the most relevant sources of information.

In supplementing its Responses and Objections to JM's Interrogatories Nos. 8, 9, and 10, TPS carved out a large chunk of the discovery record as a basis for its narrative responses: all documents produced by JM and all testimony provided by any witness. *See* ECF 193-1 at 4, 7-8, *and* 11-12. The Responses all state:

> The chart [of narrative responses, below,] only describes incidents, and cites evidence thereof, which are ***reflected in documents within TPS's possession, custody, and control and*** which TPS produced to Johns Manville in the course of this litigation. In accordance with Federal Rule of Civil Procedure 26(b)(2)(C)(i), TPS does not, in this further supplemental response to Interrogatory No. [], describe violations of the [Sherman and/or Lanham Acts] that are reflected solely in documents Johns Manville produced during the course of this litigation, because that discovery 'can be obtained by Johns Manville from some other source that is more convenient, less burdensome, or less expensive' by Johns Manville examining its own documents, which it has already reviewed and produced in the court of this litigation. Likewise, TPS does not describe evidence obtained through testimony which was offered in the presence of Johns Manville or its counsel.

*See id.* (emphasis added). This limitation means that any evidence described comes from the documents which TPS had produced (before its document production was even complete), but none of the documents that JM had produced, nor any supporting testimony provided at a deposition. As a result, party admissions by JM witnesses and first-person, non-hearsay accounts shared by non-party witnesses are all omitted from TPS's Responses. These are, of course, the sources ***most likely*** to contain relevant, admissible evidence.

As the quoted language suggests, the purpose of this limitation was to confine the burden on TPS to what the Federal Rules contemplate. TPS does not have any obligation to inform JM of the contents of its own production, nor should it need to do so. There is no basis to conclude that the silence of TPS's Interrogatory Responses as to the contents of documents not described equates with silence of those documents as to the merits of TPS's case.

Indeed, the contrary of such an assumption is true. Logic would predict that JM's document production—which includes its communications with distributor customers and internal communications about those communications—would provide more examples of JM's coercive actions than TPS documents would. (Similarly, one level of claimed hearsay would be mooted.) The reality tracks logic's prediction. The preceding pages have shown that JM's production is rife with examples of JM threatening its customers, implicitly demanding exclusivity on pain of punishment. There is ample evidence to permit a jury to find for TPS on each of its two antitrust claims. The evidentiary sample that JM urges the Court to consider is not merely unrepresentative. Worse, it is gerrymandered specifically to avoid evidence most damning for JM.

**B.  Thermal Pipe Shields has not yet had occasion to prove its case affirmatively; it has only provided a brief preview of the evidence that supports its claims.**

In a similar attempt to examine an arbitrarily limited set of documents and extrapolate conclusions, JM declares that a certain seven documents from its production are insufficient to support TPS's case. But where does the limitation of these seven documents come from? It is an artifice of JM's briefing, reflecting no principled cleavage other than that TPS's expert economist identified these documents as among those that he considered which constitute direct evidence of JM's taking (or threatening) adverse action against customers who did business with TPS. ECF 152-1 at 15. Dr. Warren-Boulton did not state, or even suggest, that this list of evidence was exhaustive. Neither did TPS in its opposition to JM's motion to exclude Dr. Warren-Boulton's testimony. At no point has TPS referred to these documents as a "prima facie case" or otherwise suggested that TPS lacks other evidence in support of its claims.

Once again, JM has unilaterally determined to dispense with a governing legal standard and import its own. Rule 56 leaves no doubt as to when summary judgment is warranted: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard is not that summary judgment will be granted when the movant creates a fiction as to the non-movant's case and then insists that such a case does not pass muster. But even if the Court were to consider just these seven documents, it must conclude that there is at least a "genuine dispute" as to whether JM threatened and took punitive action against its customers to deter—and in reprisal of—those customers' purchases of TPS calsil. The Court should also conclude that there is a "genuine dispute" as to whether these actions were effective, harming consumers and TPS.

Indeed, even these seven documents alone show that JM made the following statements:



*See* JM00001451; JM00003503; JM00003324; JM00028748; JM00018081 at JM00018083; JM00034501; JM00011469. These statements all qualify for multiple exceptions to the rule prohibiting the admission of hearsay testimony, or do not constitute hearsay at all. *See* Fed. R. Evid. 801, 803. They also all raise a genuine issue of material fact as to one or more elements of TPS's antitrust claims. Additional documentary evidence and testimony further corroborate TPS's claims; these seven documents are merely small snapshots exemplary of more evidence to come.

### C. Deposition testimony from two distributors alone proves most of the elements of Thermal Pipe Shields's two antitrust claims.

TPS deposed two distributors, Mr. Guest from 4 State and Mr. Hlavenka from DI. JM's assertion that these witnesses did not testify to anything that supports TPS's claims is simply not true. Their testimony supports at least some, if not all, of the elements of TPS's claims. *See* ECF 50 at 19-20 (citing elements of a monopolization claim); *id.* at 7 (citing elements of a tying claim) (all citations omitted).

As for TPS's monopolization claim, Mr. Guest and Mr. Hlavenka both testified to JM's monopoly power over its customers in the calsil market, buttressing Dr. Warren-Boulton's conclusions. For example, Mr. Guest testified that 4 State would continue to purchase JM's calsil *regardless* of how much JM increases its price. Mr. Guest answered ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ Guest Tr. at 35:10-16. This testimony conflicts with the contentions that there is viable competition in the calsil market and that customers have alternatives to JM calsil, or calsil altogether. Similarly, Mr. Hlavenka testified that JM calsil accounts for "traditionally, 100 percent; maybe 99 percent now" of DI's calsil supply. Hlavenka Tr. at 28:22-29:8.

Additionally, each distributor witness testified to ways in which JM used exclusionary conduct—exactly of the sort alleged in the First Amended Complaint—to maintain that monopoly power when faced with the prospect of competition from TPS. For example, Mr. Hlavenka testified that Mr. Shapiro warned Mr. Hlavenka that JM would transfer its business to a rival distributor in the Houston area "if somebody were to start stocking TPS." Hlavenka Tr. at 38:20-39:20. He also testified that, after the filing of the Complaint in this case, Mr. Alley was "being very careful about what they said" to Mr. Hlavenka in a conversation in which Mr. Alley expressed his disappointment at DI's having bought TPS calsil. Hlavenka Tr. at 37:6-38:19. Mr. Guest testified to a more direct threat from JM's Mr. Meyer. He was told "that if we continued to buy Thermal Pipe Shield's [sic], TPS's Calsil, we would no longer be able to purchase Johns Manville Calsil." Guest Tr. at 31:12-34:6.

As for TPS's tying claim, Mr. Hlavenka testified to DI's purchase of calsil from JM being implicitly conditioned on its purchase of JM perlite. Mr. Hlavenka testified that DI first bought TPS calsil in 2018 or 2019 and, also at that time, JM re-structured its agreement with DI to require a certain DI to purchase a certain quantity of calsil and perlite to qualify for rebates that had previously been unconnected. Hlavenka Tr. at 34:1-36:23. Because of DI's limited perlite needs, it could not hit the target without buying calsil from JM.

And both distributor witnesses testified to JM's economic power in the claimed tying products, as well as to its economic power over distributor customers generally. For example, Mr. Hlavenka testified that DI pays a premium for JM products because of JM's "brand name" and stated that "I don't think that we can do without JM." Hlavenka Tr. at 18:7-13; 33:18-20. Similarly, 4 State's Mr. Guest responded ███████████████████████████████████████ ███████████████████████████████ Guest Tr. at 35:10-13. Additionally, Mr. Hlavenka testified that JM's supply of the tying products is a much more significant portion of JM's insulation purchases than calsil, meaning that it would make economic sense for DI to forgo the opportunity to buy TPS's better, cheaper calsil if doing so would put its fiberglass purchases at risk. *See* Hlavenka Tr. at 28:21-29:23 (DI spends roughly $145 to $150 million per year on fiberglass and perlite purchases, compared with about $10 to $15 million in calsil purchases). And, indeed, Mr. Hlavenka testified that DI did exactly that. When asked about DI's reservations about stocking TPS calsil, Mr. Hlavenka responded: "[W]e need to have a relationship with JM. . . . We didn't—you know, we didn't want to get on JM's bad side either, by stocking TPS . . . ." Hlavenka Tr. at 66:21-67:16. And both distributor witnesses also testified to the substantial amount of

interstate commerce in calsil that JM's anticompetitive conduct affected. *See, e.g.*, Guest Tr. at

34:1-6; Hlavenka Tr. at 28:21-29:23.

## CONCLUSION

For these reasons, Thermal Pipe Shields asks that the Court deny Johns Manville's Motion

for Summary Judgment.


DATED:  February 22, 2022                    Respectfully submitted,


s/Geoffrey N. Blue                               s/Alexandra Shear
THE GEOFFREY BLUE LAW                   BONA LAW PC
FIRM, LLC                                         Alexandra Shear
Geoffrey N. Blue                                James Lerner
7350 E. Progress Place, Suite 100           287 Park Avenue South, Suite 422
Greenwood Village, CO 80111              New York, NY 10010
Telephone: (720) 647-5320                   alex.shear@bonalawpc.com
Email: gblue@gbluelaw.com                 james.lerner@bonalawpc.com

Local Attorney for Plaintiff                   Luke Hasskamp
Chase Manufacturing, Inc.                    Jarod Bona
                                                      Jon Cieslak
                                                      Kristen Harris
                                                      4275 Executive Square, Suite 200
                                                      La Jolla, CA 92037
                                                      Telephone: (858) 964-4589
                                                      luke.hasskamp@bonalawpc.com
                                                      jarod.bona@bonalawpc.com
                                                      jon.cieslak@bonalawpc.com
                                                      kristen.harris@bonalawpc.com

                                                      Attorneys for Plaintiff
                                                      Chase Manufacturing, Inc.

| Plaintiff's Exhibit | Description |
|---|---|
| 1 | Documents produced by JM |
| 2 | Documents produced by TPS |
| 3 | Documents produced by non-party Bay Insulation |
| 4 | Documents produced by non-party 4 State Supply |
| 5 | Excerpts of deposition testimony by JM's corporate representative, **David Skelly**, pursuant to Rule 30(b)(6), taken August 25, 2021 |
| 6 | Excerpts of deposition testimony by JM witness **Chad Meyer**, taken July 27, 2021 |
| 7 | Excerpts of deposition testimony by TPS's corporate representative, **David Shong**, pursuant to Rule 30(b)(6), taken August 16, 2021 |
| 8 | Excerpts of deposition testimony by TPS witness **David Shong**, taken August 17, 2021 |
| 9 | Excerpts of deposition testimony by TPS witness **Jeffrey Heckman**, taken August 19, 2021 |
| 10 | Excerpts of deposition testimony non-party witness **Joseph Guest** (of 4 State Supply), taken September 14, 2021 |
| 11 | Excerpts of deposition testimony non-party witness **Robert Hlavenka** (of Distribution International), taken September 22, 2021 |
| 12 | Email from Alex Shear to Judge Hegarty, dated November 20, 2019 |

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following persons:

Gregory J. Kerwin, Esq. (gkerwin@gibsondunn.com)
Allison Kostecka, Esq. (akostecka@gibsondunn.com)
Ryan Bergsieker, Esq. (rbergsieker@gibsondunn.com)
Lydia Lulkin, Esq. (llulkin@gibsondunn.com)
GIBSON, DUNN, CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO 80202

 *s/ Lisa Mittwol*
Lisa Mittwol, Senior Paralegal

1