IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC.,

      Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

Before the Court are the parties' Motions to Exclude Expert Testimony (ECF 134 & 135) and Defendant's Motion to Strike (ECF 176). The Motions are fully briefed, and the Court heard oral argument on February 10, 2022. The Court's ruling is as follows:

## I.      The Updated Report of Dr. Warren-Boulton

Fed. R. Civ. P. 26(a)(2) obligates Plaintiff to disclose "a complete statement of all opinions the witness will express and the basis and reasons for them." That rule requires an expert witness's report to "be detailed and complete and state the testimony the witness is expected to present during direct examination, together with the reasons therefor." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006) (citing the 1993 advisory committee's notes to Rule 26). In other words, the expert witness must provide a comprehensive statement of his or her opinions and conclusion as well as the bases therefor. It is critical that the report constitute a final and full disclosure. *Beller v. U.S.*, 221 F.R.D. 689, 695 (D.N.M. 2003).

Plaintiff produced Dr. Warren-Boulton's report on the September 27, 2021 deadline. That initial report is found in the record at ECF 135-1. On November 20, 2021, Defendant timely submitted two rebuttal reports from its expert witnesses. ECF 135-4 & 135-5.

At issue is the Updated Report from Dr. Warren-Boulton that Plaintiff produced on November 29, 2021. ECF 177. As emphasized above, it is important that a litigant make a timely and complete disclosure of an expert witness's opinions. However, that does not mean the Updated Report, which was produced after the deadline, is automatically barred. In certain limited situations, Fed. R. Civ. P. 26(a)(2) permits an expert to supplement a previously submitted report. Supplementation provides the expert the means to correct inaccuracies or to fill "the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Cook*, 580 F. Supp. 2d at 1169. Not only is supplementation permitted, but pursuant to Fed. R. Civ. P. 26(e), it is required under certain circumstances.

Plaintiff explains the reason for the Updated Report in its Response (ECF 184). In the weeks preceding Plaintiff's disclosure deadline, both sides produced additional sales data. Plaintiff added the shipping costs that it charges its customers covering the time period of May 2018 to July 2021. On September 22, 2021, Defendant produced its sales data from the first six months of 2021. Dr. Warren-Boulton was unable to include both sets of information into his initial report to meet the September 27, 2021 deadline. However, Defendant's experts did have use of it for purposes of their rebuttal reports which were due later.

It is unclear why it was not until November 29, 2021—nine days after receipt of Defendant's rebuttal reports—that Dr. Warren-Boulton was able to produce his Updated Report that factored in the additional data. Nor does it appear that counsel conferred about the need for him to supplement his report with the new data and to coordinate a date for him to submit it.

Nevertheless, the Court does not find a Rule 26(a) or 26(e) violation that warrants striking the Updated Report.

To begin with, Dr. Warren-Boulton did not use the Updated Report to introduce any new opinions or expand upon those already given. In other words, he does not state "additional opinions or rationales," and he does not seek to "'strengthen' or 'deepen' opinions expressed in the original expert report." *Cook*, 580 F. Supp. 2d at 1169. Consequently, the Updated Report does not exceed "the bounds of permissible supplementation" that would make it subject to exclusion under Fed. R. Civ. P. 37(c). *Id*. This is confirmed by the "red-lined" comparison of the initial and Updated Report that Defendant provides at ECF 177-1. That comparison confirms that the changes made to the Updated Report consisted of either immaterial typographical corrections or new calculations (mostly of damages figures) using the additional sales data. Moreover, the recalculations seem to benefit Defendant by reducing the amount of damages claimed. *See Lenox Maclaren Surgical Corp. v. Medtronic, Inc*., No. 10-cv-02139-MSK-NYW, 2015 WL 6735495, at *3 (D. Colo. Nov. 4, 2015) (finding the expert's supplement to be a proper use of corrected information and noting how the damages recalculation was favorable to the defendant).

Nor does Defendant object to the Updated Report outright. It concedes the need for an update to keep the calculations current as new sales data continues to enter the record. Indeed, Defendant regards the Updated Report as premature, rather than late, in that respect. ECF 176 at 4-5. Rather, the focus of Defendant's objection is on the inclusion of data that Plaintiff should have produced sooner. Perhaps Plaintiff should have been more proactive in gathering all its relevant cost information and making it available to Dr. Warren-Boulton in time for him to include it in his initial report by the deadline. However, this Court discerns no material changes that resulted from the update, and it is unclear what practical reason would be served by striking it. Ultimately, it

would better to have all expert witness reports not only drawing from the same data set but a data set that is as complete and accurate as possible.

The Court denies Defendant's request to strike the Updated Report from Dr. Warren-Boulton dated November 29, 2021. Because it supplants the initial version, the Court will consider Defendant's Rule 702 and *Daubert* objections against the Updated Report.

Defendant also seeks to strike the Declaration from Dr. Warren-Boulton dated January 7, 2022, that Plaintiff submits at ECF 173 in response to Defendant's Rule 702/*Daubert* Motion. The Court does not regard the Declaration (or testimony at the hearing on that Motion) to constitute an improper supplementation. The Court notes that in *Reed Constr. Data, Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 401 (S.D.N.Y. 2014)—a case relied on by Defendant—Dr. Warren-Boulton testified at a *Daubert* hearing about his challenged analysis and the opinions he derived from it. Similarly, Defendant offers to allow its expert witness, Ronald King, to testify for the purpose of rebutting Plaintiff's "baseless challenge to his qualifications and the 'reliability' of his opinions" in its Response (ECF 150 at 6) to Plaintiff's Motion to Exclude. The Court gives Dr. Warren-Boulton's Declaration and hearing testimony weight only to the extent relevant to deciding the *Daubert* challenge.

Because the Declaration will not be used as evidence at any later stage of litigation, there is no need to strike it. Plaintiff remains bound to the content of Dr. Warren-Boulton's Updated Report (or any further updated report as the parties or the Court permits as new sales data becomes available).

## II.     The Admissibility of Dr. Warren-Boulton's Updated Report

Defendant argues that Dr. Warren-Boulton's report (which for present purposes the Court regards as his Updated Report) in no way supports Plaintiff's claims for relief. It asserts that Dr.

Warren-Boulton does not address those matters that Plaintiff needs to develop its antitrust theories, and in any event, his opinions suffer from inadequate data and analysis.

### A.    Rule 702

Fed. R. Evid. 702 sets forth the standard for admissibility of an expert witness's testimony: First, the expert witness must be qualified by "knowledge, skill, experience, training, or education." If that predicate is established, then the expert may opine on matters within his or her "scientific, technical, or other specialized knowledge" if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Furthermore, the opinion must be "based on sufficient facts or data" and "the product of reliable principles and methods." Lastly, the expert must have "reliably applied the principles and methods to the facts of the case." "Accordingly, district courts have a 'gatekeeper obligation' to ensure all expert testimony admitted is both relevant and reliable." *Fischer v. BMW of N. Am., LLC*, No. 20-1399, 2021 WL 5458444, at *2 (10th Cir. Nov. 23, 2021) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-95 (1993)).

There are several factors that a court may consider when assessing reliability. They are: "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community." *Richter v. City of Commerce City, Colo.*, 185 F. Supp. 3d 1274, 1277 (D. Colo. 2016) (internal citation omitted). "These considerations are not exhaustive. Rather, the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). In short, the expert must have "good grounds" to support his or her opinion. The expert may not rely on subjective belief, unsupported speculation, circular reasoning, or *ipse dixit* conclusions. *Beltran v. InterExchange, Inc.*, No. 14-

cv-03074-CMA-KMT, 2018 WL 526907, at *5 (D. Colo. Jan. 24, 2018); *Pertile v. Gen. Motors, LLC*, No. 15-cv-00518-WJM-NYW, 2017 WL 4099895, at *5, *7-8 (D. Colo. Sept. 15, 2017). The dispositive issue is reliability, not correctness. Moreover, the party who is proffering the challenged opinion bears the burden of establishing its admissibility under the above standard. *Richter*, 185 F. Supp. 3d at 1277.

Defendant's arguments for excluding the report go to the very heart of Plaintiff's claims for relief. That necessitates establishing first what the elements are to those claims and how an antitrust violation is established before considering the report's reliability.

**B.      The Elements of Plaintiff's Two Antitrust Claims**

Plaintiff has a relationship with a factory in China that makes calsil (calcium silicate), a type of high temperature insulating material used mainly in industrial settings. Plaintiff began importing calsil into the United States in 2018. Beforehand, Defendant was the sole seller of calsil in the United States. Generally, the market for insulating products such as calsil can be divided into two sections. An upstream market consists of manufacturers and distributors, and a downstream market has distributors selling to contractors. Plaintiff brought this lawsuit alleging that Defendant took steps to hinder its entry into the calsil market by discouraging distributors from buying its calsil product. Thus, the focus of Plaintiff's antitrust allegations is on the upstream market.

Plaintiff's First Claim for relief in its Amended Complaint is for unlawful antitrust conduct in the form of "tying." ECF 30 at ¶¶ 190-200. Plaintiff alleges that Defendant "repeatedly threatened to refuse to sell fiberglass pipe insulation that customers wanted to buy if they bought calsil from [it] instead of from [Defendant]." *Id.* at ¶ 192. Section 1 of the Sherman Act prohibits unreasonable restraints of trade in the form of a tying arrangement. *Suture Express, Inc. v. Owens*

& *Minor Distribution, Inc.*, 851 F.3d 1029, 1036-37 (10th Cir. 2017) (citing 15 U.S.C. § 1). The elements of a *per se* theory of an unlawful tying arrangement, in which unreasonableness is presumed, are: (1) the involvement of two separate products, (2) defendant conditions the sale of one product on the purchase of another, (3) the defendant has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) "a 'not insubstantial' amount of interstate commerce in the tied product is affected." *Id*. at 1037. In addition, Plaintiff "must establish an injury of the type the antitrust laws were intended to prevent." *Id*. at 1044 (internal citation omitted). This means injury to competition generally, not merely to it as a competitor. *Id*.

Plaintiff's Second Claim for relief is for monopolization in violation of Section 2 of the Sherman Act. ECF 30 at ¶¶ 201-217. The elements of this offense are: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *Campfield v. State Farm Mut. Auto. Ins. Co*., 532 F.3d 1111, 1117-18 (10th Cir. 2008). "The usual form on monopolistic control" is when "suppliers utilize market power to restrict output and thereby raise prices." *Id*. at 1118. In other words, a monopoly has the power to control prices or exclude competition over a substantial length of time. *Epic Games, Inc. v. Apple, Inc*., — F. Supp. 3d. —, 2021 WL 4128925, at *92 (N.D. Cal. Sept. 10, 2021). To state a *prima facie* case, there also must be the same kind of antitrust injury that a Section 1 claim requires. *Novell, Inc. v. Microsoft Corp*., 731 F.3d 1064, 1070 (10th Cir. 2013); *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc*., 199 F.Supp.2d 362, 395-96 (M.D.N.C. 2002) (citing *Cargill, Inc. v. Monfort of Colo., Inc*., 479 U.S. 104, 110 (1986)).

Plaintiff asserts as its Third Claim for relief a Lanham Act violation. However, as this Court explains below, expert witness opinion is not necessary to support it. Consequently, the instant

ruling on the *Daubert* Motions does not concern Plaintiff's ability to substantiate this claim with expert witness opinion evidence.

> C.    **The Governing Framework for How Plaintiff Must Prove Its Antitrust Theories**

For this section, the Court draws from *Ohio v. Am. Express Co*., 138 S. Ct. 2274 (2018) and its comprehensive discussion of the governing framework. That Court began by noting that an antitrust violation requires more than just the presence of a restraint on trade or commerce. Rather, it is only a restraint that has an "undue" or "unreasonable" effect that is actionable. *Id*. at 2283.

There are two methods to show the presence of an *unreasonable* restraint. The first method is met if the challenged restraint is the kind that "always or almost always tend[s] to restrict competition and decrease output." *Id*. Case law deems restraints in this category, such as collusion between two competitors, as unreasonable *per se*. They are presumed to cause harm to competition. However, only a "small group of restraints" fall into this category. *Id*. Plaintiff brings only one *per se* claim—tying. Its monopolization claim does not rely on a *per se* theory.

For its monopolization claim, Plaintiff therefore must establish the unreasonableness of the challenged conduct through the second method: the "Rule of Reason." While at first blush a challenged conduct may seem harmful to competition, the Rule of Reason tests whether it actually has such an effect (or whether it has a neutral or even procompetitive impact). In other words, it ensures a causal relationship between a defendant's monopoly power and the anticompetitive effect. It provides a means to show an antitrust violation through "a more thorough examination of the purposes and effects of the practices involved" and a "more real-market analysis." *Suture Express*, 851 F.3d at 1037-38. The conduct about which Plaintiff complains for which unreasonableness may not be presumed is subject to the Rule of Reason. *Suture Express*, 851 F.3d at 1037-38 (noting the "general proposition" that a plaintiff may use the Rule of Reason to prove

that a tying arrangement has an actual negative effect on competition); *Epic Games, Inc. v. Apple, Inc.*, — F. Supp. 3d. —, 2021 WL 4128925, at * 98 (N.D. Cal. Sept. 10, 2021) (explaining that because unilateral anticompetitive conduct is not *per se* violative of Section 2, the Rule of Reason applies); *Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 830 (M.D.N.C. 2000) (same).

The Rule of Reason consists of three steps in which the burden of proof shifts between the parties. The first step in this process requires Plaintiff "to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express*, 138 S. Ct. at 2285. Because the remaining two steps are not dispositive of this ruling, the Court does not address them here.

Plaintiff can make the Rule of Reason's initial showing with either direct or indirect evidence. "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* at 2284 (internal citations omitted). "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.*.

Regardless of whether direct or indirect evidence is used, the Rule of Reason inquiry requires an understanding of the relevant market at issue. *Id.* at 2285. *Am. Express* observed that "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market." *Id.* at 2285. It was needed even though the plaintiffs were relying on actual evidence of adverse effects on competition. *Id.* at 2285, n.7. The Court explained that without knowing the relevant market, it could not determine whether the defendant had the market power to cause competitive harm. *Id.* Before assessing the plaintiffs' direct evidence that the challenged restraint had anticompetitive effect, the Court "must first define the relevant market." *Id.* at 2285. The Court repeated that an accurate definition of the relevant market was "necessary to accurately

assess competition." *Id*. at 2287. Therefore, the Court began its analysis by reviewing the lower court's market definition, finding that it omitted the market's full scope. After correcting that error and redefining the relevant market, the Court found that the challenged conduct lost its anticompetitive effect. *Id*. at 2288-90.

Plaintiff relies on another United States Supreme Court case, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986), to support its position that it need not define the relevant market. Indeed, Plaintiff's argument is similar to the *Am. Express* dissenting opinion. Also citing *Ind. Fed'n of Dentists*, the dissent stated that "[s]ometimes, but not always, a court will try to determine the appropriate market (the market that the agreement affects)." *Am. Express*, 138 S. Ct. at 2291. However, proof of actual detrimental effects would obviate the need to consider whether the challenged conduct potentially could impede competition, and consequently, there also would be no need to define the relevant market or measure the defendant's market power. *Id*. at 2291, 2296-97. The dissent regarded "the majority's extensive discussion of market definition [to be] legally unnecessary." *Id*. at 2297. Because the plaintiffs had "strong *direct* evidence of anticompetitive effects flowing from the challenged restraint," it was unnecessary to define the market. *Id*. (emphasis in the original). Moreover, there was no need for the plaintiffs to prove market power either because "proof of actual adverse effects on competition is, *a fortiori*, proof of market power." *Id*. However, the majority opinion distinguished *Ind. Fed'n of Dentists* on which the dissent (and Plaintiff in this case) relied, noting that it concerned a horizontal restraint by which competitors agree not to compete. *Id*. at 2285, n.7. *Am. Express* also was decided after other cases, such as *Buccaneer Energy (USA), Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297 (10th Cir. 2017), that did not require a relevant market definition if there was direct evidence of actual anticompetitive conduct.

Under *Am. Express*, the Court concludes that Plaintiff must follow the Rule of Reason framework to support its theory of antitrust violations, and in doing so, it must define in an accurate way the market in which the challenged restraints are occurring. Without that market definition, "there is no way to measure the defendant's ability to lessen or destroy competition." 138 S. Ct. at 2285 (quotation marks omitted). Antitrust law, the majority opinion explained, generally favors "actual market realities" over "legal presumptions that rest on formalistic distinctions." *Id*. at 2285. Nor is the need to define the relevant market limited to the Rule of Reason inquiry. It also is an element of the monopolization cause of action itself; as such, Plaintiff still must account for it.

That in turn raises the question of how to define the "relevant market" for an antitrust case. For the Rule of Reason inquiry, it is "the area of effective competition" which typically consists of "the arena within which significant substitution in consumption or production occurs." *Id*. (internal citations omitted). It combines different products or services in a way that reflects commercial reality. *Id*. Defining the relevant market is an intensely fact-based inquiry, and plaintiff must support a proposed definition with specific evidence. *Epic Games*, 2021 WL 4128925 at *82.

The first aspect of the relevant market is what product or products are at issue. It is not necessarily limited to the product that the plaintiff sells but also those products that are its substitute. "Substitutability" in this context means in the economic sense. "Interchangeability" considers the purpose for which the product is made in terms of price, use, and qualities, and "cross-elasticity of demand" asks whether a significant change in one product's price affects demand for another product. The availability of substitutes is a factor that may reduce a seller's pricing power. *Buccaneer*, 846 F.3d at 1313; *Epic Games*, 2021 WL 4128925 at *81; *U.S. v. Engelhard Corp*., 970 F. Supp. 1463 (M.D. Ga. 1997). The relevant market also has a geographic boundary. "The geographic market is the narrowest market which is wide enough so that products

from adjacent areas cannot compete on substantial parity with those included in the market." *Buccaneer*, 846 F.3d at 1314 (internal citation omitted).

As stated above, a plaintiff can show an anticompetitive effect—the second element of a monopoly claim—under the Rule of Reason with either direct or indirect evidence. Generally speaking, "direct" evidence is explicit and requires no inferences to establish the proposition or conclusion being asserted. *Champagne Metals v. Ken-Mac Metals, Inc*., 458 F.3d 1073, 1083 (10th Cir. 2006). In this context, direct evidence is evidence of actual anti-competitive effects such as control over price or output; in other words, it is the presence of "[a] naked, effective restraint." *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1019 (10th Cir. 1998).

Alternatively, a plaintiff may establish the detrimental effects of a challenged conduct circumstantially through indirect evidence. This option generally involves a deeper analysis of the market and its structure. "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Am. Express*, 138 S. Ct. at 2284.

"Market power" is the ability either to control price or exclude competition. *Buccaneer*, 846 F.3d at 1315. Or, stated more generally, it is the ability to force a buyer to do something the buyer would not do in a competitive market. *Suture Express*, 851 F.3d at 1037. Market power differs from "monopoly power" in its degree. Monopoly power is a substantial or extreme degree of market power. It is sufficient market power to sustain a supracompetitive price and profitability without new competitors entering the market or existing competitors increasing their production in response. *Novell,* 731 F.3d at 1070. Monopoly power may be inferred from evidence of market power. *Id*. at 1071.

"The first requirement in every suit based on the Rule of Reason is market power, without which the practice cannot cause those injuries (lower output and the associated welfare losses) that

matter under the federal antitrust laws." *Menasha Corp. v. News Am. Marketing In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004). One way to show that a defendant possesses market power is through market share. Indeed, a market share of up to seventy to eighty percent implies not only market power but also monopoly power. *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683, 694, n.18 (10th Cir. 1989). Other relevant factors include the number of competitors in the market, barriers to a new competitor's entry into the market, and market trends. *Buccaneer*, 846 F.3d at 1315. Plaintiff argues that a persistent and significantly high profit margin also is a relevant factor. ECF 153 at 58. Moreover, as *Am. Express* requires, the presence of market power alone is not enough. There also must be some evidence that the defendant used its market power to harm to competition.

### D.  Does Dr. Warren-Boulton Offer Opinions Relevant to the Governing Evidentiary Framework?

With the *prima facie* elements and the Rule of Reason framework in mind, would the expert's report be helpful to the factfinder in determining whether Defendant engaged in unlawful antitrust conduct? The Court first considers the points Dr. Warren-Boulton addresses in his report and whether they are the kind that Plaintiff needs to prove for its antitrust claim. Next, the Court reviews how he reached those opinions.

#### 1.  Relevant Market Definition

Dr. Warren-Boulton does define the relevant market, a matter not only part of the *prima facie* case but also the Rule of Reason inquiry. He describes its purpose as "to aid in the determination of competitive harm," and he refers to it as "a tool . . . to determine the required element of monopoly (or market) power." ECF 177 at 7 & n.8. He concludes that "[t]he sale of calsil in the U.S. is a relevant antitrust market for allegations of exclusionary conduct to maintain monopoly power." *Id*. at 6. He furthers that "[i]n this case, a relevant market can be defined as all

calsil sold in the U.S. (i.e. calsil sold by [Plaintiff] or [Defendant] either to distributors or directly to other customers such as contractors." *Id*. at 10.

He also sees "a narrower provisional relevant market that would consist of sales only to distributors." *Id*. In that context, "the relevant question would be whether [Defendant] had succeeded in raising the price for calsil sold to distributors above the competitive level." *Id*. Dr. Warren-Boulton cites data showing that Defendant sold 82.9 % of its domestic calsil to distributors. Given the range of "functions" they provide and the complements (not substitutes) for supplying calsil, he referred to distributors as "one level in a vertical chain of commerce." *Id*. at 11.

However, his discussion is inconsistent. Citing *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986), he also asserts that the "[m]arket definition is not a required element of either one of [Plaintiff's] antitrust claims" in light of Defendant's "actual exercise of monopoly power." *. "* ECF 177 at n.8. Dr. Warren-Boulton thereby leaves uncertain whether this case even warrants defining the relevant market in the first place. Nevertheless, as noted above, he does offer one.

He also leaves unclear its basis. First, he defines the relevant market by reference to the theory of harm. Because Plaintiff is alleging exclusionary conduct, Dr. Warren-Boulton looks to see whether Defendant has an incentive to prevent the calsil sale price from decreasing. Moreover, he says that Defendant's actual ability to charge distributors a supracompetitive price is what defines the relevant market. *Id*. at 11. This is so "regardless of the downstream level where substitution is possible, or even whether the anticompetitive effects are felt by the final consumers." *Id*.. He finds that "[t]he absence of imports, the evidence of lower margins on exports, and the presence of regulatory and other barriers all establish that the U.S. is a relevant geographic market." *Id*. at 12.

14

2.      Whether Defendant has Market Power

Dr. Warren-Boulton asserts that Defendant "has sufficient economic power over its distributors in the U.S." *Id*. at 6. He does not expressly say whether by "economic power" he means market power as a factor for establishing anticompetitive effects through indirect evidence under the Rule of Reason or whether he uses the term as a synonym for "monopoly power" in the sense of a *prima facie* element. However, he does reach separate conclusions as to Defendant's "economic" and "monopoly" powers, implying that he means them as different concepts.

He notes the rule of thumb that the ability to impose a small but significant and non-transitory increase in price ("SSNIP") of five to ten percent is the minimum for defining a relevant market (ECF 177 at n.9), and he opines that Defendant already was charging a supracompetitive price before Plaintiff's entry. He sees no need to consider product substitution to define the relevant market in this case. This is because as an established monopolist, Defendant already found the most profitable supracompetitive price and has kept it at level where product substitution would be encouraged.

In addition, Defendant has economic power in the form of limiting its greater range of products from distributors. *Id*. at 18-19. Defendant's threat is effective because the cost to them would exceed their savings from buying Plaintiff's cheaper calsil. Moreover, distributors are unable to pass to their customers the extra cost of doing business with Defendant. They create a strong disincentive for distributors to do business with Plaintiff, and Plaintiff has no alternative to bypassing distributors to sell its calsil. *Id*. at 19.

3.      Whether Defendant has Monopoly Power

Dr. Warren-Boulton concludes that Defendant "has monopoly power in the market for the sale of calsil in the U.S." ECF 177 at 6. He bases that conclusion on Defendant's "ability to set

prices for calsil in the U.S. well above the competitive level." *Id*. Because Defendant has such monopoly power, he reasons that it also "has an economic incentive to exclude or hinder [Plaintiff] from selling calsil in the U.S." *Id*. He bases this conclusion on the uncontested fact that Defendant was the sole supplier of calsil in the U.S. before Plaintiff's arrival. Moreover, he sees confirmation of a monopoly by the supracompetitive price it charges for calsil and its acts to exclude Plaintiff.

Dr. Warren-Boulton sees direct evidence of Defendant's ability to charge a supracompetitive price and thus possession of monopoly power. The direct evidence he uses is the fact that Plaintiff sells calsil substantially cheaper than Defendant. Moreover, Defendant makes a substantially greater profit from calsil than from other insulators whether measured on the basis of accounting or economic metrics. It also profits more from domestic calsil sales than from exports to markets where it faces competition.

Because there is direct evidence, he sees no "need to examine indirect (usually structural) evidence." ECF 177 at 10. He explains that the indirect evidence approach is used only for determining whether a *hypothetical* monopolist *could* charge a supracompetitive price. *Id*. at 11-12. Nevertheless, he furthers that "the structural evidence is consistent with that direct evidence." *Id*. at 12. The indirect evidence that he says confirms Defendant's monopoly power is how "sales of calsil are extremely concentrated," calsil demand is highly insensitive to price, and high profit margins. *Id*.

### 4. Harm to Competition

Citing *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc*., 429 U.S. 44, 488 (1977), Dr. Warren-Boulton states that "harm to competition is a required element of an antitrust violation." ECF 177 at n.3. He concludes that Plaintiff's entry into the market benefits all calsil purchasers because of

the lowered price, and conversely its exclusion would benefit Defendant while harming Plaintiff and calsil purchasers. *Id.* at 6.

        5.     Damages

Dr. Warren-Boulton says that the harm to Plaintiff caused by Defendant's exclusionary acts "can be reasonably estimated or calculated using standard methods." *Id.* at 7. His opinions regarding antitrust conduct rely heavily on general economic and antitrust theory; he does the same for his damages calculation which also stem from various assumptions.

However, there is no dispute over the appropriateness of his basic methodology. He estimates Plaintiff's damages by comparing its hypothetical profit in the absence of the alleged anticompetitive conduct (the but-for world) with the profit is actually earned. He creates two time frames for measuring lost profits. The first span of time runs from May 2018 (when Plaintiff first entered the U.S. calsil market) to the date of trial (when, assuming Plaintiff prevails, Defendant stops its anticompetitive actions). The second time frame runs five years after trial during which the anticompetitive effects dissipate, and the market reaches equilibrium.

Dr. Warren-Boulton establishes the respective costs to Plaintiff and Defendant of supplying calsil to the U.S. marketplace. From there, Dr. Warren-Boulton calculates past and future profits on the basis of a variety of assumptions including how costs and sale price will increase over time, how the difference in costs and sale price will narrower, and how the parties' relative market share will change. Defendant regards these projections as too speculative and too optimistic, and thereby greatly overstating Plaintiff's damages. However, Defendant also implicitly concedes at least some amount of damages, even if as little as six percent of what Plaintiff claims.

6.      Defendant's Arguments

Dr. Warren-Boulton's reliance on direct evidence to support his findings of market power and anticompetitive effect is "legally invalid," Defendant contends. Not only is use of the "direct evidence shortcut" rare, Defendant argues, but it is wholly unavailable in the vertical restraint context. Citing *Am. Express*, 138 S. Ct. at 2284 & n.7, Defendant argues that the Supreme Court "has rejected this alternative approach to proving market power as invalid as a matter of law." ECF 135 at 10. The Court agrees with Defendant that *Am. Express* "confirmed the importance of accurately defining the relevant market." ECF 135 at 30. However, the Court does not read *Am. Express* as dispensing with the direct evidence option altogether.

There may be circumstances when the presence of an unreasonable restraint may be presumed. However, Plaintiff does not bring a *per se* monopolization claim. It is alleging unilateral conduct by Defendant directed towards the distribution level of the calsil market. Plaintiff must establish the anticompetitive effects of the challenged conduct without the benefit of a *per se* presumption. That is the purpose of the Rule of Reason. The Rule of Reason offers two ways to show that a restraint on trade has an unreasonable effect on competition: either through direct evidence of such harm or through indirect evidence from which such harm may be inferred. Plaintiff relies on the direct evidence option. *Am. Express* does not foreclose that approach as a matter of law. Whether Plaintiff can meet its burden of proof to show actual anticompetitive effect is a different question. By comparison, if Plaintiff can establish its *per se* Section 1 tying claim, then presumably it has less needed to show actual anticompetitive effect.

Even if Plaintiff may rely on "direct evidence," Defendant argues next that a supracompetitive price alone is insufficient. There must be evidence of both a supracompetitive price and restricted output, but Plaintiff does not show the latter. Defendant cites to case law that

18

requires them in combination. ECF 135 at 38-39. Maybe in certain situations, both are relevant, but this Court does not discern a uniform rule. In addressing this same issue, the Second Circuit explains that direct evidence does not necessarily consist of showing the ability to increase price profitably by restricting output. Rather it can be shown through either a supracompetitive price, reduced output, *or* other harm. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 63 (2nd Cir. 2019).

As for the damages calculation, Defendant does not object to the methodology used. It concedes that the "actual" and "but for" world comparison "can be valid." ECF 135 at 50. However, it does say it is legal error for Dr. Warren-Boulton not to apportion damages between Plaintiff's different antitrust theories. The Supreme Court has stated that "at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (internal citations omitted). That case concerned two million Comcast subscribers who proposed four theories of how Comcast's "clustering" strategy had the effect of increasing the cost of cable services. Plaintiffs' damages model was based on all four theories, but only one theory later was accepted as capable of class-wide proof. The Court held that plaintiffs must rely on a model that shows damages attributable to the remaining theory. *Id.*.

This Court disagrees that *Comcast* compels excluding Dr. Warren-Boulton's damages opinion. For one, although Plaintiff advances different ways in which Defendant allegedly harmed competition, they are not necessarily so distinct nor the overall situation so complex that the lack of apportionment is fatal to its ability to establish its case. More importantly, none of Plaintiff's theories have been rejected yet. As *Comcast* furthers, "[t]his methodology might have been sound,

19

and might have produced commonality of damages, if all four of those alleged distortions remained in the case." *Id*. at 37. Potentially, if Plaintiff is able to show that Defendant harmed competition by all of the forms of challenged conduct, then there is less imperative to apportion damages between them.

Citing *In re Indep. Serv. Orgs. Antitrust Litig*., 85 F. Supp. 2d 1130, 1153 (D. Kan. 2000), Defendant argues that Plaintiff also must disaggregate damages caused by its lawful conduct. What conduct by it that was lawful and harmed Plaintiff, Defendant does not specify, and it otherwise is unclear whether the particular circumstances of this case necessitate this type of apportionment.

Defendant faults Dr. Warren-Boulton for not accounting for potential harms to Plaintiff's business that are wholly independent of it. This includes problems internal to Plaintiff's own business or outside forces. How that runs afoul of *Comcast* and *Indep. Servs*. is unclear because it does not concern *conduct by Defendant*. At some point, if it is able to show unlawful antitrust conduct by Defendant, Plaintiff also will be required to prove damages that have a causal relationship with it. The Court leaves for later determination whether it can meet its burden of proof on that element.

Lastly, Defendant challenges the extent to which the report supports Plaintiff's Lanham Act claim. However, expert witness opinion is not needed to establish damages for it. *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012). Nor does this Court consider at this juncture whether Plaintiff is entitled to pre-judgment interest.

7.    Summation

There is no dispute over Dr. Warren-Boulton's qualifications as an expert witness to opine about economic and antitrust matters. Moreover, he addresses factors that are generally relevant to establishing an antitrust violation. The Court cannot conclude that his chosen methodology is

so deficient as to warrant excluding his opinion on that basis. Nor does the Court find any opinion that should be excluded as a matter of law.

> ### E.  Are Dr. Warren-Boulton's Opinions on Matters Within that Framework Reliable?

Defendant also challenges the sufficiency of his underlying analysis and supporting data (or lack thereof). The report reasonably could be construed as relying to a significant degree on theory and assumptions although some data is incorporated into it. In a somewhat circular fashion, Dr. Warren-Boulton assumes certain key factors (the scope of the relevant market) based on others (the existence of a monopoly). He does not regard product substitution as a hedge on Defendant's monopoly power because he assumes customers already have adjusted their demand choices in response to the supracompetitive price. Many of his conclusions stem from his finding that Defendant sells calsil at a supracompetitive price. In making that foundational determination, he seems to assume that Plaintiff's calsil price is the proper benchmark competitive price. He does not go so far as to undertake a comprehensive data analysis to establish or confirm all his various assumptions or stated opinions. For example, he does little to control for other possible causes for Defendant's selling price and profit margins and thereby exclude legitimate, non-competitive reasons for the existing market structure. Nevertheless, he does at least address the point, saying that he sees no other factors that could explain the much lower profit Defendant earns on its other products. It seems obvious that any seller has the incentive to maximize profits and to maintain them, but Dr. Warren-Boulton also seems to assume that Defendant in fact acted on that incentive when it allegedly hindered Plaintiff's entry as a competitor.

Of course, a fuller analysis of the data and a clearer explanation of how the data establishes the elements and evidentiary framework of an antitrust claim under the current state of the case law would be *more* helpful to a factfinder. However, that absence of a deeper analysis does not

necessarily mean his opinions lack reliability. This may be a situation in which the direct evidence "short cut" to establishing monopoly power and anticompetitive effect is available. Indeed, that is Plaintiff's position. Plaintiff defends the bases by which Dr. Warren-Boulton reached his conclusions, arguing that they do enjoy adequate support under the circumstances of this case. It is undisputed that for a long time Defendant was the sole supplier of calsil in the U.S.; charges substantially more for it than Plaintiff; and earns its highest profit margin from it. Moreover, calsil is a relatively specialized product for which just a few other substitutes are potentially available. The relevant market may be simple enough to analyze with sales and cost data alone. It may be more straight-forward and easier to establish than the question of "whether at-shelf coupon dispensers are an economic market," *Menasha*, 354 F.3d at 661, for example.

Defendant cites *Reed Constr. Data, Inc. v. McGraw-Hill Cos., Inc*., 49 F. Supp. 3d 385 (S.D.N.Y. 2014) as an instance in which Dr. Warren-Boulton's opinion was excluded on Rule 702 grounds. That case involved the only two competing databases in the U.S. of construction projects open for bids. Plaintiff complained that the defendant engaged in various surreptitious acts to impair the quality of its database. To compensate, Plaintiff said it was forced to lower the price of its service. At issue was Dr. Warren-Boulton's methods for showing harm to plaintiff's business that was attributable to defendant's alleged wrongdoing. The Court heard from both Dr. Warren-Boulton and a rebuttal expert witness, and in a lengthy decision, it went through the many flaws it found with his methodology, data, and conclusions reached therefrom. Whether Dr. Warren-Boulton's analysis of the particular facts and circumstances in this case is flawed to the same extent is not readily apparent. The Court does not find *Reed* to compel excluding his present opinions.

Likewise, the unpublished decision of *Material Tech., Inc. v. Carpenter Tech. Corp*., No. 01-2965 (SRC), Slip Op. (D.N.J. June 28, 2005), which Defendant provides at ECF 135-2, does

not persuade this Court to exclude Dr. Warren-Boulton's opinion. That court rejected his damages opinion but not necessarily because of flaws with his own analysis. Rather, he assumed as true the (excluded) opinions of other experts that plaintiff's newly developed product was a viable substitute for the traditionally made version. He also assumed as true that plaintiff had the legal right to enter a particular joint venture to sell the product, a scenario which the court rejected in a subsequent summary judgment ruling.

Defendant's objections are better suited for challenging the report's persuasiveness. It may be that as in *Menasha*, Dr. Warren-Boulton's opinions fall short of what Plaintiff needs to survive summary judgment. *See also R.J. Reynolds Tobacco Co. v. Philip Morris, Inc*., 199 F. Supp. 2d 362 (M.D.N.C. 2002); *Bepco, Inc. v. Allied-Signal, Inc*., 106 F. Supp. 2d 814 (M.D.N.C. 2000). Likewise, his report may lack the kind of data-driven analysis that is most helpful to an antitrust theory. Whether the evidence suffices to prove Plaintiff's claims will have to be judged in the context of the merits. *Ward v. Apple, Inc*., No. 12-cv-05404-YGR, 2018 WL 934544, at *3 (N.D. Cal. Feb. 16, 2018) (finding that because Dr. Warren-Boulton relied too heavily on generalities and theories, his report did not support a motion to certify an antitrust class), *aff'd*, 784 F. App'x 539 (9th Cir. 2019); *In re Auction Houses Antitrust Litigation*, No. 00 Civ. 0648 (LAK), 2001 WL 170792, at *14-15 (S.D.N.Y. Feb. 22, 2001) (overruling an objection to a proposed settlement of a price-fixing case that was based on Dr. Warren-Boulton's opinion because it lacked persuasive support and was contrary to the approach that case law prefers); *Engelhard*, 970 F. Supp. at 1483-85 (finding that the several shortcomings in Dr. Warren-Boulton's opinion left the plaintiff unable to establish the relevant market and thus unable "to meet its ultimate burden of persuasion as to an essential element of its case."). For present purposes, Defendant does not show the basis of the report to be so defective that it calls its very reliability and usefulness into doubt.

Defendant's objection to Dr. Warren-Boulton's opinion as being too speculative includes the damages calculation. Estimating profits in the absence of the challenged conduct and forecasting future profits both are inherently speculative endeavors, and case law permits "a degree of uncertainty," *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981). If, as Defendant contends, his damages calculation lacks sufficient foundation, then it will be unpersuasive. However, the Court cannot conclude that it is so inherently unreliable that it should be excluded from consideration altogether. As Defendant states in the defense of its expert witness, Ronald King, "exclusion of expert testimony is the exception, not the rule," citing *Prima Partners, LLC v. Waterhouse*, 16-cv-02875-MEH, 2018 WL 2091075, at *3 (D. Colo. May 3, 2018).

Plaintiff still must prove all the required elements of its antitrust theories under the correct framework and the current state of the law. In reference to Defendant's pending summary judgment motion, Plaintiff also must show how genuine disputes of material fact warrant sending its claims to the factfinder for resolution. Plaintiff must do so on the basis of the current evidentiary record and explain how the report of its expert witness supports its position.

### III.    The Admissibility of Ronald King's Opinions

Defendant challenges Plaintiff's ability to use the report of Dr. Warren-Boulton on both procedural and admissibility grounds. In denying both of Defendant's Motions, the Court resolved many points in Plaintiff's favor. The Court allows the entry of the Updated Report, and even though his report is not a model of clarity or comprehensiveness, the Court found it nonetheless sufficiently reliable to survive Rule 702/*Daubert* review. Plaintiff now attacks the admissibility of Ronald King's report which Defendant submits to explain aspects of the mechanical insulation industry. Plaintiff argues that "most of Mr. King's opinions are not admissible." ECF 134 at 6.

The Court begins with Plaintiff's argument that they are:

unsupported, not reliable, and so hopelessly vague and misleading that they will be of no use to the trier of fact. Mr. King offers no basis for any of his offered opinions—indeed, he did not review any materials from this case—and they are not based on any subjective methodology but, rather, his subjective thoughts about the industry.

*Id*. at 7. "*Daubert* and the Federal Rules of Evidence demand more," Plaintiff asserts. *Id*. Unlike Dr. Warren-Boulton, an economist whose expert testimony is needed to explain how the science of economics supports Plaintiff's antitrust theories, Defendant does not ask Mr. King to explain a scientific, mathematical, or technical matter. The challenges that Plaintiff makes to Mr. King's reliability do not transfer to this context. Mr. King's expertise comes from experience, rather than scientific training. Consequently, the *Daubert* pre-screening factors do not apply to him in the same way they do to Dr. Warren-Boulton. *U.S. v. Foust*, 989 F.3d 842, 845-46 (10th Cir. 2021).

Moreover, Mr. King has the professional experience to explain how the mechanical insulation industry generally works. Indeed, that experience is so extensive, it does not require repeating here. The Court incorporates the explanation for why Mr. King is knowledge about such matters that Defendant provides in his Response (ECF 150).

Lastly, Plaintiff contends that the law of the case forecloses the need for an explanation of the mechanical insulation industry. Plaintiff refers to the Court's ruling on Defendant's Motion for Partial Summary Judgment at *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH, 2021 WL 50871 (D. Colo. Jan. 6, 2021). In it and preceding rulings, the Court declined to define the relevant market to necessarily include calsil's end users within its scope or to exclude the possibility that factors other than price may influence calsil demand. The Court did not enter summary judgment in Defendant's favor. Moreover, that ruling was limited to the record then available. Plaintiff itself regards Defendant's endeavor as "premature," (ECF 178 at 5), and at the time, Plaintiff complained that Defendant was ignoring the "highly fact-intensive" task of

"defining a relevant product market." ECF 87 at 7. The undisputed material facts that the Court drew from the then record were measured and limited in scope. Neither they nor other aspects of that ruling prevents a fuller inquiry into whether Plaintiff can prove an antitrust violation.

The Court finds no basis to exclude the challenged opinions of Mr. King on Rule 702 or *Daubert* grounds.

## CONCLUSION

The question of whether Plaintiff can prove the merits of its claims for relief remains unanswered. It will be Plaintiff's burden to explain how it must prove its case and what evidence supports its theories. It must do so on the full record. This Court sees no reason to strike or otherwise exclude the challenged expert witness reports.

Accordingly, Defendant's Motion to Strike [filed January 14, 2022; ECF 176], Defendant's Motion to Exclude [filed December 6, 2021; ECF 135], and Plaintiff's Motion to Exclude [filed December 6, 2021; ECF 134] are **denied**.

Entered this 22nd day of February, 2022, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge