THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00872-MEH

CHASE MANUFACTURING, INC., d/b/a
THERMAL PIPE SHIELDS,

Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

Defendant.

---

## JOHNS MANVILLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT DISMISSING ALL PLAINTIFF'S CLAIMS (ECF 193)

---

Gregory J. Kerwin
Ryan Bergsieker
Allison Kostecka
Lydia Lulkin
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone:    303.298.5700

Email: GKerwin@gibsondunn.com
RBergsieker@gibsondunn.com
AKostecka@gibsondunn.com
LLulkin@gibsondunn.com

*Attorneys for Defendant Johns Manville Corporation*

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................. 1

II.   TPS'S ABUSE OF DISCOVERY AND THE SUMMARY JUDGMENT PROCESS .... 4

    A.   TPS Cannot Use Its Failure to Adequately Respond to Interrogatories to Avoid Summary Judgment. ................................................................. 5

    B.   TPS Cannot Avoid Summary Judgment by Claiming It Will Provide Additional Evidence Sometime in the Future. ....................................... 7

    C.   Only Admissible Evidence May Be Considered When Ruling on Summary Judgment. ......................................................................... 7

    D.   TPS's Failure to Adhere to this Court's Summary Judgment Procedures. ............ 8

III.  REPLY IN SUPPORT OF JOHNS MANVILLE'S UNDISPUTED FACTS ................ 11

IV.   ARGUMENT .................................................................................................. 25

    A.   TPS's Cannot Prove a Properly Defined Calsil-Only Product Market Using Warren-Boulton's "Direct Evidence" Shortcut. ........................................ 25

    B.   TPS's Vague Arguments Evade the Structure Necessary to Prove Unlawful "Tying." .......................................................................... 32

        1.   TPS Fails to Point to Specific Facts Showing Any Tying Arrangement. ......................................................................... 33

        2.   Lack of a Properly Defined "Tying Product." ......................................... 35

        3.   Lack of Evidence of Market Power In Any "Tying Product." ............... 38

        4.   "Per se" tying vs. "rule of reason" tying. ................................................. 42

    C.   TPS Lacks Admissible Evidence to Prove Any Form of Unlawful Exclusionary Conduct Necessary to Prove Monopolization. ............................. 42

        1.   TPS Cannot Prove the Technical Elements of a Valid Tying Claim. ....... 42

        2.   TPS Lacks Legal Support and Evidence For Its "Refusal to Supply" Theory. ......................................................................... 42

a.     TPS Recognizes It Cannot Meet the *Aspen Highlands/Trinko* Exception. .................................................................................. 43

b.     TPS Has No Evidence for Its Unsupported Theory That Johns Manville Effectively Held Its Calsil "Ransom From Customers.".......... 45

3.     TPS Fails to Identify Unlawful Exclusive Dealing Arrangements, and Its Economist Did Not Document Substantial Foreclosure in a Properly Defined Market. ......................................................... 48

a.     TPS's Exclusive Dealing Claim Rests On Its Unproven Assumption That the Relevant Market Is Calsil-Only, Sold Nationwide.49

b.     TPS Cannot Show Johns Manville Rebate Agreements Constitute Unlawful Exclusive Arrangements. ......................................................... 50

c.     The Documents TPS Presents to Show "Significant Coercive Activity" Do Not Prove Unlawful Exclusive Arrangements. ................. 54

d.     Warren-Boulton Did Not Document Substantial Foreclosure for TPS in a Properly Defined Relevant Market. .......................................... 56

4.     TPS Lacks Evidence to Prove Trade Disparagement to Support Its Monopolization Claim .............................................................................. 56

D.     TPS Fails to Raise a Genuine Dispute Regarding Antitrust Injury. .................... 62

V.     CONCLUSION ............................................................................................................ 66

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.,*
  323 F.3d 366 (6th Cir. 2003) ...................................................................................62

*American Prof. Testing Sve. v. Harcourt Brace,*
  108 F.3d 1147 (9th Cir. 1997) ................................................................................62

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)...................................................................................................8

*AngioDynamics, Inc. v. C.R. Bard, Inc.,*
  2018 WL 3730165 (N.D.N.Y. Aug. 6, 2018) ..........................................................37

*Breaux Bros. Farms, Inc. v. Teche Sugar Co.,*
  21 F.3d 83 (6th Cir. 1994) .......................................................................................39

*Brokerage Concepts v. U.S. Healthcare,*
  1995 WL 455969 (E.D. Pa. July 27, 1995)..............................................................39

*Caldera, Inc. v. Microsoft Corp.,*
  87 F. Supp. 2d 1244 (D. Utah 1999).........................................................................58

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)....................................................................................................8

*Chase Manufacturing, Inc. v. Johns Manville Corp.,*
  2020 WL 1433504 (D. Colo. Mar. 23, 2020) ................................36, 43, 45, 55, 58

*Chase Manufacturing, Inc. v. Johns Manville Corp.,*
  No. 19-cv-00872, 2022 WL 522345 (D. Colo. Feb. 22, 2022)........2, 25-29, 32- 33, 37, 49, 63

*Cohlmia v. St. John Med. Ctr.,*
  693 F.3d 1269 (10th Cir. 2021) ...............................................................................62

*Conaway v. Smith,*
  853 F.2d 789 (10th Cir. 1988) ...................................................................................7

*Eastman Kodak v. Image Tech. Services, Inc.,*
  504 U.S. 451, 458 (1992)..........................................................................................37

*Eisai, Inc. v. Sanofi Aventis U.S., LLC,*
    821 F.3d 394 (3d Cir. 2016)..............................................................................52-53

*FTC v. Indiana Fed'n of Dentists,*
    476 U.S. 447 (1986)..............................................................................................28

*FTC v. Qualcomm Inc.,*
    969 F.3d 976 (9th Cir. 2020) ..........................................................................47, 57

*Green Earth Wellness Ctr., LLC v. Atain Specialty Ins. Co.,*
    163 F. Supp. 3d 821 (D. Colo. 2016)....................................................................7

*Hoffmeister v. Navient,*
    No. 17-cv-00889-LTB-MEH, 2019 WL 1200812 (D. Colo. Mar. 14, 2019)..................4, 5, 8

*Image Tech. Servs. v. Eastman Kodak Co.,*
    903 F.2d 612 (9th Cir. 1990) ...............................................................................38

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.,*
    507 F. Supp. 3d 1289 (D. Kan. 2020) .......................................................58, 62-64

*Jefferson Parish Hosp. Dist. v. Hyde,* 466 U.S. 2 (1984) ...........................................39

*JetAway Aviation, LLC v. Board of County Comm.,*
    2012 WL 1044304 (D. Colo. Mar. 28, 2012) .......................................................65

*JetAway Aviation, LLC v. Bd. of Cty. Comm'rs,*
    754 F.3d 824 (10th Cir. 2014) .............................................................................65

*Karara v. U.S. Dep't of Educ.,*
    No. 08-cv-00614-MEH-KMT, 2008 WL 4587251 (D. Colo. Oct. 14, 2008) ........................10

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.,*
    762 F.3d 1114 (10th Cir. 2014) ..................................................................57, 61-62

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003) (en banc)............................................................52-53

*Lorain Journal v. United States,*
    342 U.S. 143 (1951).........................................................................................3, 44

*Lucas v. Off. of Colo. State Pub. Def.,*
    No. 15-CV-00713-CBS, 2016 WL 9632933 (D. Colo. Aug. 25, 2016), *aff'd,*
    705 F. App'x 700 (10th Cir. 2017) ...................................................................9, 10

*Macsenti v. Becker,*
     237 F. 3d 1223 (10th Cir. 2001) ........................................................................30

*Menasha Corp. v. News Am.Mktg. In-Store, Inc.,*
     354 F.3d 661 (7th Cir. 2004) ...........................................................................40

*New Mexico Oncology & Hematology Consultants v.*
     *Presbyterian Healthcare Servs..*
     994 F.3d 1166 (10th Cir. 2021) ......................................................................44

*Novell, Inc. v. Microsoft Corp.,*
     731 F.3d 1064 (10th Cir. 2013) ......................................................................57

*Ohio v. Am. Express Co.,*
     138 S.Ct. 2274 (2018) ..............................................................2, 25, 42, 48, 49

*Osborn v. Sinclair Refin. Co.,*
     286 F.2d 832 (4th Cir. 1960) ..........................................................................39

*Palmyra Park Hospital v. Phoebe Putney Memorial Hospital,*
     604 F.3d 1291 (11th Cir. 2010) ......................................................................36

*Roska v. Peterson,*
     328 F.3d 1230 (10th Cir. 2003) ......................................................................12

*Sidibe v. Sutter Health,*
     2021 WL 879875 (N.D. Cal. Mar. 9, 2021)....................................................35

*SolidFX, LLC v. Jeppesen Sanderson, Inc.,*
     841 F.3d 827 (10th Cir. 2016) ........................................................................44

*Stout v. Long,*
     No. CV 15-379 WPJ, 2018 WL 1322052 (W.D. Okla. Mar. 14, 2018) ...................6

*Suture Express, Inc. v. Owens & Minor Distribution,*
     851 F.3d 1029 (10th Cir. 2017) ............................................................. 40-41, 51

*Trainor v. Apollo Metal Specialties, Inc.,*
     318 F.3d 976 (10th Cir. 2002) ..........................................................................4

*Tumbling v. Merced Irrigation Dist.,*
     No. CV F 08-1801 LJO DLB, 2010 WL 11450406 (E.D. Cal. Sept. 27, 2010) ...................6

*Unijax, Inc. v. Champion Int'l, Inc.,* 683 F.2d 678 (2d Cir. 1982) .......................... 33-34

*United States v. Dentsply Int'l, Inc.,*
    399 F.3d 181 (3d Cir. 2005)................................................................. 52-53

*United States v. Nacchio,*
    555 F.3d 1234 (10th Cir. 2009) .........................................................30

*Viamedia, Inc. v. Comcast Corp.,*
    951 F.3d 429 (7th Cir. 2020) .............................................................35

*Verizon Commc'ns v. Trinko*
    540 U.S. 398 (2004)...............................................................43-45, 47

*W. Penn. Allegheny Health Sys., Inc. v. UPMC,*
    627 F.3d 85 (3d Cir. 2010).................................................................57

*ZF Meritor, LLC v. Eaton Corp.,*
    696 F.3d 254 (3d Cir. 2012)........................................................... 52-53

**Rules**

*Fed. R. Civ. P. 56* ......................................................................4, 5, 7, 11

Judge Michael E. Hegarty Practice Standards (Dec. 1, 2021)..................................1, 9

## I.       INTRODUCTION

The Court should grant summary judgment for Johns Manville because TPS's Opposition has not identified evidence to support certain, critical elements of its antitrust claims.

In response to Johns Manville's motion for summary judgment (hereinafter, the "Motion"), TPS voluntarily withdrew its claim for false advertising under the Lanham Act, leaving only two remaining claims for tying and monopolization. The Court should enter an order dismissing or granting summary judgment on TPS's false advertising claim under the Lanham Act. With respect to the remaining two claims, Johns Manville moved for summary judgment because TPS cannot point to admissible evidence supporting essential elements of each claim. Without specific evidence of illegal conduct, TPS attempts to invoke inferences and relies heavily on its deficient expert report, chock-full of assumptions that drive its conclusions. But inferences and unsupported assumptions cannot save TPS's claims from summary judgment.

**TPS's Procedural Subterfuge**. Procedurally, TPS attempts to avoid dismissal by way of subterfuge. In response to Johns Manville's statement of undisputed material facts, TPS was required to admit or deny each undisputed fact and include both factual explanation and specific evidence supporting each denial. Hegarty Practice Standards at 4. TPS, instead, denies material facts that it cannot reasonably dispute and floods the Court with irrelevant documents in a contrived attempt to create the illusion of material fact disputes where none exist. TPS also argues that its own failure to adequately respond to Court-ordered interrogatories saves it from summary judgment, telling the Court that it has not yet made all of its evidence known to Johns Manville or the Court. TPS's disregard for the summary judgment procedures and its own discovery obligations are improper, and TPS should not be rewarded for its obstinance.

TPS's responses to Johns Manville's legal arguments are also unavailing and fail to save TPS from a summary judgment dismissal.

**<u>Calsil-Only Product Market</u>**. At the outset, in its February 22, 2022 order on the *Daubert* motions (hereinafter, the "February 22, 2022 Order,"), which was entered in the middle of briefing on this Motion, the Court invited Johns Manville to raise summary judgment arguments regarding whether TPS can prove a valid market definition with the opinions of TPS's economist (Warren-Boulton). It cannot. TPS should be precluded as a matter of law from relying on "direct evidence" of monopolization here, where the so-called "direct evidence" does not show clearly unlawful conduct and relies on Warren-Boulton's inferences and strained manipulation of financial data. Here, where TPS alleges vertical restraints, a more rigorous analysis of the structure of the proposed market—one that considers and combines substitute products into a single market when that "reflects commercial realties"—is required to define a valid product market and assess market power. *See, e.g.*, *Ohio v. Am. Express* 138 S.Ct. 2274, 2285 n.7 (2018) (unlike horizontal restraints, vertical restraints "often pose no risk to competition"). Thus, TPS's proposed "proof" of a relevant calsil-only national market, based solely on Warren-Boulton's assumptions (not analysis) about "direct evidence" of monopolization, is insufficient to establish the essential element of market power within a relevant market. The Court should grant summary judgment dismissing TPS's tying and monopolization claims because, without competent expert testimony, TPS cannot prove the essential market definition element of those claims.

**<u>Tying</u>**. TPS's tying claim also fails on both the facts and the law. TPS lacks both facts indicating any tying arrangement, and evidence supporting market power in a properly defined tying product. At the most basic level, TPS fails to identify the two separate products involved in

the alleged tie. TPS contends it can go to trial on its (unpleaded) contention that Johns Manville tied sales of some amorphous mix of "any/all" of its products to sales of calsil. That proposed "any/all" tying product fails as a matter of law. Moreover, TPS makes no effort to define the essential element of market power within any alleged, properly defined tying product market (which must take into account commercial realities about substitutes and the area of effective competition). Warren-Boulton's conclusory analysis does not purport to explain why expanded perlite, fiberglass pipe insulation—the tying products alleged in TPS's Amended Complaint—or "any/all" products Johns Manville sells, constitute a relevant product market. Without defining the relevant market for the alleged tying products, TPS cannot prove Johns Manville had any power to coerce customers' purchasing decisions using an alleged tie.

**Monopolization**. TPS's monopolization claim fares no better. TPS alleges four categories of exclusionary conduct: tying, "refusal to supply," exclusive dealing, and trade disparagement. First, for the reasons stated above, TPS's tying claims fail. Second, for its "refusal to supply" theory, TPS fails to point to any evidence indicating Johns Manville actually refused to supply any distributor or contractor that worked with TPS. TPS denies relying on the *Aspen/Trinko* exception to the general rule that refusals to deal are legal. Instead, TPS claims to rely on the 70-year-old Supreme Court decision in *Lorain Journal v. United States*, 342 U.S. 143 (1951). But in *Lorain Journal*, only actual refusals to deal were deemed to be anticompetitive, not internal discussions whether to continue to support or work with a business partner. Third, TPS fails to raise a genuine dispute of material fact regarding exclusive dealing—it has no evidence of the required illegal exclusive arrangement. And fourth, TPS lacks evidence that Johns Manville made "clearly false"

statements regarding TPS or its calsil, much less that clearly false statements harmed TPS or competition generally.

**Antitrust Injury**. Finally, TPS lacks evidence of long-term injury to competition. In arguing that Johns Manville harmed competition by way of supracompetitive prices on calsil, TPS relies solely on Warren-Boulton's assumption-driven conclusions that assume monopoly pricing because TPS charges less for calsil. But no reasonable jury could discern harm to competition based on Warren-Boulton's unproven conclusions.

The antitrust laws are designed to protect—not hinder—vigorous competition. TPS's Opposition reveals that TPS believes the Sherman Act prevented Johns Manville from competing with TPS when it started marketing calsil in the United States. That is inaccurate and TPS shoulders a heavy burden to prove Johns Manville's conduct vigorously competing with TPS was illegal. TPS cannot point to evidence in the summary judgment record that would allow a reasonable jury to find for TPS on each challenged element of its tying and monopolization claims. Summary judgment, therefore, is required.

## II.        TPS'S ABUSE OF DISCOVERY AND THE SUMMARY JUDGMENT PROCESS

A party moving for summary judgment can carry its initial burden "by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Accordingly, Johns Manville's Motion pointed to pleadings, depositions, and interrogatory responses to demonstrate that TPS *lacks* sufficient evidence to carry its burden of persuasion on critical elements of its claims. That shifted the burden to TPS to present specific facts showing that there is a genuine issue for trial on the challenged elements of its claims. Fed. R. Civ. P. 56(e); *Hoffmeister v.*

*Navient*, No. 17-cv-00889-LTB-MEH, 2019 WL 1200812, at *4 (D. Colo. Mar. 14, 2019). TPS has not met this burden, choosing instead to flout the summary judgment process by making unsupported "denials" of material facts and flooding the Court with improper, speculative, inadmissible, and irrelevant "evidence."

## A.     TPS Cannot Use Its Failure to Adequately Respond to Interrogatories to Avoid Summary Judgment.

Under Federal Rule of Civil Procedure 56(c), Johns Manville is entitled to rely on TPS's interrogatory responses in moving for summary judgment. Accordingly, Johns Manville's Motion referred to TPS's sworn responses to three contention interrogatories that asked TPS to list the evidence supporting its claims for disparagement, tying, and "refusal to supply." In its Opposition, TPS refers to evidence omitted from its sworn interrogatory responses, admitting its responses did "not consider the most relevant sources of information." *See* ECF 204 at 73–74. TPS cannot use its own failure to adequately respond to interrogatories as a basis to avoid dismissal.

Johns Manville served interrogatories that sought an explanation of the facts supporting TPS's disparagement, tying, and "refusal to supply" claims. ECF 193-1 at 2–21. TPS initially evaded these interrogatories, attempting to invoke Rule 33(d) and provide a list of relevant documents at some point in the future. When Johns Manville objected, TPS provided a supplemental response listing a few TPS documents, but still failed to fully answer the interrogatories. As fact discovery was drawing to a close, Johns Manville raised this dispute with the Court. The Court found the interrogatories "appropriate" and "pedestrian" and ordered TPS to provide "a written response" (ECF 131 (Aug. 3, 2021 Hr'g Tr.) at 52:13–17, 54:3–5), which TPS did on August 13, 2021. ECF 193-1 at 2–21.

In its second supplemental response, TPS tried to limit the scope of the court-ordered written response, stating it was based only on "incidents … reflected in documents within TPS's possession, custody, and control." ECF 193-1 at 5, 8–9, 12. Although TPS's counsel was in possession of the entire discovery record, which included documents produced by Johns Manville and third-parties, TPS claimed its interrogatory responses did not need to take these documents into account. *See id.*; *cf. Stout v. Long*, No. CV 15-379 WPJ, 2018 WL 1322052, at *7 (W.D. Okla. Mar. 14, 2018) ("Plaintiffs' response to the contention interrogatory lacks any reference to any material fact, document, or witness that could support these theories. It is therefore deficient."). TPS argues that this limitation was appropriate in light of Federal Rule of Civil Procedure 26(b)(2)(C)(i). ECF 193-1 at 5, 8–9, 12. But that Rule allows *the Court* to limit discovery if *the Court determines* the "discovery sought is unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(b)(2)(C). TPS failed to seek a protective order to limit its response to these interrogatories, and should not be rewarded for abusing the discovery process. Documents or discussion of alleged anticompetitive conduct that TPS failed to identify in its interrogatory responses should not be considered in response to this Motion. *See Tumbling v. Merced Irrigation Dist.*, 2010 WL 11450406, at *18 (E.D. Cal. Sept. 27, 2010) (refusing to consider evidence omitted from interrogatory response: "A party is entitled to know all of the facts and evidence that underlie the opposing party's case, long before dispositive motions . . . . The Court finds that the failure to . . . fully respond to the interrogatory [is] not harmless and cannot be corrected by less drastic measures at this dispositive motion stage.").

**B.    TPS Cannot Avoid Summary Judgment by Claiming It Will Provide Additional Evidence Sometime in the Future.**

TPS argues that summary judgment should not be granted because TPS "has not yet had occasion to prove its case affirmatively" and it "has not presented any comprehensive collection of supporting evidence—to the Court or to JM." ECF 204 at 72, 75–76. But TPS cannot meet its burden on summary judgment by resting on mere conjecture about evidence it expects to present at trial. *See* Fed. R. Civ. P. 56(c). If TPS had additional evidence to create a material fact dispute, it should have "presented [that] comprehensive collection of supporting evidence" (ECF 204 at 72) in response to this Motion. The Court should disregard TPS's vague claims about future, unidentified supporting documents and witnesses. *See, e.g.*, *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) ("[A] party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.").

**C.    Only Admissible Evidence May Be Considered When Ruling on Summary Judgment.**

To meet its burden on summary judgment, TPS was required to point to "sufficient competent evidence"—admissible at trial—to establish each challenged element of its claims for tying and monopolization. *Green Earth Wellness Ctr., LLC v. Atain Specialty Ins. Co.*, 163 F. Supp. 3d 821, 825 (D. Colo. 2016). TPS seeks to evade its obligation to present "admissible" evidence by arguing that Johns Manville's undisputed facts contain improper legal conclusions concerning TPS's reliance on inadmissible hearsay. ECF 204 at 10. Rule 56(c) contradicts TPS's argument, stating "[a] party asserting that a fact cannot be . . . genuinely disputed must support the assertion by: . . . showing . . . that an adverse party cannot produce *admissible* evidence to support the fact." Fed. R. Civ P. 56(c) (emphasis added). TPS's Opposition does not challenge Johns

7

Manville's hearsay arguments, much less argue that any specific document qualifies for a hearsay exception. The Court should therefore disregard hearsay evidence when evaluating this Motion.

In its Opposition, TPS also ignores its obligation to provide a proper foundation for documents it would offer at trial, failing to authenticate nearly all of the documents it filed as exhibits. *See Hoffmeister*, 2019 WL 1200812, at *1 ("Plaintiff supports her [r]esponse with documents that are not authenticated and therefore cannot be considered on a motion for summary judgment."). While some of TPS's exhibits may have "facial indicia of reliability," many do not, and TPS fails to provide any evidence to support a finding that the documents are what TPS claims. *See id.* Examples of TPS exhibits that lack any authentication include a hearsay email allegedly produced by non-party Bay Insulation and an undated PowerPoint presentation. *See* ECF 204-1 at 146 (JM00030937); ECF 204-3 at 2–3. The Court should disregard TPS's unauthenticated "evidence" when evaluating this Motion.

**D.      TPS's Failure to Adhere to this Court's Summary Judgment Procedures.**

TPS cannot avoid summary judgment by raising "the mere existence of *some* alleged fact dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Instead, to defeat summary judgment, TPS must point to specific evidence giving rise to a "genuine" dispute regarding a "material" fact. A fact is "material" only if goes to an essential element of the challenged claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" only if the evidence presented in support of, and opposition to, the Motion is so contradictory that judgment could enter for either party. *See Anderson*, 477 U.S. at 248. Here, TPS attempts to avoid dismissal by providing unsupported denials or partial denials to undisputed

facts and referencing documents that are either irrelevant to the stated fact or fail to raise a genuine dispute. The Court should disregard this evidence when deciding this Motion.

In response to Johns Manville's statement of undisputed facts, TPS obfuscated, responding to the majority of Johns Manville's facts with denials or partial denials that lack a factual explanation or specific reference to evidence *supporting that denial*. In fact, although it only "partially denies" ten of Johns Manville's undisputed facts, TPS fails to indicate what aspect of the fact it admits and what aspect it denies. To the extent TPS contended there were material facts not addressed in Johns Manville's Motion, to facilitate Johns Manville's response to such additional facts, TPS was required to set forth those facts in "simple, declarative sentence[s]" in "separately numbered paragraph[s]." Hegarty Practice Standards at III.F. TPS's attempt to raise disputed issues of fact in unexplained denials or partial denials to unrelated (and undisputed) facts undermines the process for clearly identifying relevant disputed material facts, if any. By merely attaching documents to its Opposition, TPS did not timely identify any additional disputed material facts the Court must consider.

TPS's improper responses to Johns Manville's undisputed facts can be generally grouped into three categories:

**(1)** **Conclusory Allegations Unsupported by Specific Facts.** "Conclusory allegations will not create a genuine issue of material fact necessitating trial." *Lucas v. Colo. State Pub. Def.*, No. 15-cv-00713-CBS, 2016 WL 9632933, at *3 (D. Colo. Aug. 25, 2016), *aff'd*, 705 F. App'x 700 (10th Cir. 2017). TPS, nonetheless, repeatedly relies on conclusory arguments to support its denial of undisputed facts. For example, in its attempt to deny Statement of Undisputed Fact ("SUF") ¶ 1 (TPS lacks admissible evidence that Johns Manville tied sales of calsil to sales of

expanded perlite), TPS merely speculates that "customers who purchased perlite from JM assumed that being 'cut off' by JM would include being denied the ability to purchase . . . perlite." ECF 204 at 12. TPS does not cite to "specific evidence" to support this statement, and its speculation cannot create a genuine issue of material fact.

(2)    **Cursory Citations and Citations to Irrelevant Facts.** Instead of citing to "specific evidence" that supports its denial of an undisputed fact, TPS responds to most undisputed facts with either citations to a laundry list of documents that have no bearing on the undisputed fact at issue, cursory citations to the entire Warren-Boulton expert report, or cross-citations to responses to other facts. This makes it impossible for the Court to determine what specific evidence, if any, TPS is relying on to support its denial of the particular undisputed fact at issue. *See Lucas*, 2016 WL 9632933, at *4–5 (criticizing plaintiff for responding to undisputed facts with "string cites" referencing "nearly 50 pages of exhibits" and holding "where inadequate record citations have been made, the court has ignored them"); *Karara v. U.S. Dep't of Educ.*, No. 08-cv-00614-MEH-KMT, 2008 WL 4587251, at *2 (D. Colo. Oct. 14, 2008) ("It is the Plaintiff's obligation as a litigant to cull the evidence and identify, with particularity and by page, that which is probative of a particular factual assertion. As the Tenth Circuit in *Adler* observes, the courts play a neutral role in the litigation process, and should be 'wary of becoming advocates who comb the record of previously available evidence and make a party's case for it.'") (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

(3)    **Inadmissible Evidence.** As noted above, TPS cannot create a genuine issue of material fact by citing to evidence that would be inadmissible at trial. Yet, several of the "specific facts" TPS relies on to support its denial of undisputed facts contain multiple levels of hearsay. To

cite just one example, in response to SUF ¶ 8, which states that TPS lacks admissible evidence that Johns Manville threatened to cut off calsil sales to General Insulation, TPS cites to an email from Jesse Revesz (TPS) [first layer of hearsay] where Revesz describes his conversation with an employee at Rand Industrial [second layer of hearsay], who describes a conversation between Rand Industrial and an employee at General Insulation [third layer of hearsay], who describes what General Insulation was allegedly told by "JM" [fourth layer of hearsay]. ECF 204-4 at 19–20; ECF 204-2 at 3 (TPS-0003876). This document contains at least four layers of hearsay. TPS makes no attempt to identify a hearsay exception for this evidence, and there is none.

* * * * *

TPS's response to Johns Manville's Statement of Undisputed Material Facts ignores the Federal Rules, this court's practice standards, and established precedent governing summary judgment. Because TPS failed to properly address Johns Manville's assertions of fact as required by Rule 56(c), the Court should "consider the fact[s] undisputed" and "grant summary judgment" for Johns Manville. Fed. R. Civ. P. 56(e).

## III.   REPLY IN SUPPORT OF JOHNS MANVILLE'S UNDISPUTED FACTS

Consistent with the Court's Practice Standards, Johns Manville provides the following reply to TPS's response to the statement of undisputed material facts. To facilitate discussing the substance of the 68 documents or deposition excerpts TPS identifies in the repetitive tables in its Opposition, which refer to some information designated as "Confidential-Attorneys Eyes Only" under the protective order, Johns Manville submits two charts: 1) Ex. 5.A, with a brief response to TPS's assertions about each document/deposition excerpt in TPS's tables; and 2) Ex. 5.B, with a

detailed response to TPS's indiscriminate attempt to flood the record to create the illusion of a relevant disputed fact (ECF 204 at 12–38).

**Undisputed Fact 1:** There is no admissible evidence that Johns Manville tied sales of its expanded perlite to sales of calsil.

**Johns Manville's Reply:** TPS's denial of this undisputed fact does not provide a factual explanation supporting its denial nor refer to specific evidence in the record supporting denial. TPS does not point to any evidence in the summary judgment record to support the existence of a tie between sales of expanded perlite and calsil. *See* ECF 204 at 11–12. TPS instead speculates that "customers who purchased perlite from JM *assumed* that being 'cut off' by JM would include being denied the ability to purchase . . . perlite." *Id.* (emphasis added). TPS's self-serving and unsupported conjecture about unidentified distributors' beliefs fails to show a disputed fact. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.[1]

**Undisputed Fact 2:** There is no admissible evidence that Johns Manville tied sales of its fiberglass pipe insulation to sales of calsil.

**Johns Manville's Reply:** TPS's denial of this undisputed fact does not provide a factual explanation supporting its denial nor refer to specific evidence in the record supporting denial. TPS does not point to any evidence in the summary judgment record to support the existence of a tie between sales of fiberglass pipe insulation and calsil. *See* ECF 204 at 15–16. TPS instead

---

[1]   TPS relies in part on the exact same documents and testimony to "deny" Johns Manville's SUF ¶¶ 1–5, 22–24, and 27. TPS fails to identify what, if anything, about these documents or testimony raise a genuine dispute regarding each of Johns Manville's facts, as it is required to do. TPS's bulk citation cannot, therefore, raise a genuine issue for any of these undisputed facts. *See, e.g., Roska v. Peterson*, 328 F.3d 1230, 1246 n.13 (10th Cir. 2003) ("Without a specific reference, 'we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.'")

speculates that "customers who purchased fiberglass pipe insulation from JM *assumed* that being 'cut off' by JM would include being denied the ability to purchase . . . fiberglass pipe insulation." *Id.* (emphasis added). TPS's self-serving and unsupported conjecture about unidentified distributors' beliefs fails to show a disputed fact. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

> **Undisputed Fact 3:** There is no admissible evidence that Johns Manville tied sales of any or all of its insulation materials other than calsil to sales of calsil.

**Johns Manville's Reply:** TPS's denial of this undisputed fact does not provide a factual explanation supporting its denial nor refer to specific evidence in the record supporting denial. TPS does not point to any evidence in the summary judgment record to support the existence of a tie between sales of any product and calsil. *See* ECF 204 at 16–17. TPS instead speculates that "customers who purchased any products other than calsil from JM *assumed* that being 'cut off' by JM would include being denied the ability to purchase . . . those products." *Id.* at 16 (emphasis added). TPS's self-serving and unsupported conjecture about unidentified distributors' beliefs fails to show a disputed fact. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

> **Undisputed Fact 4:** TPS did not disclose expert opinions purporting to quantify Johns Manville's alleged market power in the alleged tying products: expanded perlite, fiberglass pipe insulation, or any and all of Johns Manville's insulation materials other than calsil.

**Johns Manville's Reply:** TPS's denial of this undisputed fact does not provide a factual explanation supporting its denial nor refer to specific evidence in the record supporting denial. TPS states that "Dr. Warren-Boulton's opinions are documented in his report," but fails to provide a citation to a specific page or range of pages where Warren-Boulton quantifies Johns Manville's

alleged market power in expanded perlite, fiberglass pipe insulation, or any and all of Johns

Manville's insulation materials other than calsil. Warren-Boulton did not do that and contended

he did not need to do so because of his "direct evidence" shortcut, stating:

> Establishing the potential for harm to competition and consumers **does not require that Johns Manville have any defined measure or amount of market power in the market for each of these products**. . . . **There is no need** . . . to establish that any of these must-have products is a relevant market as defined by the Merger Guidelines or as generally used in antitrust litigation (though that would not seem to be much of a lift), or that Johns Manville has market or monopoly power in any of those markets.

ECF 177 at 19 (emphasis added).[2] Because TPS has not plausibly denied, nor raised a genuine

dispute regarding, this fact, it should be undisputed.

> **Undisputed Fact 5:** Robert Hlavenka, Senior Vice President of Strategic Sourcing of Distribution International ("DI"), testified that Johns Manville did not threaten to refuse to sell either expanded perlite or fiberglass pipe insulation to DI.

> **Johns Manville's Reply:** TPS states only that this is "[d]enied" and does not provide a

specific factual explanation supporting its denial of Hlavenka's sworn testimony. Hlavenka

testified as follows:

> [Johns Manville Counsel]: Q. So you mentioned that DI purchases expanded perlite from Johns Manville and from two other companies, right, SMC and Howred?
> [Hlavenka]: A. Yes, sir.
> Q. Johns Manville has never threatened to not sell perlite to DI, has it?
> A. No.
> . . . .
> Q. And then finally, I was asking you about whether Johns Manville ever threatened not to sell expanded perlite, and your answer was "no." Johns Manville never threatened to not sell DI fiberglass pipe insulation; correct?
> A. Say that again, sir.
> Q. Did Johns Manville ever threaten DI to not sell fiberglass pipe insulation to it?
> A. No, it never did.

---

[2]   Because the February 22, 2022 Order allows Warren Boulton's "Updated Report," cites in this Reply to the Warren-Boulton Report are to the "Updated Report," on file as ECF 177.

ECF 193-7 at 14–17 (Hlavenka Tr. 85:25–86:16; 90:23–91:13). None of the documents that TPS

cites raise a genuine dispute of fact refuting Hlavenka's sworn testimony that Johns Manville did

not threaten to refuse to sell DI either expanded perlite or fiberglass pipe insulation. Because TPS

has not plausibly denied this fact, it should be undisputed.

> **Undisputed Fact 6:** Joe Guest, regional sales manager for 4-State Supply ("4-State") based at its Omaha warehouse, testified that 4-State tries to stock calsil at its Omaha warehouse, not Wichita; and 4-State did not buy either Johns Manville's expanded perlite or fiberglass pipe insulation; instead 4-State's main supplier for fiberglass pipe insulation is Knauf, and its suppliers for expanded perlite have been TPS and SMC.

**Johns Manville's Reply:** TPS does not provide a specific factual explanation supporting

its denial of Guest's sworn testimony regarding where 4-State stocks calsil and its main suppliers

for fiberglass pipe insulation and expanded perlite. TPS's response, which focuses on 4-State's

Wichita location, is irrelevant and does not respond to this fact. Therefore, TPS's denial does not

raise a genuine disputed fact regarding Guest's sworn testimony. Because TPS has not plausibly

denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

> **Undisputed Fact 7:** There is no admissible evidence that Johns Manville threatened to not sell its calsil to Specialty Products & Insulation ("SPI") locations that purchased TPS's calsil.

**Johns Manville's Reply:** TPS does not provide *any* specific factual explanation or *any*

citations to specific, admissible facts in the record to support its denial of this fact. ECF 204 at 19.

Instead, TPS offers only a conclusory denial of this fact and claims that it "*expects*" to have an

unidentified SPI representative testify at trial. This does not raise a genuine dispute of fact

regarding whether the summary judgment record includes admissible evidence that Johns Manville

threatened to not sell its calsil to SPI locations that purchased TPS's calsil. Because TPS has not

plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

**Undisputed Fact 8:** There is no admissible evidence that "an unidentified JM representative(s)" told General Insulation that Johns Manville would not sell General Insulation its calsil if General Insulation purchased TPS's calsil. Ex. 1-A: TPS's 2d. Supp. Resp., at 10–11.

**Johns Manville's Reply:** TPS does not provide *any* specific factual explanation or *any* citations to specific, admissible facts in the record to support its denial of this fact. Instead, TPS cites to only an internal TPS email exchange from Jesse Revesz (TPS) that contains multiple layers of inadmissible hearsay that cannot defeat a motion for summary judgment. *See* ECF 204 at 20; *see also* Motion, Ex. 1.B, ECF 194 at 5 (TPS Hearsay Doc. #8). Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

**Undisputed Fact 9:** TPSX-12 calcium silicate is manufactured by BEC Industrial (Shanghai) Co., Ltd., a Chinese company that manufactured calsil in its factory in Shanghai, China until early 2021 when the factory was permanently closed. BEC's replacement calsil factory was not completed until December 30, 2021 at the earliest.

**Johns Manville's Reply:** TPS partially denies SUF ¶ 9 but does not identify what it is specifically admitting or denying. TPS does not provide any factual explanation supporting its partial denial of the fact that its calsil supplier, BEC, permanently closed its Shanghai factory, and that the replacement factory was not completed until the end of 2021. The testimony that TPS cites demonstrates that there is not a genuine dispute of fact regarding SUF ¶ 9.

**Undisputed Fact 10:** Four of the five alleged instances of "false advertising" or disparagement identified in TPS's Supplemental Interrogatory Responses concern statements purportedly made to representatives from APi; and there is no admissible evidence that proves these four alleged instances occurred.

**Johns Manville's Reply:** TPS partially denies SUF ¶ 10, but does not identify what it is specifically admitting or denying. TPS does not provide any factual explanation supporting its partial denial nor refer to specific evidence in the record supporting the partial denial. None of the

documents or testimony that TPS cites in its chart even mention APi, let alone provide admissible evidence of these alleged four instances. *See* ECF 204 at 22–23. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

**Undisputed Fact 11:** 4-State's representative, Mr. Guest, did not report hearing any disparaging comments about TPS calsil from Johns Manville representatives.

**Johns Manville's Reply:** TPS partially denies SUF ¶ 11, but does not identify what it is specifically admitting or denying. TPS does not provide any factual explanation supporting its partial denial, nor does it refer to specific evidence in the record supporting the partial denial of Guest's sworn testimony. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

**Undisputed Fact 12:** Mr. Meyer testified that, at the MICA trade show in 2018, he suggested Mr. Guest confirm that the calsil 4-State purchases meets ASTM specifications.

**Johns Manville's Reply:** TPS partially denies SUF ¶ 12, but does not identify what it is specifically admitting or denying. TPS's partial denial of this undisputed fact does not refer to specific evidence in the record that plausibly supports denial. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

**Undisputed Fact 13:** TPS conducted independent testing of TPSX-12, the calsil it purchases from BEC, to assess compliance with the ASTM standards. TPS also conducted independent testing comparing TPSX-12 to Johns Manville's calsil, Thermo-1200. TPS prepared data sheets with these results to distribute to prospective customers.

**Johns Manville's Reply:** This fact is admitted by TPS and undisputed.

**Undisputed Fact 14:** TPS provided customers and prospective customers copies of independent testing data and ASTM data for its TPSX-12 calsil including to address potential concerns about asbestos.

**Johns Manville's Reply:** This fact is admitted by TPS and undisputed.

**Undisputed Fact 15:** Before TPS's owner, Jeff Heckman, began importing calsil from BEC in 2018, he wanted to see test results confirming the amount of silica BEC's calsil manufactured in China because he knew the silica test was important for the calsil to meet Occupational Safety and Health Administration ("OSHA") safety standards in the United States arising from concerns about calsil dust workers could inhale.

**Johns Manville's Reply:** TPS partially denies SUF ¶ 15, but does not identify what it is specifically admitting or denying. TPS's partial denial of this undisputed fact does not provide a factual explanation nor refer to specific evidence in the record supporting its partial denial. TPS's response focuses on Heckman's opinion of BEC's calsil, which is irrelevant and does not respond to this fact. Nor does the testimony raised by TPS raise a genuine dispute. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

**Undisputed Fact 16:** Mr. Hlavenka of DI testified that Hal Shapiro of Johns Manville told him that the amount of free silica in TPS's calsil could be an issue, that Mr. Shong sent him copies of TPS's "spec sheets showing that it met all the ASTMs and everything else," and that DI went ahead and purchased TPS calsil.

**Johns Manville's Reply:** TPS partially denies SUF ¶ 16, but does not identify what it is specifically admitting or denying. TPS's partial denial of this undisputed fact does not provide a factual explanation nor refer to specific evidence in the record supporting denial. Nor does the testimony cited by TPS raise a genuine dispute regarding Hlavenka's sworn testimony. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

**Undisputed Fact 17:** Johns Manville does not support every branch or geographic location of every distributor it works with, typically because Johns Manville already works with one or more distributor in the geographic area, or the distributor does not promote Johns Manville materials.

**Johns Manville's Reply:** TPS partially denies SUF ¶ 17, but does not identify what it is specifically admitting or denying. TPS's partial denial of this undisputed fact does not provide a

factual explanation nor refer to specific evidence in the record supporting denial. Nor does the testimony cited by TPS raise a genuine dispute regarding this material fact for trial. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

> **Undisputed Fact 18:** 4-State has three warehouse locations: (1) Omaha, Nebraska; (2) Lenexa, Kansas; and (3) Wichita, Kansas, and primarily purchases and stocks calsil in its Omaha, Nebraska location.

**Johns Manville's Reply:** TPS partially denies SUF ¶18 but does not identify what it is specifically admitting or denying. TPS does not provide a specific factual explanation supporting its partial denial of 4-State's warehouse locations and the location where it primarily purchases and stocks calsil. TPS broadly relies on the documents and testimony in its charts in response to SUF ¶¶ 6 and 17, but does not identify specific evidence supporting its partial denial. *See supra* p. 12 n.1. Nor does the testimony cited by TPS raise a genuine dispute. TPS's response, which focuses on 4-State's Wichita location, is irrelevant and does not respond to this fact. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be deemed undisputed.

> **Undisputed Fact 19:** From 2018 to the present, 4-State has been able to purchase calsil from Johns Manville without interruption, while also purchasing from TPS during that time, although Johns Manville ships purchases for 4-State's Wichita warehouse to 4-State's Lenexa location because it already has other distributors in Wichita, and compensates 4-State for the extra shipping cost.

**Johns Manville's Reply:** TPS partially denies SUF ¶ 19 but does not identify what it is specifically admitting or denying. TPS does not provide a specific factual explanation supporting its partial denial. TPS does not cite to specific evidence supporting its partial denial, and instead, cites in bulk to the documents and testimony discussed in SUF ¶¶ 6, 17–18, which is improper. *See supra* p. 12 n.1. Nor do the documents or testimony cited by TPS raise a genuine dispute.

Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

> **Undisputed Fact 20:** There is no admissible evidence proving that Johns Manville refused to supply calsil or any other products to DI for anticompetitive reasons.

> **Johns Manville's Reply:** TPS denies this fact without providing *any* specific factual explanation. ECF 204 at 28. Instead, TPS only states that this fact is "Denied." *Id.* Hlavenka, DI's representative, testified as follows:

> > [Johns Manville Counsel]: Q. So you mentioned that DI purchases expanded perlite from Johns Manville and from two other companies, right, SMC and Howred?
> > [Hlavenka]: A. Yes, sir.
> > Q. Johns Manville has never threatened to not sell perlite to DI, has it?
> > A. No.
> > . . . .
> > Q. And then finally, I was asking you about whether Johns Manville ever threatened not to sell expanded perlite, and your answer was "no." Johns Manville never threatened to not sell DI fiberglass pipe insulation; correct?
> > A. Say that again, sir.
> > Q. Did Johns Manville ever threaten DI to not sell fiberglass pipe insulation to it?
> > A. No, it never did.
> > . . . .
> > Q. Okay. And did Johns Manville ever refuse to sell calcium silicate to DI at any time?
> > A. In particular markets, yes.
> > Q. With -- DI distribution warehouses where Johns Manville doesn't support the warehouse at all?
> > A. Well, they were supporting us with mineral wool but not with calsil.
> > Q. Because of existing commitments to other distributors?
> > A. That's correct.

ECF 193-7 at 14–17 (Hlavenka Tr. at 85:21–86:2, 90:23–91:6, 92:4–22). TPS does not refer to any specific evidence in the record supporting its denial, and none of the documents or testimony raised by TPS raise a genuine dispute regarding this material fact for trial. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

**Undisputed Fact 21**: There is no admissible evidence proving that Johns Manville refused to supply calsil or any other products to SPI, Bay, MacArthur, General Insulation, APi, or Metro Supply for anticompetitive reasons.

**Johns Manville's Reply**: TPS denies this fact without providing any specific factual explanation supporting its denial. Instead, it only states that this is "Denied." ECF 204 at 30. TPS does not refer to any specific evidence in the record supporting its denial, and none of the documents or testimony raised by TPS raise a genuine dispute regarding this material fact for trial. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

Additionally, regarding TPS's contention that "JM does not claim 'a lack of admissible evidence proving that Johns Manville refused to supply calsil or any other products' to 4 State" is irrelevant and nonresponsive to SUF ¶ 21. *Id.* Regardless, Guest's testimony (designated by 4-State as "Confidential") confirms there was no interruption to 4-State's ability to buy calcium silicate from Johns Manville. ECF 194-2 at 28 (Guest Tr at. 218:9–18).

**Undisputed Fact 22:** Johns Manville did not enter into any written contracts for an exclusive dealing arrangement with any of its distributor customers.

**Johns Manville's Reply**: TPS denies this fact without providing a specific factual explanation or record support supporting its denial. TPS also includes improper argument in its factual response regarding the significance of whether an exclusive dealing contract is in writing or whether it is "explicit or implicit," and regarding the importance of the number of calsil suppliers. ECF 204 at 33. Additionally, neither Johns Manville's Annual Incentive Agreements nor how concentrated the calsil market is raises a genuine dispute of fact regarding whether Johns Manville entered into written contracts for an exclusive dealing arrangement with any of its distributor customers. *See infra* Section IV.C.3.b (argument on exclusive dealing claim).

In addition to the documents listed in the chart, TPS also cites to the same documents and testimony that it also cites as supporting its denial of SUF ¶¶ 1-3, 5-6, 12, 17-21, but does not identify what (if anything) within these documents and testimony specifically supports TPS's denial of SUF ¶ 22 or shows that there is a genuine dispute of material fact regarding whether Johns Manville has any written exclusive dealing arrangements.[3] ECF 204 at 34. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

> **Undisputed Fact 23:** There is no admissible evidence that Johns Manville had implied exclusive dealing arrangements with any distributor-customers, or that it required its distributor-customers to only purchase its calsil.

> **Johns Manville's Reply:** TPS denies this fact without providing a specific factual explanation or record support supporting its denial. TPS also includes improper argument in its factual response regarding the importance of the number of calsil suppliers. Additionally, neither Johns Manville's Annual Incentive Agreements nor how concentrated the calsil market is raises a genuine dispute of fact regarding whether Johns Manville had implied exclusive dealing arrangements or required distributors to only purchase its calsil. *See infra* Section IV.C.3.b (argument on exclusive dealing claim).

TPS does not identify any specific, admissible evidence in the record that supports its denial of SUF ¶ 23. Nor do any of the documents and testimony that TPS generally refers back to raise a genuine dispute of material fact regarding whether Johns Manville had implied exclusive dealing arrangements or required its customers to purchase only its calsil. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

---

[3]   In response to SUF ¶¶ 22–24, TPS again relies on the documents it cited in response to ¶¶ 1–3, 5–6, 12, 17–21, without identifying what (if anything) within these documents and testimony specifically support its denial of SUF 22–24.

**Undisputed Fact 24:** There is no admissible evidence proving that a substantial portion of the industry was foreclosed from TPS due to any alleged exclusive dealing arrangements.

**Johns Manville's Reply:** TPS denies this fact without providing a specific factual explanation or record support supporting its denial of SUF ¶ 24. TPS also includes improper argument in its factual response regarding the importance of the number of calsil suppliers. ECF 204 at 35. Additionally, neither Johns Manville's Annual Incentive Agreements nor how concentrated the calsil market is raises a genuine dispute of fact regarding whether there is admissible evidence proving that TPS was substantially foreclosed from the industry due to alleged exclusive dealing arrangements. *See infra* Section IV.C.3.b (argument on exclusive dealing claim).

TPS does not identify specific, admissible evidence supporting its denial of SUF ¶ 24. Nor do the documents and testimony that TPS generally refers back to raise a genuine dispute of material fact regarding whether there is admissible evidence proving that a substantial portion of the industry was foreclosed from TPS due to alleged exclusive dealing arrangements. Because TPS has not plausibly denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

**Undisputed Fact 25:** TPS's "go-to-market" strategy consisted of inviting five distributors, DI, SPI, Bay Insulation, MacArthur, and General Insulation, to enter into exclusive partnerships.

**Johns Manville's Reply:** TPS's partial denial to this undisputed fact does not provide a factual explanation nor refer to specific evidence in the record supporting denial. TPS's product launch announcement stated: "We are offering first choice for exclusive territories to the five largest insulation distribution companies that have supported us through the years by buying our TPS pipe supports," and "We have a tremendous product that we are taking across the continent, but we are offering it to 1 COMPANY PER TERRITORY!" ECF 193-10 at 5. Nor does the

testimony raised by TPS raise a genuine dispute. Because TPS has not plausibly denied, nor raised

a genuine dispute regarding, this fact, it should be undisputed.

**Undisputed Fact 26:** TPS's corporate representative and President, David Shong, admitted that the "go-to-market" strategy in hindsight was "a little bit naïve," and that by the April 16, 2018 deadline listed in the product launch announcement, only one of the five distributors agreed to an exclusive territory with TPS—Bay signed up for the two territories in California, so TPS moved to the second step of its strategy.

**Johns Manville's Reply:** TPS does not provide a specific factual explanation supporting

its denial of its Corporate Representative's sworn testimony regarding the naivete of TPS's go-to-

market strategy and that Bay signed up two of TPS's territories. In addition, TPS cites to Warren-

Boulton's report and contends it "considers the failure of this [go-to-market] strategy," but that

does not support TPS's denial of this fact. Nor does the testimony raised by TPS or Warren-

Boulton's report supports its denial or raise a genuine dispute. Because TPS has not plausibly

denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

**Undisputed Fact 27:** The seven Johns Manville documents TPS identified as providing proof of Johns Manville either "taking" or "threatening" adverse action against TPS customers or potential customers, viewed in the light most favorable to TPS, do not provide prima facie evidence necessary for TPS to prove either unlawful exclusive dealing or an unlawful "refusal to supply."

**Johns Manville's Reply:** TPS does not provide a specific factual explanation or record

support supporting its denial of this fact. Instead, TPS asserts in a conclusory fashion that it has

more evidence to prove its claims and refers back to the documents and testimony it cited as

supporting its denial of SUF ¶¶ 1–26. In addition, other than quoting from the seven Johns

Manville documents, TPS does not identify what in these documents it is relying on to support its

denial of this fact or what raises a genuine dispute of material fact. Because TPS has not plausibly

denied, nor raised a genuine dispute regarding, this fact, it should be undisputed.

IV.    ARGUMENT

In response to Johns Manville's Motion, TPS withdrew its Lanham Act claim. TPS defends the remaining antitrust claims with vague, unfocused characterizations of Johns Manville internal documents and deposition testimony that, viewed in the light most favorable to TPS, cannot prove a *prima facie* case for tying or monopolization.

**A.    TPS's Cannot Prove a Properly Defined Calsil-Only Product Market Using Warren-Boulton's "Direct Evidence" Shortcut.**

TPS's tying and monopolization claims rest on a foundation that TPS cannot prove at trial: the **assumption** (but not competent evidence), that the jury can properly evaluate TPS's antitrust claims using a **calsil-only product market**, sold in a **nationwide geographic market**. The Court's February 22, 2022 Order, applying *Ohio v. Am. Express Co.*, 138 S.Ct. 2274 (2018), confirms that TPS "must establish the unreasonableness of the challenged conduct through the second method [i.e., not as a *per se* claim]: the "Rule of Reason." *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872, 2022 WL 522345, at *4 (D. Colo. Feb. 22, 2022).

Although it ultimately declined to exclude all the opinions from TPS's economist ("Warren-Boulton"), the February 22, 2022 Order takes note of Warren-Boulton's deficient opinions, which are laced with assumptions that drive his *ipse dixit* conclusions:

- Warren-Boulton's "discussion is inconsistent." *Id.* at *7.
- Warren-Boulton "concludes" that the sale of calsil in the U.S. is a relevant market. *Id.*
- By contending market definition is not a required element of either antitrust claim because of his "direct evidence" approach, "Warren-Boulton thereby leaves uncertain whether this case even warrants defining the relevant market in the first place." *Id.*
- Warren-Boulton's report "leaves unclear its basis" for market definition. "First he defines the relevant market by reference to the theory of harm." *Id.*
- Warren-Boulton's report "reasonably could be construed as relying to a significant degree on theory and assumptions." "In a somewhat circular fashion" he "assumes certain key factors (the scope of the relevant market) based on others (the existence of a monopoly)." *Id.* at *11.

25

- In making "the foundational determination" that Johns Manville sells "calsil at a supracompetitive price," Warren-Boulton "seems to assume that Plaintiff's calsil price is the proper benchmark competitive price." *Id.*
- Warren-Boulton "does not go so far as to undertake a competitive data analysis to establish or confirm all of his various assumptions or stated opinions." *Id.*
- Warren-Boulton "does little to control for other possible causes for Defendant's selling price and profit margins and thereby exclude legitimate, non-competitive reasons for the existing market structure." *Id.*
- Warren-Boulton's "report is not a model of clarity or comprehensiveness." *Id.* at *13.

At the end of its Order, the Court stated it will consider whether to grant summary judgment based on the insufficiency of Warren-Boulton's conclusions about TPS's proposed calsil-only national market: "It may well be that as in *Menasha*, Dr. Warren-Boulton's opinions fall short of what Plaintiff needs to survive summary judgment." *Id.* at *12. It added: "[w]hether the evidence suffices to prove Plaintiff's claims will have to be judged in the context of the merits." *Id.*

Based on that guidance, Johns Manville renews the undecided argument presented in its *Daubert* motion (ECF 135 at 32–38, 39–43): whether Warren-Boulton's proposed "direct evidence" proof of a calsil-only, national market is valid as a matter of law.[4] The jury cannot decide this *legal* issue—the validity of Warren-Boulton's proposed use of the rarely applied "direct evidence" shortcut to define his proposed relevant market under applicable case law. The Court is also able to determine whether Warren-Boulton's analysis raises a genuine dispute of material fact regarding a central element of TPS's claim: market definition.

To establish a relevant market under the Rule of Reason:

- TPS must "prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market"

---

[4]    TPS is not prejudiced by Johns Manville renewing this argument in this Reply as the Court suggested addressing this issue on summary judgment and *sua sponte* allowed TPS to file a sur-reply to respond. ECF 207, 208.

- TPS must present "an accurate definition of the relevant market"; it "must define in an accurate way the market in which the challenged restraints are occurring." Such an "accurate definition" is "necessary to accurately assess competition" including considering "the market's full scope."

  o "Without that market definition, there is no way to measure the defendant's ability to lessen or destroy competition."

- The accurate market definition must be consistent with "actual market realities" rather than "legal presumptions that rest on formalistic distinctions."

  o In defining the relevant market under the Rule of Reason, the market must encompass "the area of effective competition, which typically consists of the arena within which significant substitution in consumption or production occurs."

  o The relevant market "combines different products or services in a way that reflects commercial reality."

  o The relevant product market "is not necessarily limited to the product that the plaintiff sells, but also those products that are its substitutes."

- Defining the relevant market must take into account substitutability in the economic sense. "Interchangeability considers the purpose for which the product is made in terms of price, use, and qualities, and cross-elasticity of demand asks whether a significant change in one product's price affects demand for another product."

- "The availability of substitutes is a factor that may reduce a seller's pricing power."

- "The relevant market also has a geographic boundary. The geographic market is the narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market."

*Chase Mfg.*, 2022 WL 522345, at **5–6 (internal quotes and citations omitted).

Warren-Boulton elected to "define" TPS's proposed calsil-only national market using the seldom-applied "direct evidence" shortcut (where he supposedly defined the market by the anticompetitive effects he perceives in the proposed market he seeks to rely on), rather than the traditional "indirect evidence" approach. *Id.* at *8 (Because Warren-Boulton claims there is direct evidence, he sees "'no need to examine indirect (usually structural) evidence.'"). As the Court notes, "direct evidence" must be "explicit and requires ***no inferences*** to establish the proposition

or conclusion being asserted." *Id.* at \*6 (emphasis added). An example of evidence that required "no inferences" is the impact from collusion among competing dentists that the Supreme Court relied on in *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986). Here, Warren-Boulton's purported "direct evidence" is full of inferences, where he assumes (or infers) that his calculations about pricing and accounting data prove the conclusion about monopoly power that he asserts.

Among other things, Warren-Boulton's superficial, conclusory analysis consciously skips over or disavows the need for the correct market definition analysis using the factors the Court identified in its February 22, 2022 Order:

- <u>Presumptions/formalistic distinctions</u>: Warren-Boulton relies on legal presumptions and formalistic distinctions ("direct evidence") and disavows the need to consider "actual market realities."

  - o   Warren-Boulton prefers a product market tailored to match "the product the plaintiff sells"

    - ▪   *See* Report, ECF 177 at 10 ("a relevant market can be defined as all calsil sold in the U.S.," citing no market structure analysis, just TPS allegations that Johns Manville sought to exclude TPS from selling its calsil. Therefore, he contends "one relevant market would include all calsil sales . . . .".)

- <u>Calsil substitutes</u>: Warren-Boulton disavows the need even to consider calsil substitutes, that "reduce a seller's pricing power." *Chase Mfg.*, 2022 WL 522345, at \*6.

  - o   *See* Report, ECF 177 at 10 (asserting that "[o]nly in the absence of such [direct] evidence would one need to examine indirect (usually structural) evidence" including "the existence of close substitutes for calsil.")

  - o   Warren-Boulton does not define a product market that encompasses the "area of effective competition" and "consists of the arena within which significant substitution in consumption or production occurs." *Chase Mfg.*, 2022 WL 522345, at \*6.

    - ▪   *See* Report, ECF 177 at 10 (in arriving at conclusion that "one relevant market would include all calsil sales," Warren-Boulton does not discuss or consider the arena in which significant substitution occurs, or even what other high-temperature insulation materials are used in place of calsil). Although Warren-Boulton cites Hlavenka (DI) deposition testimony, he

ignores Hlavenka's testimony describing the insulation materials that a large distributor like DI views as calsil substitutes. *See* ECF 135-7 at 13 ("So mineral wool, calsil, perlite, aerogel, ceramic fiber would all be candidates for substitutions." (Hlavenka Tr. at 51:9–11)).

- ▪ *See also* ECF 137 at 5–8 (Hlavenka/DI); 12–19 (Guest/4-State Supply); 26–30 (Shong/TPS) (summarizing undisputed deposition testimony Warren-Boulton ignores, including from David Shong of TPS, explaining high-temperature insulation and calsil substitutes).

- o Warren-Boulton does not combine "different products or services in a way that reflects commercial reality." *Chase Mfg.*, 2022 WL 522345, at *6.

- Warren-Boulton does not consider "the purpose for which the product is made in terms of price, use, and qualities, and cross-elasticity of demand, and asks whether a significant change in one product's price affects demand for another product." *Id.*

  - o *See supra* (Warren-Boulton's refusal to consider substitutes); *see also* Report, ECF 177 at 10 (Because Warren-Boulton relies on so-called "direct evidence," he denies the need to examine "indirect (usually structural) evidence" such as "whether that was even possible. i.e., whether calsil sold in the US is a relevant market in the sense that a hypothetical monopolist of calsil sold in the US 'could' profitably raise the price significantly above the competitive level or whether the existence of close substitutes for calsil at the competitive price would make such a price increase unprofitable (i.e., the lost profits resulting from reduced sales because of switching prompted by a SSNIP above the competitive price would exceed the increase in the profits on retained sales at the higher price).").

  - o Instead, Warren-Boulton makes an assumption that he cannot do such analysis because he **assumes** Johns Manville's current calsil price—which he says is about 25% above what TPS has been charging for its imported calsil, with all the challenges that come with purchasing from TPS—is not a "competitive" price.

    - o *See id.; see also* Report, ECF 177 at 12–13: contending that TPS's price of about 25% less than Johns Manville calsil price provides "direct evidence of monopoly power"; having declared TPS's price the benchmark "competitive" price, Warren-Boulton contends this makes the SSNIP test for defining a relevant market unnecessary.

- <u>Geographic market</u>: Warren-Boulton skips analysis of undisputed evidence that calsil prices vary among different regions in the United States—there is not a nationwide market.

  - o *See* Report, ECF 177 at 10 (Warren-Boulton accepts without data or analysis TPS's assertion that relevant geographic market for calsil sales is the entire United States:

"a relevant market can be defined as all calsil sold in the US"; as proof he cites TPS's allegations.)

o   *But see* ECF 137 at 9–12 (Hlavenka/DI); 19–23 (Guest/4-State Supply); 24–26 & 31–33 (Shong/TPS) (summarizing undisputed deposition testimony Warren-Boulton ignores, including from David Shong of TPS, explaining local/regional geographic markets, not national market).

Although defining a relevant market ultimately presents issues of fact for the jury to decide, the Court cannot leave it to the jury to decide the threshold issue of whether TPS's reliance on the "direct evidence" shortcut is proper here *as a matter of law*. That is a legal decision for the Court. The Court can also conclude that no reasonable jury, presented with Warren-Boulton's opinions, could find that TPS has properly defined product and geographic markets using the approach summarized in *American Express* and this Court's February 22, 2022 Order.

As a result, based on the summary judgment record concerning the actual factual basis, if any, for TPS's claims, the Court still needs to rule on the specific legal objections Johns Manville presented in Section III.C.1 & 2 (ECF 135 at 32–43) of its *Daubert* motion to Warren-Boulton's proposed use of the "direct evidence" shortcut to defining the calsil-only national product market that TPS seeks to apply here. *See, e.g., United States v. Nacchio,* 555 F.3d 1234, 1246 (10th Cir. 2009) (upon timely request, "the trial judge is assigned the task of insuring that an expert's testimony rests on a reliable foundation and is relevant . . . .") (quoting *Macsenti v. Becker*, 237 F. 3d 1223, 1231 (10th Cir. 2001)). The proponent of expert testimony bears the burden of establishing its admissibility. *Id.* at 1245.

•   <u>Undisputed evidence of relevant calsil substitutes</u>: Warren-Boulton failed to conduct any reasoned analysis of substitutes for calsil, instead choosing to disregard calsil substitutes as "irrelevant." ECF 135 at 32–34. As explained in the *Daubert* motion, this represents another instance of Warren-Boulton using assumptions, rather than analysis and evidence, to define the proposed market.

- <u>Lack of accepted methodology for Warren-Boulton's "direct evidence" conclusions</u>:

  o <u>Analyzing Johns Manville calsil prices and accounting margins</u>: Warren-Boulton's price comparisons and analysis of accounting margins reflect an inherently unreliable methodology that courts and distinguished commentators (e.g., Judge Bork) regard as unreliable and "a totally misleading enterprise." ECF 135 at 35–38, 39–41. The Court cannot leave to the jury the decision of whether to accept this "direct evidence" methodology based on Warren-Boulton's self-serving testimony and arguments from counsel.

    ▪ As a simple example, there are lawful, rational reasons for Johns Manville to charge more in a free market for its calsil than TPS's imported calsil (which is sold by an unproven entity and subject to inherent uncertainty due to shipping delays because large quantities must ordered in shipping containers imported directly from China). ECF 135 at 40–41. Therefore, it is legal error to allow Warren-Boulton to tell the jury this price difference constitutes the kind of "direct evidence" that courts allow to define a relevant market (i.e., for calsil-only nationwide).

    ▪ Warren-Boulton's comparison of Johns Manville's accounting margins for calsil and for other insulation materials (that Warren-Boulton contends are not calsil substitutes) reflects reasoning by conclusion that ignores the context in which each of those different types of insulation materials is sold. *Id.* at 37–38.

- <u>Comparing data about Johns Manville U.S. calsil sales with non-U.S. sales</u>: In the context of this lawsuit, which has never involved allegations or discovery about competitive conditions outside the United States, Warren-Boulton has no legitimate basis to rely on his made-to-order perceptions about non-U.S. markets to purport to make a reasonable comparison of Johns Manville calsil markets within and outside the U.S. ECF 135 at 41–43. In addition, Warren-Boulton's cherry-picking of data to rely on certain countries but not others, reflects an unreliable pattern of letting assumptions drive the conclusions. *Id.* at 42–43.

TPS's proposed "proof" of a calsil-only national market using Warren-Boulton's "direct evidence" shortcut instead of the Rule of Reason analysis, is insufficient as a matter of law to establish the essential element of market power within a relevant market. The Court should grant summary judgment dismissing TPS's tying and monopolization claims because, without expert testimony, TPS cannot prove at trial the essential market definition element of those claims under

the Rule of Reason. *See* ECF 135 at 54-57 (competent expert testimony is required for market definition and TPS cannot supply such opinion testimony from an undisclosed lay witness).

**B.     TPS's Vague Arguments Evade the Structure Necessary to Prove Unlawful "Tying."**

A tying claim represents a highly specialized antitrust claim that requires a specific technical structure—properly defined tying and tied products, with proven market power in those products, and conduct proving an actual tie-in. TPS cannot prove this structure. Just saying customers want to buy something so the seller has power to coerce their purchases and is liable for tying, is not sufficient. TPS has been offering blurry and imprecise arguments regarding how it could prove tying, such as by contending there are undefined "must have" Johns Manville products, without regard to market power in properly defined markets, including how many entities sell those products and what substitutes exist. More recently, TPS abandoned any pretense of proving the instances of tying alleged in its Amended Complaint (which named expanded perlite and fiberglass pipe insulation as "tying" products), arguing instead that any materials Johns Manville sells other than calsil constitute the relevant "tying product."

Johns Manville's Motion identifies major structural flaws with TPS's tying claim, including its lack of evidence of any tying arrangement and its failure to identify, much less properly define, a relevant market (e.g., that measures market power and encompasses all substitutes) for the supposed "tying products." The Court confirmed in its February 22, 2022 Order that TPS must meet the Rule of Reason test for the markets on which its tying claim rests. *Chase Mfg.*, 2022 WL 522345, at *4. TPS cannot do that.

TPS's Opposition reflects just a smokescreen invoking vague "threats" that TPS cannot prove led to coercion of any customers' actual purchase decisions. Mere "threats" do not establish

a tying arrangement. *See Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685 (2d Cir. 1982) (the "use of 'strong persuasion, encouragement, or cajolery to the point of obnoxiousness" does not "amount to actual coercion" and "if the evidence merely demonstrates that Champion was dissatisfied with Unijax's performance and threatened to cease supplying the company unless sales were increased, there would not be sufficient evidence for the jury's determination that an illegal tying arrangement existed"). And TPS persists with its argument that "any/all" insulation materials Johns Manville sells can constitute a properly defined "tying product" with market power. TPS's dodge illustrates the core problem with its tying claim: TPS must demonstrate some kind of unlawful coercion of customers' purchase decisions tied to market power in a specific, properly defined tying product. TPS conveniently assumes, without evidence, that Johns Manville can force customers to purchase "any/all" materials it sells.

### 1.    TPS Fails to Point to Specific Facts Showing Any Tying Arrangement.

TPS's Opposition evades proof of conduct demonstrating any actual tying arrangement, i.e., "defendant conditions the sale of one product on the purchase of another." *Chase Mfg., Inc.*, 2022 WL 522345, at *4. TPS cites no specific instance when Johns Manville actually conditioned the sale of any insulation material, including the two tying products TPS alleges in the Amended Complaint (expanded perlite and fiberglass pipe), on the purchase or non-purchase of calsil. *See* ECF 204 at 63–69. Instead, TPS tries to reframe this legal element, contending Johns Manville takes "an artificially narrow view" of the evidence. *Id.* at 64. Citing no evidence, TPS asserts that "JM threatened multiple distributors—including DI, 4-State, API, and Bay, that it would stop making the tying products available if they purchased or stocked TPS's calsil." ECF 204 at 64.

But mere threats, even if proven, do not prove an unlawful tying arrangement if such threats did not actually condition the sale of one product on the customer's purchase of another.

The elements of unlawful tying require an actual tying arrangement, not "threatened tying." *See Unijax*, 683 F.2d at 685. TPS cites no case that treats vague threats as equivalent to proof of an actual tying arrangement. And even Warren-Boulton's summary of distributor sales and TPS's sales data show that each of the four distributors TPS lists (DI, 4-State, Bay, and APi), purchased TPS calsil—they were not prevented or coerced from doing so. *See* ECF 177 at 88 (Warren-Boulton Table 5 (for DI, 4-State-Bay); ECF 89 (filed Oct. 9, 2020 as Restricted Ex. D) (TPS sales data show sales to APi). There is no admissible evidence in the discovery record establishing that Johns Manville made sales of its products to APi and Bay contingent on their refusal to sell to TPS. SUF ¶ 21 (noting the lack of documentary evidence and testimony from APi and Bay). Indeed, TPS admits both companies entered into partnerships with TPS to stock and sell its calsil. *See* ECF 204-7 at 13 (Shong/TPS Rule 30(b)(6) Tr. at 248:7–19). The DI and 4-State witnesses did not testify that Johns Manville conditioned the sale of any insulation material on purchase or nonpurchase of TPS calsil. SUF ¶¶ 5, 6 (4-State did not purchase expanded perlite or fiberglass pipe from Johns Manville, much less claim it was coerced by threats about those materials).

Lacking evidence of any actual tying arrangement, TPS retreats to rhetoric about "reasonable inferences and interpretations" (ECF 204 at 65), but provides no explanation why it deserves an inference from zero evidence. Indeed, while TPS argues in response to Johns Manville's undisputed facts regarding the lack of evidence of a tying arrangement that "customers . . . assumed that being 'cut off' by JM would include being denied the ability to purchase" the tying products, it cites no admissible evidence to support this rank speculation. ECF 204 at 12, 16

(TPS's bulk citation in its tables does not prove this assumption). Nor do the two cases cited by TPS support an argument that it is somehow entitled to any interference. The detailed evidence of "forced purchases" that the Seventh Circuit recited in *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 470–71 (7th Cir. 2020), does not resemble TPS's complete lack of proof of any actual tying arrangement showing Johns Manville actually conditioned the sale of expanded perlite, fiberglass, or any other material on a customer's decision on some other material. And in *Sidibe v. Sutter Health*, 2021 WL 879875, at *6 (N.D. Cal. Mar. 9, 2021), the disputed facts that precluded summary judgment concerned specific systemwide contracts, with a factual issue concerning the *effect* of the contracts. TPS has not identified actual agreements (written or verbal) between Johns Manville and any customer that could constitute unlawful tying arrangements.

### 2.  Lack of a Properly Defined "Tying Product."

Abandoning the allegations in its own Amended Complaint, TPS contends the supposed "tying product" is a vaguely defined catch-all, circular category: "other products that JM sells to distributors that give it economic power over them." ECF 204 at 63. This reduces TPS's tying claim to an empty argument that certain of Johns Manville's customers like to purchase all the materials it manufactures, so it should be liable for "tying" based only on that popularity. Yet even with that circular description of the purported "tying products," TPS still fails to identify what *particular* insulation materials fall within its catch-all category of tying products, stating only that the relevant materials "include, *at least*, fiberglass, perlite, mineral wool, and InsulThin." ECF 204 at 64 (emphasis added).[5] TPS has abandoned its claim that either expanded perlite (which TPS

---

[5]  TPS offers no justification for its untimely attempt to broaden its list of "tying products" long after the September 1, 2021 close of fact discovery. TPS never moved to amend its First Amended

also imports and sells) or fiberglass pipe insulation (a widely available material generally used for commercial—not industrial—facilities) constitute a properly defined, relevant "tying product."

TPS cites no cases that support its flawed approach to relying on an open-ended "any/all" tying product. TPS cannot go to trial on tying claims that do not properly define a relevant market with market power for "tying products" because it, inevitably, excuses TPS from proving the technical elements of a tying claim. Missing from TPS's blurry analysis is the core tying concept that the seller of a properly defined "tying product" has the ability through properly defined market power in the tying product to *coerce* the purchaser's decisions with respect to the tied product. *See, e.g., Chase Mfg.*, 2022 WL 522345, at *6 (market power "is the ability to force a buyer to do something the buyer would not do in a competitive market").

TPS cites to three cases it contends allow "multiple tying products" (ECF 204 at 64), but —unlike here—the plaintiffs in those cases specifically defined the tying products and established market power in properly defined product markets. In *Palmyra Park Hosp. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1297 (11th Cir. 2010), the complaint identified "three separate medical-services product markets" in which the defendant had market power. Those defined tying product markets were acute-care obstetrics, neonatology, and cardiovascular catheterization service, not *any/all* hospital services offered by the defendant. *Id. Palmyra* does not justify TPS's

---

Complaint. *Cf.* ECF 30 at 43–44 (¶¶ 193, 196) (Amended Complaint listing "fiberglass pipe insulation" as the "first tying product" and "expanded perlite" as the "second tying product). The Court relied on those specific allegations in its ruling two years ago allowing TPS to proceed on its Amended Complaint, and specifically putting TPS on notice then that "the market power of the tying product is important" and "evaluating the relevant tying market requires an appropriate product market and geographic market." *See Chase Mfg., Inc. v. Johns Manville Corp.*, 2020 WL 1433504, at *2, *4 (D. Colo. Mar. 23, 2020) (quotations omitted) (citing "fiberglass pipe insulation" and "expanded perlite" as the "tying products" on which TPS's claims are based).

"any/all" dodge here. Similarly, in *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 2018 WL 3730165, at **5–7 (N.D.N.Y. Aug. 6, 2018), the alleged tying product was one specific thing—"tip location systems" (systems that allow a doctor to locate a catheter's location inside a person's body)—and the disputed issue on which the court ruled was whether the tying and tied products were even separate products. TPS also misleadingly cites *Eastman Kodak v. Image Tech. Services, Inc.*, 504 U.S. 451, 458 (1992), contending that the tying product in that case ("replacement parts for micrographic and copying machines," referred to in the opinion as "parts") is comparable to TPS's undefined tying products. ECF 204 at 64. But the Supreme Court's short-hand reference to replacement "parts," which constituted a separate and defined tying product does not rescue TPS's failure to allege a valid tying product here. *See Kodak*, 504 U.S. at 460.

In addition, TPS's catch-all category of tying products is not founded on any valid Rule of Reason analysis that defines a relevant tying product market, taking into account the "area of effective competition" and a single market that includes substitutes based on "commercial realities." In its February 22, 2022 Order, the Court confirmed that under the Supreme Court's *American Express* decision, "Plaintiff must follow the Rule of Reason framework to support its theory of antitrust violations, and in doing so, it must define in an accurate way the market in which the challenged restraints are occurring." *Chase Mfg.*, 2022 WL 522345, at *6. The Court added, "[w]ithout that market definition, 'there is no way to measure the defendant's ability to lessen or destroy competition.'" *Id.* TPS's economist, Warren-Boulton, did not attempt such a Rule of Reason market analysis because he denied the need for such analysis, while asserting it would not be a "heavy lift." ECF 177 at 19.

### 3.   Lack of Evidence of Market Power In Any "Tying Product."

TPS further attempts to conceal its lack of evidence that Johns Manville has "economic power" (market power) in TPS's vaguely defined any/all "tying product."

"Market share" in cherrypicked/unproven "market": For example, TPS offers its counsel's back-of-the-envelope "market *share*" calculations in an assumed "market" as supposedly proving bona fide "market *power*" or "economic power." ECF 204 at 65. Such market share estimates in a cherrypicked/unproven "market" are misleading and do not prove market power in a properly defined relevant market.[6] For example, selling 40% of expanded perlite in the U.S. does not equate with selling 40% of all high-temperature industrial insulation in the U.S., and represents a meaningless percentage to determine market power in a relevant market if (as is true) many other insulation materials, including calsil, mineral wool, and thin blanket, compete as substitutes with expanded perlite.[7] Thus, TPS offers a junk science calculation from counsel that Johns Manville's

---

[6]  Thus, confusing "market share" with "market power," and ignoring the Rule of Reason proof necessary to evaluate market power in a properly defined market, TPS contends "courts often find that market shares well below 40% can support a finding of 'market power,'" and that if Johns Manville sells a "significant market share" of U.S. volumes of perlite and mineral wool, that suffices for TPS to prove "market power" in those materials at trial. ECF 204 at 66. This argument from counsel represents pure speculation that cannot support liability for tying at trial. If the relevant "market" in which to determine market share and evaluate market power based on a range of factors is "high-temperature insulation," because customers view other insulation materials as substitutes for expanded perlite and mineral wool (and they do—including calsil and thin blanket dominated by aerogel), then a "significant market share" selling expanded perlite or mineral wool provides no insight about market power to coerce customers buying high-temperature insulation.

[7]  TPS's string cite to older decisions contending "market share" estimates can prove "sufficient economic power" in a "tying product" (ECF 204 at 66) is inaccurate and misleading:

*(1) Image Tech. Servs. v. Eastman Kodak Co.*, 903 F.2d 612, 615 n. 1, 616, 618 (9th Cir. 1990) (not considering rule of reason analysis; court's analysis assumed relevant "tying market" was the Kodak "parts market"; noted "market share is not alone determinative of market power"; holding that because defendant's share of the relevant market "may approach as much as twenty-three

"sales of calsil to its distributors" represent only a fraction of "its total sales of five products: calsil, fiberglass, perlite, mineral wool, and InsulThin." ECF 204 at 65. The faulty logic of this calculation contends that Johns Manville must have economic power because it sells a larger volume of five insulation materials (Calsil, Fiberglass pipe, Perlite, Mineral Wool, and InsulThin) than one of those insulation materials (Calsil). Identifying five types of industrial insulation materials Johns Manville sells proves nothing about whether Johns Manville can coerce customers to purchase any of those materials from it, rather than competing firms—which is the key inquiry for tying.

Warren-Boulton's non-analysis of market power in alleged tying products: TPS also relies on the Warren-Boulton report, even though Warren-Boulton disclaimed the need to conduct a Rule of Reason analysis of TPS's proposed tying markets (offering only an unsupported conclusion that "[t]here is no need, however, to establish that any of these must-have [tying] products is a relevant

---

percent," plaintiffs' evidence was sufficient to raise a material issue of fact on market power), analysis superseded by *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451 (1992).

(2) *Osborn v. Sinclair Refin. Co*., 286 F.2d 832, 834–41 (4th Cir. 1960) (this 62-year old decision is inconsistent with current antitrust analysis about vertical restraints including *American Express*, or requirements for a "per se" tying claim, *see* ECF 193 at 22 n.1; courts do not cite it as relevant to assessing market power in a properly defined tying market; the 4th Circuit assumed sale of gasoline in Maryland was a relevant market for purposes of its discussion of market share).

(3) *Brokerage Concepts v. U.S. Healthcare*, 1995 WL 455969 at *3 (E.D. Pa. July 27, 1995) (in denying a motion to dismiss, the court noted "an inquiry into the nature of the market at issue is required, and [ ] the market's structure in combination with a defendant's market share leads to a decision on market power"; the court merely rejected the argument that a seller with a 14 percent market share could not, as a matter of law, have sufficient market power for a per se tying claim).

(4) *Breaux Bros. Farms, Inc. v. Teche Sugar Co*., 21 F.3d 83, 84–88 (5th Cir. 1994) (Fifth Circuit held there was no per se tying violation and no unlawful tying arrangement; the court's discussion of "market share" percentages was in the context of its recognition that a per se tying claim requires a finding of "significant market power" in the tying market (quoting *Jefferson Parish Hosp. Dist. v. Hyde*, 466 U.S. 2, 26 (1984)), and analyzing such market power in the context of considering whether "sugar cane land" was a relevant tying product market).

market," ECF 177 at 19). *See* ECF 204 at 66 (TPS contending (contrary to case law) that proof of "any defined measure or amount of market power" was not necessary, and instead "what is needed is that a sufficient number of distributors or other customers value access to Johns Manville's products"). That is just more "garbage in/garbage out" from Warrren-Boulton, using assumptions to drive an *ipse dixit* conclusion. *Cf. Menasha Corp. v. News Am.Mktg. In-Store, Inc.*, 354 F.3d 661, 665–66 (7th Cir. 2004) (Warren-Boulton's assumption that drove his proposed relevant market for at-shelf coupons, represented "Garbage in, garbage out."). The Court should reject this shortcut to proving actual "economic power" or "market power" in the alleged tying products.

TPS also cites Warren-Boulton's unsupported conclusion that he "has" "direct evidence" of sufficient economic power in "tying product markets" because of his separate, unsupported conclusion about "anticompetitive effects in the calsil (tied product) market." ECF 204 at 67.[8] This supposed evidence of market power rests on a house of cards. First, Warren-Boulton *assumes* Johns Manville sells calsil at a "monopoly" price because TPS charges less for imported calsil (with the uncertainty and risk from buying imported calsil from TPS, a new entrant with a tiny customer support operation). ECF 177 at 12–14. He then declares the market for calsil a relevant market in which, by his *ipse dixit*, he deems substitutes irrelevant. *Id.* at 10. Second, TPS declares this so-called "direct evidence" of monopoly power in Warren-Boulton's gerrymandered calsil

---

[8]   TPS cites the discussion in *Suture Express, Inc. v. Owens & Minor Distribution*, 851 F.3d 1029 (10th Cir. 2017) and two cases discussed therein (*Kodak* and *PeaceHealth*), but TPS leaves out the Tenth Circuit's conclusion after detailed analysis of those cases that "a court should not consider direct evidence of tied market effects as conclusive" and such evidence "is not dispositive" although it can be considered. *Suture Express*, 851 F.3d at 1041. If "direct evidence" cannot be dispositive or conclusive in proving market power for a tying claim, then TPS needs other evidence to survive summary judgment, and it does not have it. In addition, Suture Express predates the Supreme Court's further limits on use of "direct evidence" in *American Express*.

market (a supposedly "tied market") proves "sufficient economic power" in *any* insulation material the seller sells, which TPS declares without proof to be a properly defined relevant "tying product" market. *Id.* at 19. Such assumptions fail to prove market power in the alleged tying products.

"Importance" of Johns Manville to large distributor like DI: Recognizing it lacks evidence to prove Johns Manville has market power in any properly defined tying product, TPS retreats to more mush, arguing all it needs to prove is that distributors regard Johns Manville as "important" to their businesses. ECF 204 at 67 (contending distributors testified "about the importance of JM to their businesses."). TPS conveniently ignores Hlavenka's (DI) testimony confirming Johns Manville never refused to sell any insulation material to DI—its largest customer—apart from a few DI local areas where Johns Manville supports other distributors. *See* ECF 193-7 at 14–18 (Hlavenka Tr. at 85:25–86:16; 90:23–91:13, 92:4-16).

Subjective views that a seller is "important" to a customer do not prove market power in a relevant tying product. TPS offers no case law in which a court defined a tying or tied product based on whether a "sufficient number" of customers "value access to" it or regard the seller as "important." ECF 204 at 66-67. The only case TPS cites for this theory is *Suture Express*, which discussed using properly defined "market power" to evaluate whether the seller can "force a purchaser to do something he would not do in a competitive market," not the mere subjective "importance" of a seller to a customer. *Suture Express*, 851 F.3d at 1037 (internal quotation and citation omitted). TPS's tying theory would punish for "tying" every successful company that is attractive to current and potential customers. Thus, TPS has no competent evidence to prove market power at trial in TPS's "any/all" tying product.

### 4. "Per se" tying vs. "rule of reason" tying.

Johns Manville's Motion explains why calling TPS's tying claim a "*per se*" claim makes no practical difference; TPS must still prove the Rule of Reason elements including properly defined markets and harm to competition. *See* ECF 193 at 22 n. 1. Thus, TPS's arguments about "*per se*" and rule of reason tying claims add nothing to the analysis. TPS objects that Johns Manville does not "raise any procompetitive justifications" for TPS's tying claims (ECF 204 at 69), ignoring that a defendant bears the burden of proving "procompetitive justifications" so there is no reason to raise such defenses in a summary judgment motion. *See Am. Express Co.*, 138 S.Ct. at 2284 (if plaintiff carries its burden to show substantial anticompetitive effect in a relevant market, "the burden shifts to the defendant to show a procompetitive rationale for the restraint."). Given the lack of evidence, the Court should grant summary judgment dismissing TPS's tying claims, whether under a *per se* or rule of reason analysis.

**C. TPS Lacks Admissible Evidence to Prove Any Form of Unlawful Exclusionary Conduct Necessary to Prove Monopolization.**

### 1. TPS Cannot Prove the Technical Elements of a Valid Tying Claim.

As explained in Section IV.B, above, TPS's blurry analysis of the technical elements of a tying claim conceals its inability to prove a valid tying claim. Tying cannot survive summary judgment as either a stand-alone claim or as evidence of unlawful exclusionary conduct.

### 2. TPS Lacks Legal Support and Evidence For Its "Refusal to Supply" Theory.

Viewing the summary judgment record in the light most favorable to TPS, the only plausible evidence of any "refusal to supply" is that Johns Manville refused to ship calsil directly to the Wichita branch of 4-State Supply, sending such shipments for the Wichita location to 4-State's Lenexa, KS warehouse instead. Guest testified that 4-State:

- currently orders Johns Manville calsil for Wichita through its nearby Lenexa, KS warehouse with a price that helps cover the extra shipping cost for transferring calsil from Lenexa to Wichita;

- purchased and continues to purchase, without interruption, both TPS and Johns Manville calsil;

- prefers to stock calsil in its Omaha warehouse, not Wichita;

- does not purchase either expanded perlite or fiberglass pipe insulation from Johns Manville; and

- experienced problems buying TPS calsil and nearly lost a major sale to a Nebraska power plant, which had to order a back-up supply of calsil, after TPS barely got its shipping containers from China to the customer when they were needed.

SUF ¶¶ 6, 18, 19; ECF 204-10 at 17–18 (Guest Tr. at 171:1–172:14). This undisputed testimony fails to support TPS's (legally invalid) refusal to supply theory. TPS's exaggerated account of 4-State's Wichita warehouse, viewed in the light most favorable to TPS, does not harm TPS or competition generally. TPS cannot prove unlawful exclusionary conduct at trial on these facts.

### a.    TPS Recognizes It Cannot Meet the *Aspen Highlands/Trinko* Exception.

After dismissing TPS's initial "refusal to deal" claim because it plainly contradicts case law that companies generally are free to choose their business partners, the Court allowed TPS to proceed to discovery on the rebranded "refusal to supply" claim in its First Amended Complaint. The Court specifically allowed this claim to proceed based on the narrow *Aspen Highlands/Trinko* exception to the general rule that "refusals to deal" do not violate U.S. antitrust law. *See Chase Mfg., Inc. v. Johns Manville Corp.*, 2020 WL 1433504, at **10–11 (D. Colo. Mar. 23, 2020) (reciting initial dismissal of TPS's "refusal to supply" theory and quoting exception in *Verizon Commc'ns v. Trinko*, 540 U.S. 398, 409 (2004), as basis to allow amended claim to proceed)

TPS recognizes that it cannot meet the narrow requirements under the *Aspen Highlands/Trinko* exception. Instead, it seeks to proceed on a different, legally unsupported "refusal to supply" theory, citing a 70-year old Supreme Court case (*Lorain Journal Co. v. U.S.,* 342 U.S. 143 (1951)). ECF 204 at 41–42. The Court should reject TPS's moving target approach and grant summary judgment dismissing the latest iteration of TPS's "refusal to supply" claim.

TPS's Opposition quickly moves past any discussion of legal support for its "refusal to supply" theory, because it has none.[9] After citing *Lorain Journal*, TPS provides no explanation as to how that case supports TPS's claim here. As explained in the Motion (and unrebutted by TPS), the Tenth Circuit recently rejected *Lorain Journal* as sufficient to support a refusal to deal claim. ECF 193 at 43–44. The Tenth Circuit cited *Trinko* when explaining *Lorain Journal*, and the Circuit's explanation demonstrates *Lorain Journal* does not create a refusal to deal exception broader or different than the *Aspen Highlands/Trinko* exception, which TPS disavows. *See New Mexico Oncology*, 994 F.3d at 1174.

After clearly stating it is not relying on the *Aspen Highlands/Trinko* exception, (ECF 204 at 41), TPS's Opposition paraphrases that very exception as the supposed legal basis for its current "refusal to supply" theory, arguing: "JM had **preexisting, voluntary, and presumably profitable** relationships with its distributors, the profitability of which it threatened to forsake for no apparent

---

[9] <u>First</u>, TPS discusses the defense of "procompetitive benefits," which is irrelevant to whether the Court should grant summary judgment on elements TPS must prove. <u>Second</u>, TPS refers to *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 841–43 (10th Cir. 2016), which TPS admits involved a refusal to deal claim based on *Aspen Highlands/Trinko.* <u>Finally</u>, TPS briefly mentions *New Mexico Oncology & Hematology Consultants v. Presbyterian Healthcare Servs.*, 994 F.3d 1166 (10th Cir. 2021), without explaining how that case validates TPS's unsupported "refusal to supply" theory. ECF 204 at 50–51.

purpose . . . ." ECF 204 at 51 (emphasis added); *compare Chase Mfg., Inc.*, 2020 WL 1433504 at *11 (summarizing the *Trinko* exception "when there is a **preexisting voluntary and presumably profitable** course of dealing between the parties and the monopolist's discontinuation of the preexisting course of dealing") (emphasis added)). TPS also tries to argue that Johns Manville, the defendant, must identify cases that allow it to "halt sales to 'disloyal' customers." ECF 204 at 50. That argument cites the *Aspen Highlands/Trinko* exception for a preexisting relationship, but ignores the core antitrust principle that, as a general rule "businesses are free to choose whether or not to do business with others and free to assign what prices they hope to secure for their own products." *Chase Mfg.*, 2020 WL 1433504, at *11 (quotations omitted). The only exception is *Aspen Highlands/Trinko*, which TPS cannot meet and disavows. Thus, TPS has no legal support for its "refusal to supply" claim regardless of TPS's factual arguments.

> **b.    TPS Has No Evidence for Its Unsupported Theory That Johns Manville Effectively Held Its Calsil "Ransom From Customers."**

Skating past the Court's narrow authorization in March 2020 to pursue a claim based on the *Aspen Highlands/Trinko* exception, TPS compliments the Court for summarizing TPS's "refusal to supply" theory as meaning Johns Manville "effectively hold[s] its products ransom from customers." ECF 204 at 42. But TPS has no evidence of Johns Manville holding its insulation materials ransom from customers. At most, TPS has pointed to internal discussions of whether Johns Manville should stop supporting distributors who chose to stop purchasing products from Johns Manville. "Refusal" means "the act of refusing or denying," not mere internal discussions or even "threats." *Refusa*l, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/refusal. Similarly, the Court's "ransom" analogy means "to free from captivity or punishment by paying a price." *Ransom*, Merriam-Webster Online Dictionary,

https://www.merriam-webster.com/dictionary/ransom. TPS fails to point to any specific evidence indicating Johns Manville stopped supporting any distributor, period.

TPS's rambling seven-page list of grievances about six distributors (ECF 204 at 43–49), fails to identify evidence of unlawful conduct. Indeed, although Johns Manville is free to choose its business partners—and free to stop working with customers that fail to promote its products—TPS cannot even prove Johns Manville "refused to supply" or held its insulation materials "ransom" for the six distributors TPS identifies: 4-State Supply, APi Distribution, Distribution International (DI), Bay, SPI, and MacArthur. *See* SUF ¶¶ 5, 6, 7, 18, 19, 20, 21. TPS has no evidence of any actual "refusal" to sell by Johns Manville, and no evidence any distributor actually declined to buy from TPS based on such a nonexistent "refusal."

Instead, to try to keep this lawsuit alive for the continuing publicity and notoriety TPS seeks by being in litigation with Johns Manville, TPS continues to complain about supposed lost sales to distributors who have been buying calsil from TPS. Viewed in the light most favorable to TPS, its fact recitation reveals no admissible evidence of unlawful conduct:

- **4-State**: There is no relevant factual dispute about the 4-State Wichita warehouse. Johns Manville delivers the calsil 4-State orders for Wichita area customers to the 4-State Lenexa warehouse. *See* SUF ¶¶ 6, 18, 19. 4-State can purchase Johns Manville calsil. The fact that Johns Manville does not deliver calsil directly to 4-State's Wichita warehouse remains the core of TPS's "refusal to supply" theory. ECF 204 at 43–46. As demonstrated in the introduction to Section II.B.2 above, TPS's rhetoric about 4-State does not prove unlawful conduct. Not even 4-State buys into TPS's rhetoric. *See* SUF ¶ 19 (From 2018 to the present, 4-State has been able to purchase calsil from Johns Manville without interruption; Johns Manville's pricing compensates 4-State for the extra shipping cost to move material from Lenexa to Wichita). No reasonable jury could find harm to competition through evidence regarding 4-State's ability to order calsil for its Wichita warehouse.

- **APi Distribution**: For APi Distribution, TPS's rhetoric about a supposed "refusal to supply" or ransom collapses down to TPS's claim that "threats" were discussed. ECF 204 at 46–47. TPS cites Shong's self-serving testimony for TPS that "API really didn't buy anything" after the supposed threats (referring to TPS calsil). *Id.* But TPS decided not to take a deposition of

anyone from APi to talk about its purchase decisions. Shong cannot speak for APi, and his testimony does not prove Johns Manville refused to supply APi, which is the conduct TPS needs to prove for its "refusal to supply" theory. A threat is not equivalent to a "refusal" or a "ransom."

- **DI**: TPS argues that DI did not "want to get on JM's bad side" by "stocking TPS," selectively quotes from Hlavenka's (DI) testimony regarding a conversation with Shapiro (Johns Manville), and TPS debates an email that talks about how the partnership with DI could "potentially change." ECF 204 at 47. This is not evidence that would prove an unlawful "refusal to supply." In contrast, the same DI witness (Hlavenka) clearly stated that Johns Manville did not refuse to supply insulation materials to DI. SUF ¶¶ 5, 20. Warren-Boulton's data show DI has purchased a lot of calsil from both Johns Manville and TPS. ECF 177 at 88.

- **Bay**: TPS's supposed proof of a "refusal to supply" is nothing more than an internal Johns Manville email and TPS's speculation about what Bay supposedly "understood." ECF 204 at 47–48. This is not evidence that would prove an unlawful "refusal to supply."

- **SPI**: TPS relies here too on an internal Johns Manville email seeking to understand who is communicating with FBM/SPI. ECF 204 at 48. Again, this is not evidence that would prove an unlawful "refusal to supply."

- **MacArthur**: TPS again relies just on an internal Johns Manville email that asks whether MacArthur is purchasing TPS calsil. ECF 204 at 48. Once again, this is not evidence that would prove an unlawful "refusal to supply."

TPS appears to believe that when it started selling its imported calsil in 2018, Johns Manville was required to do nothing and say nothing to take note of that development. Not so. The antitrust laws are supposed to protect and foster competition, not squelch it. *See, e.g.*, *Trinko*, 540 U.S. at 407–08; *FTC v. Qualcomm Inc.*, 969 F.3d 976, 1005 (9th Cir. 2020).

The Court should grant summary judgment dismissing TPS's "refusal to supply" theory both as a matter of law and because TPS cannot present admissible evidence at trial showing any unlawful "refusal to supply."

    **3.**    **TPS Fails to Identify Unlawful Exclusive Dealing Arrangements, and Its Economist Did Not Document Substantial Foreclosure in a Properly Defined Market.**

Like tying, an antitrust claim for unlawful exclusive dealing requires proof of technical elements, including proof of actual *unlawful* exclusive dealing arrangements, and proof that such arrangements result in substantial foreclosure of participants' ability to compete in the relevant market (with competition foreclosed in a significant share of the market). ECF 193 at 46–47. As the Supreme Court recently explained in *American Express*: "Vertical restraints often pose no risk to competition unless the entity imposing them has market power, . . . . 138 S.Ct. at 2285 n. 7 (citing *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 898 (2007))

To prove substantial foreclosure of a relevant market, TPS must first define the relevant market under the Rule of Reason. Proof of these technical elements is critical to proving an antitrust violation because many types of exclusive arrangements (e.g., agreements between a manufacturer and distributors that provide discounts or encourage distributors to promote the manufacturers products) are lawful and procompetitive. ECF 193 at 46–47. TPS does not dispute these legal requirements.

TPS again invokes blurry analysis to justify its exclusive dealing claim because it cannot meet the required technical requirements.

<u>First</u>, TPS cannot prove any unlawful exclusive arrangement. TPS cites rebate agreements ("Annual Incentive Agreements") between Johns Manville and certain distributors, but admits such agreements do not include exclusivity provisions. *See* ECF 204 at 56 (arguing "express exclusivity" provision is not required). Those distributors remain free to purchase insulation materials from any manufacturer, and TPS presents no evidence that any of these distributors

agreed to buy any insulation materials exclusively from Johns Manville. Indeed, the undisputed evidence is that these distributors also purchase TPS's imported calsil, which disproves TPS's exclusivity argument. TPS also contends the evidence shows Johns Manville engaged in "significant coercive activity threatening to retaliate against its customers" if they bought TPS calsil. ECF 204 at 51–52. But TPS's supposed "threats" do not prove unlawful exclusive dealing arrangements (i.e., contracts or mutually agreed understandings).

<u>Second</u>, TPS cannot prove substantial foreclosure of competition in any properly defined relevant market. Warren-Boulton did not do the Rule of Reason analysis necessary to define some relevant market in which to measure substantial foreclosure—he contends (mistakenly) that such analysis is not necessary. SUF ¶ 24. As with tying, TPS's back-of-the-envelope "market *share*" calculations represent meaningless attempts to measure market power without a properly defined relevant market that combines different products or services into a single market that reflects commercial realities. *See, e.g.*, *Chase Mfg.*, 2022 WL 522345, at *6 (quoting *American Express*).

### a. TPS's Exclusive Dealing Claim Rests On Its Unproven Assumption That the Relevant Market Is Calsil-Only, Sold Nationwide.

TPS exclusive dealing argument rests on the foundational assumption that the relevant market here is limited to a calsil-only nationwide market. *See, e.g.,* ECF 204 at 52–56. If competition is occurring in the broader market for high-temperature insulation in a group of local and regional areas, then TPS's exclusive dealing claim collapses. As explained above in Section IV.A, Warren-Boulton's conclusions about supposed "direct evidence" do not suffice, as a matter of law, to prove that sales of calsil-only in a nationwide geographic market, constitutes a properly defined relevant market under the Rule of Reason factors the Court identified in its February 22, 2022 Order. That alone warrants granting summary judgment on TPS's exclusive dealing claim.

### b. TPS Cannot Show Johns Manville Rebate Agreements Constitute Unlawful Exclusive Arrangements.

TPS cites Johns Manville rebate agreements with DI, SPI, and Bay, to argue those agreements coerced distributors' purchase decisions because they "provided significant rebates for calsil" as well as other insulation materials. ECF 204 at 55–56. TPS contends that these agreements "locked in nearly 75% of all calsil sold in the distributor market." *Id.* at 56. But TPS's speculation misconstrues both the agreements and their effect. Based on the summary judgment record, TPS cannot prove at trial that the rebate agreements are unlawful. Instead, such agreements represent a normal, lawful way to provide a small discount to purchasers who buy in larger quantities.

#### i.   TPS misconstrues the written agreements.

TPS misreads the rebate agreements. Four of the agreements its relies on do not provide rebates for calsil or other *industrial* insulation products. *See* ECF 204-1 at 171 (JM00031378), 175 (JM0003138) ("Products Covered" includes commercial "Pipe insulation" products and makes no mention of calsil or other industrial insulation materials); ECF 204-1 at 3 (JM00000127) (same); ECF 204-1 at 185 (JM00058167) (same).[10]

#### ii.   The three rebate agreements that concern calsil are short-term agreements that provide only a small incentive if sales exceed the previous year's volume.

The terms of the incentive agreements with DI and SPI are structured on an annual basis

---

[10]   The DI agreements for 2018 and 2019, and the SPI (FBM) agreement for 2018, which provide rebates for industrial insulation materials, demonstrate that Johns Manville knows how to refer to calsil and other industrial insulation materials in rebate agreements. ECF 204-1 at 44–45 (JM0003856) (2018 FBM/SPI agreement: covering calsil ("Thermo-12-Gold") and other industrial materials of perlite and mineral wool); ECF 204-1 at 68–69 (JM00015905) (2018 DI agreement covering calsil ("Thermo-12 Gold") and other industrial materials of perlite and mineral wool); ECF 204-1 at 189–190 (JM00061014) (2019 DI agreement covering calsil and other industrial materials).

(i.e., they are not long-term agreements) with no corresponding commitment or obligation by the distributor to do anything. The agreements provide only a small percentage rebate under one of two structures:

- In the two agreements for 2018, the distributor receives a small percentage rebate if its calsil sales for the year reach a threshold of 85% of the previous year, with small additional rebates of 1% or 2% if annual sales exceed 100% or 103% of the previous year, and an extra 1% or 2% for further increases. *See* ECF 204-1 at 45–46 (JM00003856); ECF 204-1 at 69–70 (JM00015905). The rebate available for other insulation materials does not change if the calsil rebate thresholds are not met.

- In the remaining agreement for 2019, regardless of sales volume, the distributor automatically gets a small rebate (different percentage for different insulation materials). If the distributor's combined total purchases of calsil and expanded perlite exceed the prior year plus 6%, it receives an additional 1% rebate on those combined purchases. ECF 204-1 at 190 (JM00061014).

### iii. These agreements do not trigger antitrust concern under applicable cases.

The Tenth Circuit determines whether bundling or rebate agreements violate antitrust laws by analyzing whether the agreements result in prohibitively high switching costs for customers. In *Suture Express*, 851 F.3d at 1041–44, the Tenth Circuit examined antitrust claims challenging a seller's bundling of prices for medical products (sutures). The court analyzed the bundling as a purported "tying" claim, and after considering the market in detail, the court rejected the "bundling" theory. *Id.* at 1041. The Tenth Circuit noted how the district court concluded the challenged bundling packages "did not result in prohibitively high switching costs for customers, which could be indicative of market exclusion." *Id.* Based partly on this conclusion and additional analysis, it held a reasonable jury could not conclude the defendants possess market power sufficient to force the tie. *Id.* at 1044.

In a 2016 case that TPS does not cite, the Third Circuit analyzed *ZF Meritor*, *LePage's*, and *Dentsply*, three older Third Circuit cases that TPS does cite. In *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 399 (3d Cir. 2016), the court rejected an exclusive dealing claim concerning the sale of anticoagulant drugs that was similar to TPS's argument here. The Third Circuit disagreed with the plaintiff's arguments that agreements blocked competitor access and represented "payoffs" to customers, and instead held the challenged agreements just provided "discounts" to the customers that reflected its marketing of its products. *Id.* In evaluating the challenged agreements, the Third Circuit noted that the discount structure motivated customers to purchase more of the defendant's drug, but the customers "were not contractually obligated to do so." *Id.* at 400. It also noted that the contracts did not prohibit the customers from buying competing anticoagulant drugs (i.e., putting them in their formularies). *Id.* The Third Circuit rejected the plaintiff's argument (relying on *ZF Meritor, LePage's,* and *Dentsply*) that "customers lacked any meaningful ability to switch products." *Id.* at 406. It noted "the threat of a lost discount is a *far cry* from the anticompetitive conduct at issue in *ZF Meritor* or *Dentsply*." *Id.* at 407 (emphasis added). Based on its analysis of the agreements, the Third Circuit affirmed summary judgment in favor of the defendant based on the rule of reason analysis. *Id.* at 408.

Here, TPS points to the three cases the Third Circuit distinguished in *Eisai*, but the restrictive agreements challenged in those cases do not resemble the Johns Manville incentive agreements TPS challenges. In *Eisai*, the Third Circuit explained that in each of those cases "the defendant's anticompetitive conduct rendered [consumers'] choice [between products] meaningless." *Id.* at 404.

- *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc): In *LePage's* the plaintiffs challenged a multi-tiered bundled rebate structure which offered higher rebates when

customers purchased products from many of the defendant's product lines. *Eisai*, 821 F.3d at 405. That harmed a potential competitor who does not manufacture an equally diverse group of products and cannot make a comparable offer. *Id.*

- *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005): In *Dentsply*, a "dominant manufacturer" of prefabricated teeth hindered competition when it prohibited dealers from adding competing tooth lines to their product offerings and retained the ability to terminate the dealer relationships at will." *Eisai*, 821 F.3d at 404.

- *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012): In *ZF Meritor*, the Third Circuit "limited the reasoning of *LePage's*" to a bundled rebate program by a producer of multiple products "which conditions the rebate on purchases across multiple different product lines." *Eisai*, 821 F.3d at 405. In addition, in *ZF Meritor*, "compliance with the market penetration targets was mandatory" and failure to meet them would "jeopardize the customer's relationship with the manufacturer." *Id.* at 406 (internal quotations, citation, and alteration omitted).

Applying these legal principles to TPS's exclusive dealing claim, TPS has no reasonable basis to contend that DI and SPI were coerced to purchase Johns Manville calsil rather than TPS calsil based on the chance for an extra one or two percent rebate. TPS has been touting to the Court as supposed proof of monopoly pricing how TPS has been charging 25% less for calsil than Johns Manville. If that were true, no rational distributor that wants TPS calsil would pass up the chance to pay 25% less just to obtain an additional 1% or 2% rebate with a higher purchase volume for the year. There is nothing coercive about the structure of these incentive agreements. They are negotiated, last for only one calendar year, and require no commitment from distributors about what insulation materials they purchase or do not purchase from Johns Manville. *See* ECF 204-1 at 45–46 (JM00003856); ECF 204-1 at 69–70 (JM00015905); ECF 204-1 at 190 (JM00061014). These incentive agreements provide a small discount for volume sales—a lawful method for marketing products.

    **c.  The Documents TPS Presents to Show "Significant Coercive Activity" Do Not Prove Unlawful Exclusive Arrangements.**

To bootstrap its frivolous argument about Johns Manville's rebate agreements, TPS argues that its back-of-the-envelope calculations from counsel demonstrate substantial market foreclosure ECF 204 at 54–55. (Warren-Boulton failed to calculate the "substantial share of line of commerce affected" by the alleged market foreclosure. SUF ¶ 24.) TPS tries to also bootstrap Warren-Boulton's unsupported "direct evidence" conclusion that Johns Manville is a "monopolist" to argue that any exclusive dealing by a monopolist is unlawful. ECF 204 at 54–55.

TPS's supposed "calculation" of foreclosure, which is based only on percentages of calsil purchased by certain U.S. distributors, rests on the same faulty assumption that underlies all of TPS's arguments—that customers have no substitutes for calsil. TPS misleadingly contends the "industrial insulation market" is "highly concentrated" but bases that argument on TPS's calculations about distributors' purchases of *only calsil*, not "industrial insulation." ECF 204 at 54. TPS attributes 40% of its proposed calsil-only distributor purchases to DI, but Hlavenka (with DI) clearly identified the industrial insulation materials DI sees as "candidates for substitution" for calsil, including thin blanket, expanded perlite, and mineral wool. ECF 135-7 at 13 (JM *Daubert* Ex. #7a (Hlavenka Tr. at 51:4–11)). So TPS's discussion of DI's supposed "40% of the calsil market" represents a meaningless calculation that does not comport with the "commercial realities" that the customer, DI, perceives, and does not reflect the "area of effective competition" as the Supreme Court requires. *See Am. Express*, 138 S.Ct. at 2285. Without DI's large 40% number in TPS's manipulated product market that DI does not recognize, the calculation by TPS's counsel of supposed substantial market foreclosure in a calsil-only market falls apart.

TPS's only other proposed evidence of implied unlawful exclusive dealing agreements is its rhetoric misconstruing deposition testimony as proving "coercion." TPS selectively quotes Hlavenka's testimony as indicating DI needs Johns Manville as a supplier, arguing this proves coercion. ECF 204 at 56–57. Hlavenka confirmed Johns Manville would have been stupid to threaten not to sell fiberglass pipe insulation or expanded perlite to its largest distributor customer, DI, and the only instances of Johns Manville actually not selling DI calsil occurred in local markets where Johns Manville had existing commitments to distributors. ECF 193-7 at 14–15, 17 (Hlavenka Tr. at 85:25–86:8 (expanded perlite), 91:4–9 (fiberglass pipe insulation), 92:4–16 (calsil); *see also* ECF 137 at 10–11 (calsil)). Hlavenka agreed that if DI had stopped purchasing calsil from Johns Manville, it would have been proper for Johns Manville to work with an additional Gulf Coast distributor to sell the calsil DI was no longer purchasing. ECF 204-11 at 26–27 (Hlavenka Tr. at 80:3–81:4).[11] TPS tries to twist that statement into proof of unlawful exclusive dealing (ECF 204 at 57), but TPS's construction is unreasonable. A manufacturer is free to choose which distributors to deal with, *see, e.g., Chase Mfg.*, 2020 WL 1433504 at *11 ("[B]usiness are free to choose whether or not to do business with others."), so of course Johns Manville was free to turn to a DI competitor if DI stopped purchasing. But the discussion is all speculation—it never happened, and DI has been purchasing calsil from both Johns Manville and TPS.

TPS's last gasp for supposed proof of unlawful exclusive dealing is speculation about two documents: (1) an inadmissible, unautheticated hearsay document purporting to recount

---

[11]   The TPS exhibit with this Hlavenka deposition excerpt omits the full text of the question and answer to Mr. Hlavenka on pp. 80:25-81:4.  Rather than submit another exhibit page, the full text of the omitted question and answer is: "Q. "Isn't that just competition, though, that if they're not selling as much calcium silicate through DI, they might turn to another distributor to sell their material?  A. That's totally correct.".

information from Mark Duppler of Bay, and (2) TPS's speculation about comments where Johns Manville took note that Bay received TPS calsil samples. ECF 204 at 57. The Court should disregard TPS's reliance on inadmissible hearsay from Bay. TPS had two years to take a deposition of Duppler and did not. Missing from TPS's argument is any proof the alleged threat to Bay worked and actually created an implied exclusive dealing agreement. The cited hearsay document says just the opposite: that Bay would be looking to TPS for support. ECF 204-3 at 2–3. TPS's sales records show Bay purchased substantial volumes of TPS calsil. *See* ECF 89 (filed Oct. 9, 2020) (Chart summarizing TPS sales along with TPS-10 sales spreadsheet, filed as Ex. D-Restricted).

### d. Warren-Boulton Did Not Document Substantial Foreclosure for TPS in a Properly Defined Relevant Market.

Warren-Boulton's Report did not calculate any estimate of the actual foreclosure to TPS in some properly defined relevant market. SUF ¶ 24. Instead, Warren-Boulton just assumed that Johns Manville customers need to purchase the materials it sells so he assumes TPS is foreclosed. *See* ECF 177 at 19 (arguing no need to define a relevant market for exclusive dealing). TPS's lack of expert testimony on this core issue requires dismissing its exclusive dealing claim. The calculations in TPS's brief of purported market share in an assumed calsil-only product market do not suffice to prove this essential element.

### 4. TPS Lacks Evidence to Prove Trade Disparagement to Support Its Monopolization Claim

In its Opposition, TPS's trade disparagement arguments boil down to assertions that Johns Manville should not have competed against TPS when it began selling calsil. TPS argues that Johns Manville unlawfully "disparaged" it by comparing the products its sold to TPS's product, urging confirmation that any imported product meets U.S. and job-specific standards and

specifications, and noting downsides associated with purchasing calsil that has to be shipped from China from a new seller (TPS). TPS's arguments turn antitrust law on its head, by seeking to stamp out aggressive competition. *See FTC v. Qualcomm Inc.*, 969 F.3d 976, 1005 (9th Cir. 2020) ("Hypercompetitive behavior is not [illegal under federal antitrust law]. Qualcomm has exercised market dominance . . . for many years . . . . The company has asserted its economic muscle 'with vigor, imagination, devotion, and ingenuity.' . . It has also 'acted with sharp elbows—as businesses often do.' . . . Our job is not to condone or punish Qualcomm for its success[.]").

TPS's Opposition correctly notes that trade disparagement "'rarely interferes with competition enough to violate the antitrust laws.'" ECF 204 at 58 (quoting *W. Penn. Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 n.14 (3d Cir. 2010)). The Tenth Circuit, in fact, has held that defendants' allegedly "deceptive actions—usually aimed at third parties in the marketplace" can give rise to antitrust liability when the deceptive acts are "so widespread and longstanding and practically incapable of refutation that they are capable of injuring both consumers and competitors." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1079–80 (10th Cir. 2013). TPS fails to meet this high-standard.

Courts presume that allegedly deceptive statements "bear[] only a *de minimis* effect on competition" unless a plaintiff can satisfy a six-factor test showing that the disparagement was "(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1127 (10th Cir. 2014). In the Motion, Johns Manville pointed out

that TPS lacks admissible evidence to establish that any disparaging remarks were even made *and*, even if it had such evidence, cannot overcome the *de minimis* presumption. ECF 193 at 49.[12]

To go to trial on its trade disparagement claim, TPS must point to evidence showing a "clearly false" statement was made. Unlike the Lanham Act, trade disparagement requires more than potentially ambiguous or even misleading representations—the challenged statement must be "clearly false." *See, e.g.*, *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 507 F. Supp. 3d 1289, 1361 (D. Kan. 2020) (requiring clear falsity, not just an inference of falsity, and holding "the summary judgment record doesn't present a jury question whether the statements . . . were 'clearly false'"). The documents TPS cites to support its trade disparagement allegations do not raise a genuine dispute about whether a "clearly false" statement was made:

- **ECF 204-1 at 73–75 (JM00017011).** TPS argues that Johns Manville's "Sales Talking Points" "lead customers to believe that TPS's calsil, because it was manufactured in China, would not pass 'safety and performance standards and would not meet ASTM specifications." ECF 204 at 59. But the "Sales Talking Points" do not contain any "clearly false" statement regarding TPS or its calsil. The fact that TPS's product is manufactured in China is true, and it is also true that importing products from China can have consequences in terms of long lead times and government decisions affecting cost and supply such as tariffs and sanctions. The talking points do not state TPS's product does not meet safety standards, but encouraged customers to ensure all products meet the appropriate U.S. specifications and standards.

---

[12] In opposing summary judgment dismissing TPS's trade disparagement claims as a type of exclusionary conduct, TPS cites *Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244, 1249 (D. Utah 1999). ECF 204 at 58. But in *Caldera* the plaintiff did not assert product disparagement as a separate basis to support its monopolization claim. *See id.* ("Caldera "has not alleged libel or business disparagement"; "Caldera has not alleged a separate product disparagement claim.") Therefore, the Utah court's decision not to grant summary judgment for Microsoft based on alleged false statements to computer makers does not support TPS's remaining disparagement argument here. The Court should follow the Tenth Circuit's *Lenox* factors for trade disparagement to hold that TPS lacks the evidence of false statement it needs to prove trade disparagement to support its monopolization claim. *See Chase Mfg.*, 2020 WL 1433504, at *12.

- **ECF 204-1 at 58 (JM00011680).** An email about whether the talking points were to be handed out or just available does not raise a dispute about whether a "clearly false" statement was made.

- **ECF 204-1 at 60–62 (JM00011700).** An email about marketing Johns Manville strengths versus TPS's weaknesses does not raise a dispute about whether a "clearly false" statement was made.

- **ECF 204-11 at 21 (Hlavenka Tr. at 41:9–24).** Testimony from a representative from DI that Hal Shapiro told him to "be careful with Chinese calsil because the amount of free silica . . . could be a huge issue" does not demonstrate a "clearly false" statement regarding TPS calsil was made. Hlavenka went on to state that Shapiro explained, when Johns Manville worked with the Chinese factory, it shipped "all the raw materials form the U.S. . . . to make sure . . . it was meeting all standards" but it could not confirm whether TPS was doing that now. SUF ¶ 16.

- **ECF 204-1 at 77-80 (JM00018081).** An email (containing inadmissible hearsay) to DI that mentions potential issues with selling TPS's calsil imported from China does not raise a dispute about whether a "clearly false" statement was made.

- **ECF 204-1 at 146 (JM00030937).** An undated and unauthenticated presentation that does not mention anything about TPS or its calsil does not raise a dispute about whether a "clearly false" statement was made to any customer.

TPS argues that Chad Meyer of Johns Manville testified that that he "suggest[ed]" TPS's calsil might contain asbestos to Joe Guest at 4-State Supply. But Meyer's testimony does not raise a genuine dispute about whether a "clearly false" statement was made:

> **[TPS's Counsel]:** Q. Did you ask Mr. Guest why he would want to risk buying a product that may not meet the specifications?
> **[Meyer]:** A. I may have.
> **Q.** Did you say to him that TPS calsil may not meet specifications?
> **A.** I did not.
> **Q.** Did you imply that TPS calsil may not meet specifications?
> **A.** I did not.
> **Q.** What was the purpose of asking Mr. Guest why he would want to buy a product that may not meet the specifications?
> **A.** We had seen on a project in Ohio some calsil that came in with some equipment from China and some racks where the product did not meet the ASTM specification, and the contractors had a very hard time installing the product and elected, at that point, not to use the product. So my comment to Joe was to make sure that any product that you buy meets the ASTM specifications.

**Q.** All right. Did – you said that Mr. Guest knew that . . . TPS calsil was imported from China. Did you suggest to him that any calsil imported from China might include asbestos?

**A.** I relayed a story that had been circulated around the industry that in the past there was a sample of calsil that came in from China that may have contained trace amounts of asbestos.

**Q.** What was the purpose of telling that story?

**A.** The purpose of telling that story was the same purpose of advising him to make sure that the product meets the ASTM specifications and that was just know what you're buying and make sure that it meets all of the U.S. specifications.

ECF 204-6 at 9–11 (Meyer Tr. 133:19–135:11). Joe Guest's testimony establishes that TPS cannot

raise a genuine dispute of material fact on this point:

> **[TPS's Counsel]:** Q. Did Mr. Meyer make any comments about TPS's products?
> **[Guest]:** A. No.
> **Q.** So he didn't suggest the quality of TPS's calsil was inferior?
> **A.** No.
> **Q.** Did he suggest that TPS calsil may contain asbestos?
> **A.** He did not, no.

SUF ¶ 11 (ECF 194-2 at 17 (Guest Tr. 44:11–19)).

TPS also fails to raise genuine issues of material fact with respect to the other *Lenox* factors.

TPS fails to point to "specific facts" giving rise to a genuine dispute regarding the third

*Lenox* factor, whether any "clearly false" statement was "clearly likely to induce reasonable

reliance." *Lenox*, 762 F.3d at 1127. TPS cites testimony from Hlavenka that "quality, price,

availability, [and] meeting a particular spec" are "probably the key factors" for *DI's customers*

when purchasing industrial insulation. ECF 204-11 at 11 (Hlavenka Tr. at 31:1–7). This testimony

says nothing about the "key factors" for DI when it was deciding what materials to carry. TPS also

ignores the testimony from Hlavenka that indicated he put little stock in Johns Manville's

statements regarding Chinese calsil. *See* SUF ¶ 16. The Court should disregard TPS's unsupported

conclusion that this factor is satisfied because "using products that may contain asbestos would

have been a non-starter." ECF 204 at 62. Similarly, testimony from Johns Manville's Rule 30(b)(6) witness regarding the education Johns Manville provides to market participants says nothing about whether the alleged false statements were "clearly likely to induce reasonable reliance."

TPS fails to point to any specific evidence showing a genuine and material dispute regarding the fourth *Lenox* factor, whether the alleged "clearly false" statements were "made to buyers without knowledge of the subject matter." *Lenox*, 762 F.3d at 1127. Nor could it. TPS argues the alleged false statements were made to experienced distributors, who—as the undisputed facts show—were provided with TPS's data sheet indicating it met ASTM specifications and did not contain asbestos. SUF ¶ 14. And while TPS makes a futile attempt to argue that the alleged "clearly false" statements "persisted for months, if not years" (ECF 204 at 62, it fails to point to specific facts supporting its argument. Instead, TPS points to an email discussing drafts of Johns Manville's sales talking points (ECF 204-1 at 192–94, from March 2018), and an undated PowerPoint presentation that fails to mention TPS at all (ECF 204-1 at 88–127). Johns Manville's talking points do not contain a "clearly false" statement regarding TPS, and fail to plausibly indicate any "clearly false" statement was made to any calsil customer. The PowerPoint presentation is not dated, and TPS fails to provide an evidentiary foundation to show when and if it was even used.

Finally, TPS cannot point to a factual dispute regarding the sixth *Lenox* factor, whether the allegedly deceptive statements were "not readily susceptible to neutralization or other offset by rivals." *Lenox*, 762 F.3d at 1127. Indeed, it is undisputed that TPS conducted independent testing of TPSX-12 to assess its asbestos content and compliance with ASTM standards and prepared data sheets with the testing results to distribute to customers to proactively confirm the lack of asbestos,

which it did in fact distribute to customers and prospective customers. SUF ¶¶ 13, 14, 16. TPS points to no specific facts on this point and instead weakly argues that "disparaging statements are not readily susceptible if they are hidden from TPS," admitting that "while [it] may have succeeded in some cases in neutralizing disparaging statements, it was only able to do so when comments were affirmatively brought to [its] attention." ECF 204 at 62. This argument ignores both the facts and the law. TPS fails to point to any "specific facts" from which one could plausibly infer that Johns Manville made disparaging comments at all, much less made statements that TPS was unable to neutralize. SUF ¶ 14, 16. Moreover, "[t]he final *Lenox* factor doesn't require a showing that plaintiff succeeded in its effort to neutralize the alleged false statements—it just requires a showing that the statements aren't 'readily susceptible to neutralization or other offset.'" *In re EpiPen*, 507 F. Supp. 3d at 1362 (quoting *Lenox*, 762 F.3d at 1127); *see also Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 372 (6th Cir. 2003) (affirming summary judgment because "the record clearly establishes that any negative effects of the statements could be cured with relative ease by plaintiff" and plaintiff "clearly did so in a number of instances"); *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace*, 108 F.3d 1147, 1152 (9th Cir. 1997) (affirming judgment where plaintiff "presented little evidence" that defendant's "false advertising was not readily susceptible to neutralization or other offset by" plaintiff).

## D.     TPS Fails to Raise a Genuine Dispute Regarding Antitrust Injury.

To survive summary judgment, TPS must also come forward with facts showing a genuine issue of long-term harm to competition, not just harm to TPS's business. *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1280–81 (10th Cir. 2012). TPS argues that it has "evidence of harm to competition in the form of: (1) supracompetitive prices for calsil; (2) reduced market output; (3)

reduced innovation and the use of JM's inferior product; and (4) reduced consumer choice in calsil products." *I*ECF 204 at 69.

**Price.** TPS's Opposition relies entirely on Warren-Boulton's circular assumptions that drive his conclusion that Johns Manville's current calsil prices (roughly 25% above the price TPS has been charging) proves harm to competition. ECF 204 at 70–72. In essence, TPS argues it can prove harm to competition because Warren-Boulton assumes current calsil prices are not competitive. But it is well-established that "setting a high price is not in itself anticompetitive." *In re EpiPen*, 507 F. Supp. 3d at 1364 (internal quotation marks and alterations omitted). And Warren-Boulton's conclusory and unsupported assumptions regarding "supracompetitive" calsil prices do not create triable issues regarding competitive harm.

As the Court recognized, in making the "foundational determination" that Johns Manville sells "calsil at a supracompetitive price," Warren-Boulton "seems to assume that Plaintiff's calsil price is the proper benchmark competitive price." *Chase Mfg.*, 2022 WL 522345, at *11; *see also* ECF 204 at 71 (citing Hlavenka testimony that TPS's product was "roughly 20 percent cheaper" as evidence of a "supracompetitive" price). Warren-Boulton's circular analysis of "supracompetitive" pricing fails to "undertake a comprehensive data analysis to establish or confirm all [Warren-Boulton's] various assumptions or stated opinions" and "does little to control for other possible causes for Defendant's selling price and profit margins and thereby exclude legitimate, non-competitive reasons for the existing market structure." *Chase Mfg.*, 2022 WL 522345 at *11. No reasonable jury, relying on Warren-Boulton's unsupported conclusions, could conclude that the *challenged conduct* increased *calsil prices* to supracompetitive levels.

**Output and Quality.** TPS bootstraps Warren-Boulton's assumption that current prices are not competitive to argue output and innovation must be harmed by supposedly excessive prices. TPS summarily argues that "Warren-Boulton shows that JM's anticompetitive conduct reduced output and stifled innovation by suppressing TPS's ability to bring its calsil to a substantial portion of the market." ECF 204 at 70–71 (citing ECF 152-1 at 8 n.17 and Figures 18, 21-22). But the cited parts of Warren-Boulton's report do not discuss calsil output or quality (which are not subjects on which an economist would have expertise), much less support TPS's argument that Johns Manville's alleged anticompetitive conduct reduced calsil output or quality. *See* ECF 177- at 12 n.17 and Figures 18, 21–22. Footnote 17 merely provides the equation for the Warren-Boulton's "profit-maximining price," while Figure 18 provides Warren-Boulton's depiction of market share in the actual and hypothetical but-for world, and neither states anything about calsil output overall. Figures 21 and 22 show historic and predicted future sales volumes of calsil in the actual and but-for worlds. Both figures show a steady decline in total output of calsil, which contradicts TPS's argument. No reasonable jury could conclude from this "evidence" that Johns Manville's alleged anticompetitive conduct restricted overall calsil output or prevented customers from accessing higher quality calsil.

**Consumer Choice.** Finally, TPS argues that Johns Manville's conduct deprived consumers of choice. TPS fails to cite to any evidence (let alone admissible evidence) in support of this argument. And, in fact, the summary judgment record establishes that distributors or contractors that wanted to purchase calsil from TPS did so, with no adverse consequences from Johns Manville. SUF ¶¶ 1, 2, 3, 5, 7, 16, 19, 20, 21; *see also In re EpiPen*, 507 F. Supp. 3d at 1365–66.

**Lack of Causal Connection and Long Term Impact.** TPS makes no effort to point to any evidence showing the required "direct causal connection" between Johns Manville's alleged violations of the antitrust laws and harm to competition. *See, e.g.*, *Suture Express*, 851 F.3d at 1044–45 (rejecting plaintiff's but for argument as the "crux of the antitrust harm injury" because that inquiry ignored economic realities that some unconstrained customers chose to purchase from the defendant).

TPS attempts to marginalize precedent requiring anticompetitive conduct that violates the Sherman Act to have "more than a temporary effect on the market." *JetAway Aviation, LLC v. Board of County Comm.*, 2012 WL 1044304 (D. Colo. Mar. 28, 2012) (Matsch, J.) at *4, 6 (granting summary judgment dismissing monopolization claim), *aff'd in part, appeal dismissed in part*, 754 F.3d at 825–26 (per curiam). While TPS can distinguish *JetAway* on the facts—Johns Manville never argued the facts were similar—it cannot avoid the underlying precedent. As the Tenth Circuit explained:

> In divining the presence of an antitrust injury, courts have disregarded temporary anticompetitive effects. . . . This is because the Sherman Act is concerned only with conduct that has long-run anti-competitive effects. . . . Were temporary effects on competition sufficient, an "ordinary business tort" and an antitrust violation would often be indistinguishable. . . . In sum, if the effect on competition is not more than temporary or "transitory," it is of no concern to the antitrust laws.

*JetAway Aviation*, 754 F.3d at 841–42 (Holmes, J. concurring) (internal quotation marks and citations omitted). TPS, once again, points only to Warren-Boulton's analysis to argue that Johns Manville's alleged "supracompetitive prices, reduced output, and reduced innovation lasted for years." ECF 204 at 72 (citing ECF 152-1 at 8 n.17, Figures 1–4, and Tables 3–4). But, again, Warren-Boulton fails to opine at all about reduced output and innovation. And while he argues that Johns Manville's prices were too high, his analysis relies on improper benchmarks (i.e. TPS's

price for a new and imported product), fails to consider market-realities for other products used as benchmarks, and selectively picks non-U.S. benchmarks despite the lack of non-U.S. discovery and in total disregard for market-realities for those markets.

On this record, no reasonable jury could determine that TPS can establish a long-term injury to competition—not merely TPS—of the type the antitrust laws were intended to prevent.

## V.      CONCLUSION

A trial is not warranted on TPS's claims. The Court should dismiss the withdrawn Lanham Act claim, and grant summary judgment on the remaining claims for tying and monopolization.

Dated: March 8, 2022

Respectfully submitted,

*s/ Gregory J. Kerwin*
Gregory J. Kerwin
Ryan Bergsieker
Allison Kostecka
Lydia Lulkin
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone:    303.298.5700
Email: GKerwin@gibsondunn.com
RBergsieker@gibsondunn.com
AKostecka@gibsondunn.com
LLulkin@gibsondunn.com

*Attorneys for Defendant Johns Manville Corporation*

66

**<u>Defendant's Exhibits</u>**

5.     **<u>Two Charts</u>** filed as **Restricted Level 1**: addressing details of Confidential/Attorney's Eyes documents TPS cited in the tables in its response to the Statement of Undisputed Facts (ECF 204 at 12-38):

     A.     Chart with a brief response to TPS's assertions about each document/deposition excerpt in TPS's tables

     B.     Chart with a detailed response to TPS's indiscriminate attempt to flood the record to create the illusion of a relevant disputed fact (addressing TPS response for each separate Undisputed Fact).

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2022, I electronically filed JOHNS MANVILLE'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT DISMISSING ALL PLAINTIFF'S CLAIMS (ECF 193) with the Clerk of Court using the CM/ECF system. A copy of this document was served on the following counsel of record for Plaintiff through the Court's ECF system:

Alexandra H. Shear
Jarod M. Bona
Luke Hasskamp
Bona Law PC
375 Park Avenue, Suite 2607
New York, NY 10152
Emails: alex.shear@bonalawpc.com
jarod.bona@bonalawpc.com
luke.hasskamp@bonalawpc.com

Geoffrey N. Blue
Gessler Blue LLC
7350 E. Progress Pl., Suite 100
Greenwood Village, CO 80111
gblue@gesslerblue.com

_s/ Donna Luca_
Donna Luca