### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:19-cv-00872-MEH**

CHASE MANUFACTURING, INC., d/b/a
THERMAL PIPE SHIELDS,

<em>Plaintiff,</em>

v.

JOHNS MANVILLE CORPORATION,

<em>Defendant.</em>

---

### PLAINTIFF'S SUR-REPLY IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

.

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

RULE OF REASON FRAMEWORK ............................................................................ 4

ARGUMENT ................................................................................................................. 8

I.     JM'S LATE MARKET DEFINITION ARGUMENT CONLIFCTS WITH PRIOR RULINGS AND CONTRADICTS MARKET REALITIES ......................................... 8

     A.    TPS Has Raised Genuine Factual Disputes on All Topics on Which Dr. Warren-Boulton Opines .................................................................................................... 8

     B.    As the Court Previously Ruled, the Relevant Market to Be Tried Is Calsil Sold by Manufacturers to Their Direct Customers in the United States ............................ 10

     C.    Dr. Warren-Boulton Analyzed and Properly Identified the Correct Relevant Antitrust Market ................................................................................................. 21

II.    MARKET DEFINITION IS THE BEGINNING OF ANTITRUST ANALYSIS AND IS INCORPORATED INTO MANY ELEMENTS OF MANY ANTITRUST CLAIMS ............................................................................................................................... 36

     A.    Relevant Market Definition Is Incorporated into Both of TPS's Claims ............. 36

          1.     Monopolization ........................................................................................... 36

              a)  Monopoly power in the relevant market........................................37

              b)  Harm to competition.......................................................................39

          2.     Tying......................................................................................................... 39

              a)  Two distinct products......................................................................40

              b)  Market power in the markets for the tying products........................41

               c)  A not insubstantial amount of commerce is affected.......................42

III.   THE FACTUAL EVIDENCE OF JM'S EXCLUSIONARY CONDUCT IS OVERWHELMING ................................................................................................. 42

     A.    Refusal to Supply ................................................................................................. 43

     B.    Requiring Exclusivity—Whether Explicitly or Implicitly—that Substantially Foreclosed TPS from the Calsil Market............................................................... 45

     C.    JM's Disparagement of TPS and Its Product ...................................................... 46

     D.    JM Conditioned the Sale of Its Other Products to the Sale of JM Calsil.............. 47

IV.   JM PROVIDES NO OTHER REASON THIS CASE SHOULD NOT GO TO TRIAL ............................................................................................................................... 50

V.    ADDITIONAL EVIDENCE PAINTS A PICTURE JM'S CUSTOMERS' FEAR ...... 54

VI.      JM'S PROCEDURAL COMPLAINTS ARE WITHOUT MERIT ............................. 57

CONCLUSION ................................................................................................................. 62

## **TABLE OF AUTHORITIES**

*Alfonso v. SSC Pueblo Belmont Operating Co.,* No. 11-cv-01186-PAB-KLM,
  2012 U.S. Dist. LEXIS 95641 (D. Colo. July 11, 2012) ..........................................................62

*Allen v. Term Commodities, Inc. (In re Term Commodities Cotton Futures Litig.),*
  No. 12-CV-5126 (ALC), 2020 U.S. Dist. LEXIS 181704 (S.D.N.Y. Sep. 30,
  2020) ...........................................................................................................................................9

*Auraria Student Hous. v. Campus Vill. Apts.,*
  843 F.3d 1225 (10th Cir. 2016) ...................................................................................................3

*Bell v. Fur Breeders Agric. Co-op.,*
  348 F.3d 1224 (10th Cir. 2003) ........................................................................................ 53, 54

*Brooke Grp. v. Brown & Williamson Tobacco Corp.,*
  509 U.S. 209 (1993)....................................................................................................................29

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962)...............................................................................................................23, 38

*Chi. Bd. of Trade v. United States,*
  246 U.S. 231 (1918)......................................................................................................................5

*Dauro Advert., Inc. v. GMC,*
  75 F. Supp. 2d 1165 (D. Colo. 1999).........................................................................................50

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992).........................................................................................................41, 49, 50

*EEOC v. Columbine Health Sys.,*
  No. 15-cv-01597-MSK-CBS, 2017 U.S. Dist. LEXIS 152986 (D. Colo. Sept.
  19, 2017) ......................................................................................................................................9

*Emerson Elec. Co. v. Holmes,*
  No. 16-cv-1390 (PKC) (SIL), 2019 U.S. Dist. LEXIS 100957 (E.D.N.Y. June
  14, 2019) ...................................................................................................................................8, 9

*Epic Games, Inc. v. Apple, Inc.,*
   No. 4:20-cv-05640-YGR, 2021 U.S. Dist. LEXIS 172303 (N.D. Cal. Sept.
  10, 2021) ........................................................................................................................6, 19, 28

*Flannery v. Boxer F2, L.P.,*
  No. 20-cv-00099-DDD-STV, 2022 U.S. Dist. LEXIS 33973 (D. Colo. Jan. 27,
  2022) ...........................................................................................................................................58

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
    394 U.S. 495 (1969)................................................................................................41

*In re Fosamax Prods. Liab. Litig.*,
    No. 1:06-md-1789 (JFK), 2009 U.S. Dist. LEXIS 82136 (S.D.N.Y. Sept. 8,
    2009) ........................................................................................................................8, 9

*Gonzales v. Sun Life Ins. Co. (In re Furr's Supermarkets, Inc.)*,
    485 B.R. 672 (Bankr. D.N.M. 2012) ....................................................................60

*Hamblin v. British Airways PLC*,
    No. 09-cv-3077, 2010 U.S. Dist. LEXIS 153924 (E.D.N.Y. Aug. 12, 2010) ..........9

*Hous. Cas. Co. v. Swinerton Builders*,
    No. 20-cv-03558-NYW, 2022 U.S. Dist. LEXIS 30870 (D. Colo. Feb. 22,
    2022) ......................................................................................................................62

*Int'l Wood Processors v. Power Dry, Inc.*,
    792 F.2d 416 (4th Cir. 1986) ...........................................................................13, 24

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984).........................................................................................40, 41, 50

*In re Joint E. & S. Dist Asbestos Litig.*,
    52 F.3d 1124 (2d Cir. 1995)....................................................................................9

*Karara v. U.S. Dep't of Educ.*,
    No. 08-cv-00614-MEH-KMT, 2008 U.S. Dist. LEXIS 117921 (D. Colo. Oct.
    14, 2008) .................................................................................................................61

*Katt v. City of N.Y.*,
    151 F. Supp. 2d 313 (S.D.N.Y. 2001)......................................................................9

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
    762 F.3d 1114 (10th Cir. 2014) ...........................................................................36

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951)......................................................................................50, 51, 52

*Lucas v. Office of the Colorado State Public Defender*,
    No. 15-cv-00713-CBS, 2016 U.S. Dist. LEXIS 193956 (D. Colo. Aug. 25,
    2016) ..................................................................................................................60, 61

*MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*,
    No. 05-cv-01948-RPM-KLM, 2008 U.S. Dist. LEXIS 33397 (D. Colo. Apr.
    23, 2008) .................................................................................................................10

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) .............................................................................52

*Melvin v. Cnty. of Westchester*,
  No. 14-CV-2995 (KMK), 2019 U.S. Dist. LEXIS 42772 (S.D.N.Y. Mar. 15,
  2019) .....................................................................................................................8

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
  311 F. Supp. 2d 1048 (D. Colo. 2004) ............................................................14, 22

*Novell, Inc. v. Microsoft, Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ........................................................13, 43, 53, 54

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ................................................................................ *passim*

*Realtime Data, LLC v. Stanley*,
  897 F. Supp. 2d 146 (S.D.N.Y. 2012)....................................................................9

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 4306 (3d Cir. 1997)...............................................................................16

*Stout v. Long*,
  No. 15-379 WPJ, 2018 U.S. Dist. LEXIS 42756 (W.D. Okla. Mar. 14, 2018)......................59

*Strepka v. Jonsgaard*,
  No. 10-cv-00320-PAB-KMT, 2011 U.S. Dist. LEXIS 77516 (D. Colo. July
  18, 2011) .........................................................................................................61, 62

*Suture Express, Inc. v. Owens Minor Distrib., Inc.*,
  851 F.3d 1029 (10th Cir. 2017) ........................................................................39, 52

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961).........................................................................................50, 51

*Telecor Commc'ns v. Sw. Bell Tel. Co.*,
  305 F.3d 1124 (10th Cir. 2002) ...................................................................11, 32, 35

*Thomas v. Int'l Bus. Mach.*,
  48 F.3d 478 (10th Cir. 1995) .................................................................................62

*Times-Picayune Publ'g Co. v. United States*,
  345 U.S. 594 (1953).............................................................................................23

*Tumbling v. Merced Irrigation District*,
   No. CV F 08-1801 LJO DLB, 2010 U.S. Dist. LEXIS 101404 (E.D. Cal. Sept.
   27, 2010). ..................................................................................................................58

*United States v. Bohle*,
   475 F.2d 872 (2d Cir. 1973)......................................................................................9

*United States v. Dentsply*, *Int'l Inc.*,
   399 F.3d 181 (3d Cir. 2005).............................................................................20, 21

*United States v. E. I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956).......................................................................... *passim*

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966)..........................................................................20, 36, 43

*United States v. Harrell*,
   642 F.3d 907 (10th Cir. 2011) .................................................................................57

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)..........................................................................23, 25, 28

*Valdez v. Ward*,
   219 F.3d 1222 (11th Cir. 2000) ................................................................................9

*In re Zetia Ezetimibe Antitrust Litig.*,
   No. 2:18md2836, 2022 U.S. Dist. LEXIS 35784 (E.D. Va. Feb. 24, 2022)................... *passim*

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)......................................................................................51

## Statutes and Rules

15 U.S.C. § 1 ...................................................................................................2, 18, 41

Fed. R. Civ. P. 37...........................................................................................................57

Fed. R. Civ. P. 26...........................................................................................................58

## Other Authorities

10A Wright & Miller et al., *Federal Practice & Procedure* § 2722 (4th ed. 2021).....................62

Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of
   Antitrust Principles and their Application* (4th and 5th eds. 2015–2021)...................... *passim*

Model Jury Instructions in Civil Antitrust Cases (Am. Bar Ass'n 2016) ............................ *passim*

Richard A. Posner, Antitrust Law (2d ed. 2001) ........................................................................25

# INTRODUCTION

Since Thermal Pipe Shields ("TPS") first filed this suit in March 2019, Johns Manville ("JM") has been terrified of what a jury will do when TPS presents its evidence of JM's wrongdoing. In three years, JM has filed no fewer than seven motions seeking to preclude TPS from obtaining or introducing evidence. *See* ECF 21, 23, 76, 102, 135, 176, 193. Yet the Court has made clear that TPS has a right to try its case "on the full record." ECF 205 at 26. Aware of what that record will enable TPS to prove, JM moved for summary judgment by seeking to have the Court hold that small, cherrypicked snippets of the record provide insufficient factual support for TPS's case. But, upon reading TPS's opposition, JM finally confronted a significant body of factual evidence collected in one document. Then, JM knew what would happen when a jury is presented with the whole record. It would hear JM's threat that ███████████████████ and it would hear a distributor's subsequent testimony that "[W]e learned that we were no longer able to purchase Calsil in Wichita." And then the jury would find that JM engaged in the conduct alleged and deliver a verdict in favor or TPS. *See* ECF 204-1 at 85; ECF 204-10 at 40:11–16.

As a result, JM switched course mid-stream. In its reply brief, rather than pursuing its strained arguments that TPS lacks factual evidence of its wrongdoing, JM instead decided to seek re-argument of the Court's two most significant rulings against it: denying partial summary judgment and admitting TPS's expert's testimony in full. Not only is JM's summary judgment reply brief an improper vehicle to do this, but JM's tactic also undercuts its quest for summary judgment. JM's desperate attempt to define the relevant product market at this juncture ***raises*** a question of fact, when JM's task on summary judgment is to demonstrate that none exists.

To prove its case to the jury, TPS must do two things: present economic evidence about

market definition and market power and present factual evidence about JM's unlawful conduct. To prevail on this motion for summary judgment, TPS's two tasks are to raise a genuine dispute of material fact in each of these two areas, encompassing all elements of its two antitrust claims. JM's reply brief alone is sufficient to accomplish the first task. But TPS had already done so. In allowing all the opinions in the report of Dr. Frederick R. Warren-Boulton to be presented to the jury, this Court has already ruled that TPS has raised a genuine dispute of material fact as to the topics that his report addresses. ECF 205. In its opposition to this motion, TPS presented documentary evidence and testimony describing JM's anticompetitive actions. ECF 203. This accomplishes TPS's second task. Because a genuine dispute of material fact exists both as to whether JM engaged in the behavior alleged in the First Amended Complaint, and whether that behavior harms competition in violation of the Sherman Act, the Court should deny JM's motion for summary judgment and allow a jury to decide this case.

Indeed, it is no surprise that JM is so desperate to revive the issue of market definition, even though it is procedurally improper. Both parties are acutely aware of the role of market definition here. Any effects of JM's anticompetitive conduct must be evaluated in the context of the market affected by that conduct. The broader the market is, the more diffuse the effects of JM's conduct will be. The narrower the market, the more concentrated they will be. For this reason, JM has repeatedly pleaded with the Court to find that TPS has not defined the relevant product market appropriately. Each time, however, the Court has refused to do so, ruling that the jury must answer this question of fact. JM's disregard of these rulings—even calling the issues they address "undecided"—will not make the Court forget them, much less reverse them now. They are well-reasoned decisions that apply relevant precedent to achieve a common-sense outcome. Moreover,

they are the law of the case and not subject to re-argument.

JM knows how damning the factual evidence against it is; JM could not possibly deny its actions. Rather, JM knows that its best chance of success is to argue that the consequences of its conduct are being exaggerated. To insist that the harm it caused in the calsil market, when evaluated against the market for all insulation materials, is ***not that bad***. Yet this dilution approach cannot save JM on summary judgment. As JM itself has repeatedly told the Court, "[t]he proposed product market must represent a 'true economic market.'" *See, e.g.*, ECF 76 at 7 (quoting *Auraria Student Hous. v. Campus Vill. Apts.*, 843 F.3d 1225, 1245 (10th Cir. 2016)). Whether TPS's market definition does so is a question of fact.

Before proceeding, TPS must dispel some confusion as to what it has argued in the past. TPS's position is, and always has been, that TPS must define the relevant market for its antitrust claims. At the hearing on JM's *Daubert* motion, TPS's counsel stated that it is "absolutely true that market definition is an essential task for an economic analysis of these claims." Feb. 10, 2022 Hr'g Tr. at 61:5–24. This is why Dr. Warren-Boulton undertook this task. Indeed, most of his report is devoted to it. *See* ECF 177 at 6 (defining the relevant market as "calsil sold by Johns Manville or Thermal Pipe Shields either to distributors or directly to other customers such as contractors"). First, certain elements of TPS's claims depend on the relevant market having been defined, such as those elements which require proof of whether the defendant possesses market or monopoly power or whether the tying and tied products both belong in the same or distinct relevant markets. And all antitrust claims require harm to competition in the relevant market. Second, whether market definition is a necessary "essential task" or a necessary "element" of any claim is merely a semantic distinction. Moreover, this semantic question is academic because "Dr. Warren-

Boulton *does* define the relevant market." ECF 205 at 13 (emphasis added).

This raises another misrepresentation that JM makes about TPS's argument. JM argues that Dr. Warren-Boulton neglects to consider whether there are substitutes for calsil and omits any such substitutes from his relevant market definition. But this is not true. Dr. Warren-Boulton expressly explains that potential substitutes are relevant to market definition, but that there are none for calsil. He reaches this conclusion based on four analyses which all yield the same conclusion: no substitutes for calsil exist when the analysis of substitutability is done correctly.

So where does all this leave the parties? Notwithstanding JM's effort to whittle down the body of evidence against it, the full evidentiary record remains intact. TPS is poised to present the jury with competent evidence—both direct and circumstantial—of each element of each of its two antitrust claims. And JM has used its last chance to prevent that. JM's handful of lame procedural objections, which it fails to support, and its bizarre choice to ignore the Court's previous rulings, cannot carry JM's burden. To the contrary, TPS has done what the Court has said that TPS must do: "[S]how how genuine disputes of material fact warrant sending its claims to the factfinder for resolution. Plaintiff must do so on the basis of the current evidentiary record and explain how the report of its expert witness supports its position." *Id*. at 24. As shown in its opposition brief, *see* ECF 203, and below, TPS has presented the Court with multiple evidentiary bases—in the form of expert opinion, documentary evidence, and fact witness testimony—to find that a reasonable juror will find in TPS's favor on each element of each of its claims. For this reason, the Court should deny JM's motion for summary judgment and permit this case to go to trial.

## RULE OF REASON FRAMEWORK

As the Court noted in its decision denying JM's *Daubert* motion, the appropriate

framework in which TPS must prove its claims begins with the question of whether the challenged restraint is an ***unreasonable*** one, rather than just the ordinary competitive conduct that may allow the defendant to obtain (or maintain) a competitive advantage over its competitors, but not at the expense of competition. ECF 205 at 8 (citing *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018)).

The Court also noted two methods of proving unreasonableness: showing that a challenged restraint is unreasonable *per se*, or unreasonable under the Rule of Reason. *Id*. To determine whether a restrain is unreasonable, the Rule of Reason establishes a burden shifting analysis. The first step of this analysis is that the plaintiff must show that the challenged restraint is unreasonable ***because*** it harms competition in the relevant market. *Id*. at 9 (citing *Am. Express*, 138 S. Ct. at 2285); *accord* Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and their Application* ¶¶ 1501–02 (4th and 5th eds. 2015–2021) ("Areeda & Hovenkamp") (citing *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) ("The legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition")). This showing may be made using direct or indirect evidence. ECF 205 at 9 (citing *Am. Express*, 138 S. Ct. at 2284).

This Court explicitly rejected JM's argument that *American Express* precludes the use of direct evidence. ECF 205 at 18 ("The Rule of Reason offers two ways to show that a restraint on trade has an unreasonable effect on competition: either through direct evidence of such harm or through indirect evidence from which such harm may be inferred. Plaintiff relies on the direct

evidence option. *Am. Express* does not foreclose that approach as a matter of law."); 9, 12 (same). Indeed, this made it surprising to see the phrase "direct evidence shortcut" sprinkled so liberally throughout JM's reply brief. ECF 211.

It was even more surprising to read the sentence, "The jury cannot decide this ***legal*** issue—the validity of [Dr.] Warren-Boulton's proposed use of the rarely applied 'direct evidence' shortcut to define his proposed relevant market under applicable case law." *Id*. at 26. The jury need not decide this issue; the Court already did. ECF 205. Likewise, JM is wrong that "the Court still needs to rule on the specific legal objections Johns Manville presented in [] its Daubert motion to [Dr.] Warren-Boulton's proposed use of the 'direct evidence' shortcut." *Id*. at 30 (citations omitted). As the Court knows, it ruled on JM's objections, rejecting them in their entirety. ECF 205. Similarly, although it is true, it is bizarre that JM would say that "defining a relevant market ultimately presents issues of fact for the jury to decide." ECF 211 at 30. This statement concedes that market definition is a factual issue, a dispute about which precludes summary judgment.

By establishing the correctness of Dr. Warren-Boulton's opinions about what the relevant product market is, TPS will also be able to show the harmful effects of JM's misconduct—of which there is ample documentary evidence and descriptive testimony—on competition in that market. TPS will prove that: (1) calsil sold by manufacturers in the United States is the relevant market and (2) JM's anticompetitive threats to distributors resulted in both increased prices in ***and*** the exclusion rivals from that market. *See* ECF 205 at 7 "In other words, a monopoly has the power to control prices or exclude competition over a substantial length of time." (citing *Epic Games, Inc. v. Apple, Inc*., No. 4:20-cv-05640-YGR, 2021 U.S. Dist. LEXIS 172303, at *235–36 (N.D. Cal. Sept. 10, 2021))." A reasonable juror certainly could find in TPS's favor on this point. Indeed,

JM's contention—that its threats to distributors, which allowed JM to raise **calsil** prices and exclude rival **calsil** suppliers—should be forgiven because certain other entities outside the calsil market are not harmed by those threats does not pass muster. TPS's argument more correctly captures the harm flowing from JM's conduct because:

- JM's customers then re-sell JM's overpriced calsil to their own customers;

- those customers then install JM's overpriced calsil in facilities owned by other entities (who do not purchase calsil at all, except in limited circumstances when they still do not purchase it from a calsil manufacturer, only from a distributor or contractor);

- once the price of calsil is raised to the point where it can no longer be tolerated, those facility owners could choose to insulate their pipes with another material instead of calsil;

- even though there is no insulation material that is an economic substitute for calsil; and

- there is no other insulation material that is an economic substitute for calsil (from the perspective of functional fungibility).

The Court identified the reason that JM's argument fails: the relevant market for an antitrust claim "is 'the area of effective competition.'" ECF 205 at 11 (quoting *Am. Express*, 138 S. Ct. at 2285). TPS claims that JM harmed competition by the way it conducted calsil sales—showing evidence that it threatened customers who acquiesced to those threats. What, then, justifies considering entities that do not purchase or sell calsil in analyzing these claims? They do not belong within the "area of effective competition." To the extent that the parties disagree about which entities **do** belong within the "area of effective competition," that is a fact dispute which precludes summary judgment.

Moreover, the only purpose of including these entities is to achieve JM's desired effect: to dilute the harm that resulted from its conduct. And JM's strained market definition does so twice. Once by **capturing entities who do not belong in the market**—for two distinct reasons: (1) they

are misrepresentative because they do not suffer harm from JM's conduct; and (2) they are misrepresentative because they have a greater ability to accept substitutes than those entities who actually purchase calsil from the claimed monopolist—and again by ***capturing products that do not belong in the market***—because those products are not substitutes for (meaning reasonably interchangeable for) calsil in the eyes of those who matter.

## ARGUMENT

## I.     JM'S LATE MARKET DEFINITION ARGUMENT CONLIFCTS WITH PRIOR RULINGS AND CONTRADICTS MARKET REALITIES

### A.     TPS Has Raised Genuine Factual Disputes on All Topics on Which Dr. Warren-Boulton Opines

JM's market definition argument relies on legal arguments that it raised and lost previously, in its failed *Daubert* motion. Indeed, this Court has deemed all of Dr. Warren-Boulton's opinions admissible—because they are reliable and will be helpful to the jury—and confirmed the appropriateness of his methodology, including the use of direct evidence. These legal questions are the law of the case, and offer no basis by which to grant JM summary judgment. Indeed, presenting admissible expert testimony—which TPS has done here—is sufficient to overcome the moving party's "burden to demonstrate that there is no dispute of material fact." *Melvin v. Cnty. of Westchester*, No. 14-CV-2995 (KMK), 2019 U.S. Dist. LEXIS 42772, at *45–46 (S.D.N.Y. Mar. 15, 2019). That is because "[i]f the testimony is admissible, the court is 'bound to consider the evidence in the light most favorable to plaintiff' in deciding the summary judgment motion." *In re Fosamax Prods. Liab. Litig.*, No. 1:06-md-1789 (JFK), 2009 U.S. Dist. LEXIS 82136, at *17 (S.D.N.Y. Sept. 8, 2009) (citation omitted). And this is the correct outcome even where the moving party presents a competing expert opinion, because "[c]onflicting expert opinions constitute

evidence upon which 'a reasonable jury could return a verdict for the nonmoving party.'" *Emerson Elec. Co. v. Holmes*, No. 16-cv-1390 (PKC) (SIL), 2019 U.S. Dist. LEXIS 100957, at *25–26 (E.D.N.Y. June 14, 2019) (quoting *Hamblin v. British Airways PLC*, No. 09-cv-3077, 2010 U.S. Dist. LEXIS 153924, at *14–15 (E.D.N.Y. Aug. 12, 2010)).

Indeed, many cases recognize that conflicting expert opinions render summary judgment inappropriate. *See, e.g.*, *id.* ("[W]hen there are dueling experts, both of whom have put forward opinions in contradiction with each other, and when those opinions are important to resolution of a material factual dispute, summary judgment may not be appropriate.") (quoting *Realtime Data, LLC v. Stanley*, 897 F. Supp. 2d 146, 153 (S.D.N.Y. 2012)); *Valdez v. Ward*, 219 F.3d 1222, 1238 (11th Cir. 2000) (determination of whose expert's "testimony at trial was more credible was an issue solely within the province of the jury") (citing *United States v. Bohle*, 475 F.2d 872, 874 (2d Cir. 1973)); *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995) ("Trial courts should not abrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts."); *Allen v. Term Commodities, Inc. (In re Term Commodities Cotton Futures Litig.)*, No. 12-CV-5126 (ALC), 2020 U.S. Dist. LEXIS 181704, at *70 (S.D.N.Y. Sept. 30, 2020) ("Indeed, the Parties present a classic battle of the experts . . . . The Court cannot choose, as a matter of law, which studies are more convincing.") (citation omitted); *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 351 (S.D.N.Y. 2001) ("it is solely for the jury to weigh and assess the credibility of dueling experts").

Courts in this district agree. *See EEOC v. Columbine Health Sys.*, No. 15-cv-01597-MSK-CBS, 2017 U.S. Dist. LEXIS 152986, at *13 (D. Colo. Sept. 19, 2017) (denying summary judgment because conflicting, admissible expert opinions addressed a "material factual issue");

*MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, No. 05-cv-01948-RPM-KLM, 2008 U.S. Dist. LEXIS 33397, at *4 (D. Colo. Apr. 23, 2008) ("the defendants' motion for summary judgment must be denied" because there "are conflicting expert opinions" and "plaintiff has shown a triable issue of fact").

### B.   As the Court Previously Ruled, the Relevant Market to Be Tried Is Calsil Sold by Manufacturers to Their Direct Customers in the United States

JM's market definition argument also reprises legal arguments that it raised and lost in its failed partial summary judgment motion. JM's ostensibly new argument about the availability of substitutes for calsil is substantively no different from the argument that the Court already rejected, holding that "[l]imiting the 'customers' of calsil to distributors (and to a lesser extent, contractors), i.e., all direct purchasers of calsil from a manufacturer, is not artificial or too narrow." ECF 109 at 9; Nov. 9, 2021 Hr'g Tr. at 42:18–21 (the Court said that JM's argument "seems a little bit like a result that was tried to fit somebody's idea of a—you know, what the conclusion should be and it—kind of retrofitted it for that purpose").

Now, JM argues again that the relevant market definition turns on whether there are substitutes for calsil. And again, JM makes the same mistake of offering evidence that addresses this question only from the perspective of end-users who, critically, are ***not the entities who are actually customers of TPS and JM***. ECF 211 at 29, 54 (pointing to distributor testimony that certain products may be considered candidates for substitution, but omitting the critical qualifier, "if the facility owner and its contractor approve." *See* Hlavenka Tr. (ECF 152-2) at 50:16–51:16.

To qualify as a substitute, a product must be viewed as such by those who purchase calsil in the market that JM is claimed to have monopolized. JM has cited no evidence supporting the idea that its customers view other products as reasonably interchangeable for calsil. Put another

10

way, JM cites no evidence, nor could it, that ***its customers*** could elect to stop purchasing calsil altogether if they were dissatisfied with the price that JM charges for it. At most, the evidence shows that distributors may be willing to tolerate paying supracompetitive prices for calsil because they hope to recoup at least some of the overcharge by passing it on to their downstream customers. *Cf. In re Zetia Ezetimibe Antitrust Litig.*, No. 2:18md2836, 2022 U.S. Dist. LEXIS 35784, at *28– 29 (E.D. Va. Feb. 24, 2022) (disregarding the views of other, non-customer entities, about substitution because, "[o]n this record [showing supracompetitive price levels for Zetia], without some evidence of [a purported substitute's] capacity to significantly constrain Zetia pricing, no reasonable jury could conclude that any such [purported substitute] had such capacity"). But it simply does not matter how willing non-calsil purchasers are to tolerate an increase in calsil prices.

Indeed, in denying JM's previous motion for summary judgment, the Court held that "Defendant fails to establish as an undisputed fact that calsil is reasonably interchangeable with other insulators." ECF 109 at 10; *id.* at 9–10 (citing *Telecor Commc'ns v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1132-33 (10th Cir. 2002)) ("As the Court perceives Defendant's argument, it is quite similar to that rejected in *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.* . . . . In *Telecor*, as here, plaintiffs complained of defendant's anticompetitive conduct at the intermediate level, while defendant wanted to focus on the ultimate consumer.").

There is no new evidence requiring a different conclusion. JM may have presented evidence that downstream actors may be willing to consider alternative insulation materials, but there is considerable evidence that TPS and JM's customers are unable to do so. *See* Bay Insulation Supply Inc.'s Response to the requests for Production of Documents from Chase Manufacturing Inc. d/b/a Thermal Pipe Shields (Pl.'s Ex. 1 at 2 ) ("We can't receive or sell products that don't

meet the ASTM standard as substitutes for JM products that meet the ASTM standard"); Guest Tr. (ECF 152-3) at 94:15–21 (When Mr. Guest of 4 State was asked, "If a customer came in and . . . said I have a specification for calsil, would you ever try to sell them a different type of insulation material, or would you just try to supply them with Calsil?" he replied, "[j]ust try to supply them with the Calsil available, but first and foremost follow the spec."); ECF 152-2 at 50:16–51:3 (Mr. Hlavenka of DI suggests that there may be some willingness to substitute among downstream customers of distributors (contractors); he does not say that sales from manufacturers to distributors are characterized by similar elasticity); *see also* Hlavenka Tr. (Pl.'s Ex. 2) at 20:2–22; JM 30(b)(6) Tr. (ECF 152-7) at 170:3–12 (When asked "if an engineer has specified a specific material or product, is the contractor required to follow that specification subject to the additional process that you've described?", JM's 30(b)(6) corporate representative stated, "Yes, he's required to follow whatever—whatever is ultimately agreed upon. So if he doesn't—if there hasn't been any additional dialogue to change that specification, then the contractor is generally required to install it per the specification.").

And the facts are clear: end-users are not buyers.[1] ECF 177 at 6–7 and Table 1 ("Johns Manville Sales by Distribution Channel"). Every JM witness who testified on this topic said the

---

1.      The parties' sales data for calsil reflect the following entities:

| | Distributor | Contractor | OEM | *End-User or Facility Owner* | Total |
|---|---|---|---|---|---|
| TPS | ██ | ██ | █ | █ | ██ |
| JM | ███ | ███ | ██ | █ | ███ |

same. *See, e.g.*, Bittner Tr. (Pl.'s Ex. 3) at 119:11–20 (explaining that, if JM considers entities other than distributors and contractors to be "customers" that is because "they're all ***involved in the use of*** our products") (emphasis added). Because it is still an undisputed fact that calsil manufacturers do not sell to end-users, the preferences of end-users remain irrelevant for purposes of market definition. *Compare* ECF 109 at 4 (Court's finding of undisputed material fact 10: "Defendant seeks to ***influence*** downstream actors' product choices" but manufacturers "***compete*** at the distributor level.") (emphasis added).

JM should not be permitted to invoke the "influence" of actors—or mere existence of similarly functional products—outside the relevant market to make its market power appear to be artificially diffuse. *See Novell, Inc. v. Microsoft, Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013) ("The greater the elasticity of demand and the larger the relevant geographic area of competition, the higher the chance that the defendant's market share will dilute past the point where it can be taken as posing a serious threat to the competitive process."); *Zetia*, 2022 U.S. Dist. LEXIS 35784, at *16 (quoting *Int'l Wood Processors v. Power Dry, Inc.*, 792 F.2d at 430) (defendants seek to minimize the anticompetitive effects of their conduct by enlarging the relevant market, "'the anticompetitive effect of plaintiff's elimination from [a] larger market necessarily would have been less'"). Indeed, as the Court held, the relevant market for an antitrust claim is "the area of effective competition." ECF 205 at 11. it is not disputed that neither TPS nor JM competes with any downstream entity for any sales.

Market definition entails answering both: (1) Who are the sellers and buyers in that market?

---

TPS sold calsil to ███, and JM sold calsil to ███, "OEM" entities. All are distributors, contractors, fabricators, or some combination of these. None is a facility owner or "end-user." ECF 177 at 6–7 and Table 1 ("Johns Manville Sales by Distribution Channel"), and underlying data.

and (2) Which products do those sellers sell to those buyers—including which products are and are not economic substitutes for them? *See Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1075–76 (D. Colo. 2004). "[T]he first determination necessary in defining the market in this case is locating, in a meringue of transactions and exchanges, the sellers, the buyers, and the products at issue. Only after determining these broader issues can the court focus on the narrower issue of the scope of the product market based on reasonable interchangeability."

In answering the first question, the Court's characterization of the calsil market is not quite accurate. The Court stated that:

> Generally, the market for insulating products such as calsil can be divided into two sections. An upstream market consists of manufacturers and distributors, and a downstream market has distributors selling to contractors. Plaintiff brought this lawsuit alleging that Defendant took steps to hinder its entry into the calsil market by discouraging distributors from buying its calsil product. Thus, the focus of Plaintiff's antitrust allegations is on the upstream market.

ECF 205 at 6.[2] More accurately, ***there are two distinct markets***—not two sections of the same market—for insulating products such as calsil. One upstream market consists of manufacturers and distributors, and a second, downstream market has distributors selling to contractors.

TPS claims that JM unlawfully hindered its entry into the calsil market by discouraging distributors from buying its calsil product. Thus, the focus of TPS's antitrust allegations is on the first, upstream market—the one in which JM sells calsil and in which TPS has tried to sell calsil. Because distributors' purchasing decisions are "locked in" by material selections decisions made by others, they are unable to determine not to buy calsil—and cannot select another material in its

---

2.     *See also* discussion in ECF 205 at 14 (citing Dr. Warren-Boulton's Report, ECF 177).

place as a "substitute"—in the event of a SSNIP by JM or TPS.

By contrast, there is no "effective competition" between calsil manufacturers and either insulation distributors who resell calsil or contractors who furnish and install it. They do not compete for the same sets of customers, nor do they provide the same services to their respective sets of customers. And entities such as end-user facility owners, who do not purchase calsil, are not even potential customers of TPS or JM.[3] For the two questions of market definition, TPS's answer is simple, straightforward, and sensible:

- The sellers are the only two manufacturers and the buyers are all of their customers, but only their customers; the product is calsil only—because the buyers *in the market* do not view any other product as reasonably interchangeable for it.

Meanwhile, JM's answer strains credulity and presents a mere factual dispute at best:

- The sellers are the only two manufacturers, plus their distributor customers who re-sell calsil, plus contractors who do not even sell calsil, but rather furnish and install it. The buyers are distributors who purchase calsil from manufacturers, contractors who purchase calsil from distributors, and end-user facility owners, who do not purchase calsil at all, but rather hire contractors to furnish and install it. The products are all insulation products because those end-users *who do not purchase* calsil might consider other insulation materials as an alternative to supracompetitively-priced calsil.

---

3.      JM's argument to expand the relevant market would be more persuasive if it could argue that TPS's market definition includes certain customers, but excludes others, that are similarly affected by JM's conduct. For example, if TPS argued that the relevant market should include distributors, but exclude direct-buy contractors, there might be an argument that the commercial realities of both segments of sales are such that the two channels should be combined. Principally, this might be justified because both sets of customers are subject to similar constraints when purchasing calsil from TPS or JM; both are powerless to avoid JM's supracompetitive prices. But TPS includes both constituencies in the relevant market. JM's argument is that still others—who are not similarly constrained or subject to JM's pricing behavior—should be included in the relevant market, notwithstanding that they do not purchase calsil and so it cannot be argued that they would be affected similarly (even before considering their willingness to accept a product that they deem "reasonably interchangeable" as a substitute for calsil).

|  | **TPS Position** | **JM Position** |
| --- | --- | --- |
| **Suppliers in the Relevant Market** | Sellers of calsil (TPS and JM) | - Sellers of calsil (TPS and JM);<br>- distributors who purchase calsil from TPS and JM;<br>- contractors who furnish and install calsil |
| **Buyers in the Relevant Market** | Customers of TPS and JM | - Customers of TPS and JM;<br>- contractors who are customers of distributors, but do not buy calsil from TPS or JM;<br>- end-user facility owners who do not buy calsil (except on rare occasion, and then not from TPS or JM) |
| **Products in the Relevant Market** | Calsil; [And anything deemed reasonably interchangeable for calsil by customers of TPS and JM, but that is an empty set] | - Calsil;<br>- anything deemed reasonably interchangeable by customers of TPS and JM;<br>- anything deemed reasonably interchangeable by contractors who are customers of distributors, but do not buy calsil from TPS or JM;<br>- anything deemed reasonably interchangeable by end-user facility owners who do not buy calsil (except on rare occasion, and then not from TPS or JM) |

A reasonable juror would perceive the fundamental flaw in JM's argument and conclude correctly that entities who do not purchase calsil should not be considered in the market for calsil and so their willingness to substitute another product for calsil (even assuming it was considered appropriately—at a competitive price for calsil) does not matter. Indeed, the Court will likely instruct the jury to do precisely that:

> The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other ***from the buyer's point of view***; that is, the products compete with each other. In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the ***actual behavior of buyers*** and marketing efforts of sellers.

ABA Model Jury Instructions at 75 (citing, *inter alia*, the *Cellophane* case) (emphasis added); *see also Zetia*, 2022 U.S. Dist. LEXIS 35784, at *27–28 (the relevant inquiry is "the substitutability of products ***from the point of view of buyers***") (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 n.6 (3d Cir. 1997)). Here, that willingness is zero.

Nothing in *American Express* changes this result. In that case, the Supreme Court did not announce any unusual proposition of law. Rather, it confronted an unusual type of market. As the Court explained in that case: "When a cardholder uses a credit card to buy something from a merchant, the transaction is facilitated by a credit-card network. The network provides ***separate but interrelated*** services to both cardholders and merchants." *Am. Express*, 138 S. Ct. at 2280 (emphasis added). The credit card company provided credit to cardholders, enabling purchases that might not otherwise be possible. *Id.* The credit card company provides merchants with guaranteed payment and reduces the cost of processing payments, enabling sales that might not otherwise be possible. *Id.* "By providing these services to cardholders and merchants, credit-card companies bring these parties together, and therefore operate what economists call a 'two-sided platform.' As the name implies, a two-sided platform offers different products or services to two different groups who both depend to the platform to intermediate between them." *Id.* The Court defined the package of services that American Express provides to merchants and cardholders— together, as one set of customers—as "transactions." *Id.* As the Court noted, "the key feature of transaction platforms [such as credit card networks] is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other. *Id.*

Plaintiffs in that case challenged the "antisteering" provisions that American Express imposed on merchants to discourage them from steering customers to use another credit card, after

benefiting from the investment made by American Express to bring those customers into the merchant's store. American Express justified the provisions as protecting itself from free-riding, but plaintiffs claimed that the antisteering provisions raised costs for merchants—and harmed competition in that side of the market. In evaluating whether the antisteering provisions in fact harmed competition, the courts grappled with whether it was appropriate to consider that the harm to merchants was offset by benefits to cardholders. This boiled down to a question of whether competitive harm in one market was outweighed by competitive benefit in another (which would not save the conduct in the eyes of the Sherman Act), or whether competitive harm in **one side of a** market was outweighed by competitive benefit in **the other side of the** same market (which would). *See id.* at 2288 ("On the other side of the market, Amex uses its higher merchant fees to offer its cardholders a more robust rewards program, which is necessary to maintain cardholder loyalty and encourage the level of spending that makes Amex valuable to merchants.") (citation omitted).

Each court that ruled in the *American Express* case agreed that, to succeed on their Rule of Reason claims, the plaintiffs needed to prove harm to competition in the relevant market. Rather, the point of contention between the district and appellate courts was only about **the scope** of that relevant market. *See id.* at 2283 (the district court "found that the credit-card market should be treated as two separate markets—one for merchants and one for cardholders," while the Second Circuit "concluded that the credit-card market is one market, not two"). Applying a similar analysis to that of the lower court, the Second Circuit found that the challenged conduct ***did not*** harm competition in the broader market that it defined, despite the lower court's finding that the same conduct ***did*** harm competition in the narrower portion of that market that the District Court

considered (the merchant side only).

The Supreme Court agreed with both lower courts that the law requires it to examine harm to competition in the appropriate market, but sided with the appellate court, rather than the trial court, about what the reach of that market actually was. *See id.* The Court agreed with the Second Circuit that the relevant market in which to evaluate whether American Express harmed competition is the ***transaction*** market, encompassing both the merchant side that the District Court considered and also the cardholder side.

> [T]wo-sided transaction platforms, like the credit-card market…facilitate a single, simultaneous transaction between participants. For credit cards, the network can sell its services only if a merchant and cardholder both simultaneously choose to use the network.…It cannot sell transaction services to either cardholders or merchants individually . . . . Transaction platforms are thus better understood as 'supplying only one product'—transactions.

*Id.* at 2286 (citations omitted).

This definition reflects the idiosyncrasies of two-sided, transaction platforms. *Id.* at 2286–87. Moreover, this disagreement among the courts about the contours of the relevant market merely illustrates that market definition is inherently a fact-based inquiry, reflecting the particularities of each particular market. ECF 205 at 11 ("Defining the relevant market is an intensely fact-based inquiry.") (citing *Epic Games*, 2021 U.S. Dist. LEXIS 172303 at *207).

Importantly, the Court defined the market to encompass both types of parties with which American Express transacts—finding two portions of one larger market, rather than two distinct markets—***specifically because the transactions in each part of the market affect one another***. *Am. Express*, 138 S. Ct. at 2286–87. But the Court held only that an antitrust plaintiff must properly identify, and prove harm to competition in, the relevant market—capturing all of it, but no more and no less. There was no suggestion—which would defy established law—that an entire chain of

19

commerce must be included in any market definition as a matter of law. *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("We see no barrier to combining in a single market a number of different products or services ***where that combination reflects commercial realities***.").

Here, the commercial reality is that the market for calsil sales to distributors and the market for calsil sales to end-users are wholly distinct. In a case that examined a similar market structure, the Third Circuit explained why the relevant market should be defined as sales by manufacturers to their customers, who were largely distributors. In *United States v. Dentsply*, *International, Inc.*, 399 F.3d 181 (3d Cir. 2005), the defendant-manufacturer had about 80% of the market for artificial teeth sales to laboratories and dealers, while the next largest competitor had a 5% market share. *Id.* at 188. The defendant-manufacturer made strategic exclusive dealing arrangements with product distributors, such that the only way for competing manufacturers to enter the market was by selling directly to end-users. *Id.* The district court had determined that the government failed to properly define the product market because it did not account for end-users (to whom it was presumed that the manufacturers could sell directly), and thus, the market was not foreclosed. *Id.*

The Third Circuit reversed, holding that the district court's market definition was incorrect because it failed to recognize that the mode of business in the market was to work through distributors. *Id.* at 189–90 ("[T]he Court's scrutiny should have been applied ***not*** to the 'ultimate consumers' who used the [product], but to the 'customers' who purchased the [product].") (emphasis added). The Third Circuit reasoned that the defendant "had supremacy over the dealer network and ***it was at that crucial point in the distribution chain*** that monopoly power over the market for artificial teeth was established." *Id.* at 190 (emphasis added). Thus, the government's product market definition, which addressed the defendant-manufacturer's sales to distributors (but

did include the limited amount of sales in other channels), was entirely proper.

In this case, as in *Dentsply*, calsil manufacturers do not transact with end-users or their engineers; they only sell to their customers. (It does not matter that their customers are generally of two types—all customers of calsil manufacturers are included in TPS's relevant market definition because all were harmed by JM's conduct.) There are no sub-parts or divisions of the market in which TPS claims JM harmed competition: sales by manufacturers to their customers; nor is there any basis to consider other markets in conjunction with that one. Accordingly, there is no basis—provided by the *American Express* decision or otherwise—to expand the relevant market beyond those customers to whom TPS and JM sell calsil. *See Nobody in Particular*, 311 F. Supp. 2d at 1076 ("The identity of the relevant product to be studied to determine the market ***varies based on the level of commerce where the plaintiffs argue the defendants have monopolized competition*** . . . . Similarly, the identity of the relevant consumer for the purposes of determining market definition is ***not necessarily the end-user of the product, but, rather, is also determined based on the level of commerce effected (sic) by defendant's behavior***.") (emphasis added) (citations omitted).

### C.   Dr. Warren-Boulton Analyzed and Properly Identified the Correct Relevant Antitrust Market

Dr. Warren-Boulton submitted a detailed report explaining how to define a relevant market given the market reality of a single-supplier product area, defining the market for calsil sales to manufacturers' direct customers as the relevant antitrust market, and concluding that JM's power within that market was monopolistic.  In so doing, he studied both direct and indirect evidence. In terms of direct evidence, based on the parties' sales and margin data, Dr. Warren-Boulton conducted four separate empirical analyses to test, in different ways, whether JM actually charged

supracompetitive prices for calsil before TPS's attempted entry. One of those studies consisted of an econometric test; all four analyses produced the same compelling result: that JM did, in fact, charge supracompetitive prices for calsil to its direct purchaser customers, making that a relevant market for antitrust purposes. Despite the conclusiveness of the direct evidence, Dr. Warren-Boulton also studied the indirect evidence, which likewise confirmed that based on market concentration, unavailability of imports, and barriers to entry, among other things, the market realities support the conclusion that JM monopolized a relevant market for calsil sold to its direct purchasers. In more detail, the steps of Dr. Warren-Boulton's analysis were:

- **A market consists of a product and its substitutes.**

- **Something qualifies as a substitute if buyers of the product consider it to be reasonably interchangeable for that product.**

- **The existence of one or more reasonably interchangeable substitutes—at any price level—will prevent further price increases.**

- **To matter in a monopolization case, "reasonable interchangeability" must exist when a product is priced competitively. [Reasonable interchangeability must also exist in the view of buyers to matter. The views of non-buyers do not factor into the analysis.]**

- **The price increase of concern in a monopolization case is the increase from a competitive level to a supracompetitive level.**

- **This is because the ability to charge supracompetitive prices equates with monopoly power.**

- **Actually charging supracompetitive prices is one way that a monopolist harms competition.**

- **The scope of the supracompetitive pricing—the scope of competitive harm—is the relevant market.**

**A market consists of a product and its substitutes**

It is hornbook antitrust law that the "outer boundaries of a product market are determined by the reasonable interchangeability of use," which can be defined by considering "the cross-elasticity of demand between the product itself and substitutes for it," if any exist. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *accord* ECF 205 at 11.

**Something qualifies as a substitute if buyers of the product consider it to be reasonably interchangeable for that product**

Substitution is defined as "reasonable interchangeability." *See United States v. Microsoft Corp.*, 253 F.3d 34, 51–54 (D.C. Cir. 2001) ("[T]he relevant market must include all products 'reasonably interchangeable by consumers for the same purposes.'") (citations omitted); *see also* ECF 205 at 11. As the ABA Model Jury Instructions explain:

> The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers.

ABA Model Jury Instructions at 75 (citations omitted).

"'[F]or every product, substitutes exist,' [but] the 'relevant market cannot meaningfully encompass that infinite range.'" *Zetia*, 2022 U.S. Dist. LEXIS 35784, at *17 (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953)). Rather, the relevant market must include only those substitutes which exist at a competitive price level, because these are the ones that constrain a price increase above that level. A product that is not generally viewed by buyers as reasonably interchangeable will likely be unable to constrain price increases. "When balancing these considerations, '[t]he circle must be drawn narrowly to exclude any other product

to which, within reasonable variations in price, only a limited number of buyers will turn . . . .'"
*Id.* Yet, as the price level of product increases, so does the range of products that buyers will deem
reasonably interchangeable for it. Such products do not belong within the relevant market. "The
court must ultimately ascertain 'the narrowest market which is wide enough so that products . . .
from other producers in the same area cannot compete on substantial parity with those included in
the market.'" *Zetia*, 2022 U.S. Dist. LEXIS 35784, at *18 (quoting *Int'l Wood Processors v. Power
Dry, Inc.*, 792 F.2d 416, 430 (4th Cir. 1986)).

### The existence of one or more reasonably interchangeable substitutes—at any price level—will prevent further price increases

Dr. Warren-Boulton explains that, unless constrained, a supplier will increase its prices
continually "until products from other firms become (or are about to become) close enough
substitutes for its products that any further price increase would be unprofitable." ECF 177 at 5.
The way in which a further increase would be unprofitable is that buyers would choose to buy a
different product, rather than pay any more for that product. It is the concern that customers will
"substitute or switch to another product if prices were raised further" that stops prices from
increasing perpetually. *Id.* The ABA Model Jury Instructions track Dr. Warren-Boulton's opinion:

> To determine whether products are reasonable substitutes for each other, you must
> consider whether a small but significant and non-transitory increase in the price of
> one product would result in enough customers switching from that product to
> another product such that the price increase would not be profitable. In other words,
> will customers accept the price increase or will so many switch to alternative
> products that the price increase will be withdrawn? . . . . If you find that customers
> would switch and that the price increase would not be profitable, then you must
> conclude that the products are in the product market. If, on the other hand, you find
> that customers would not switch, then you must conclude that the products are not
> in the product market.

ABA Model Jury Instructions at 76 (citations omitted); *see also Microsoft*, 253 F.3d at 51–52 ("the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level").

### To matter in a monopolization case, "reasonable interchangeability" must exist when a product is priced competitively

Throughout this case, JM has repeatedly told the Court what it believes that TPS is arguing. These reports have not always been correct. Specifically, JM's assertion that Dr. Warren-Boulton neglected to consider whether substitutes for calsil exist is inaccurate. Rather, Dr. Warren-Boulton analyzed whether there are substitutes for calsil and concluded that there are none. *Compare* ECF 211 at 30 ("[Dr.] Warren-Boulton failed to conduct any reasoned analysis of substitutes for calsil, instead choosing to disregard calsil substitutes as 'irrelevant'") *with* ECF 177 at 5 ("The *Cellophane* Fallacy and the irrelevance of substitutes *at the current price*") (emphasis added).

Dr. Warren-Boulton cautions—consistent with consensus legal and economic opinion— that it is important to assess reasonable interchangeability between a product and those which are substitutes for it (i.e., cross-elasticity of demand) *when that product is being sold at a competitive price*. Otherwise, the analysis will be distorted so as to include products that are not bona fide substitutes in the relevant market. ECF 177 at 5 ("Judge Posner has observed, 'Reasonable interchangeability at the current price but not at a competitive price level, far from demonstrating the absence of monopoly power, might well be a symptom of that power.'") (quoting Richard A. Posner, *Antitrust Law* 150–51 (2d ed. 2001)). This *Cellophane* fallacy is a well-established trap, known for decades, that the antitrust world has learned to avoid.

The timing of the inquiry matters: to define a market, one must determine whether reasonably interchangeable substitutes exist under ordinary circumstances, in a competitive

market. This is what Dr. Warren-Boulton did. He did not ignore the possibility of substitutes. Of course, there are atypical situations in which buyers may—however reluctantly—need to expand the universe of products they will consider *reasonably interchangeable*. For example, if there is a supply shortage of widgets and none are available to purchase, a buyer might consider buying gadgets when she otherwise would not. Similarly, if widgets are being sold at an exorbitant, monopoly price, gadgets start to seem more appealing. Put another way, gadgets may be *reasonably* interchangeable for supracompetitively priced widgets, but it might be *unreasonable* to consider gadgets to be interchangeable for widgets where widgets can be acquired at an appropriate (i.e., competitive) price.

What Dr. Warren-Boulton considers to be *irrelevant* is the possible existence of calsil substitutes *after JM had already raised the price for calsil above the competitive level*. ECF 177 at 5–6. "[A] profit-maximizing monopolist eventually creates close economic substitutes for its own product." *Id*. at 5–6. This is because buyers' willingness to deem an alternative product "reasonably interchangeable" increases as the price for the monopoly product climbs higher. *See* ABA Model Jury Instructions at 75 (citing, *inter alia*, the *Cellophane* case) ("[t]he basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view"). Accordingly, a monopolist "can always assert as a defense that competition from those ostensible substitute products currently constrains the monopolist from *further* raising its prices . . . . Thus, Johns Manville's assertions that it can identify current substitutes, even close substitutes, for calsil [] are both expected and irrelevant to the issues of market definition and monopoly power in this case." ECF 177 at 5–6.

**The price increase of concern in a monopolization case is the increase from a competitive level to a supracompetitive level**

As the Court notes, "it is only a restraint that has an 'undue' or 'unreasonable' effect that is actionable." ECF 205 at 8 (citation omitted). This means that some price increases are permissible and may often result from procompetitive conduct. However, by definition, when prices are raised to a supracompetitive level, competition is harmed. Areeda & Hovenkamp note:

> *In the typical merger case* multiple firms produce the same product using the same or similar technology and the market is presumably behaving competitively, or at least nearly so, prior to the merger. *The concern is whether the merger may lead to a further price increase above current levels.* In contrast, *in a monopolization [case]* the given assumption is that a firm already has monopoly power, and is engaging in exclusionary practices in order to prolong or strengthen its monopoly position. *The relevant question is* not necessarily whether its actions will permit a price increase beyond current levels, but typically *whether it already has the power to charge supracompetitive prices.*

Subchapter C ¶ 539a2 (emphasis added).

This is what Dr. Warren-Boulton means when he says that "[t]he purpose of market definition is to aid in the determination of competitive harm. Accordingly, markets are defined with respect to the specific theory of harm." ECF 177 at 3. This statement refers to whether a market should be defined as the zone in which a future price increase will happen—as in a merger case—or the zone in which a past price already happened—as in a monopolization case.

Dr. Warren-Boulton continues, consistent with Areeda & Hovenkamp: "market definition in a merger context provides a basis to ascertain whether a price increase from that merger is possible or likely. When the concern is exclusionary conduct, markets are defined so as to assist in determining whether a defendant has an incentive to prevent a price decrease through exclusionary conduct. Thus, in the former case, the 'reference' or 'but-for' price is the current price, while in the latter case the reference price is the competitive price." *Id.* at 3–4.

Areeda & Hovenkamp note the danger of using the wrong reference price—i.e., mistakenly using the current price, rather than the competitive price, as a benchmark. And, indeed, they reveal why JM hopes the Court will make the same mistake here. Using the current price, which risks overlooking harm to competition that has already occurred in the form of supracompetitive pricing, is likely to result in an artificially broad—and inaccurate—market definition. *See* Areeda & Hovenkamp, Subchapter C ¶ 539a1 ("We therefore question decisions relying on apparent high cross-elasticity of demand at prevailing prices to adopt a broad market. . . .").[4]

### This is because the ability to charge supracompetitive prices equates with monopoly power

Monopoly power is defined as "the power to control prices or exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). This is uncontroversial—both the Court and Dr. Warren-Boulton have posited the same definition. *Compare* ECF 205 at 7 ("[A] monopoly has the power to control prices or exclude competition over a substantial length of time") (citing *Epic Games*, 2021 U.S. Dist. LEXIS 172303, at *235–36) *with* ECF 177 at 4 (defining monopoly power as "the ability to raise prices above the competitive level by at least a SSNIP or exclude competitors"); *see also Microsoft*, 253 F.3d at 51–52 ("[A] firm is a monopolist if it can profitably raise prices substantially above the competitive level") (citations omitted).

Dr. Warren-Boulton acknowledges that, if substitutes for calsil existed—when calsil was priced *at the competitive level* (or less than a SSNIP above it)—the existence of such substitutes

---

4.      Areeda & Hovenkamp note that a broad market definition may, in some instances, be appropriate despite prevailing monopoly pricing. Typically, these require "finding intense competition among" sellers of the monopoly product and "significant product (or sometimes spatial) differentiation that extends beyond mere brand names." Subchapter C ¶ 539a1. Neither circumstance applies here. *See* ECF 177 at Fig. 18 (JM's market share is roughly ██ as of November 2021; TPS's share is roughly ██); ECF 205 at 22 ("[C]alsil is a relatively specialized product."); ECF 109 at 3 ("Calsil itself is a generic commodity.").

would have prevented JM from executing the price increase that it managed to get away with. "The only issue is whether Johns Manville has already succeeded in raising the price of calsil by at least a SSNIP above the competitive level." ECF 177 at 5–6. JM got away with raising calsil prices precisely because no substitutes existed to stop it.

**Actually charging supracompetitive prices is one way that a monopolist harms competition**

It is also widely accepted that harm to competition may be shown in a market by proving that a defendant has charged supracompetitive prices. In *American Express*, for example, the Court held that supracompetitive prices reflect anticompetitive effects in the market where they prevail. 138 S. Ct. at 2287–88 ("To demonstrate anticompetitive effects on the two-sided credit-card market as a whole, the plaintiffs must prove that [American Express] increased the cost of credit-card transactions ***above a competitive level***" and "The plaintiffs did not offer any evidence that the price of credit-card transactions was higher than the price ***one would expect to find in a competitive market***.") (citations omitted); *see also Brooke Grp. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) ("[A] jury may not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level.") (citation omitted).

**The scope of the supracompetitive pricing—and competitive harm—is the relevant market**

A corollary to the truism that "an unconstrained profit-maximizing firm will increase prices for its products until . . . any further price increase would be unprofitable" is that the power to control price only exists within a relevant market. *See* ECF 177 at 5. A monopolist has monopoly power—i.e., "the power to control prices or exclude competition"—only over the product that it sells. *See E. I. du Pont*, 351 U.S. at 391. Put another way, a monopolist is only "unconstrained"

insofar as it has monopoly power. When it lacks this power, it is "constrained" and therefore unable "to control prices or exclude competition." *See* ECF 177 at 5. The monopolist's dominion is the relevant market. As Areeda & Hovenkamp explain:

> A first approximation 'provisional market' [the "test" market—in this case, calsil sold by manufacturers in the United States] is in fact *already* a relevant antitrust market if its prices are significantly supracompetitive. Such a market definition would be incorrectly broadened by adding a second product or region that would make a *further* price increase unprofitable to the first firm or set of firms. To put it another way, in seeking out a profit-maximizing price the monopolist or oligopolist finds a price so high that a still further price increase would be unprofitable because too many sales would be lost. As a result, cross-elasticity of demand is high when prices are already monopolistic. This fact can be a disabling limitation in monopolization cases, where substantial market power presumably exists prior to judicial assessment. Its impact is significantly less in challenges to mergers, some attempts to monopolize, or joint venture cases, where one assumes that the market is at least moderately competitive prior to the challenge.

Subchapter C ¶ 539.

*American Express* reveals the importance of market definition. In that case, there was no question about either (1) the defendant's conduct or (2) the effects of that conduct—increased prices to merchants (demonstrated by direct evidence). The only question was whether the market should be defined narrowly, to includes merchants only, or more broadly, to include both merchants and cardholders. If the former, then the antisteering provisions harmed competition in that market. But if the latter, then those same restraints—and their same consequences—would not be unreasonable. *Am. Express*, 138 S. Ct. at 2283.This illustrates why JM is desperate to broaden the relevant market. Yet, in the case of credit-card transactions, the same conduct that harmed merchants benefitted cardholders, and so those two types of entities were inextricably linked. At the time of any single transaction, both are involved; it must always be a three-party transaction

with American Express at the center. As for calsil, by contrast, when either TPS or JM sells calsil

to a customer, no other entity is involved.

Moreover, TPS's market definition—supported by Dr. Warren-Boulton's four analyses—

reflects both the factual record and common sense. JM tries to create the misimpression that the

calsil market is an interconnected web of entangled parties. At the hearing on JM's motion for

partial summary judgment, which the Court rightly denied twice, JM presented this demonstrative

purporting to depict the calsil "chain of commerce."



But in reality, the relationships between these parties are much simpler and more

straightforward. Removing all duplicative or extraneous lines—such as those connecting parties

who do not transact with one another—and all other irrelevant information results in the following:



As a result, the Court should examine only the commercial realities reflected in the green box of the revised graphic. *Cf.* Areeda & Hovenkamp, Subchapter C ¶ 533 (substitutability should be considered from either the supplier's viewpoint (e.g., TPS and JM) or the buyer's viewpoint (e.g., entities that buy calsil from TPS or JM): "[W]hat other products are ***buyers*** willing to substitute for widgets?") (emphasis added). The Tenth Circuit correctly held in *Telecor*:

> However, regardless of the interchangeability of pay phones and cell phones at the end-user level, there is no doubt that pay phones and cell phones are not interchangeable at the location-owner level, and that is the level where the Plaintiffs argued that Southwestern Bell has monopolized competition. In other words, the Plaintiffs argue that Southwestern Bell's interchangeability argument is wrongly directed at showing that cell phones and pay phones are interchangeable for end-users, but that is not the market where the Plaintiffs are complaining of Southwestern Bell's anti-competitive behavior.

305 F.3d at 1132.

JM's similar attempt at misdirection—in arguing that mineral wool, perlite, aerogel, and ceramic fiber are substitutes for calsil—must fail because ***TPS and JM's*** customers, who are largely distributors, do not view them as interchangeable, no matter how the manufacturers' customers' customers may feel. *See* ECF 135 at 24–25 (citing testimony from a representative of

distributor DI that "distributors work with **contractors and end-**users to give **them** options for a substitute material required on short notice"), citing ECF 152-2 at 50:8–51:16 (emphasis added).

More relevant to the question at hand is the response of distributor Bay Insulation ("Bay") to TPS's document request: "We can't receive or sell products that don't meet the ASTM standard as substitutes for JM products that meet the ASTM standard." Pl.'s Ex. 1 at 2. This means that, in Bay's view, the only substitute for JM's calsil is another material that complies with the same ASTM material standard specification (in this case, ASTM C533 Type I). The only such product that exists is TPS calsil.

Further, JM's argument ignores that "[s]ubstitutability in this context means in the economic sense." ECF 205 at 11. This means that a product does not qualify as a substitute merely because it functions in the same way.[5] *Accord* Pl.'s Ex. 2. at 20:7–22 (there is no price level for calsil at which **DI itself** would decide to stop purchasing it and choose another product instead; DI would only stop buying calsil if there was no demand among its customers for calsil and so DI would be unable to resell it).

---

5.      Even by this standard, many products that JM contends are substitutes for calsil do not qualify. *See* ECF 127, listing products that JM argues are substitutes for calsil "in high-temperature, industrial applications," citing June 1, 2022 Hr'g Tr. at 25:19–26:10. These include: polyiso foam, which has a maximum use temperature of 300° F; fiberglass pipe insulation, which is generally only suitable for commercial, rather than industrial uses, because of its softness; and mineral wool, which is largely ineffective in inhibiting corrosion under insulation (CUI). https://www.astm.org/c0591-21.html (polyiso foam can be used between -70° and 300° F); https://www.jm.com/content/dam/jm/global/en/mechanical-insulation/pipe/micro-lok-hp/JM_MECH_MicroLok_HP_Data_Sheet_EN.pdf (recommending that "[f]or applications with excessive physical abuse or vibration at high temperatures, consult your local Insulation Systems Market Development Manager for alternate material recommendations"); https://www.jm.com/content/dam/jm/global/en/industrial-insulation/Industrial%20Documents/JM_IND_PARTTool.pdf (on a 1 to 9 scale, rating mineral wool a 1 and rating calsil a 9 in the category of "Protection against CUI").

Finally, the Court should not adopt JM's misrepresentation that Dr. Warren-Boulton overlooked the possible existence of calsil substitutes. *See, e.g.*, ECF 211 at 30 ("instead choosing to disregard calsil substitutes as 'irrelevant'") (citing JM's motion (ECF 135), rather than Dr. Warren-Boulton's report, to support JM's characterization of that report). More accurately, he considered this question and determined that there are none. ECF 177 at 6 (stating that "Johns Manville's assertions that it can identify **current** substitutes, even close substitutes, for calsil . . . are both expected and irrelevant to the issues of market definition and monopoly power in this case." This is so because "Johns Manville has already succeeded in raising the price of calsil by at least a SSNIP above the competitive level.") (emphasis added). Most importantly, unlike JM's expert economists, Dr. Warren-Boulton properly considered the possibility of substitution **only at the competitive price level for calsil**. *Id*. at 5–6. Once a monopolist succeeds in elevating prices far enough above the competitive level, buyers begin to consider products to be reasonably interchangeable, even though those same buyers did not consider those products to be reasonably interchangeable at the competitive level.

> Actual trading patterns, cross-elasticity, and hypothetical price increases all delineate the market correctly when actual [widget] prices are at (or near) the competitive level but indicate overly broad markets when those prices are supracompetitive. The reason is easy to see. Buyers may have shifted to the [gadget] firms precisely because the [widget] price has been monopolistic and, therefore, has not been adequately constrained by competition from the [gadget] firms. At the profit-maximizing price for [widgets], many customers are almost, but not quite, ready to reduce their purchases or find a substitute. Hence, cross-elasticity of demand is surely high for the [widget] firms that have *already* maximized profits by balancing the gains from higher prices against the losses from losing sales to [gadgets] or other firms. The observed high "cross-elasticity of demand" between [widgets] and [gadgets] then reflects not the absence of market power, but rather the fact that it already exists and is being exercised.

Areeda & Hovenkamp, Subchapter C ¶ 539a1 (citations omitted); *accord* ECF 177 at 5 ("products that are only physically substitutable for the product in question ***become*** economic substitutes" as the price difference between them narrows). Having nothing to say to counter this universally accepted economic understanding, JM entirely omitted the topic from its *Daubert* reply brief. ECF 180. This silence confirms that JM could not conceive of any argument in favor of considering the availability of substitution at any price level other than the competitive one. Accordingly, to determine "'[s]ubstitutability' [] in the economic sense," it is critical that the appropriate parameters be observed: the willingness of ***buyers only*** to accept a product that they view as reasonably interchangeable when the product at issue is priced ***at a competitive level***. *Telecor*, 305 F.3d at 1132–33.

|  | Customer of TPS or JM | Not a Customer of TPS or JM |
|---|---|---|
| **Calsil Prices at a Competitive Level** | ✓ | X |
| **Calsil Prices at a Supracompetitive Level** | X | X |

Otherwise, the boundaries of the relevant market could be infinite and there might never be a determination of competitive harm. More troublesome, the relevant market would be untethered from "actual market realities." ECF 205 at 11 (citing *Am. Express*, 138 S. Ct. at 2285). The *American Express* Court applied the analysis correctly:

> To demonstrate anticompetitive effects on the two-sided credit-card market as a whole, the plaintiffs must prove that Amex's antisteering provisions increased the cost of credit-card ***transactions*** [the combination of services that American Express provides to merchants and cardholders] ***above a competitive level*** . . . . They failed to do so. The plaintiffs did not offer any evidence that the price of credit-card transactions was higher than the price one would expect to find ***in a competitive market***.

35

138 S. Ct. at 2287–88 (citations omitted and emphasis added). Indeed, JM hopes that the relevant market will be defined in this case—which is an issue of fact, not law—in a way that does not reflect the market realities. Because the market reality is that, in the market for calsil sold by manufacturers to their customers, JM had "the power to control prices or exclude competition"—powers which it successfully exercised for both purposes—before TPS's entry into that market. *E. I. du Pont*, 351 U.S. at 391. There is also a significant body of evidence that JM maintained that power in an unlawful way, rather than by "consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71. This evidence of JM's conduct, when considered alongside Dr. Warren-Boulton's opinions about the effects of that conduct in the calsil market, more than carries TPS's burden to demonstrate a genuine dispute as to the material facts pertinent to each element of its antitrust claims.

## II.   MARKET DEFINITION IS THE BEGINNING OF ANTITRUST ANALYSIS AND IS INCORPORATED INTO MANY ELEMENTS OF MANY ANTITRUST CLAIMS

### A.   Relevant Market Definition Is Incorporated into Both of TPS's Claims

#### 1.   Monopolization

"There are three elements to a Section 2 monopolization claim: the first element is a 'monopoly power in the relevant market'; the second is 'willful acquisition or maintenance of this power through exclusionary conduct'; and the final element is 'harm to competition.'" ECF 205 at 7; ECF 50 at 19–20 (quoting *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1119 (10th Cir. 2014)). A court cannot determine whether a challenged restraint harms competition without first knowing where to look for competition (and anticompetitive effects). This is why market definition is necessary: it identifies the boundaries of the search for anticompetitive effects.

A corollary to this is that relevant market definition establishes the parameters of a plaintiff's task to prove anticompetitive effects. *See* Areeda & Hovenkamp, Subchapter C ¶ 531 ("Market definition is an important tool for estimating the competitive effects of a merger or, for that matter, other antitrust practices."). But "[f]inding the relevant market . . . is typically not a goal in itself but a mechanism for considering the plausibility of antitrust claims" concerning market power. *Id.* For this reason, a demonstration of market power necessarily proves the existence of the market in which that power was exerted and where its effects are felt. "There are three elements to a Section 2 monopolization claim: the first element is a 'monopoly power in the relevant market'; the second is 'willful acquisition or maintenance of this power through exclusionary conduct'; and the final element is 'harm to competition.'" ECF 205 at 7; ECF 50 at 19–20 (quoting *Lenox MacLaren Surgical*, 762 F.3d at 1119).

### a) Monopoly power in the relevant market

A reasonable juror could conclude that TPS has shown that JM possesses monopoly power in the relevant market because Dr. Warren-Boulton concluded that direct evidence shows that (1) JM has monopoly power in the market for calsil sales and (2) calsil sales ***is*** the relevant market. JM's contention that substitutes for calsil exist is belied by the direct evidence of monopoly power that Dr. Warren-Boulton observed. *See* Areeda & Hovenkamp, Subchapter C ¶ 533 ("The ability of a defendant to charge supracompetitive prices is constrained by the availability of other products and producers."). Had customers viewed these products as reasonably interchangeable for calsil, those customers would have purchased them (i.e., switched to a substitute), rather than continuing to purchase calsil, without switching, since at least 2012 (the earliest date for which JM produced price data), in response to JM's consistent increase of its calsil prices over that period.

Thus, by showing monopoly power in calsil sales by manufacturers, Dr. Warren-Boulton also showed the market in which JM need not worry about the possibility of its customers buying a substitute; and it is this possibility that constrains price increases. It prevails only outside the relevant market, precisely because the relevant market *already includes all reasonably interchangeable substitutes*. *Brown Shoe*, 370 U.S. at 325 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); *compare Zetia,* 2022 U.S. Dist. LEXIS 35784, at *25–26 (granting summary judgment to plaintiff on market definition on a showing that defendant's purported substitutes "did not 'constrain Zetia pricing above the competitive level'").

"The function of defining a market is to determine that grouping of sales that, if controlled by a single firm or a cartel, could charge noncompetitive prices. But that is not possible if *either* demand or supply elasticity is high." Areeda & Hovenkamp, Subchapter C ¶ 533f. The relevant market should be no broader than, and no narrower than, this group of sales. It is the exact point in which the sales considered are neither overinclusive nor underinclusive, but rather, exactly commensurate with the scope of the power to charge supracompetitive prices.

Dr. Warren-Boulton's analysis allows a jury to conclude that JM *did* charge supracompetitive (or "noncompetitive") prices for the "grouping of sales" defined as calsil sales by manufacturers. This means that sales by manufacturers is the "grouping of sales" for which JM *could* have done so and the relevant market for analyzing such a claim. Drawing the market more narrowly, to omit some calsil sales, *would improperly exclude* from the group certain sales for which JM *could have charged a supracompetitive price*. Drawing the market more broadly, to include all calsil sales plus some sales of other insulation products, *would improperly include* in

the group certain sales for which JM **presumably could not have charged a supracompetitive price** (because there is no sign that it did).

### b)  Harm to competition

Similarly, by showing the market in which JM did charge supracompetitive prices for calsil, Dr. Warren-Boulton also showed the market in which JM's conduct harmed competition— because supracompetitive prices are the quintessential type of consumer harm. This satisfies the first element of TPS's Rule of Reason claim for monopolization, thus shifting the burden to JM to show a procompetitive justification for its conduct. Of course, JM cannot do so because no such justification exists and, regardless, JM makes no attempt to even try.

### 2.    Tying

As with monopolization, multiple elements of a tying claim depend on the definition of the relevant market:

> The elements of a *per se* theory of an unlawful tying arrangement, in which unreasonableness is presumed, are: (1) the involvement of two separate products, (2) defendant conditions the sale of one product on the purchase of another, (3) the defendant has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a 'not insubstantial' amount of interstate commerce in the tied product is affected." . . . . In addition, Plaintiff 'must establish an injury of the type the antitrust laws were intended to prevent.'

ECF 205 at 7 (quoting *Suture Express, Inc. v. Owens Minor Distrib., Inc.*, 851 F.3d 1029, 1036– 37, 1044 (10th Cir. 2017) (citations omitted)); ECF 50 at 7 (quoting *Suture Express*, 851 F.3d at 1037). ("In the Tenth Circuit, to succeed on a per se tying claim a plaintiff must show that '(1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a "not insubstantial" amount of

interstate commerce in the tied product is affected.'") (citations omitted). Because TPS claims that JM's tying harmed competition in the calsil market, this claim—like monopolization—requires TPS to define the calsil market and show how JM's actions harmed competition in that market. Moreover, the amount of such harm must be "not insubstantial." *Id.*

### a) Two distinct products

The requirement that the tied and tying products be "distinct" from one another means that the relevant market for the tied product must not include the tying product(s).[6] As the Court correctly notes, the relevant product market "is not necessarily limited to the product that the plaintiff sells but also those products that are its substitute." ECF 205 at 11. This means that the tying products cannot be substitutes for the tied product, because, in that case, the tied and tying products would be in the same relevant market.

TPS claims that JM tied sales of calsil to sales of its other products, relying on customers' need for other JM-branded products that they buy in much greater quantities than calsil to drive their calsil-purchasing decisions, rather than allowing their preference for better quality, lower-priced calsil to determine what brand to purchase. *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13–14 (1984) ("Accordingly, we have condemned tying arrangements when the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market.") (citations omitted). Dr. Warren-Boulton's opinion that calsil sold by manufacturers is a single-product relevant market is also, of course, an opinion

---

6. Incidentally, this is also what distinguishes a tying claim from a refusal to supply claim. Whereas the former applies to a scenario in which a supplier tells customers, "I will not sell you my widgets unless you also buy my gadgets," the latter appliers to a scenario in which a supplier tells customers, "I will not sell you my widgets unless you buy widgets only from me."

that any other JM products to which JM might have tied its calsil fall outside that relevant market. *See* ECF 177. Thus, TPS has raised a genuine dispute of material fact as to this element.

### b) Market power in the markets for the tying products

Dr. Warren-Boulton also offers opinions about JM's market power over distributors, particularly about distributors' need to buy JM's branded products apart from (but also including) its calsil. *See id.*

> A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Such an arrangement violates § 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-462, (1992) (citing *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969)).

These opinions, which track distributor testimony that distributor Distribution International ("DI") did not "think that we can do without JM" as a supplier and distributor 4 State Supply ("4 State") did not "believe that it could get by without doing business with Johns Manville." Hlavenka Tr. (ECF 204-11) at 33:18–25; ECF 204-10 at 35:10–36:11. Whether these sentiments reflect JM's ability "to force [these and other distributors] to do something that [they] would not do in a competitive market" is a question of fact that the jury must answer. *See Jefferson Par. Hosp.*, 466 U.S. at 13–14 (citations omitted).

TPS's contention that the answer to the question is affirmative is consistent with t the market realities that these customers confirmed. For example, DI discussed the importance of access to JM's entire line of products, not just calsil. DI bought nearly ███████ of JM fiberglass, more than ███████ of mineral wool, and more than ███████ of expanded perlite during the

relevant period. And DI purchases about ▮▮ of its perlite needs, ▮▮▮ of its fiberglass needs, and ▮▮ of its calsil needs from JM. ECF 204-11 at 28:21–29:23. Losing access to JM's products would have a substantial impact on its business. Moreover, because of the relatively small quantities of calsil that they purchase, TPS could not provide any discount on calsil to compensate for it. This is apparent why JM's customers would forgo the TPS opportunity (a higher quality product at a lower price) to ensure continued access to JM's full suite of products.

### c)  A not insubstantial amount of commerce is affected

Dr. Warren-Boulton estimates that JM's conduct harmed TPS resulting in nominal damages of approximately ▮▮▮▮▮. ECF 177 at 18. JM does not contend that this amount is "not insubstantial," nor could it seriously do so.

## III.   THE FACTUAL EVIDENCE OF JM'S EXCLUSIONARY CONDUCT IS OVERWHELMING

As the Court noted, for TPS to succeed on the merits of its claims, "There also must be some evidence that defendant used its market power to harm [] competition." ECF 205 at 13. This means that TPS must show that JM affirmatively engaged in anticompetitive behavior. As Dr. Warren-Boulton also correctly noted, "I'm not a fact witness." Feb. 10, 2022 Hr'g Tr. at 9:23–10:8. This means that evidence about JM's conduct—things that JM said or did, and who those words and actions were understood by others—are outside the scope of Dr. Warren-Boulton's work. *Id.* at 9:23–10:8; ECF 177 at 1–2, 15–16 ("Thermal Pipe Shields will provide direct evidence of Johns Manville's taking adverse action against customers who did business with Thermal Pipe Shields—or threatening adverse action against those who contemplated doing business with Thermal Pipe Shields . . . [and] that this action caused customers to abstain from doing business or continuing to do business with Thermal Pipe Shields."). Dr. Warren-Boulton did not present

much of this evidence because it was not his task. Feb. 10, 2022 Hr'g Tr. at 9:23–10:8; ECF 177 at 1–2, 15–16 ("I have no particular expertise as an economist in describing or evaluating most of that evidence, nor am I the arbiter of factual issues, and I see my responsibility as properly limited to reviewing the factual record to determine that it is consistent (and not inconsistent) with my observations and opinions.").

That Dr. Warren-Boulton did not present this evidence does not imply that no such evidence exists. To the contrary, TPS identified more than enough of this type of evidence in its opposition brief to create a genuine dispute of material fact as to the "action" elements of its two antitrust claims. *See* ECF 203. Additionally, the evidence TPS has presented—insofar as it shows exclusionary conduct—is discussed below:

### A.    Refusal to Supply

The relevant inquiry is whether the challenged conduct "is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors." *Novell*, 731 F.3d at 1072. If not, the challenged conduct is exclusionary, which the Supreme Court condemned as that which produces business success other than by "consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71.

JM's promise to ███████████ to customers who buy from TPS, ████████████ ████████████████████████████████████ is not consistent with competition on the merits as the *Grinnell* Court defined it. Rather, it reflects competition on the basis of coercion. This conduct does not provide benefits to customers—as those on the receiving end of these threats confirmed. Nor did it make any business sense for JM to say that customers

could not buy its products if it intended to follow through; this threat makes sense only to ensure

TPS's exclusion from the market.



| ECF 204-1 at JM00074261:<br>• ■■■■<br>• ■■■■ | Meyer Tr. (ECF 204-6) at 109:9-111:25:<br>• ■■■■ | ECF 204-11 at 33:18-25:<br>• DI did not "think that we can do without JM." |
| ECF 204-1 at JM00034501:<br>• ■■■■ | ECF 204-1 at JM00028748:<br>• ■■■■ | ECF 204-1 at JM00007814:<br>• ■■■■ |
| ECF 204-1 at JM00028748-49:<br>• ■■■■ | ECF 204-1 at JM00001451:<br>• ■■■■ | ECF 204-1 at JM00011469:<br>• ■■■■ |
| ECF 204-1 at JM00003324:<br>• ■■■■ | ECF 204-1 at JM00018081 at JM00018083:<br>• ■■■■ | Duppler email (ECF 204-3) at 2:<br>• "I hope TPS plans on supporting Bay at any location since it sounds pretty likely that JM will be cutting us off from cal sil." |



| Guest Tr. (ECF 204-10) at 33:23-34:6: | ECF 204-11 at 38:20-39:25; 79:16-80:24: | ECF 204-1 at JM00004024: |
|---|---|---|
| • 4 State was "concerned" because "being told that we may not be able to purchase [JM products] puts a strain on 4 State the company to distribute products to our customer." | • JM told DI that "if somebody were to start stocking TPS," then JM would have to "relook" its relationship with DI and possibly support DI's competitor instead. | • ▮ |
| ECF 204-1 at JM00003503: | ECF 204-11 at 66:21-67:16: | ECF 204-1 at JM0003854: |
| • ▮ | • "We didn't—you know, we didn't want to get on JM's bad side either, by stocking TPS, in that regard." | • ▮ |

### B. Requiring Exclusivity—Whether Explicitly or Implicitly—that Substantially Foreclosed TPS from the Calsil Market

JM and TPS are the only two suppliers of calsil in the U.S. market. Thus, any activity that serves to foreclose TPS from a region or a customer will result in exclusivity for JM. Further, the highly concentrated nature of the industrial insulation market amplified the effects of JM's conduct to foreclose competition in the calsil market. The top four distributors accounted for more than ▮ of all calsil bought by distributors. DI alone accounted for nearly ▮, while the three distributors who ▮ constituted ▮ of distributors' purchases of calsil. This means that JM could foreclose TPS from accessing much of the market with a few, targeted threats.

The effects of this conduct were further exaggerated by JM's significant market power. Even after TPS's entry into the calsil market, JM continued to possess more than ▮ market

share, well above the 40% required, and indeed at monopolist levels. Agreements demanded by

monopolists are subject to greater scrutiny. Here, that scrutiny reveals that JM's foreclosure of

TPS denied customers access to better quality, lower-priced calsil with no corresponding benefit

provided in exchange.



### C.   JM's Disparagement of TPS and Its Product

This conduct placed doubt in customers' minds about the safety of TPS calsil—doubt

which JM knew not to be warranted by any fact—which reinforced the hesitation that customers

felt about buying from TPS that resulted from JM's threats.





**D.    JM Conditioned the Sale of Its Other Products to the Sale of JM Calsil**

The fact evidence that shows JM's conduct on the "action" element of its tying claim is

discussed in TPS's opposition brief, *see* ECF 203, and below:





| ECF 204-11 at 38:20-39:25; 79:16-80:24: | ECF 204-1 at JM00011469: | ECF 204-1 at JM00003503: |
|---|---|---|
| ECF 177, Table 5: | ECF 177, Table 5: | Meyer Tr. (ECF 204-6) at 109:9-111:25: |
| ECF 204-11 at 28:21-29:23: | ECF 204-1 at JM00004024:<br>• "[SPI] has assured me they did not quote TPS." | ECF 204-1 at JM00028748: |



JM's bizarre argument that a problem with TPS's claim is that JM's coercion was not tied to any specific product, but to all of JM's products, is an artificial one. This defense elevates form over substance. The reality of JM's threats is that the language used may not always have aligned perfectly with that of an antitrust treatise. This is usually the case, and never an obstacle to a finding of antitrust liability. JM has tied several of its products, including fiberglass, mineral wool, expanded perlite, and InsulThin, to the purchase of its calsil. Because JM's threats were successful, there never was any confirmation as to which product JM would have stopped selling to the customer who did not buy its calsil from JM.

Case law recognizes this as an unlawful tie. All that is required are products that are "separate and distinct," and that is shown when there is sufficient demand for each product separately to make it efficient for a firm to provide the products separately. *See Eastman Kodak*

*Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992) ("For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts."); *Jefferson Par. Hosp.*, 466 U.S. at 21–22 (There must be "sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the tied product] separately from [the tying product]."); *see also Dauro Advert., Inc. v. GMC*, 75 F. Supp. 2d 1165, 1169 (D. Colo. 1999) ("GM's Strategy Program implicates the tying of a distinct product (GM cars and trucks) to a distinct service (advertising for GM cars and trucks). Thus, two separate products or services are involved.").

## IV.   JM PROVIDES NO OTHER REASON THIS CASE SHOULD NOT GO TO TRIAL

First, there is no denial of the conduct itself. ECF 211 at 1, 5, 12, 67. Instead, JM argues that it did not actually cut any customer off, either from its calsil or other tying products. Even if this were correct, which it is not, it would not matter. That JM's threats succeeded in preventing its customers' disloyalty does not immunize them from antitrust challenge. *Lorain Journal Co. v. United States*, 342 U.S. 143, 154 (1951) (finding a violation of § 2 when a monopolist—even if that monopoly power was lawfully acquired—"uses its monopoly to destroy threatened competition"). The Court has been clear that this is the law each time it has rejected the same argument that JM now makes. *See, e.g.*, ECF 50 at 9, 23–24 (agreeing with TPS that "an outright refusal to sell is not necessary" to establish anticompetitive conduct).

Second, JM argues that it did not establish any arrangements where exclusive dealing was explicit. But the law does not even require total exclusivity; rather the key question for exclusive dealing is whether "the practical effect" is to prevent a customer from using the products of a

competitor. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326 (1961); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) ("An express exclusivity requirement . . . is not necessary, because we look . . . to ascertain the relationship between the parties and the effect of the agreement in the real world. Thus, *de facto* exclusive dealing claims are cognizable under the antitrust laws."). Additionally, an important—undisputed—fact is that TPS and JM are the only two sellers of calsil. This means that any action that deters a customer from purchasing calsil from TPS is one that causes that customer to buy calsil exclusively from JM. Thus, there is no need for JM to state explicitly that it requires exclusivity from its customers. Communicating to customers that they may not purchase calsil from TPS achieves this objective.

Finally, there is no authority—which is why JM cites none—that requires that an exclusive dealing agreement be written to violate the antitrust laws. *See* ECF 211 at 21–22, 50 (citing no law to show any relevance of JM's Undisputed Fact 22, which states that "Johns Manville did not enter into any ***written*** contracts for an exclusive dealing arrangement with any of its distributor customers") (emphasis added).

A reasonable juror could conclude that JM's threats prevented customers from purchasing better-quality, lower-priced calsil from TPS, thereby harming competition in the calsil market. ECF 50 at 25 ("Exclusive dealing arrangements are not unlawful in the absence of anticompetitive effects . . . . [A] plaintiff must show that a defendant's 'exclusive dealing arrangements foreclose competition in a substantial share of the line of commerce affected.' [as well as] anticompetitive effects resulting from 'a substantial foreclosure of their ability to compete in the relevant market.'") (citations omitted); Areeda & Hovenkamp, Subchapter C ¶ 768e3 ("Extraction of an agreement not to deal with a competitor—or the equivalent, refusing to deal with buyers who do—

can be exclusionary and particularly damaging where the buyers cannot do without the seller's product or service. A supplier's requirement that a customer not deal with a particular rival seems particularly hard to justify.") (citing *Lorain Journal*, 342 U.S. 143 (1951)).

In *McWane, Inc. v. FTC*, the Eleventh Circuit held that foreclosure occurs when "the opportunities for other traders to enter into or remain in the market are significantly limited by the exclusive dealing arrangements." 783 F.3d 814, 837 (11th Cir. 2015). TPS's failure to capture significant market share reflects that its "opportunities . . . to enter into or remain in the market [were] significantly limited," and a reasonable juror could conclude that JM's conduct is the reason that this is so. The second important implication of there being two suppliers in the calsil market is that the market shares of TPS and JM reflect the entire market. Any foreclosure that JM caused TPS to experience was recaptured by JM. There is no need to trace where that foreclosed market share—what TPS would have captured but for JM's anticompetitive conduct—went. It only could have gone to one competitor: JM. Dr. Warren-Boulton's Report calculates TPS's market shares in the but-for and actual worlds. The difference between the two *is* the extent to which JM foreclosed TPS from entering the calsil market. ECF 177 at 19–21 and Figure 18 ("Thermal Pipe Shields Market Share"); *cf. Suture Express*, 851 F.3d at 1041, 1043 (finding that successful entry by competitors negated a finding that the defendant excluded rivals). JM does not even argue, nor could it, that this foreclosure is not "substantial."

Third, JM argues that "TPS's proof of a 'refusal to supply' is nothing more than an internal Johns Manville email and TPS speculation about what Bay supposedly 'understood.'" ECF 211 at 47. JM does not otherwise elaborate on these points or explain why "internal" JM emails cannot serve as evidence of anticompetitive conduct. Moreover, JM's characterization of this evidence as

"internal discussions" is inaccurate. *Compare* ECF 211 at 45 ("At most, TPS has pointed to internal discussions of whether Johns Manville should stop supporting distributors . . . .") *with, e.g.*, ECF 204-1 at 31 ███████████████████████████████████████████████ ████████████████████████████ ECF 204-11 at 38:20–39:25 (distributor DI testified that "Hal [Shapiro of JM] had ***mentioned to me*** . . . . If [DI] were to start stocking TPS [calsil], [JM] may have to relook at setting up [DI's competitor], General"); and ECF 204-10 at 31:24–32:4 (distributor 4 State Supply testified that "Chad Meyer of JM ***said that*** "if we continued to buy Thermal Pipe Shield's, TPS's Calsil, we would no longer be able to purchase Johns Manville Calsil") (emphasis added in all).

Moreover, the evidence, of course, must be viewed in the light most favorable to TPS— JM can argue later to the jury that its interpretation is correct. But for JM to argue now that its version of the facts—what its threats to "cut off" customers actually meant—forecloses TPS's claims as a matter of law is incorrect. Plus, given the fact-intensive nature of many aspects of antitrust claims, the Tenth Circuit has recognized that "summary judgment should be used sparingly in antitrust cases . . . ." *Bell v. Fur Breeders Agric. Co-op.*, 348 F.3d 1224, 1229 (10th Cir. 2003). This is particularly true here where the evidence unquestionably raises at least a genuine dispute, if not conclusively proves, that the conduct occurred.

Further, TPS need not create questions of fact for all four types of anticompetitive conduct alleged (refusal to supply, exclusive dealing, tying, and disparagement) for its monopolization claim to survive summary judgment. Instead, a question of fact as to any type of anticompetitive conduct will satisfy this element. "In determining whether a defendant's conduct was anticompetitive or was legitimate business conduct, fact finders are instructed to determine

whether the conduct "is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors." *Novell*, 731 F.3d at 1072. Here, when viewed in its full context, JM's conduct has had no value other than to protect its own market power (nor does it even suggest any procompetitive justification for its conduct).

## V.   ADDITIONAL EVIDENCE PAINTS A PICTURE JM'S CUSTOMERS' FEAR

Along with all the evidence described above and in TPS's opposition brief of JM's threats to its customers, there is additional evidence from which a reasonable juror could conclude that JM's calsil sales to its customers were conditioned on those customers' loyalty, and that JM's customers understood this. For example, in the declaration submitted by David Skelly in support of JM's motion, Mr. Skelly declares:

> Once a customer account is set up in Johns Manville's SAP system, the customer can place individual orders for materials as long as it is in good credit standing with Johns Manville. In response to a customer's order, Johns Manville Customer Service prepares a document called a Sales Order Confirmation, which confirms the date of the order, the materials ordered, the cost, and the delivery location. The Sales Order Confirmation to a customer does not place any limitation on the customer's ability to order any materials from a Johns Manville competitor at any time.

ECF 193-15, ¶ 6. While this statement may be true, it is largely irrelevant and does not convey the complete picture. The "response to a customer's order" is not automatic. *Id*. Before JM "prepares a document called a Sales Order Confirmation," the JM sales representative seeks approval— which, as the evidence shows, may be withheld based on the customer's dealings with TPS.

One example involves ███████████ which placed an order in February 2019. JM's customer service representative, ████████████████████████████████ ████████████████████████████████████████████



████████████████████████████████████████████████████ Pl.'s Ex. 4 at

JM00002473 at 2. Later, █████████████████████████████████████████

███████████████████████████████████████ *Id.* at 1. In the

interim, ████████████████████████████████████████████████

█████████ Pl.'s Ex. 4 at JM0002476 at 1. Ultimately, ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████ Pl.'s Ex. 4 at JM00002473 at 1.

While the Sales Order Confirmation *itself* "does not place any limitation on the customer's

ability to order any materials from a Johns Manville competitor at any time," the same cannot be

said of JM's *decision to issue* the Sales Order Confirmation. ████████████████████

████████████████████████████████████████████████

Moreover, the next day, ██████████████████████████████████

████████████████████████████████████████████████

█████████ ECF 204-1 at JM00007814 at 2. ███████████████████████

████████████████████████████████████████████████

█████████████████████ *Id.* at 1. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████ *Id.* A few months later, ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████ Pl.'s Ex. 4 at JM00002307 at 1.

The tone of the exchange above suggests that both Bay and JM believed that Bay's decision to order calsil from TPS could jeopardize its relationship with JM. And other JM documents create a similar inference. For some examples:



- Pl.'s Ex. 4 at JM00010848.

- Pl.'s Ex. 4 at JM00019594 at page 1.

  *Id.*

- Pl.'s Ex. 4 at JM00028443.

- Pl.'s Ex. 4 at JM00017015.

- Pl.'s Ex. 4 at JM00018957 at page 1.

-

████████████████████████████████████████████████

Pl.'s Ex. 4 at JM00000595 at pages 2–3.

A threat need not be explicit to be understood. From this evidence, a reasonable juror could conclude that JM's threats were understood by each of these customers—and that they were effective in suppressing competition from TPS.

## VI.     JM'S PROCEDURAL COMPLAINTS ARE WITHOUT MERIT

Finally, ignoring its own blatant procedural improprieties[7] and in an effort to distract from the substantive deficiencies of its motion, JM raises several procedural complaints about certain aspects of TPS's opposition brief. All are meritless and should be rejected.

First, TPS appropriately responded to JM's interrogatories, and JM waived any challenge by failing to timely object to TPS's responses. In fact, JM did not object to or otherwise dispute TPS's interrogatory responses until its Reply brief in support of summary judgment, months after discovery closed. If JM believed that TPS's discovery responses were incomplete, its recourse was to move the Court for "an order compelling disclosure." Fed. R. Civ. P. 37(a)(1). Thus, JM forfeited this argument by failing to challenge TPS's carve-out of JM's documents and deposition testimony. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived."); *Flannery v. Boxer F2, L.P.*, No. 20-cv-00099-DDD-STV, 2022 U.S. Dist. LEXIS 33973, at *6 (D. Colo. Jan. 27, 2022) (same). Moreover, JM does not even claim any prejudice. JM's uncontroversial statement that "a

---

7.     For example, JM "declined to respond" to nine of the twenty-one interrogatories that TPS served, and, notwithstanding the requirements of Rule 33, JM provided a partial response— without stating that it was doing so—to TPS's Interrogatory No. 1 which requested that JM identify the products that it claims are substitutes for calsil. The Court addressed this latter discovery abuse at a hearing on June 1, 2021.

party is entitled to know all of the facts and evidence that underlie the opposing party's case," is inapplicable because the evidence JM claims to seek ***belongs to JM***. Finally, the Federal Rules dispel JM's argument that TPS should have identified JM's own documents and deposition testimony in response to JM's interrogatories. They provide for the exact process that TPS followed. Rule 26(b)(1) explains that "the scope of discovery" must consider, among other things, "the parties' relative access to relevant information." JM's own documents were, of course, inherently more accessible to JM.

Nor is this a situation where TPS kept relevant documents hidden or refused to produce relevant evidence in its possession until the eve of trial. Rather, TPS highlighted what its interrogatory responses did not cover, so JM could consult those sources or object. By contrast, JM's late complaint—after the time to remedy has expired—is the last-minute surprise that the Court should not permit.  JM relies on an irrelevant case from the Eastern District of California. ECF 211 at 6. In *Tumbling v. Merced Irrigation District*, the defendants asked the plaintiff to describe the complaints that plaintiff made about discrimination in the workplace, a required element for a retaliation claim. No. CV F 08-1801 LJO DLB, 2010 U.S. Dist. LEXIS 101404, at *54–55 (E.D. Cal. Sept. 27, 2010). Plaintiff answered that he complained about persons not sharing information, verbal harassment, and an incident involving sexual harassment. *Id*. Yet, in his opposition to defendant's motion for summary judgment, plaintiff asserted that he "complained about substantially different conduct—race and gender discrimination." *Id*. at *55. The court found plaintiff's interrogatory response was insufficient and not harmless because "allowing plaintiff to alter drastically the scope and nature of his claims at this point far outweighs the factors which might favor allowing plaintiff to enhance his retaliation claim." *Id*. at *59–60.

Here, by contrast, TPS has not altered the scope or nature of its claims. TPS expressly identified that its interrogatory responses did not refer to JM's documents. Thus, JM was aware of the parameters of TPS's response and raised no issues with the scope of TPS's response. Indeed, the evidence JM complains about is either evidence from its own custodians, which it reviewed and produced to TPS, or is testimony that was given simultaneously to both parties as with deposition testimony. Thus, JM cannot (and does not) complain of prejudice or harm.

The only other case JM cites is *Stout v. Long*, No. 15-379 WPJ, 2018 U.S. Dist. LEXIS 42756 (W.D. Okla. Mar. 14, 2018). But that was a decision on a motion to compel, which would have been the appropriate vehicle for JM to raise such a challenge. Further, *Stout* is inapposite because it again involved an attempt to deviate from a party's previously articulated theory of liability. As JM noted, the *Stout* court found that "[p]laintiffs' response to the contention interrogatory lacks any reference to any material fact, document, or witness that could support these theories." *Stout*, 2018 U.S. Dist. LEXIS 42756, at *19. The court's comment about "these theories" referred to the plaintiffs' assertion that, despite identifying statements of two witnesses and a portion of a defendant's answer in its response to an interrogatory seeking "the material facts that Plaintiffs rely upon to support their excessive force claim," at the motion to compel hearing the plaintiffs argued that they "may pursue alternative theories of liability on their excessive force claim." *Id*. at *18. It was in response to plaintiffs' argument to pursue these alternative theories that the court found plaintiffs' interrogatory response to be insufficient. Here, TPS is not attempting to pursue alternative theories of liability. Thus, the Court should reject JM's argument that TPS's interrogatory responses were inadequate.

Second, JM complains about the specificity of TPS's disputes to its Statement of Undisputed Facts and evidentiary support. But JM does not claim to be confused by any disputed fact, showing that its objection is meaningless. Nor does JM claim to not understand the evidence offered in dispute. The disputes are clear. Moreover, JM itself is responsible for any confusion it claims to suffer now; its Statement of Undisputed Material Facts is riddled with improper, compound, misleading, and irrelevant facts—not to mention meaningless legal conclusions—that JM inappropriately included. *See Gonzales v. Sun Life Ins. Co. (In re Furr's Supermarkets, Inc.)*, 485 B.R. 672, 683–84 (Bankr. D.N.M. 2012) (striking legal conclusions from defendant's statement of undisputed facts). These problematic facts shaped TPS's responses to them.

To pick one example, JM's Undisputed Fact 1 merely stated, "There is no admissible evidence that Johns Manville tied sales of its expanded perlite to sales of calsil." Setting aside that admissibility is a legal question, TPS disputed this "fact," explaining how JM's challenged conduct tied its sales of expanded perlite (and other JM products) to sales of its calsil and providing two and a half pages of evidentiary citations, with quotations of relevant text.

JM seems to argue that the multiple sources of supporting "specific evidence" that TPS provided is somehow speculation or confusing. These contentions have no merit. TPS's factual response is appropriate and cites to specific excerpts of deposition transcripts and specific pages of documents. Unlike *Lucas v. Office of the Colorado State Public Defender*, *see* ECF 211 at 10, where the record plaintiff submitted was "comprised of nearly 700 pages" and "included each deposition in its entirety, as well as hundreds of additional pages that are often referenced *en masse* or . . . not cited at all," TPS has pointed to specific documents and excerpts of depositions to

support its disputed facts. No. 15-cv-00713-CBS, 2016 U.S. Dist. LEXIS 193956, at *12–13 (D. Colo. Aug. 25, 2016).

*Karara v. United States Department of Education* also fails to support JM's argument. There, the plaintiff moved for summary judgment solely by relying on "decisions in his prior lawsuit" rather than pointing to specific evidence to establish every element of his claim. No. 08-cv-00614-MEH-KMT, 2008 U.S. Dist. LEXIS 117921, at *5–6 (D. Colo. Oct. 14, 2008). Thus, the court found a genuine issue of material fact existed and denied summary judgment. *Id*. at *7. Here, TPS has pointed the Court to specific documents and excerpts of testimony to dispute JM's Statement of Undisputed Facts.

Another example is JM's Undisputed Fact 11, which stated that "4-State's representative, Mr. Guest, did not report hearing any disparaging comments about TPS calsil from Johns Manville representatives." This is a meaningless and misleading fact. TPS disputed it, noting that JM's own witness testified about making a disparaging statement to Mr. Guest. Whether a witness reported something in a deposition is not relevant to the ultimate issues in this case. What matters is whether the underlying fact—here, the disparagement—actually occurred. It did, and TPS cites evidence that it did. That is the end of the inquiry.

Third, JM half-heartedly complains about a couple of pieces of evidence cited by TPS, but does not actually object to the evidence nor has it moved to strike. Thus, JM has not properly raised any evidentiary challenge, and the Court should not consider the issue further. Nonetheless, TPS has pointed to sufficient competent evidence to establish each element of its tying and monopolization claims. As the nonmoving party on a summary judgment motion, "Plaintiff is not required to produce evidence 'in a ***form*** that would be admissible at trial, but the content or

substance of the evidence must be admissible.'" *Strepka v. Jonsgaard*, Civ. Action No. 10-cv-00320-PAB-KMT, 2011 U.S. Dist. LEXIS 77516, at *16 (D. Colo. July 18, 2011) (quoting *Thomas v. Int'l Bus. Mach.*, 48 F.3d 478, 485 (10th Cir. 1995)). Further, JM cannot plausibly argue either that its own documents are hearsay or inauthentic or that documents it received from a non-party were "allegedly" produced. ECF 211 at 8, 61. Thus, the Court should reject JM's argument that TPS evaded its obligation to present admissible evidence.

Since 2010, "the Federal Rules do not require that a party authenticate all documents to be considered on summary judgment." *Hous. Cas. Co. v. Swinerton Builders*, No. 20-cv-03558-NYW, 2022 U.S. Dist. LEXIS 30870, at *9 (D. Colo. Feb. 22, 2022) (citing 10A Wright & Miller et al., Federal Practice & Procedure § 2722 (4th ed. 2021)); *see also Alfonso v. SSC Pueblo Belmont Operating Co.,* No. 11-cv-01186-PAB-KLM, 2012 U.S. Dist. LEXIS 95641, at *4 (D. Colo. July 11, 2012) (rejecting defendant's "failure-to-authenticate" argument and finding "Plaintiff's purported ability to authenticate her own award and plaque is sufficient explanation as to how the contents of [the exhibit defendant objected to] may be admissible at trial"). Additionally, JM's attack on TPS's use of one PowerPoint presentation ignores that it ***has been authenticated***. In fact, a more comprehensive version of that presentation was used in TPS's deposition of JM's Jack Bittner, who attested to the authenticity of the presentation. Pl.'s Ex. 3 at 104:2–107:5.

## CONCLUSION

For these reasons and those offered in its opposition brief, Thermal Pipe Shields asks that the Court deny Johns Manville's Motion for Summary Judgment.

DATED:  March 22, 2022

s/Geoffrey N. Blue
THE GEOFFREY BLUE LAW
FIRM, LLC
Geoffrey N. Blue
7350 E. Progress Place, Suite 100
Greenwood Village, CO 80111
Telephone: (720) 647-5320
Email: gblue@gbluelaw.com

Local Attorney for Plaintiff
Chase Manufacturing, Inc.

Respectfully submitted,

s/Alexandra Shear
BONA LAW PC
Alexandra Shear
James Lerner
287 Park Avenue South, Suite 422
New York, NY 10010
alex.shear@bonalawpc.com
james.lerner@bonalawpc.com

Luke Hasskamp
Jarod Bona
Jon Cieslak
Kristen Harris
4275 Executive Square, Suite 200
La Jolla, CA 92037
Telephone: (858) 964-4589
luke.hasskamp@bonalawpc.com
jarod.bona@bonalawpc.com
jon.cieslak@bonalawpc.com
kristen.harris@bonalawpc.com

Attorneys for Plaintiff
Chase Manufacturing, Inc.

**Index of Plaintiff's Exhibits**

| Plaintiff's Exhibit | Description |
| --- | --- |
| 1 | Discovery response by non-party **Bay Insulation** |
| 2 | Excerpts of deposition testimony non-party witness **Robert Hlavenka** of Distribution International taken September 22, 2021 |
| 3 | Excerpts of deposition testimony party witness **Jack Bittner** taken August 26, 2021 |
| 4 | Documents produced by **JM** |

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2022, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the following

persons:

Gregory J. Kerwin, Esq. (gkerwin@gibsondunn.com)
Allison Kostecka, Esq. (akostecka@gibsondunn.com)
Ryan Bergsieker, Esq. (rbergsieker@gibsondunn.com)
Lydia Lulkin, Esq. (llulkin@gibsondunn.com)
GIBSON, DUNN, CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO 80202


*s/ Lisa Mittwol*
Lisa Mittwol, Senior Paralegal