IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC.,

      Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Before the Court is Defendant's Motion for Summary Judgment (ECF 193) and Motion to Strike (ECF 221). Both Motions are fully briefed, and the Court heard oral argument on April 18, 2022. For the following reasons, the Motion for Summary Judgment is granted and the Motion to Strike is denied.

## <u>BACKGROUND</u>

### I.    Claims for Relief

      Before addressing Plaintiff's claims for relief, it is helpful to establish the surrounding context. The parties do not provide such information in their statements of fact, but there is no dispute about them either. The Court draws them from previous filings and rulings, and summarizes them as such:

      Defendant manufactures and sells mechanical insulation materials for use in industrial settings to insulate pipes, tanks, or equipment at very high temperatures. There are several

materials that can be used for that purpose. One such product is hydrous calcium silicate thermal insulation ("calsil"). At issue here is the kind of calsil that complies with the ASTM C533 Type I industry standard regarding quality and performance characteristics.

Defendant manufactures calsil in the United States. For many years before Plaintiff's entry into the calsil market, Defendant also was the sole seller in the U.S. A factory in China is another source of calsil. In March 2018, Plaintiff began importing calsil made at the Chinese factory into the U.S., thereby entering the U.S. market as Defendant's sole competitor.

Both Defendant and Plaintiff sell their respective calsil products primarily to distributors. Roughly speaking, the manufacturer-to-distributor step in the greater supply chain constitutes the upstream market. It is the focus of Plaintiff's antitrust claims. Distributors, in turn, sell calsil to those who need it for particular construction projects. Many of these downstream sales are to contractors.

The Court denied Defendant's first summary judgment motion, finding the record insufficient to grant judgment on "how Plaintiff's definition of the relevant product market is factually and legally inadequate." *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH, 2021 WL 50871, at *6 (D. Colo. Jan. 6, 2021). Summarizing the then-available record, the Court observed how:

> calsil is a product that is used to meet highly technical needs in industrial or equivalent settings, and that the choice to use it is likewise technical in nature. The processes for obtaining and installing it at a project site involve many actors, and distributors play the critical role in providing calsil to contractors and to others who seek it for project needs.

*Id*. The Court disagreed with Defendant that "Plaintiff's focus on the distributor level [was] legally inadequate." *Id*. Nor does the current record show how the technical aspects of the industrial insulation material market should be ignored or why the upstream, distributor-level of the supply

chain should not be the focus of inquiry. A distributorship network can play an important role and benefit both the manufacturer and the end user. *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 192-93 (3rd Cir. 2005).

Within that context, Plaintiff raises two theories for why Defendant's reaction to Plaintiff's entry into the U.S. calsil market violated antitrust law. Its first theory rests on the allegation that Defendant conditioned the sale of its other insulator products on distributors' calsil purchases. That requirement, Plaintiff contends, represents an unlawful tying arrangement in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). The second theory is that Defendant engaged in various exclusionary acts that constitute unlawful monopolization under Section 2 of the Sherman Act (15 U.S.C. § 2).

Plaintiff had asserted a third claim for relief based on a violation of the Lanham Act. Because Plaintiff now withdraws that claim (ECF 204 at 10, n.1), the Court need not address it here. However, the Court still reviews evidence related to it to the extent it overlaps with Plaintiff's claim of disparagement as a form of exclusionary conduct.

## II.    Scope of the Record

The disputes over the record itself are nearly as extensive as those concerning the claims' merits. One issue concerns the adequacy of Plaintiff's answers to Contention Interrogatory Nos. 9 and 10 (found in the record at ECF 193-1) in which Defendant asked, in effect, for Plaintiff to identify the evidence that supports two particular allegations of wrongdoing. As Plaintiff explains in its Opposition (ECF 204 at 73-76), it limited its interrogatory answers to those materials over which it had direct access, *i.e.*, the information "which [is] reflected in documents within [Plaintiff's] possession, custody, and control and which [Plaintiff] produced to [Defendant] in the course of this litigation." *Id.* at 73. In other words, Plaintiff excluded from its answers the evidence

that came from Defendant–even though Plaintiff regards Defendant as the primary source of relevant, admissible evidence (*id*. at 74). Plaintiff uses its Opposition to provide just "a brief preview of the evidence that supports its claims," and prefers to wait until trial to "prove its case affirmatively." *Id*. at 75.

Defendant did not object to the sufficiency of the interrogatory answers during the discovery phase of litigation. Instead, Defendant says the answers should restrict the scope of the evidentiary record for purposes of the present summary judgment analysis. For the sake of thoroughness and the policy favoring rulings on the merits, the Court takes into consideration all evidence which Plaintiff submits as part of the current briefing. Defendant already knew of that evidence, even if Plaintiff omitted some of it from its answers to those specific interrogatories.

Defendant also complains about admissibility and authentication defects with the evidence upon which Plaintiff relies for its Opposition and Sur-Reply. As a general rule, a court only may consider admissible evidence when ruling on a summary judgment motion. *Strepka v. Jonsgaard*, No. 10-cv-00320-PAB-KMT, 2011 WL 2883375, at *6 (D. Colo. July 18, 2011) (citing *Johnson v. Weld Cnty., Colo*., 594 F.3d 1202, 1209-10 (10th Cir. 2010)). Fed. R. Civ. P. 56(c)(1)(B) permits as a summary judgment argument that the "adverse party [here, Plaintiff] cannot produce admissible evidence to support the fact" at issue. Rule 56(c)(2) permits the objection "that the material cited to support or dispute a fact *cannot* be presented in a form that *would* be admissible in evidence." (emphasis added). In other words, a court may not consider an exhibit if it could not be presented in some admissible form later at trial. *SEC v. Mahabub*, No. 15-cv-2118-WJM-MLC, 2017 WL 6555039, at *2 (D. Colo. Dec. 22, 2017). Moreover, case law construes a Rule 56 admissibility objection to concern the content or substance of the evidence, not its form. *Johnson v. Salt Lake City Sch. Dist*., No. 19-cv-743-JNP-DAO, 2021 WL 4895241, at *3 (D. Utah Oct. 20,

2021); *Strepka*, 2011 WL 2883375, at *6 ("As the nonmoving party, Plaintiff is not required to produce evidence 'in a *form* that would be admissible at trial, but the content or substance of the evidence must be admissible.'") (quoting *Thomas v. Int'l Bus. Mach*., 48 F.3d 478, 485 (10th Cir. 1995)). The burden is on the proponent of the exhibit to show how it could be admissible. *Royal Pacific Ltd. v. Faith Elec. Manuf. Co., Ltd*., No. 17-357-MIS/JFR, 2022 WL 228218, at *5 (D.N.M. Jan. 26, 2022). At the same time, the Court enjoys "broad discretion to determine at the summary judgment stage what evidence it will consider pursuant to Rule 56(c)(2)." *Id*.

Defendant objects to various emails as hearsay. However, Plaintiff may have potential hearsay exceptions which it could raise at a trial. One possibility is the emails constituting records of regularly conducted activity under Fed. R. Evid. 803(b). *Johnson*, 2021 WL 4895241 at *5. In addition, under Fed. R. Evid. 801(d), if the emails contain statements made by an agent or employee of Defendant which Plaintiff offers against the Defendant, they are not hearsay. *Id*. The focus of Defendant's argument concerns more the failure of Plaintiff to depose the emails' authors. However, that objection seems better placed if Plaintiff was submitting a declaration or affidavit to introduce new, undisclosed testimony that could have been developed by deposing the declarant. Moreover, Plaintiff may be able to call a witness to the stand to testify at the trial even if Plaintiff did not depose the witness, and in doing that, lay the necessary foundation for emails.

An example of Defendant's hearsay objection is the email exchange between Russell Huff and Mark Duppler (presumably both of the third-party distributor, Bay), about Defendant taking a hard line against anyone buying Plaintiff's calsil. ECF 204-3. Defendant argues that Plaintiff should have deposed Mr. Duppler or another Bay representative. However, as the Court explains above, there is the possibility that Plaintiff still may be able to admit the email at a trial. The Court also notes that Defendant itself relies on the email to support its position. ECF 211 at 63.

Defendant's stronger hearsay argument concerns emails that contain second-hand information. One such email is between Plaintiff's employees on October 22, 2019 in which Mr. Revesz relays others' reports of threats they heard Defendant make. ECF 204-2 at 3. How Plaintiff would admit the multiple layers of hearsay in those emails is less apparent.

Rule 56(c)(2) applies the same with respect to authentication.[1] Rule 56 no longer requires strict authentication of all exhibits. *Houston Cas. Co. v. Swinerton Builders*, No. 20-cv-03558-NYW, 2022 WL 523434, at *3 (D. Colo. Feb. 22, 2022) (accepting for consideration the insurer's submission of the underlying policy insurance contract over the insured's authenticity objections). A court may exclude a document from consideration if there is no way to authenticate it. *Mahabub*, 2017 WL 6555039 at *2. That permits a party to resolve an authentication objection by explaining how it will do so at trial. *Alfonso v. SSC Pueblo Belmont Operating Co*., LLC, No. 11-cv-01186-PAB-KLM, 2012 WL 2863128, at *2 (D. Colo. July 11, 2012). At issue is the PowerPoint slideshow (found in the record at ECF 204-1 beginning at page 128) that Defendant presented at its Industrial Product Information Workshop and which various contractors, distributors, engineers, and facility owners (that is, all those involved in the use of Defendant's products) attended. Plaintiff authenticates it through the deposition testimony of Defendant's witness, Jack Bittner, which it attaches to its Sur-Reply at ECF 219-3. Further ameliorating Defendant's concern is the fact that it is Defendant's own document, produced to Plaintiff during discovery. *Johnson*, 2021 WL 4895241 at n.2 (citing *U.S. v. Doe*, 465 U.S. 605, n.13 (1984)).

---

[1] "The issue of authentication of exhibits in summary judgment briefing is not the same as admissibility at trial." *VanderLaan v. Ameriprise Auto & Home Ins*., No. 20-cv-00191-PAB-STV, 2021 WL 4439875 at n.6 (D. Colo. Sept. 27, 2021). Consequently, accepting a document as capable of being authenticated for summary judgment purposes does not necessarily mean it will be admissible at trial.

The Motion to Strike (ECF 221) concerns the exhibits that Plaintiff attaches to its Sur-Reply which Defendant regards as untimely. Why Plaintiff did not include them as part of its Opposition is unclear. Moreover, despite the body of the Sur-Reply being sixty-two pages long, little of it is responsive to the Court's *Daubert* ruling (ECF 205), the reason why the Court permitted the additional briefing. Because of those procedural defects, Defendant asks the Court to strike the exhibits, or alternatively, to give it leave to file a sur-surreply. In order to bring finality to the briefing—and because Defendant's Motion to Strike in substance doubles as a sur-surreply, the Court declines to strike the exhibits and will let the record stand as is. *Mahabub*, 2017 WL 6555039 at *2 (observing "no blanket procedural exclusion" of evidence attached to a reply brief and permitting its use to fill "in the purported gaps asserted by" the nonmovant and to authenticate documents with additional deposition excerpts).

## III.     Statement of Material Undisputed Facts

In opposing summary judgment, most of the evidentiary record upon which Plaintiff relies is filed under restricted access, and Plaintiff redacts its Opposition and Sur-Reply briefs heavily. That of course makes it difficult to write a summary judgment ruling that will be publicly available. The Court endeavors to the greatest extent possible to avoid discussing obviously sensitive details such as specific sales figures. However, much of relevant record draws from deposition testimony and emails from third party distributors, and it appears that Plaintiff and Defendant endeavor to be sensitive to those third parties' discussions of their own business operations. Because of the difficulty in discerning what fact details the parties intend to be redacted and in discussing the fact background without losing context or clarity necessary for the legal analysis, the Court dockets the below Statement of Material Undisputed Facts section separately under restricted access. The

Court does so out of sensitivity to the distributors who are not parties to this lawsuit and who are in competition with each other.

## LEGAL STANDARDS

### I.     Fed. R. Civ. P. 56(c)

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown

"by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Despite the lengthy summary judgment briefing and the benefit of the Court's many rulings already rendered in this case, Plaintiff's theories about how an antitrust violation occurred continue to rely on inference and speculation. The essential thrust of Plaintiff's Opposition is that its claims should be given to the jury for resolution. However, Defendant's Motion for Summary Judgment obliges Plaintiff to come forward now and define precisely what constitutes an unlawful antitrust act, submit all relevant evidence, and explain how that record could support a finding of such an antitrust violation. As the Court explains below, Plaintiff does not do so.

## I.    Monopolization

The Court's previous ruling on the parties' *Daubert* motions, *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH, 2022 WL 522345 (D. Colo. Feb. 22, 2022), provides a detailed discussion of how the law defines unlawful monopolization. That ruling stated the basic elements of: (1) Defendant's possession of monopoly power in the relevant market, (2) Defendant's willful maintenance of that power, and (3) antitrust injury. *Id*. at *4. The Court also

keeps in mind the proper focus of antitrust law: it is meant to protect competition itself, not the competitor. *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997).

### A.     Monopoly Power

Broadly stated, a monopolist has the power to control prices or exclude competition over a substantial length of time. *Chase Mfg.*, 2022 WL 522345 at *4. There is no dispute that Defendant was the sole maker and supplier of calsil in the U.S. and had a *de facto* monopoly in the practical sense. There is evidence that of all its products, calsil earned Defendant its highest profit margin, and that Defendant charged twenty to twenty-five percent more for calsil than Plaintiff did despite a possibly inferior quality product. From this, Plaintiff's expert witness, Dr. Warren-Boulton, infers not only that Defendant had a monopoly on calsil but that it charged a supracompetitive price for it as well. *Id*. at *8. Whether the price Defendant was charging was in fact a supracompetitive price, this Court need not answer definitively at this stage. Theoretically, there is the potential of legitimate causes for the price difference. Compare for the sake of argument if Defendant manufactured calsil at a U.S. factory paying union wages and under strict environmental regulations but Plaintiff made calsil at an Asian factory that enjoyed generous subsidies. Of course, there is no evidence of such in this record. Dr. Warren-Boulton does not endeavor to exclude legitimate factors affecting price, and if there are any, Defendant does not identify them.

For present purposes, the Court assumes that Defendant had a monopoly over U.S. calsil sales *before* Plaintiff's entry. To prevail on its claim, Plaintiff must show that Defendant's monopoly power continued afterwards as well.

B.      **Relevant Market**

A monopolist's power cannot be measured without knowing the market in which it operates, and several factors go into defining what that relevant market is. *Id.* at *6. Dr. Warren-Boulton says it is calsil sold by manufacturers (only Plaintiff and Defendant) to distributors (or other direct buyers) within the U.S. *Id.* at *7. Defendant disagrees and says it should be (1) expanded to include other insulator materials and downstream buyers but (2) reduced geographically from the national to region level. With regard to just the various insulating products, the degree of substitution remains unclear. Nevertheless, because the record contains evidence that reasonably supports Plaintiff's definition, the Court accepts it for present purposes. The Court gives Plaintiff the benefit of the doubt and considers its monopolization claim in the context of a market that consists of upstream sales to distributors of calsil at the national level.

C.      **Willful Maintenance of Monopoly Power**

Simply being a monopoly or having monopoly power is not necessarily unlawful. The present lawsuit is not based on the allegation that Defendant unlawfully had *acquired* such a favorable position before Plaintiff entered the calsil market. Dr. Warren-Boulton opines that Defendant's monopoly position gives it motivation to preserve it. For present purposes, the Court assumes that Defendant did have such an incentive, but in any event, a desire to maintain a monopoly's benefit is not the dispositive point. What is dispositive is if Defendant willfully acted on that motivation and took affirmative steps to defend its monopoly upon Plaintiff's entry. In other words, there must be anticompetitive conduct.

Plaintiff advances several forms of exclusionary conduct that it says Defendant employed to protect its calsil monopoly. To encourage distributors to continue to buy its product, Defendant either threatened to *withhold* from them its calsil and other products or *tied* calsil to their purchases

of other products. To discourage distributors from buying its calsil, Plaintiff contends that Defendant also disparaged it and its product. Thirdly, Plaintiff claims that Defendant used exclusive dealing arrangements to block it from accessing distributors.

### D.    Unreasonable Restraint on Trade

More is needed than just any act of exclusionary conduct. To be actionable, the restraint on trade or commerce must be of an undue or unreasonable degree. *Id*. at *4. The Court already has held that Plaintiff must use the "Rule of Reason" method to establish the unreasonableness of a challenged conduct. *Id*. at *4. In other words, there is no *per se* restraint[2] at issue in this case to permit the inference of competitive harm. The Rule of Reason's first step requires Plaintiff to prove how the particular restraint has a substantial anticompetitive effect that harms the consumers in the relevant market. *Id*. at *5.

The simpler way for Plaintiff to satisfy the Rule of Reason is with direct evidence of actual anticompetitive effect. Plaintiff's expert witness, Dr. Warren-Boulton, primarily relies on the direct evidence option. However, there is no evidence of an obvious restraint. Assuming Plaintiff's claims as true, Defendant only endeavored to dissuade distributors from buying Plaintiff's calsil. It is not readily apparent on the face of the evidence that its efforts were effective in achieving that goal to a significant degree. Consequently, the Court does not see in the record the kind of evidence that this approach requires. *Id*. at *6 (providing a definition of direct evidence for Rule of Reason purposes). Indirect evidence, which entails a deeper analysis, is the other option. To prevail on it,

---

[2] A *per se* restraint is one that almost always tends to restrict competition. In other words, it has a manifest anticompetitive effect and lacks any procompetitive redeeming value. Case law conveys *per se* status to a type of restraint only after significant experience considering it and when it can predict confidently that application of the Rule of Reason would invalidate it. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc*., 551 U.S. 877, 885-87 (2007).

Plaintiff must have proof of market power and evidence of how the challenged restraint harms competition. *Id*. at *6.

### E.      Exclusionary Conduct

The focus of Defendant's summary judgment motion is on the alleged exclusionary acts which concern the second *prima facie* element. To prove monopolization, Plaintiff must demonstrate conduct whose only rational benefit is to harm competition, *Novell, Inc. v. Microsoft Corp*., 731 F.3d 1064, 1072 (10th Cir. 2013), for example, by excluding competition or harming a competitor. That stands in contrast with legitimate factors such as a superior product, business acumen, or even historic accident that creates success consistent with competition on the merits. *U.S. v. Grinnell Corp*., 384 U.S. 563, 571 (1966). In other words, the inquiry asks whether Defendant's conduct constituted coercion or competition. The Court defines the respective alleged acts in turn below and considers whether the record contains supportive evidence.

### 1.      Refusal to Supply

The Court begins by noting the general rule that "unilateral conduct cannot be considered anticompetitive." *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs*., 994 F.3d 1166, 1172 (10th Cir. 2021). A firm is free to choose with whom it does business and to set an optimal sale price for its product. *Novell*, 731 F.3d at 1072. Nor is a firm required to *help* its competitor. *Id*. Nevertheless, case law recognizes the potential for many different forms of anticompetitive conduct and thus the possibility that a unilateral refusal to deal may have an unlawful effect. *New Mexico Oncology*, 994 F.3d at 1172. That potential exists when (1) the monopolist had a preexisting voluntary and presumably profitable course of dealing (2) which the monopolist willingly discontinued and gave up short-term profit from it in order to achieve an anticompetitive end. *Id*. While case law allows for such a claim, it remains a limited

exception, only available if the unilateral conduct is irrational but for the anticompetitive benefit. *Solidfx, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 843 (10th Cir. 2016).

The above case law considers this exception in the context of the refusal to supply a *rival or competitor*. That is not the situation presented here. Plaintiff does not complain about Defendant's refusal to do business with it but rather third-party customers. Plaintiff couches Defendant's refusal to supply in terms of a leverage to discourage distributors from leaving it. Although the context may be different, the same general principles apply: Defendant's right to exercise its own independent discretion with whom it will deal does not go so far as to permit it to maintain a monopoly. *Lorain Journal*, 342 U.S. at 155.

The Court already has permitted Plaintiff to frame this theory in terms of the refusal to sell or supply calsil to third-party distributors, and the Court borrowed as the claim's *prima facie* elements those from the refusal-to-deal context. *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH, 2020 WL 1433504, at *11 (D. Colo. Mar. 23, 2020). However, the question no longer is whether "Plaintiff's allegations provide a plausible basis to infer Defendant's refusal to sell to customers runs afoul of Section 2 of the Sherman Act," *id.*, as it was at the time of that ruling, but rather whether the claim "lacks significantly probative evidence," *New Mexico Oncology*, 994 F.3d at 1172 (citing *Anderson*, 477 U.S. at 249-50).

The Court does not doubt Plaintiff's ability to establish at trial the first element regarding a preexisting profitable relationship. What is lacking is probative evidence that Defendant willingly inflicted upon itself harm in the short run in order to thwart Plaintiff's entry into the U.S. calsil market. To begin with, there is no evidence of *systemic* refusal by Defendant to sell calsil.

Plaintiff's claim rests on Defendant's threats not to support those distributors who bought from it. The evidence would support finding that Defendant had taken such a stance, monitoring

shipments of imported calsil and making its displeasure known to offenders. The next point of inquiry is whether Defendant articulated its general displeasure and the threat of non-support to distributors. As the Court notes at ¶¶ 9-10 of the above fact statements, there is evidence that two distributors, SPI and MacArthur, assured Defendant that they were not buying from Plaintiff. That evidence permits the inference that they perceived the need to keep Defendant happy.

There also is evidence of Defendant making more direct threats, such as with DI. Defendant once orally communicated the threat to DI (¶ 16); once on March 23, 2018 emailed the threat to it; and later expressed its displeasure to it (¶ 33). In October 2018, 4-State perceived such a threat if it bought from Plaintiff. ¶ 23. Defendant warned APi that continued purchases from Plaintiff would cause a change in the relationship. ¶ 20. However, Plaintiff does not explain how mere threats (whether as vague changes to the business relationship generally or refusals to supply calsil or other products specifically) prove its antitrust claim, even if Defendant made them with the intent to preserve its calsil monopoly.

The next question is whether Defendant followed through on those threats. In other words, Plaintiff must show that a distributor suffered actual negative repercussions and harm as a result of a purchase of Plaintiff's calsil. DI did not necessarily perceived Defendant's threat as substantial or improper. It both doubted the wisdom of the threat (¶ 18) and conceded that shifting support to a competing distributor is a legitimate competitive response should it not fully support Defendant's product (¶ 16). Moreover, Defendant apologized for its aggressive tone. ¶ 17. Where Defendant did stop supplying particular DI branches, it was in regional markets where Defendant had commitments to other distributors (which Plaintiff exploited). ¶ 18. By the fall of 2019, DI felt comfortable entering a formal relationship with Plaintiff. ¶ 35. There is no evidence that Defendant actually cut APi off, although apparently APi ceased buying from Plaintiff anyway from which it

could be inferred that Defendant's threat was effective. ¶¶ 14, 20-21. The only change in Defendant's relationship with the 4-State distributor was to cease shipments to its Wichita, Kansas branch. However, the adverse impact of that change was minimized by Defendant's continued shipments to another Kansas location at a discounted price. ¶ 23. Defendant never actually declined to supply Bay, although it did hold up one particular order while it investigated the amount of business it was doing with Plaintiff. ¶¶ 25-26. Moreover, Bay was dismissive towards Defendant's expressions of displeasure. ¶ 25. Overall, there were few instances of concrete threats articulated to distributors, and little, if any, harm suffered by any them. Plaintiff does not demonstrate how such isolated and insignificant coercive acts rise to the level of an antitrust violation.

More importantly, however, the focus of this theory of antitrust conduct is on Defendant. There is no evidence that Defendant suffered self-inflicted harm upon itself. This is a consequence of the upstream nature of the calsil supply chain. Defendant is selling to distributors, not end users. There are some regional markets where distributors are in competition with each other. When Defendant did threaten to (or actually did) stop selling calsil to a distributor, it occurred in those markets where Defendant could shift that business to another local distributor. Consequently, the complained-of conduct did not require Defendant to lose calsil sales, and neither did it deprive end users of calsil.

The present record provides a fuller understanding of Defendant's threats and how the upstream market works. Those facts show how this situation is distinguishable from the one in *Lorain Journal*. The "product" at issue there was the ability to advertise for which area businesses were the customers. Until the victim-radio station commenced operations, the defendant-newspaper possessed "a commanding and overpowering" control over the product's supply. *Lorain Journal*, 342 U.S. at 146. In a "bold, relentless, and predatory" way, the newspaper refused

to sell the product to those customers who also bought the same from the radio station. *Id*. at 149. The scheme effectively discouraged customers from buying the product from the radio station, and that harmed the radio station because it primarily relied on that product's sales to stay in business. *Id*. There is no evidence that Defendant's alleged scheme went so far or was as effective. It is true, construing the record in Plaintiff's favor, that Defendant tried to leverage distributors' dependence on it to discourage them from doing business with Plaintiff. However, there is no evidence that Defendant went so far as to fully withhold the product being sold. In actuality, it was the threat to sell to a distributor's competitor that Defendant leveraged. The law recognizes how the development of a favored relationship or imposing certain restrictions can have procompetitive effects at the distributor level. *See, e.g., Leegin Creative*, 551 U.S. at 889-92 (observing the "procompetitive justifications for a manufacturer's use of resale price maintenance" and other forms of vertical restraint). In sum, Defendant pursued a rational course of action.

Case law permits an antitrust claim on the basis of a unilateral decision not to deal or supply, but as an exception to the rule. On this record, with few instances of threatened or actual refusals to supply and no evidence of resulting adverse effects, the Court sees insufficient evidence by which Plaintiff could establish such an exceptional situation. Establishing the monopolization claim is made more difficult still given the manufacturer-distributor context for which the case law has greater tolerance of vertical restraints.

### 2. Exclusive Dealing

Plaintiff argues that Defendant used exclusive dealing agreements with multiple distributors to cordon off a substantial share of the calsil market for itself, thereby blocking Plaintiff from accessing it. Plaintiff asserts it as another form of exclusionary conduct for its Section 2 monopolization claim.

"An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods only from a particular seller for a certain period of time." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3rd Cir. 2012). Such an agreement can be in the form of an express written contract, but if in forming the contract the buyer received consideration for the exclusivity requirement, there is less potential of anticompetitive harm. *McWane v. F.T.C.*, 783 F.3d 814, 834 (11th Cir. 2015). Alternatively, such an agreement can be *de facto* in nature if practical realities compel the buyer into an exclusive buying relationship. Comparatively speaking, a *de facto* arrangement can a pose a more problematic effect on competition. *Id*.

Case law does not regard exclusive dealing arrangements as *per se* harmful to competition. *ZF Meritor*, 696 F.3d at 270. They can have many procompetitive benefits. However, they can be anticompetitive if they unreasonably deny (or slow) a competitor's access to the market, and they are of special concern when imposed by an already existing monopolist. *Id*. at 270-71. Therefore, case law applies the Rule of Reason to determine whether a subject exclusivity arrangement is indeed harmful. *Id*. at 271. The starting point to such a determination is whether the agreement forecloses a competitor's access to a substantial share of the relevant market. A total bar is unnecessary, *McWane,* 783 F.3d at 838, but the effect must be enough "to bar a substantial number of rivals or severely restrict the market's ambit." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3rd Cir. 2016) (internal citation omitted). The degree of foreclosure that courts regard as unlawful varies, and there is no "fixed percentage at which foreclosure become 'substantial'." *Id*.

The market foreclosure inquiry entails consideration of a variety of factors. These factors include the percentage of the market foreclosed; the arrangement's restrictiveness, coerciveness, and duration; the parties' relative strength (such as the degree of the defendant's market power and

its customers' ability to resist); and direct evidence of anticompetitive harm such as a resulting increase in price or decline in output of the product. *McWane,* 783 F.3d at 835; *ZF Meritor*, 696 F.3d at 271-72. The ultimate focus of inquiry is not disadvantage to the incoming rival but rather the lessening of competition. *McWane,* 783 F.3d at 835; *ZF Meritor*, 696 F.3d at 272.

The nature of the exclusive dealing arrangement may vary as well. It involves not just prohibitions against a customer's ability to buy from a competitor, but also incentives such as bundled rebates. *Eisai*, 821 F.3d at 405. Common to them all, however, is the concern whether they "break the competitive mechanism" by "depriv[ing] customers of the ability to make a meaningful choice." *Eisai*, 821 F.3d at 404 (internal citation omitted). For example, for a rebate scheme to constitute an unlawful exclusive dealing arrangement, it must make the cost of switching to the new competitor prohibitively expensive. *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1041 (10th Cir. 2017).

Plaintiff stresses how Defendant was the sole seller of calsil when it entered the market, after which Defendant added a rebate term that bundled calsil with the purchase of products that Plaintiff does not sell. That way of calculating a rebate reward was added to the 2019 Annual Incentive Agreements with the biggest distributor (DI) and several others (including Bay and SPI). However, even after giving the arrangement closer scrutiny in light of Defendant's dominance in the calsil market and the involvement of significant volume buyers, Plaintiff fails to show a resulting anticompetitive effect of sufficient degree. The Annual Incentive Agreements do not appear to be mandatory; they were something each distributor chose to accept. Even if the agreements were *de facto* mandatory, the size of the rebate reward did not create an insurmountable burden. Plaintiff fails to show how the resulting discount offered by the rebates (assuming a distributor met all criteria for the maximum benefit) was enough to offset the savings from its

cheaper calsil price. In other words, Plaintiff does not demonstrate how the rebate scheme goes beyond permissible price competition to unlawful coercion.

There is no evidence of some other exclusive dealing arrangement whereby Defendant expressly prohibited distributors from doing business with Plaintiff. Plaintiff may contend such an arrangement consists on a *de facto* or implied basis, but even construing the record in Plaintiff's favor on this particular point, it still shows insufficient coercive effect. Comparison with *McWane v. F.T.C.* illustrates the shortcomings of Plaintiff's theory. As concentrated as the calsil market is, the product market at issue in *McWane* was more so. Like Defendant here, McWane was the sole domestic manufacturer. However, McWane's market dominance only increased due to a new procurement regulation that favored the use of American-made products; in practical effect, that regulation weakened buyers' ability to switch to product substitutes. *McWane*, 783 F.3d at 819-20, 829. The upstream level of the supply chain also was more concentrated, with just two distributors controlling up to sixty percent of all distribution, *id*. at 820, with less ability to circumvent through direct sales, *id*. at 840. McWane's exclusive dealing arrangement was far more developed. It fully executed its threat to cut off all supply (of the American-made products needed to secure contracts) and cease all rebates. *Id*. at 821. Moreover, McWane imposed its terms unilaterally on the distributors. *Id*. at 834. McWane's scheme was far more effective than Defendant's, both at securing distributors' compliance by rendering it infeasible to switch to the entrant despite a cheaper price, *id*. at 821, 837-38, and at hindering the entrant, which was unable to increase its sales enough to undertake the kind of capital investment needed to achieve critical operational mass, *id*. at 822, 838-39. Moreover, McWane directly benefitted from its scheme which enabled it to increase both the price charged and the profit margin earned on its products.

*Id*. at 822, 839. Helping the FTC to prove its antitrust case was evidence of McWane's deliberate, purposeful intent to use the scheme to harm the new entrant. *Id*. at 821, 841.

Nothing in the record before the Court shows any of the attributes discussed in *McWane*. There is one *similarity* between *McWane* and the instant case, but it also favors Defendant. In *McWane*, there was "evidence that some distributors started to ignore [McWane's exclusive dealing scheme] after they learned of the FTC's investigation into McWane's practices." *Id*. at 822. The record suggest that the filing of this lawsuit favored Plaintiff in a similar way. On this record, Plaintiff is unable to establish how Defendant can be held liable under antitrust law for "exclusive dealing" conduct.

### 3.   Disparagement

Plaintiff gathers from the record critical statements that Defendant made about its product. The two main sources of the statements are the talking points that Defendant prepared for its sales force to use and from comments made by Defendant's managers directly to distributors. The subjects of the claimed disparaging statements range from highlighting the Chinese origin of Plaintiff's calsil (and various disadvantages related thereto), questioning its quality (namely, whether it contains asbestos or free silica), and doubting its compliance with industry standards.

At this juncture, the Court notes that Defendant's comments about practical disadvantages of relying on an overseas supply of a product, such as supply time, tariffs, sanctions, or disaster scenarios, seem to be legitimate selling points. Nor does Plaintiff indicate how they are factually false. They only cast a negative light of Plaintiff's product (such as Plaintiff does when it says Defendant's calsil is of inferior quality). These particular comments therefore do not appear to implicate the concern about defamation that "plainly is not competition on the merits." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 507 F. Supp. 3d

1289, 1359 (D. Kan. 2020) (citing *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 n.14 (3rd Cir. 2010)).

The Tenth Circuit permits an antitrust claim to be based on exclusionary conduct in the form of trade disparagement aimed at third party customers in the marketplace. However, the mere utterance of a false statement is not enough. Antitrust liability only attaches if the misleading statements are "so widespread and longstanding and practically incapable of refutation that they are capable of injuring both consumers and competitors." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1079-80 (10th Cir. 2013). In other words, the false speech "must have a significant and enduring adverse impact on competition itself." *Harcourt*, 108 F.3d at 152. Otherwise, the Tenth Circuit presumes that the false statement has only a *de minimis* effect on competition. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc*., 762 F.3d 1114, 1127 (10th Cir. 2014).

To overcome that presumption and to show how an act of trade disparagement rises to the level of an antitrust violation, Plaintiff must satisfy a six-factor test. This test requires a showing that the disparagement was: (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset. *In re EpiPen*, 507 F. Supp. 3d at 1359. As to whether a plaintiff must satisfy every factor, the Tenth Circuit does not expressly address. *Lenox*, 762 F.3d at 1128 n.9.

To begin with, the Court assumes that the complained-of criticisms of the content and standards of Plaintiff's calsil are clearly material and clearly likely to induce reliance. Presumably they are matters important to the decision whether to buy Plaintiff's calsil either in its own right or in comparison with Defendant's competing product. The Court likewise construes in Plaintiff's

favor that the accusations of testing and standards non-compliance are clearly false. According to Plaintiff, Defendant knew its calsil was fully compliant.

The record does not go so far as to permit the finding that the statements about asbestos and free silica content likewise were clearly false. Although they are matters of obvious concern, especially in regards to asbestos, these statements still were measured. The asbestos comment was made in the context of a story about an experience at one particular project in which Chinese-made calsil (from an unidentified supplier) may have contained asbestos (among other problems). Plaintiff does not regard the story itself, which presumably is verifiable, as made up. Further minimizing its adverse impact, the story was that the particular shipment "may" have contained just a "trace amount" of asbestos. The conditional nature about how the silica content of the Chinese-made product "*could* be a huge issue" has a similarly limiting effect. Neither statement was definitive.

Establishing the degree of the complained-of statements' falsity is just one hurdle. Plaintiff also must address the context in which Defendant made them and their audience. Assuming that all of them, including the otherwise internally suggested sales talking points, were actually expressed to them, the distributors are sophisticated buyers who are independently knowledgeable about calsil. Indeed, the person to whom the silica comment was made knew to retort that Defendant had used that same factory itself. Defendant's comments did not go so far as to create the kind of safety doubts that occurred in *Lenox*, 762 F.3d at 1127. Relatedly, Plaintiff can easily rebut any criticism about the content or quality of its calsil through laboratory test results. Plaintiff implicitly concedes the ability to neutralize a disparaging statement when it complains that it only has the opportunity to do so when it learns of one. However, the standard asks whether a

misleading statement is "readily susceptible to neutralization," not whether it actually was able to do so.

Even if Plaintiff need not refute all six factors, there still is insufficient evidence by which it could overcome the general presumption that the complained-of statements had only a minor effect on competition. Overall, the subject statements were isolated and conditional, and on their face, invited the distributors' own inquiry and verification. Nor does the evidence support Plaintiff's assertion that the disparagement occurred over a prolonged period of time. Plaintiff points to a sales talking-point document, but it was created in March 2018 (contemporaneous with its entry into the U.S. calsil market). Plaintiff also relies on a PowerPoint slideshow, but its date is unknown. Overcoming the *de minimus* presumption is not the only component of the claim. Plaintiff also must establish a causal relationship between the disparagement and harm to itself and to competition. *Novell*, 731 F.3d at 1080. However, there is no evidence that the subject statements played a significant role in dissuading a distributor from buying Plaintiff's calsil.

Although case law recognizes the potential of antitrust liability for disparagement, there still is a high standard to prevail. Indeed, in *Harcourt*, the court of appeals affirmed the district court's entry of judgment in the defendant's favor after a jury found for the plaintiff on the matter. 108 F.3d at 1151-52. That court regarded as insufficient the defendant's act of anonymously distributed fliers that created doubt about the plaintiff's ability to provide the offered service (because of a regulatory investigation and a bankruptcy proceeding which were unrelated to plaintiff's operational ability) and plaintiff's contemporaneous and otherwise unexplainable drop in business. *Id*. at 1150. The instant case, by comparison, involves sophisticated participants in a more contained environment that permits Plaintiff the opportunity to address customer concerns.

There is an additional point worth noting. This type of antitrust claim more likely will succeed when combined with other anticompetitive acts. *In re EpiPen*, 507 F. Supp. 3d at 1362. Here, however, there is insufficient evidence to establish the other forms of antitrust behavior that Plaintiff raises. That makes it more difficult for Plaintiff to prevail on its disparagement antitrust theory.

## II.    Tying

The Court discusses above Plaintiff's theory of refusal to supply as a means by which Defendant encouraged distributors to buy from it. However, Defendant's refusal to sell a product— whether calsil or another type of insulator–was just one aspect of Plaintiff's exclusionary conduct theory. Plaintiff also complains that Defendant incentivized distributors to buy its calsil by tying it to their purchases of its other products. Not only does Plaintiff raise tying as a form of exclusionary conduct in support of its monopolization claim, but it also raises it as a free-standing antitrust violation. As it did for the dismissal ruling, *Chase Mfg.*, 2020 WL 1433504 at *10, the Court discusses both versions of that tying argument together.

The Court draws the general concept of a tying arrangement from *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678 (2nd Cir. 1982) and *Suture Express*, 851 F.3d at 1037-44, but recasts it in terms of the parties and products at issue in this case. The first aspect of a tying arrangement is a seller's possession of market power over the "tying" product. (As applied here, that would involve the Defendant having market power over the other insulating materials.) These are products that a buyer (here, a distributor) wants from Defendant. The other aspect is the "tied" product (here, calsil) which a distributor may prefer to buy elsewhere (such as from Plaintiff because the distributor perceives its calsil as cheaper or better quality). The tying arrangement is unlawful if Defendant uses its market power over the other materials to force distributors to buy its calsil as

well. In other words, Defendant refuses to sell the two products separately which thereby coerces distributors into buying its calsil when they otherwise would prefer to buy it from Plaintiff. If a distributor rejects the tie-in, then Defendant will not sell the other desired product to it.

The next matter is the means by which Plaintiff must prove unlawful tying. As the Court observed in its prior ruling, Plaintiff brings a *per se* version of the claim. *Chase Mfg.*, 2022 WL 522345 at *4. The Tenth Circuit defines a tying arrangement that is *per se* unlawful by four elements: (1) the involvement of two separate products, (2) conditioning the sale of one product on the purchase of the other, (3) the seller's possession of economic power in the tying product market sufficient to enable it to restrain trade in the tied product market, and (4) a "not insubstantial" affect on interstate commerce in the tied product market. *Chase Mfg.*, 2022 WL 522345 at *4; *Chase Mfg.*, 2020 WL 1433504 at *3 (citing case law). The Court assumes for present purposes that Plaintiff could prove the fourth element about the involvement of interstate commerce.

Should a plaintiff be unable to establish the *per se* version of the claim, the Tenth Circuit permits the Rule of Reason alternative, *Chase Mfg.*, 2020 WL 1433504 at *3 (citing case law), which Plaintiff includes in its Opposition. The Rule of Reason entails "a more thorough examination of the purposes and effects of the practices involved" and "an inquiry into the actual effect of the tying arrangement on competition" based on a "real-market analysis." *Suture Express*, 851 F.3d at 1037-38. The Rule of Reason also has a shifting burden of persuasion, with the first step requiring Plaintiff to show a substantially adverse effect on competition. *Id*. at 1038. The two approaches–*per se* or Rule of Reason–are for practical purposes the same, with the Rule of Reason "mainly different in degree, not necessarily in kind." *Id*. at 1038 & n.4. As the Second Circuit likewise observed, "[t]he factual elements that must be proven for a [*per se*] tying claim capture

much of what must be demonstrated in a rule of reason case." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (2nd Cir. 2020). Because proving an unlawful tying arrangement under the Rule of Reason implies a *per se* violation as well, the Court simplifies the discussion by limiting its consideration to whether Plaintiff submits sufficient evidence by which it could prevail under the Rule of Reason approach.

As noted above, the Rule of Reason method entails consideration of the four defining elements of a tying arrangement, and consequently, the Court begins the analysis with them. The first element requires the involvement of two separate products. Here, the tied product–what Defendant allegedly wants to force distributors to buy–is clear. It is calsil. Broadly speaking, the tying product–what distributors do want to buy from Defendant and what Defendant allegedly is leveraging to compel calsil sales–is clear as well. It is a range of alternative high temperature insulating materials. For present purposes, the Court assumes that calsil and the other products are distinct. The issue is whether Plaintiff may rely on such a broad range as the "tying product" or, as Defendant contends, if Plaintiff must identify a specific product. Defendant also complains about the shifting nature of Plaintiff's claim, initially pleading it in terms of fiberglass and perlite specifically but now taking a more expansive approach. Whether the law requires Plaintiff to identify a specific tying product the Court need not answer because the third element renders that matter moot. Plaintiff only may rely on those tying product(s) for which it can show Defendant possess market power.

Plaintiff points out how the non-calsil products comprise seventy-seven percent of Defendant's high temperature insulating material sales (with calsil being the remaining twenty-three percent). ECF 204 at 65. The flaw with that argument is that it ignores the presence of established competing sellers of the non-calsil products. Defendant's dominance (if any) over the

supply of those other products is less than it is over calsil. Plaintiff also addresses Defendant's market share in comparison to competing sellers, but in that context, it limits its argument to Defendant's forty percent share of the overall perlite and fiberglass markets. *Id*. at 66. In other words, Plaintiff implicitly limits the tying products to just perlite and fiberglass (as it originally pleaded the claim). While important, market share alone does not establish market power.

The Court notes evidence of how distributors generally preferred maintaining their relationship with Defendant and even felt dependent upon it, but in the overall context, the inference of market power that can be drawn from that evidence is weak (as the below coercion discussion shows). The overall market structure for fiberglass and perlite is different than it is for calsil, sufficiently so to necessitate the kind of thorough analysis that the Rule of Reason requires. Plaintiff must demonstrate how Defendant wielded market power over these other materials. In other words, Plaintiff must show how Defendant could have raised those products' prices or restrict their output as an alternative to using them for a tie-in. *Chase Mfg.*, 2020 WL 1433504 at *7. Plaintiff leaves unclear how the evidence, even with the inclusion of Dr. Warren-Boulton's report, reveals such power in the tying product market.

The other dispositive point is whether Plaintiff can prove some sort of arrangement to tie sales of different insulating materials together. Plaintiff's argument is limited to how Defendant had "threatened multiple distributors–including DI, 4-State, API, and Bay–that it would stop making the tying products available if they purchased or stocked [its] calsil." ECF 204 at 64. A tying arrangement need not be in the form of an express contract; the condition can be tacit or implied. *Viamedia*, 951 F.3d at 471. However, without further explanation or development, Plaintiff leaves this claim "blurry," as Defendant puts it. Underlying this element is the ability to actually coerce a buyer to purchase the tied product. *Id*. at 470-71. However, the evidence does

not show how Defendant was able to force a distributor to buy its calsil as part of a fiberglass or perlite purchase. While evidence shows Defendant was able to influence distributors to act favorably toward it, there is insufficient evidence that it went so far as to create an actually tied purchase.

Whether under the *per se* or Rule of Reason approach, Plaintiff provides insufficient evidence by which it could prove the existence of an unlawful tying arrangement, as the law defines that form of anticompetitive conduct. Rather than meet the added elements that define tying, Plaintiff simply reargues its refusal-to-supply claim. The inferences and speculation upon which Plaintiff relies are too vague to warrant sending it to trial for the factfinder to resolve.

## III.   Injury

Plaintiff's antitrust claims–whether as a Section 2 monopolization or Section 1 tying theory–both require the occurrence of "an injury of the type the antitrust laws were intended to prevent" and that bears a relationship with the alleged antitrust act. *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1280 (10th Cir. 2012) (discussing antitrust injury as defined by the Sherman Act). It is not enough that Defendant was motivated to preserve its dominance in the calsil market or acted toward that end. Its effort also must have resulted in an actual anticompetitive effect and restrained trade to an unreasonable degree.

The typical markers of competition harm–higher price, reduced output, reduced innovation, or inferior product quality–are not evident here. There is evidence to suggest a supracompetitive calsil price *before* Plaintiff entered the market, but Plaintiff leaves unclear how the price remained supracompetitive afterwards (and if so, how Defendant's efforts to thwart its entry was the cause). Plaintiff submits the report of its expert witness, Dr. Warren-Boulton, but as the Court explained in its prior ruling, he falls short of presenting a compelling argument. From

what the Court can discern of his opinion, Dr. Warren-Boulton relies heavily on assumptions such as about lingering effects of Defendant's previous monopoly position. His report's lack of clarity limits its evidentiary value.

More importantly, however, is what the evidence shows about the actual dynamics and interplay between Defendant and the distributors after Plaintiff's entry. There is little evidence of how Defendant successfully interfered with distributors' ability to buy calsil from Plaintiff. Of what evidence there is or may be inferred from it, there is no indication that the effect was either substantial in degree or prolonged in duration. There is no evidence that end users were adversely affected.

The focus of antitrust injury is on competition, itself, but even if the Court were to consider harm to Plaintiff, evidence is lacking. Plaintiff was able to pursue opportunities at the distribution level where they arose and develop its own infrastructure base. Defendant's monitoring of imports indicates that Plaintiff's calsil was making it to projects despite the threats to distributors. Dr. Warren-Boulton opines that Plaintiff should have grown faster or should have sold more calsil than it did. However, given the complex dynamics involved, his report and its reliance on assumptions are too tenuous to create a genuine dispute of material fact on the matter.

## <u>CONCLUSION</u>

"[T]he line between anticompetitive conduct and aggressive competition can be indistinguishable." *New Mexico Oncology*, 994 F.3d at 1173 (internal citation omitted). Construing the evidence in Plaintiff's favor shows that Defendant reacted to its entry into the calsil market by aggressively trying to protect its market share. Simply put, it preferred that distributors continued to rely solely on it for their calsil needs. That alone is not an anticompetitive act. Any seller prefers to sell as much as possible, and every sale it makes is at the expense of its competitor. What is

lacking here is how Defendant crossed the line into antitrust behavior. Defendant's conduct did not go so far as to harm competition, itself. To the contrary, Defendant's response to Plaintiff's entry into the market–to test its relationships with distributors and to tout the advantages of its product–was both legitimate and *pro*competitive in nature.

Accordingly, Defendant's Motion to Strike [filed March 31, 2022; ECF 21] is **denied**, and Defendant's Motion for Summary Judgment [filed February 1, 2022; ECF 193] is **granted** as to all claims.

The Clerk of Court shall enter Final Judgment in Defendant's favor and close this case.

Entered this 26th day of April, 2022, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge